# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| RAMOT AT TEL AVIV UNIVERSITY LTD., | § § § | |
| | § | CIVIL ACTION NO. 2:22-CV-00168 |
| Plaintiff, | § § | |
| v. | § § | JURY TRIAL DEMANDED |
| CISCO SYSTEMS, INC., | § § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S MOTION TO TRANSFER**
**PURSUANT TO THE FIRST-TO-FILE RULE**

# <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ...................................................................................................1

   A.   Ramot's Nearly Decade-Long Litigation Strategy Towards Cisco and Acacia. ...................................................................................................... 1

      1.   2014 Eastern District of Texas Action (dismissed without prejudice). .................................................................................... 2

      2.   2019 Eastern District of Texas Action (currently stayed). ....................... 2

      3.   February 2021 Delaware Action (currently stayed)................................... 2

      4.   September 2021 Delaware Action (currently active)................................. 3

   B.   The Present Litigation Involving the '998 Patent. .................................... 3

III.  LEGAL STANDARD FOR THE FIRST-TO-FILE RULE ...................................4

IV.   ARGUMENT .........................................................................................................5

   A.   The Delaware Action Was First-Filed. ..................................................... 5

   B.   This Action is Substantially Similar to Cisco's First-Filed Delaware Action, Necessitating Transfer to Delaware. ............................................. 6

   C.   No "Compelling Circumstances" Justify Departure From Application of the First-to-File Rule........................................................................... 9

      1.   Ramot's Alleged Exception Should be Decided by the District of Delaware as the First-Filed Court. ........................................... 9

      2.   Ramot Fails to Carry its Burden to Show Compelling Circumstances to Deviate From the Application of the First-to-File Rule. .................................................................................... 9

V.    CONCLUSION....................................................................................................12

i

## TABLE OF AUTHORITIES

**Cases**

*Amerada Petroleum Corp. v. Marshall*,
   381 F.2d 661 (5th Cir. 1967) ...................................................................................10

*In re Amperex Tech. Ltd.*,
   No. 2022-105, 2022 WL 135431 (Fed. Cir. 2022) ........................................... 10-11

*Cadle Co. v. Whataburger of Alice, Inc.*,
   174 F.3d 599 (5th Cir. 1999) ...........................................................................4-5, 8-9

*Chapa v. Mitchell*,
   No. A-05-cv-769-JN, 2005 WL 2978396 (W.D. Tex. Nov. 4, 2005).....................10

*Communications Test Design, Inc. v. Contec, LLC*,
   952 F.3d 1356 (Fed. Cir. 2020)....................................................................... 10-11

*Datamize, Inc. v. Fid. Brokerage Servs.*,
   No. 2:03-cv-321-DF, 2004 WL 1683171 (E.D. Tex. Apr. 22, 2004) ......................9

*E-Z-EM, Inc. v. Mallinckrodt, Inc.*,
   No. 2:09-cv-00124, 2010 WL 1378820 (E.D. Tex. Feb. 26, 2010)......................4, 6

*Elecs. For Imaging, Inc. v. Coyle*,
   394 F.3d 1341 (Fed. Cir. 2005).................................................................................4

*Genentech, Inc. v. Eli Lilly and Co.*,
   998 F.2d 931 (Fed. Cir. 2008)...................................................................... 4-5, 10

*Mann Mfg., Inc., v. Hortex, Inc.*,
   439 F.2d 403 (5th Cir. 1971) ..............................................................................4, 9

*Novak Druce Connolly Bove & Quigg, LLP v. Arochi*,
   CV H-18-3490, 2019 WL 4222700 (S.D. Tex. Sept. 5, 2019) ...............................11

*Platt v. Nash*,
   No. 4:16-cv-00294, 2016 WL 6037856 (E.D. Tex. Oct. 14, 2016)......................6, 9

*RPost Holdings, Inc. v. Sophos, Inc.*,
   2:13-cv-0959-JRG, 2014 WL 10209205 (E.D. Tex. Aug. 20, 2014) .......................9

*RPost Holdings, Inc. v. Yesware, Inc.*,
   No. 2:13-cv-0953-JRG, 2014 WL 12712410 (E.D. Tex. Sept. 4, 2014) .......... 4-5, 8

*Sherwin-Williams Co. v. Holmes Cty.*,
   343 F.3d 383 (5th Cir. 2003) ................................................................................10

DM2\15943537.1

*SIPCO, LLC v. Emerson Elec. Co.*,
   No. 6:15-cv-0907, 2016 WL 7743496 (E.D. Tex. July 1, 2016) .........................................4, 6

*In re Toyota Hybrid Brake Litigation*,
   No. 4:20-cv-0127, 2020 WL 6161495 (E.D. Tex. Oct. 21, 2020) .........................................10

*True View Surgery Ctr. One, L.P. v. Goodman Glob. Holdings, Inc.*,
   No. CV H-15-3287, 2016 WL 755494 (S.D. Tex. Feb. 24, 2016) .........................................10

*Virtual Fleet Mgmt., LLC v. Position Logic*,
   LLC, No. 2:17-cv-00014-JRG, 2017 WL 10276708 (E.D. Tex. May 17, 2017) .....................4

DM2\15943537.1

## I.     INTRODUCTION

Defendant Cisco Systems, Inc. ("Cisco") respectfully requests that the Court transfer this case, which Ramot at Tel Aviv University, Ltd. ("Ramot") filed, because it is the "second-filed" case. Under this Court's precedent, this case presents a straightforward application of the "first-filed rule": Cisco filed the first case on U.S. Patent No. 11,342,998 ("the '998 patent") as a declaratory judgment in the District of Delaware. Because Ramot filed the instant case after the Delaware action on the same '998 patent and the same accused products, the Court should enter an order transferring the case.

## II.    BACKGROUND

On May 24, 2022, the USPTO issued the '998 patent, titled "Linearized Optical Digital-to-Analog Modulator" to Ramot. The '998 patent, at issue both here and in the first-filed Delaware case, is directed to methods and systems for converting digital data into modulated optical signals. It is a continuation of a patent that is the subject of a pending case in the District of Delaware, and it is also a continuation of a number of other patents at issue in cases filed both here and in the District of Delaware.  As of the time of this filing, all of the cases on these ancestor patents have been either stayed or dismissed, with one exception: Cisco's declaratory judgment action in Delaware on U.S. Patent 11,133,872 ("the '872 patent"). On March 7, 2022, Ramot answered and filed a counterclaim for infringement in that case, and that case is proceeding.

### A.     Ramot's Nearly Decade-Long Litigation Strategy Towards Cisco and Acacia.

Before the cases on the '998 patent (*i.e.*, the first-filed case in Delaware and the second-filed case here), the parties filed four different cases on related patents over the last eight years: two in this Court and two in Delaware. All of these patents have the same specification. The chronology of the four cases is as follows.

### 1.     2014 Eastern District of Texas Action (dismissed without prejudice).

Ramot asserted two patents—U.S. Patent Nos. 8,044,835 and 8,797,198—which were the first to issue from the "Linearized Optical Digital-to-Analog Modulator" family. *Ramot at Tel Aviv Univ. Ltd. v. Cisco Sys., Inc.*, No. 2:14-cv-01018-JRG (E.D. Tex.). Ramot voluntarily dismissed that case in February 2014, approximately three months after filing.

### 2.     2019 Eastern District of Texas Action (currently stayed).

On June 12, 2019, Ramot sued Cisco in this Court on three patents from the same family, which it had obtained since it dismissed the original 2014 action. *Ramot at Tel Aviv Univ. Ltd. v. Cisco Sys., Inc.*, No. 2:19-cv-0225-JRG (E.D. Tex.) (hereinafter, the "2019 Eastern District of Texas Action"). Ramot initially asserted U.S. Patent Nos. 10,270,535 ("the '535 patent") and 10,033,465 ("the '465 patent"), and amended its complaint to add U.S. Patent No. 10,461,866 ("the '866 patent") shortly after the USPTO issued the patent. *Id.*, Dkt. 48. In January 2021, this Court stayed the case because of the pendency of *ex parte* reexaminations against the asserted patents.

### 3.     February 2021 Delaware Action (currently stayed).

In February 2021—a month after this Court stayed the 2019 Eastern District of Texas Action—Ramot filed suit in the District of Delaware, this time against Acacia Communications, Inc., on two of the patents in the 2019 Eastern District of Texas Action. Cisco completed its acquisition of Acacia on March 1, 2021, three days after Ramot filed this suit. Since then, Acacia has been a wholly-owned subsidiary of Cisco. In this lawsuit, Ramot asserted two of the patents from the 2019 Eastern District of Texas Action:  the '535 patent and the '465 patent. *Ramot at Tel Aviv Univ. Ltd. v. Acacia Commc'ns, Inc.*, No. 1:21-cv-00295 (D. Del.) (hereinafter, the "February 2021 Delaware Action"). On September 3, 2021, the Delaware Court stayed that case pending the outcome of *ex parte* reexaminations on those patents.  *Id.*, Dkt. 23.

2

### 4. September 2021 Delaware Action (currently active).

On September 28, 2021, the USPTO issued U.S. Patent 11,133,872 ("the '872 patent") to Ramot. The '872 patent is a continuation of the '866 patent previously asserted against Cisco in the 2019 Eastern District of Texas Action and against Acacia in the February 2021 Delaware Action. On September 28, 2021, Cisco and Acacia filed a Complaint for Declaratory Judgment in the District of Delaware, seeking a declaration of noninfringement. *See Cisco Sys. Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 1:21-cv-01365 (D. Del.) (hereinafter, the "September 2021 Delaware Action"). Ramot did not challenge venue in Delaware. On March 7, 2022, Ramot filed a counterclaim, alleging infringement of the '872 patent. *Id.*, Dkt. 8 at ¶¶ 77-163. That case remains active.

### B. The Present Litigation Involving the '998 Patent.

On May 24, 2022, the USPTO issued the '998 patent. Just as it did with the '872 patent in the September 2021 Delaware Action, Cisco and Acacia filed a Complaint for Declaratory Judgment against Ramot in the District of Delaware seeking a declaration that Cisco's and Acacia's products do not infringe any claim of the '998 patent. *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 1:22-cv-00674 (D. Del.), Dkt. 1 (hereinafter, "the First-Filed Delaware Action"). The First-Filed Delaware Action was filed on May 24, 2022 at 12:01 am EDT. An hour and twenty-two minutes later, at 12:23 am CDT, Ramot filed the instant lawsuit alleging that Cisco directly and indirectly infringes the '998 patent by "making, using, offering for sale, selling and importing optical networking transceiver modules and line cards, and components thereof, providing advanced electro-optical modulation techniques—including, without limitation, certain Cisco's and subsidiary Acacia's various optical networking modules, line cards, and associated circuitry and software." Dkt. 1 at ¶ 3 (hereinafter, "Ramot's Second-Filed Action").

## III.    LEGAL STANDARD FOR THE FIRST-TO-FILE RULE

"When the declaratory action can resolve the various legal relations in dispute and afford relief from the controversy that gave rise to the proceeding, and absent sound reason for a change of forum, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action." *Genentech, Inc. v. Eli Lilly and Co.*, 998 F.2d 931, 938 (Fed. Cir. 2008) (application of the first-to-file rule is governed by Federal Circuit law in patent cases); *see also Elecs. For Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1347 (Fed. Cir. 2005); *Virtual Fleet Mgmt., LLC v. Position Logic*, LLC, No. 2:17-cv-00014-JRG, 2017 WL 10276708, at \*1 (E.D. Tex. May 17, 2017). Under the first-to-file rule, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap. *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999).

To find substantial overlap, all that needs to be present is that the "two actions involve closely related questions or common subject matter, or that the core issues substantially overlap. The cases need not be identical to be duplicative." *Cadle*, 174 F.3d at 603. In patent cases, courts determining substantial similarity have examined "whether they involved the same parties, the same technology, the same inventors, overlapping remedies, the same witnesses, or overlapping issues in claim construction." *SIPCO, LLC v. Emerson Elec. Co.*, No. 6:15-cv-0907, 2016 WL 7743496, at \*2 (E.D. Tex. July 1, 2016); *E-Z-EM, Inc. v. Mallinckrodt, Inc.*, No. 2:09-cv-00124, 2010 WL 1378820, at \*2 (E.D. Tex. Feb. 26, 2010). "Once the 'substantial similarity' threshold is crossed, the first-to file rule accords the ***first-filed*** court the responsibility to determine which case should proceed." *RPost Holdings, Inc. v. Yesware, Inc.*, No. 2:13-cv-0953-JRG, 2014 WL 12712410, at \*1 (E.D. Tex. Sept. 4, 2014) (emphasis in original); *see also Cadle*, 174 F.3d at 605-06 (quoting *Mann Mfg., Inc., v. Hortex, Inc.*, 439 F.3d 403, 407 (5th Cir. 1971)). Thus, the proper

course of action is for the second-filed court to transfer the case to the first-filed court for that determination. *Cadle*, 174 F.3d at 606.

## IV.    ARGUMENT

The Court should transfer Ramot's Second-Filed Action in favor of Cisco's First-Filed Delaware Action because judicial economy mandates it. Under the first-to-file rule, this Court should refuse to hear the case because it is the second-filed case, and the issues raised by the cases substantially overlap. *See Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999).

### A.    The Delaware Action Was First-Filed.

Ramot cannot dispute that this case is the second-filed case. Cisco and Acacia filed a Complaint for Declaratory Judgment against Ramot in the District of Delaware at 12:01 am EDT on May 24, 2022. Ex. A, Declaration of Holly Engelmann In Support of Defendant's Motion to Transfer (hereinafter "Engelmann Decl.), Ex. 1 (D. Del. ECF Notice). The present case was filed an hour and twenty-two minutes later at 12:23 am CDT. *Id*., Ex. 2 (E.D. Tex. Docket Activity Report). Under the Federal Circuit's and this District's case law, the first-to-file rule means precisely that –"'the first filed'; not the first filed by a minute, an hour, a day or a week—but simply 'the first filed.'" *RPost Holdings, Inc. v. Yesware, Inc.*, No., 2:13-cv-953-JRG, 2014 WL 12712410, at *2 (E.D. Tex. Sept. 4, 2014); *see also Genetech v. Eli Lilly & Co.*, 998 F.2d 931, 938 (Fed. Cir. 1993), *abrogated on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) (the "first to file" rule "favors the forum of the first-filed action, whether or not it is a declaratory judgment action."). As such, the first-to-file rule applies in favor of Cisco.

DM2\15943537.1

**B.      This Action is Substantially Similar to Cisco's First-Filed Delaware Action, Necessitating Transfer to Delaware.**

This action satisfies the standard for applying the first-to-file rule. "As the second-filed court, the Court's limited role is to determine whether there is substantial overlap between the two suits." *Platt v. Nash*, No. 4:16-cv-00294, 2016 WL 6037856, at *2 (E.D. Tex. Oct. 14, 2016). In patent cases, courts determining substantial similarity have examined "whether they involved the same parties, the same technology, the same inventors, overlapping remedies, the same witnesses, or overlapping issues in claim construction." *SIPCO, LLC v. Emerson Elec. Co.*, No. 6:15-cv-0907, 2016 WL 7743496, at *2 (E.D. Tex. July 1, 2016); *E-Z-EM, Inc. v. Mallinckrodt, Inc.*, No. 2:09-cv-00124, 2010 WL 1378820, at *2 (E.D. Tex. Feb. 26, 2010).

*Same parties.* Here, the same parties are involved in both actions. The First-Filed Delaware Action involves Cisco and Acacia as plaintiffs and Ramot as the defendant. *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 1:22-cv-00674 (D. Del.), Dkt. 1. While Ramot's Second-Filed Action currently names only Cisco as a defendant, Ramot includes Acacia under the "Parties" Section Header (*Id.* at ¶ 9), accuses "certain of Cisco's and subsidiary Acacia's various optical networking modules, line cards, and associated circuity and software" (*Id.* at ¶ 3), discusses "Acacia's Accused Products" separate from "Cisco's Accused Products" (*Id.* at ¶¶ 25-44), and alleges direct, indirect, and willful infringement by Acacia (*Id.* at ¶¶ 63-92).

*Same patent and inventors.* Both actions involve only the '998 patent and thus, involve the same three inventors (Yossef Ehrlichman, Ofer Amrani, and Shlomo Ruschin).

*Same technology.* The '998 patent is directed to methods and systems for converting digital data into modulated optical signals and implicates the same technology in both actions. More specifically, the First-Filed Delaware Action explains that "[t]he products at issue include (a) networking equipment including line cards and optical transceiver modules; (b) the optical

6

network transceiver modules themselves, including coherent optical transceiver modules; and (c) components of optical transceiver modules and associated circuitry and software, such as digital signal processing application specific integrated circuits and silicon photonic integrated circuits (the 'Accused Products')." *Id*. at ¶ 37. Ramot's Second-Filed Action describes the same accused products: "various coherent optical transceiver modules, as well as major components of such modules such as its Acacia Digital Signal Processing ('DSP') application specific integrated circuits ('ASICs') and Silicon Photonoic integrated circuits ('ICs') suitable for use by others in building infringing optical transceiver modules." Dkt. 1 at ¶ 25.

Specifically, Ramot names the same Cisco and Acacia products in this action as those at issue in the First-Filed Delaware Action. Ramot has essentially accused Cisco's and Acacia's entire line of optical transceiver modules, components thereof, and networking equipment incorporating such modules – all which are identified in paragraphs 37-46 of the First-Filed Delaware Action and "encompassed within the definition of Accused Products for purposes of [that action]." *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 1:22-cv-00674 (D. Del.), Dkt. 1 at ¶ 47. The First-Filed Delaware Action explains that the Accused Products include: the "AC1200 products, AC400 products, CIM8 pluggable modules, and 100G, 200G, and 400G pluggable modules in a variety of standard form factors such as CFP-DCO, CFP2-DCO, CFP2-ACO, OSFP, and QSFP-DD" (*Id*. at ¶ 38) and Ramot's Second-Filed Action explains that the Accused Products include: "AC1200, AC400, CIM 8 products, as well as 100G, 200G, and 400G pluggable modules in a variety of standard form factors such as CFP-DCO, CFP2-DCO, CFP2-ACO, OSFP, and QSFP-DD" (Dkt. 1 at ¶ 26).

***Overlapping remedies.*** Both actions seek the same remedies regarding whether Cisco and Acacia infringe the '998 patent, and whether Ramot would be entitled to damages for that alleged

infringement. The First-Filed Delaware Action seeks a finding that Cisco and Acacia do not infringe and has not infringed (directly, contributorily, or by inducement) any claim of the '998 patent by manufacturing, using, selling, offering for sale, or importing any of the accused products. *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 1:22-cv-00674 (D. Del.), Dkt. 1 at Prayer for Relief. Ramot's Second-Filed Action seeks a finding that Cisco (on its own and through Acacia) infringed (directly, contributorily, and by inducement) one or more claims of the '998 patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States. Dkt. 1 at ¶¶ 85-88.

**Same witnesses.** Given that both cases involve the same inventors, same parties, and same accused products, the relevant witnesses should be identical.

**Overlapping issues in claim construction.** Because the same patent is at issue in both cases, the same claim terms would be at issue and presented for construction.

In sum, these two cases clearly meet the criteria of "substantially overlapping" sufficient to trigger the first-to-file rule. "Once the 'substantial similarity' threshold is crossed, the first-to file rule accords the ***first-filed*** court the responsibility to determine which case should proceed" and the proper course of action for the second-filed court is to transfer the case to the first-filed court for that determination. *RPost Holdings, Inc. v. Yesware, Inc.*, No. 2:13-cv-0953-JRG, 2014 WL 12712410, at *1 (E.D. Tex. Sept. 4, 2014) (emphasis in original); *see also Cadle*, 174 F.3d at 606 (analyzing the question "Transfer or Dismiss?" and finding the district court erred by dismissing the suit instead of transferring). Because the cases are "substantially similar," the first-to-file rule requires this Court to transfer Ramot's Second-Filed Action to Delaware where that court can determine whether this suit should be dismissed, stayed, or transferred and consolidated.

8

**C.      No "Compelling Circumstances" Justify Departure From Application of the
First-to-File Rule.**

During the parties' meet-and-confer, Ramot argued that Cisco's First-Filed Delaware
Action falls within an exception to the first-to-file rule as an "anticipatory filing" (Engelmann
Decl., ¶ 4), but that exception would require a showing that Cisco acted in bad faith, which Ramot
has never suggested.

**1.      Ramot's Alleged Exception Should be Decided by the District of
Delaware as the First-Filed Court.**

As a threshold matter, the question of whether the first-filed action was a "bad faith"
anticipatory action is for the District of Delaware to determine, as the first-filed court. *Platt v.
Nash*, No. 4:16-cv-00294, 2016 WL 6037856, at *2 (E.D. Oct. 14, 2016); *see also RPost Holdings,
Inc. v. Sophos, Inc.*, 2:13-cv-0959-JRG, 2014 WL 10209205, at *1 (E.D. Tex. Aug. 20, 2014)
("[O]nce the 'substantial similarity' threshold is crossed, the first-to-file rule accords the ***first-filed***
court the responsibility to determine which case should proceed") (emphasis in original); *Cadle
Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 605-06 (5th Cir. 1999) (holding that the second-
filed court correctly refused to resolve the question of whether the first-filed court or the second-
filed should retain the case). Accordingly, once this Court decides that there is substantial overlap
here, its inquiry is at an end..

**2.      Ramot Fails to Carry its Burden to Show Compelling Circumstances
to Deviate From the Application of the First-to-File Rule.**

Ramot's alleged exception fails in any event because Cisco's First-Filed Delaware Action
is not in "bad faith," as required by the recognized exception.  Ramot, as the party seeking to avoid
the application of the first-to-file rule, has the burden to show compelling circumstances to deviate
from the application of the rule. *Datamize, Inc. v. Fid. Brokerage Servs.*, No. 2:03-cv-321-DF,
2004 WL 1683171, at *7 (E.D. Tex. Apr. 22, 2004) (citing *Mann Mfg., Inc., v. Hortex, Inc.*, 439

9

F.2d 403, 407 (5th Cir. 1971)). Fifth Circuit courts have identified two compelling circumstances that prevent application of the first-to-file rule; neither applies here. The first is a "bad faith" exception when "a party engage[s] in bad faith conduct, by inducing an opposing party to delay filing a lawsuit, so that he c[an] file a preemptive lawsuit." *In re Toyota Hybrid Brake Litigation*, No. 4:20-cv-0127, 2020 WL 6161495, at *7 (E.D. Tex. Oct. 21, 2020) (citing *Chapa v. Mitchell*, No. A-05-cv-769-JN, 2005 WL 2978396, at *2 (W.D. Tex. Nov. 4, 2005) (citing *Amerada Petroleum Corp. v. Marshall*, 381 F.2d 661, 663 (5th Cir. 1967)) and (citing *True View Surgery Ctr. One, L.P. v. Goodman Glob. Holdings, Inc.*, No. CV H-15-3287, 2016 WL 755494, at *6 (S.D. Tex. Feb. 24, 2016). Ramot does not argue that this exception applies, and it plainly does not.

The second exception is similar: an "anticipatory-filing" that involves additional factors such as a "nefarious motive" or bad faith intent *beyond* simply filing first in anticipation of a later filed suit. *In re Amperex Tech. Ltd.*, No. 2022-105, 2022 WL 135431, at *2 (Fed. Cir. 2022); *Communications Test Design, Inc. v. Contec, LLC*, 952 F.3d 1356, 1363-64 (Fed. Cir. 2020); *Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 391 (5th Cir. 2003) ("courts use pejorative terms such as 'forum shopping' or 'procedural fencing' to identify a narrower category of federal declaratory judgment lawsuits filed for reasons *found improper and abusive*, other than selecting a forum or anticipating related litigation") (emphasis added)). Importantly, anticipation alone is not enough to be a compelling circumstance requiring deviation from the first-to-file rule. *Genentech, Inc. v. Eli Lilly and Co.*, 998 F.2d 931, 938-39 (Fed. Cir. 2008) (reversing district court's dismissal of a declaratory action as it was premised solely on the fact that the suit was designed to anticipate a later-filed complaint in another forum); *Sherwin-Williams Co. v. Holmes*

*Cty.*, 343 F.3d 383, 391 (5th Cir. 2003) ("merely filing a declaratory action 'is not in itself improper anticipatory litigation or otherwise abusive forum shopping.'").

