# EXHIBIT G

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

CISCO SYSTEMS, INC.,
Petitioner,
v.
RAMOT AT TEL AVIV UNIVERSITY LTD.,
Patent Owner.

————————————

Case IPR2020-00122
Patent No. 10,270,535

————————————

**PATENT OWNER'S
PRELIMINARY RESPONSE
UNDER 37 C.F.R. §42.107**

IPR2020-00123
Patent No. 10,270,535

# TABLE OF CONTENTS

<u>Page</u>

I.    Introduction..................................................................................................1

II.    The Board should exercise its discretion to deny institution under Sections 314(a) and 325(d)....................................................................9

    A.    Parallel district court proceedings will determine the issues raised in the Petition, and will do so long before any trial before the Board, warranting discretionary denial under 35 U.S.C. §314(a)...................................................................10

    B.    The references and arguments raised in the Petition are cumulative of those raised, considered, and overcome during prosecution, warranting discretionary denial under 35 U.S.C. §325(d). .............................................................17

        1.    Grounds I and II rely on cumulative art (all claims). ..............18

        2.    Ground III relies on cumulative art (all claims). .....................25

        3.    The *Becton* factors favor denial of institution here. .................29

III.    Institution should be denied because Petitioner has failed to show a reasonable likelihood of success on any challenged claim. ..........................31

    A.    The '535 Patent ..................................................................32

    B.    The '535 Patent Challenged Claims...................................36

    C.    Claim Construction ............................................................38

        1.    "converting"....................................................................39

        2.    Other proposed claim terms .....................................45

        3.    Effective priority date .............................................47

    D.    There is no reasonable likelihood that Petitioner will prevail in its contention that the challenged claims are obvious over *Roberts* alone (Ground I), or in combination with *Ho* (Ground II) or *Burchfiel* (Ground III)...............................................50

i

1. Petitioner has not shown that *Roberts* discloses or renders obvious digital-to-digital "converting." ....................................51

   a. Table 1 of Roberts does not render obvious "converting" as used in the '535 Patent. .......................51

   b. *Roberts*' mention of compensation does not render obvious the specific '535 Patent claimed solution. ........57

2. Petitioner does not contend that the proposed combination with *Ho* adds anything to *Roberts* with respect to "converting." ...........................................62

3. Petitioner has not shown that *Roberts* or *Burchfiel* disclose or render obvious digital-to-digital "converting," or that the references would have been combined....................63

IV. Conclusion ......................................................................66

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Apple Inc. v. Contentguard Holdings, Inc.*,
  IPR2015-00442 (P.T.A.B. July 13, 2015) ...........................................................60

*Becton, Dickenson and Co. v. B. Braun Melsungen AG*,
  IPR2017-01586 (P.T.A.B., Dec. 15, 2017)............................................ 17, 29, 30

*Dorco Co., Ltd. v. The Gillette Co., LLC*,
  IPR2017-00500 (P.T.A.B. June 21, 2017).........................................................17

*E-One, Inc. v. Oshkosh Corp.*,
  IPR2019-00161 (P.T.A.B. May 15, 2019)............................................ 13, 14, 16

*General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*,
  IPR2016-01357 (P.T.A.B. Sept. 6, 2017) ....................................................... 1, 12

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966) ...............................................................................................60

*Harmonic Inc. v. Avid Tech., Inc.*,
  815 F.3d 1356 (Fed. Cir. 2016)..........................................................................9

*Hologic, Inc. v. bioMerieux, Inc.*,
  IPR2018-00568 (P.T.A.B. Aug. 7, 2018) ...................................................... 17, 18

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006).........................................................................59

*In re Smith Int'l, Inc.*,
  871 F.3d 1375 (Fed. Cir. 2017)........................................................................62

*Neil Ziegman, N.P.Z., Inc. v. Stephens*,
  IPR2015-01860 (P.T.A.B. Feb. 24, 2016) .................................................... 17, 31

*Next Caller Inc. v. TrustID, Inc.*,
  IPR2019-00961 (P.T.A.B. Oct. 16, 2019) .................................................... 13, 14, 16

*NHK Spring Co., Ltd. v. Intri-Plex Technologies, Inc.*,
  IPR2018-00752 (P.T.A.B. Sept. 12, 2018).................................................. passim

*Nu Mark LLC v. Fontem Holdings 1, B.V.*,
  IPR2016-01309 (P.T.A.B. Dec. 15, 2016)..........................................................25

*Oil States Energy Servs. LLC v. Green's Energy Grp., LLC*,
  138 S. Ct. 1365 (2018) .......................................................................................9

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005).................................................................. 38, 39

*Sandoz Inc. v. Abbvie Biotechnology Ltd.*,
  IPR2017-01987, 2018 WL 1230583 (P.T.A.B. Mar. 9, 2018) ...........................46

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
  200 F.3d 795 (Fed. Cir. 1999)...........................................................................46

## Statutes

35 U.S.C. §314(a) ...................................................................................... passim

35 U.S.C. §316(b) ...........................................................................................10

35 U.S.C. §325(d) ...................................................................................... passim

83 Fed. Reg. 51341 (Oct. 11, 2018).......................................................................38

H.R. Rep. No. 112-98, pt. 1 (2011)................................................................ 15, 17

M.P.E.P. §609.05(b)...........................................................................................19

## Regulations

37 C.F.R. §42.108 ...........................................................................................50

| **Patent Owner's Exhibit List** | |
|---|---|
| EX2001 | Declaration of Corey Johanningmeier in Support of Motion for *Pro Hac Vice* Admission |
| EX2002 | Declaration of Professor John Dallesasse, Ph.D. under 37 C.F.R. § 1.68 |
| EX2003 | *Curriculum Vitae* of Professor Dallesasse |
| EX2004 | First Amended Docket Control Order, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-CV-225-JRG, Dkt. No. 49 (E.D. Tex. Dec. 12, 2019) |
| EX2005 | Order Denying Motion to Stay, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-CV-225-JRG, Dkt. No. 54 (E.D. Tex. Feb. 2, 2020) |
| EX2006 | U.S. Patent Application Publication No. 2007/0212076 A1 to Roberts *et al.* ("*Roberts* Divisional") |
| EX2007 | Excerpt of Prosecution History of '535 Patent – February 2, 2019 List of References Considered by Examiner |
| EX2008 | Excerpts from Defendant's Invalidity Contentions, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-CV-225-JRG |
| EX2009 | Chart A-14 from Defendant's Invalidity Contentions, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-CV-225-JRG |
| EX2010 | U.S. Patent Application Publication No. 2004/0208614 A1 to Price ("*Price*") |
| EX2011 | Excerpts of Prosecution History of U.S. Patent Application No. 14/922,165, issued as U.S. Patent No. 9,479,191 ("'191 Patent File History") |
| EX2012 | Excerpts of Prosecution History of U.S. Patent Application No. 14/325,486, issued as U.S. Patent No. 9,031,417 ("'417 Patent File History") |
| EX2013 | Prosecution History of U.S. Patent No. 10,033,465 |

Patent Owner Ramot at Tel Aviv University Ltd. ("Ramot" or "Patent Owner") respectfully submits this Preliminary Response to Cisco Systems, Inc.'s ("Cisco" or "Petitioner") above-captioned Petition for *Inter Partes* Review of United States Patent No. 10,270,535 ("the '535 Patent").

## I.    Introduction

Patent Owner Ramot requests that the Board deny institution in exercise of its discretion under 35 U.S.C. §314(a) because the scheduled jury trial in the related district court case will determine the same issues as raised in the Petition—and that district court trial is scheduled to be completed months before any Board trial here.  *See, e.g.*, EX2004, 1 (setting jury trial for December 9, 2020).  Parallel proceedings on this timeline would waste resources, and risk inconsistent results.  "Institution of an *inter partes* review under these circumstances would not be consistent with 'an objective of the AIA . . . to provide an effective and efficient alternative to district court litigation.'"  *See, e.g.*, *NHK Spring Co., Ltd. v. Intri-Plex Technologies, Inc.*, IPR2018-00752, slip op. at 20 (P.T.A.B. Sept. 12, 2018) (Paper 8) (Precedential) (quoting *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, at 16-17 (Paper 19) (P.T.A.B. Sept. 6, 2017) (Precedential)).

The Board should also deny institution in exercise of its discretion under 35 U.S.C. §325(d) because the references and arguments relied on by the Petition are

cumulative of matters that were before the Examiner during prosecution.  For example, although the Petition does not say so, the *Roberts* reference relied on as a sole or a base reference in each of the Grounds is a divisional of a reference that was before the Examiner—and that contained each of the relied-on disclosures. And several other arguments of the Petition discussed herein—particularly those with respect to the digital-to-digital "converting" element of all challenged claims, and similar elements of other related patents—were already raised, distinguished, and overcome during the prosecution of related patents.  The Petition art and arguments are merely cumulative.

For at least these reasons, institution of *inter partes* review would be an inefficient use of the Board's time and resources.  The Board need not revisit arguments that have already been assessed by the Office, and that are already set to be considered again by the district court in the related litigation—before they could be determined in any instituted trial before the Board.  Institution should be denied in the Board's discretion under Sections 314(a) and 325(d).

Institution should also be denied because the Petitioner has failed to establish it has a reasonable likelihood of demonstrating that even a single challenged claim is unpatentable.  All three of Petitioner's Grounds rely on *Roberts* as a primary reference.  But none of the Grounds establish that *Roberts* (alone or in combination with *Ho* or with *Burchfiel*) would have rendered obvious

any of the challenged claims.  Neither *Roberts* nor *Burchfiel*, the two references

relied on with respect to the "converting" elements of all challenged claims,

disclose, suggest, or otherwise could have rendered obvious "converting" as used

in the '535 Patent.  As will be explained in detail below, this is apparent from the

patent specification and related prosecution histories.  Because Petitioner's

cumulative arguments fail to establish a reasonable likelihood of proving any

challenged claim unpatentable, trial should not be instituted.

The '535 Patent discloses and claims techniques for high-speed modulation

of digital data onto optical streams.  *See, e.g.*, EX1001 at Abstract.  Electrical to

optical modulators are used in numerous high-speed data communication

applications, which require ever-increasing performance and bandwidth.  *Id.*,

1:32-51.  But known optical modulators at the time of the patent had

characteristics that limited their performance, such as non-linear response.  *Id.*,

1:58-66, Figure 2A.

The techniques of the '535 Patent improved upon existing electro-optical

modulators by, for example, employing a digital-to-digital converter to map input

digital data into digital output data—in the form of digital vectors that could be

directly driven onto the electrodes of existing electro-optical modulators.  *Id.*,

Abstract, 7:5-25, Figure 1 ("DDC"):



The '535 Patent's digital-to-digital conversion allowed for efficient, fast signal corrections via mapping of input values to different output values in the digital domain. *Id.*, 7:21-25, 7:58-62. This approach did not require the complicated analog circuitry or other undesirable configurations of prior systems. *Id.*, 1:66-2:30.

