# EXHIBIT J

IPR2020-00122
Patent No. 10,033,465

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

CISCO SYSTEMS, INC.,
Petitioner,
v.

RAMOT AT TEL AVIV UNIVERSITY LTD.,
Patent Owner.

————————

Case IPR2020-00122
Patent 10,033,465

————————

**DECLARATION OF JOHN DALLESASSE IN SUPPORT OF
PATENT OWNER'S PRELIMINARY RESPONSE
UNDER 37 C.F.R. § 42.107**

I, John Dallesasse, declare as follows:

## INTRODUCTION

1.      My name is John Dallesasse.  I have been retained to provide information and assistance regarding U.S. Patent No. 10,033,465 ("'465 Patent"). Specifically, I have been asked by Ramot at Tel Aviv University Ltd. ("Ramot") to consider the Petition for *Inter Partes* Review numbered IPR2020-00122 ("Petition") regarding the '465 Patent.  For the purposes of this declaration, I have been asked to provide information and opinions about the knowledge of a person of ordinary skill in the art, certain claim constructions, and related issues.  If an *Inter Partes* Review is instituted, I reserve the right to provide opinions on the state of the art, claim construction of additional terms, the cited references in the Petition, the obviousness arguments presented in the Petition, the validity of the '465 claims in light of the cited references under 35 U.S.C. § 103, and any other issues arising in connection with the Petition and these proceedings.

2.      I have personal knowledge of the facts and opinions set forth in this declaration, and, if called upon to do so, I would testify competently thereto.

3.      I am currently Professor, Electrical and Computer Engineering, at the University of Illinois at Urbana-Champaign.  I hold Ph.D., Master of Science, and Bachelor of Science degrees in Electrical and Computer Engineering from the

-1-

Ramot Exhibit 2002
Page 2 of 21

University of Illinois at Urbana-Champaign, and have over 25 years of experience in optoelectronics, both in industry and academia.  I am also a named inventor on 45 issued patents on optoelectronics and related technologies.  My experience will be described further below under Qualifications and Background.

4.    I am being compensated for my work in connection with this matter at my standard hourly consulting rate.  My compensation for my work in this matter is not dependent in any way on my conclusions and opinions, the contents of this declaration, the substance of any further opinions or testimony that I may provide, or the outcome of this matter or any matter involving the '465 Patent.

5.    The materials I have reviewed in forming the opinions in this declaration include the following:

    a.  The '465 Patent (EX1001) and its prosecution history (EX1002).

    b.  U.S. Provisional Patent Application No. 60/943,559 (EX1023).

    c.  P.C.T. Publication No. WO2008/15264A1 (EX1024).

    d.  The *Roberts* (EX1005), *Ho* (EX1006), and *Burchfiel* (EX1008) references cited in the Petition.

    e.  The Declaration of Professor Blumenthal (EX1003) and the materials discussed therein.

    f.  The Petition and its remaining exhibits.

    g.  Other patents and prosecution histories related to the '465 Patent,

including related U.S. Patent No. 10,270,535 ("'535 patent"), which I understand is the subject of another Petition for *Inter Partes* Review numbered IPR2020-00123.

6.    In addition, I have considered the relevant legal standards for claim construction as I understand them.  I have also considered the knowledge and understanding of a person of ordinary skill at the time of the '465 Patent, based on my own such knowledge and experience.

## QUALIFICATIONS AND BACKGROUND

7.    My education and professional background is in Electrical and Computer Engineering, with a particular focus on optoelectronic systems and technologies.  I hold Ph.D. (1991), Master of Science (1987), and Bachelor of Science (1985) degrees in Electrical and Computer Engineering from the University of Illinois at Urbana-Champaign.

8.    I received my Ph.D. degree under the direction of Professor Nick Holonyak, Jr., the inventor of the red LED.  While working in Professor Holonyak's group, I was involved in the demonstration of red lasers in the InAlGaP-GaAs material system and developed the III-V oxidation process used to make Vertical-Cavity Surface-Emitting Lasers (VCSELs).  Oxide-confined VCSELs are used in optical transceivers for enterprise networks and data centers, optical "mice," and in the facial recognition systems used in smart phones.  For my

Ramot Exhibit 2002
Page 4 of 21

work on III-V Oxidation, I was elected a Fellow of both the Optical Society of America (OSA) and the Institute of Electrical and Electronics Engineers (IEEE).