There is nothing approaching bad faith conduct or nefarious motive here. Cisco simply returned to the forum (Delaware) where Ramot had previously instigated litigation against Acacia and where Cisco and Acacia had previously brought a declaratory judgment action (which is currently ongoing) against Ramot without objection from Ramot. Indeed, Ramot filed a counterclaim against Cisco and Acacia, without challenge to the forum. This case and the parties' history of filing in Delaware are a far cry from cases where courts have deviated from the first-to-file rule based on an anticipatory-filing exception. In *In re Amperex Tech. Ltd.*, the plaintiff feigned cooperation with ongoing licensing negotiations, stating that it would "be in touch as soon as [it] can get the materials" to defendant to further their negotiations, but hours later filed a declaratory judgment action. No. 2022-105, 2022 WL 135431, at *2 (Fed. Cir. 2022). In *Communications Test Design, Inc. v. Contec, LLC*, the plaintiff strung the defendant along "just long enough to get the judicial drop and file this lawsuit" while "expressly agree[ing] to have further licensing discussions the following week, thereby ensuring that [defendant] would refrain from filing its complaint." 952 F.3d 1356, 1363-64 (Fed. Cir. 2020) (district court described the pre-suit communications and actions as revealing a "nefarious motive"). In *Novak Druce Connolly Bove & Quigg, LLP v. Arochi*, the plaintiff lied during settlement discussions when it represented it would not file a declaratory judgment action in Texas before the defendant filed an infringement action in the District of Columbia, but did so anyway. CV H-18-3490, 2019 WL 4222700, at *2-4 (S.D. Tex. Sept. 5, 2019). Here, Cisco simply filed its lawsuit first, and in Delaware.

In short, Ramot cannot meet its burden of establishing a compelling circumstance for this Court to depart from the application of the first-to-file rule. Indeed, if merely filing a declaratory

judgment lawsuit in a different forum in anticipation of being sued were sufficient to trigger the exception, then the exception would swallow the rule itself, since the first-to-file rule was set forth to resolve the very situation where a party files a declaratory judgment action in a different jurisdiction.

## V.   CONCLUSION

For the foregoing reasons, Cisco respectfully requests that the Court transfer Ramot's Second-Filed Action to the District of Delaware pursuant to the first-to-file rule.

Dated:  June 30, 2022

Respectfully submitted,

*/s/ Melissa R. Smith*
Melissa R. Smith
Texas Bar No. 07921800
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

L. Norwood Jameson
GA Bar No. 003970
wjameson@duanemorris.com
Matthew C. Gaudet
GA Bar No. 287789
mcgaudet@duanemorris.com
DUANE MORRIS LLP
1075 Peachtree Street NE, Suite 2000
Atlanta, GA 30309-3939
Telephone: (404) 253-6900
Facsimile: (404 253-6901

Holly E. Engelmann
hengelmann@duanemorris.com
Texas Bar No. 24040865
DUANE MORRIS LLP
100 Crescent Court, Suite 1200
Dallas, Texas 75201
Telephone: (214) 257-7226
Facsimile: (214) 257-7201

**Counsel for Defendant Cisco Systems, Inc.**

DM2\15943537.1

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). Plaintiff's counsel of record were served with a true and correct copy of the foregoing document by the CM/ECF system on June 30, 2022.

*/s/ Melissa R. Smith*

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(h), counsel for Defendant met and conferred with counsel for Plaintiff, and counsel for Plaintiff indicated that Plaintiff is opposed to the relief sought by this Motion.

*/s/ Melissa R. Smith*

DM2\15943537.1

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |
|---|---|
| RAMOT AT TEL AVIV UNIVERSITY LTD. | |
| Plaintiff, | Case No. 2:22-cv-00168-JRG |
| v. | JURY TRIAL DEMANDED |
| CISCO SYSTEMS, INC., | |
| Defendant. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER
PURSUANT TO THE FIRST-TO-FILE RULE**

## TABLE OF CONTENTS

Page

I.   THE MOTION SHOULD BE DENIED .......................................................................... 1

II.  COMPELLING CIRCUMSTANCES WARRANT DENIAL OF TRANSFER ............... 3

     A.   Judicial familiarity with Ramot's patent family supports venue in Texas.............. 4

     B.   The other transfer factors also support venue in Texas ......................................... 5

     C.   The purely anticipatory nature of Cisco's suit excepts it from the rule................. 6

III. THE COURT SHOULD NOT TRANSFER TO A VACANT JUDGESHIP ................. 10

IV.  CONCLUSION............................................................................................................. 11

# TABLE OF AUTHORITES

Page(s)

<u>**CASES**</u>

*American Employers' Ins. Co. v. Eagle Inc.*,
    122 Fed. App'x. 700 (5th Cir. 2004) .................................................................. 7

*Cerro Wire Inc. v. Southwire Co.*,
    777 F. Supp. 2d 1334 (N.D. Ga. 2011) ............................................................ 1

*Communications Test Design, Inc. v. Contec*, LLC,
    952 F.3d 1356 (Fed. Cir. 2020) ............................................................ 5, 6, 7, 9

*DataTreasury Corp. v. First Data Corp.*,
    243 F. Supp. 2d 591 (N.D. Tex. 2003) ............................................................ 4

*GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*,
    90 F.3d 479 (Fed. Cir. 1996) ......................................................................... 1

*In re Amperex Tech. Ltd.*,
    No. 2022-105, 2022 WL 135431 (Fed. Cir. Jan. 14, 2022) ............................... 7

*In re Cisco Systems, Inc.*,
    834 Fed. Appx. 571 (Fed. Cir. 2020) ............................................................. 9

*In re Nitro Fluids, LLC*,
    978 F.3d 1308 (Fed. Cir. 2020) ........................................................... 1, 2, 5, 6

*In re Toyota Hybrid Brake Litigation*,
    No. 4:20-CV-127, 2020 WL 6161495 (E.D. Tex. Oct. 21, 2020) ........................... passim

*International Union v. Dana Corp.*,
    No. 3:99-CV-7603, 1999 WL 33237054 (N.D. Ohio 1999) ............................... 7

*Kmart Corp. v. Key Industries, Inc.*,
    877 F. Supp. 1048 (E.D. Mich. 1994) ............................................................ 7

*Micron Tech., Inc. v. Mosaid Techs., Inc.*,
    518 F.3d 897 (Fed. Cir. 2008) ....................................................................... 5

*Mobility Electronics, Inc. v. American Power Conversion Corp.*,
    No. 5:07-CV-83, 2007 WL 9724768 (E.D. Tex. Oct. 10, 2007) ..................... 2, 4

*Network-1 Sec. Solutions, Inc. v. D-Link Corp.*,
    433 F. Supp. 2d 795 (E.D. Tex. 2006) ............................................................ 2

*Nobelbiz, Inc. v. Global Connect, LLC*,
    No. 6:13-cv-804-MHS, 2014 WL 12613389 (E.D. Tex. Feb. 26,
    2014) ............................................................................................................................. 1

*Parallel Networks, LLC v. Microsoft Corp.*,
    No. 2:09-cv-172, 2009 WL 10708739 (E.D. Tex. Aug. 3, 2009).................................... 11

*Sherwin-Williams Co. v. Holmes Cty.*,
    343 F.3d 383 (5th Cir. 2003) ...................................................................................... 7, 8

*Texas Instruments Inc. v. Micron Semiconductor, Inc.*,
    815 F. Supp. 994 (E.D. Tex. 1993)............................................................................... 3

*Traxxas, L.P v. Sunny Days Entertainment, LLC*,
    No. 2:18-cv-00035-JRG, 2018 WL 10716502 (E.D. Tex. May 30,
    2018) ........................................................................................................................... 10

# I. THE MOTION SHOULD BE DENIED

Cisco's Delaware local counsel stayed up until the wee hours of the morning on May 24, 2022—in order to file a declaratory judgment action at 12:01 am on the day the '998 Patent was supposed to issue. This was the second issue-day declaratory judgment action Cisco has filed. Cisco made the same venue pre-emptive filing in Delaware when Ramot's related '872 Patent was due to issue on Sept. 28, 2021. Meanwhile, Ramot filed the above-captioned action in this district shortly after verifying via the USPTO website that the '998 Patent had indeed issued.[1] As Cisco argues, its declaratory suit was indeed first in absolute time.

But an undesirable race to hit the "file" button, and the mechanical awarding of venue to the winner, is not always the answer under settled law. Courts in this district—as well as the Fifth Circuit, Federal Circuit, and elsewhere—recognize a "compelling circumstances" exception to application of the first-to-file rule. *See, e.g.*, *In re Nitro Fluids, LLC*, 978 F.3d 1308, 1311, fn. 2 (Fed. Cir. 2020). Such circumstances exist here, where Cisco asks for transfer from a Court that has presided over litigation on related patents all the way to pretrial—to a judgeship that is currently vacant, in a district chosen solely to avoid Ramot's venue choice.

Contrary to Cisco's suggestion, "bad faith" is not required to be shown. Anticipatory filing solely to preempt the patent owner's choice of venue—as indisputably occurred here—is an established factor supporting application of the compelling circumstances exception, particularly

---

[1] Courts in this district have presumed that patents issue at midnight in the Eastern time zone on the day noticed for issuance. *See, e.g.*, *Nobelbiz, Inc. v. Global Connect, LLC*, No. 6:13-cv-804-MHS, 2014 WL 12613389, *2 (E.D. Tex. Feb. 26, 2014). Neither this district or the District of Delaware appear to have directly addressed a ***dispute*** on the question of whether "the stroke of midnight, or the patent's appearance on the PTO website" should govern—but other courts have and have opted for the former. *See, e.g.*, *Cerro Wire Inc. v. Southwire Co.*, 777 F. Supp. 2d 1334, 1338 (N.D. Ga. 2011). But even if the midnight rule were followed, Cisco's tactic of pressing "file" as the chimes are still ringing risks launching a suit without standing if the patent does not in fact issue. *Id.* at 1336. Filing before issuance is a jurisdictional defect not cured by later issue. *GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 482 (Fed. Cir. 1996).

when other considerations are also present.  *See, e.g.*, *Mobility Electronics, Inc. v. American Power Conversion Corp.*, No. 5:07-CV-83, 2007 WL 9724768 at *3-4 (E.D. Tex. Oct. 10, 2007) ("***considerations of judicial and litigant economy***, and the just and effective disposition of disputes"); *see also Nitro Fluids,* 978 F.3d at 1311 ("We further accept that a ***balance of the transfer factors*** can support such an exception") (emphases added).  In the case of anticipatory filings, such other considerations include a court's familiarity with a patent family through other pending litigation, as this Court has developed here.  *Mobility Electronics*, 2007 WL 9724768 at *4 (*citing*, *e.g.*, *Network-1 Sec. Solutions, Inc. v. D-Link Corp.*, 433 F. Supp. 2d 795, 802 (E.D. Tex. 2006)).

Cisco omits discussion of these relevant circumstances, and does not engage with the "transfer factors" at all—arguing for a mechanical application of the rule based solely on filing time of day and substantial overlap.  But more is required when compelling circumstances—such as those discussed herein—are shown.  *See, e.g.*, *In re: Toyota Hybrid Brake Litigation*, No. 4:20-CV-127, 2020 WL 6161495 at *5-9 (E.D. Tex. Oct. 21, 2020) ("But Alaniz's assertion that a finding of substantial overlap is 'the end of this Court's inquiry' is patently wrong [].  Mechanical application of the first-to-file rule is not required on every occasion and may very well be inappropriate in specific instances … .") (internal citations omitted).

Notably, Cisco fails to tell the Court that each of the Delaware actions it mentions are currently assigned to a VACANT judgeship—as-yet unfilled since Judge Stark was confirmed to the Federal Circuit.  Ramot has told Cisco that it intends to seek transfer of Cisco's two declaratory judgment actions from Delaware to this Court—based largely on the same judicial economy factors as discussed herein.  But as of now, there is no Article III judge assigned to consider that contemplated motion—or for this Court to defer to for decision on venue in this case as Cisco suggests.  Mot. at 8.

As discussed below, in similar situations the court has stayed pending word from the would-be transferee court. Here, there is no practical reason that this case cannot proceed through early stages rather than wait.

Under the circumstances, Cisco's ask, and preference for the District of Delaware, is nothing more than forum shopping and a bid for further delay. Cisco claims no urgency here on its part driving its alleged need to resolve infringement via declaratory suits. Nor could it credibly do so. Cisco filed at 12:01 am in Delaware expecting to get sued immediately in Texas. Also, Cisco has repeatedly sought *stays* of infringement actions brought by Ramot on this patent family—so that it could serially litigate validity in the Patent Office, filing five *inter partes* review petitions and seven *ex parte* reexamination requests so far. In view of this, Cisco's Delaware non-infringement suits are clearly "no more than a race to the courthouse" and "further[] none of the purposes of a declaratory judgment action." Rather they exist solely to deny "the injured party the right to choose the forum in which to seek redress." *Texas Instruments Inc. v. Micron Semiconductor, Inc.*, 815 F. Supp. 994, 997-98 (E.D. Tex. 1993).

## II.   COMPELLING CIRCUMSTANCES WARRANT DENIAL OF TRANSFER

As shown herein, Ramot's opposition is supported by compelling circumstances that include substantially more than just Cisco's obvious forum shopping—such this Court's familiarity with patents in this family that share a specification, the absence of a judge in Delaware who could decide a transfer motion, Ramot's choice of forum, and other convenience factors. All of this suggests that transfer would be inappropriate, and Cisco has provided nothing to counter it other than the fact of its minutes-earlier filing. "Blindly applying the first-to-file rule only on the basis of the actual filing dates ... would not further the goals of the rule." *In re: Toyota Hybrid Brake Litigation*, 2020 WL 6161495 at *6-7.

## A. Judicial familiarity with Ramot's patent family supports venue in Texas

Judicial familiarity with the patent family at issue has often been deemed a compelling circumstance against mechanical application of the first-to-file rule. *See, e.g.*, *Mobility Electronics*, 2007 WL 9724768 at *3-4 ("federal courts will recognize the wisdom of allowing a judge who has familiarity with the subject matter at issue to preside over subsequent litigation"). The benefits to judicial economy and avoidance of competing result grow even stronger when, as here, there is other pending litigation before the same judge within a patent family. *See DataTreasury Corp. v. First Data Corp.*, 243 F. Supp. 2d 591, 595-97 (N.D. Tex. 2003). Consolidation of related patent cases before a single judge with familiarity promotes "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *In re Toyota Hybrid Brake Litigation*, 2020 WL 6161495 at *7.

This Court presided over litigation of three related patents through discovery, claim construction, expert disclosure, motions, and pre-trial filings to within weeks of trial—before the Court granted Cisco's third motion to stay (pending *ex parte* reexamination). *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No 2:19-cv-00225-JRG, Dkt. 235 (E.D. Tex. Jan. 13, 2021). Those related patents share a specification, and indeed many claim elements, with the newly-issued '998 Patent here. That case is still pending. *Id.* at Dkt. 241. And while Cisco has acquired former third-party supplier Acacia Communications for $4.5 billion, and has released new accused products, since this Court stayed the prior case—substantial overlap with the currently pending litigation in this Court is inevitable with respect to at least infringement and invalidity theories, claim construction arguments, and damages models. There would be substantial and undeniable benefits to judicial economy, and to the parties, in proceeding with litigation over Ramot's newly issued patents in this Court as well. Cisco has not suggested, and could not show, otherwise.

## B. The other transfer factors also support venue in Texas

Courts often look to the § 1404(a) convenience factors by analogy as additional sources of compelling circumstance to support exemption from mechanical application of the first-to-file rule. "'[T]rial courts have discretion to make exceptions to this general rule in the interest of justice or expediency,' and we have recognized that such 'exceptions are not rare.'" *Communications Test Design, Inc. v. Contec*, LLC, 952 F.3d 1356, 1362 (Fed. Cir. 2020) (*quoting Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 904 (Fed. Cir. 2008)). "'Other factors include the convenience and availability of witnesses, the absence of jurisdiction over all necessary or desirable parties, and the possibility of consolidation with related litigation.'" *Id.*; *see also In re Toyota Hybrid Brake Litigation*, 2020 WL 6161495 at *7, fn. 8 (collecting cases). Establishing a favorable balance of factors is not required to avoid the first-to-file rule, but when "the balance of convenience favors the second-filed action," it "can be" the basis for an exception to the rule. *See Nitro Fluids*, 978 F.3d at 1311.

Here, the balance of factors clearly favors this Court, and Cisco offers no analysis of the factors to say otherwise.

With respect to the public interest factors, as discussed above, this Court's prior experience—including claim construction and other rulings—concerning other patents in this family plainly and strongly support venue in this Court under the familiarity and avoidance of conflict factors. And as discussed below, even without resort to time-to-trial statistics—which consistently favor this Court—the current vacancy to which these matters are assigned in Delaware supports venue here under the court congestion factor. The local interest factor is also served by venue in this Court, for all the reasons given to support venue in Ramot's Complaint. Dkt. 1 at ¶¶ 10-12, 14-15.

With respect to the private interest factors, the parties have already demonstrated, through

discovery and pretrial proceedings in the prior case here, that the sources of proof and necessary witnesses are available and amenable to attendance at trial in this Court. Cisco cannot show, and has not attempted to show, that any of its proof or witnesses are resident in or more available in Delaware. Several of Ramot's likely witnesses, including inventor Dr. Ehrlichman as well as Ramot's corporate representative and both experts in the prior stayed case, are resident in the Western or Mid-Western United States (*see* Dkt. 1 at ¶ 18), making this Court cheaper and geographically more convenient to attend than Delaware. Cisco is based in California and has substantial offices in this district. *Id.* at ¶¶ 8-11.

The balance of factors under § 1404(a) strongly favors venue in the Eastern District of Texas. Cisco cannot show otherwise and has not tried. Accordingly, the balance of convenience factors here provides additional compelling circumstances justifying an exception to the first-to-file rule. *See, e.g.*, *Nitro Fluids*, 978 F.3d at 1311.

### C. The purely anticipatory nature of Cisco's suit excepts it from the rule

Compelling circumstances also arise because of the purely anticipatory nature of Cisco's filings in Delaware. This is a recognized "compelling circumstance" in Fifth Circuit cases and elsewhere, separate from the "bad faith" exception. *In re Toyota Hybrid Brake Litigation*, 2020 WL 6161495 at *7. The cases Cisco cites do indeed establish that the mere fact of filing of a declaratory action isn't enough. But they also do not require a showing of "bad faith" beyond an intention to preempt. *See, e.g.*, *Communications Test Design*, 952 F.3d at 1362-64 (finding that "regardless of [filing party's] motive or intent," no abuse of discretion to consider anticipatory nature of suit as revealed from communications and conduct). "We have recognized that the first-to-file rule is not absolute, that a declaratory judgment action in particular may even be dismissed though filed first, and that a 'court may consider whether a party intended to preempt another's infringement suit … .'" *In re Amperex Tech. Ltd.*, No. 2022-105, 2022 WL 135431, at *2 (Fed.

Cir. Jan. 14, 2022).

In *Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 397 (5th Cir. 2003), the court looked at a federal suit filed in anticipation of state cases, and noted that the "mere fact" of anticipation "does not require" dismissal of the declaratory suit. Instead, the court looked to whether the **sole purpose** of the suit was "improper 'procedural fencing' undermining 'the wholesome purposes' of declaratory actions" *Id.*; *see also American Employers' Ins. Co. v. Eagle Inc.*, 122 Fed. App'x. 700, 703 (5th Cir. 2004) (in *Sherman-Williams*, "we were concerned with whether there was a legitimate reason" to be in the court). Here, Cisco hasn't provided any legitimate reason at all to be in court in Delaware rather than Texas—other than that it prefers to, and it filed at 12:01 am hoping to preemptively secure that result.

As Cisco's own cases suggest, facts showing that no motivation exists other than anticipatory forum shopping, along with other factors, can make such a filing unworthy of deference under the rule. *See also Kmart Corp. v. Key Industries, Inc.*, 877 F. Supp. 1048, 1053 (E.D. Mich. 1994) ("For example, a suit brought **purely in anticipation** of a filing by the defendant in another forum should be dismissed") (emphasis added). Forum shopping is its own disfavored practice, as is often recognized. *See, e.g.*, *International Union v. Dana Corp.*, No. 3:99-CV-7603, 1999 WL 33237054, at *6 (N.D. Ohio 1999) (collecting cases, and noting that: "Such motive is found most readily, and viewed most unenthusiastically, where the first filer acted on the basis of an anticipation that its opponent was about to file a substantive suit against it.").

Anticipating an infringement suit with a declaratory judgment action in another forum is not a legitimate purpose under the Declaratory Judgment Act. *See, e.g.*, *Communications Test Design*, 952 F.3d at 1362-64. And when the facts indicate, as here, that anticipatory forum shopping was the only reason for the filing, these are compelling circumstances that (along with the other factors shown herein) warrant departure from mechanical application of the rule.

Cisco has not disputed that it filed in Delaware at 12:01 am on the day of scheduled issuance of the patent solely in anticipation of, and to attempt to preempt, Ramot's filing here. Indeed, this is the second time Cisco has filed before the virtual ink was dry on a new Ramot patent. *See, e.g.*, *Cisco Sys. Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 1:21-cv-01365-VAC-CJB, Dkt. 1 at ¶ 2 (D. Del. Sept. 28, 2021) ("a copy of the '872 patent is not yet available from the United States Patent and Trademark Office ("USPTO") in downloadable form").

Further, Cisco cannot, and does not, claim in its Motion a desire or need to resolve any dispute without waiting to be sued. Courts recognize urgency of resolution as a legitimate purpose for an anticipatory suit. *See, e.g.*, *Sherwin-Williams*, 343 F.3d at 397 ("to allow potential defendants to resolve a dispute without waiting to be sued"). But here, the only urgency was in avoiding Ramot's intended venue. Cisco filed at 12:01 am in Delaware, expecting to get sued in Texas and intending to use the first-to-file rule for its advantage. There is no other reasonable explanation offered, or available, for staying up late to file as it did.

Further, as this Court well knows, there are numerous other proceedings, in this Court, in the Patent Office, and in Delaware, involving Ramot's optical modulation patent family and its enforcement against Cisco's ongoing infringement. Already concluded are three *inter partes* review petitions and four appellate petitions from their denial. Still pending are five district court matters, seven *ex parte* reexamination requests, and two more *inter partes* reviews (on the '872 Patent). Both of Ramot's infringement actions on three ancestor patents of the '998 Patent—the case that nearly reached trial in this Court, and the case Ramot filed in Delaware against Acacia Communications when it was still a separate entity from Cisco with no Texas offices or other Texas acts or connections—are stayed at Cisco's request. *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No 2:19-cv-00225-JRG, Dkt. 235 (E.D. Tex. Jan. 13, 2021); *Ramot at Tel Aviv University Ltd., v. Acacia Communications, Inc.*, 1:21-cv-00295-VAC, Dkt. No. 23 (Oral

Order) (D. Del. Sept. 3, 2021).

Cisco cannot reasonably argue that its declaratory judgment actions in Delaware are based on an urgent need to resolve infringement of either new patent, when its core strategy in the course of litigation between the parties has been to delay or stay proceeding on infringement while repeatedly seeking to re-litigate validity in the Patent Office.[2]

Cisco has not cited to a single convenience or other factor in support of the transfer it requests—or given any other reason to prefer Delaware. Cisco has failed to mention or consider both the effect of the judicial vacancy in Delaware, and this Court's judicial familiarity with these parties and patent family.

In short, these facts strongly suggest, as Ramot asserts, that Cisco filed solely in anticipation and entirely to forum-shop in avoidance of further proceedings in this Court. Cisco's midnight filing was not an ordinary declaratory judgment case, but rather a purely anticipatory forum-grab of the sort courts find to be compelling circumstances warranting an exception to the first-to-file rule.

Further, the expanding course of litigation described above calls out for some manner of efficient consolidation—and the judicially efficient and just location for that is clearly with the Court that already has substantial experience presiding over litigation between these parties about this patent family. The "possibility of consolidation with related litigation" is a further compelling circumstance warranting exception to the first-to-file rule. *Communications Test Design*, 952 F.3d

---

[2] Cisco has not done particularly well in the Patent Office or on appeal here, but also has not given any indication that it intends to stop. *See, e.g.*, IPR2020-00484, Paper 10, Decision Denying Institution (PTAB Aug. 18, 2020) ("We have reviewed the Petition and determine that its merits are not particularly strong here."); *In re Cisco Systems, Inc.*, 834 Fed. Appx. 571, 574 (Fed. Cir. 2020) (Cisco "clearly has a readily available alternative legal channel to raise its arguments concerning the validity of the asserted patents. While Cisco prefers to raise those arguments before the Board, it has no clear and indisputable right to do so.").

at 1362.

For all of these reasons, the Court should find that Ramot has established compelling circumstances in exception to operation of the first-to-file rule.