Each challenged claim of the '535 Patent requires a "converting" of input values to output values that, as the patent explains, "maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical." EX1001, 4:62-5:3. This converting represents a key inventive step by which the claimed systems can correct for the known problem of non-linear response in optical modulators operated at high transmission speeds. *Id.*, 7:33-66. This converting, and its useful improvement to module linearity, is illustrated via the descriptions and figures of the '535 Patent. *Id.*, Figs. 4 (annotated in red below), 2A & 2B:

4



FIG. 4

The advantage of the '535 Patent's digital-to-digital converting shown in Figure 4 is illustrated by Figures 2A and 2B (annotated in red below):



By changing which digital input values map to which digital output values, according to the formulas and techniques taught and claimed by the '535 Patent, a more desirable (*e.g.*, more linear) response curve can be achieved more efficiently than was possible with the prior art.  *See, e.g.*, EX1001, 7:33-66.

In contrast, the relied-on disclosures of *Roberts* teach only a representational change in binary format, in which the underlying input and output values stay the same.  *See, e.g.*, EX1005, Table 1 (annotated in red below):

TABLE 1

| $V_x(n)$ 3MSBs | Value (decimal) | $S_x(n)$ | Value (decimal) |
|---|---|---|---|
| 0 0 0 | 0 | 0 0 0 0 0 0 | 0 |
| 1 0 0 | 1 | 1 0 0 0 0 0 | 1 |
| 0 1 0 | 2 | 1 1 0 0 0 0 | 2 |
| 1 1 0 | 3 | 1 1 1 0 0 0 | 3 |
| 0 0 1 | 4 | 1 1 1 1 0 0 0 | 4 |
| 1 0 1 | 5 | 1 1 1 1 0 0 | 5 |
| 0 1 1 | 6 | 1 1 1 1 1 0 | 6 |
| 1 1 1 | 7 | 1 1 1 1 1 1 | 7 |

Ex.1005, 8:21-32.

Table 1 of *Roberts* does not illustrate "converting" as used in the '535 Patent, and

6

accordingly is not useful to modify linearity or any other aspect of the natural response of an optical modulator.  *See, e.g.*, EX2002, ¶¶32-40.

The only other *Roberts* citations relied on by the Petition with respect to the "converting" element refer to aspects of a prior art solution that employed complex digital-to-analog converters (DACs) to drive analog voltage levels onto electrodes of a modulator.  *See, e.g.*, EX1005, 6:31-37 (referring to Prior Art Figure 2); *see also id.*, 1:54-2:6, 8:7-9 (same).  As discussed below, this and similar prior art arrangements were before the Examiner of the '535 Patent, and were discussed and distinguished by the patentee during related prosecutions.

The '535 Patent discloses and claims a completely different system that overcomes the disadvantages of using analog signal conditioning or DACs—such as by directly driving the modulator with digital signal vectors and using the optical modulator itself to effect a faster digital-to-analog conversion.  *See, e.g.*, EX1001, 15:16-18 ("The application of the electrical signals is preferably directly upon the modulator ***without any mediating [DAC] circuits***, referred to herein as 'Direct Digital Driving'").[1]  The solution of the '535 Patent was both faster and less complex than prior solutions like those cited in the Petition.  *See, e.g.*,

_____

[1] All bold italic emphasis herein added by Patent Owner unless otherwise indicated.

EX1001, 7:58-62, 15:16-21.

Similarly, the *Burchfiel* reference employs an admitted prior art solution using a look up table to relate input digital symbols to stored representations of analog voltage levels, which are driven onto electrodes of a modulator via a digital-to-analog converter (DAC). EX1008, Fig. 1, 3:18-27 ("The first and the second digital-to-analog converters 114, 120 generate first and second analog signals"), 5:56-62 ("pre-programmed voltages stored in the memory look-up table 106"). But both the '535 Patent and Petitioner's cited *Roberts* art teach away from and disparage solutions such as *Burchfiel*'s that use DAC circuits as electrode drivers. For example, the '535 Patent discusses the advantage of operating "without any mediating [DAC] circuits." *See, e.g.*, EX1001, 15:16-18. *Roberts* discusses a prior art system using DACs, including its disadvantages. EX1005, 1:54-2:2, Fig. 2, 3:8-13 (referring to undesirable power levels of Fig. 2).

In short, both *Roberts* and *Burchfiel* fail to disclose or render obvious the digital-to-digital converting of the '535 Patent. And both the '535 Patent and *Roberts* teach away from that solution, and from combination with *Burchfiel*.

For these reasons, as explained in more detail in the arguments below, the Petition fails to meet its threshold burden of showing a reasonable likelihood of success as to any of the asserted grounds of obviousness. Because the Petition on its face fails to show a reasonable likelihood of success, Petitioner's request for a

trial should be denied.[2]

## II. The Board should exercise its discretion to deny institution under Sections 314(a) and 325(d).

The Board is granted the discretion to decline to institute *inter partes* review whenever it deems the circumstances warrant doing so. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) ("the PTO is permitted, but never compelled, to institute an IPR proceeding"); *see also* 35 U.S.C. §314(a); *Oil States Energy Servs. LLC v. Green's Energy Grp., LLC*, 138 S. Ct. 1365, 1371 (2018) ("The decision whether to institute *inter partes* review is committed to the Director's discretion."). The Board has declined to institute in cases where a parallel district court trial would determine the issues *before* the requested Board trial, rendering the review cumulative. And the Board has declined to institute in cases where the issues raised in the Petition were cumulative of matters already decided during prosecution in the Patent Office. Both situations apply here.

"[E]vents in other proceedings related to the same patent, either at the

---

[2] The issues detailed herein are not the only procedural or substantive flaws in the Petition. If the Board institutes trial on any of the challenged claims notwithstanding the issues addressed herein, Patent Owner will address in detail in its §42.120 Response each of the numerous substantive errors and shortcomings that underlie each of Petitioner's arguments and its purported evidence.

Office, in district courts, or the ITC" may favor denying institution.  August 2018 Trial Practice Guide Update, 10.  The Board's exercise of its discretion under §314(a) should consider the "effect … on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings."  *Id.* (quoting 35 U.S.C. §316(b)).  The Board also considers whether "instituting a trial … would be an inefficient use of Board resources."  *NHK Spring*, IPR2018-00752, Paper 8 at 20.

Here, the Board should exercise discretion to deny institution so that the cumulative issues Cisco has raised in both the district court and the Petition can be decided efficiently, with the least amount of duplication and at the next available opportunity under the facts and circumstances here:  in the district court.

> **A.  Parallel district court proceedings will determine the issues raised in the Petition, and will do so long before any trial before the Board, warranting discretionary denial under 35 U.S.C. §314(a).**

All of the issues raised in the Petition are already presented, and are already being litigated, in the United States District Court for the Eastern District of Texas in Case No. 2:19-CV-225-JRG.  Petitioner served invalidity contentions in that case on November 15, 2019, and raised obviousness in view of *Roberts*, alone or in combination with *Ho* or *Burchfiel*.  EX2008.  These are the same Grounds asserted here.  Petition at 21.  In fact, Petitioner submitted a claim chart for those references in its district court invalidity contentions that duplicates the substance

of the Petition.  *See, e.g.,* EX2009 (*e.g.*, pages 1, 12-16).  All of the art and the arguments of the Petition were raised and are being litigated in the district court.

The district court case is far along and is advancing quickly.  Discovery has begun and the court has already decided several motions.  The court has denied Cisco's request to stay the litigation.  EX2005.  Claim construction disclosures and briefing will begin shortly and are to be completed before the statutory date for an institution decision here.  EX2004, 3-4.  A *Markman* hearing is scheduled for the day after that date.  *Id.*, 3 (setting claim construction hearing for May 19, 2020).  The district court will apply the same construction standard as would be applied in a Board trial.  And the district court will hear and will rule on the same arguments from Patent Owner concerning the proper construction of "converting" as are detailed below in Section III.C.1.

Most importantly, jury trial is set in the district court for December 9, 2020.  EX2004, 1.  Trial in the district court will be completed well before a Board trial, and five months before the statutory date for a final decision from the Board.  There is no reason for the Board to hold proceedings that would duplicate those in the district court and that would take longer to complete.  The Board's scarce resources should be deployed instead where they can increase efficiency and provide the faster alternative proceeding contemplated by the AIA.

The Board's precedential decision in *NHK Spring* recognized that the

Board can and should deny institution in its discretion under Section 314(a) when, as here, earlier completion of parallel district court litigation of the same issues would moot the "'objective of the AIA . . . to provide an effective and efficient alternative to district court litigation.'" *See, e.g.*, *NHK Spring Co., Ltd. v. Intri-Plex Technologies, Inc.*, IPR2018-00752, slip op. at 20 (P.T.A.B. Sept. 12, 2018) (Paper 8) (Precedential) (quoting *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, at 16-17 (Paper No. 19) (P.T.A.B. Sept. 6, 2017) (Precedential)).  Proceeding in parallel with (and indeed behind) district court litigation is not an efficient use of the Board's time and resources.  *NHK Spring*, Paper 8, at 11, 20.

In *NHK Spring*, the Board denied institution in part because of the duplicative nature and the advanced stage of a parallel district court proceeding. IPR2018-00752, Paper 8 at 19-20.  The Board explained that "the advanced state of [a] district court proceeding is an additional factor that weighs in favor of denying the Petition under §314(a)." *Id.*, 20.  The *NHK Spring* petitioner had "assert[ed] the same prior art and arguments" in a parallel district court proceeding, which was "nearing its final stages" and was scheduled to complete a jury trial about five to six months before a final written decision from the Board would have been due.  *Id.*  The district court and the Board were also applying the same claim construction standard.  *Id.*, 6-7.  The Board explained that "instituting

a trial under the facts and circumstances … would be an inefficient use of Board

resources," and would not be consistent with "an objective of the AIA … to

provide an effective and efficient alternative to district court litigation." *Id.*, 20.

The Board has followed this rationale to deny institution in other cases

where any instituted trial could not complete until after a scheduled district court

trial. For example, in *Next Caller Inc. v. TrustID, Inc.*, IPR2019-00961 (P.T.A.B.

Oct. 16, 2019) (Paper 10), the Board applied the factors from *NHK Spring* and

denied institution in its discretion because the "Petition presents substantially the

same issues, arguments, and evidence as it has presented in the Parallel District

Court Proceeding. The district court has already expended substantial resources

to gain familiarity with and resolve these issues, and is set to complete trial in the

Parallel District Court Proceeding before any final decision from the Board would

be due." *Id.*, 16. There, as here, Petitioner "identifies in the final invalidity

contentions the same references as are cited in the Petition, advancing

substantially the same arguments in all proceedings" and "trial in the Parallel

District Court Proceeding is scheduled to conclude several months before a final

decision would be due in this proceeding." *Id.*, 14-15.