9.      I have served as an Associate Editor for the IEEE Journal of Quantum Electronics, was appointed to the Steering Committee of the IEEE Journal of Lightwave Technology and currently serve as the Secretary for that committee, serve as the Chair of the Steering Committee for the IEEE Transactions on Semiconductor Manufacturing, have served as the Optoelectronic Devices Technical Committee Chair for the IEEE Electron Devices Society (EDS), was elected to the Board of Governors for the IEEE Electron Devices Society, and was elected to serve as the Vice President of Technical Committees for EDS.

10.      I have 45 awarded patents, over 45 publications in peer-reviewed journals, have contributed to a book chapter, and have over 75 presentations, papers in conference proceedings, and other publications including invited and plenary talks.

11.      Over the course of my career, I have been directly involved in the development of optical transceiver devices, technologies, and products.  At Amoco Technology Company (1991-1994), I was involved in the development of integrated assemblies for high-speed (1-3 Gbps) optical communications.  This program, funded by DARPA and in conjunction with E-Systems, developed photonic components and assembly techniques for producing an integrated monitor

-4-

Ramot Exhibit 2002
Page 5 of 21

photodiode – laser – external absorption modulator on silicon optical bench assembly.

12.     While at Molex Fiber Optics (1999 – 2003), I was responsible for managing the engineering team designing optical transceivers for Ethernet and Fibre Channel in the 1 – 10 Gbps speed range.  I was also an active participant in the development of the IEEE 802.3 Standard.  During this time I was involved in evaluating optical networking technologies and determining the strategic direction of our product development.

13.     While at Emcore Corporation (2003 – 2009) I had a wide range of responsibilities that included optical component and transceiver design.  In addition, I was involved in technical due diligence on companies Emcore was considering acquiring.  This included companies working on 40 Gbps optical transceivers and transceiver technologies using externally modulated lasers.

14.     My current research includes work on Mach-Zehnder modulators for communication applications, and on optical phase control for phased arrays.

15.     EX2003 contains a true and correct copy of my *Curriculum Vitae* further describing my background and experience.

### THE '465 PATENT

16.     I have reviewed the '465 Patent (EX1001) and its file history (EX1002).  The '465 Patent issued from U.S. Patent Application No. 15/298,327,

which was filed on October 20, 2016, and claims priority to Provisional

Application No. 60/943,559, filed June 13, 2007.

17.    The '465 Patent is one of a family of patents that teach and claim

methods for achieving high-speed modulation of digital data onto optical streams.

*See, e.g.*, EX1001 at Abstract.  Electrical to optical modulators are used in many

high-speed data communication applications such as cable TV, phone, and data

networks, or in connections between servers in and among datacenters.  And as the

patent acknowledges, there is an ever-increasing need for improvements in

performance and bandwidth.  *Id.*, 1:30-49.  Known optical modulators at the time

of the '465 Patent had characteristics that limited their performance, such as non-

linear response.  *Id.*, 1:56-64, Figure 2A.  And known modulation systems also had

various undesirable complexities or performance limits.  *See, e.g.*, *id.*, 1:64-2:29

18.    As the specification of the patent indicated to a person of skill in the

art at the time, the inventors of the '465 Patent came up with methods to improve

upon existing electro-optical modulators.  For example, the patent described and

claimed using a digital-to-digital converter to map input digital data into digital

output data, in the form of digital vectors that could be directly driven onto the

electrodes of existing electro-optical modulators.  *Id.*, Abstract, 7:5-25, Figure 1

("DDC"):

Ramot Exhibit 2002
Page 7 of 21

IPR2020-00122
Patent No. 10,033,465



19.    According to the '465 Patent, this digital-to-digital mapping / conversion allowed for efficient, fast signal corrections via mapping of input values to different output values in the digital domain. *Id.*, 7:21-25, 7:31-62.  This mapping could compensate for modulator non-linearity or other undesirable signal characteristics in a way that was both simpler and faster than prior solutions. *See, e.g.*, *id.*, 7:60-62.  A person of skill in the art would have understood that the approach of the '465 Patent was advantageous because it did not require the complicated digital-to-analog converters, analog signal conditioning and driving circuitry, or other undesirable configurations of previously known systems. *See, e.g.*, *id.*, 1:64-2:29.

20.    I have included additional discussion of these and other aspects of the '465 Patent in the claim construction section below.