## III.   THE COURT SHOULD NOT TRANSFER TO A VACANT JUDGESHIP

As discussed above—and as Cisco fails to mention and leaves off its citations—all three of the Delaware actions between Ramot and Cisco and/or Acacia are assigned to a judgeship that is vacant.  *See, e.g.*, *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 1:22-cv-00674-VAC (D. Del.); *Cisco Sys. Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 1:21-cv-01365-VAC-CJB (D. Del.); *Ramot at Tel Aviv University Ltd., v. Acacia Communications, Inc.*, 1:21-cv-00295-VAC (D. Del.).  This unusual situation of a vacancy in the first-filed court presents further compelling circumstances warranting denial of Cisco's motion.

Ramot has read this Court's prior decisions on the first-to-file rule and recognized an admirable desire to promote collegial judicial relations and confer with or defer to the Court's colleagues on the bench—but that is not yet possible here.  At a minimum, the situation warrants denial of Cisco's Motion to Transfer, and proceeding with this case until the Delaware court can be consulted about its views on judicial economy here.  As detailed above, the factors supporting further infringement proceedings in this Court rather than Delaware are compelling and undisputed.  Ramot does not perceive any likely harm to judicial comity in proceeding with this litigation—and would prefer to do so given its strong interest in timely enforcement against long-time accused infringer Cisco.  But Ramot acknowledges that some courts have responded to similar circumstances with a stay.

For example, in *Traxxas, L.P v. Sunny Days Entertainment, LLC*, No. 2:18-cv-00035-JRG, 2018 WL 10716502 at *2 (E.D. Tex. May 30, 2018), this Court stayed rather than transfer where the would-be transferee court had a potential jurisdictional defect to resolve that could have

prevented proceeding there. Similarly, in *Parallel Networks, LLC v. Microsoft Corp.*, No. 2:09-cv-172, 2009 WL 10708739 at *3 (E.D. Tex. Aug. 3, 2009), the court stayed pending the Delaware court's decision on both a jurisdictional motion and motion to transfer to Texas.

Again, should the Court wish to defer to or confer with its new colleague in Delaware once confirmed, Ramot respectfully suggests that there is no practical reason this case cannot proceed here whilst waiting for that confirmation and conference. In any event, the case should not be transferred to a judgeship that could remain vacant for an indefinite period of time, or be transferred before Ramot (by motion) or this Court can solicit the views of the new judge on whether to proceed here or transfer in the interests of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *In re: Toyota Hybrid Brake Litigation*, 2020 WL 6161495 at *7.

## IV.    CONCLUSION

For all of these reasons, Ramot respectfully requests that the Court deny the Motion in its entirety.

Dated:  July 19, 2022                          Respectfully Submitted,


                                                    By:  /s/ Corey Johanningmeier

                                                         S. Calvin Capshaw
                                                         State Bar No. 03783900
                                                         Elizabeth L. DeRieux
                                                         State Bar No. 05770585
                                                         **CAPSHAW DERIEUX, LLP**
                                                         114 E. Commerce Ave.
                                                         Gladewater, TX 75467
                                                         Telephone: 903-845-5770
                                                         Email: ccapshaw@capshawlaw.com
                                                         Email: ederieux@capshawlaw.com

                                                         Denise De Mory
                                                         Corey Johanningmeier
                                                         **BUNSOW DE MORY LLP**
                                                         701 El Camino Real
                                                         Redwood City, CA 94063

Telephone: (650) 351-7248
Facsimile: (415) 426-4744
ddemory@bdiplaw.com
cjohanningmeier@bdiplaw.com

Attorneys for Plaintiff
**RAMOT AT TEL AVIV UNIVERSITY LTD.**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) with a copy of this document via the Court's CM/ECF system.

Dated:  July 19, 2022

By:  /s/ *Corey Johanningmeier*
Corey Johanningmeier

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| RAMOT AT TEL AVIV UNIVERSITY LTD., | § § § | |
| | § | CIVIL ACTION NO. 2:22-CV-00168 |
| Plaintiff, | § § | |
| v. | § § | JURY TRIAL DEMANDED |
| CISCO SYSTEMS, INC., | § § | |
| Defendant. | § § | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO TRANSFER
PURSUANT TO THE FIRST-TO-FILE RULE**

Ramot does not meaningfully engage the controlling point of Cisco's motion: the first-filed Court—which all parties agree is the District of Delaware—should decide the forum in which the litigation on the at-issue patent should proceed. Ramot should direct its arguments to that forum.

On the merits, Ramot attempts to transform the first-to-file rule into a standard §1404(a) analysis, but this Court's precedent shows they are different. Even so, Ramot's arguments fail. Cisco and Acacia filed suit in the venue where they are incorporated and where two other related actions (one of which was filed by Ramot) are pending, one of which is active. In contrast, Ramot (an Israeli limited liability company with a principal place of business in Tel Aviv) has no relationship to this District other than using it as a place to file lawsuits against Cisco.[1] It is thus ironic that Ramot asserts that Cisco's filing "is nothing more than forum shopping."

Finally, Ramot's argument that a "VACANT" assignment of the two active Delaware cases as a basis to deny transfer is a red herring. First, on July 20, 2022, the Senate confirmed Gregory B. Williams to fill the seat and an investiture will be forthcoming. Second, the District of Delaware's Standing Order 2022-VAC-1 provides procedures to keep cases progressing.

## A.    Ramot Admits that the Delaware Action Was Filed First.

There is no dispute that the Delaware Action was filed first. Ramot admits that Cisco's "declaratory suit was indeed first in absolute time." Dkt. 20 at 1. Under Fifth Circuit precedent, the first-to-file rule is straightforward—the court with the second-filed case may refuse to hear it if the issues raised by the cases substantially overlap. *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999). That point is dispositive because "[o]nce the 'substantial similarity'

---

[1]    Ramot has filed five U.S. lawsuits: three against Cisco in this District (2:14-cv-01018; 2:19-cv-00225; and 2:22-cv-00168), and two in Delaware against Snap (1:16-cv-01021) and Acacia (1:21-cv-00295) as they are Delaware corporations without any Texas connections. *See* Dkt. 20 at 8.

threshold is crossed, the first-to-file rule accords the ***first-filed*** court the responsibility to determine which case should proceed." *RPost Holdings, Inc. v. Yesware, Inc.*, No. 2:13-cv-0953-JRG, 2014 WL 12712410, at *1 (E.D. Tex. Sept. 4, 2014) (emphasis in original). Thus, the second-filed court should transfer the case to the first-filed court for that determination. *Cadle*, 174 F.3d at 606.

Ramot does not contend that "substantial overlap" is absent here, as described in Cisco's Opening Brief. Dkt. 13 at 6-8. Instead, Ramot argues that there is also substantial overlap between this case and an earlier filed case in this Court involving three *different*, but related patents. Dkt. 20 at 4 (citing Case No. 2:19-cv-00225-JRG). Ramot's argument identifies a different type of potential overlap (arising from potential commonalities between cases involving the same patent family) than the situation here, where the two cases involve the *same* patent. The purpose of the first-to-file rule is to avoid parallel, mirror-image cases proceeding on the same patent in two different districts. None of the "overlap" identified by Ramot implicates that concern.  Thus, the first-to-file rule accords the Delaware Court the responsibility to determine which of the mirror-image cases should proceed.

**B.      No Compelling Circumstances Exist to Deviate From the First-to-File Rule.**

Throughout its response, Ramot claims that "compelling circumstances" justify departure from the first-to-file rule. Ramot does not attempt to satisfy the standard (essentially, a showing of bad faith by the first-filing party) as described in Cisco's Opening Brief (Dkt. 13 at 9-12), but tries to turn this dispute to one under § 1404(a). It is not. In any event, it is for the Delaware Court to decide the proper forum.

**1.      The Court's Experience With Related Patents Does Not Trump the First-to-File Rule.**

Relying on *Mobility Elecs., Inc. v. Am. Power Conversion Corp.*, No. 5:07-cv-0083, 2007 WL 9724768, at *3-4 (E.D. Tex. Oct. 10, 2007), Ramot claims that judicial familiarity with the

patent family at issue has been deemed a "compelling circumstance." Dkt. 20 at 4. Ramot ignores that familiarity with asserted patents goes to the question of what weight the ***first-filed*** court should give in determining which forum should proceed, not which forum should decide the issue.

Ramot's argument also fails. The Federal Circuit very recently held that while a court may consider its prior familiarity with the asserted patents to determine transfer under § 1404(a), "just because 'a patent is litigated in a particular [forum]' does not mean 'the patent owner will necessarily have a free pass to maintain all future litigation involving that patent in that [forum].'" *In re Google LLC*, No. 2022-140, 2022 WL 1613192, at *4 (Fed. Cir. 2022) (quoting *In re Vistaprint Ltd.*, 628 F.3d 1342, 1347 n.3 (Fed. Cir. 2010)). "Here, any judicial economy gained in having the district court preside over this case based on its prior familiarity with some of the issues, from a prior claim construction in a different case brought by [patent owner], is clearly insufficient in this case to outweigh the other factors that clearly favor transfer." *Id*.

Moreover, *Mobility* is distinguishable for two reasons. First, the court in *Mobility* denied transfer because of the court's prior involvement with *all* of the patents-in-suit, not just *related* patents. 2007 WL 9724768, at *4-7 (E.D. Tex. Oct. 10, 2007). Second, the first-filed Delaware Court has an equally weighted judicial economy argument favoring application of the first-to-file rule. The District of Delaware will have to conduct claim constructions on the related patents from the same family in the two cases already pending there and where Ramot either brought suit (the 2019 Delaware Action against Acacia)[2] or did not challenge Delaware as the appropriate forum and filed counterclaims alleging infringement against Cisco and Acacia (the September 2021 Delaware Action brought by Cisco).

---

[2]     Of course, claim construction will not occur in this case if no claims survive the pending reexamination and the stay is not lifted.

### 2.    Ramot Has Not Met its Burden, Even Under § 1404(a).

Even though Cisco's motion was brought under the first-to-file rule, Ramot insists on analyzing § 1404(a) convenience factors and unfairly criticizes Cisco for offering "no analysis of the factors to say otherwise." Analyzing §1404(a) convenience factors is not a threshold requirement under governing first-to-file case law, but at best, comes into play only if the first-filed action was filed in bad faith. It was not. Regardless, § 1404 private and public interest factors do not establish a "compelling circumstance" here warranting an exception to the application of the first-to-file rule.

***Public interest factors.*** In addition to this Court's familiarity with the patents, Ramot argues that the local interest in the case and time to trial weigh against transfer. In *In re Apple*, the Federal Circuit stated that "an assessment of the local interest factor must focus on whether there are 'significant connections between a particular venue and *the events that gave rise to a suit*'," and then found no comparable interest in the Western District of Texas because plaintiff did not reside in the district. No. 2022-137, 2022 WL 1676400, at *2 (Fed. Cir. 2022) (emphasis in original). Here, Ramot has no presence in this District, and has never sued Acacia in this District because it too has no presence here. Dkt. 20 at 8. Ramot did not try to identify any nexus between the events giving rise to its suit and this District other than the fact that Ramot has sued Cisco here previously, which cannot carry the day. The Federal Circuit also addressed time to trial, stating "precedent does not permit giving such speculation about whether a court can reach trial faster more weight than all the remaining factors." 2022 WL 1676400, at *2 (Fed. Cir. 2022)

***Private interest factors.*** After complaining that Cisco did not attempt to analyze the relative ease of access to sources of proof and convenience of potential witnesses under § 1404(a) (which Cisco did not move under, nor has the burden of proof), Ramot declares in conclusory fashion that Ramot's likely witnesses (most are experts) are in the "Western or Mid-Western

United States." Dkt. 20 at 5-6. First, this is unsupported. Second, it concedes it has no proof or witnesses in this District. Ramot's contention that witnesses from the 2019 Eastern District of Texas Action are available and amenable to attendance at trial in this Court (*id.*) is wholly unsupported, speculative, and even if credited, of marginal relevance. Indeed, the Federal Circuit noted that witnesses outside the district are "not entitled to significant weight because these witnesses 'would require hours of travel regardless.'" *In re Google*, 2022 WL 1613192, at *3.

### 3.   The Senate Confirmed Mr. Williams to the District Ct. of Delaware.

Ramot relies heavily on the District of Delaware having a vacant seat on the judiciary, but on July 20, 2022, the Senate confirmed Gregory B. Williams to the U.S. District Court in Delaware, to fill Judge Leonard Stark's seat. Even before this, Standing Order 2022-VAC-1 provides procedures for cases with a vacancy to keep them moving. For example, Magistrate Judge Burke issued orders regarding the case schedule in the September 2021 Delaware Action. As to the pending first-filed, mirror-image case in Delaware, so far, neither party has filed a contested motion that would even require the assignment of an Article III judge. For example, Ramot has not filed a motion to transfer or dismiss the first-filed Delaware action. And even if Ramot does file a contested motion, the Standing Order states that the "filing of a motion shall not be grounds to prevent the case, including discovery, from progressing . . . briefing shall proceed according to the Local Rules" and emergency motions "will be reviewed by the District Judge who is acting as the Court's duty judge on the date the motion is filed or the date a party contends the motion has become an emergency." In short, the District of Delaware intends for its cases to progress, and Judge Williams' impending investiture obviates Ramot's concerns of an "indefinite" delay.

*     *     *

Cisco respectfully requests that the Court transfer this case to the District of Delaware pursuant to the first-to-file rule.

Dated:  July 25, 2022

Respectfully submitted,

*/s/ Melissa R. Smith*
Melissa R. Smith
Texas State Bar No. 07921800
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

L. Norwood Jameson
GA Bar No. 003970
wjameson@duanemorris.com
Matthew C. Gaudet
GA Bar No. 287789
mcgaudet@duanemorris.com
DUANE MORRIS LLP
1075 Peachtree Street NE, Suite 2000
Atlanta, GA 30309-3939
Telephone: (404) 253-6900
Facsimile: (404 253-6901

Holly E. Engelmann
hengelmann@duanemorris.com
Texas Bar No. 24040865
DUANE MORRIS LLP
100 Crescent Court, Suite 1200
Dallas, Texas 75201
Telephone: (214) 257-7226
Facsimile: (214) 257-7201

**Counsel for Defendant Cisco Systems, Inc.**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). Plaintiff's counsel of record were served with a true and correct copy of the foregoing document by the CM/ECF system on July 25, 2022.

<u>/s/ Melissa R. Smith</u>

# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

RAMOT AT TEL AVIV UNIVERSITY LTD.

                    Plaintiff,

            v.

CISCO SYSTEMS, INC.,

                    Defendant.

Case No. 2:22-cv-00168-JRG

JURY TRIAL DEMANDED

## PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER PURSUANT TO THE FIRST_TO_FILE RULE

<u>T</u>ABLE OF <u>C</u>ONTENTS

I.     THIS COURT SHOULD FIND COMPELLING CIRCUMSTANCES HERE ................. 1

II.    CISCO FAILS TO REBUT RAMOT'S GROUNDS FOR EXCEPTION ........................ 3

    A.    Cisco's declaratory suits are purely anticipatory forum shopping .......................... 3

    B.    This Court's familiarity, and all other factors, support venue here ...................... 3

    C.    Opportunity for consolidation also warrants exception and venue here ................ 5

III.   CONCLUSION .................................................................................................... 5

# T<small>ABLE OF</small> A<small>UTHORITIES</small>

## CASES

*Apicore US LLC v. Beloteca, Inc.*, No. 2:19-CV-00077-JRG, 2019 WL
    1746079 (E.D. Tex. Apr. 18, 2019) ............................................... 1

*Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599 (5th Cir. 1999).................................... 1, 4

*Communications Test Design, Inc. v. Contec*, LLC, 952 F.3d 1356 (Fed.
    Cir. 2020) ........................................................................... 2, 5

*Hart v. Donostia LLC*, 290 F. Supp. 3d 627  (W.D. Tex. 2018) ................................ 1, 4

*In re Nitro Fluids, LLC*, 978 F.3d 1308 (Fed. Cir. 2020) ........................................... 2, 4

*In re: Toyota Hybrid Brake Litigation*, No. 4:20-CV-127, 2020 WL
    6161495 (E.D. Tex. Oct. 21, 2020) ........................................... 1, 3

*Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403 (5th Cir. 1971)...................................... 1

*Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897 (Fed. Cir. 2008).................................... 2

*Mobility Electronics, Inc. v. American Power Conversion Corp.*, No. 5:07-
    CV-83, 2007 WL 9724768 (E.D. Tex. Oct. 10, 2007) ...................................... 1

*Sanofi-Aventis Deutschland GmbH v. Novo Nordisk, Inc.*, 614 F. Supp. 2d
    772 (E.D. Tex. 2009) ............................................................... 2

## I.      THIS COURT SHOULD FIND COMPELLING CIRCUMSTANCES HERE

Cisco argues for an application of the first-to-file rule that would swallow its own exceptions.  The first-to-file rule does indeed suggest that the second-addressed Court defer to the first to decide where a substantially overlapping pair of suits should proceed—*unless* circumstances warrant that an *exception* to the rule applies.  When the case for an exception is made, as here, no such deference is categorically required—else it would be no real exception. *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407 (5th Cir. 1971) ("*In the absence of compelling circumstances* the court initially seized of a controversy should be the one to decide whether it will try the case") (emphasis added).[1]

As shown in Ramot's opposition, courts, including those in the Fifth Circuit, decline to apply the rule in the face of compelling circumstances—as have been shown here—without consulting or transferring to other courts.  *See, e.g.*, *In re: Toyota Hybrid Brake Litigation*, No. 4:20-CV-127, 2020 WL 6161495 at *5-9 (E.D. Tex. Oct. 21, 2020) ("But [Cisco's] assertion that a finding of substantial overlap is 'the end of this Court's inquiry' is patently wrong"); *Mobility Electronics, Inc. v. American Power Conversion Corp.*, No. 5:07-CV-83, 2007 WL 9724768 at *4 (E.D. Tex. Oct. 10, 2007) (second-filed court finding compelling circumstances from the court's involvement in related proceedings and other factors, and declining to apply the rule); *Hart v. Donostia LLC*, 290 F. Supp. 3d 627, 633-35 (W.D. Tex. 2018) (second-filed court finding

---

[1] Cisco's briefs, as well as many decisions within the Fifth Circuit, cite to *Cadle* for the proposition that the second-filed court must yield the decision to the first.  *See* Reply at 1-2.  But that rule originates with the earlier *Mann* case, which formulated the rule to apply *only* when there are no compelling circumstances warranting exception.  *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 606 (5th Cir. 1999) (*citing Mann*, 439 F.2d at 407).  There was no finding of compelling circumstances in *Cadle*.  Accordingly, this Court has previously acknowledged the possible compelling circumstance exception to the rule that the first-filed court decides—albeit in a case where the actual issue had been mooted.  *See Apicore US LLC v. Beloteca, Inc.*, No. 2:19-CV-00077-JRG, 2019 WL 1746079 at *6 (E.D. Tex. Apr. 18, 2019) (*citing Mobility*, 2007 WL 9724768 at *3).  Here it is not moot, and Ramot has shown compelling ground for exception.

"compelling circumstances exist such that the case should not be dismissed or transferred pursuant to the first-to-file rule").

Put simply, the counsel to defer to a decision by the first-filed court is not as inflexible as Cisco suggests—and exceptions are made, particularly in the context of preemptive declaratory suits over patent infringement. *Sanofi-Aventis Deutschland GmbH v. Novo Nordisk, Inc.*, 614 F. Supp. 2d 772, 775 (E.D. Tex. 2009) ("However, more recent case law suggests that the Federal Circuit now rejects any categorical rule that the first-filed court is always the appropriate court to determine which case should proceed in the context of patent infringement suits"); *In re Nitro Fluids, LLC*, 978 F.3d 1308, 1311, fn. 2 (Fed. Cir. 2020) ("We proceed from the district court's premise that transfer pursuant to the first-to-file rule would be proper in this case absent the existence of compelling circumstances. We further accept that a balance of the transfer factors can support such an exception"); *see also Communications Test Design, Inc. v. Contec*, LLC, 952 F.3d 1356, 1362 (Fed. Cir. 2020) ("we have recognized that such 'exceptions are not rare'") (*quoting Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 904 (Fed. Cir. 2008))

Ramot's opposition provides numerous grounds supporting an exception to the first-to-file rule—including the part of the rule that suggests deference to the first-filed court for decision. For example, this Court has unique and detailed experience presiding over litigation between Ramot and Cisco over this patent family. Opp. at 4. All of the transfer factors, often considered in this context, direct toward venue in this district. *Id.* at 5-6. Under the recognized "anticipatory filing" exception, Cisco's 12:01 am suit was indisputably filed solely to preempt Ramot's forum choice. *Id.* at 6-9. Finally, the need and opportunity for consolidation of various actions in service of judicial efficiency also supports venue here, as the only court with litigation over these patents that has moved past initial stages. *Id.* at 9.

## II.    CISCO FAILS TO REBUT RAMOT'S GROUNDS FOR EXCEPTION

Several key things are missing from Cisco's Motion and Reply here, including any cogent rebuttal to Ramot's compelling circumstantial grounds warranting an exception to the rule.

### A.    Cisco's declaratory suits are purely anticipatory forum shopping

Cisco fails to offer a single reason, legitimate or otherwise, for its attempt at forum preemption via declaratory lawsuits in Delaware.  It is both obvious from the timing of Cisco's 12:01 am filing, and undisputed in these briefs, that Cisco filed in Delaware solely to avoid further proceedings in this Court on this patent family.  The purely anticipatory nature of Cisco's lawsuit supports taking exception to the first-to-file rule here—for all of the reasons already given.  Opp. at 6-9.  There is no "bad faith" requirement in the recognized exception when a parties' sole purpose is preempting an infringement plaintiff's forum choice, as it indisputably was here.  *Id.*; *In re: Toyota Hybrid Brake Litigation*, 2020 WL 6161495 at *7 ("under the 'anticipatory-filing' exception, the first-to-file rule should be set aside when 'a party files a declaratory judgment action in anticipation of a suit by its adversary, which can create an opportunity for forum-shopping.'").

Cisco's sole purpose of taking the fight elsewhere should be strongly disfavored—both because it deprives Ramot of its choice of forum, and because under the circumstances, it would be wildly inefficient to start over and ignore this Court's familiarity with the patent family, the construction of its claims, and the parties' disputes here.

### B.    This Court's familiarity, and all other factors, support venue here

Cisco fails to identify even a single § 1404(a) factor that suggests venue would be more convenient elsewhere.  It does not, and cannot, argue with the fact that this Court presided over the prior litigation and construed patents in this family, that Ramot chose this Court, that Ramot's witnesses are closer to Texas, that Cisco has a large presence here as detailed in the Complaint, and that this Court is faster.  When all the factors point in one direction, it is not a fair argument to

say that certain particular factors alone are not dispositive.  *See* Reply at 4-5.  This entirely one-way "balance" of the convenience factors also supports taking exception to the first-to-file rule here.  Opp. at 5-6.

Courts, including in the Western District of Texas where *Cadle* was decided, now often look to the § 1404(a) factors in determinations about compelling circumstances exceptions to the first-to-file rule.  *See, e.g.*, *Hart*, 290 F. Supp. 3d at 633 (applying factors and discussing Fifth Circuit endorsement of same); *id.* at 634-5 (finding compelling circumstances where none of the factors favored transfer to first-filed court).  The Federal Circuit has also approved of using the factors in this context—even where it has disagreed with particular details of their application by the lower court.  *See, e.g.*, *In re Nitro Fluids*, 978 F.3d at 1311, fn. 2 ("We further accept that a balance of the transfer factors can support such an exception").

In this context the burden falls to the party seeking to establish the exception (*id.* at 1311), and Ramot has met this burden.  Opp. at 5-6; *see also* Complaint, Dkt. 1 at ¶¶ 10-12, 14-15 (showing local interest based on Cisco's substantial presence, ***and acts of infringement***, in this district).  Cisco does not, and cannot, deny that it is accused of committing acts of infringement in this district or that this Court's well-defined procedures offer less congestion and a faster time to trial.  Cisco also does not offer any countervailing facts regarding access to proof or availability and convenience of witnesses in this district.[2]  Similarly, Cisco offers no reason for abandoning the undisputed judicial efficiency of having this case proceed in the same Court as the prior related

---

[2] Cisco cites one recent Mandamus petition decision that did not "give significant weight" to preference and shorter travel of out-of-district witnesses.  *See* Reply at 5.  But there is no need to anticipate appellate weighing of transfer factors here, where Cisco has declined to offer any counterweight to Ramot's evidence.  Cisco hasn't identified anyone who is at home in, or even closer to, Delaware—or otherwise countered the assertion that inventor Dr. Ehrlichman, and others, are closer to and could more easily travel to Texas.  Whatever weight is accorded witness convenience favors venue here.

litigation that nearly reached trial.

### C. Opportunity for consolidation also warrants exception and venue here

Cisco also fails to acknowledge or address the possibility of consolidation of judicial effort here, in the Court with experience with patents in this family and the parties' disputes over them. Opp. at 9. The "possibility of consolidation with related litigation" is an accepted circumstance warranting exception to the first-to-file rule where present. *See, e.g.*, *Communications Test Design*, 952 F.3d at 1362.