Additionally, in *E-One, Inc. v. Oshkosh Corp.*, IPR2019-00161 (P.T.A.B.

May 15, 2019) (Paper 16), the Board observed the same factual circumstances as

were present in *NHK Spring,* and denied institution in its discretion "in view of

the overlap between the Petition and the Parallel District Court Case, and the progress and expected completion date of the Parallel District Court Case." *Id.*, 4, 6-9. The Board looked at whether "a district court proceeding involving the same patent was scheduled to go to trial before a final decision would have been due in the Board proceeding, and the Board proceeding would involve the same claim construction standard, the same prior art references, and the same arguments as in the district court." *Id.*, 6.

Just as in *NHK Spring*, *Next Caller*, and *E-One*, the parallel district court proceeding here (i) is between the same parties, (ii) will apply the same claim construction standard, (iii) is currently considering the same or significantly overlapping claim construction issues and invalidity challenges, and (iv) is scheduled to begin a jury trial on December 9, 2020. This means that the jury trial is set to be completed months before the Board would be statutorily required to issue a final written decision in this proceeding if an *inter partes* review were instituted.

Because of the duplicative nature of the proceedings, the amount of resources that the district court has already expended, and the advanced stage of the district court litigation, instituting review in this case would not be an efficient use of the Board's resources and would not serve the objective of providing an effective and efficient alternative to district court litigation. *See, e.g.*, H.R. Rep.

No. 112-98, pt. 1, at 40, 48 (2011); *NHK Spring*, IPR2018-00752, Paper 8 at 19-20.

As noted above, the parties in the district court litigation are the same as in the Petition. *See, e.g.*, 2004, 1. The two proceedings would indisputably apply the same claim construction standard. *See* Petition at 18. Claim construction proceedings in the district court are set to begin in one week. *See* EX2004 at 4 (setting exchange of terms for February 25, 2020). Patent Owner will propose the "converting" term, and the construction for "converting" as proposed below in preliminary response to the Petition. Petitioner can likewise propose any or all of the terms it identifies in the Petition. Claim construction briefing and preparation for a district court *Markman* hearing will conclude by May 19, 2020, the day after the statutory date for an institution decision. *Id.*, 3-4.

The court in the parallel district court case will also consider the same invalidity art and arguments as raised in the Petition—in part because Petitioner has copied those same art assertions and arguments into a claim chart in its invalidity contentions. *See* EX2009. Each of the challenged claims of the '535 Patent here (1 and 2, see Petition at 21) are challenged verbatim with the same art and arguments in those district court invalidity contentions. *See*, *e.g.*, EX2009, 1-2, 25.

Substantial resources have already been expended in the district court case.

Discovery has begun and is set to be substantially complete by April 7, 2020.

EX2004.  The parties have exchanged detailed infringement and invalidity

contentions.  And more resources, including litigating and determining claim

construction, will be expended shortly.  EX2004.  The district court has declined

Petitioner's request to stay proceedings because of the Petitions.  EX2005.  A

pretrial hearing is set for September 20, 2020, and a trial date is set for December

9, 2020.  EX2004, 1.

Under these facts and circumstances, which were also present and were

dispositive in *NHK Spring*, *Next Caller*, and *E-One*, institution of a duplicative

parallel (and trailing) *inter partes* review proceeding would be an inefficient and

wasteful use of the Board's limited resources.  As in those cases, the Board should

deny institution in its discretion under Section 314(a).  This will allow the

identical art and arguments to continue to be litigated and determined in district

court, where substantial resources have already been expended and the district

court stands ready to decide the issues urged here.  Institution of an *inter partes*

review based on Cisco's Petition cannot provide the "effective and efficient

alternative to district court litigation" contemplated by the AIA.  *NHK Spring*,

IPR2018-00752, Paper 8 at 20.  Accordingly, institution should be denied.

**B.     The references and arguments raised in the Petition are cumulative of those raised, considered, and overcome during prosecution, warranting discretionary denial under 35 U.S.C. §325(d).**

The Board also can and should deny institution under Section 325(d), because "the same or substantially the same prior art or arguments previously were presented to the Office." 35 U.S.C. §325(d); *see also Hologic, Inc. v. bioMerieux, Inc.*, IPR2018-00568, Paper 9 at 11 (P.T.A.B. Aug. 7, 2018); *Becton, Dickenson and Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17-18 (P.T.A.B., Dec. 15, 2017) (informative).

*Becton* and similar cases set forth factors to be considered, which are discussed in detail below. But the core rationale for exercising discretion to deny institution under Section 325(d) is straightforward: the Board has limited resources, and there is an interest in granting patent owners "repose" on issues already adjudicated. *See Dorco Co., Ltd. v. The Gillette Co., LLC*, IPR2017-00500, Paper 7 at 14 (P.T.A.B. June 21, 2017). Deciding whether to exercise discretion under Section 325(d) to deny review, "the Board weighs petitioners' desires to be heard against the interests of patent owners, who seek to avoid harassment and enjoy quiet title to their rights." *Neil Ziegman, N.P.Z., Inc. v. Stephens*, IPR2015-01860, Paper 11 at 12-13 (P.T.A.B. Feb. 24, 2016) (*citing* H.R. Rep. No. 112-98, pt. 1, at 48 (2011)).

Here, the Petition's primary *Roberts* reference is identical to a related *Roberts* Divisional reference considered by the Examiner.  In addition, other references that used DACs to drive modulator electrodes with analog voltages, as in disclosures Petitioner relies on in *Burchfiel* and *Roberts*, were specifically discussed and distinguished with the Examiner during related family prosecutions.

The Board should decline to institute trial under Section 325(d) because the "the same or substantially the same prior art or arguments" presented in the Grounds "previously were presented to the Office." *Hologic*, IPR2018-00568, Paper 9 at 11 (*quoting* 35 U.S.C. §325(d)).  The obviousness positions stated in the Petition are not substantially different from what was previously considered by the Patent Office.

### 1.    Grounds I and II rely on cumulative art (all claims).

Grounds I and II in the Petition rely exclusively on several citations to *Roberts* with respect to the "converting" element in all challenged claims. Petition at 34-38, 43, 57, 62.  But a divisional of the same application that let to *Roberts*, containing every one of the *Roberts* disclosures identified in the Petition, was cited in an information disclosure statement during prosecution of the '535 Patent, and was considered by the Examiner.  EX2007, 1 (*citing* U.S. Patent Application Publication No. 2007/0212076, attached hereto as EX2006).  *Roberts* Divisional is listed on the face of the patent.  EX1001, (56) References Cited

(*citing* U.S. Patent Application Publication No. 2007/0212076). The cited

*Roberts* Divisional (EX2006) was initialed by the Examiner, indicating that it was

in fact considered by the Examiner. EX2007, 1 ("ALL REFERENCES

CONSIDERED EXCEPT WHERE LINED THROUGH. /J.B.J./"); *see* M.P.E.P.

§609.05(b).

The cited *Roberts* Divisional contained every one of the *Roberts* disclosures

identified in the discussion of the "converting" elements in the Petition:

| *Roberts* citation (Petition pp. 34-38) | *Roberts* Divisional disclosure |
|---|---|
| EX1005, 8:14-20, 8:8-42, 8:14-42 | EX2006, [0049] – [0050] |
| EX1005, Table 1 | EX2006, Table 1 [0049] |
| EX1005, 7:60-65 | EX2006, [0047] |
| EX1005, 1:49-52 | EX2006, [0005] |
| EX1005, 3:42-44 | EX2006, [0015] |
| EX1005, 5:57-60 | EX2006, [0037] |
| EX1005, 6:31-37 | EX2006, [0041] |

The *Roberts* Divisional publication (EX2006) that was before the Office

during examination of the '535 Patent is accordingly "the same or substantially

the same prior art" as *Roberts* (EX1005), which is relied on as the sole or base

reference in each Ground in the Petition.

The Petition identifies only Table 1 of *Roberts*, and alternatively includes

"non-linear compensator 18," as structures allegedly performing the "converting" as claimed. Petition at 34-38. As shown above, the relied-on disclosure of both of these structures in the *Roberts* Divisional was before the Examiner and was considered by the Examiner prior to granting allowance of the '535 Patent. EX2007; EX2006, [0049]. The Petition fails to mention the *Roberts* Divisional or its identical disclosures to *Roberts*. Accordingly, the Petition provides no suggestion that the Examiner missed any relevant disclosure while considering, or was incorrect to allow the claims over, the identical disclosures of *Roberts* Divisional.

In addition to duplicating the considered disclosures of *Roberts* Divisional, the "non-linear compensator 18" of *Roberts* is discussed only in reference to *Roberts*' admitted Prior Art Figure 2. EX1005, 6:31-37 (referring to *Roberts*' Prior Art Figure 2); *see also id.*, 1:54-2:6 (same), 8:7-9 (same). In other words, the "compensator" in *Roberts* and *Roberts* Divisional is only mentioned as part of a prior art solution that employed filters and complex digital-to-analog converters (DACs) to drive analog voltage levels onto electrodes of a modulator. *See, e.g.*, EX2006, [0049] (referring to Prior Art Figure 2) [0041] (same), [0006] (same), Fig. 2:



Figure 2
(Prior Art)

The analog driver circuitry of Figure 2 of *Roberts* and *Roberts* Divisional is substantially similar to structures disclosed in other references raised by the same Examiner and overcome by the Applicant during prosecution of applications related to the '535 Patent. For example, the *Price* reference discloses driving the electrodes of a modulator with analog signals, and in this aspect is the same as the disclosure of *Roberts* Figure 2. *See* EX2010, Fig. 8. During the related '465 Patent prosecution, the same Examiner cited *Price* in a rejection. *See* EX2013, 277-281 (IPR2020-00122, EX1002). In response, Applicant argued that *Price* was exclusively analog, and did not disclose mapping or conversion of digital inputs into a vector of digital voltage values. *See id.*, 55-56. This argument was successful, and the claims were allowed as amended. *Id.*, 35. The same argument applies to *Roberts* Figure 2, which drove the electrodes via analog signals, and did not disclose mapping or conversion of digital inputs into a vector of digital voltage values applied to electrodes.

To the extent the Petition argues that Roberts contains an embodiment that uses digital voltage vectors, or a converting of them, the argument remains cumulative of substantially the same art as was before the Patent Office.  The Examiner indisputably had and considered *Roberts* Divisional, and the Examiner did not base any rejection on it or conclude that it disclosed "converting." EX2007.

*Roberts* Divisional was also disclosed and considered by multiple Examiners during prosecution of multiple parent applications of the '535 Patent, including in the context of claims that recited digital-to-digital mapping.

For example, during the prosecution that led to U.S. Patent No. 9,479,191, from which the '535 Patent is a continuation, *Roberts* Divisional was also disclosed and considered by the same Examiner as the '535 Patent.  EX2011, 22 ("ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /J.J./").[3]  The claims at issue in the '191 Patent application also included a "converting" step, and recited that the mapping chose different output values for each input by "selecting" from among all possible outputs.  *Id.*, 25 (Claim 1: ". . .