## ONE OF ORDINARY SKILL

21.    I have been asked to provide my opinion of the level of education and

Ramot Exhibit 2002
Page 8 of 21

experience that would have been possessed by one of ordinary skill in the art at the time of the '465 Patent, which I take for purposes of this declaration to be as of the current earliest asserted priority date on June 13, 2007. In forming my opinion, I have reviewed the level of experience of the person of ordinary skill in the art as described and applied in the Petition and by Dr. Blumenthal in his declaration.

22.    In my opinion, a person of ordinary skill in the art would have at least a Master of Science degree in Electrical Engineering or Electrical and Computer Engineering, with at least two years of academic or professional engineering experience in the analysis and design of optoelectronic systems for optical communications.

23.    As described above, I obtained my Ph.D. in Electrical and Computer Engineering in 1991, and had more than fifteen years of professional experience in the analysis and design of optoelectronic devices and systems for optical communications prior to the date of the '465 Patent. I believe that my own education and experience exceeds that of a person of ordinary skill in the art, under my definition or the Petition's definition, today and as of the current earliest asserted priority date of the '465 Patent (June 13, 2007).

## CLAIM CONSTRUCTION

24.    I understand that in claim construction for an *Inter Partes* Review proceeding, the claim terms are to be construed in accordance with the *Phillips*

Ramot Exhibit 2002
Page 9 of 21

standard that is also used in district court. I understand that the proper construction of a disputed term under that standard is the meaning that would be understood by a person of ordinary skill in the art at the time of the patent, considered in the context of the patent specification. I also understand that a patentee may choose to be his own "lexicographer," and set forth a special definition that is different from the plain meaning of that term.

25.    I understand that Cisco has proposed certain claim constructions for terms in the '465 Patent. I have considered Petitioner's and Ramot's proposals with respect to the "mapping" claim term, and in my opinion that term should be construed according to the express definition of "digital-to-digital converter" given in the '465 patent. I agree, therefore, that the construction proposed by Ramot is the meaning that is consistent with how a person of ordinary skill would understand "mapping" as claimed, defined, and explained in the '465 Patent specification. I will discuss those opinions in detail below:

| Claim term | Patent Owner Ramot proposed construction | Petitioner Cisco proposed construction |
|---|---|---|
| "mapping" (claims 1, 4) | "converting a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical," | Does not require formal construction |

Ramot Exhibit 2002
Page 10 of 21

**"mapping"**

26.    The '465 Patent includes an explicit definitions section, which defines the term "digital-to-digital converter" as "a device which maps a set of possible input values to a set of possible digital output values, where the input and output values are non-identical." EX1001, 4:62-65. The patent specification goes on to describe the converter as a "non-trivial converter in which there is typically not a one-to-one mapping between bits of the input data and bits of the output data." *Id.*, 4:66-5:3. While the mapping may typically not be one-to-one, it is in all cases defined as necessarily non-identical. *Id.*, 4:66-5:3, Figure 4, 7:17-25, 7:33-66, 11:23-29, 12:3-17.

27.    The '465 patent uses variants of "mapping" and "converting" interchangeably, and always in reference to the digital-to-digital convertor of this explicit definition. *See, e.g.*, EX1001, 7:64-67 ("digital-to-digital mapping" and "a digital-to-digital converter"), Abstract ("digital-to-digital converter that provides a mapping"), 13:23-31, 15:16-22 ("DDC mappings"). An example of the mapping, illustrating the required non-identity between input and output values along with its potential effect on module response linearity, is demonstrated via Figures 4, 2A, and 2B, and their accompanying descriptions. *See, e.g.*, EX1001, Figs. 4, 2A & 2B, 5:49-59, 6:5-9, 7:33-66. The non-identical mapping is clear from Figure 4:

Ramot Exhibit 2002
Page 11 of 21

FIG. 4

| DDC Input | DDC Output |
|-----------|------------|
| 0000 | 0000 |
| 0001 | 0011 |
| 0010 | 0100 |
| 0011 | 0101 |
| 0100 | 0101 |
| 0101 | 0110 |
| 0110 | 0111 |
| 0111 | 0111 |
| 1000 | 1000 |
| 1001 | 1001 |
| 1010 | 1001 |
| 1011 | 1010 |
| 1100 | 1011 |
| 1101 | 1011 |
| 1110 | 1100 |
| 1111 | 1101 |

28.    In my opinion, a person of ordinary skill reading the specification of the '465 patent would understand that the mapping employed in the claimed invention must involve input and output values that are not identical.  The patent repeatedly and consistently describes the mapping this way.  *See, e.g.*, EX1001, 4:62-65 ("maps . . . where the ***input and the output values are non-identical***"), 7:17-25 ("***differing*** from a simple one-to-one mapping of data bits"), 11:25-29 ("it is understood that a binary input data vector $D_i$ has to be ***mapped*** to a control vector $B_i$, ***yet $B_i \neq$ [not equal] $D_i$***.  The DDC, implemented as all-electronic, shall perform this ***mapping operation***.") (emphases added).