A judge has now just been confirmed for the vacant seat in Delaware to which Cisco's declaratory lawsuits are assigned. And Ramot intends to move that court to decline jurisdiction under the declaratory judgment act and transfer under § 1404(a). *See id.* at 1361-62. There is still no way to determine when the Delaware court will be seated and able to consider and rule on such a motion, which further supports this Court finding compelling circumstances exception and proceeding with the case here. Opp. at 2-3, 10-11. This case is not ripe for transfer, even if one were warranted.[3] And one is not, for all the reasons discussed herein and in Ramot's opposition.

## III.   CONCLUSION

Ramot wants and deserves a trial on the merits of its well-supported claims that Cisco infringes its optical modulator family of patents. Since 2019, Cisco has filed nineteen proceedings—six *inter partes* review petitions, four appeals from them, seven *ex parte* reexamination petitions, and two declaratory judgment actions—in avoidance of that result. Ramot respectfully requests that Cisco's Motion be denied, and this case proceed toward trial in this Court.

---

[3] Also, while Cisco chose not to mention it in Reply here, Cisco has now filed a motion alleging failure to join Acacia (Dkt. 21)—which is not a necessary party here for all the reasons Ramot will explain in its forthcoming opposition to that motion.

Dated:  August 1, 2022               Respectfully Submitted,

By:  /s/ *S. Calvin Capshaw*

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
**CAPSHAW DERIEUX, LLP**
114 E. Commerce Ave.
Gladewater, TX 75467
Telephone: 903-845-5770
Email: ccapshaw@capshawlaw.com
Email: ederieux@capshawlaw.com

Denise De Mory
Corey Johanningmeier
**BUNSOW DE MORY LLP**
701 El Camino Real
Redwood City, CA 94063
Telephone: (650) 351-7248
Facsimile: (415) 426-4744
ddemory@bdiplaw.com
cjohanningmeier@bdiplaw.com

Attorneys for Plaintiff
**RAMOT AT TEL AVIV UNIVERSITY LTD.**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) with a copy of this document via the Court's CM/ECF system.

Dated:  August 1, 2022

By:  /s/ *Corey Johanningmeier*
Corey Johanningmeier

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| RAMOT AT TEL AVIV UNIVERSITY LTD., | § | |
| | § | |
| | § | CIVIL ACTION NO. 2:22-CV-00168 |
| Plaintiff, | § | |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| CISCO SYSTEMS, INC., | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S MOTION TO DISMISS PURSUANT TO 12(B)(7)

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ........................................................................................1

II.    BACKGROUND ........................................................................................2

    A.    Acacia has no connections to the Eastern District of Texas. ................................. 2

    B.    Ramot's claims are directed to Acacia, its activities, products, and knowledge. ........................................................................................ 3

III.    LEGAL STANDARD...................................................................................3

IV.    ARGUMENT ..............................................................................................4

    A.    Acacia is an Active and Primary Participant in the Alleged Infringement and is therefore a Necessary Party under Fifth Circuit Law.................................. 4

    B.    Joinder is not feasible because venue is improper as to Acacia. ........................... 6

    C.    This case cannot proceed in equity and good conscience without Acacia. ............ 7

        1.    A judgment cannot be shaped to avoid the resulting prejudice caused by Acacia's absence. ..................................................................... 8

        2.    Ramot has an adequate remedy if this case is dismissed because it can bring its claims against Acacia in the District of Delaware as counterclaims in the already pending suit.................................................. 9

V.    CONCLUSION...........................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Akoloutheo, LLC v. System Soft Techs., Inc.*, No. 4:20-cv-985, 2021 WL 1947343
(E.D. Tex. May 14, 2021) .................................................................................3

*In re Cray Inc.*, 871 F.3d 1355 (Fed. Cir. 2017) ...........................................................7

*Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings
LLC*, 434 F.Supp.3d 473 (E.D. Tex. Jan. 17, 2020) ......................................4

*Freeman v. Northwest Acceptance Corp.*, 754 F.3d 553 (5th Cir. 1985) ...................5-6

*Haas v. Jefferson Nat'l Bank*, 442 F.2d 394 (5th Cir. 1971) .........................................5

*Hood ex rel. Miss. v. City of Memphis*, 570 F.3d 625 (5th Cir. 2009)...........................4

*Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305 (5th Cir. 1986) ........................................8

*Soverain IP, LLC v. AT&T, Inc.*, No. 2:17-cv-00293-RWS-RSP, 2017 WL
5126158 (E.D. Tex. Oct. 31, 2017)...................................................................7

*Stonite Products Co. v. Melvin Lloyd Co.*, 315 U.S. 561 (1942)...................................6

*Timberlake v. Synthes Spine, Inc.*, No. V-08-4, 2011 WL 2607044 (S.D. Tex. June
30, 2011) ...........................................................................................................6

**Statutes**

28 U.S.C. § 1400(b) .......................................................................................................6

**Other Authorities**

FED. R. CIV. P. 12(b)(7)..........................................................................................1, 3, 10

FED. R. CIV. P. 19 ...............................................................................................*Passim*

## I.    INTRODUCTION

Even though Acacia Communications, Inc. ("Acacia") is not a party to this lawsuit, the bulk of Ramot's Complaint alleges that Acacia infringes claim 1 of U.S. Patent 11,342,998 ("the '998 patent") by making, using, selling, and or offering for sale various Acacia optical networking transceiver modules and line cards, and components thereof ("Acacia Accused Products") as identified and described in paragraphs 25-43 of the Complaint. Dkt. 1. These allegations are virtually identical to Ramot's Counterclaims for Patent Infringement filed against Acacia in the District of Delaware. *Compare* Dkt. 1 at ¶¶ 25-44, 73-75, 77, 80-81, 85-89, *with Cisco Sys. Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 1:21-cv-01365, Dkt. 8 at ¶¶ 97-116, 145-147, 149, 151-152, 154-158 (D. Del. Feb. 7, 2022) (hereinafter, the "September 2021 Delaware Action"). The only material difference is Ramot's re-phrasing of its allegations here as "Cisco (*through its wholly owned subsidiary Acacia*)," thus imputing Acacia's alleged actions and alleged accused products onto Cisco. The remaining allegations accuse "Cisco Accused Products"—some of which are comprised of accused Acacia components. As such, this case is substantially about Acacia, Acacia's products, and Cisco products that contain Acacia's products.

Knowing that venue does not lie in this District as to Acacia (a Delaware corporation with a principal place of business in Maynard, Massachusetts), Ramot seeks to impose liability on Cisco for the acts of its wholly-owned subsidiary. Because Acacia is an active and primary participant to the claims pled in the Complaint, Acacia is a necessary party under Fifth Circuit law. Cisco respectfully requests that the Court dismiss this case under Federal Rule of Civil Procedure 12(b)(7) for failure to join a necessary party under Rule 19.[1] Ramot will not be prejudiced because

---

[1]    On June 30, 2022, Cisco filed a Motion to Transfer Pursuant to the First-to-File Rule. Dkt. 13. If the Court grants that motion, this motion is moot. If the Court find that transfer is not warranted under the first-to-file rule, Cisco respectfully requests dismissal under Rule 12(b)(7).

it can bring its allegations against Acacia in Delaware, where Ramot has previously sued Acacia for alleged infringement of two patents related to the '998 patent (*Ramot at Tel Aviv Univ. Ltd. v. Acacia Commc'ns, Inc.*, No. 1:21-cv-00295 (D. Del.) (hereinafter, the "February 2021 Delaware Action"))[2] and filed a counterclaim alleging infringement of another related patent (September 2021 Delaware Action). Ramot can also file a counterclaim for infringement in a first-filed, mirror-image action brought by Cisco and Acacia involving the <u>same</u> Asserted Patent, currently pending in the District of Delaware. *See Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 1:22-cv-00674 (D. Del.).

## II.   BACKGROUND

Acacia is not a named party in this lawsuit, however, Ramot's Complaint is replete with allegations that Acacia itself infringes the Asserted Patent and that Acacia's products are the "Acacia Accused Products" or are components of the "Cisco Accused Products."

### A.   Acacia has no connections to the Eastern District of Texas.

Cisco completed its acquisition of Acacia on March 1, 2021 and since then, Acacia has been a wholly-owned subsidiary of Cisco.  Acacia Communications Inc., March 1, 2021 Form 8-K, found here: https://content.edgar-online.com/ExternalLink/EDGAR/0001193125-21-008768.html?hash=37b2231bc1e63664416d5d0d8f56c7ffe19441914b6dd177b930f83370bfe182&dest=D110570DEX21_HTM#D110570DEX21_HTM (stating that Acacia was a wholly owned subsidiary of Cisco).  Acacia has its own separate website that markets Acacia branded products (https://acacia-inc.com/products/) and provides sales and technical support for Acacia branded

---

[2]      The two patents at issue in the February 2021 Delaware Action are also the subject of an action before this Court that was stayed in January, 2021. *See Ramot at Tel Aviv Univ. Ltd v. Cisco Sys. Inc.*, Case No. 2:19-cv-00225-JRG, Dkt. No. 235 (Jan. 13, 2021) (staying case pending *ex parte* reexamination). In other words, Ramot is aware that venue against Acacia does not lie in this District.

products (https://acacia-inc.com/support-center/). In the United States, design and development of the "Acacia Accused Products" is done at Acacia's offices in Massachusetts, New Jersey, and Northern California. (https://acacia-inc.com/contact-us/). Acacia does not have a place of business or any presence in the Eastern District of Texas. *Id*.

**B.      Ramot's claims are directed to Acacia, its activities, products, and knowledge.**

In the Complaint, Ramot accuses "Cisco (through its wholly owned subsidiary Acacia)" of making, using, offering to sell, and selling Acacia Accused Products and of infringing the Asserted Patent, both directly and indirectly. *See* Dkt. 1. A large part of the Complaint describes Acacia Accused Products (¶¶ 25-44), alleges direct infringement by Acacia Accused Products (¶¶ 65, 68, 70, 73, 75, 77, 80, 81, and 83), and asserts that Acacia had knowledge of the Asserted Patent and related patents, attempting to establish a factual basis for willfulness and indirect infringement claims (¶¶ 90, 92-93).

## III.   LEGAL STANDARD

The Federal Rules of Civil Procedure allow a district court to dismiss an action for "failure to join a party under Rule 19." FED. R. CIV. P. 12(b)(7). Rule 19 provides for joinder of all parties whose presence in a lawsuit is required for the fair and complete resolution of the dispute at issue. FED. R. CIV. P. 19(a). A Rule 12(b)(7) analysis involves a two-step inquiry. *Akoloutheo, LLC v. System Soft Techs., Inc.*, No. 4:20-cv-985, 2021 WL 1947343, at *1 (E.D. Tex. May 14, 2021) (citing *H.S. Res., Inc. v. Wingate*, 327 F.3d 432, 439 (5th Cir. 2003)). First, the court must determine whether under Rule 19(a) a party is necessary and indispensable. *Id*. Second, if joinder is not feasible, Rule 19(b) provides that the court must determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed" based on the following factors:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

FED. R. CIV. P. 19(b)(1)-(4).

In ruling on a dismissal for lack of joinder of an indispensable party, a court may go outside the pleadings and look to extrinsic evidence such as documents or affidavits. *Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings LLC*, 434 F.Supp.3d 473, 498 (E.D. Tex. Jan. 17, 2020) (quoting *Estes v. Shell Oil Co.*, 234 F.2d 847, 849 (5th Cir. 1956)). While the movant bears the initial burden of demonstrating that a missing party is necessary, the burden shifts to the party opposing joinder once that showing is made. *Hood ex rel. Miss. v. City of Memphis*, 570 F.3d 625, 628 (5th Cir. 2009).

## IV.    ARGUMENT

The Court should dismiss Ramot's Complaint because it has failed to join Acacia, a necessary party in the alleged infringement and without whom the Court cannot accord complete relief in this matter. Acacia, however, cannot be joined because venue would be improper. Because the "equity and good conscience" test fails, this case must be dismissed.

### A.    Acacia is an Active and Primary Participant in the Alleged Infringement and is therefore a Necessary Party under Fifth Circuit Law.

As an initial matter, Ramot does not allege in its Complaint that Cisco and Acacia are joint tortfeasors or otherwise collectively acted in a single act of infringement. The only allegation by Ramot is that Cisco makes, uses, sells, and/or offers to sell in the United States the accused Acacia Products "through its wholly owned subsidiary Acacia." *See* Dkt. 1 at ¶ 63. There are no additional assertions or claims that tie Cisco and Acacia together in any act of alleged infringement. Without expressly stating so, Ramot is essentially asking the Court to pierce the separate corporate structure

of Cisco and Acacia and hold Cisco liable for alleged acts of infringement by Acacia for no other reason than Acacia is Cisco's subsidiary. But under Fifth Circuit law, merely being a subsidiary is not enough.

Subsidiaries that are the "primary" or "active" participants in the events giving rise to litigation are considered necessary parties that are required to be joined in that litigation. *Freeman v. Northwest Acceptance Corp.*, 754 F.3d 553, 559 (5th Cir. 1985). The Fifth Circuit uniformly supports the proposition that joinder of a subsidiary is required when a plaintiff seeks to impose liability on a parent, not for its own acts, but for those of the subsidiary (wholly-owned or not). *Id.* (citations omitted). Acacia is clearly a person to be joined because its presence is critical to the disposition of the important issues in this litigation (whether Acacia's products infringe the Asserted Patent) and its evidence will either support the Complaint or bolster the asserted defenses. *See Haas v. Jefferson Nat'l Bank*, 442 F.2d 394, 398 (5th Cir. 1971).

Even if Ramot alleged that Cisco and Acacia were joint tortfeasors, which Ramot did not, under Fifth Circuit law, Acacia would still be a required party because it is a primary participant. While patent infringement is considered a tort, the general rule is that joint tortfeasors are not deemed "required" or indispensable parties under Rule 19. The Fifth Circuit, however, has found exceptions in cases where "active participants" were necessary parties to the action. In *Haas v. Jefferson Nt'l Bank of Miami Beach*, the Fifth Circuit addressed a claim by a stockholder (named Haas) for conversion of Haas's stock by a bank who delivered that stock to a second bank as collateral for a loan held by an unjoined party (named Glueck), who allegedly owned a one-half interest in the stock. 442 F.2d at 398 (5th Cir. 1971). The Fifth Circuit concluded that Glueck was a necessary party to the action because he was involved in key issues and because his testimony would be of inestimable value. *Id.* The court's holding sets forth the rule that a person should be

5

joined under Rule 19 when their "presence is critical to the disposition of the important issues in the litigation [and its] evidence will either support the complaint or bolster the defense." *Id*. Citing *Haas*, the Fifth Circuit in *Freeman v. Nw. Acceptance Corp.* concluded that a wholly-owned subsidiary was a necessary party when the plaintiffs were seeking to impose liability on the parent company for the acts of the subsidiary, which was the "primary participant" in an alleged conversion. 754 F.2d 553, 559 (5th Cir. 1985). In *Timberlake v. Synthes Spine, Inc.*, the district court similarly ruled that a subsidiary that was the primary actor in designing, manufacturing, and selling an allegedly defective product constituted a necessary party in a product liability action. No. V-08-4, 2011 WL 2607044, at *2 (S.D. Tex. June 30, 2011).

Here, Acacia is a "primary participant" because many of the allegations in the Complaint are that Acacia itself is the accused infringer, and that Cisco is liable though its parent relationship. Even as to claims directed against Cisco (for re-selling Acacia Accused Products within larger Cisco Accused Products), Acacia will be crucial to the determination of whether Acacia Accused Products and Cisco Accused Products that include of Acacia components work in the way Ramot alleges. Acacia's evidence either will substantiate or undercut Ramot's contentions of direct and indirect infringement; and Acacia either will corroborate or compromise allegations of knowledge required for indirect and willful. Acacia is more than a key witness; Acacia is an active and primary participant, necessary to this lawsuit.

**B.       Joinder is not feasible because venue is improper as to Acacia.**

In patent infringement lawsuits, venue must be proper for each defendant. *Stonite Products Co. v. Melvin Lloyd Co.*, 315 U.S. 561, 563-64 (1942). For venue to be proper under 28 U.S.C. § 1400(b), a defendant must engage in the infringing acts and have "a regular and established place of business" in the judicial district. Establishing that a defendant "has a regular and established place of business" requires that: (1) there is a fixed physical location (rather than a virtual presence)

in the district; (2) the location is a regular and established place of business, not just a temporary or sporadic location, and (3) it is the defendant's location, not just the home of an employee who resides at a location of the employee's choice. *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017).

Venue in this District is not proper as to Acacia, and joinder of Acacia is not feasible. Acacia has no offices or physical presence in Texas, and any attempt to impute Cisco's "regular and established place of business" to Acacia (as a wholly-owned subsidiary) would fail because Acacia and Cisco are legally separate corporate entities. Acacia is incorporated under the laws of Delaware and has offices in Massachusetts, New Jersey, and Northern California. *See* https://acacia-inc.com/contact-us/. In the United States, the design and development of the "Acacia Accused Products" is done at Acacia's offices. So long as a formal separation of entities is preserved between separate, but closely related corporations, the courts ordinarily will not treat the place of business of one corporation as the place of business of the other. *Soverain IP, LLC v. AT&T, Inc.*, No. 2:17-cv-00293-RWS-RSP, 2017 WL 5126158, at *1 (E.D. Tex. Oct. 31, 2017). Ramot cannot meet the difficult standard of showing that Acacia and Cisco lack or disregard their formal corporate separateness such that it would be appropriate to impute Cisco's place of business to Acacia. Ramot itself appears to recognize this distinction, as evidenced by the pending litigations against Acacia in Delaware and by its failure to name Acacia as a defendant in this case.

## C.  This case cannot proceed in equity and good conscience without Acacia.

Because Acacia is a necessary party that cannot be joined, this case can only proceed if the Court concludes that "in equity and good conscience, the action should proceed among [Ramot and Cisco]" alone. FED. R. CIV. P. 19(b). This "equity and good conscience" test is based upon the following factors:

1.  the extent to which a judgment rendered in Acacia's absence might prejudice Acacia or the parties to this action;

2.  whether prejudice to Acacia or the present parties could be lessened or avoided by protective provisions in the judgment, shaping the relief, or any other means;

3.  whether a judgment rendered in Acacia's absence would be adequate; and

4.  whether Ramot would have an adequate remedy if this action were dismissed for nonjoinder.

*Id.* As set forth below, in the absence of Acacia, this case cannot proceed in equity and good conscience and should be dismissed.

### 1.   A judgment cannot be shaped to avoid the resulting prejudice caused by Acacia's absence.

As to parts 1-3 of the equity and good conscience test, the Court cannot shape a judgment to avoid the prejudice caused by Acacia's absence. Considerations of prejudice to absent persons alone may give rise to dismissal for failure to join an indispensable party. FED. R. CIV. P. 19(b). When substantially similar issues are litigated in separate suits, Fifth Circuit precedent makes clear that "the establishment of a negative precedent" against an absentee party "can provide the requisite prejudice" under Rule 19. *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1313 (5th Cir. 1986). This is true even where the claims asserted are not identical, but hinge on similar issues. *See id.* at 1312-13 (finding that a determination by one court would influence the other court's determination on the same issue and that the same witnesses will testify about the same things).

There are currently two other active and one presently stayed cases—all pending in the District of Delaware—involving Acacia, Cisco, Ramot, the same Accused Products, and the same and related patents. On May 24, 2022, Cisco and Acacia filed a declaratory action suit against Ramot involving the same Asserted Patent at issue here. *Cisco Sys., Inc. v Ramot at Tel Aviv Univ., Ltd.*, No. 1:22-cv-00674 (D. Del.). On September 28, 2021, Cisco and Acacia filed a declaratory action suit against Ramot involving a patent related to the Asserted Patent, and on February 7,

2022, Ramot filed a counterclaim asserting virtually identical allegations against the same Acacia Accused Products that are accused here. *See* September 2021 Delaware Action, Dkt. 8 (D. Del. Feb. 7, 2022). On February 26, 2021, Ramot filed a patent infringement action against Acacia accusing the same Acacia Accused Products of infringing two patents related to the Asserted Patent. *See* February 2021 Delaware Action, Dkt. 1 (D. Del. Feb. 26, 2021). The February 2021 Delaware Action is currently stayed pending the outcome of ex parte reexaminations on the patents-in-suit. *Id.*, Dkt. 23. Thus, there are other pending suits involving identical and similar issues, such that any rulings and/or judgment here has the potential to impact these other cases.

Moreover, Acacia has an interest in this action based on the numerous allegations directly against it and/or its products as incorporated into Cisco's products. Disposing of this action without Acacia would cause significant prejudice to Acacia. A judgment rendered by this Court in Acacia's absence would create the potential for inconsistent findings and obligations arising from the three Delaware cases involving the same or related patents and the same Acacia Accused Products.

> **2.      Ramot has an adequate remedy if this case is dismissed because it can bring its claims against Acacia in the District of Delaware as counterclaims in the already pending suit.**

Ramot has an adequate alternative forum to prosecute this action against Acacia—in the District of Delaware—where Ramot has previously sued Acacia for infringement of related patents. *See* February 2021 Delaware Action (alleging infringement of two related patents); *see also* September 2021 Delaware Action (counter-claiming infringement of a third related patent). Ramot can simply file a counterclaim for infringement in a first-filed action brought by Cisco and Acacia involving the <u>same</u> Asserted Patent currently pending in the District of Delaware. *See Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 1:22-cv-00674 (D. Del.). Because Ramot can prosecute its action against Acacia in an alternative forum that is both available and adequate, dismissal would not prejudice Ramot.

## V.    CONCLUSION

Acacia is required to be joined and Ramot has failed to do so. Therefore, Cisco respectfully requests that the Court grant Cisco's Motion to Dismiss in its entirety in accordance with Federal Rule of Civil Procedure 12(b)(7) and dismiss Ramot's claims.

Dated:  July 25, 2022

Respectfully submitted,

/s/ Melissa R. Smith
Melissa R. Smith
Texas State Bar No. 07921800
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

L. Norwood Jameson
GA Bar No. 003970
wjameson@duanemorris.com
Matthew C. Gaudet
GA Bar No. 287789
mcgaudet@duanemorris.om
DUANE MORRIS LLP
1075 Peachtree Street NE, Suite 2000
Atlanta, GA 30309-3939
Telephone: (404) 253-6900
Facsimile: (404 253-6901

Holly E. Engelmann
hengelmann@duanemorris.com
Texas Bar No. 24040865
DUANE MORRIS LLP
100 Crescent Court, Suite 1200
Dallas, Texas 75201
Telephone: (214) 257-7226
Facsimile: (214) 257-7201

**Counsel for Defendant Cisco Systems, Inc.**

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). Plaintiff's counsel of record were served with a true and correct copy of the foregoing document by the CM/ECF system on July 25, 2022.

/s/ Melissa R. Smith

# Exhibit F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

RAMOT AT TEL AVIV UNIVERSITY LTD.

Plaintiff,

v.

CISCO SYSTEMS, INC.,

Defendant.

Case No. 2:22-cv-00168-JRG

JURY TRIAL DEMANDED

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(7)

# TABLE OF CONTENTS

I.     ACACIA IS NOT A NECESSARY PARTY ................................................................... 1

II.    CISCO CAN DEFEND ITS OWN INFRINGEMENT HERE ........................................... 2

III.   CISCO FAILS ITS BURDEN TO SHOW NECESSITY ................................................... 6

IV.   CISCO FAILS ITS BURDEN TO SHOW INDISPENSABILITY ................................... 8

V.    CONCLUSION ................................................................................................................ 10

# TABLE OF AUTHORITIES

## CASES

*AbbVie Inc. v. Alvotech hf.*, No. 21-C-2258, 2021 WL 3737733 (N.D. Ill. Aug. 23, 2021) .................................................................................. 2, 9, 10

*Akoloutheo, LLC v. System Soft Technologies, Inc.*, No. 4:20-cv-985, 2021 WL 1947343 (E.D. Tex. May 14, 2021) .............................................. 1, 6, 7, 8

*Alkot Industries, Inc. v. Takaro Co., Ltd.*, 106 F.R.D. 373 (N.D. Ill. 1985) ................................. 7

*Askew v. Sheriff of Cook County, Ill.*, 568 F.3d 632 (7th Cir. 2009) ........................................... 10

*Bowman v. W. Rim Prop. Services, Inc.*, 4:14-cv-672, 2016 WL 7799625 (E.D. Tex. Feb. 9, 2016) ........................................................................... 1, 7

*Dainippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266 (Fed. Cir. 1998) ........................... 2, 9

*Haas v. Jefferson Nat'l Bank of Miami Beach*, 442 F.2d 394 (5th Cir. 1971) ............................. 7

*Nottingham v. Gen. Am. Commc'ns Corp.*, 811 F.2d 873 (5th Cir. 1987) ................................. 1, 7

*Payan v. Cont'l Tire N. Am., Inc.*, 232 F.R.D. 587 (S.D. Tex. 2005) ........................................... 7

*Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-cv-00225-JRG (E.D. Tex.) .......................................................................... 5, 8

*Unisys Corp. v. Amperif Corp.*, 1994 WL 116105 (E.D. Pa. March 15, 1994) ........................................................................................... 7

I.     **ACACIA IS NOT A NECESSARY PARTY**

This case is about *Cisco's* infringement of Ramot's newly issued '998 Patent.  That infringement includes Cisco's use, offer, and sale of accused products, as well as Cisco's inducement of and contribution to infringement by its customers.  *Cisco* also makes or directs others to make many of the accused products, also infringing by doing so.  Some of the products *Cisco* makes include Acacia components.  *Cisco* directs its former supplier and now wholly-owned subsidiary Acacia to make still other products—which *Cisco* then uses, offers, and sells, also infringing by doing so.