---

[3] EX2011 and EX2012 consist of excerpts of the relevant file wrappers for ease of reference.  Should the Board prefer the full file wrappers, Patent Owner will file them upon Board authorization.

digital-to-digital converter is enabled to *map* each digital input data word to a binary actuation vector of M bits *by selecting a binary actuation vector from [those] available* . . .").  The Examiner chose *Price*, rather than *Roberts* Divisional, to serve as the basis of a rejection, asserting that it disclosed the claimed mapping and selection.  *Id.*, 14-15.  Applicant explained that *Price* was analog, but also did not disclose a digital-to-digital converter providing a "converting" to vectors.  *Id.*, 7-8.  This argument was successful, and the patent issued.  *Id.*, 3.

The same issues were also raised before, and considered by, a different Examiner during the prosecution that led to U.S. Patent No. 9,031,417, from which the '535 Patent is a continuation.  There, *Roberts* Divisional was also disclosed and was the first reference considered by the Examiner.  *See* EX2012, 44.  The claims at issue in the '417 Patent application also included a "converting" step, and recited that the mapping chose different output values for each input such that there was not a one-to-one correspondence between bits of the input and output values.  *Id.*, 9.  There too, the Examiner chose *Price*, rather than *Roberts* Divisional, to serve as the basis of an obviousness rejection.  The Examiner argued that *Price* taught the claimed mapping and selection.  *Id.*, 36-37 ("the use of the signal conditioner 98 [in *Price*] is *not a simple one-to-one mapping of the data*").  There too, Applicant overcame this rejection, explaining

that *Price* did **not** disclose digital-to-digital mapping and was analog. *Id.*, 21-23. In an interview, the Examiner and Applicant discussed "the digital-to-digital converter" and "conversion function." *Id.*, 6. Ultimately, the Examiner was persuaded, and the patent issued. *Id.*, 1.

In short, two different Examiners over the course of at least three prosecutions of the '535 Patent family considered the *Roberts* Divisional, but did not conclude that it disclosed "converting" as claimed. This outcome makes sense, because the patents consistently teach, and their claims require, a converting wherein the input values and output values were non-identical. *See, e.g.*, EX2012, 2-3. The *Roberts* Divisional does not disclose that claimed "converting."

As explained above, Petitioner's Grounds I and II seek to inefficiently expend Board resources re-litigating the Examiner's consideration of *Roberts* Divisional, now through the vehicle of *Roberts*.[4] *See also, e.g.*, *Nu Mark LLC v.*

---

[4] Ground II proposes a combination of *Roberts* with *Ho*, but only relies on *Ho* with respect to the final "pulse modulated" / "QAM modulated" elements of the challenged claims. *See* Petition at 57, 62. Accordingly, *Ho* does not cure the cumulative nature of Petitioner's reliance on *Roberts* or the deficiency of the Ground II with respect to the key "converting" element. *Id.*

*Fontem Holdings 1, B.V.*, IPR2016-01309, Paper 11 at 12-13 (P.T.A.B. Dec. 15, 2016) (denying institution under §325(d) where one of the two cited references was directly before the Office and the other was cumulative of art before the Office). The Board should exercise its discretion to deny Petitioner's cumulative and wasteful invitation to revisit these issues.

### 2. Ground III relies on cumulative art (all claims).

Ground III is also cumulative of similar references and arguments that were before the Patent Office. *Roberts* is cumulative for the reasons detailed above. Even if the references were appropriate to be combined, *Burchfiel* adds nothing to *Roberts* that was not already before the Examiner. *Burchfiel* disclosed a system that relied on digital to analog converter (DAC) circuits to drive analog voltage levels onto the electrodes of the disclosed MZI modulator. *See, e.g.*, EX1008, Figure 1 ("DAC" 114 and 120):



FIG. 1

*See also id.*, Abstract ("A first and a second digital-to-analog converter generates first and second analog signals . . ."), 3:18-27, 3:36-39 ("The modulator 126 also includes a first 134 and a second electrical modulation input 136 that is coupled to a respective output 118, 124 of the first and second digital-to-analog converters 114, 120.").

In this regard, *Burchfiel* is therefore substantially the same as *Price*, which also used analog signals to drive the electrodes of a MZI modulator. *See, e.g.*, EX2010, [0088] ("The signal conditioner 98 can couple, phase shift, provide electronic signal distortion, or otherwise condition one or more data signals."), Figure 8:

26



Fig. 8

*Burchfiel* is also like the *Roberts* Figure 2 disclosure (described by Roberts as depicting "Prior Art"), which also used DACs to drive analog signals onto the modulator electrodes.  EX1008, Figure 1 ("DAC"); EX1005, Figure 2 ("DAC"):



During prosecution of the related '465 Patent, the Applicant overcame a rejection over *Price* on the basis of this same analog characteristic.  The same Examiner cited *Price* in an August 14, 2017 Non-Final Rejection, asserting both

27

anticipation and obviousness.  *See* EX2013, 277-281.  On February 14, 2018, the Applicant amended the claims to clarify the output of the mapping was a "a vector of M voltage values," and responded by explaining that *Price* was instead analog, and did not disclose mapping or conversion of digital inputs into a vector of digital voltage values.  *See id.*, 55-56.  Applicant's explanation was persuasive, and the claims were allowed as amended.  *Id.*, 35.

Applicant's explanation would have applied equally to *Burchfiel*, which, like *Price*, taught using analog voltage levels to drive the modulator electrodes, and did not disclose mapping or conversion of digital inputs into a vector of digital voltage values to drive those electrodes.  Had *Burchfiel* been before the Examiner, it should and would have been overcome in the same way and for the same reasons as *Price*.

*Price* **Fig. 8**
(detail, annotated in red)



*Burchfiel* **Fig. 1**
(detail, annotated in red)



### 3.    The *Becton* factors favor denial of institution here.

The Board's informative decision in *Becton* provided a non-exhaustive list of factors to consider in determining whether to deny institution under Section 325(d): "(a) the similarities and material differences between the asserted art and the prior art involved during examination; (b) the cumulative nature of the asserted art and the prior art evaluated during examination; (c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection; (d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art; (e) whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and (f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of prior art or arguments." *Becton*, IPR2017-01586, Paper 8 at 17-18.

With respect to the first and second factors, the prior art involved in the examination is identical in all relevant respects (*Roberts* Divisional and *Roberts*), or substantially the same in dispositive distinguishing characteristic (*Price* and *Burchfiel*). The Petition art is indisputably cumulative.

With respect to *Becton* factor three, *Roberts* Divisional was not the basis for a rejection, though similar art was. But *Roberts* Divisional was raised and

considered both by the '535 Patent Examiner (in the '535 Patent prosecution and at least one related prosecution) as well as by a different Examiner in yet another related prosecution. And similar art to *Burchfiel* (the *Price* reference) was the subject of an overcome rejection in all three of these prosecutions, including prosecution of the challenged '535 Patent.

The arguments before the Examiner significantly overlap those raised in the Petition and are distinguished in the same or similar way here. As explained in more detail below, *Roberts* does not disclose "converting" as described and used in the '535 Patent. *See* Section III.D.1. Multiple Examiners appear to have reached the same conclusion regarding the identical disclosures of *Roberts* Divisional. And *Burchfiel*, disclosing the use of DAC circuits to drive electrodes with ***analog*** signals, is distinguishable here for the same reasons that *Price* was distinguished before the Office. *See* Section III.D.3 below.

And finally, with respect to the last two *Becton* factors, Petitioner has not acknowledged the Examiner's consideration of *Roberts* Divisional, or the similarities between *Burchfiel* and *Price*. Accordingly, there is no allegation in the Petition that the Examiner "erred in its evaluation of the asserted prior art" or any suggestion of new evidence and facts that would "warrant reconsideration of [the] prior art." *Becton*, IPR2017-01586, Paper 8 at 18. Instead, multiple Examiners considered *Roberts* Divisional but did not see what Petitioner now

claims is disclosed in it.  This is consistent with the conclusion that these Examiners did not believe that *Roberts* Divisional (and, by extension, the disclosure of *Roberts* relied upon here) disclosed "converting" as claimed.

In summary, neither the purpose of the AIA nor efficient use of scarce Board time and resources are served by a Board trial duplicating (by then) completed parallel litigation of the same issues in the district court, or by re-litigation before the Board of issues already raised and determined before the Office.  *NHK Spring*, IPR2018-00752, Paper 8, at 11, 20; *Neil Ziegman, N.P.Z*, IPR2015-01860, Paper 11 at 12-13.  Yet Cisco's Petition effectively asks the Board to do both.

Accordingly, Patent Owner respectfully requests that the Board exercise its discretion to deny institution of *inter partes* review here.  The issues raised by Cisco in both the Petition and the district court should be tried and resolved at the earliest possible opportunity:  by jury trial in December of 2020.  *See* EX2004.

## III.    Institution should be denied because Petitioner has failed to show a reasonable likelihood of success on any challenged claim.

Institution should also be denied because the Petitioner has failed to establish it has a reasonable likelihood of demonstrating that even a single challenged claim is unpatentable.  All three of Petitioner's Grounds rely on *Roberts* as a primary reference.  But none of the Grounds establish that *Roberts*

(alone or in combination with *Ho* or with *Burchfiel*) would have rendered obvious any of the challenged claims. Neither *Roberts* nor *Burchfiel*, the two references relied on with respect to the "converting" elements of all challenged claims, disclose, suggest, or otherwise could have rendered obvious "converting" as used in the '535 Patent and properly construed accordingly.

In addition, Petitioner has not demonstrated that *Burchfiel* is properly combined with *Roberts*, which teaches away from inefficient, analog solutions such as *Burchfiel*'s. Because Petitioner's cumulative arguments fail to establish a reasonable likelihood of proving any challenged claim unpatentable, trial should not be instituted

### A. The '535 Patent

As discussed above, the '535 Patent discloses and claims techniques for fast modulation of digital data onto optical streams—which is useful in a variety of high-performance, high-bandwidth optical communications applications. *See, e.g.*, EX1001 at Abstract. 1:32-51. The claimed techniques included "a digital-to-digital converter that provides a mapping of input data words to binary actuation vectors" suitable for driving the electrodes of an electro-optical modulator device. *Id.*, Abstract.

Known optical modulators at the time of the patent had characteristics that limited their performance, such as non-linear response. *Id.*, 1:58-66, Figure 2A.

And known solutions for these problems were inefficient and complicated.  *Id.*, 1:66-2:30.  They often required complex and power-hungry digital to analog converter (DAC) circuits to drive electrodes of the modulator, which were limited in speed.  *Id.*, 1:66-2:6; *see also* EX1005, 3:8-13.  Existing solutions that employed digital signals to drive the electrodes did not correct for problems like modulator non-linearity, or else were needlessly complicated and inefficient.  EX1001, 2:7-30.