29.    In light of all these disclosures, a person of ordinary skill would understand that the claimed "mapping" step implements the inventive function of

-11-

the digital-to-digital converter, between the input value of the "set of N input values corresponding to N bits of digital data" to the output value "vector of M voltage values." *See* EX1001, 17:8-10 (claim 1), 17:38-40 (claim 4). The mapping "select[s] a binary actuation vector from a subset of binary actuation vectors available to represent each of the input data words." *Id.*, Abstract. That selection would be understood to be necessarily non-identical, in order to achieve the inventive result of correcting for non-linearities or other undesirable signal characteristics of the modulator. *See, e.g.*, EX1001, 11:25-29 ("binary input data vector $D_i$ has to be ***mapped*** to a control vector $B_i$, ***yet $B_i \neq$ [not equal] $D_i$***") (emphases added), 4:62-65.

30.    In my opinion, the term "mapping," which is used interchangeably with "converting" and in discussions of digital-to-digital conversion and digital-to-digital mapping in the '465 patent, would be understood by a person of ordinary skill according to the express definition of "digital-to-digital converter" in the patent. In my opinion, the term "mapping" should be given the construction "converting a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical,".

## Other Claim Terms

31.    I have reviewed the proposed constructions offered by Cisco in its Petition for the terms "pulse modulate/modulated," "digital," "electrode," and

-12-

"modulator." *See* Petition at 19-21. I also understand that Cisco does not assert that its proposed constructions for the latter three terms are necessary to its Petition. *Id.* at 21. In any event, I have not been asked to give an opinion in this declaration about the proper construction of any of these terms. I reserve the right to do so in any district court litigation or further proceedings before the Board.

## SPECIFIC RESPONSES TO THE PETITION

32.    I have reviewed the Petition and the references cited in its three Grounds. I have been asked to consider whether a person of ordinary skill would understand Table 1 of *Roberts*, as relied on in the Petition, to disclose or render obvious the "mapping" element of the challenged claims. *See, e.g.*, Petition, 36. In my opinion, Roberts does not disclose or render obvious "mapping" as used in the '465 Patent, including for the reasons discussed below.

33.    Table 1 of *Roberts* merely discloses the correspondence of input values, expressed in 3-bit little-endian binary coded format, to <u>identical</u> output values, expressed as a 7-bit binary vector. While the binary format is different, the underlying value of each of the 3-bit sets of binary bits on the left would be understood to be the same as the value represented by the corresponding sets of binary digits on the right. I have included Table 1 below, with added annotations in red indicating the corresponding values (in decimal notation) that a person of ordinary skill in the art would understand are represented:

Ramot Exhibit 2002
Page 14 of 21

## TABLE 1

| $V_x(n)$ 3MSBs | Value (decimal) | $S_x(n)$ | Value (decimal) |
|---|---|---|---|
| 0 0 0 | 0 | 0 0 0 0 0 0 0 | 0 |
| 1 0 0 | 1 | 1 0 0 0 0 0 0 | 1 |
| 0 1 0 | 2 | 1 1 0 0 0 0 0 | 2 |
| 1 1 0 | 3 | 1 1 1 0 0 0 0 | 3 |
| 0 0 1 | 4 | 1 1 1 1 0 0 0 | 4 |
| 1 0 1 | 5 | 1 1 1 1 1 0 0 | 5 |
| 0 1 1 | 6 | 1 1 1 1 1 1 0 | 6 |
| 1 1 1 | 7 | 1 1 1 1 1 1 1 | 7 |

Ex.1005, 8:21-32.