Cisco is accused for *its own acts* of infringement, including its direction that others make products that Cisco then uses, offers, imports, and/or sells.  This is not a vicarious liability case—and to the extent Cisco's Motion suggests otherwise it is mischaracterizing the Complaint. *See* Complaint, D.I. 1 at ¶¶61 ("*Cisco* makes, uses, offers to sell, sells (including by technology leases to its customers), and/or imports into the United States the Accused Products."), 85-89, 95-96 ("As a result of *Cisco's infringement* of the Asserted Patent, Ramot has suffered monetary damages, and seeks recovery in an amount adequate to compensate for *Cisco's infringement*, but in no event less than a reasonable royalty with interest and costs").

Acacia is not a necessary party.  The question is not close.  *See, e.g.*, *Akoloutheo, LLC v. System Soft Technologies, Inc.*, No. 4:20-cv-985, 2021 WL 1947343 at \*2 (E.D. Tex. May 14, 2021):

> Patent infringement is a tort. 35 U.S.C. § 271. "It is well settled that joint tortfeasors are not considered 'required' or indispensable parties under Rule 19." *Bowman v. W. Rim Prop. Services, Inc.*, 4:14-cv-672, 2016 WL 7799625, at \*2 (E.D. Tex. Feb. 9, 2016) (*citing Nottingham v. Gen. Am. Commc'ns Corp.*, 811 F.2d 873, 880 (5th Cir. 1987)).

*See also Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary to join all joint tortfeasors to be named as defendants in a single lawsuit.").

And even if Acacia were necessary, it is not indispensable and this case can fairly proceed without it, because its parent Cisco can adequately represent the interests of its wholly-owned subsidiary. Acacia won't be prejudiced if only participating under subpoena—as it did in Ramot's prior case against Cisco—or through its parent. Specifically in the patent context, courts have held that a parent corporation is presumed to "adequately protect the interests of its wholly-owned subsidiary." *See AbbVie Inc. v. Alvotech hf.*, No. 21-C-2258, 2021 WL 3737733, at *9 (N.D. Ill. Aug. 23, 2021) (*citing Dainippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266, 1272 (Fed. Cir. 1998)). Cisco has failed to cite any case finding a subsidiary patent infringer (or contract manufacturer) necessary and indispensable to an infringement action against an infringing parent. Its examples from other contexts don't match the facts here, nor do they support the result Cisco seeks.

Dismissal for alleged lack of joinder is only required if the party is necessary, and then only if their presence is also indispensable—such that the action cannot proceed "in equity and good conscience" without them. Fed. R. Civ. P. 19. Cisco has failed to meet its burden to show that Acacia is a necessary party here. And even if that were not so, Cisco cannot show prejudice, or any other reason, that would make its wholly-owned subsidiary indispensable to an action accusing *Cisco* of infringement. Cisco's Motion should be denied.

## II.    CISCO CAN DEFEND ITS OWN INFRINGEMENT HERE

Cisco uses, offers, and sells products it develops, as well as Acacia-developed products—referred to in the Complaint for convenience as the "Cisco Accused Products" and "Acacia Accused Products," or together as the "Accused Products." *See, e.g.*, Complaint, D.I. 1 at ¶57 fn. 2:

> The Acacia Accused Products described above are also Cisco Accused Products now that Acacia has been acquired by and is wholly owned by Cisco. They are listed as separate categories of Accused Product here simply for convenience of

reference.

*See also id.* at ¶85:

> By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the Accused Products, **Cisco (on its own and through its wholly owned subsidiary Acacia)** has injured Ramot and is liable to Ramot for directly infringing one or more claims of the Asserted Patent, including without limitation claim 1, pursuant to 35 U.S.C. § 271(a).

Cisco's Motion misleadingly ignores and fails to explain any of this language—instead citing only one Complaint paragraph (¶63) which seems to have unintentionally omitted the "on its own and …" portion of the bolded language above. But even that paragraph is clear that it is **Cisco** being accused (including for its own acts through directing its subsidiary). And the operative language of subsequent paragraphs takes away any ambiguity. *See, e.g.*, *id.* at ¶¶85-89, 95-96 ("Cisco's infringement of the Asserted Patent").[1]

Any of the listed acts in 35 U.S.C. § 271 can independently make Cisco liable for infringement, including Cisco's offer and sale of the Acacia-developed products, and of products containing components from Acacia. Cisco cannot deny these alleged acts, which are presumed true on a motion to dismiss, and are in fact true.

Cisco mentions Acacia's website, but fails to mention that the Acacia-developed products are also marketed and sold on Cisco's website as Cisco products. *See, e.g.*, Complaint, D.I. 1 at ¶55; Datasheet c78-744377, "Cisco 400G Digital Coherent Optics QSFP-DD Optical Modules Data Sheet," *available at* https://www.cisco.com/c/en/us/products/collateral/interfaces-modules/transceiver-modules/datasheet-c78-744377.pdf; Cisco Datasheet c78-743732, "Cisco

---

[1] To the extent the Court believes the language of the Complaint should be clarified to further rule out Cisco's misinterpretation that independent acts of Acacia are accused (they are not), Ramot would be happy to amend. Ramot respectfully suggests, however, that even the short delay involved in amendment is unnecessary here, for all the reasons given herein.

Digital    CFP2-DCO    Coherent    Optical    Module    Data    Sheet," *available    at* https://www.cisco.com/c/en/us/products/collateral/interfaces-modules/transceiver-modules/datasheet-c78-743732.pdf.

And even on Acacia's website, recent marketing presentations show that Cisco is strategically directing and selling current and future "Acacia" products. *See, e.g.*, Presentation, "The Road Ahead for Pluggable Coherent Optics," *available at* https://acacia-inc.com/wp-content/uploads/2022/03/OFC-MWV-Panel_Road-Ahead-Coherent-Pluggable_Anuj-Malik.pdf:





Cisco has integrated the Acacia products into its development organization and **treats the sales of Acacia-developed products as Cisco sales**. *See, e.g.*, Complaint, D.I. 1 at ¶54; Cisco Blog: "650,000+ Coherent Ports Shipped by Cisco and Acacia," *available at* https://blogs.cisco.com/sp/650000-coherent-ports-shipped-by-cisco-and-acacia ("Cisco has put together a best-in-class development organization to address this technology requirement. Combining Acacia DSPs with Cisco's internally developed designs, more than 650,000 coherent ports have been shipped"); Cisco Annual Report – 2021, *available at* https://www.cisco.com/c/dam/en_us/about/annual-report/cisco-annual-report-2021.pdf, at 67 ("**Revenue from the Acacia acquisition has been included in our Infrastructure Platforms product category**.").

In addition, the "Acacia Accused Products" are made at Cisco's direction.  Liability for "making" the products is cumulative here given Cisco's liability for its own acts of using, offering, selling, importing, inducing infringement, and/or contributing to infringement.  D.I. 1 at ¶¶85-89.  But Cisco's directing of a wholly-owned subsidiary supplier to make an infringing product is itself an act of infringement.  It is also a fact pattern that appears in many patent litigations, where an accused infringer contracts with a third-party or overseas subsidiary supplier to make the accused product that is then imported and sold here.  None of these cases require joinder of the supplier, and Cisco hasn't provided even a single example of a patent misjoinder case to support the result it seeks.

Cisco's Motion also neglects to mention that prior to being acquired by Cisco, ***Acacia participated as a third-party subpoena respondent in the prior litigation*** in this Court between Ramot and Cisco.  *See, e.g.*, Complaint at ¶90; *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-cv-00225-JRG, D.I. 97 at 6 (E.D. Tex. July 8, 2020).  As here, Cisco was accused in the prior (currently stayed) case of infringing through the making, using, offering, selling, and/or importing of: its own products, products sourced from Acacia that Cisco qualified for re-sale and sold, and products that included components sourced from suppliers such as Acacia.  *See, e.g.*, *id.*, D.I. 166 at 2 ("Acacia is a supplier of DSPs included in some of the Accused Products").

***Cisco never argued that Acacia needed to be joined in the prior litigation***.  Cisco chose instead to resist production of technical material by claiming lack of control over then third-party Acacia.  *See id.*, D.I. 97 (Motion to Compel) at 6 ("Both Cisco and Acacia have objected that the other is the better source of information.").  Now that Acacia has been acquired and some of the same products are accused in this case, the only thing that has changed here is that Cisco can no longer say—with even a shred of credibility—that it lacks

knowledge of, or access to and control over, technical material about subsidiary supplier Acacia's DSPs that are sold by Cisco or incorporated into Cisco products.

Just as the prior litigation was able to proceed all the way through pre-trial disclosures with Acacia-developed products of Cisco accused and Acacia not joined as a party—so can this litigation.  For sure, Ramot expects that the acquisition and integration of Acacia into Cisco will make discovery easier to obtain—Cisco's excuses and objections in the prior litigation being even less credible now.  But joinder cannot be necessary or indispensable here, with Acacia as Cisco's subsidiary supplier, where it wasn't with Acacia as Cisco's third-party supplier.  Cisco's Motion is nothing more than a misleading further tactic in service of its desire to transfer this case away from this Court.

## III.   CISCO FAILS ITS BURDEN TO SHOW NECESSITY

Joinder of Acacia is only required under Rule 19(a) if its presence would be required for the fair and complete resolution of the dispute at issue.  Fed. R. Civ. P. 19(a); *Akoloutheo*, 2021 WL 1947343 at *1.  A party is only necessary if proceeding in their absence means that: 1) the Court "cannot accord complete relief among existing parties;" 2) the absent party's "ability to protect the[ir] interest" would be impaired; or 3) an existing party would be subject to multiple or inconsistent obligations.  Fed. R. Civ. P. 19(a)(1).

Where, as Cisco alleges here,[2] joinder would destroy jurisdiction, Rule 19(b) provides a second required inquiry.  The Court "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P.

---

[2] Ramot reserves the right to contest Cisco's unsupported assertion here that venue would impossible over Acacia in the Eastern District of Texas, should discovery reveal contrary facts. Cisco fails to meet its burden under Rule 19 here even if it is correct about venue over Acacia.

19(b).  The rule lists some of the factors that must be considered in making this determination. *Id.*  Cisco has the burden to show both that Acacia meets the criteria to be a necessary party, and then to show that Acacia is also indispensable under the Rule 19(b) factors.  *See Payan v. Cont'l Tire N. Am., Inc.*, 232 F.R.D. 587, 589 (S.D. Tex. 2005).  Cisco has failed to do both.

Cisco completely omits any discussion of the Rule 19(a) criteria.  *See* Motion at 4-6.  Instead, Cisco incorrectly suggests that it is accused vicariously for the acts of Acacia.  *Id.* at 4-5.  It is not.  As detailed above, Cisco is accused for its own acts of infringement here.  Then, Cisco refers to "primary participant" language in several cases, improperly attempting to recast that as the test for necessary party status.  *Id.* at 5-6.  But even Cisco's (not about patent infringement) seminal "primary participant" case analyzed the Rule 19(a) criteria.  *See, e.g.*, *Haas v. Jefferson Nat'l Bank of Miami Beach*, 442 F.2d 394, 398 (5th Cir. 1971) ("Applying the criterion of Rule 19(a)(2)(ii), we believe that …").

And Cisco fails to distinguish or even mention the numerous cases finding it "well-settled" that joint patent infringers "are not considered 'required' or indispensable parties under Rule 19." *Akoloutheo*, 2021 WL 1947343 at *1; *Bowman*, 2016 WL 7799625 at *2; *Nottingham*, 811 F.2d at 880; *Unisys Corp. v. Amperif Corp.*, 1994 WL 116105 at *5, fn. 15 (E.D. Pa. March 15, 1994) ("A joint infringer is not a necessary party."); *Alkot Industries, Inc. v. Takaro Co., Ltd.*, 106 F.R.D. 373, 376 (N.D. Ill. 1985).

Cisco cannot show that providing "complete relief among existing parties" Ramot and Cisco somehow requires Acacia—and does not attempt to.  Similarly, Cisco cannot, and does not attempt to, show that Acacia's interests would be impaired by this action.  And finally, Cisco cannot, and does not attempt to show that Cisco would be subject to multiple or inconsistent obligations if Acacia is not joined.  Fed. R. Civ. P. 19(a).   Acacia is not a "primary participant" in *Cisco*'s acts of infringement.

-7-

This Court has presided or is presiding over thousands of patent infringement actions in which third parties supply components or assemblies to an accused infringer who then uses and sells them. *See, e.g.*, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-cv-00225-JRG (E.D. Tex.). Cisco's proposed rule would transform every one of those thousands of suppliers from (at best) technical subpoena witnesses to being a potentially venue-destroying necessary party, based solely on their participation in product development. Cisco cites no precedent for such a result, and the Court should not find Acacia to be a necessary party here.

## IV. CISCO FAILS ITS BURDEN TO SHOW INDISPENSABILITY

Even if Acacia were necessary under Rule 19(a)—which it is not for all the reasons given above—Cisco has failed its burden to establish that "equity and good conscience" requires Acacia as a party here. In this circumstance, Rule 19(b) requires that the Court consider:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b)(1)-(4); *Akoloutheo*, 2021 WL 1947343 at *1.

Cisco treats the first three factors together, and offers only the specter of duplicative or inconsistent rulings in the declaratory judgment action that Cisco and Acacia filed at 12:01 am in Delaware hoping to escape the jurisdiction of this Court. Motion at 8-9. But if this is prejudice (it is not), it is of Cisco and Acacia's own making. Rule 19 does not exist as a mechanism to achieve a forum swap for defendants.

And in any event, parallel rulings are unlikely to occur here. Neither Ramot nor Cisco intend for both this action and the Delaware declaratory actions to proceed in parallel. Cisco has moved to transfer this case to Delaware and Ramot has opposed. *See* D.I. 20, 24. Ramot will move the Delaware court to dismiss Cisco's and Acacia's declaratory actions and transfer Ramot's infringement allegations against Cisco here.[3]

Wherever the case proceeds, any interest of Acacia in whether components that it develops and supplies to Cisco infringe the patent(s) will be adequately represented by its parent Cisco—which indisputably has substantial resources for defending itself and an interest in doing so. As mentioned above, multiple cases hold that a parent is adequate to represent the interests of a wholly-owned subsidiary in a patent litigation. *See, e.g.*, *Dainippon*, 142 F.3d at 1272 ("prejudice to an absent party is mitigated when the interests of that party are 'adequately protected by those who are present.'"); *AbbVie*, 2021 WL 3737733 at \*9 ("Where a subsidiary's interests are protected, it is not prejudiced by lack of joinder"). Cisco fails to offer any suggestion that it cannot defend the interests of its subsidiary Acacia in the process of defending its own accused infringement, or that Cisco and Acacia's interests diverge in any way.

Finally, on the fourth factor of "whether the plaintiff would have an adequate remedy," Cisco merely points again to its midnight declaratory judgment case in Delaware. Motion at 9. Of course, Cisco does not explain the lack of symmetry between its claim of prejudice if this case goes forward here, and its claim that Ramot would somehow not be prejudiced if it does not. At bottom, Cisco and Acacia prefer not to be in this Court and Ramot prefers to. To the extent there is prejudice in not getting to choose the forum, courts side with plaintiffs and are

---

[3] Ramot expects to file this motion this week, but does not know when newly-confirmed Judge Williams will be able to consider it. *See also* D.I. 20 at 10-11, 24 at 5.

"reluctant to dismiss for failure to join where doing so deprives the plaintiff of his choice of federal forum." *AbbVie*, 2021 WL 3737733 at \*10; *Askew v. Sheriff of Cook County, Ill.*, 568 F.3d 632, 634 (7th Cir. 2009) ("Dismissal, however, is not the preferred outcome under the Rules.").

In short, Cisco's defense of its own infringement here will protect any interest Acacia also has in whether the Accused Products are found to infringe. The proper forum dispute that is already briefed relative to Cisco's transfer motion also does not make Acacia an indispensable party here. Acacia is neither necessary nor indispensable and dismissal is not appropriate.

## V. CONCLUSION

For all of the reasons herein, Ramot respectfully requests that Cisco's Motion be denied, and this case proceed toward trial in this Court.

Dated: August 8, 2022                    Respectfully Submitted,

By: /s/ *S. Calvin Capshaw*

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
**CAPSHAW DERIEUX, LLP**
114 E. Commerce Ave.
Gladewater, TX 75467
Telephone: 903-845-5770
Email: ccapshaw@capshawlaw.com
Email: ederieux@capshawlaw.com

Denise De Mory
Corey Johanningmeier
**BUNSOW DE MORY LLP**
701 El Camino Real
Redwood City, CA 94063
Telephone: (650) 351-7248
Facsimile: (415) 426-4744
ddemory@bdiplaw.com
cjohanningmeier@bdiplaw.com

Attorneys for Plaintiff
**RAMOT AT TEL AVIV UNIVERSITY LTD.**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) with a copy of this document via the Court's CM/ECF system.


Dated:  August 8, 2022

By: /s/ *Corey Johanningmeier*
Corey Johanningmeier

# Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

RAMOT AT TEL AVIV UNIVERSITY )
LTD., )
       )
               Plaintiff, )
       )
              v. )
       )
CISCO SYSTEMS, INC., )
       )
              Defendant. )
       )
       )
       )
       )
       )

CIVIL ACTION NO. 2:22-cv-00168

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1.      Plaintiff Ramot at Tel Aviv University, Ltd. ("Ramot") files this complaint for

Patent Infringement against Cisco Systems, Inc. ("Cisco"), requests a trial by jury, and alleges as

follows upon actual knowledge with respect to itself and its own acts and upon information and

belief as to all other matters.

## NATURE OF ACTION

2.      This is an action for patent infringement.  Ramot alleges that Cisco infringes U.S.

Patent No. 11,342,998 ("the '998 patent" or the "Asserted Patent"), a copy of which is attached

hereto as Exhibit A.

3.      Ramot alleges that Cisco directly and indirectly infringes the Asserted Patent by

making, using, offering for sale, selling and importing optical networking transceiver modules

and line cards, and components thereof, providing advanced electro-optical modulation

techniques—including, without limitation, certain of Cisco's various optical networking

modules, line cards, and associated circuitry and software.  Ramot further alleges that Cisco induces and contributes to the infringement of others.  Ramot further alleges that Cisco's infringement is willful.  Ramot seeks damages and other relief for Cisco's infringement of the Asserted Patent.

## PARTIES

4.     Ramot is a limited liability company organized under the laws of Israel with its principal place of business at Tel Aviv University, Senate Building at Gate no. 4, George Wise Street, Tel Aviv, Israel.

5.     Ramot is the Business Engagement Center of Tel Aviv University ("TAU") and acts as the University's liaison to industry.  Ramot connects cutting-edge promising innovations at the University with the global commercial marketplace through collaboration with industry partners around the world as well as the formation of new companies.  TAU was founded in 1956 and is the largest academic and research institution in the State of Israel.  It is the most multidisciplinary with many young scientists that graduated from some of the leading research institutions around the world, which resulted in accomplishing the third highest position among the EU scientific community for the young scientist category.  Ramot provides the resources, as well as the business and legal frameworks for inventions made by TAU's faculty, students, and researchers, protecting the discoveries with IP and working jointly with industry and the venture community to bring scientific innovations to the global markets.

6.     Ramot manages a portfolio of more than 5000 patents and patent applications worldwide.  This number represents hundreds of distinct technology families of which more than 30 percent are already commercialized to multi-national companies as well as newly founded

companies.  Ramot is the owner of more than 600 granted patents of which more than 400 are United States patents.

7.      Ramot is the assignee and owner of the Asserted Patent.  The Asserted Patent is based on and claims the inventions of Dr. Yossef Ehrlichman, Dr. Amrani Ofer, and Professor Shlomo Ruschin.  Each of the inventors was affiliated with TAU's School of Electrical Engineering during the relevant time period of the inventions, and assigned his rights to the Asserted Patent to Ramot.

8.      On information and belief, Defendant Cisco is a Delaware corporation with its principal place of business at 170 West Tasman Drive, San Jose, California 95134.

9.      On information and belief, Acacia Communications, Inc. ("Acacia") is a wholly-owned subsidiary of Cisco.  Cisco completed its acquisition of Acacia on March 1, 2021 for a sum of $4.5 billion dollars.  Since at least that time, party Cisco has directed the activities of Acacia, including those detailed herein.

10.     Cisco is registered to do business in the State of Texas.

11.     On information and belief, Cisco maintains places of business and does business in Texas and in the Eastern District of Texas, *inter alia*, at its campus at 2250 East President George Bush Turnpike, Richardson, Texas 75082, and at its data center at 2260 Chelsea Blvd., Allen, Texas 75013.  Cisco's Richardson and Allen facilities were appraised and taxed together by the Collin County Appraisal District at a combined value of over $300,000,000.

12.     By registering to conduct business in Texas and by having facilities where it regularly conducts business in this District, Defendant has a permanent and continuous presence in Texas and a regular and established place of business in the Eastern District of Texas.

## JURISDICTION AND VENUE

13.     This is an action arising under the patent laws of the United States, 35 U.S.C.

§ 271, *et seq.*  Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§

1331 and 1338(a).

14.     This Court has personal jurisdiction over Cisco due, *inter alia*, to its continuous

presence in, and systematic contact with, this judicial district and its registration in Texas and

domicile in this judicial district.  Cisco is subject to this Court's jurisdiction pursuant to due

process and/or the Texas Long Arm Statute due at least to its substantial business in this State

and judicial district, including at least part of its past infringing activities, regularly doing or

soliciting business at its Richardson and Allen facilities, and engaging in persistent conduct

and/or deriving substantial revenue from goods and services provided to customers in the State

of Texas, including in the Eastern District of Texas.  Cisco directly and/or through subsidiaries

or intermediaries (including distributors, retailers, and others), has committed and continues to

commit acts of infringement in this judicial district by, among other things, making, using,

importing, offering for sale, and/or selling products and/or services that infringe the Asserted

Patent.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b), (c), (d)

and 1400(b) because Cisco has a permanent and continuous presence in, has committed acts of

infringement in, and maintains a regular and established place of business in this district.  Upon

information and belief, Cisco has committed acts of direct and indirect infringement in this

judicial district, including using and purposefully transacting business involving the Accused

Products in this judicial district such as by sales to one or more customers in the State of Texas,

including in the Eastern District of Texas, and maintains regular and established places of

business in this judicial district, as set forth above.

# FACTUAL ALLEGATIONS

## Ramot Patents

16.     Ramot is the Business Engagement Center at Tel Aviv University, Israel's
foremost research and teaching university.  Ramot's mission is to foster, initiate, lead and
manage the transfer of new technologies from the laboratory to the marketplace.  Ramot helps
commercialize promising scientific discoveries by providing the resources, business, Intellectual
Property, and legal framework for researchers—creating successful business connections
between Tel Aviv University's scientists and researchers, and technology companies ranging
from startups to Fortune 500 companies.

17.     Since 1999, Ramot has helped found more than 130 technology startup
companies.  Within the area of electronics and electro-optics, Ramot is currently affiliated with
over 70 accomplished researchers who are developing dozens of distinct cutting-edge
technologies.  Ramot owns hundreds of granted patents worldwide that span various fields of
technology.