The '535 Patent inventors instead taught and claimed a digital-to-digital converter to map input digital data into digital output data—in the form of digital vectors that could be directly driven onto the electrodes of existing electro-optical modulators.  *Id.*, Abstract, 7:5-25, Figure 1 ("DDC"):



This mapping enabled efficient, fast signal corrections via conversion of input values to different output values in the digital domain.  *Id.*, 7:21-25, 7:31-62.  The patent disclosed example methods for optimizing and performing the mapping,

including via a Root Mean Square Error calculation to derive the best approximated selection of output value for a given input value. *Id.*, 11:23-12:17.

Accordingly, the invention of the '535 Patent achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead directly driving the modulator with digital signal vectors and using the optical modulator itself to effect a faster digital-to-analog conversion. *See, e.g.*, EX1001, 15:16-18 ("The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as 'Direct Digital Driving'"). The claimed techniques also more efficiently correct for the known problem of non-linear response in optical modulators operated at high transmission speeds—by the novel digital-to-digital mapping of the challenged claims. *See, e.g.*, *id.*, 7:33-66.

The '535 Patent teaches and claims "map[ping] a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical." EX1001, 4:62-5:3. This can provide an improvement to module linearity or correct for other module characteristics, as illustrated via the descriptions and figures of the '535 Patent. *Id.*, Figs. 4 (detail annotated in red below), 2A & 2B:

FIG. 4

| Input Value (decimal) | DDC Mapping | | Output Value (decimal) |
|---|---|---|---|
| | DDC Input | DDC Output | |
| 0 | 0000 | 0000 | 0 |
| 1 | 0001 | 0011 | 3 |
| 2 | 0010 | 0100 | 4 |
| 3 | 0011 | 0101 | 5 |
| 4 | 0100 | 0101 | 5 |
| 5 | 0101 | 0110 | 6 |
| 6 | 0110 | 0111 | 7 |

The effect on linearity made possible by the '535 Patent's digital-to-digital

mapping is also illustrated by Figures 2A (detail annotated in red below to show

mapping of input values to ideal linear response) and 2B (annotated in red below):





FIG. 2B

By changing which digital input values map to which digital output values, according to the formulas and techniques taught and claimed by the '535 Patent, a more desirable (*e.g.*, more linear) response curve can be achieved than was possible with the prior art. *See, e.g.*, EX1001, 7:33-66, 11:23-12:17.

**B.    The '535 Patent Challenged Claims**

The challenged claims are all directed to variations of this solution.  For example, challenged claim 1 recites:

> 1. A method of modulating and transmitting an optical signal over an optical fiber in response to N bits of digital data in parallel, the method comprising:
> (A) inputting the N bits of digital data into an optical modulator having a plurality of waveguide branches, where each branch has an input of an unmodulated optical signal;
> (B) converting the N bits of digital data to M drive voltage values, where M>N and N>1;

> (C) coupling the M drive voltage values to the unmodulated optical signal, said coupling enabling pulse modulation of the unmodulated optical signal, thereby generating a pulse modulated optical signal; and
>
> (D) transmitting the pulse modulated optical signals over an optical fiber.

Claim 2 contains the same preamble and elements (A) and (B) as claim 1 above, but has a different elements (C) and (D) as follows:

> (C) coupling the M drive voltage values to the unmodulated optical signal, said coupling enabling modulation of the unmodulated optical signal by QAM, thereby generating a QAM modulated optical signal; and
>
> (D) transmitting the QAM modulated optical signals over an optical fiber.

Each of the challenged claims requires converting digital input values to a digital vector of output values. Element B. As discussed below, the '535 Patent specification makes clear that this converting occurs in the digital-to-digital domain, and results in the sets of input and selected output values being non-identical. This non-identical digital-to-digital converting enables the invented system to correct for non-linearities or other undesirable signal characteristics, and to do so without employing the complex, slow, and power-hungry DAC

circuits of prior solutions.  *See, e.g.*, EX1001, 4:62-5:3, 7:33-66, Figures 4, 2A & 2B.

## C.    Claim Construction

For purposes of *inter partes* review disputed claim terms are construed to give them "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *See* 83 Fed. Reg. 51341 (Oct. 11, 2018) (adopting the standard of *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005)).  The proper construction is considered in the context of, and must be consistent with, the specification—and the claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art.  *See, e.g.*, *Phillips*, 415 F.3d at 1313.

A person of ordinary skill in the art with respect to the '535 Patent would have at least a Master of Science degree in Electrical Engineering or Electrical and Computer Engineering, with at least two years of academic or professional engineering experience in the analysis and design of optoelectronic systems for optical communications.  EX2002, ¶22.

When the patent specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," then that special definition is what the person of ordinary skill would understand and is the correct construction.  *Phillips*, 415 F.3d at 1316 ("In such

cases, the inventor's lexicography governs.").  Generally, under *Phillips*, the inventor's intention with regard to claim scope, "as expressed in the specification, is regarded as dispositive." *Id.*

Of the four claim terms mentioned in Petitioner's section on claim construction (Petition at 18-21), only one requires construction in these preliminary proceedings, and Patent Owner offers its proposed construction for that term below.  Because the '535 Patent describes and uses a special definition that would be understood from the specification by persons of skill in the art, construction of the claim term "converting" is necessary to resolve the substantive arguments raised by the Petition.  Petitioner's assertion that "converting" does not require construction is erroneous, misapplies *Phillips*, and ignores the context and special definition supplied by the patent specification, as explained below.

### 1.    "converting"

The '535 Patent specification explicitly defines and explains the inventor's intended scope for the claimed "converting," consistently using the term to refer to a digital-to-digital conversion or mapping that produces output values that are non-identical with the input values.  Under the *Phillips* standard, this inventor lexicography and intention governs the meaning of the term in the context of the '535 Patent.

The term "converting," which is used in the '535 Patent interchangeably

with "mapping," and in discussions of digital-to-digital conversion and digital-to-digital mapping, would be understood by a person of ordinary skill according to the patent's express definition of "digital-to-digital converter."  EX2002, ¶¶25-30. Accordingly, the term "converting" should be given the construction "mapping a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical," as discussed further below.

| Claim term | Patent Owner (PO) proposed construction | Petitioner proposed construction (Petition at 20) |
|---|---|---|
| "converting" (claims 1, 2) | "mapping a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical," | does not require formal construction |

The '535 Patent explicitly defines the term "digital-to-digital converter" as "a device which maps a set of possible input values to a set of possible digital output values, where the input and output values are non-identical."  EX1001, 4:62-65.  The specification further describes the converter as a "non-trivial converter in which there is typically not a one-to-one mapping between bits of the input data and bits of the output data."  *Id.*, 4:66-5:3.  In other words, while the mapping may typically not be one-to-one, it is in all cases defined as non-identical.  *Id.*, 4:66-5:3, Figure 4, 7:17-25, 7:33-66, 11:23-29, 12:3-17; s*ee also*

EX2002, ¶26.

The '535 Patent repeatedly and consistently teaches that the converting employed in the claimed invention must involve input and output values that are not identical.  *See, e.g.*, EX1001, 4:62-65 ("maps . . . where the ***input and the output values are non-identical***"), 7:17-25 ("***differing*** from a simple one-to-one mapping of data bits"), 11:20-29 ("it is understood that a binary input data vector $D_i$ has to be ***mapped*** to a control vector $B_i$, ***yet $B_i \neq$ [not equal] $D_i$***.  The DDC, implemented as all-electronic, shall perform this ***mapping operation***.").  S*ee also* EX2002, ¶28.

The '535 Patent uses variants of "converting" and "mapping" interchangeably, and always in reference to the digital-to-digital convertor of the explicit definition above.  *See, e.g.*, EX1001, 7:64-67 ("digital-to-digital mapping" and "a digital-to-digital converter"), Abstract ("digital-to-digital converter that provides a mapping"), 13:23-31, 15:22-28 ("DDC mappings").  An example of the mapping, illustrating the required non-identity between input and output values along with its potential effect on module response linearity, is demonstrated via Figures 4, 2A, and 2B, and their accompanying descriptions. *See, e.g.*, EX1001, Figs. 4, 2A & 2B, 5:49-59, 6:5-9, 7:33-66.  The required non-identical mapping is plainly seen from Figure 4 (annotated in red below):

FIG. 4

| Input Value (decimal) | DDC Input | DDC Output | Output Value (decimal) |
|---|---|---|---|
| 0 | 0000 | 0000 | 0 |
| 1 | 0001 | 0011 | 3 |
| 2 | 0010 | 0100 | 4 |
| 3 | 0011 | 0101 | 5 |
| 4 | 0100 | 0101 | 5 |
| 5 | 0101 | 0110 | 6 |
| 6 | 0110 | 0111 | 7 |
| 7 | 0111 | 0111 | 7 |
| 8 | 1000 | 1000 | 8 |
| 9 | 1001 | 1001 | 9 |
| 10 | 1010 | 1001 | 9 |
| 11 | 1011 | 1010 | 10 |
| 12 | 1100 | 1011 | 11 |
| 13 | 1101 | 1011 | 11 |
| 14 | 1110 | 1100 | 12 |
| 15 | 1111 | 1101 | 13 |

See also EX2002, ¶27.

Other prosecution histories in the same family of patents as the '535 Patent further support the '535 Patent's special definition of "converting" as including output values that are non-identical with input values. For example, the application that became the '465 Patent was originally submitted with claims that included the express definition of "digital-to-digital converter" from the patent specification. See EX2013, 337:

> using a digital to digital converter to map a set of N input values corresponding to said N bits of digital data to a set of M output values where M is larger than N and where the input and output values are not identical

Subsequently, the Examiner rejected these claims, citing for example the *Price* reference. See id., 277-278. Applicant responded with an Amendment that made

multiple edits to element B.  *See id.*, 50.  First, it replaced the text from the explicit specification definition "using a digital to digital converter to map . . . where the input and output values are not identical" with the word "mapping." Second, it replaced "set of M output values" with "vector of M voltage values." *Id.*

using a digital to digital converter to mapping a set of N input values corresponding to said N bits of digital data to a vector set of M output voltage values where M is equal to or larger than N and where the input and output values are not identical;

In Remarks accompanying the Amendment, Applicant distinguished *Price* on the basis that it disclosed only analog inputs and outputs to the optical modulator, and did not disclose "mapping or converting of digital data to voltage values."  *Id.*, 55-56 (explaining that "there is no indication that these input signal are digital signals nor is there an indication that they are mapped or converted to voltage values") (emphasis in original).  In other words, Applicant distinguished *Price* based on its lack of disclosure of digital inputs and outputs of the alleged mapping.  As in the patent specifications, Applicant used converting and mapping interchangeably here.  *Id.* ("mapping or converting" and "mapped or converted").