34.    The various formats for representing numerical values in binary are commonly taught in introductory undergraduate courses in Electrical or Computer Engineering.  A person of ordinary skill, or indeed anyone who had taken such a course, would be intimately familiar with them.   Accordingly, such a person would immediately understand that in the 3-bit little-endian binary notation of the format used on the left side of Table 1, the first column represents the ones digit, the second column represents the twos digit, and the third column represents the fours digit.  So in the bottom row, for example, "111" indicates 1 one, 1 two, and 1 four, that is $1 + 2 + 4 = 7$.  Two rows above, "101" indicates 1 one, no twos, and 1 four, that is $1 + 0 + 4 = 5$.  A person of ordinary skill would also immediately recognize that the right side of Table 1 instead involves merely counting the bits with a 1 to get the corresponding decimal value.  So in the bottom row, for example "1111111" has seven ones and indicates 7, and "1111100" has five ones

-14-

Ramot Exhibit 2002
Page 15 of 21

and indicates 5.

35.    A person of ordinary skill would not understand Table 1 to show any difference between the values represented by the eight alleged "sets of N input values corresponding to N bits of digital data" on the left of the table and the values represented by the eight alleged "vectors of M voltage values" on the right of the table.  The first set and the first vector in the first row both have the value zero, the second set and the second vector in the second row both have the value one, and so on.

36.    This distinction becomes even clearer with comparison to Figure 4 of the '465 Patent.   In Figure 4, both the input sets and output vectors are represented in 4-bit big-endian binary coded decimal format (such that the right-most bit is the ones bit).  As the annotations in red below indicate, Figure 4 discloses input values mapped to different output values:

Ramot Exhibit 2002
Page 16 of 21

FIG. 4

| Input Value (decimal) | DDC Input | DDC Output | Output Value (decimal) |
|---|---|---|---|
| 0 | 0000 | 0000 | 0 |
| 1 | 0001 | 0011 | 3 |
| 2 | 0010 | 0100 | 4 |
| 3 | 0011 | 0101 | 5 |
| 4 | 0100 | 0101 | 5 |
| 5 | 0101 | 0110 | 6 |
| 6 | 0110 | 0111 | 7 |
| 7 | 0111 | 0111 | 7 |
| 8 | 1000 | 1000 | 8 |
| 9 | 1001 | 1001 | 9 |
| 10 | 1010 | 1001 | 9 |
| 11 | 1011 | 1010 | 10 |
| 12 | 1100 | 1011 | 11 |
| 13 | 1101 | 1011 | 11 |
| 14 | 1110 | 1100 | 12 |
| 15 | 1111 | 1101 | 13 |

37.     Because the left and right columns of Figure 4 are in the same binary representation format, it is easy to see the mapping of input values to different output values:

FIG. 4

DDC Mapping

| Input Value (decimal) | DDC Input | DDC Output | Output Value (decimal) |
|---|---|---|---|
| 0 | 0000 | 0000 | 0 |
| 1 | 0001 | 0011 | 3 |
| 2 | 0010 | 0100 | 4 |
| 3 | 0011 | 0101 | 5 |
| 4 | 0100 | 0101 | 5 |
| 5 | 0101 | 0110 | 6 |
| 6 | 0110 | 0111 | 7 |

The set of 4-bit input values differs from the set of 4-bit output vector values.  And in this case there is also not one-to-one correspondence, as some inputs (1, 2) are not mapped to outputs, while other input values (5) are used twice in the output set.

-16-

Ramot Exhibit 2002
Page 17 of 21

IPR2020-00122
Patent No. 10,033,465

38.    But Table 1 shows no such non-identical mapping:

TABLE 1

| $V_x$ (n) 3MSBs | Value (decimal) | $S_x$ (n) | Value (decimal) |
|---|---|---|---|
| 0 0 0 | 0 → | 0 0 0 0 0 0 | 0 |
| 1 0 0 | 1 → | 1 0 0 0 0 0 | 1 |
| 0 1 0 | 2 → | 1 1 0 0 0 0 | 2 |
| 1 1 0 | 3 → | 1 1 1 0 0 0 0 | 3 |
| 0 0 1 | 4 → | 1 1 1 1 0 0 0 | 4 |
| 1 0 1 | 5 → | 1 1 1 1 1 0 0 | 5 |
| 0 1 1 | 6 → | 1 1 1 1 1 1 0 | 6 |
| 1 1 1 | 7 → | 1 1 1 1 1 1 1 | 7 |

39.    As I explained above, a person of ordinary skill reading the specification of the '465 Patent would understand the digital-to-digital mapping of inputs to different output values as a key mechanism disclosed for achieving the invented signal improvements (to linearity or other signal characteristics). Table 1 of *Roberts* does nothing to accomplish this end, as a person of ordinary skill would immediately understand. Table 1 of *Roberts* merely discloses an identical, one-to-one translation between binary formats.