18.     Co-Inventor Dr. Yossef Ehrlichman, received the B.Sc.(EE) and MBA degrees
from the Technion, Haifa, Israel, in 1999 and 2002, respectively.  He received the M.Sc.(EE) and
Ph.D. degrees from Tel Aviv University, Tel Aviv, Israel, in 2007 and 2015, respectively.
During his Ph.D., he worked on photonic integrated mixed signal circuits, such as photonic
digital-to-analog and analog-to-digital converters.  He co-invented a direct digital drive method
which allows the integration of digital CMOS circuits with photonic integrated modulators.
Between 2013-2015 he worked as a Radiometry Engineer at SemiConductor Devices (SCD),
Israel, developing advanced cooled-IR detectors.  Between 2015-2017 he held a position of a
Postdoctoral Research Associate at the University of Colorado Boulder investigating silicon
photonics devices and circuits for RF photonics applications.  Between 2017-2018 he held a

position of Postdoctoral Researcher at University of California San Diego, continuing his research on silicon photonic devices and circuits for RF photonics applications.  Since 2018 he is a Senior Member of the Technical Staff at Axalume, San Diego, CA, developing silicon-photonics hybrid lasers, and electronics-photonics circuits for data centers.  Dr. Ehrlichman is a senior member of the IEEE.

19.     Co-Inventor Dr. Ofer Amrani is faculty at Tel Aviv University's School of Electrical Engineering, Tel Aviv, Israel.  He received the Ph.D. degree in Electrical Engineering with honors from Tel Aviv University in November 2000.  In 1999 he co-founded CUTE-systems and served as its CTO.  In October 2001 he joined Tel Aviv University in the department of Electrical Engineering-Systems.  In 2006 he was a visiting scientist at the Dept. of Electrical Engineering, Technion-Israel Institute of Technology.  Since 2007 he has been with Tel Aviv University as a senior lecturer.  His main research interests include various aspects of digital communications; as well as optical components and new transistor architectures for interfacing between electronic and optical signals.  Dr. Amrani currently heads the Tel-Aviv University nano-satellite laboratory and led the development, construction, and recent successful launch of the University's first orbiting research satellite.  Since 1994 he has been consulting to various industrial companies.

20.     Co-Inventor and Professor Shlomo Ruschin received the B.Sc. degree in Physics and Mathematics from the Hebrew University in Jerusalem in 1969.  He continued his graduate studies at the Technion-Israel Institute of Technology in Haifa where he specialized in the fields of Lasers and Quantum Optics.  He received the M.Sc. degree in 1973 and the D.Sc. in 1977. During the period 1978-79 he completed Postdoctoral studies at Cornell University where he was involved in the research of laser diagnostics of molecules and bistability effects.  In 1980, Dr.

Ruschin joined the Department of Physical Electronics at the Faculty of Engineering of Tel Aviv University, where he presently is Professor Emeritus of Electrical Engineering.  During the years 2013-2018 he was Incumbent of the Chana and Heinrich Manderman Chair in Optoelectronics. His fields of research include Laser Physics and electro-optics, and he presently leads the Photonic Devices group at the University.  The group is dedicated to various aspects of theory and practice of wave guided devices for optical communication and sensing.  Other topics of his research interest are the shaping of coherent beams, and near-field optics.  He published more than 165 articles in reviewed periodicals in subjects related to quantum optics, electro-optics, and lasers.  In 2001, Shlomo Ruschin co-founded ColorChip Inc., a company marketing integrated optics components and high-speed optical transceivers for data centers.  During 1995-1999, Prof. Ruschin acted as Head of the Department of Electrical Engineering-Physical Electronics at Tel Aviv University.

21.     The Asserted Patent, entitled "Linearized Optical Digital-to-Analog Modulator," was duly and lawfully issued on May 24, 2022.  Ramot is the owner of all right, title, and interest in the Asserted Patent.  A true and correct copy of the Asserted Patent is attached hereto as Exhibit A.

22.     The Asserted Patent describes problems and shortcomings in the field of optical modulators for converting high speed digital data into modulated optical signals, and claims novel and inventive technological improvements and solutions to such problems and shortcomings.

23.     For example, the Asserted Patent discloses and claims methods for performing advanced modulation techniques that meet the need for "high-performance and large bandwidth" signal conversion for multi-GHz communication systems.  In one aspect of the invention, the

disclosed and claimed features enable actuating a plurality of electrodes using multiple actuating voltage levels so as to modulate the optical signal according to a QAM (Quadrature Amplitude Modulation) modulation scheme.  In another aspect of the invention, the disclosed and claimed features enable using a digital mapping of symbols to pre-equalize or compensate for known signal degradations—such as the non-linear response of modulator components.

24.     For example, the Asserted patent explains that Mach-Zehnder Interferometer modulators used in fiber-optic communications applications exhibited serious problems at higher speeds due to the "inherent non-linear response of the modulator."  The Asserted patent discloses and claims solutions to this problem that "offer improved linearity of response without sacrificing efficiency or dynamic range."  In one aspect of the invention, the disclosed and claimed features enable digital mapping of data bits to voltage values, suitable for driving modulator electrodes or for being coupled indirectly to the modulator (such as through a driver circuit or digital to analog converter), so as to select the actuation pattern that best models a desired optical signal output for a given digital input.  In this and other disclosed aspects of the invention, the mapping function, in combination with the disclosed and claimed advanced modulation techniques, enables multi-GHz optical communication with improved speed, clarity, and/or linearity.

## CISCO'S USE OF THE PATENTED TECHNOLOGY

### A.     Cisco's Acacia-Developed Optical Transceiver Modules and DSP Chips

25.     On information and belief, Cisco—on its own and through directing its wholly owned subsidiary, Acacia—makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States various coherent optical transceiver modules, as well as major components of such modules such as its Acacia-developed Digital Signal Processing ("DSP")

application specific integrated circuits ("ASICs") and Silicon Photonic integrated circuits ("ICs") suitable for use by others in building infringing optical transceiver modules. For example, Cisco makes (including by directing others including Acacia to make), uses, imports, offers, and sells embedded and pluggable coherent optical transceiver modules (and components thereof), for use in cloud datacenter interconnect, high-speed metro, long-haul, and submarine optical networks, as well as in several optical access network applications. *See, e.g.*, Applications, *available at* https://acacia-inc.com/applications/.

26.     Cisco's Acacia-developed coherent optical transceiver modules include embedded or pluggable "Multi-Haul Modules" such as the AC1200, AC400, and CIM 8 products, as well as 100G, 200G, and 400G pluggable modules in a variety of standard form factors such as CFP-DCO, CFP2-DCO, CFP2-ACO, OSFP, and QSFP-DD. *See, e.g.*, Products, *available at* https://acacia-inc.com/products/.

 

27.     Cisco also sells multiple generations of Acacia-developed DSP ASICs and Silicon Photonic ICs as standalone products. *See, e.g.*, Products, *available at* https://acacia-inc.com/products/. Cisco's customers can buy embedded or pluggable modules as a complete solution, or can "buy the DSP directly from Acacia and integrate them directly on their linecards using an Acacia-provided reference design." *See, e.g.*, DSP ASIC Products, *available at* https://acacia-inc.com/product/dsp-asic-products/. Cisco's customers can also buy the Silicon Photonic ICs used in Acacia-developed modules as a separate component, to be "Coupled with

Acacia's DSP ASIC" in their own linecard designs.  *See, e.g.*, *available at* https://acacia-inc.com/product/silicon-photonic-integrated-circuits-pic/.

28.    Cisco's Acacia-developed coherent optical transceiver modules (and components thereof) operate at speeds of 100Gbps or higher per optical wavelength.  *See, e.g.*, Product Portfolio: Powering High Speed Communications at 100G and Beyond, *available at* https://acacia-inc.com/wp-content/uploads/2018/08/Acacia-Product-Portfolio-BRO-073118-v11-WEB.pdf.  Cisco's Acacia-developed products include modules that transmit as much as 1.2Tbps on a single wavelength.  *See, e.g.*, Blog: "Introducing the AC1200-SC$^2$ Coherent 1.2T Single-Chip, Single-Channel Module," *available at* https://acacia-inc.com/blog/introducing-the-ac1200-sc2-coherent-1-2t-single-chip-single-channel-module/.



29.    Each of Cisco's currently offered Acacia-developed coherent optical transceiver modules employ advanced modulation techniques such as Quadrature Amplitude Modulation (QAM) with modulation constellations ranging from 4 (QPSK) to as many as 64 (64QAM) points.  *See, e.g.*, Acacia Unveils Industry's First Single Carrier 1.2T Multi-Haul Pluggable Module, *available at* https://acacia-inc.com/blog/acacia-unveils-industrys-first-single-carrier-1-2t-multi-haul-pluggable-module/ ("delivering 1.2T per carrier capacity for high-capacity DCI interfaces and 800G per carrier capacity over most optical links using 4 bits/symbol (~16QAM) modulation"); Product Portfolio at 3 (AC200 CFP2-DCO Product Family: "With support for 100 Gbps using QPSK modulation and 200 Gbps using either 8QAM or 16QAM, the module offers

enhanced flexibility in a pluggable coherent solution"); Whitepaper, "Network Optimization in the 600G Era," *available at* https://acacia-inc.com/acacia-resources/white-paper-network-optimization-in-the-600g-era/ ("The AC1200 uses a dual-core modem design to drive two tunable 600G C-band or L-band wavelengths from one DSP device for a total transmission capacity of 1.2Tb per module up to 64QAM"); QSFP DD Product Family, *available at* https://acacia-inc.com/product/qsfp-dd-product-family/ (400ZR QSFP-DD Pluggable Coherent Optical Module: "reaches up to 120km using 16QAM transmission"); Press Release, Acacia Communications Announces the Industry's First Coherent Flex-rate 400G 5×7 Transceiver Module ("The new AC-400 is the first Flex-Rate 400G Coherent 5×7 Transceiver Module supporting the most advanced modulation modes including 8QAM, 16QAM and QPSK"); Press Release, Acacia Communications Industry-First Coherent AC100-CFP Now Generally Available and Shipping in Volumes ("enabling single wavelength coherent 100G PM-QPSK in a CFP form factor"); Press Release, Acacia Communications Introduces CFP2-ACO Module Based on Its Silicon PIC ("Acacia's CFP2-ACO is capable of supporting both 100G DP-QPSK and 200G DP-16QAM modulation"); *see also* H. Zhang, *et al.*, Real-time transmission of 16 Tb/s over 1020km using 200Gb/s CFP2-DCO, Optics Express, Vol. 26, No. 16, Mar. 19, 2018 at Fig. 2:



Fig. 2. Evolution in power and density per 100Gbps for coherent transceiver modules.

30. With the exception of Cisco's CFP2-ACO modules, each of Cisco's currently offered Acacia-developed coherent optical transceiver modules employ one or more instances of one of the various generations of Acacia-developed DSP ASIC, integrated into the module. *See, e.g.*, Coherent Interconnect Module 8, *available at* https://acacia-inc.com/product/coherent-interconnect-module-8/ ("Powered by Jannu, our 8th-generation digital signal processor (DSP) ASIC"); OSFP Product Family, *available at* https://acacia-inc.com/product/osfp-product-family/ ("The 400G OSFP product family is based on our Greylock 7nm DSP"); QSFP-DD Product Family, *available at* https://acacia-inc.com/product/qsfp-dd-product-family/ ("based on our 7nm DSP technology"); AC1200 Product Family, *available at* https://acacia-inc.com/product/ac1200/ ("based on our Pico digital signal processor (DSP) ASIC"); CFP2-DCO Product Family, *available at* https://acacia-inc.com/product/cfp2-dco/, ("incorporates Acacia's Meru DSP ASIC"); AC400 Flex Product Family, *available at* https://acacia-inc.com/product/ac400-flex/ ("based on our Denali DSP"); *see also* Whitepaper, "Network Optimization in the 600G Era," *available at* https://acacia-inc.com/acacia-resources/white-paper-network-optimization-in-the-600g-era/ at Figure 7:



Figure 7. AC1200 simple block diagram. Shared local oscillator (LO) and Tx laser.

31.     For example, Cisco's Acacia-developed line of 400Gbps pluggable modules in

OSFP, QSFP-DD, and CFP2-DCO form factors use the latest generation of Acacia-developed

DSP ASIC and Silicon Photonic ICs to address an important application for high-speed coherent

optical links in data center interconnect and at the access edge of service provider networks. *See,*

*e.g.*, Blog, 400G Pluggables Usher in an Architectural Change to High-Bandwidth DCI,

*available at* https://acacia-inc.com/blog/400g-pluggables-usher-in-an-architectural-change-to-

high-bandwidth-dci/ ("Acacia's new 400G pluggable modules are based on its Greylock 7nm

DSP"); Video, The New Era of 400G Coherent Pluggable Solutions, *available at* https://acacia-

inc.com/acacia-resources/the-new-era-of-400g-coherent-pluggable-solutions/:



32.     The digital mapping technologies of the Asserted Patent, as practiced by Cisco's

Acacia-developed DSP ASICs, are an enabling technology for these 400Gbps coherent

transmission applications. *See, e.g.*, Presentation, Coherent Solutions Evolving Toward Edge

and Access Applications, Optinet 2020, Aug. 27, 2020 at 8, *available at* https://acacia-

inc.com/wp-content/uploads/2020/08/Optinet-2020_Coherent-Solutions-Evolving-Towards-

Edge-and-Access-Applications_Acacia.pdf (listing "Electrical compensations" for

-13-

"impairments" from, *inter alia*, "Components" among motivators for use of 400 Gbps coherent in Edge/Access applications); Whitepaper, 400ZR: Accessible 400G for Edge DCIs and Beyond, at 5, *available at* https://acacia-inc.com/wp-content/uploads/2019/07/400ZR-Market-Backgrounder_June2019-FINAL1.pdf ("However, advances in CMOS, integrated optics, coherent digital signal processor (DSP) designs, as well as DSP coding and equalization algorithms, have significantly reduced the power and size of coherent interfaces for edge DCI applications while maintaining a high level of performance"); Presentation, Coherent Optical Solutions for Data Center Interconnect, Optinet 2019, June 13, 2019, at 8, *available at* https://acacia-inc.com/wp-content/uploads/2019/06/Optinet-China-2019_Acacia_Fenghai-Liu_UpLoad_v1.pdf ("Efficient EQ for non-perfect optics"), 6 ("Spectral shaping" and "Impairment equalization" in "Advanced DSP" for "Equalization of imperfections"):



33.     Use of digital mapping for "compensating linear and non-linear impairments" is also among the important, performance-enhancing features Cisco advertises with respect to its newest DSP chips and latest transceiver modules. *See, e.g.*, Coherent Interconnect Module 8, *available at* https://acacia-inc.com/product/coherent-interconnect-module-8/ ("The Jannu DSP includes Acacia's advanced line-rate power-efficient processing algorithms to efficiently

overcome fiber transmission impairments over greenfield or brownfield fiber infrastructures by compensating linear and non-linear impairments").

34.     Cisco (on its own and through directed activities of Acacia) participates in, and advertises that its modules are interoperable with, a number of industry working group standards and implementation agreements.  For example, Acacia participated in, and advertises that its 400G pluggable modules are interoperable with, the OIF 400ZR Implementation Agreement. *See, e.g.*, QSFP-DD Product Family ("Acacia's 400Gbps 400ZR QSFP-DD coherent optical module is designed to adhere to the Optical Internetworking Forum (OIF) 400ZR Implementation Agreement"); CFP2-DCO Product Family ("Acacia's 400Gbps CFP2-DCO coherent optical module is designed with adherence to OpenROADM, OpenZR+, OIF 400ZR, as well as CableLabs specifications"); *see also* Optical Interface Forum, Implementation Agreement 400ZR, OIF-400ZR-01.0, March 10, 2020 at 99, *available at* https://www.oiforum.com/wp-content/uploads/OIF-400ZR-01.0_reduced2.pdf.

35.     Cisco's Acacia-developed CFP2-ACO module is designed to be used with an external DSP ASIC on a linecard.  *See, e.g.*, CFP2-ACO Product Family, *available at* https://acacia-inc.com/product/cfp2/.  It can be used in this configuration with Cisco's Acacia-developed standalone DSP ASICs.  In that configuration, the combination of CFP2-ACO module and DSP ASIC would infringe the Asserted Patent, for the same reasons discussed herein that Cisco's Acacia-developed integrated CFP2-DCO modules (with an Acacia-developed Meru DSP ASIC built into the module) infringe.

36.     Each of Cisco's currently offered Acacia-developed coherent optical transceiver modules employ Silicon Photonics optical modulator ICs developed by Acacia.  *See, e.g.*, Coherent Interconnect Module 8, *available at* https://acacia-inc.com/product/coherent-

interconnect-module-8/ ("It combines the 5nm CMOS Jannu DSP with our 3D Siliconization packaging technology which includes the silicon photonics integrated circuit (SiPh PIC), high-speed modulator driver and transimpedance amplifier (TIA) in a single opto-electronic package"); OSFP Product Family, *available at* https://acacia-inc.com/product/osfp-product-family/ ("our silicon photonic integrated circuit (PIC)"); QSFP-DD Product Family, *available at* https://acacia-inc.com/product/qsfp-dd-product-family/ ("our silicon photonic integrated circuit (PIC)"); AC1200 Product Family, *available at* https://acacia-inc.com/product/ac1200/ ("Key Acacia technologies include:" "Highly integrated silicon photonics circuit that supports high baud rates while reducing interconnect costs"); CFP2-DCO Product Family, *available at* https://acacia-inc.com/product/cfp2-dco/, ("Acacia's silicon PIC"); AC400 Flex Product Family, *available at* https://acacia-inc.com/product/ac400-flex/ ("Leveraging our dual-core Denali DSP and in-house silicon PIC technology"); CFP2-ACO Product Family, *available at* https://acacia-inc.com/product/cfp2/ ("Acacia's CFP2-ACO is our fourth Acacia product family to utilize its integrated coherent silicon PIC"); CFP-DCO Product Family, *available at* https://acacia-inc.com/product/cfp-dco/ ("The integration of power saving DSP technology and silicon photonic integrated circuit (PIC) technologies has allowed Acacia to optimize the balance of power and performance"); *see also* Silicon Photonic Integrated Circuits (PICs), *available at* https://acacia-inc.com/product/silicon-photonic-integrated-circuits-pic/:



-16-

37.     Cisco's Acacia-developed Silicon Photonic Integrated Circuits employ multiple

Mach-Zehnder optical modulators.  *See, e.g.*, L. Chen, *et al.*, Silicon Photonics for 100G-and-

beyond Coherent Transmissions, OFC 2016 at 1 ("The chip includes 4 carrier- depletion Mach-

Zehnder modulators"), Figs 1(a)-(d):



Fig. 1. Silicon coherent PIC and modules. (a) Block diagram of a silicon single chip transceiver excluding laser. (b) Gold box with the silicon PIC packaged with drivers, transimpedance amplifiers, fiber array, and other components. (c) Acacia's coherent CFP with the silicon PIC and ASIC. (d) Acacia's dual-carrier with one ASIC and two silicon PICs.

*See also* C. Doerr, *et al.*, Single-Chip Silicon Photonics 100-Gb/s Coherent Transceiver, OFC

Postdeadline 2014 ("On the transmitter side, there are two in-phase (I) / quadrature (Q) traveling

wave Mach-Zehnder modulators (MZMs)"); H. Zhang, *et al.*, Real-time transmission of 16 Tb/s

over 1020km using 200Gb/s CFP2-DCO, Optics Express, Vol. 26, No. 16, Mar. 19, 2018 at 2,

*available at* https://acacia-inc.com/wp-content/uploads/2018/03/Optics-Express-26-6-6943.pdf

("The CFP2-DCO module . . . integrates a tuneable narrow-linewidth laser, a single-chip silicon

photonic integrated circuit for quad-parallel Mach-Zehnder modulators"); Presentation, Coherent

Optical Solutions for Data Center Interconnect, Optinet 2019, June 13, 2019 at 6, *available at*

https://acacia-inc.com/wp-content/uploads/2019/06/Optinet-China-2019_Acacia_Fenghai-

Liu_UpLoad_v1.pdf (image detail below):



38.    Cisco's Acacia-developed coherent optical transceiver modules (and DSP ASIC

components thereof) achieve optical networking transport speeds of 100 Gbps and above by

employing the digital signal mapping techniques of the Asserted Patent.  Mapping of the digital

symbols prior to transmission to pre-equalize or compensate for modulator non-linearity and

other such signal degradations is necessary at the high per-lane speeds and extended reaches at

which Cisco's Acacia-developed products operate.  Accordingly, Cisco's various generations of

Acacia-developed DSP ASIC perform multiple digital mappings according to the claims of the

Asserted Patent, in order to implement these digital pre-compensation functions. *See, e.g.*, H.

Zhang, *et al.*, "Real-time Transmission of Single-Carrier 400 Gb/s and 600 Gb/s 64QAM over

200km-Span Link," ECOC 2019 at 1 ("High-baud rate 64QAM is intrinsically more susceptible

to noise as well as linear and nonlinear distortions from analog electrical and optical

components.  Transmitter pre-distortion effectively improves the performance of high-baud rate

64QAM."), 2 ("digital pre-distortion"); 2 ("The ASIC includes . . . a DSP engine which performs

pulse shaping and pre-equalization on the transmitter side"), Fig. 1.:



Fig. 1. (a) Coherent transciver and (b) silicon-photonics integrated citucits, (c, d) Received 64 QAM constellation in X- and Y- polarizations at 69 GBd

39.     For example, Cisco advertises that its Acacia-developed AC1200 module and Pico DSP ASIC perform "3D Shaping" on transmit modulation constellation points. *See, e.g.*, AC1200 Product Family, *available at* https://acacia-inc.com/product/ac1200/ ("A primary capability of the AC1200 family is 3D-Shaping which enables fine-tune adjusting of the line-side modulation characteristics helping network operators optimize capacity and reach for their particular network or link"); Blog, Get in Shape with the AC1200, *available at* https://acacia-inc.com/blog/get-in-shape-with-the-ac1200/; Whitepaper, Optimize Network Utilization with 3D Shaping, *available at* https://acacia-inc.com/wp-content/uploads/2018/05/Optimize-Network-Utilization-with-Acacia-3D-Shaping.pdf ("3D Shaping enables fine-tune adjusting of the line-side coherent modulation characteristics"):



These digital shaping adjustments utilize the claimed digital mapping of the Asserted Patent.

40.     Cisco's publications and product marketing material emphasize the capability of its Acacia-developed DSP ASICs to perform digital pre-equalization or compensation of signals to be transmitted—to correct for non-linearity and other known signal degradations. *See, e.g.*, H. Zhang, *et al.*, "Real-time Transmission of Single-Carrier 400 Gb/s and 600 Gb/s 64QAM over 200km-Span Link," ECOC 2019 at 1 ("susceptible to noise as well as linear and nonlinear distortions from analog electrical and optical components. Transmitter pre-distortion effectively improves the performance"); Whitepaper, "Network Optimization in the 600G Era," *available at* https://acacia-inc.com/acacia-resources/white-paper-network-optimization-in-the-600g-era/ (discussing use of features such as "nonlinear equalization" to "provide additional system margin improvement"); H. Zhang, *et al.*, Real-time transmission of 16 Tb/s over 1020km using 200Gb/s CFP2-DCO, Optics Express, Vol. 26, No. 16, Mar. 19, 2018 at 3, *available at* https://acacia-inc.com/wp-content/uploads/2018/03/Optics-Express-26-6-6943.pdf ("The ASIC includes . . . a DSP engine which performs pulse shaping and pre-equalization on the transmitter side"); Presentation, Coherent Optical Solutions for Data Center Interconnect, Optinet 2019, June 13, 2019, at 6, *available at* https://acacia-inc.com/wp-content/uploads/2019/06/Optinet-China-2019_Acacia_Fenghai-Liu_UpLoad_v1.pdf (highlighting digital "Impairment equalization" in the Acacia-developed DCP ASIC for "Equalization of imperfections" in the signal path):



41.     Cisco has specifically highlighted the benefits received from use of the inventions of the Asserted Patent for signal compensation, marketing its use of DSP technology to provide a "better algorithm to mitigate or compensate the penalty from those [photonic and RF] components."  *See, e.g.*, Video, Acacia Talks Coherent: Hongbin Zhang and Digital Signal Processing, *available at* https://acacia-inc.com/acacia-resources/acacia-talks-coherent-hongbin-zhang-and-digital-signal-processing/ (last accessed Feb. 4, 2022).  A screenshot from this marketing video on Acacia's commercial website highlights "3D Shaping" and "Non-linear compensation" as key benefits of its DSP technology:



  *See also* Whitepaper: 100GBaud+ Silicon Photonics Solutions Drive Optical Network Evolution, *available at* https://acacia-inc.com/wp-content/uploads/2020/12/100GBaud-Silicon-Photonics-Solutions-Drive-Optical-Network-Evolution.pdf (noting need for "techniques to mitigate opto-electronic RF signal impairments").  These features are made possible through Cisco's infringement of the Asserted Patent.