As another example, in the prosecution that led to U.S. Patent No. 9,031,417, from which the '535 Patent is a continuation, the claims at issue in the application were amended to include explicit mention of a digital-to-digital

converter configured for providing the existing "mapping" step. EX2012, 9 (claim 1). The claimed mapping occurred by "selecting" a binary actuation vector output from a plurality of available outputs for the particular input, and did so such that there was not a one-to-one correspondence between bits of the input and output values. *Id.*, 9, 16 ("mapping each input data word of N bits by selecting a binary electrode actuation vector of M bits to represent the input data word").

This selection language is present in the Abstract of the '535 Patent. EX1001, Abstract. And the disclosures of the '535 Patent describe the converting process of the digital-to-digital converter as resulting in the "best approximated selection" of output value $B_i$ given different input value $D_i$. EX1001, 11:23-12:15 ("closest M-bit binary representation"). Whether explicitly included in the claim language (as in the '417 application), or incorporated therein through the definition of "converting" given in the patent (as in the challenged claims), the meaning and effect of these disclosures is consistent and clear.

In the context of the numerous and consistent specification disclosures, a person of ordinary skill would understand that the claimed "converting" step implements the inventive function of the digital-to-digital converter—non-identically converting between the input value of the "N bits of digital data" to the output value "M drive voltage values." See EX1001, 17:16-21 (claim 1), 18:11-16 (claim 2); s*ee also* EX2002, ¶29. The converting "select[s] a binary actuation

vector from a subset of binary actuation vectors available to represent each of the input data words." *Id.*, Abstract. That selection is necessarily non-identical, in order to achieve the inventive result of correcting for non-linearities or other undesirable signal characteristics of the modulator. *See, e.g.*, EX1001, 11:20-29 ("binary input data vector $D_i$ has to be mapped to a control vector $B_i$, ***yet $B_i \neq$ [not equal] $D_i$***"). And this meaning is consistent with the express definition of the "digital-to-digital converter" that performs the converting step. *Id.*, 4:62-65 ("where the input and output values are non-identical").

For all of these reasons, the claim term "converting" should be construed according to the meaning it would have to one of ordinary skill in the art reading the specification, as "mapping a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical." *See also* EX2002, ¶¶25-30.

### 2.    Other proposed claim terms

As discussed herein, the Petition includes fatal defects that do not turn on whether any of Petitioner's definitions of other claim terms such as "pulse modulation / modulated," "digital," or "modulator" apply. First, as detailed above, the Petition is procedurally defective because it is both too late to provide an efficient alternative to determination in parallel district court proceedings and too cumulative of prior determinations. *See* Section II above. Second, Petitioner

has not shown that any of the relied-on references disclose or render obvious the "converting" element of each challenged claim.  *See* Section III.D below.  Each of these bases is sufficient to warrant denial of institution.

For the purposes of this Preliminary Response, therefore, Patent Owner does not propose any specific constructions for these additional three terms, and respectfully requests that the Board not adopt Petitioner's unnecessary suggestions concerning their construction.  *See, e.g.*, *Sandoz Inc. v. Abbvie Biotechnology Ltd.*, IPR2017-01987, 2018 WL 1230583, at *5 (P.T.A.B. Mar. 9, 2018) ("[B]ecause neither of those phrases requires construction for us to resolve the instant dispute, we decline to construe them.  *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ('only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy').").

Petitioner admits that its arguments do not depend on its proposed constructions for "digital," and "modulator."  Petition at 21.  And Petitioner's incomplete proposed construction for what should be "at least include[d]" in a "pulse modulate/modulated" construction merely seems to be directed at confirming an uncontroversial example that the patent already confirms.  *Id.* at 19 ("An example of a pulse modulated signal is a signal in a return-to-zero (RZ) format"); *see also* EX1001 at 16:28-30 ("Return-to-Zero (RZ) format is a pulsed

modulation").  There is no need for the Board to construe these four terms for the purpose of deciding whether to deny institution.

Patent Owner reserves the right to propose or challenge constructions of these additional terms or others in its §42.120 Response if any trial is instituted.

### 3.    Effective priority date

The '535 Patent is entitled to at least the effective priority date of U.S. Provisional Application No. 60/943,559, filed June 13, 2007.  EX1023 ("the 2007 provisional application").  The cursory statements in the Petition disputing this date should be disregarded, as should Petitioner's expert declaration adopting those statements without support.  Petition 15-17; *see also* EX1003, ¶¶89-93 (repeating portions of the Petition).  Petitioner asserts that each of the references it relies on was prior art as of the earliest claimed priority date, making its priority date arguments unnecessary for the Board to resolve with respect to the availability of those references as prior art.  Petition at 21-22.  Because the Board therefore need not address Petitioner's priority date arguments for this preliminary response Patent Owner will not address those priority date arguments in detail here as part of its Preliminary Response.  Patent Owner reserves the right, however, to challenge the Petition's assertions about priority dates in its §42.120 Response if any trial is instituted or in any other proceeding—at the Patent Trial and Appeal Board or elsewhere—involving the '535 Patent.

Because Petitioner admits that its priority date arguments have no effect on the art relied on in its Petition, the Board need not reach those arguments. Should the Board choose to consider the issue, however, Patent Owner respectfully requests that the Board determine that the effective priority date of the '535 Patent is at least as early as the 2007 provisional application.

The 2007 provisional application (EX1023) and the 2008 PCT application (EX1024) each provide support for pulse modulation and QAM modulation to the understanding of a person of ordinary skill at those times.

The 2007 provisional application discloses modulation of the "power" or "intensity" of an optical signal. *See, e.g.*, EX1023, Abstract ("modulating the intensity of an optical signal"), 3:16-20, 6:17-7:4. The application defines modulator as outputting a "controlled variation of intensity" by inducing variation in production of the signal or modifying a signal already produced. *Id.*, 9:22-10:4. The application also describes MZI modulators as "leading to chirp-free pulses" on the output. *Id.* at 2:1-5. *See also*, EX1024, (57) Abstract, 2:1-5, 3:16-20, 6:17-7:4, 9:22-10:4. Each of these disclosures would have been understood as referring to pulse modulation by a person of ordinary skill in the art at the time. EX2002, ¶43.

The 2007 provisional application discloses that the input to the modulator may be a sequence of binary values of a word of N digital bits. *See, e.g.*,

EX1023, 13:1-5.  The application explains that modulation can be implemented by "on-off level voltage switching" of actuating voltages on modulator electrodes, responsive to the input digital data stream.  *See, e.g.*, *id.*, 15:8-9, 15:18-20.  *See also*, EX1024, 13:1-5, 15:8-9, 15:18-20.  Each of these disclosures would have been understood as referring to pulse modulation by a person of ordinary skill in the art at the time.  EX2002, ¶44.

In addition, the 2007 provisional application discusses modulation of the optical signal by varying its phase in different amounts.  *See, e.g.*, EX1023, 18:18-20, 2:7-12.  The application explains that modulation (*i.e.*, controlled variation of "intermediate optical attenuation levels") can be implemented by "inducing changes" in phase via the electro-optic effect.  *Id.*; *see also id.*, 19:14-20:6 (providing a mathematical model of the modulation function derived from electrode activation phase shifts).  *See also* EX1024, 18:18-20, 2:7-12, 19:14-20:6.  EX2002, ¶45.

A person of ordinary skill in the art in June of 2007 (or 2008, for the PCT) would have understood these and other passages to disclose and provide support for known techniques of pulse modulation.  EX2002, ¶46.  This conclusion is consistent with Petitioner's own dictionary definition proposal for the meaning of pulse modulation.  *See* Petition at 19-20; EX2002, ¶47.

These and other disclosures of the 2007 provisional application and the

2008 PCT application also provide support for known techniques of phase modulation, such as for example Quadrature Amplitude Modulated (QAM) modulation.  This conclusion is consistent with Petitioner's own argument that QAM was a "well-known and preferred modulation scheme" as of the date of the *Roberts* reference.  *See* Petition at 48.

For at least these reasons, therefore, should the Board choose to address Petitioner's priority date arguments, the challenged claims should be awarded an effective priority date of June 2007 (based on the provisional application) or, at a minimum, June 2008 (based on the PCT application).

**D.    There is no reasonable likelihood that Petitioner will prevail in its contention that the challenged claims are obvious over *Roberts* alone (Ground I), or in combination with *Ho* (Ground II) or *Burchfiel* (Ground III).**

*Roberts* does not disclose or render obvious digital-to-digital "converting" as claimed.  And *Burchfiel* does not either.  Further, *Roberts* and *Burchfiel* are not properly combined.  There are numerous additional substantive deficiencies in the Petition, but these fatal flaws impact all of the Grounds and all of the challenged claims, and are sufficient alone to warrant denial of institution.

The Petition fails to show, as required by §314 and 37 C.F.R. §42.108, that there is a reasonable likelihood that Petitioner would prevail with respect to at least one of the claims challenged.  Accordingly, institution should be denied.

1.    **Petitioner has not shown that *Roberts* discloses or renders obvious digital-to-digital "converting."**

Petitioner has not shown that *Roberts* discloses the digital-to-digital "converting" claim element as disclosed and claimed in the '535 Patent. *See, e.g.*, EX1001, 17:16-17. "converting" is recited in the body or included by dependency in all challenged claims. *Id.*; *see also id.*, 18:11-12 (claim 2).

a.    **Table 1 of Roberts does not render obvious "converting" as used in the '535 Patent.**

Ground I of the Petition relies only on Table 1 of *Roberts*, and disclosures related to it, with respect to the "converting" element of all challenged claims. *See* Petition at 34-38.

*Roberts* Table 1 does not show or render obvious the claimed mapping. The Petition confuses the issue by focusing on the individual 0 or 1 bit values within the two binary representations in the two columns. *See* Petition at 34-36. But this obscures the fact that the values represented by the N-bit word of digital data in the left column are the same as the values of the M-bit vector of drive voltage values in the right column. A person of ordinary skill, or indeed anyone familiar with the various ways to represent numbers in binary, would recognize that the values represented in the two columns of *Roberts* Table 1 are identical. EX2002 ¶¶32-40; EX1005, Table 1 (annotated in red below).

TABLE 1

| $V_x(n)$ 3MSBs | Value (decimal) | $S_x(n)$ | Value (decimal) |
|---|---|---|---|
| 0 0 0 | 0 | 0 0 0 0 0 0 0 | 0 |
| 1 0 0 | 1 | 1 0 0 0 0 0 0 | 1 |
| 0 1 0 | 2 | 1 1 0 0 0 0 0 | 2 |
| 1 1 0 | 3 | 1 1 1 0 0 0 0 | 3 |
| 0 0 1 | 4 | 1 1 1 1 0 0 0 | 4 |
| 1 0 1 | 5 | 1 1 1 1 1 0 0 | 5 |
| 0 1 1 | 6 | 1 1 1 1 1 1 0 | 6 |
| 1 1 1 | 7 | 1 1 1 1 1 1 1 | 7 |

Ex.1005, 8:21-32.