40.    In summary, in my opinion Table 1 of *Roberts* does not disclose or render obvious "mapping," as that term is properly understood and construed in light of the descriptions and inventive solution of the '465 Patent.

## PRIORITY DATE OF THE '465 PATENT

41.    I understand that Cisco has challenged the effective priority date of the '465 Patent, and has argued that the June 13, 2007 provisional application

-17-

Ramot Exhibit 2002
Page 18 of 21

(EX1023) and June 12, 2008 PCT application (EX1024) do not support certain aspect of the claims such as, for example, "pulse modulated" optical streams. Petition at 15-17.  I have also reviewed the Declaration of Professor Blumenthal, which repeats and adopts this argument.  EX1003, ¶¶ 88-89.

42.    I have been asked to consider whether a person of ordinary skill in the art would understand the 2007 provisional application and 2008 PCT application to support pulse modulation.  I disagree with the factual conclusions of Cisco and Professor Blumenthal on this issue.  For example, in my opinion, both the 2007 provisional application and 2008 PCT application adequately disclose pulse modulation to a person of ordinary skill at those times.

43.    For example, the 2007 provisional application repeatedly discusses modulation of the "power" or "intensity" of an optical signal.  *See, e.g.*, EX1023, Abstract ("modulating the intensity of an optical signal"), 3:16-20, 6:17-7:4.  In fact the 2007 provisional application defines modulator as outputting a "controlled variation of intensity" by inducing variation in production of the signal or modifying a signal already produced.  *Id.*, 9:22-10:4.  The 2007 provisional application describes MZI modulators as "leading to chirp-free pulses" on the output.  *Id.* at 2:1-5.  Similar disclosures exist in the 2008 PCT application.  *See, e.g.*, EX1024, (57) Abstract, 2:1-5, 3:16-20, 6:17-7:4, 9:22-10:4.

44.    The 2007 provisional application discusses how the input to the

modulator may be a sequence of binary values of a word of N digital bits. *See, e.g.*, EX1023, 13:1-5. The application discloses how the modulation can be implemented by "on-off level voltage switching" of actuating voltages on modulator electrodes, responsive to the input digital data stream. *See, e.g.*, *id.*, 15:8-9, 15:18-20. Similar disclosures exist in the 2008 PCT application. *See, e.g.*, EX1024, 13:1-5, 15:8-9, 15:18-20.

45.    The 2007 provisional application discloses inducing modulation of the optical signal by varying its phase in different amounts. *See, e.g.*, EX1023, 18:18-20, 2:7-12. The application discloses how the modulation (*i.e.*, controlled variation of "intermediate optical attenuation levels") can be implemented by "inducing changes" in phase via the electro-optic effect. *Id.*; *see also id.*, 19:14-20:6 (providing a mathematical model of the modulation function derived from electrode activation phase shifts). Similar disclosures exist in the 2008 PCT application. *See, e.g.*, EX1024, 18:18-20, 2:7-12, 19:14-20:6.

46.    A person of ordinary skill in the art in June of 2007 or 2008 would understand these and other passages to disclose known techniques of pulse modulation.

47.    Also, I note that Cisco has proposed a broad dictionary definition for pulse modulation, and has argued that this definition would be "plain and ordinary" to a person of skill in the art at the time. *See* Petition at 19-20. Without agreeing

Ramot Exhibit 2002
Page 20 of 21

IPR2020-00122
Patent No. 10,033,465

or disagreeing with those assertions, I have applied Cisco's proposed definition, and in my opinion the disclosures I mention above plainly support pulse modulation as so defined. For example, the applications' discussion of "controlled variation of intensity" would be understood as disclosing "varying the basic characteristics" according to Cisco's proposed definition. *See, e.g.*, EX1023, 3:16-20, 9:22-10:4.

## CONCLUSION

48.     As I explained above, I have been asked at this preliminary stage to provide only the limited set of opinions detailed above. I reserve the right to supplement this declaration or provide additional declarations including analysis and opinion regarding Petitioner's obviousness arguments, the Blumenthal Declaration, the cited references in the Petition, additional claim construction issues (for the terms discussed herein or any other terms), any decisions by the Patent Trial and Appeal Board or the Patent Office, or any other issues that may arise in this matter.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 18th day of February, 2020 in Champaign, Illinois.

By: _____
John Dallesasse, Ph.D

-20-