  42. As described above, and detailed with respect to patent claims below, Cisco's Acacia-developed infringing coherent optical transceiver modules (and DSP ASIC and Silicon Photonic IC components thereof) (the "Acacia Accused Products") support advanced mapping and modulation techniques according to the Asserted Patent—including without limitation digital mapping to provide digital pre-equalization, pre-distortion, shaping, and non-linearity compensation, and modulation by varied quadrature modulation formats (*e.g.*, QPSK, 8QAM, 16QAM, 32QAM, 64QAM, etc.).

43.     Cisco's Acacia Accused Products include, but are not limited to: 100, 200, and 400 Gbps pluggable CFP-DCO and CFP2-DCO modules; 1.2T (AC1200) and 400G (AC400) embedded modules; CIM8 pluggable modules; 400 Gbps OSFP and QSFP-DD pluggable modules that operate relative to 400ZR or OpenZR+ industry implementation agreements; and 100G QSFP-DD pluggable modules; as well as any similarly capable products under development by Acacia.  Cisco's Acacia Accused Products also include Acacia-developed CFP2-ACO modules to the extent they are used with an Acacia- or Cisco-developed DSP ASIC on a linecard.  Cisco is also accused of directly infringing via its reference and test designs, and indirectly infringing by inducing or contributing to its customer's designs—that implement one of Cisco's Acacia-developed Denali, Meru, Pico, Greylock, or Jannu DSP ASICs coupled together with one of Cisco's Acacia-developed Silicon Photonic ICs.

44.     Cisco (on its own and through directing its wholly owned subsidiary Acacia) makes, uses, offers to sell, sells (including directly to end users and as an original equipment manufacturer to resellers), and/or imports into the United States the Acacia Accused Products.  On information and belief, Cisco (on its own and through directing its wholly owned subsidiary Acacia) also uses the Accused Products during testing in the United States and uses and offers the Accused Products during demonstrations and trials with customers and partners and through the activities of its Sales team and its Field and Systems Applications Engineers.  Cisco (on its own and through directing its wholly owned subsidiary Acacia) further uses and offers its Accused Products at industry trade shows and demonstrations to existing or potential customers.  *See, e.g.*, Blog: "Introducing the AC1200-SC$^2$ Coherent 1.2T Single-Chip, Single-Channel Module," *available at* https://acacia-inc.com/blog/introducing-the-ac1200-sc2-coherent-1-2t-single-chip-single-channel-module/; Blog, Aloha PTC '19 – Acacia Prepares to Hang-10 at the

annual Pacific Telecommunications Council event, *available at* https://acacia-inc.com/blog/aloha-ptc-19-acacia-prepares-to-hang-10-at-the-annual-pacific-telecommunications-council-event/.

### B. Cisco Optical Transceiver Modules and Line Cards

45.     On information and belief, Cisco makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States various networking equipment including routers and switches.  For example, Cisco makes, uses, and sells converged networking routers and switches, for use in high-speed local, metro, and wide-area networks, that include high-speed optical networking ports.  In addition, Cisco sells datacenter and cloud switches that include high-speed optical networking ports.

46.     Many of these Cisco router and switch products include line cards and associated optical transceiver modules that together enable high-speed optical communications of 100 Gbps or higher per port.  *See, e.g.*, Cisco Brochure c02-741700, "The Next Frontier for Cloud Networking: Cisco Nexus 400G" (Jan. 2019), *available at* https://www.cisco.com/c/dam/en/us/solutions/collateral/data-center/high-capacity-400g-data-center-networking/brochure-c02-741700.pdf; Cisco Datasheet c78-729222, "Cisco Network Convergence System 4000 Series" (Nov. 2018), *available at* https://www.cisco.com/c/en/us/products/collateral/optical-networking/network-convergence-system-4000-series/data_sheet_c78-729222.pdf; Cisco Datasheet c78-741560, "Cisco Nexus 9300-GX Series Switches" (July 2021), *available at* https://www.cisco.com/c/en/us/products/collateral/switches/nexus-9000-series-switches/nexus-9300-gx-series-switches-ds.pdf; Cisco Datasheet c78-742571, "Cisco 8000 Series Routers Data Sheet" (Sept. 2021), *available at*

https://www.cisco.com/c/en/us/products/collateral/routers/8000-series-routers/datasheet-c78-742571.pdf:



47.     Cisco's various routers and switches include line cards, including removable blades and built-in circuit boards, that include functionality to provide digital signal processing for various optical networking ports, including Optical Transport Network (OTN) or Ethernet ports operating at speeds up to and including 100, 200, and 400 Gbps.  *See, e.g.*, Cisco Datasheet c78-736495, "Cisco NCS 4000 400 Gbps DWDM/OTN/Packet Universal Line Card" (Sept. 2017), *available at* https://www.cisco.com/c/en/us/products/collateral/optical-networking/network-convergence-system-4000-series/datasheet-c78-736495.pdf ("Up to 2x 200 Gbps Dense Wavelength-Division Multiplexing (DWDM) wavelengths using the CFP2 ports"); *see also* Cisco Datasheet c78-741557, "Cisco Nexus 3432D-S Switch" (Apr. 2019), *available at* https://www.cisco.com/c/en/us/products/collateral/switches/nexus-3000-series-switches/datasheet-c78-741557.pdf ("Each QSFP-DD port can operate at 400, 100, 50, 40, and 25 Gbps"); Cisco Datasheet c78-2463203, "Cisco Network Convergence System 1004 800G QSFP-DD Transponder Line Card" (Sept. 2021), *available at* https://www.cisco.com/c/en/us/products/collateral/optical-networking/network-convergence-

system-1000-series/network-convergence-system-1004-800g-ds.pdf; Cisco Datasheet c78-239132, "Cisco NCS 2000 1.2 Tbps DWDM Line Module" (Aug. 2021), *available at* https://www.cisco.com/c/en/us/products/collateral/optical-networking/network-convergence-system-2000-series/datasheet-c78-2391320.pdf; Cisco Datasheet c78-742016, "Cisco Network Convergence System 5700 Series: 400GE and 100GE Line Cards Data Sheet" (Jan. 2022), *available at* https://www.cisco.com/c/en/us/products/collateral/routers/network-convergence-system-5500-series/datasheet-c78-742016.pdf; Cisco Datasheet c78-742571, "Cisco 8000 Series Routers Data Sheet" ("36-port QSFP56-DD 400 GbE line card"):



Figure 10.
36-port QSFP56-DD 400 GbE line card

48.     Cisco makes, uses, and/or sells various optical transceiver modules for use with the optical networking ports on its routers and switches. *See, e.g.*, Cisco Datasheet c78-736495 at 2 ("CFP2 ACO pluggables"); Cisco Datasheet c78-741557 at 3 ("The Cisco Nexus 3400-S are Quad Small Form factor pluggable – Double Density (QSFP-DD) platforms that support the full range of optical transceviers [sic]"); Cisco Brochure c02-741700 at 2 ("400G optics: QSFP-DD" and "QDD-400G-FR4-S"); Cisco Product Brief c45-740242, "Cisco 40/100Gb QSFP100 BiDi Pluggable Transceiver" (Feb. 2018), *available at* https://www.cisco.com/c/en/us/products/collateral/interfaces-modules/transceiver-modules/at-a-

glance-c45-740242.pdf.  *See also* Cisco Datasheet c78-744377, "Cisco 400G Digital Coherent

Optics QSFP-DD Optical Modules Data Sheet" (Oct. 2021), *available at*

https://www.cisco.com/c/en/us/products/collateral/interfaces-modules/transceiver-

modules/datasheet-c78-744377.pdf; Cisco Datasheet c78-743172, "Cisco 400G QSFP-DD Cable

and Transceiver Modules Data Sheet" (Jan. 2022), *available at*

https://www.cisco.com/c/en/us/products/collateral/interfaces-modules/transceiver-

modules/datasheet-c78-743172.pdf; Cisco Datasheet c78-73628, "Cisco 100GBASE QSFP-

100G Modules Data Sheet" (Aug. 2021), *available at*

https://www.cisco.com/c/en/us/products/collateral/interfaces-modules/transceiver-

modules/datasheet-c78-736282.pdf.

49.     These optical transceiver modules are sold in a variety of configurations, varying

in form factor, communication speed, optics supported, and type of modulator employed.

Numerous variations of these transceiver modules operating at speeds of 100Gbps and above,

along with associated digital signal processing functionality in the modules and/or on the

associated line cards, infringe the Asserted Patent, as further detailed herein.

50.     Cisco participates in and leads various industry standards, multi-vendor

implementation agreements, and specification efforts to define the physical form factor,

operation, requirements, and capabilities of its optical transceiver modules.  For example, the

CFP2 ACO pluggable modules used, *inter alia*, with the NCS 4000 400 Gbps

DWDM/OTN/Packet Universal Line Card, are defined and specified in part in Optical

Internetworking Forum, OIF-CFP2-ACO-01.0, Implementation Agreement for Common Analog

Coherent Optics Module (Jan. 22, 2016)  Cisco's QSFP-DD and other modules are also defined

in various industry standards and implementation agreements in which Cisco participates, such

as the 100G Lambda MSA Group's 100G-FR, 100G-LR, and 400G-FR4 Technical

Specifications, Rev 2.0 (Sept. 18, 2018), and the QSFP-DD MSA's Common Management

Interface Specification, Rev 3.0 and Hardware Specification, Rev 4.0 (Sept. 18, 2018), as well as

related IEEE standards and standardization efforts.  Cisco promotes these industry standards and

implementation agreements, and their resulting specifications, including on its website and blogs.

     51.    Cisco's infringing products achieve optical networking transport speeds of 100

Gbs and above by employing the advanced modulation techniques and digital mapping of the

Asserted Patent, including via signal processing in its line cards and/or optical transceiver

modules.  *See, e.g.*, Cisco Datasheet c78-736495 at 2 ("The NCS 4000 Universal line card also

provides two 200 Gbps 16-QAM DWDM Long Haul transmission ports through the CFP2 ACO

pluggables" and "latest generation of Digital Signal Processor (DSP) technology dramatically

increases the performance of 100 Gbps QPSK and 200 Gbps 16-QAM optical transport"); Cisco

Datasheet c78-741557 at 3 ("The Cisco Nexus® 3400-S is the first 400G programmable switch

series in the Nexus 3000 portfolio with 50 Gbps PAM4 Serial-Deserializers (SerDes), and is

designed for data centers with industry-leading performance-per-watt power efficiency at low

latency");  Cisco Product Brief c45-740242 at 1 ("PAM4 optical modulation"); Cisco Datasheet

c78-728110, "Cisco CPAK 100GBASE Modules Data Sheet" (Aug. 2021), *available at*

https://www.cisco.com/c/en/us/products/collateral/interfaces-modules/transceiver-

modules/data_sheet_c78-728110.pdf ("The Cisco CPAK-100G-FR Module supports link lengths

of up to 2 km over a standard pair of G.652 Single-Mode Fiber (SMF) with duplex LC

connectors.  The 100 Gigabit Ethernet optical signal is carried over a single wavelength using a

PAM4 (Pulse-Amplitude Modulation 4-Level) modulation scheme.").

52.      Cisco has publicly acknowledged and endorsed the need for, and adoption of, the advanced modulation techniques of the Asserted Patent in order to achieve data rates of 100 Gbps and higher using fewer lines or channels.  *See, e.g.*, Cisco Blog SP360: Service Provider, "PAM4 for 400G Optical Interfaces and Beyond (Part 1)," *available at* https://blogs.cisco.com/sp/pam4-for-400g-optical-interfaces-and-beyond-part-1 ("In order to avoid costly electrical and optical design, there has been a recent revival of research on coherent technology and multi-level modulation formats to achieve greater than 25G channel rates.  4-level pulse amplitude modulation (PAM4), a relatively low-cost solution, has been adopted in the transceiver industry, enabling high-speed data rates, toward 400G and beyond."); Solution Overview: "Single-Lambda 100G Pluggable Optics Solution Overview" (June 2021), *available at* https://www.cisco.com/c/en/us/products/collateral/interfaces-modules/transceiver-modules/solution-overview-c22-743387.pdf.  Cisco's optical transceivers homepage touts infringing technologies that it developed, and also acquired from Acacia, such as Silicon Photonics, Pluggable Coherent Optics, and 100G PAM4 "single lambda" transceivers.  *See* "Cisco Optics," at https://www.cisco.com/c/en/us/products/interfaces-modules/transceiver-modules/index.html (last visited February 6, 2022).

53.      The advanced digital mapping techniques of the Asserted Patent are key features of products crucial to Cisco's optical networking platforms.  For example, Cisco advertises the Pluggable Coherent Optics it acquired from Acacia—which on information and belief use the digital mapping techniques of the Asserted Patent—as an enabling technology for Cisco's "Routed Optical Networking" initiative.  "Pluggable Coherent Optics for Routed Optical Networking At-a-Glance" (Feb. 2021), *available at*

https://www.cisco.com/c/en/us/products/collateral/interfaces-modules/transceiver-modules/at-a-glance-c45-744704.pdf ("TX filter shaping").

54.     Cisco's "Routed Optical Networking" homepage describes how: "Routers are connected hop-by-hop with standardized pluggable coherent optics."  *See, e.g.*, Cisco Routed Optical Networking, https://www.cisco.com/c/en/us/solutions/service-provider/routed-optical-networking/index.html (last visited Feb. 6, 2022);  Blog: "Routed Optical Networking – It's About the Architecture" (Nov. 9, 2021), *available at* https://blogs.cisco.com/sp/routed-optical-networking-its-about-the-architecture ("Pluggable Coherent Optics:  With advances in silicon and silicon photonics, we are now able to deliver 400G coherent wavelengths in a pluggable that may be plugged directly into the router. . . . It is our conviction around the value of pluggable coherent optics to our customers that led Cisco to acquire Acacia in March 2021.");  Blog: "650,000+ Coherent Ports Shipped by Cisco and Acacia" (June 3, 2021), *available at* https://blogs.cisco.com/sp/650000-coherent-ports-shipped-by-cisco-and-acacia;  Cisco Annual Report – 2021 at 3, *available at* https://www.cisco.com/c/dam/en_us/about/annual-report/cisco-annual-report-2021.pdf ("We launched a new routed optical networking solution integrating our scalable, high-performance routers and Acacia's pluggable optics, which offers significant cost savings.  We are also significantly expanding our footprint with our webscale customers as they begin their 400G upgrade cycles.").

55.     As described above, the coherent pluggable optics that Cisco paid $4.5 billion to acquire from Acacia use the digital mapping techniques of the Asserted Patent to provide digital pre-equalization, pre-distortion, shaping, and non-linearity compensation.  *See also* Cisco Datasheet c78-744377, "Cisco 400G Digital Coherent Optics QSFP-DD Optical Modules Data Sheet" (Oct. 2021), *available at* https://www.cisco.com/c/en/us/products/collateral/interfaces-

modules/transceiver-modules/datasheet-c78-744377.pdf ("multiple configuration options in terms of Modulation scheme, TX filter shaping" and "signal shaping"); Cisco Datasheet c78-743732, "Cisco Digital CFP2-DCO Coherent Optical Module Data Sheet" (June 2021), *available at* https://www.cisco.com/c/en/us/products/collateral/interfaces-modules/transceiver-modules/datasheet-c78-743732.pdf.

56.     Cisco's infringing products also achieve optical networking transport speeds of 100 Gbs and above by employing the digital signal mapping techniques of the Asserted Patent. Mapping of the digital symbols to correct for modulator non-linearity and other such signal degradations is necessary at the high per-lane speeds at which the infringing products operate. Industry standards, including for example the IEEE 802.3bs-2017 standard amendment, have included, *inter alia*, transmitter linearity and signal quality requirements and tests in recognition of this need.  *See* IEEE Standard for Ethernet, "Amendment 10: Media Access Control Parameters, Physical Layers, and Management Parameters for 200 Gb/s and 400 Gb/s Operation," IEEE Std 802.3bs-2017 at §§ 120D.3.1.1 - 120D.3.1.8.  Cisco's infringing products comply with these and similar transmission signal quality requirements, including through the use of the digital signal mapping techniques of the Asserted Patent.

57.     Cisco's infringing transceiver modules and associated DSP functionality (the "Cisco Accused Products")[1] support advanced mapping and modulation techniques, including without limitation Quadrature Modulation (*e.g.*, 16-QAM) and Pulse Amplitude Modulation (*e.g.*, PAM4).  The Accused Products include, but are not limited to: 100, 200, and 400 Gbps pluggable coherent modules, including CFP2-ACO and CFP2-DCO modules, and QSFP-DD or

---

[1] Cisco's Acacia Accused Products described above are also Cisco Accused Products now that Acacia has been acquired by and is wholly owned by Cisco.  They are listed as separate categories of Accused Product here simply for convenience of reference.

OSFP format 400G ZR modules; 100 Gbps and higher-speed embedded coherent modules; 100, 200, and 400 Gbps QSFP28, QSFP56 and QSFP-DD pluggable modules, including modules that operate at speeds at or above 50 Gbps per optical or electrical lane; "BiDi" modules that communicate at or above 100 Gbps, including 100G BiDi or 400G BiDi products; 100G "single lambda" modules that communicate according to the 100G-FR, 100G-LR, 400G-FR4, or similar Technical Specifications; and other modules that include similar functionality, along with the associated digital signal processing functionality, whether implemented in the module itself or in an associated circuit or processor.

58.     Examples of Cisco Accused Products currently offered for sale on Cisco's website include, but are not limited to:  CFP2-ACO pluggable transceivers (*e.g.*, ONS-CFP2-WDM); CFP2-DCO pluggable transceivers (*e.g.*, CFP2-WDM-DETS-1HL, CFP2-WDM-DS-1HL, CFP2-LIC-UPG-200G); 400G ZR coherent pluggable transceivers (*e.g.*, QDD-400G-ZR-S, QDD-400G-ZRP-S); Single-lambda CPAK transceivers, *e.g.*, CPAK-100G-FR; 40/100G "BiDi" transceivers, *e.g.*, QSFP-40/100G-SRBD; 100G single-lambda QSFP transceivers (*e.g.*, QSFP-100G-DR-S, QSFP-100G-FR-S, QSFP-100G-LR-S, QSFP-100G-ELR-S); and 400G pluggable QDFP56 or QSFP-DD transceiver modules (*e.g.*, QDD-400G-DR4-S, QDD-400G-FR4-S, QDD-400G-LR4-S, QDD-400G-LR8-S, QDD-4x100G-FR-S, QDD-4x100G-LR-S, QDD-400-AOCxM).

59.     In addition, Cisco Accused Products include Cisco's numerous line cards and systems with embedded coherent transceivers, such as the Cisco NCS 2000 200-Gbps Multirate DWDM Line Card (*e.g.*, NCS2K-200G-CK-C=), the NCS1004 system, C-Band 1.2T Transponder Line Card, L-Band Transponder Line Card, and 800G QSFP-DD Transponder Line Card (*e.g.*, NCS1K4-1.2T-K9=, NCS1K4-1.2TL-K9=, NCS1K4-2-QDD-C-K9=).  *See, e.g.*,

Cisco Datasheet c78-733699, "Cisco NCS 2000 200-Gbps Multirate DWDM Line Card Data Sheet" (July 2015), *available at* https://www.cisco.com/c/en/us/products/collateral/optical-networking/network-convergence-system-2000-series/datasheet-c78-733699.pdf; Cisco Datasheet c78-744554, "Cisco Network Convergence System 1004 C-Band 1.2T Transponder Line Card Data Sheet" (July 2021), *available at* https://www.cisco.com/c/en/us/products/collateral/optical-networking/network-convergence-system-1000-series/datasheet-c78-744554.pdf:



Figure 1.
Cisco NCS 1004 1.2T C band line card

60.    In addition, Cisco Accused Products include Cisco's numerous line cards and systems with embedded DSP circuitry and slots for pluggable optics such as CFP2-ACO transceivers, such as the NCS 1002 system (*e.g.*, NCS 1002-K9=); Cisco NCS 2000 series, 400 Gbps XPonder Card (*e.g.*, NCS2K-400G-XP=), the NCS 4000 series, 400 Gbps DWDM/OTN/Packet Universal Line Card (*e.g.*, NCS4K-4H-OPW-QC2=), the Cisco NCS 5500 series, 1.2-Tbps IPoDWDM Modular Line Card (*e.g.*, NC55-6x200-DWDM-S), or the Cisco 9000 Series Routers, 400G and 200G Modular Line Cards (*e.g.*, A9K-MOD400-SE line card with A9K-MPA-2X100GE modular port adaptor).  *See*, *e.g.*, Cisco Datasheet c78-736916, "Cisco NCS 2000 400 Gbps XPonder Line Card Data Sheet" (Jan. 2021), *available at*

https://www.cisco.com/c/en/us/products/collateral/optical-networking/network-convergence-system-2000-series/datasheet-c78-736916.pdf:



**Figure 1.**
Cisco NCS 2000 400 Gbps XPonder

61.     Cisco makes, uses, offers to sell, sells (including by technology leases to its customers), and/or imports into the United States the Accused Products.  On information and belief, Cisco also uses the Accused Products during testing in the United States and uses and offers the Accused Products during demonstrations and trials with customers and partners and through the activities of its Sales team and its Field and Systems Applications Engineers.  Cisco further uses and offers its Accused Products at industry trade shows and demonstrations to existing or potential customers.  *See, e.g.*, Cisco Blog, SP360: Service Provider, "OFC 2017 Demo: Cisco 400GbE Optical Module," *available at* https://blogs.cisco.com/sp/ofc-2017-demo-cisco-400gbe-optical-module; Cisco Blog, SP360: Service Provider, "Cisco Optics On Display and Demonstrated at OFC 2018," *available at* https://blogs.cisco.com/sp/cisco-optics-on-display-and-demonstrated-at-ofc-2018 ("live demo of the QSFP-DD form factor for 400G optical interfaces" and "dual-rate 40/100 Gb QSFP BiDi transceiver"); Cisco Blog, SP360: Service Provider, "Cisco Optics Demos and Displays at OFC 2019," *available at*

-34-

https://blogs.cisco.com/sp/cisco-optics-demos-and-displays-at-ofc-2019 ("100G 1-λ Silicon Photonics For 10km. Cisco's silicon photonics will be on display in a live demo, showing single-lambda PAM4 performance over 10km of duplex SMF.").

## COUNT I
## (INFRINGEMENT OF U.S. PATENT NO. 11,342,998)

62. Ramot repeats and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

63. Cisco (on its own and through directing its wholly owned subsidiary Acacia) makes, uses, sells, and/or offers to sell in the United States, and/or imports into the United States products that directly infringe the Asserted Patent, including Cisco's above identified Cisco Accused Products and Acacia Accused Products that use advanced PAM modulation (*i.e.*, PAM4) or QAM modulation techniques (QPSK, 8-QAM, 16-QAM, 64QAM, etc.), as well as digital mapping of data for, *inter alia*, equalization, pre-distortion, shaping, or compensation of the transmitted signal ("Accused Products"). Cisco's Accused Products that use advanced modulation techniques and digital mapping infringe one or more claims of the Asserted Patent, including without limitation, claim 1 of the Asserted Patent.

64. The Accused Products comprise an optical modulation system. For example, and without limitation, see the evidence cited and discussed above, including with respect to paragraphs 26, 29, 36-37, 48, 51, and 57.

65. The Accused Products comprise an input for a plurality of N digital input data bits. Cisco's coherent optical transceiver modules manipulate digital data in the form of multi-bit words or symbols, which is converted, modulated, and transmitted as optical signals. For example, and without limitation, on information and belief Cisco's DSP ASICs take in, and

operate internally, on parallel digital data words. *See, e.g.*, Presentation, Coherent Optical

Solutions for Data Center Interconnect, Optinet 2019, June 13, 2019, at 6:



*see also* Whitepaper, "Network Optimization in the 600G Era," at Figure 7:



Cisco's various transceiver modules and DSP ASICs accept parallel digital data from a host

interface and then operate internally on multi-bit symbols. *See, e.g.*, OIF-400ZR-01.0 at 5

("1x400GAUI-8"):



**Figure 1: 400ZR reference diagram**

*See also id.* at 18, 48 ("Each 128-bit code word is mapped to 16 DP-16QAM symbols (S)"), Fig. 6.

66.    As an additional example, Cisco's optical routers and switches include line cards and modules that manipulate digital data in the form of multi-bit words or symbols, which is converted and transmitted as optical signals.  For example, and without limitation, Cisco's Network Convergence System (NCS) 4000 Series products route and switch packet-based digital data and provide optical transmission for transport across networks.  *See, e.g.*, Cisco Datasheet c78-729222 at Figure 1:



**Figure 1.    Cisco NCS 4016 Chassis (Right) and NCS 4009 Chassis (Left)**

.

*See also* Cisco Datasheet c78-736495 at Figure 1:



Figure 1.    Cisco® NCS 4000 400 Gbps WDM/OTN/Packet Universal Line Card

*Id.* at 2 ("The NCS 4000 Universal line card also provides two 200 Gbps 16-QAM DWDM Long Haul transmission ports through the CFP2 ACO pluggables."); Cisco Datasheet c78-741079, "Cisco Digital CFP2 Pluggable Optical Module" (July 2018) at Figure 1:.