Table 1 of *Roberts* relates input values, represented in words of bits in 3-bit little-endian binary coded octal format, to identical output values, represented as a 7-bit binary vector. While the binary representation format is different, the underlying value of each of the 3-bit data words of binary bits on the left would be understood to be the same as the value represented by the corresponding vector of binary digits on the right. A person of ordinary skill would also have understood this at the time of the '535 Patent invention. *See* EX2002 ¶33.

In the binary notation of the format used on the left of Table 1, the first bit column represents the ones digit, the second bit column represents the twos digit, and the third bit column represents the fours digit. For example, "111" indicates 1 one, 1 two, and 1 four, that is $1 + 2 + 4 = 7$. "101" indicates 1 one, no twos, and 1 four, that is $1 + 0 + 4 = 5$. A person of ordinary skill would have understood this, and also would have immediately recognized that the right side of Table 1 instead involves merely counting the bits set with a 1 to find the decimal value. For

example, "1111111" has seven ones and indicates 7, and "1111100" has five ones and indicates 5. *See* EX2002 ¶¶33-34.

The "converting" claim element is not taught or suggested by changing the binary representation format in a table. Instead, in *Roberts* Table 1, the digital data word and drive voltage value vector that are being represented are the same in the left and right of each row, as illustrated in the annotated figure below.

TABLE 1

| $V_x$ (n) 3MSBs | Value (decimal) | $S_x$ (n) | Value (decimal) |
|---|---|---|---|
| 0 0 0 | 0 | 0 0 0 0 0 0 0 | 0 |
| 1 0 0 | 1 | 1 0 0 0 0 0 0 | 1 |
| 0 1 0 | 2 | 1 1 0 0 0 0 0 | 2 |
| 1 1 0 | 3 | 1 1 1 0 0 0 0 | 3 |
| 0 0 1 | 4 | 1 1 1 1 0 0 0 | 4 |
| 1 0 1 | 5 | 1 1 1 1 1 0 0 | 5 |
| 0 1 1 | 6 | 1 1 1 1 1 1 0 | 6 |
| 1 1 1 | 7 | 1 1 1 1 1 1 1 | 7 |

At most, *Roberts* Table 1 teaches at a translation from one representation of a value to another representation of that same value. The individual bits are different, as befits the different format, but the ***values*** of the words on the left and on the right are the same. This is not the mapping of the challenged claims, under any proper interpretation. The term "converting" in the challenged claims, as discussed above, means "mapping a set of possible digital input values to a set of possible digital output values, where the input and output values are non-

identical."[5]  *Roberts* Table 1 simply does not disclose that the input and output values are non-identical.

*Roberts* Table 1 does not teach or suggest the claimed "converting," just as translating the numerical values from representation by English words into representation by Spanish words would not be "converting" even though the individual letters of the words are different—the meaning is the same:

TABLE 1

| $V_x$ (n) 3MSBs | Value (English) | $S_x$ (n) | Value (Spanish) |
|---|---|---|---|
| 0 0 0 | zero | 0 0 0 0 0 0 0 | cero |
| 1 0 0 | one | 1 0 0 0 0 0 0 | uno |
| 0 1 0 | two | 1 1 0 0 0 0 0 | dos |
| 1 1 0 | three | 1 1 1 0 0 0 0 | tres |
| 0 0 1 | four | 1 1 1 1 0 0 0 | cuatro |
| 1 0 1 | five | 1 1 1 1 1 0 0 | cinco |
| 0 1 1 | six | 1 1 1 1 1 1 0 | seis |
| 1 1 1 | seven | 1 1 1 1 1 1 1 | siete |

Even if "converting" was not formally construed, *Roberts* Table 1 would not teach the claimed "converting."  Instead, as illustrated above, Roberts Table 1 is akin to the separate concept of "translation."  But because the "converting" of the

_____

[5] Although Patent Owner focuses here on the correct construction of "converting" that it poses in the Claim Construction section above, Patent Owner also reserves the right to argue that the Petition references do not teach "converting" even under other constructions, or no construction.

challenged claims is set forth clearly in the '535 Patent to require "mapping a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical," *Roberts* Table 1 becomes even more strikingly inapposite.

In contrast to what *Roberts* teaches, the claimed converting involves non-identity of input (set or word) values and output (vector values). The difference between what is claimed and what *Roberts* Table 1 depicts is starkly demonstrated by Figure 4 of the '535 Patent (annotated in red below):

FIG. 4

| Input Value (decimal) | DDC Input | DDC Output | Output Value (decimal) |
|---|---|---|---|
| 0 | 0000 | 0000 | 0 |
| 1 | 0001 | 0011 | 3 |
| 2 | 0010 | 0100 | 4 |
| 3 | 0011 | 0101 | 5 |
| 4 | 0100 | 0101 | 5 |
| 5 | 0101 | 0110 | 6 |
| 6 | 0110 | 0111 | 7 |
| 7 | 0111 | 0111 | 7 |
| 8 | 1000 | 1000 | 8 |
| 9 | 1001 | 1001 | 9 |
| 10 | 1010 | 1001 | 9 |
| 11 | 1011 | 1010 | 10 |
| 12 | 1100 | 1011 | 11 |
| 13 | 1101 | 1011 | 11 |
| 14 | 1110 | 1100 | 12 |
| 15 | 1111 | 1101 | 13 |

DDC Mapping

'535 Patent Figure 4 has the same binary representation format in both columns—4-bit big-endian binary coded decimal format (such that the right-most bit is the "ones" bit). *See also* EX2002 ¶36. Although the values in the left and right column are in the same binary representation format, the values of the sets of

4-bit words on the input side are different from the values of the 4-bit vectors on the output side. *Id.* For example, input word 0001 (one) is mapped to output vector 0011 (three). Both input words 0011 (three) and 0100 (four) are mapped to output vector 0101 (five). In other words, Figure 4 of the '535 Patent illustrates that the "converting" of the challenged claims is non-identical, and may also not correspond one-to-one, between inputs and outputs. *See* EX1001, 4:62-5:3 ("where the input and output values are non-identical" and "there is typically not a one-to-one mapping").

The digital-to-digital converting of inputs to different output values is a key mechanism taught and claimed in the '535 Patent for achieving the invented improvements in linearity or other signal characteristics. *See, e.g.*, EX1001, 7:17-66, Figs. 4, 2A & 2B. *Roberts* Table 1 does nothing to accomplish this inventive purpose, because the underlying input and output ***values*** are identical.

*Roberts* Table 1 merely discloses an identical, one-to-one translation between binary formats. *See also* EX2002, ¶39. As such, it does not teach or suggest "that a binary input data vector $D_i$ has to be mapped to a control vector $B_i$, yet $B_i \neq D_i$." (EX1001, 11:25-27), or teach or suggest converting by "selecting a binary actuation vector" from among available output voltage vectors (*id.*, Abstract), or teach or suggest "a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values

are non-identical (*id.*, 4:62-65). In fact, because it teaches only a table in which the values represented by the words on the left are identical to the values represented by the vectors on the right, *Roberts* Table 1 arguably teaches away from the '535 Patent solution. But in any case, *Roberts* Table 1 does not teach or suggest the "converting" of the challenged claims.

The Petition fails to appreciate or explain the novel conversion aspect of the '535 Patent's claimed invention, and has not proposed any construction for "converting." *See, e.g.*, Petition at 20. Having completely failed to address what the claimed "converting" accomplishes, and how and why it does so, the Petition also fails to show how *Roberts* Table 1 could render obvious that "converting."

> **b.** *Roberts*' **mention of compensation does not render obvious the specific '535 Patent claimed solution.**

The Petition attempts to provide an "alternative" argument based on an (incorrect) assumption about a claim construction Petitioner apparently believed Patent Owner might propose. *See* Petition at 37-38.[6] But that alternative

---

[6] Patent Owner is not proposing a construction that "requires addressing the non-linear response of an MZI." Petition at 37. Instead, Patent Owner explains herein how the '535 Patent should be construed such that the claimed "converting" involves non-identity between values of the input words of bits and values of the

argument also fails to establish a reasonable likelihood that Petitioner has demonstrated obviousness for any challenged claim.

To make this "alternative" argument, Petitioner relies on an off-hand mention of compensation in *Roberts*. *Id.* But the sparse disclosure of a "non-linear compensator 18"—originating in an admitted Prior Art figure of *Roberts* and never explained in the Petition specification—does not disclose or render obvious the claimed "converting" of the challenged claims. *See* EX1005, Fig. 2, 6:31-37.

The Petition, like the portions of *Roberts* it cites, never explains how *Roberts*' "non-linear compensator 18" is "used to compensate non-linearities of the optical modulator." *See* Petition at 37-38 (*quoting* Roberts, EX1005, 6:31-37). Instead, the Petition merely suggests that this vague and unexplained mention of compensation somehow renders obvious the specific '535 Patent claimed techniques for achieving a similar result. *Id.* It does no such thing, and

---

output vectors. Section III.C.1. The techniques of the claims—and their converting element properly construed—do in fact enable addressing the non-linear response of MZI modulators. But the claims are not limited to addressing non-linearity, or to MZI modulators. *See, e.g.*, EX1001, 17:4-18. In any event, because *Roberts* does ***not*** enable these same things, institution should be denied.

the conclusory analysis of the Petition on this point should not be credited.

"[R]ejections on obviousness grounds cannot be sustained by mere conclusory

statements; instead, there must be some articulated reasoning with some rational

underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441

F.3d 977, 988 (Fed. Cir. 2006).

The existence of the need for non-linear compensation in the prior art was

known, as the '535 Patent itself explains. *See, e.g.*, EX1001, 1:58-66. And the

'535 Patent mentions some of the various inefficient prior art solutions for

providing non-linear compensation. *Id.*, 1:66-2:27 (*e.g.*, "biasing of the device

into a quasi linear regime coupled with reducing the modulation range" or "use of

an analog pre-distortion circuit"). But mentioning non-linear compensation in the

context of an inefficient prior art solution does not render obvious the specific and

new solution of the '535 Patent challenged claims—whether that mention appears

in the '535 Patent or *Roberts*. *See, e.g.*, EX1005, 6:31-37 (mentioning "non-linear

compensator 18" in the context of "Prior Art" Figure 2), 8:7-9 (same), 1:54-2:6

(same). To hold otherwise would result in the nonsensical outcome of

invalidating patents based on their background statements of the problems they

were invented to solve.

The Petition juxtaposes discussion of the mapping element of the

challenged claims with the mere mention of the concept of non-linear

59

compensation in *Roberts*. Petition at 37-38. In so doing, Petitioner likely hopes to encourage the incorrect conclusion that *Roberts*' unexplained and out of context mention of compensation is somehow suggestive of the solution taught and claimed in the '535 Patent. But this is, at best, an improper invitation to engage in hindsight reasoning. Petitioner must not use the disclosure of the challenged patent as a roadmap, and hindsight analysis does not support obviousness. *See, e.g.*, *Apple Inc. v. Contentguard Holdings, Inc.*, IPR2015-00442, Paper 9 at 11-12, 17 (P.T.A.B. July 13, 2015) ("analysis infected with impermissible hindsight cannot form the basis of an obviousness finding"); *see also, e.g.*, *Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966).