Figure 1.    Difference between analog and digital CFP2 modules

67.     As an additional example, Cisco's Nexus 400G products switch digital data and provide optical transmission for transport across networks, including within advanced data centers. *See, e.g.*, Cisco Brochure c02-741700; Cisco Datasheet c78-741557 at 3, Figure 1:



**Figure 1.**
Cisco Nexus 3432D-S Switch

Cisco Blog, "OFC 2017 Demo: Cisco 400GbE Optical Module":



*QSFP-DD Form Factor*

*See also* Cisco Product Brief c45-740242 at 2 ("In 100Gb mode, it operates 50Gb PAM4 channels, for a total aggregate bandwidth of 100Gb. PAM4 technology enables 50Gb data rate with signaling at 25Gbaud rates. The 40/100G BiDi contains a gearbox to translate the signal from a 4x25G format, native to the QSFP28 form factor, to the 2x50Gb format for the optical domain. It also employs onboard forward-error-correction (FEC) to reduce bit error rate."), Figures 1 and 2:



68.     The Accused Products comprise an input optical signal.  As described above, the

Silicon Photonic optical modulators of Cisco's Acacia Accused Products have a plurality of

waveguide branches, where each branch has an input of an unmodulated optical signal.  For

example, and without limitation, Cisco's Acacia-developed Silicon Photonic ICs take as an input

an unmodulated laser which is used in the IC for driving the various arms (*i.e.*, waveguide

branches) of a nested Mach-Zehnder type modulator.  *See, e.g.*, Presentation, Coherent Optical

Solutions for Data Center Interconnect, Optinet 2019, June 13, 2019, at 6:



*See also* L. Chen, *et al.*, Silicon Photonics for 100G-and-beyond Coherent Transmissions,

OFC 2016 at 1 ("Figure 1(a) is a block diagram of the silicon PIC.  The three optical IOs ('T', 'L', and 'R') are for transmitter output, laser input that is split between the transmitter and receiver, and receiver input, respectively. The chip includes 4 carrier- depletion Mach-Zehnder modulators"), Figs 1(a)-(d):



Fig. 1. Silicon coherent PIC and modules. (a) Block diagram of a silicon single chip transceiver excluding laser. (b) Gold box with the silicon PIC packaged with drivers, transimpedance amplifiers, fiber array, and other components. (c) Acacia's coherent CFP with the silicon PIC and ASIC. (d) Acacia's dual-carrier with one ASIC and two silicon PICs.

69.    As an additional example, and without limitation, the OIF-CFP2-ACO-01.0 Implementation Agreement for CFP2 modules specifies an unmodulated laser driving the various arms (*i.e.*, waveguide branches) of a nested Mach-Zehnder type modulator.  *See, e.g.*, OIF-CFP2-ACO-01.0 at Figure 3:



Figure 3: Superset Transmit Function Block Diagram with an MDIO Only Control Interface

A Cisco technical journal paper describes the "[t]ypical components in a CFP2-ACO module" accordingly.  *See, e.g.*, Fludger, *et al.*, "1Tb/s Real-Time 4 x 40 Gbaud DP-16QAM Super-Channel Using CFP2-ACO Pluggable Modules Over 625 km of Standard Fiber," IEEE J. Lighwave Tech. 35, pp. 949, Figure 1 (Feb. 2017):



Fig. 1.  Typical components in a CFP2-ACO module.

Similarly, another Cisco technical journal paper describes Cisco's use of "Segmented MZM [Mach-Zehnder]" type modulators in QSFP form factor devices to achieve PAM-4 modulation.

*See, e.g.*, Mazzini, *et al.*, "25GBaud PAM-4 Error Free Transmission over both Single Mode Fiber and Multimode Fiber in a QSFP form factor based on Silicon Photonics," 2015 Optical Fiber Conference, paper Th5B.3 at 1, Figure 1(b) ("(b) Segmented MZI PAM-4 transmitter block diagram with Cisco PAM-4 optical eye diagrams."):



A continuous-wave (CW) distributed feedback laser (DFB) provides the unmodulated optical signal to the MZM in this example. *Id.*

70.     The Accused Products comprise a modulator for modulating the input optical signal responsively to the plurality of N digital input data bits to output a modulation of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers. *See, e.g.*, *id.* at 48 ("DP-16QAM symbols"); H. Zhang, *et al.*, Real-time transmission of 16 Tb/s over 1020km using 200Gb/s CFP2-DCO, Optics Express, Vol. 26, No. 16, Mar. 19, 2018 at Fig. 2:



H. Zhang, *et al.*, "Real-time Transmission of Single-Carrier 400 Gb/s and 600 Gb/s 64QAM over 200km-Span Link," ECOC 2019 at Fig. 1(c) and (d):



Fig. 1. (a) Coherent transceiver and (b) silicon-photonics integrated citucits, (c, d) Received 64 QAM constellation in X- and Y- polarizations at 69 GBd

*See also* Blog, Get in Shape with the AC1200, at 2 ("Shaping of the constellation points' location to increase reach"):



Products Overview ("Our optical interconnect solutions include sophisticated modules engineered to perform a majority of the DSP and optical functions required to process network traffic at transmission speeds of 100 Gbps to greater than 1 Tbps").

71.     As an additional example, and without limitation, in Cisco's CFP2 pluggable modules include Mach-Zehnder modulator structures.  *See, e.g.*, OIF-CFP2-ACO-01.0 at Figure 3 (detail below):



72.    As an additional example, Cisco has made, demonstrated, sold, and offered to sell at least 40G/100G "BiDi," 100G "single lambda," and 400Gbps QSFP-DD pluggable modules including modulators that use PAM4 pulse modulation.  Cisco Product Brief c45-740242 at 1 ("PAM4 optical modulation"); Cisco Blog, SP360: Service Provider, "Cisco Optics Demos and Displays at OFC 2019," *available at* https://blogs.cisco.com/sp/cisco-optics-demos-and-displays-at-ofc-2019 ("100G 1-λ Silicon Photonics For 10km.  Cisco's silicon photonics will be on display in a live demo, showing single-lambda PAM4 performance over 10km of duplex SMF.");  Cisco Blog, SP360: Service Provider, "Silicon Photonics Demonstration at OFC 2019," *available at* https://blogs.cisco.com/sp/silicon-photonics-demonstration-at-ofc-2019 ("We plugged two of our 100G single-wavelength PAM4 modules into a Cisco Nexus 9k ethernet switch. . . . The PAM4 modules (green in the diagram) had two different spools of single-mode fiber inserted, one for each direction of traffic."):



Cisco Datasheet c78-741560, "Cisco Nexus 9300-GX Series Switches" (July 2021), *available at* https://www.cisco.com/c/en/us/products/collateral/switches/nexus-9000-series-switches/datasheet-c78-741560.pdf, at 3 ("16 x 400/100-Gbps QSFP-DD ports"); "Leviton Cabling Guide for Cisco 100G and 400G Optics" (October 2019) at 1, *available at* https://www.cisco.com/c/dam/en/us/products/collateral/interfaces-modules/transceiver-modules/cabling-guide-100-400g.pdf (listing 100G and 400G part numbers).

73.     The Accused Products generate modulated optical signals for transmission over optical fibers.  As described above, Cisco's Acacia-developed coherent optical transceiver modules (and Silicon Photonic IC components thereof) each generate and transmit optical signals.  *See, e.g.*, Products Overview ("Our optical interconnect solutions include sophisticated modules engineered to perform a majority of the DSP and optical functions required to process network traffic at transmission speeds of 100 Gbps to greater than 1 Tbps").  Cisco's Acacia Accused Products have optical fiber ports for transmitting over optical fibers of various lengths, types, and wavelengths.  *See, e.g.*, Blog: "Introducing the AC1200-SC[2] Coherent 1.2T Single-Chip, Single-Channel Module ("1.2 Terabit (1.2T) on a single-channel."):



*See also* H. Zhang, *et al.*, "Real-time Transmission of Single-Carrier 400 Gb/s and 600 Gb/s 64QAM over 200km-Span Link," ECOC 2019 at 1 ("We transmit 41 x 600Gb/s polarization multiplexed (PM) 64QAM channels on a 100 GHz grid over 32 nm bandwidth with uniform loading"); H. Zhang, *et al.*, Real-time transmission of 16 Tb/s over 1020km using 200Gb/s CFP2-DCO, Optics Express, Vol. 26, No. 16, Mar. 19, 2018 at 2 ("We demonstrate transmission of 80 x 200Gb/s polarization multiplexed (PM) 8QAM and 16QAM channels on a 50 GHz grid with 2.8dB and 1.2dB $Q^2$-factor margin, respectively.").

74.     As an additional example, and without limitation, Cisco's Accused Products have optical fiber ports for transmitting over optical fibers of various lengths, types, and wavelengths. *See, e.g.*, Cisco Datasheet c78-741079 at 2 ("16-QAM schemes could offer up to 400km of reach on standard G.652 Single mode fiber"); Cisco Brochure c02-741700 at 2 ("2km duplex SMF (LC)"); Cisco Datasheet c78-736282, "Cisco 100GBASE QSFP-100G Modules" (Aug. 2021), *available at* https://www.cisco.com/c/en/us/products/collateral/interfaces-modules/transceiver-modules/datasheet-c78-736282.pdf, at 2 ("The Cisco QSFP 40/100 Gb dual-rate bi-directional (BiDi) transceiver is a pluggable optical transceiver with a duplex LC connector interface for short-reach data communication and interconnect applications using Multi-Mode Fiber (MMF).").

75.     The Accused Products comprise the above-described system, wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values.  As described above, Cisco's Acacia-developed coherent optical transceiver modules (and DSP ASIC components thereof) perform digital signal processing on multi-bit symbols, in order to pre-equalize, pre-distort, shape, or compensate in the digital domain for known impairments.  For example, and without limitation, Cisco's Acacia-developed DSP ASICs perform "3D Shaping" that "enables fine-tune adjusting of the line-side coherent modulation characteristics."  *See, e.g.*, Whitepaper, Optimize Network Utilization with 3D Shaping:



*See also* Video, Acacia Talks Coherent: Hongbin Zhang and Digital Signal Processing ("mitigate or compensate the penalty from those components" and "Non-linear compensation"); Presentation, Coherent Optical Solutions for Data Center Interconnect, Optinet 2019, June 13, 2019, at 8 ("Efficient EQ for non-perfect optics"), 6 ("Spectral shaping" and "Impairment equalization" in "Advanced DSP" for "Equalization of imperfections"):



76.     As an additional example, and without limitation, Cisco's CFP2 pluggable

modules (including signal processing components on the line card in the case of CFP2-ACO

modules or integrated into the module in the case of CFP2-DCO modules), receive multiple-bit

inputs of digital data, then process those digital symbols via mapping, encoding, QAM symbol

mapping, and signal conditioning modules that convert the digital data.  *See, e.g.*, Fludger *et al.*

at Figure 2(a):



Fig. 2.    (a) ASIC processing, interface and CFP2-ACO pluggable. (b)

*See also* Mazzini, *et al.*, at Figure 1(b) (describing FEC and PAM4 encoding modules used with

a segmented Mach-Zehnder modulator in a QSFP form factor solution).

77. The Accused Products comprise the modulator described above, wherein the input optical signal is modulated based on the plurality of voltage values. For example, and without limitation, in Cisco's Acacia-developed coherent optical transceiver modules the QAM modulated symbols and corresponding voltage values described above are coupled to the unmodulated optical signal via Drivers and associated circuitry for the branches of the Mach-Zehnder modulator structures. *See, e.g.*, Presentation, Coherent Optical Solutions for Data Center Interconnect, Optinet 2019, June 13, 2019, at 6 (detail below):



*See also* C. Doerr, *et al.*, Single-Chip Silicon Photonics 100-Gb/s Coherent Transceiver, OFC Postdeadline 2014 ("adjust the MZM phases to produce QPSK"), Fig. 1:



*See also* Whitepaper: 100GBaud+ Silicon Photonics Solutions Drive Optical Network Evolution, available at https://acacia-inc.com/wp-content/uploads/2020/12/100GBaud-Silicon-Photonics-Solutions-Drive-Optical-Network-Evolution.pdf, at 4 ("the DSP and the PIC are tightly co-

packaged" with the "high-speed Si modulator driver"), 5 ("high-speed, high-resolution digital-to-analog convertors (DACs)"), Figure 6:



*See also* Coherent Interconnect Module 8 ("including the DSP, PIC, drivers, and TIAs").

78.     As an additional example, in Cisco's CFP2-ACO pluggable modules the digital output data bits described above are provided to digital to analog converters and/or drivers and associated circuitry for the branches of the Mach-Zehnder modulator structures.  *See, e.g.*, OIF-CFP2-ACO-01.0 at Figure 3 (detail below):



*See also* Mazzini, *et al.*, at Figure 1(b).

79.     The Accused Products comprise the above-described system, wherein the digital-to-digital mapping comprises, for each digital input value included in a set of possible digital input values for the plurality of N digital input data bits, a set of corresponding digital output values from a set of possible digital output values.  For example, and as described above, the digital signal processing of the Accused Products described herein maps each digital input value to one of a set of possible corresponding digital output values.

80.     For example, the Accused Products include digital-to-digital mapping that outputs a pattern that alters the linearity of an optical response of the modulator.  For example, as described above, Cisco's Acacia Accused Products use digital signal processing to perform digital pre-equalization, pre-distortion, shaping, and non-linearity compensation.  *See, e.g.*, H. Zhang, *et al.*, "Real-time Transmission of Single-Carrier 400 Gb/s and 600 Gb/s 64QAM over 200km-Span Link," ECOC 2019 at 1 ("susceptible to noise as well as linear and nonlinear distortions from analog electrical and optical components.  Transmitter pre-distortion effectively improves the performance"); Whitepaper, "Network Optimization in the 600G Era," *available at* https://acacia-inc.com/acacia-resources/white-paper-network-optimization-in-the-600g-era/ (discussing use of features such as "nonlinear equalization" to "provide additional system margin improvement"); H. Zhang, *et al.*, Real-time transmission of 16 Tb/s over 1020km using 200Gb/s CFP2-DCO, Optics Express, Vol. 26, No. 16, Mar. 19, 2018 at 3, *available at* https://acacia-inc.com/wp-content/uploads/2018/03/Optics-Express-26-6-6943.pdf ("The ASIC includes . . . a DSP engine which performs pulse shaping and pre-equalization on the transmitter side"); Presentation, Coherent Optical Solutions for Data Center Interconnect, Optinet 2019, June 13, 2019, at 6, *available at* https://acacia-inc.com/wp-content/uploads/2019/06/Optinet-China-

2019_Acacia_Fenghai-Liu_UpLoad_v1.pdf (highlighting digital "Impairment equalization" in the Acacia-developed DCP ASIC for "Equalization of imperfections" in the signal path):



81. As discussed above, Cisco prominently markets its use of DSP technology to provide a "better algorithm to mitigate or compensate the penalty from those [photonic and RF] components." *See, e.g.*, Video, Acacia Talks Coherent: Hongbin Zhang and Digital Signal Processing, *available at* https://acacia-inc.com/acacia-resources/acacia-talks-coherent-hongbin-zhang-and-digital-signal-processing/ (last accessed Feb. 4, 2022) (highlighting "3D Shaping" and "Non-linear compensation" as key benefits of Cisco's Acacia-developed DSP technology):



These techniques perform mapping in the digital domain that produce digital output patterns, such that the associated drive voltages as provided to the modulator alter the linearity of the optical response of the modulator—as compared to an unmapped providing of drive voltages associated with digital input values to the modulator. In so doing, these techniques perform the input to output mapping described in the claims of the Asserted Patent.

82.     As an additional example, Cisco's QSFP-40/100G-SRBD "BiDi" modules employ digital-to-digital mapping to perform a transmit pre-emphasis function. *See, e.g.*, Press Release: "Broadcom Announces Complete End-to-end Optical PAM-4 Platform for 40/100/200/400GbE Data Center Interconnects" (Mar. 21, 2016), *available at* https://investors.broadcom.com/news-releases/news-release-details/broadcom-announces-complete-end-end-optical-pam-4-platform ("High efficiency laser driver with pre-emphasis function").

83.     The Accused Products comprise the above-described system, wherein, within the digital-to-digital mapping, for a first subset of successively increasing digital input values

specified in the digital-to-digital mapping, deltas between numerical values of successive digital

outputs in the set of digital output values corresponding respectively to the successively

increasing digital input values in the first subset, decrease.  For example, and as described above,

the digital signal processing of the Accused Products described herein maps digital input values

to corresponding digital output values, in order to alter the optical response of the modulator.  On

information and belief, this mapping results in subsets of successively increasing digital input

values for which the deltas between numerical values of the corresponding mapped digital

outputs decrease.  *See, e.g.*, Whitepaper, Optimize Network Utilization with 3D Shaping:



*See also* Video, Acacia Talks Coherent: Hongbin Zhang and Digital Signal Processing ("mitigate

or compensate the penalty from those components" and "Non-linear compensation");

Presentation, Coherent Optical Solutions for Data Center Interconnect, Optinet 2019, June 13,

2019, at 8 ("Efficient EQ for non-perfect optics"), 6 ("Spectral shaping" and "Impairment

equalization" in "Advanced DSP" for "Equalization of imperfections").

   84.  The Accused Products comprise the above-described system, wherein, within the

digital-to-digital mapping, for a second subset of successively increasing digital input values

specified in the digital-to-digital mapping, deltas between numerical values of successive digital

outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the second subset, increase. For example, and as described above, the digital signal processing of the Accused Products described herein maps digital input values to corresponding digital output values, in order to alter the optical response of the modulator. On information and belief, this mapping results in subsets of successively increasing digital input values for which the deltas between numerical values of the corresponding mapped digital outputs increase. *See, e.g.*, evidence cited above.

85. By making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the Accused Products, Cisco (on its own and through directing its wholly owned subsidiary Acacia) has injured Ramot and is liable to Ramot for directly infringing one or more claims of the Asserted Patent, including without limitation claim 1, pursuant to 35 U.S.C. § 271(a).

86. Cisco (on its own and through directing its wholly owned subsidiary Acacia) also infringes the Asserted Patent under 35 U.S.C. § 271(b) & (c).

87. Cisco (on its own and through directing its wholly owned subsidiary Acacia) knowingly encourages and intends to induce infringement of the Asserted Patent by making, using, offering for sale, and/or selling products in the United States, and/or importing them into the United States, including but not limited to the Accused Products, with knowledge and specific intention that such products will be used by its customers. As in the website postings, Blog posts, Presentations, Whitepapers, and Videos discussed herein, Cisco (on its own and through directing its wholly owned subsidiary Acacia) encourages and instructs its customers on how to use and implement the technology claimed in the Asserted Patent.

88.     Cisco (on its own and through directing its wholly owned subsidiary Acacia) also contributes to the infringement of the Asserted Patent.  Cisco (on its own and through directing its wholly owned subsidiary Acacia) makes, uses, sells, and/or offers to sell products in the United States, and/or imports them into the United States, including but not limited to the Accused Products, knowing that those products constitute a material part of the claimed invention, that they are especially made or adapted for use in infringing the Asserted Patent, and that they are not staple articles or commodities of commerce capable of substantial non-infringing use.

89.     On information and belief, Cisco was aware of the Asserted Patent and related Ramot patents, had knowledge of the infringing nature of its activities, and nevertheless continues its infringing activities.  Cisco has had notice of related predecessor Ramot patents and Ramot's allegations of infringement since at least April of 2014.

90.     For example, on June 12, 2019, Ramot sued Cisco for infringement of Ramot patents related to the Asserted Patent.  *See Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-cv-00225-JRG (E.D. Tex.), D.I. 1.  Cisco was also aware that Acacia participated in that lawsuit as a third party under subpoena, and that Cisco was accused of infringement in part for its use and sale of certain Acacia-developed components.

91.     Cisco defended against Ramot's assertion of certain claims of three of those related predecessor patents in Case No. 2:19-cv-00225-JRG through claim construction, discovery, expert discovery, dispositive motions, and pretrial preparations—before that case was (and remains) stayed.  Cisco also filed three unsuccessful *Inter Partes* Review petitions against these related predecessor Ramot patents, unsuccessfully appealed and sought a mandamus ruling

from those unsuccessful IPR efforts, and then filed seven *Ex Parte* Reexamination petitions

against these related predecessor Ramot patents.

92.     In addition, on February 26, 2021, prior to Acacia's acquisition by Cisco, Ramot

sued Acacia for infringement of related Ramot patents.  *Ramot at Tel Aviv University, Ltd. v.*

*Acacia Comm'ns, Inc.*, C.A. No. 21-295-LPS (D. Del.), D. I. 1.  Cisco was aware of that lawsuit.

93.     In addition, Cisco filed a declaratory judgment action concerning another related

predecessor Ramot patent (the '872 Patent) that had just issued.  *Cisco Systems, Inc. and Acacia*

*Communications, Inc. v. Ramot at Tel Aviv University Ltd.*, C.A. No. 21-1365-VAC (D. Del.).

On information and belief, Cisco followed the prosecution of the '872 Patent and prepared the

declaratory judgment action prior to the patent issuing.  For example, Cisco filed the declaratory

judgment action on the same day the '872 Patent was to issue.  Cisco has also filed two more

*Inter Partes* Review petitions (IPR2022-00575 and IPR2022-00576) concerning the claims of

the '872 Patent, which are pending.

94.     In addition, Cisco filed a declaratory judgment action concerning the '998 Patent.

*Cisco Systems, Inc. and Acacia Communications, Inc. v. Ramot at Tel Aviv University Ltd.*, C.A.

No. 22-674-VAC (D. Del.).  On information and belief, Cisco followed the prosecution of the

'998 Patent and prepared the declaratory judgment action prior to the patent issuing.  For

example, Cisco filed the declaratory judgment action at 12:01 am on the same day the '998

Patent was to issue.

95.     In addition, on November 5, 2014, Ramot sued Cisco for infringement of two

related predecessor patents of the Asserted Patent.  *See Ramot at Tel Aviv University Ltd. v.*

*Cisco Systems, Inc.*, Case No. 2:14-cv-1018 (E.D. Tex. Nov. 5, 2014), Dkt. 1 at ¶ 1.  Cisco filed

papers in that action, which was later voluntarily dismissed without prejudice.  *Id.* at Dkt. 12, 16.

In addition, related predecessor Ramot patents of the Asserted Patent were cited by and relied on by the patent examiner in at least one patent prosecution of a Cisco patent. *See* U.S. Patent No. 8,320,720 at 1.

96.    Cisco's infringement of the Asserted Patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

97.    As a result of Cisco's infringement of the Asserted Patent, Ramot has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Cisco's infringement, but in no event less than a reasonable royalty with interest and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and seeks relief against Cisco as follows:

(a)    For judgment that U.S. Patent No. 11,342,998 has been and continues to be infringed by Cisco;

(b)    For an accounting of all damages sustained by Plaintiff as the result of Cisco's acts of infringement;

(c)    For finding that Cisco's infringement is willful and enhancing damages pursuant to 35 U.S.C. § 284;

(d)    For a mandatory future royalty payable on each and every future sale by Cisco of a product that is found to infringe the Asserted Patent and on all future products which are not colorably different from products found to infringe;

(e)    For an award of attorneys' fees pursuant to 35 U.S.C. § 285 or otherwise permitted by law;

(f)    For all costs of suit; and

(g)     For such other and further relief as the Court may deem just and proper.


Dated:  August 15, 2022                          Respectfully Submitted,


                                        By:  /s/ *Corey Johanningmeier*

                                             S. Calvin Capshaw
                                             State Bar No. 03783900
                                             Elizabeth L. DeRieux
                                             State Bar No. 05770585
                                             **CAPSHAW DERIEUX, LLP**
                                             114 E. Commerce Ave.
                                             Gladewater, TX 75467
                                             Telephone: 903-845-5770
                                             Email: ccapshaw@capshawlaw.com
                                             Email: ederieux@capshawlaw.com

                                             Denise De Mory
                                             Corey Johanningmeier
                                             **BUNSOW DE MORY LLP**
                                             701 El Camino Real
                                             Redwood City, CA 94063
                                             Telephone: (650) 351-7248
                                             Facsimile: (415) 426-4744
                                             ddemory@bdiplaw.com
                                             cjohanningmeier@bdiplaw.com


                                             ATTORNEYS FOR PLAINTIFF
                                             RAMOT AT TEL AVIV UNIVERSITY LTD.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) with a copy of this document via the Court's CM/ECF system.

Dated:  August 15, 2022

By:  /s/ *Corey Johanningmeier*
                  Corey Johanningmeier