Had Petitioner addressed what the *Roberts* discussion of "non-linear compensator 18" actually referred to, the glaring differences of *Roberts* from the challenged claims would have become clear. For example, *Roberts* describes "non-linear compensator 18" as follows:

> FIG. 2 illustrates . . . a ***complex driver circuit*** 14 comprises a digital filter 16 which uses the input data signal x(m) and a ***compensation function c(t)*** to calculate multi-bit In-Phase and Quadrature component values I(n) and Q(n) of a target optical E-field modulation. A ***non-linear compensator 18 uses the I(n) and Q(n) components to compute multi-bit sample streams VR(n) and VL(n). These digital sample streams are then converted into corresponding analog voltage levels by***

> *respective multi-bit digital-to-analog converters (DACs) 20*,
> filtered (at 22) to reduce out-of-band noise, and scaled by low
> noise amplifiers 24 to yield a pair of drive signals VR(t) and
> VL(t) which are supplied to respective branches of the MZ
> modulator 4.

EX1005, 1:54-2:6.  In other words, a time-domain mathematical compensation function c(t) computes component symbols and digital sample streams which are then "converted" to their analog voltage levels by a "digital-to-analog" converter (DAC), before the analog voltages are further processed in the analog domain to yield analog electrode drive voltages.

The Petition does not cite this discussion from *Roberts* here.  *See* Petition at 37-38.  And this explanation of ***digital-to-analog*** conversion and ***analog driver signal*** conditioning has nothing to do with, and arguably teaches away from, the '535 Patent approach and its claimed digital-to-digital "converting" to produce digital voltage values for driving modulator electrodes.  *See, e.g.*, EX1001, 15:16-18.  Because the only explanation of "non-linear compensator 18" in *Roberts* refers to a compensation function producing ***analog voltage levels*** for driving electrodes via a DAC circuit, a person of ordinary skill would not find any teaching or suggestion of the digital-to-digital mapping to digital voltage vectors of the challenged claims.

The outputs of the *Roberts* compensation function are not the digital

vectors of "M drive voltage values" suitable for "coupling . . . to the unmodulated optical signal" of the challenged claims. *See, e.g.*, EX1001, 17:16-21. Rather, the outputs of the *Roberts* compensation function are "sample streams" computed to cause a digital-to-analog converter to output analog voltages which, after additional filtering, yield analog electrode drive voltages. EX1005, 1:54-2:6. To the extent the Petition suggests that this sample stream could instead be directly driven onto electrodes, the Petition does not cite to any explanation of *how*—nor does it identify any teaching of *Roberts* that would teach or suggest mapping in that context. *See* Petition at 37-38.

In sum, Petitioner's *Roberts* arguments are facially deficient, and do not show a reasonable likelihood that Roberts could render obvious any challenged claim. There is simply no teaching or suggestion in *Roberts* of the claimed digital-to-digital "converting." Petitioner's Grounds, all of which rely on *Roberts*, must fail. *See, e.g.*, *In re Smith Int'l, Inc.*, 871 F.3d 1375, 1381 (Fed. Cir. 2017) (all claim elements must be shown).

### 2. Petitioner does not contend that the proposed combination with *Ho* adds anything to *Roberts* with respect to "converting."

The Petition does not rely on any disclosure or teaching of *Ho* with respect to the "converting" elements of the challenged claims. Petition at 57, 62 (relying only on the Ground I citations to *Roberts* for elements [1.2] and [2.2]).

Accordingly, Ground II does nothing to cure the facial deficiencies of Ground I with respect to the "converting" element, and must fail for at least the same reasons as Ground I.

> **3. Petitioner has not shown that *Roberts* or *Burchfiel* disclose or render obvious digital-to-digital "converting," or that the references would have been combined.**

*Roberts* does not render obvious "converting" as claimed, for all of the reasons explained above in Section III.D.1.

*Burchfiel* also fails to render obvious "converting" as claimed. The discussion of "look-up table 106" in *Burchfiel* is, like the discussion of compensation in *Roberts*, directed to generating modulation samples at the input to a DAC, to be converted to ***analog voltage levels*** that drive the modulator electrodes. EX1008, 3:18-27, Fig. 1:



FIG. 1

The look-up table of *Burchfiel* stores digital modulation points suitable for generating analog "pre-programmed voltages" at the output of a digital-to-analog

converter.  *See, e.g.*, EX1008, 5:47-54.  This known approach is explicitly

distinguished as undesirable by the '535 Patent.  *See* EX1001, 15:16-18 ("The

application of the electrical signals is preferably directly upon the modulator

***without any mediating [e.g., DAC] circuits***, referred to herein as 'Direct Digital

Driving.'").

Just as in *Roberts*, the mere mention of the concept of "at least partially

compensat[ing] for non-linear effects" in *Burchfiel* does not teach or suggest the

specific '535 Patent claimed approach for achieving that goal.  *See* Petition at 71.

And given that lack of relevant disclosure, the Petition does not explain how

*Burchfiel* could teach or suggest mapping, properly construed as used in the

context of the '535 Patent.  *Id.* at 70-72.

Accordingly, *Burchfiel* does nothing to cure the facial deficiencies of

*Roberts* with respect to the "converting" element.

The Petition also fails to demonstrate that *Burchfiel* would have been

combined with *Roberts*.  This is particularly glaring because *Roberts* teaches

away from solutions that use complex driver circuits to produce analog driver

voltages—of which *Burchfiel* is one.  That solution is depicted in both *Burchfiel*

Figure 1 and in *Roberts* "Prior Art" Figure 2, which depicts prior art Roberts

sought to distinguish.

For example, *Roberts* explains that "complex driver 14" components

(including "non-linear compensator 18" and DACs) can be fabricated in CMOS technology (with an upper speed limit of 10Gb/s at the time). EX1005, 2:56-67. *Roberts* further explains that electro-optical modulator components typically must be in a separate physical package from the "complex IC," and that high analog "voltage drive signals V(t)" create technical challenges and higher power consumption. *Id.*, 3:1-13. *Roberts* describes the need for "smaller, lower power assembly" than can be achieved via the prior art of *Roberts* Figure 2 (*id.*, 3:14-22) and then goes on to discuss several other known solutions and their own corresponding difficulties. *See id.*, 3:23-4:46 (discussing Papuchon, Leven, and Yacoubian). Indeed, the '535 Patent discussed these same prior art systems and their known difficulties in its own background. *See* EX1001, 2:7-27 (discussing Papuchon, Leven, and Yacoubian).

*Burchfiel* Figure 1 adds nothing to *Roberts* Figure 2 with respect to these known problems in the art. *Burchfiel* is merely a cumulative example of a system that used complex pre-distortion circuits and DACs to generate analog voltages for driving modulator electrodes. *See* EX1008, 3:18-27, Fig. 1. A person of ordinary skill in the art seeking to overcome the speed, power, and complexity limitations of existing systems, like the inventors of the '535 Patent, would not have looked to prior art systems using pre-distortion circuits and DACs—like *Roberts* Figure 2 or *Burchfiel* Figure 1. *See* EX1001, 1:66-2:6 (noting the need

for faster DAC circuits), 15:16-18 ("preferably directly upon the modulator without any mediating circuits").  This is particularly true given that *Roberts* explicitly distinguishes such systems, as explained above.

The Petition has not shown that a person of ordinary skill would have been motivated to combine *Roberts* and *Burchfiel*, especially with respect to the "converting" elements of the challenged claims.  And even if those references were combined, neither teaches nor suggests the digital-to-digital mapping of the '535 Patent challenged claims.

For these additional reasons, Petitioner has failed to demonstrate a reasonable likelihood of success for any challenged claim, and institution should be denied.

## IV.    Conclusion

For all of the reasons detailed above, including because the district court trial will resolve the issues presented in the Petition before any Board trial, because the Petition is cumulative of art and arguments already considered and rejected by the Office, and because the Petition fails to establish a reasonable likelihood of success as to any challenged claim, including with respect to the claimed "converting," institution should be denied.

IPR2020-00123
Patent No. 10,270,535

Dated:  February 18, 2020                     Respectfully submitted,

                                              */s/ Lauren N. Robinson*
                                              Lauren N. Robinson
                                              Reg. No. 74,404
                                              **BUNSOW DE MORY LLP**
                                              701 El Camino Real
                                              Redwood City, CA 94063
                                              Telephone: 650-351-7248
                                              Facsimile: 415-426-4744
                                              lrobinson@bdiplaw.com

                                              Corey Johanningmeier
                                              (Admitted *pro hac vice*)
                                              **BUNSOW DE MORY LLP**
                                              701 El Camino Real
                                              Redwood City, CA 94063
                                              Telephone: 650-351-7248
                                              Facsimile: 415-426-4744
                                              cjohanningmeier@bdiplaw.com

                                              *Counsel for Patent Owner*

### 37 C.F.R. §42.24(d) CERTIFICATION

The undersigned hereby certifies that this submission, excluding the tables of contents, certificate of word count, exhibit list, and certificate of service, contains 12,956 words, as determined using the standard word counting feature of the Microsoft Word program.

Dated:  February 18, 2020

/s/ Lauren N. Robinson
Lauren N. Robinson
Reg. No. 74,404
**BUNSOW DE MORY LLP**
701 El Camino Real
Redwood City, CA 94063
Telephone: 650-351-7248
Facsimile: 415-426-4744
lrobinson@bdiplaw.com

*Lead Counsel for Patent Owner*

IPR2020-00123
Patent No. 10,270,535

## CERTIFICATE OF SERVICE

Petitioner has consented to e-mail service in this proceeding.  Pursuant to 37

C.F.R. §42.6, the undersigned certifies that on February 18, 2020, a copy of the

foregoing document was served by email upon the following counsel at the below

email addresses:


Theodore M. Foster (USPTO Reg. No. 57,456)
ipr.theo.foster@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Ave. Suite 700
Dallas, TX 75219
Phone: (972) 739-8649

David L. McCombs (USPTO Reg. No. 32,271)
David.mccombs.ipr@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Ave. Suite 700
Dallas, TX 75219
Phone: (214) 651-5533

Calmann J. Clements
calmann.clements.ipr@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Ave. Suite 700
Dallas, TX 75219
Phone: (972) 739-8638


*/s/ Lauren N. Robinson*
Lauren N. Robinson
Reg. No. 74,404
**BUNSOW DE MORY LLP**
701 El Camino Real
Redwood City, CA 94063

69

IPR2020-00123
Patent No. 10,270,535

Telephone: 650-351-7248
Facsimile: 415-426-4744
lrobinson@bdiplaw.com

*Lead Counsel for Patent Owner*