# EXHIBIT K

UNITED STATES PATENT AND TRADEMARK OFFICE
————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————————

CISCO SYSTEMS, INC.,
Petitioner,
v.
RAMOT AT TEL AVIV UNIVERSITY LTD.,
Patent Owner.

————————————

Case IPR2020-00484
Patent No. 10,461,866

————————————

**PATENT OWNER'S
PRELIMINARY RESPONSE
UNDER 37 C.F.R. §42.107**

IPR2020-00484
Patent No. 10,461,866

# TABLE OF CONTENTS

Page

I.    Introduction..................................................................................................1

II.   The Board should exercise its discretion to deny institution under
      Sections 314(a) and 325(d)..........................................................................9

      A.    Parallel district court proceedings will determine the issues
            raised in the Petition, and will do so long before any trial
            before the Board, warranting discretionary denial under 35
            U.S.C. §314(a) ..................................................................................11

            1.    *Fintiv* Factor 1:  The district court denied a stay and the
                  advanced stages of the case weighs heavily in favor of
                  denying a renewed motion ........................................................17

            2.    *Fintiv* Factors 2 & 3:  Substantial investment by the
                  parties will already be spent prior to the institution
                  decision, and trial will be completed many months prior
                  to any final written decision here.............................................20

            3.    *Fintiv* Factors 4 & 5: The district court proceedings
                  involve the same parties and issues as the Board
                  proceedings here .....................................................................21

            4.    *Fintiv* Factor 6:  Institution has already been denied as to
                  two related patents; the merits of this proceeding also
                  favor denial here.......................................................................23

      B.    The references and arguments raised in the Petition are
            cumulative of those raised, considered, and overcome during
            prosecution, warranting discretionary denial under 35 U.S.C.
            §325(d). ..............................................................................................25

            1.    Grounds I and II rely on the cumulative *Roberts*
                  reference (all challenged claims) .............................................27

            2.    Ground II relies on the cumulative *Mark* reference
                  (claims 19, 20, 22-24) ..............................................................32

            3.    The *Becton* factors favor denial of institution here .................33

III.   Institution should be denied because Petitioner has failed to show a
reasonable likelihood of success on any challenged claim. ..........................36

A.    The '866 Patent ...................................................................................37

B.    The '866 Patent Challenged Claims....................................................40

C.    Claim Construction ..............................................................................43

1.    "digital to digital converter" and the meaning of
"mapping" in the '866 Patent.....................................................46

2.    Effective priority date ................................................................50

D.    There is no reasonable likelihood that Petitioner will prevail in
its contention that the challenged claims are obvious over
*Roberts* in combination with *Ho* (Ground I) or *Ho* and *Mark*
(Ground II) ...........................................................................................53

1.    Petitioner has not shown that *Roberts* discloses or renders
obvious "using a digital to digital converter for mapping" ......54

a.    Ground I: Table 1 of *Roberts* does not render
obvious "using the digital to digital converter for
mapping" as used in the '866 Patent. ..............................54

b.    Ground II: The undescribed linear compensator of
*Roberts* does not render obvious "using the digital
to digital converter for mapping" as used in the
'866 Patent .......................................................................60

2.    Petitioner does not contend that the proposed
combination with *Ho* adds anything to *Roberts* with
respect to "using the digital to digital converter for
mapping."....................................................................................62

3.    Petitioner has not shown that *Roberts* in combination
with *Mark* disclose or render obvious "using the digital to
digital converter for mapping."..................................................63

IV.   Conclusion .....................................................................................................64

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Apple Inc. v. Contentguard Holdings, Inc.*,
　IPR2015-00442 (P.T.A.B. July 13, 2015) ..................................................... 62, 64

*Apple Inc. v. Fintiv Inc.*,
　IPR2020-00019 (P.T.A.B. Mar. 20, 2020) .................................................. passim

*Becton, Dickenson and Co. v. B. Braun Melsungen AG*,
　IPR2017-01586 (P.T.A.B., Dec. 15, 2017)........................................ 25, 33, 34, 35

*DMF, Inc. v. AMP Plus, Inc.*,
　Case No. 2-18-cv-07090 (C.D. Cal. July 12, 2019 .............................................18

*Dorco Co., Ltd. v. The Gillette Co., LLC*,
　IPR2017-00500 (P.T.A.B. June 21, 2017).........................................................26

*E-One, Inc. v. Oshkosh Corp.*,
　IPR2019-00161 (P.T.A.B. May 15, 2019)................................................... 15, 24

*General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*,
　IPR2016-01357 (P.T.A.B. Sept. 6, 2017) ..................................................... 2, 13

*Graham v. John Deere Co.*,
　383 U.S. 1 (1966) .................................................................................. 62, 64

*Harmonic Inc. v. Avid Tech., Inc.*,
　815 F.3d 1356 (Fed. Cir. 2016)...........................................................................9

*Hologic, Inc. v. bioMerieux, Inc.*,
　IPR2018-00568 (P.T.A.B. Aug. 7, 2018) ................................................... 25, 26

*In re Kahn*,
　441 F.3d 977 (Fed. Cir. 2006).........................................................................60

*In re Smith Int'l, Inc.*,
　871 F.3d 1375 (Fed. Cir. 2017).........................................................................62

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
    No. 2:17-cv-00577 (E.D. Tex. Dec. 13, 2018) ....................................................19

*Neil Ziegman, N.P.Z., Inc. v. Stephens*,
    IPR2015-01860 (P.T.A.B. Feb. 24, 2016) .................................................... 26, 36

*Next Caller Inc. v. TrustID, Inc.*,
    IPR2019-00961 (P.T.A.B. Oct. 16, 2019) .................................................... 14, 24

*NHK Spring Co., Ltd. v. Intri-Plex Technologies, Inc.*,
    IPR2018-00752 (P.T.A.B. Sept. 12, 2018) ................................................. passim

*Nu Mark LLC v. Fontem Holdings 1, B.V.*,
    IPR2016-01309 (P.T.A.B. Dec. 15, 2016) ..........................................................32

*Oil States Energy Servs. LLC v. Green's Energy Grp., LLC*,
    138 S. Ct. 1365 (2018) ..........................................................................................9

*Pers. Web Techs., LLC v. Apple, Inc.*,
    848 F.3d 987 (Fed. Cir. 2017).............................................................................64

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................... 43, 46

*Sandoz Inc. v. Abbvie Biotechnology Ltd.*,
    IPR2017-01987, 2018 WL 1230583 (P.T.A.B. Mar. 9, 2018) ...........................46

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999).............................................................................46

**Statutes**

35 U.S.C. §314(a) ........................................................................................... passim

35 U.S.C. §316(b) ..................................................................................................10

35 U.S.C. §325(d) ........................................................................................... passim

83 Fed. Reg. 51341 (Oct. 11, 2018)........................................................................43

H.R. Rep. No. 112-98, pt. 1 (2011)................................................................. 17, 26

M.P.E.P. §609.05(b)...............................................................................................27

IPR2020-00484
Patent No. 10,461,866

**Other Authorities**

Consolidated Trial Practice Guide ........................................................................10

**Regulations**

37 C.F.R. §42.108 ...........................................................................................54

IPR2020-00484
Patent No. 10,461,866

| Patent Owner's Exhibit List | |
|---|---|
| EX2001 | Declaration of Corey Johanningmeier in Support of Motion for *Pro Hac Vice* Admission |
| EX2002 | Declaration of Professor John Dallesasse, Ph.D. under 37 C.F.R. § 1.68 in support of Patent Owner's Preliminary Response in IPR2020-00123. |
| EX2003 | *Curriculum Vitae* of Professor Dallesasse |
| EX2004 | First Amended Docket Control Order, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-CV-225-JRG, Dkt. No. 49 (E.D. Tex. Dec. 12, 2019) |
| EX2005 | Order Denying Motion to Stay, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-CV-225-JRG, Dkt. No. 54 (E.D. Tex. Feb. 2, 2020) |
| EX2006 | Amended Docket Control Order, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-CV-225-JRG, Dkt. No. 68 (E.D. Tex. April 9, 2020) |
| EX2007 | P.R. 4-3 Joint Claim Construction and Prehearing Statement, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-CV-225-JRG, Dkt. No. 63 (E.D. Tex. Mar. 17, 2020) |
| EX2008 | Memorandum Opinion and Order on Claim Construction, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-CV-225-JRG, Dkt. No. 83 (E.D. Tex. May 15, 2020) |
| EX2009 | U.S. Patent Application Publication No. 2007/0212076 A1 to Roberts *et al.* ("*Roberts* Divisional") |
| EX2010 | Excerpt of Prosecution History of '866 Patent – July 22, 2019 List of References Considered by Examiner |
| EX2011 | Excerpts from Defendant's Amended Invalidity Contentions, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-CV-225-JRG |

| Patent Owner's Exhibit List | |
|---|---|
| EX2012 | Charts C-14 and C-16 from Defendant's Amended Invalidity Contentions, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, Case No. 2:19-CV-225-JRG |
| EX2013 | Excerpts of Prosecution History of U.S. Patent Application No. 15/298373, issued as U.S. Patent No. 10,205,527 ("'527 Patent File History") |
| EX2014 | Excerpts of Prosecution History of U.S. Patent Application No. 14/922,165, issued as U.S. Patent No. 9,479,191 ("'191 Patent File History") |
| EX2015 | Excerpts of Prosecution History of U.S. Patent Application No. 14/325,486, issued as U.S. Patent No. 9,031,417 ("'417 Patent File History") |
| EX2016 | Decision Denying Institution of *Inter Partes* Review in IPR2020-00122 (U.S. Patent No. 10,033,465 B1) (Paper 15) (May 15, 2020) |
| EX2017 | Decision Denying Institution of *Inter Partes* Review in IPR2020-00123 (U.S. Patent No. 10,270,535 B1) (Paper 14) (May 15, 2020) |
| EX2018 | *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 2:17-cv-00577, Dkt. 255 (E.D. Tex. Dec. 13, 2018) |

Patent Owner Ramot at Tel Aviv University Ltd. ("Ramot" or "Patent Owner") respectfully submits this Preliminary Response to Cisco Systems, Inc.'s ("Cisco" or "Petitioner") above-captioned Petition for *Inter Partes* Review of United States Patent No. 10,461,866 ("the '866 Patent").

## I.    Introduction

Patent Owner Ramot requests that the Board deny institution in exercise of its discretion under 35 U.S.C. §314(a) because the scheduled jury trial in the related district court case will determine the same issues as raised in the Petition—and that district court trial is scheduled to be completed months before any Board trial here. *See, e.g.*, EX2004, 1 (setting jury trial for December 9, 2020); *see also* EX2006, 1 (same). Indeed, the Board recently denied under §314(a) two other Petitions challenging claims of patents related to the '866 Patent that were also asserted in the parallel district court proceeding here. *See* Decisions Denying Institution in IPR2020-00122 (P.T.A.B. May 15, 2020) (Paper 15) (EX2016), IPR2020-00123 (P.T.A.B. May 15, 2020) (Paper 14) (EX2017). For all of the same reasons, and for the additional reasons discussed below, institution should also be denied here.

Parallel proceedings on this timeline would waste resources, and risk inconsistent results. "Institution of an *inter partes* review under these circumstances would not be consistent with 'an objective of the AIA . . . to

provide an effective and efficient alternative to district court litigation.'" *See, e.g.*, *NHK Spring Co., Ltd. v. Intri-Plex Technologies, Inc.*, IPR2018-00752, Paper 8 at 20 (P.T.A.B. Sept. 12, 2018) (Precedential) (quoting *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 16-17 (P.T.A.B. Sept. 6, 2017) (Precedential)); *Apple Inc. v. Fintiv Inc.*, IPR2020-00019, Paper 11 at 3 (P.T.A.B. Mar. 20, 2020) (Precedential) ("*NHK* applies to the situation where the district court has set a trial date to occur earlier than the Board's deadline to issue a final written decision in an instituted proceeding").

The Board should also deny institution in exercise of its discretion under 35 U.S.C. §325(d) because the references and arguments relied on by the Petition are cumulative of matters that were before the Examiner during prosecution. For example, although the Petition does not say so, the *Roberts* reference relied on as a base reference in each of the Grounds is a divisional of a reference that was before the Examiner—and that contained each of the relied-on disclosures. In addition, the *Mark* reference relied on in the second Ground was also before the Examiner—and was discussed as a basis for an overcome rejection during the prosecution of a related predecessor patent. And several other arguments of the Petition discussed herein—particularly those with respect to the digital-to-digital conversion element of all challenged claims, and similar elements of other related

patents—were already raised, distinguished, and overcome during the prosecution of related patents.  The Petition art and arguments are merely cumulative.

For at least these reasons, institution of *inter partes* review would be an inefficient use of the Board's time and resources.  The Board need not revisit arguments that have already been assessed by the Office, and that are already set to be considered again by the district court in the related litigation—before they could be determined in any instituted trial before the Board.  Institution should be denied in the Board's discretion under Sections 314(a) and 325(d).

Institution should also be denied because the Petitioner has failed to establish it has a reasonable likelihood of demonstrating that even a single challenged claim is unpatentable.  Both of Petitioner's Grounds rely on *Roberts* as a primary reference.  But none of the Grounds establish that *Roberts* (in combination with *Ho* or with *Ho* and *Mark*) would have rendered obvious any of the challenged claims.  Neither *Roberts* nor *Mark*, the two references relied on with respect to the digital to digital converter elements of all challenged claims, disclose, suggest, or otherwise could have rendered obvious digital-to-digital conversion as used in the '866 Patent.

Because Petitioner's cumulative arguments fail to establish a reasonable likelihood of proving any challenged claim unpatentable, trial should not be instituted.

The '866 Patent discloses and claims techniques for high-speed modulation of digital data onto optical streams. *See, e.g.*, EX1001, Abstract. Electrical to optical modulators are used in numerous high-speed data communication applications, which require ever-increasing performance and bandwidth. *Id.*, 1:34-53. But known optical modulators at the time of the patent had characteristics that limited their performance, such as non-linear response. *Id.*, 1:60-2:1, Figure 2A.

The techniques of the '866 Patent improved upon existing electro-optical modulators by, for example, employing a digital-to-digital converter to map input digital data into digital output data—in the form of digital vectors with elements corresponding to voltages that could be driven onto the electrodes of existing electro-optical modulators. *Id.*, Abstract, 7:5-25, Figure 1 ("DDC"):



The '866 Patent's digital-to-digital conversion allowed for efficient, fast signal corrections via mapping of input values to different output values in the digital domain. *Id.*, 7:21-25, 7:58-62.

Each challenged claim of the '866 Patent requires using a "digital to digital converter for mapping" of input values to output values that, as the patent explains, "maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical." EX1001, 4:63-5:4. This mapping or converting represents a key inventive step by which the claimed systems can correct for the known problem of non-linear response in optical modulators operated at high transmission speeds. *Id.*, 7:33-66. This converting, and its useful improvement to (*e.g.*) module linearity, is illustrated via the descriptions and figures of the '866 Patent. *Id.*, FIGs. 4 (annotated in red below), 2A & 2B:

## FIG. 4

| Input Value (decimal) | DDC Input | DDC Output | Output Value (decimal) |
|---|---|---|---|
| 0 | 0000 | 0000 | 0 |
| 1 | 0001 | 0011 | 3 |
| 2 | 0010 | 0100 | 4 |
| 3 | 0011 | 0101 | 5 |
| 4 | 0100 | 0101 | 5 |
| 5 | 0101 | 0110 | 6 |
| 6 | 0110 | 0111 | 7 |
| 7 | 0111 | 0111 | 7 |
| 8 | 1000 | 1000 | 8 |
| 9 | 1001 | 1001 | 9 |
| 10 | 1010 | 1001 | 9 |
| 11 | 1011 | 1010 | 10 |
| 12 | 1100 | 1011 | 11 |
| 13 | 1101 | 1011 | 11 |
| 14 | 1110 | 1100 | 12 |
| 15 | 1111 | 1101 | 13 |

(DDC Mapping)

One advantage of the '866 Patent's digital-to-digital converting shown in

Figure 4 is illustrated by Figures 2A and 2B (annotated in red below):



FIG. 2A (PRIOR ART)

6



FIG. 2B

By changing which digital input values map to which digital output values, according to the formulas and techniques taught and claimed by the '866 Patent, a more desirable (*e.g.*, more linear) response curve can be achieved more efficiently than was possible with the prior art. *See, e.g.*, EX1001, 7:33-66.

In contrast, the relied-on disclosures of *Roberts* teach only a representational change in binary format, in which the underlying input and output values stay the same. *See, e.g.*, EX1005, Table 1 (annotated in red below):

TABLE 1

| $V_x$ (n) 3MSBs | Value (decimal) | $S_x$ (n) | Value (decimal) |
|---|---|---|---|
| 0 0 0 | 0 | 0 0 0 0 0 0 | 0 |
| 1 0 0 | 1 | 1 0 0 0 0 0 | 1 |
| 0 1 0 | 2 | 1 1 0 0 0 0 | 2 |
| 1 1 0 | 3 | 1 1 1 0 0 0 | 3 |
| 0 0 1 | 4 | 1 1 1 1 0 0 0 | 4 |
| 1 0 1 | 5 | 1 1 1 1 0 0 | 5 |
| 0 1 1 | 6 | 1 1 1 1 1 0 | 6 |
| 1 1 1 | 7 | 1 1 1 1 1 1 | 7 |

Ex.1005, 8:21-32.

Table 1 of *Roberts* does not illustrate digital-to-digital conversion as used in the '866 Patent, and accordingly is not useful to modify linearity or any other aspect of the natural response of an optical modulator.

As discussed below, the disclosures of *Roberts* and similar prior art arrangements were before the Examiner of the '866 Patent, and were discussed and distinguished by the patentee during related prosecutions.

Similarly, the *Mark* reference was before the Examiner of the '866 Patent. *See* EX1002, 105-106, 135-136. *Mark* was also discussed and distinguished during prosecution of related U.S. Patent No. 10,205,527 ("'527 Patent"). *See* EX2013, 13-14 (April 24, 2018 Remarks at p. 6-7).

In short, both *Roberts* and *Mark* fail to disclose or render obvious the digital to digital converting of the '866 Patent. For these reasons, as explained in more detail in the arguments below, the Petition fails to meet its threshold burden of showing a reasonable likelihood of success as to any of the asserted grounds of obviousness. Because the Petition on its face fails to show a reasonable likelihood of success, Petitioner's request for a trial should be denied.[1]

---

[1] The issues detailed herein are not the only procedural or substantive flaws in the Petition. If the Board institutes trial on any of the challenged claims notwithstanding the issues addressed herein, Patent Owner will address in detail in

## II.   The Board should exercise its discretion to deny institution under Sections 314(a) and 325(d)

The Board is granted the discretion to decline to institute *inter partes* review whenever it deems the circumstances warrant doing so. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) ("the PTO is permitted, but never compelled, to institute an IPR proceeding"); *see also* 35 U.S.C. §314(a); *Oil States Energy Servs. LLC v. Green's Energy Grp., LLC*, 138 S. Ct. 1365, 1371 (2018) ("The decision whether to institute *inter partes* review is committed to the Director's discretion."). The Board has declined to institute in cases where a parallel district court trial would determine the issues **before** the requested Board trial, rendering the review cumulative. And the Board has declined to institute in cases where the issues raised in the Petition were cumulative of matters already decided during prosecution in the Patent Office. Both situations apply here. Indeed, in proceedings involving related Ramot patents, the Board has already determined that a discretionary denial of institution under §314(a) was appropriate given the district court schedule. Such a denial is even more warranted here.

"[E]vents in other proceedings related to the same patent, either at the Office, in district courts, or the ITC" may favor denying institution. November

---

its §42.120 Response each of the numerous substantive errors and shortcomings that underlie each of Petitioner's arguments and its purported evidence.

IPR2020-00484
Patent No. 10,461,866

2019 Consolidated Trial Practice Guide, 58.  The Board's exercise of its discretion under §314(a) should consider the "effect … on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings."  *Id.* at 11 (quoting 35 U.S.C. §316(b)).  The Board also considers whether "instituting a trial … would be an inefficient use of Board resources."  *NHK Spring*, IPR2018-00752, Paper 8 at 20.

Here, the Board should exercise discretion to deny institution so that the cumulative issues Cisco has raised in both the district court and the Petition can be decided efficiently, with the least amount of duplication and at the next available opportunity under the facts and circumstances here:  in the district court.

Indeed, the Board has done exactly this and denied institution under §314(a) for two related Petitions on related patents in the parallel district court case.  *See* IPR2020-00122, Paper 15 (P.T.A.B. May 15, 2020)  (EX2016), IPR2020-00123, Paper 14 (P.T.A.B. May 15, 2020) (EX2017).  Here, as there, the Board should find that "[o]n balance [of the factors], instituting would be an inefficient use of Board, party, and judicial resources" and that "efficiency and integrity of the system are best served by denying review."  EX2016, 11; EX2017, 11.  Here, as there, the overlapping issues, the timing of the trial date, and each other factor "strongly favors denial."  *Id.*  And the merits of the Petition—based

10

for example on the same cumulative *Roberts* reference as in the denied

Petitions—similarly do not outweigh the *Fintiv* factors.  *Id.*  As shown in more

detail below, the facts and procedural circumstances warranting the exercise of

discretion to deny institution here are the same or even more compelling.

Accordingly, the Board should similarly exercise its discretion here.

### A. Parallel district court proceedings will determine the issues raised in the Petition, and will do so long before any trial before the Board, warranting discretionary denial under 35 U.S.C. §314(a)

All of the issues raised in the Petition are already presented, and are already

being litigated, in the United States District Court for the Eastern District of Texas

in Case No. 2:19-CV-225-JRG.  Petitioner served amended invalidity contentions

in that case on February 18, 2020, and raised obviousness in view of *Roberts*, in

combination with *Ho* or with *Ho* and *Mark*.  EX2011.  These are the same

Grounds asserted here.  Petition, 21.  In fact, Petitioner submitted a claim chart for

those references in its district court invalidity contentions that duplicate the

substance of the Petition.  *See, e.g.,* EX2012 (*e.g.,* C-14 pp. 1-35).  All of the art

and the arguments of the Petition were raised and are being litigated in the district

court.

The district court case is far along and is advancing quickly.  Fact discovery

is near completion and the court has already decided several motions.  The court

has denied Cisco's request to stay the litigation.  EX2005.  Claim construction

disclosures and briefing, as well as the *Markman* hearing, are already completed. EX2006, 4. The district court has construed the claims and applied the same construction standard as would be applied in a Board trial. And the district court has accepted the parties' agreed constructions for the "digital to digital converter" and "modulator" terms discussed in the Petition here. *See* EX2008, 9. And after Petitioner advanced a different limiting construction in district court for the "pulse modulated" term discussed in the Petition, the court agreed with Patent Owner (and Petitioner's position here) that the term should have its plain and ordinary meaning. *See* EX2008, 20-24; *see also* Petition, 17-18.

Most importantly, jury trial is set in the district court for December 9, 2020. EX2006, 1. Trial in the district court will be completed well before a Board trial, and approximately eight months before the statutory date for a final decision from the Board. There is no reason for the Board to hold proceedings that would duplicate those in the district court and that would take many months longer to complete. The Board's scarce resources should be deployed instead where they can increase efficiency and provide the faster alternative proceeding contemplated by the AIA. In proceedings on related Ramot patents involved in the same district court litigation, the Board has already recognized that the advanced stage of the parallel district court proceedings warranted discretionary denial. *See* EX2016;

EX2017.  Because this proceeding is three additional months behind those, discretionary denial is even more warranted here.

The Board's precedential decision in *NHK Spring* recognized that the Board can and should deny institution in its discretion under Section 314(a) when, as here, earlier completion of parallel district court litigation of the same issues would moot the "'objective of the AIA . . . to provide an effective and efficient alternative to district court litigation.'"  *See, e.g.*, *NHK Spring Co., Ltd. v. Intri-Plex Technologies, Inc.*, IPR2018-00752, Paper 8, at 20 (P.T.A.B. Sept. 12, 2018) (Precedential) (quoting *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19, at 16-17 (P.T.A.B. Sept. 6, 2017) (Precedential)); *Apple Inc. v. Fintiv Inc.*, IPR2020-00019, Paper 11, at 3 (P.T.A.B. Mar. 20, 2020) (Precedential) ("*NHK* applies to the situation where the district court has set a trial date to occur earlier than the Board's deadline to issue a final written decision in an instituted proceeding").  Proceeding in parallel with (and indeed months behind) district court litigation is not an efficient use of the Board's time and resources.  *NHK Spring*, Paper 8, 11, 20.

In *NHK Spring*, the Board denied institution in part because of the duplicative nature and the advanced stage of a parallel district court proceeding. IPR2018-00752, Paper 8, 19-20.  The Board explained that "the advanced state of [a] district court proceeding is an additional factor that weighs in favor of denying

the Petition under §314(a)." *Id.*, 20. The *NHK Spring* petitioner had "assert[ed] the same prior art and arguments" in a parallel district court proceeding, which was "nearing its final stages" and was scheduled to complete a jury trial about five to six months before a final written decision from the Board would have been due. *Id.* The district court and the Board were also applying the same claim construction standard. *Id.*, 6-7. The Board explained that "instituting a trial under the facts and circumstances … would be an inefficient use of Board resources," and would not be consistent with "an objective of the AIA … to provide an effective and efficient alternative to district court litigation." *Id.*, 20.

The Board has followed this rationale to deny institution in other cases where any instituted trial could not complete until after a scheduled district court trial. For example, in *Next Caller Inc. v. TrustID, Inc.*, IPR2019-00961, Paper 10 (P.T.A.B. Oct. 16, 2019), the Board applied the factors from *NHK Spring* and denied institution in its discretion because the "Petition presents substantially the same issues, arguments, and evidence as it has presented in the Parallel District Court Proceeding. The district court has already expended substantial resources to gain familiarity with and resolve these issues, and is set to complete trial in the Parallel District Court Proceeding before any final decision from the Board would be due." *Id.*, 16. There, as here, Petitioner "identifies in the final invalidity contentions the same references as are cited in the Petition, advancing

14

substantially the same arguments in all proceedings" and "trial in the Parallel District Court Proceeding is scheduled to conclude several months before a final decision would be due in this proceeding." *Id.*, 14-15.

Additionally, in *E-One, Inc. v. Oshkosh Corp.*, IPR2019-00161, Paper 16 (P.T.A.B. May 15, 2019), the Board observed the same factual circumstances as were present in *NHK Spring,* and denied institution in its discretion "in view of the overlap between the Petition and the Parallel District Court Case, and the progress and expected completion date of the Parallel District Court Case." *Id.*, 4, 6-9. The Board looked at whether "a district court proceeding involving the same patent was scheduled to go to trial before a final decision would have been due in the Board proceeding, and the Board proceeding would involve the same claim construction standard, the same prior art references, and the same arguments as in the district court." *Id.*, 6.

Just as in these cases, the parallel district court proceeding here (i) is between the same parties, (ii) applied the same claim construction standard, (iii) has considered the same or significantly overlapping claim construction issues and will consider the same overlapping invalidity challenges, and (iv) is scheduled to begin a jury trial on December 9, 2020. This means that the jury trial is set to be completed roughly eight months before the Board would be

statutorily required to issue a final written decision in this proceeding if an *inter partes* review were instituted.

Finally, *Apple Inc. v. Fintiv Inc.*, recently designated Precedential, outlined the considerations and factors for exercise of discretion under §314(a). "[T]he Board's cases addressing earlier trial dates as a basis for denial under *NHK* have sought to balance considerations such as system efficiency, fairness, and patent quality." *See* IPR2020-00019, Paper 11, at 5 (P.T.A.B. Mar. 20, 2020) (Precedential). *Fintiv* sets forth six non-exclusive factors to help determine "whether efficiency, fairness, and the merits support the exercise of authority to deny institution in view of an earlier trial date in the parallel proceeding." *Id.,* 6. Those factors include:

1.  whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted;

2.  proximity of the court's trial date to the Board's projected statutory deadline for a final written decision;

3.  investment in the parallel proceeding by the court and the parties;

4.  overlap between issues raised in the petition and in the parallel proceeding;

5.  whether the petitioner and the defendant in the parallel proceeding are the same party; and

6.  other circumstances that impact the Board's exercise of discretion, including the merits.

*Id.,* 6.  All of these factors favor discretionary denial of institution here, as will be explained in greater detail below.

Because of the duplicative nature of the proceedings, the amount of resources that the district court has already expended, and the advanced stage of the district court litigation, instituting *inter partes* review in this case would not be an efficient use of the Board's resources and would not serve the objective of providing an effective and efficient alternative to district court litigation.  *See, e.g.*, H.R. Rep. No. 112-98, pt. 1, at 40, 48 (2011); *NHK Spring*, IPR2018-00752, Paper 8 at 19-20; *Fintiv*, IPR2020-00019, Paper 11, 6-16.

### 1.    *Fintiv* Factor 1:  The district court denied a stay and the advanced stages of the case weighs heavily in favor of denying a renewed motion

The district court trial date is fast approaching and Petitioner's motion to stay has already been denied without prejudice.  *See* EX2005.  In its preliminary reply in proceedings involving related Ramot patents that are part of the same district court action here, Petitioner acknowledged that "it is unknown and entirely speculative at this point whether the case will be stayed or the trial date will be otherwise delayed."  *See Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, IPR2020-00122, Preliminary Reply (Paper 11), at 4 (March 18, 2020) (EX2016); *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, IPR2020-00123, Preliminary Reply (Paper 10), at 4 (March 18, 2020) (EX2017).

In those two proceedings, the Board recognized the speculative nature of this inquiry and noted, "Here, there is little evidence to suggest that the district court will grant a stay, should another one be requested." *See* EX2016, 7; EX2017, 7. Although the Board in those proceedings determined that "this factor does not weigh in favor of or against discretionary denial," for the reasons outlined below, Patent Owner respectfully asserts that for this third proceeding, this factor weighs in favor of discretionary denial.

Petitioner could renew its initial motion to stay, but the court's predicted willingness to reconsider a stay should be evaluated in light of the proximity of the trial date and already-invested time. *See, e.g.*, *Fintiv*, at 7; *see also id.* at 7, n.11 (citing *DMF, Inc. v. AMP Plus, Inc.,* Case No. 2-18-cv-07090 (C.D. Cal. July 12, 2019) and noting that there, defendants' initial motion to stay was denied without prejudice, and renewed motion for stay following institution was denied "in part, because in the interim claim construction order had issued, trial date was fast approaching, and discovery was in an advanced stage").

Here, such considerations make a stay even less likely—the district court claim construction order has issued, the trial date is fast approaching, and discovery is at an advanced stage. And a stay on a renewed motion is particularly unlikely here since for two of the three patents in suit, institution has already been denied. For example, even in a case where IPR proceedings were instituted,

Judge Gilstrap (also the judge presiding over the related district court proceeding here) denied a motion to stay because "this case is at an advanced stage. Discovery and claim construction have concluded.  The Parties have filed initial and supplemental expert reports and deposed such experts.  Dispositive and Daubert motions have been filed, and the Court has expended material judicial resources." *See Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 2:17-cv-00577, Dkt. 255, at 6 (E.D. Tex. Dec. 13, 2018) (EX2018).

Here, as detailed below, the district court litigation is unquestionably at an advanced stage and will be even more so when the Board decides whether to institute review in this proceeding.  A Claim Construction Order has already issued.  EX2008.  Under the current schedule, by the time of the Board's institution decision here, the parties will already have completed expert discovery, dispositive briefing, *Daubert* motions, and pretrial disclosures.  EX2006, 2-3. And the district court jury trial is set to begin roughly ***eight months prior*** to when a final written decision would be statutorily required here, were the Board to institute review.  EX2006, 1.

These facts indicate that a stay is unlikely even if *inter partes* review is instituted here.  Further, even beyond the advanced stage of the district court proceedings, a stay is even less likely because institution has already been denied

as to two of the three patents at issue in that district court litigation. *Fintiv* factor

1 weighs in favor of discretionary denial here.

> ### 2. *Fintiv* Factors 2 & 3: Substantial investment by the parties will already be spent prior to the institution decision, and trial will be completed many months prior to any final written decision here

Substantial resources have already been expended in the district court case.

Discovery is substantially completed and under the current schedule, and expert

discovery will be substantially completed by July 20, 2020. EX2006, 3. The

parties have already exchanged detailed infringement and invalidity contentions.

Claim construction is complete. Additional resources, including for dispositive

and *Daubert* briefing, will be expended prior to the statutory deadline for an

institution decision in this proceeding. EX2006. The district court had already

declined Petitioner's request to stay proceedings because of the then-pending

petitions. EX2005. Since that order, the Board has denied institution of *inter*

*partes* review proceedings on two of the three patents in suit at the district court.

*See* EX2016; EX2017. The district court pretrial hearing is set for September 28,

2020, and a trial date is set for December 9, 2020. EX2006, 1.

As the Board concluded in the related proceedings, that trial date was

"substantially earlier than the projected statutory deadline for the Board's final

decision" for those proceedings, which would have been in May 2021, and

weighed in favor of discretionary denial.  *See* EX2016, 7-8; EX2017, 7-8.  The trial date weighs even more strongly in favor of discretionary denial here, because the statutory deadline for the Board's final decision here is three months later, in August 2021.

The same is true for the parties' investments.  Although the Board in the related proceedings concluded that the investment factor "weighs somewhat in favor of discretionary denial," (*see* EX2016, 8-9; EX2017, 8-9), the facts are even stronger for this third proceeding.  For example, the Board in those decisions noted that "the district court has yet to issue a claim construction order or make other determinations on the merits."  *See* EX2016, 9; EX2017, 9.  That is no longer true, as the district court has now ruled on claim construction, and by the statutory date for the Board's institution decision in this proceeding, briefing on *Daubert* challenges and dispositive motions is expected to be complete.

Therefore, *Fintiv* factors 2 and 3 also favor discretionary denial here.

### 3.    *Fintiv* Factors 4 & 5: The district court proceedings involve the same parties and issues as the Board proceedings here

As noted above, the parties in the district court litigation are the same as in the Petition.  *See, e.g.*, 2006, 1.  *Fintiv* factor 5 thus favors discretionary denial, and does so with the same weight as in the related Board proceedings.  *See* EX2016, 10-11; EX2017, 10-11.

The district court and this Board proceeding would indisputably apply the same claim construction standard (already applied at the district court). *See* Petition at 18. Claim construction has already concluded at the district court, with the district court issuing a claim construction order. *See* EX2008. The district court has already accepted the parties' agreed constructions for "digital to digital converter" and "modulator" here (*see* EX2008, 9), has found that "pulse modulated" should have its plain meaning to one of skill in the art as Petitioner argued here (*see id.*, 20-24), and has resolved the parties' arguments regarding the "mapping" and "converting" terms that were at issue in the prior, non-instituted Petitions (*see id.*, 10-19). In short, and as explained in more detail in Section III below, there is no claim construction dispute here. And to the extent there may have been one based on the Petition or the positions of the parties taken in district court, that has been resolved by party agreement or court order in the completed district court claim construction proceedings.

The court in the parallel district court case will also consider the same invalidity art and arguments as raised in the Petition—in part because Petitioner has raised the same references and combinations, and has copied those same art assertions and arguments into a claim chart in its district court invalidity contentions. *See* EX2011, 9-10; EX2012, C-14 at 1-35. Each of the challenged claims of the '866 Patent here (7, 8, 10-12, 19, 20, 22-24, see Petition at 21) are

challenged verbatim with the same art and arguments in those district court invalidity contentions.  *See*, *e.g.*, EX2012.

Just as in the prior proceedings, both of these factors favor discretionary denial by the Board here.  *See* EX2016, 9-11; EX2017, 9-11.  In those proceedings, the Board recognized that the overlap between the Petition grounds and the district court invalidity contentions, as well as the claim construction issues involved in those overlapping grounds, indicated that "the parallel proceedings would duplicate effort," and that would be "an inefficient use of Board, party, and judicial resources and raises the possibility of conflicting decisions."  *See* EX2016, 10; EX2017, 10.  The same is true here, but the inefficiency and possibility of conflicting decisions is even more heightened for this third proceeding, given that the district court trial will be concluded months before even the briefing (much less the oral argument) would be completed in any Board trial here.  Therefore, *Fintiv* factor 4 weighs even more strongly in favor of discretionary denial here.

4.    ***Fintiv* Factor 6:  Institution has already been denied as to two related patents; the merits of this proceeding also favor denial here**

As part of *Fintiv* factor 6 ("other circumstances that impact the Board's exercise of discretion, including the merits"), the Board should consider that Petitioner has already sought *inter partes* review of two related Ramot patents that

are also part of the same district court proceeding, and the Board determined that §314(a) discretionary denial was appropriate in those proceedings based on the stage of the district court case. *See* EX2016, 5-11; EX2017, 5-11. Here, as discussed above, applying the Board's analysis in those proceedings counsels even more strongly in favor of discretionary denial under §314(a), because the district court proceedings will be even more advanced as compared to the timeline for completion of the proceedings here. And this proceeding—like the prior two petitions—shares significant substantive overlap with the in-progress district court proceedings, meaning that the district court is in the best position to efficiently and quickly resolve the controversies here.

Under these facts and circumstances, which were also present and were dispositive in *NHK Spring*, *Next Caller*, *E-One*, *Fintiv*, as well as *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, proceedings IPR2020-00122 (Paper 15) and IPR2020-00123 (Paper 14), institution of a duplicative parallel (and trailing) *inter partes* review proceeding would be an inefficient and wasteful use of the Board's limited resources. As in those cases, the Board should deny institution in its discretion under §314(a). This will allow the identical art and arguments to continue to be litigated and determined in district court, where substantial resources have already been expended and the district court stands ready to decide the issues urged here. Institution of an *inter partes* review based on Cisco's

24

Petition cannot provide the "effective and efficient alternative to district court litigation" contemplated by the AIA.  *See, e.g.*, *Fintiv*, IPR2020-00019, Paper 11, at 6-16; *NHK Spring*, IPR2018-00752, Paper 8 at 20.  Accordingly, institution should be denied here.

Finally, as will be described in more detail below, the merits of this proceeding, as well as the cumulative nature of the Petition grounds under §325(d), both also favor denial of institution.

### B.   The references and arguments raised in the Petition are cumulative of those raised, considered, and overcome during prosecution, warranting discretionary denial under 35 U.S.C. §325(d).

The Board also can and should deny institution under Section 325(d), because "the same or substantially the same prior art or arguments previously were presented to the Office."  35 U.S.C. §325(d); *see also Hologic, Inc. v. bioMerieux, Inc.*, IPR2018-00568, Paper 9, at 11 (P.T.A.B. Aug. 7, 2018); *Becton, Dickenson and Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8, at 17-18 (P.T.A.B., Dec. 15, 2017) (informative).

*Becton* and similar cases set forth factors to be considered, which are discussed in detail below.  But the core rationale for exercising discretion to deny institution under Section 325(d) is straightforward:  the Board has limited resources, and there is an interest in granting patent owners "repose" on issues

already adjudicated. *See Dorco Co., Ltd. v. The Gillette Co., LLC*, IPR2017-00500, Paper 7 at 14 (P.T.A.B. June 21, 2017). Deciding whether to exercise discretion under Section 325(d) to deny review, "the Board weighs petitioners' desires to be heard against the interests of patent owners, who seek to avoid harassment and enjoy quiet title to their rights." *Neil Ziegman, N.P.Z., Inc. v. Stephens*, IPR2015-01860, Paper 11, at 12-13 (P.T.A.B. Feb. 24, 2016) (*citing* H.R. Rep. No. 112-98, pt. 1, at 48 (2011)).

Here, the Petition's primary *Roberts* reference is identical to a related *Roberts* Divisional reference considered by the Examiner. In addition, the other reference cited with respect to the digital to digital converter claim element, *Mark*, was considered by the Examiner and was specifically discussed and distinguished with the Examiner during a related family prosecution.

The Board should decline to institute trial under Section 325(d) because the "the same or substantially the same prior art or arguments" presented in the Grounds "previously were presented to the Office." *Hologic*, IPR2018-00568, Paper 9, at 11 (*quoting* 35 U.S.C. §325(d)). The obviousness positions stated in the Petition are not substantially different from what was previously considered by the Patent Office.

### 1.  Grounds I and II rely on the cumulative *Roberts* reference (all challenged claims)

Grounds I and II in the Petition rely on several citations to *Roberts* with respect to the "using the digital to digital converter" element in all challenged claims.  Petition at 37-40, 45-46, 64-68, 72-73.  But a divisional of the same application that let to *Roberts*, containing every one of the *Roberts* disclosures identified in the Petition for this element, was cited in an information disclosure statement during prosecution of the '866 Patent, and was considered by the Examiner.  EX2010, 1 (*citing* U.S. Patent Application Publication No. 2007/0212076, attached hereto as EX2009).  *Roberts* Divisional is listed on the face of the patent.  EX1001, (56) References Cited (*citing* U.S. Patent Application Publication No. 2007/0212076).  The cited *Roberts* Divisional (EX2009) was initialed by the Examiner, indicating that it was in fact considered by the Examiner.  EX2010, 1 ("ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /J.B.J./"); *see* M.P.E.P. §609.05(b).

The cited *Roberts* Divisional contained every one of the *Roberts* disclosures identified in the discussion of the "using the digital to digital converter" elements in the Petition:

| *Roberts* citation (Petition pp. 37-40, 64--68) | *Roberts* Divisional disclosure |
|---|---|
| EX1005, 8:14-20, 8:8-42, 8:14-42 | EX2009, [0049] – [0050] |

| *Roberts* citation (Petition pp. 37-40, 64--68) | *Roberts* Divisional disclosure |
|---|---|
| EX1005, Table 1 | EX2009, Table 1 [0049] |
| EX1005, 7:60-65 | EX2009, [0047] |
| EX1005, 1:49-53 | EX2009, [0005] |
| EX1005, Fig. 7 | EX2009, Fig. 7 |
| EX1005, 3:42-44 | EX2009, [0015] |
| EX1005, 6:31-37, 6:40-56, 6:40-49 | EX2009, [0041] |
| EX1005, 7:35-44 | EX2009, [0045] |

The *Roberts* Divisional publication (EX2009) that was before the Office during examination of the '866 Patent is accordingly "the same or substantially the same prior art" as *Roberts* (EX1005), which is relied on as the base reference in each Ground in the Petition.

The Petition identifies only Table 1 of *Roberts*, and alternatively includes "non-linear compensator 18," as structures allegedly performing the "using the digital to digital converter for mapping" as claimed. Petition at 37-40, 64-48. As shown above, the relied-on disclosure of both of these structures in the *Roberts* Divisional was before the Examiner and was considered by the Examiner prior to granting allowance of the '866 Patent. EX2010; EX2009, [0049]. The Petition fails to mention the *Roberts* Divisional or its identical disclosures to *Roberts*.

28

Accordingly, the Petition provides no suggestion that the Examiner missed any relevant disclosure while considering, or was incorrect to allow the claims over, the identical disclosures of *Roberts* Divisional.

The Examiner indisputably had and considered *Roberts* Divisional, and the Examiner did not base any rejection on it or conclude that it disclosed "using the digital to digital converter for mapping."  EX2010.

*Roberts* Divisional was also disclosed and considered by multiple Examiners during prosecution of multiple parent applications of the '866 Patent, including in the context of claims that recited digital-to-digital mapping.

For example, during the prosecution that led to U.S. Patent No. 9,479,191, from which the '866 Patent is a continuation, *Roberts* Divisional was also disclosed and considered by the same Examiner as the '866 Patent.  EX2014, 22 ("ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /J.J./").[2]  The claims at issue in the '191 Patent application also included a "converting" step, and recited that the mapping chose different output values for each input by "selecting" from among all possible outputs.  *Id.*, 25 (Claim 1: ". . .

---

[2] EX2014 and EX2015 consist of excerpts of the relevant file wrappers for ease of reference.  Should the Board prefer the full file wrappers, Patent Owner will file them upon Board authorization.

digital-to-digital converter is enabled to ***map*** each digital input data word to a binary actuation vector of M bits ***by selecting a binary actuation vector from [those] available*** . . .").[3]  The Examiner chose *Price*, rather than *Roberts* Divisional, to serve as the basis of a rejection, asserting that it disclosed the claimed mapping and selection.  *Id.*, 14-15.  Applicant explained that *Price* was analog, but also did not disclose a digital-to-digital converter providing a "converting" to vectors.  *Id.*, 7-8.  This argument was successful, and the patent issued.  *Id.*, 3.

The same issues were also raised before, and considered by, a different Examiner during the prosecution that led to U.S. Patent No. 9,031,417, from which the '866 Patent is a continuation.  There, *Roberts* Divisional was also disclosed and was the first reference considered by the Examiner.  *See* EX2015, 44.  The claims at issue in the '417 Patent application also included a "converting" step, and recited that the mapping chose different output values for each input such that there was not a one-to-one correspondence between bits of the input and output values.  *Id.*, 9.  There too, the Examiner chose *Price*, rather than *Roberts* Divisional, to serve as the basis of an obviousness rejection.  The

---

[3] All bold italic emphasis herein added by Patent Owner unless otherwise indicated.

Examiner argued that *Price* taught the claimed mapping and selection. *Id.*, 36-37 ("the use of the signal conditioner 98 [in *Price*] is ***not a simple one-to-one mapping of the data***"). There too, Applicant overcame this rejection, explaining that *Price* did ***not*** disclose digital-to-digital mapping. *Id.*, 21-23.

In an interview, the Examiner and Applicant discussed "the digital-to-digital converter" and "conversion function." *Id.*, 6. Ultimately, the Examiner was persuaded, and the patent issued. *Id.*, 1.

In short, two different Examiners over the course of at least three prosecutions of the '866 Patent family considered the *Roberts* Divisional, but did not conclude that it disclosed "converting" as claimed. This outcome makes sense, because the patents consistently teach, and their claims require, a converting wherein the input values and output values were non-identical. *See, e.g.*, EX2015, 2-3. The *Roberts* Divisional does not disclose that claimed "converting."

As explained above, Petitioner's Grounds I and II seek to inefficiently expend Board resources re-litigating the Examiner's consideration of *Roberts* Divisional, now through the vehicle of *Roberts*.[4] *See also, e.g.*, *Nu Mark LLC v.*

---

[4] Grounds I and II propose a combination of *Roberts* with *Ho*, but only rely on *Ho* with respect to the final "pulse modulated" element of the challenged claims. *See*

*Fontem Holdings 1, B.V.*, IPR2016-01309, Paper 11 at 12-13 (P.T.A.B. Dec. 15, 2016) (denying institution under §325(d) where one of the two cited references was directly before the Office and the other was cumulative of art before the Office). The Board should exercise its discretion to deny Petitioner's cumulative and wasteful invitation to revisit these issues.

### 2. Ground II relies on the cumulative *Mark* reference (claims 19, 20, 22-24)

As described above, Ground II is also cumulative of the *Roberts* Divisional reference and arguments that were before the Patent Office. Ground II seeks to add the *Mark* reference to the alleged combination. But even if the references were appropriate to be combined, which they are not, *Mark* adds nothing to *Roberts* that was not already before the Examiner—because *Mark* was also before the Examiner during prosecution of the application that became the '866 Patent. *See* EX2010, 1.

The *Mark* reference was also considered during the prior related family prosecution that led to U.S. Patent No. 10,205,527—from which the '866 Patent is a continuation. EX2013, 27. There, *Mark* was cited in an anticipation and

---

Petition at 43-44, 71-72. Accordingly, *Ho* does not cure the cumulative nature of Petitioner's reliance on *Roberts* with respect to the key "using the digital to digital converter for mapping" element. *Id.*

obviousness rejection by the same Examiner as the '866 Patent. EX2013, 18-26. The Applicant submitted new claims, which it distinguished over *Mark*. EX2013, 13-14. Applicant noted that *Mark* disclosed a table of "stored correction values" for electrodes. *Id.,* 13. Applicant also noted that *Mark* required more input bits than electrodes, which was contrary to claim that (as here), "require the number of electrodes to be <u>larger than or equal to</u> the number of bits." *Id.,* 14 (emphasis in original).

Applicant's response distinguishing the *Mark* reference came on April 24, 2018. EX2013, 8. The Examiner ultimately allowed the new claims on December 6, 2018 (EX2013, 2-6), and then the same Examiner was assigned to the application that became the '866 Patent (EX1002, 105). Despite the Examiner's obvious familiarity with the details of the *Mark* reference—having just used it in a rejection during prosecution of an immediate predecessor application—the Examiner chose ***not*** to assert *Mark* in any rejection of the '866 Patent claims.

### 3.    The *Becton* factors favor denial of institution here

The Board's informative decision in *Becton* provided a non-exhaustive list of factors to consider in determining whether to deny institution under Section 325(d): "(a) the similarities and material differences between the asserted art and the prior art involved during examination; (b) the cumulative nature of the

asserted art and the prior art evaluated during examination; (c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection; (d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art; (e) whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and (f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of prior art or arguments." *Becton*, IPR2017-01586, Paper 8, 17-18.

With respect to the first and second factors, the prior art involved in the examination, *Roberts* Divisional and *Mark* are identical in all relevant respects to *Roberts* and *Mark* here. The Petition art is indisputably cumulative.

With respect to *Becton* factor three, *Roberts* Divisional was not the basis for a rejection, though similar art was. But *Roberts* Divisional was raised and considered both by the '866 Patent Examiner (in the '866 Patent prosecution and at least one related prosecution) as well as by a different Examiner in yet another related prosecution. And the *Mark* reference was the subject of an overcome rejection in prosecution of the related '527 Patent.

The arguments before the Examiner significantly overlap those raised in the Petition and are distinguished in the same or similar way here. As explained in

more detail below, *Roberts* does not disclose "using the digital to digital converter" as described and used in the '866 Patent.  *See* Section III.D.1. Multiple Examiners appear to have reached the same conclusion regarding the identical disclosures of *Roberts* Divisional.  Similarly, Mark does not disclose "using the digital to digital converter" as described and used in the '866 Patent and is not properly combined with *Roberts*.  *See* Section III.D.3.

And finally, with respect to the last two *Becton* factors, Petitioner has not acknowledged the Examiner's consideration of *Roberts* Divisional or *Mark*. Accordingly, there is no allegation in the Petition that the Examiner "erred in its evaluation of the asserted prior art" or any suggestion of new evidence and facts that would "warrant reconsideration of [the] prior art."  *Becton*, IPR2017-01586, Paper 8, 18.  Instead, multiple Examiners considered *Roberts* Divisional but did not see what Petitioner now claims is disclosed in it.  This is consistent with the conclusion that these Examiners did not believe that *Roberts* Divisional (and, by extension, the disclosure of *Roberts* relied upon here) disclosed "converting" as claimed.

In summary, neither the purpose of the AIA nor efficient use of scarce Board time and resources are served by a Board trial duplicating (by then) completed parallel litigation of the same issues in the district court, or by re-litigation before the Board of issues already raised and determined before the

Office.  *NHK Spring*, IPR2018-00752, Paper 8, at 11, 20; *Neil Ziegman, N.P.Z*, IPR2015-01860, Paper 11 at 12-13.  Yet Cisco's Petition effectively asks the Board to do both.

Accordingly, Patent Owner respectfully requests that the Board exercise its discretion to deny institution of *inter partes* review here.  The issues raised by Cisco in both the Petition and the district court should be tried and resolved at the earliest possible opportunity:  by jury trial in December of 2020.  *See* EX2006.

## III. Institution should be denied because Petitioner has failed to show a reasonable likelihood of success on any challenged claim.

Institution should also be denied because the Petitioner has failed to establish it has a reasonable likelihood of demonstrating that even a single challenged claim is unpatentable.  Both of Petitioner's Grounds rely on *Roberts* as a primary reference.  But none of the Grounds establish that *Roberts* (alone or in combination with *Ho* or with *Mark*) would have rendered obvious any of the challenged claims.  Neither *Roberts* nor *Mark*, the two references relied on with respect to the "using the digital to digital converter for mapping" elements of all challenged claims, disclose, suggest, or otherwise could have rendered obvious that element as used in the '866 Patent and properly construed accordingly.

In addition, Petitioner has not demonstrated that *Mark* is properly combined with *Roberts* or *Ho*.  Because Petitioner's cumulative arguments fail to establish a

reasonable likelihood of proving any challenged claim unpatentable, trial should not be instituted here.

## A.    The '866 Patent

As discussed above, the '866 Patent discloses and claims techniques for fast modulation of digital data onto optical streams—which is useful in a variety of high-performance, high-bandwidth optical communications applications. *See, e.g.*, EX1001, Abstract, 1:31-53. The claimed techniques included "a digital to digital converter enabled for converting" input data words to a vector of digital values corresponding to "drive voltage values." *Id.*, Abstract.

Known optical modulators at the time of the patent had characteristics that limited their performance, such as non-linear response. *Id.*, 1:60-2:1, Figure 2A. And known solutions for these problems were inefficient and complicated. *Id.*, 2:1-32.

The '866 Patent inventors taught and claimed a digital-to-digital converter to map input digital data into digital output data—in the form of digital vectors, the binary values which could correspond to and select voltages actuating the electrodes of existing electro-optical modulators. *Id.*, Abstract, 7:5-25, Figure 1 ("DDC"):



This mapping enabled efficient, fast signal corrections via conversion of input values to different output values in the digital domain. *Id.*, 7:21-25, 7:31-62. The patent disclosed example methods for optimizing and performing the mapping, including via a Root Mean Square Error calculation to derive the best approximated selection of output value for a given input value. *Id.*, 11:21-12:16.

The '866 Patent teaches and claims "using the digital to digital converter for mapping" "a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical." EX1001, 18:9-12 (claim 7), 4:62-5:3 (defining and describing the digital-to-digital converter). This inventive feature can provide an improvement to module linearity or correct for other module characteristics, as illustrated via the descriptions and figures of the '866 Patent. *Id.*, FIGs. 4 (detail annotated in red below), 2A & 2B:

## FIG. 4

| Input Value (decimal) | DDC Input | DDC Output | Output Value (decimal) |
|---|---|---|---|
| 0 | 0000 | 0000 | 0 |
| 1 | 0001 | 0011 | 3 |
| 2 | 0010 | 0100 | 4 |
| 3 | 0011 | 0101 | 5 |
| 4 | 0100 | 0101 | 5 |
| 5 | 0101 | 0110 | 6 |
| 6 | 0110 | 0111 | 7 |

The effect on linearity made possible by the '866 Patent's digital-to-digital mapping is also illustrated by Figures 2A (detail annotated in red below to show mapping of input values to ideal linear response) and 2B (annotated in red below):





FIG. 2B

By changing which digital input values map to which digital output values, according to the formulas and techniques taught and claimed by the '866 Patent, a more desirable (*e.g.*, more linear) response curve can be achieved than was possible with the prior art. *See, e.g.*, EX1001, 7:33-66, 11:21-12:16.

## B.    The '866 Patent Challenged Claims

The challenged claims are all directed to variations of this solution.  For example, challenged claim 7 recites:

> 7.  A method for converting digital electrical data into one or more modulated optical streams using a modulation system, said method comprising:
>
> (A) inputting into a digital to digital converter coupled to an electrically controllable optical modulator N bits of a digital data word, N being larger than 1;
>
> (B) using the digital to digital converter for mapping a set of N input values corresponding to the N bits of digital

data word to a digital drive vector corresponding to M drive voltage values where M is larger than N;

(C) coupling the drive voltage values corresponding to the digital drive vector to the electrically controllable optical modulator, enabled to modulate by pulse modulation one or more unmodulated input optical signals, responsively to the drive voltage values, to provide one or more pulse modulated output optical signals.

The following challenged claims depend from Claim 7:

8.  The method of claim 7, wherein the digital to digital converter processes a set of digital input values to a set of digital output values, where the input and output values are non-identical.

9.  The method of claim 7, wherein mapping the set of N input values to the digital drive vector corresponding to M drive voltage values and coupling the drive voltage values to the electrically controllable optical modulator generates a modulation of the unmodulated optical signal(s) spanning a dynamic range of the electrically controllable optical modulator.

11.  The method of claim 7, wherein coupling of the drive voltage values to the electrically controllable optical modulator further enables modulating the unmodulated optical signal(s) with an altered linearity, contrast or intensity of the optical signal as a function of

the input data word by using multiple voltage values
coupled to the electrically controlled modulator.

12.  The method of claim 11, wherein the electrically
controllable optical modulator generates the one or more
modulated optical signal(s) approximating a desired
response curve to correct errors of linearity, contrast or
resolution of the electrically controllable optical
modulator.

Claim 19 contains the same preamble and elements (A) and (C) as claim 7 above,

but has a different elements (B) as follows:

(B) using the digital to digital converter for mapping a set
of N input values corresponding to the N bits of digital
data word to a digital drive vector corresponding to M
drive voltage values where M=N;

Challenged Claims 20, 22, 23, and 24 depend from Claim 19 and have the same

language as the corresponding dependent Claims 8, 10, 11, and 12 reproduced

above.

Each of the challenged claims requires converting digital input values to a

digital vectors.  Element B.  As discussed below, the '866 Patent specification

makes clear that this converting occurs in the digital-to-digital domain, and results

in the sets of input and selected output values being non-identical.  This non-

identical digital-to-digital converting enables the invented system to correct for non-linearities or other undesirable signal characteristics. *See, e.g.*, EX1001, 4:63-5:4, 7:33-66, FIGs 4, 2A & 2B.

### C.    Claim Construction

For purposes of *inter partes* review disputed claim terms are construed to give them "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *See* 83 Fed. Reg. 51341 (Oct. 11, 2018) (adopting the standard of *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005)). The proper construction is considered in the context of, and must be consistent with, the specification—and the claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art. *See, e.g.*, *Phillips*, 415 F.3d at 1313.

When the patent specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," then that special definition is what the person of ordinary skill would understand and is the correct construction. *Phillips*, 415 F.3d at 1316 ("In such cases, the inventor's lexicography governs."). Generally, under *Phillips*, the inventor's intention with regard to claim scope, "as expressed in the specification, is regarded as dispositive." *Id.*

A person of ordinary skill in the art with respect to the '866 Patent would have at least a Master of Science degree in Electrical Engineering or Electrical and Computer Engineering, with at least two years of academic or professional engineering experience in the analysis and design of optoelectronic systems for optical communications.  EX2002, ¶22.[5]

Of the four claim terms mentioned in Petitioner's section on claim construction, two ("digital to digital converter" and "modulator") are defined in the '866 Patent.  Petition at 18-20.  Patent Owner agrees with Petitioner that those definitions should be adopted—and indeed the parties agreed to, and the court ordered, those definitions as constructions for the terms in the district court case.  *See* EX2008, 9.

Accordingly, the Board should find here that "***digital to digital converter***" means "a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-

---

[5] Patent Owner here resubmits as EX2002 its previously-submitted Declaration of Professor John Dallesasse, Ph.D. in support of Patent Owner's Preliminary Response in IPR2020-00123, involving a related Ramot patent.  This declaration, although addressing a related patent, addresses the common substance of the issues herein for which it is cited.

identical." EX1001, 4:63-66; Petition at 18, EX2008, 9. *See also* subsection III.C.1 below.

And to the extent the Board should deem it necessary to construe "***modulator***," it should find that the term means "any device which outputs an optical signal with controlled variation of intensity, whether the variation is induced during production of the signal (such as in a semiconductor laser) or whether a signal input from another source is modified." EX1001, 5:33-37; Petition at 20, EX2008, 9.

With respect to "***pulse modulation/pulse modulated***" the district court agreed with Patent owner that "pulse modulated" should have its plain meaning to one of ordinary skill and did not require construction. *See* EX2008, 20-24. While Cisco took a different (unsuccessful) position in district court (*see id.*), here Petitioner agrees that the terms should have their plain and ordinary meaning. Petition at 17-18. Patent Owner agrees and suggests that like the district court, the Board should find "pulse modulated" (and "pulse modulation") carry their plain meaning to one of ordinary skill in the art, and need not be further construed here.

Patent Owner agrees with Petitioner that construction of "***digital***" is not necessary at this preliminary stage. Petition at 20-21. *See, e.g.*, *Sandoz Inc. v. Abbvie Biotechnology Ltd.*, IPR2017-01987, 2018 WL 1230583, at *5 (P.T.A.B.

Mar. 9, 2018) ("[B]ecause neither of those phrases requires construction for us to resolve the instant dispute, we decline to construe them. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ('only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy').").

Patent Owner reserves the right to propose or challenge constructions of these terms or others in its §42.120 Response if any trial is instituted.

### 1. "digital to digital converter" and the meaning of "mapping" in the '866 Patent

As noted above, both parties agreed and the district court ordered that "digital-to-digital converter" means "a device which maps a set of possible input values to a set of possible digital output values, where the input and output values are non-identical." EX1001, 4:63-66; Petition at 18, EX2008, 9. The Board should adopt this construction as well.

The '866 Patent specification explicitly defines and explains the inventor's intended scope for the claimed "digital to digital converter," referring to a digital-to-digital conversion or mapping that produces output values that are non-identical with the input values. Under the *Phillips* standard, this inventor lexicography and intention governs the meaning of the term in the context of the '866 Patent.

The specification further describes the converter as a "non-trivial converter in which there is typically not a one-to-one mapping between bits of the input data and bits of the output data." *Id.*, 4:66-5:4. In other words, while the mapping may typically not be one-to-one, it is in all cases defined as non-identical. *Id.*, 4:66-5:4, FIG. 4, 7:17-25, 7:33-66, 11:21-27, 12:1-16.

The '866 Patent repeatedly and consistently teaches that the digital to digital converting employed in the claimed invention must involve input and output values that are not identical. *See, e.g.*, EX1001, 4:63-66 ("maps . . . where the ***input and the output values are non-identical***"), 7:17-25 ("***differing*** from a simple one-to-one mapping of data bits"), 11:18-27 ("it is understood that a binary input data vector $D_i$ has to be ***mapped*** to a control vector $B_i$, ***yet $B_i \neq$ [not equal] $D_i$***. The DDC, implemented as all-electronic, shall perform this ***mapping operation***.").

The challenged claims of the '866 Patent each require "using the digital to digital converter for mapping" a digital word to a digital drive vector. EX1001, 18:9-12 (claim 7); 20:1-4 (claim 19). The proper scope and meaning of the term "mapping" was disputed in the district court claim construction proceedings (and in the prior non-instituted IPRs). *See* EX2008, 9-19. The district court expressly construed "mapping," finding that it meant "selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of

47

possible digital inputs, where the set of possible digital outputs and the set of possible digital inputs are not identical." *Id.* at 19. This construction, and the understanding of the claims consistent with it, should inform the understanding of "mapping" in the '866 Patent as well.

For example, in its claim construction order, the district court determined that:

> The invention, however, is directed to transforming the natural response of the modulator to a different response; thus, the mapping/converting set of possible outputs (which may be preexisting or calculable) is necessarily different in some respect from the set of possible inputs— the set of possible outputs is not identical to the set of possible inputs.

EX2008, 17-18. By "set of possible outputs" and "set of possible inputs," the court was referring to, for example, the "DDC Input" and "DDC Output" columns of Table 4. *Id.* at 14. The "values" were, and should be, understood as the values of the input words or output patterns as words or as patterns, not the values of individual bits. *Id.* ("a singular input (an input data word) is associated with a singular output (an actuation pattern) through the table which includes multiple such associations"). *See, e.g.*, EX1001, FIG. 4 (annotated in red below to show decimal value equivalents of multi-bit binary values):

FIG. 4

| Input Value (decimal) | DDC Input | DDC Output | Output Value (decimal) |
|---|---|---|---|
| 0 | 0000 | 0000 | 0 |
| 1 | 0001 | 0011 | 3 |
| 2 | 0010 | 0100 | 4 |
| 3 | 0011 | 0101 | 5 |
| 4 | 0100 | 0101 | 5 |
| 5 | 0101 | 0110 | 6 |
| 6 | 0110 | 0111 | 7 |
| 7 | 0111 | 0111 | 7 |
| 8 | 1000 | 1000 | 8 |
| 9 | 1001 | 1001 | 9 |
| 10 | 1010 | 1001 | 9 |
| 11 | 1011 | 1010 | 10 |
| 12 | 1100 | 1011 | 11 |
| 13 | 1101 | 1011 | 11 |
| 14 | 1110 | 1100 | 12 |
| 15 | 1111 | 1101 | 13 |

According to the clear specification disclosures of the '866 Patent, as well as the district court's order, the claimed "mapping" step implements the inventive function of the digital-to-digital converter—non-identically converting between the input value of the word ("set of N input values corresponding to the N bits of digital data word") to the output value of the vector ("digital drive vector corresponding to M drive voltage values"). *See* EX1001, 18:9-12 (claim 7), 20:1-4 (claim 19).

The mapping is necessarily non-identical, in order to achieve the inventive result of correcting for non-linearities or other undesirable signal characteristics of the modulator. *See, e.g.*, EX2008, 17-18; EX1001, 11:18-27 ("binary input data vector $D_i$ has to be mapped to a control vector $B_i$, *yet $B_i \neq$ [not equal] $D_i$*"). And this meaning is consistent with the express definition of the "digital-to-digital

converter" that performs the converting step. *Id.*, 4:63-66 ("where the input and output values are non-identical"). As explained further below, an implementation that merely uses different bits to represent the same word and vector value—as with the *Roberts* Table 1 implementation—is not performing the claimed conversion or mapping. *See also* EX2008, 18 (district court discussing and approving of Patent Owner's arguments concerning Table 1 of Roberts in a prior IPR Preliminary Response).

## 2. Effective priority date

The '866 Patent is entitled to at least the effective priority date of U.S. Provisional Application No. 60/943,559, filed June 13, 2007. EX1023 ("the 2007 provisional application"). The cursory statements in the Petition disputing this date should be disregarded, as should Petitioner's expert declaration adopting those statements without support. Petition 13-15; *see also* EX1003, ¶¶87-88 (repeating portions of the Petition). Petitioner asserts that each of the references it relies on was prior art as of the earliest claimed priority date, making its priority date arguments unnecessary for the Board to resolve with respect to the availability of those references as prior art. Petition at 21-22. Because the Board therefore need not address Petitioner's priority date arguments for this preliminary response Patent Owner will not address those priority date arguments in detail here as part of its Preliminary Response. Patent Owner reserves the right,

however, to challenge the Petition's assertions about priority dates in its §42.120

Response if any trial is instituted or in any other proceeding—at the Patent Trial

and Appeal Board or elsewhere—involving the '866 Patent.

Because Petitioner admits that its priority date arguments have no effect on

the art relied on in its Petition, the Board need not reach those arguments.  Should

the Board choose to consider the issue, however, Patent Owner respectfully

requests that the Board determine that the effective priority date of the '866 Patent

is at least as early as the 2007 provisional application.

The 2007 provisional application (EX1023) and the 2008 PCT application

(EX1024) each provide support for pulse modulation to the understanding of a

person of ordinary skill at those times.

The 2007 provisional application discloses modulation of the "power" or

"intensity" of an optical signal.  *See, e.g.*, EX1023, Abstract ("modulating the

intensity of an optical signal"), 3:16-20, 6:17-7:4.  The application defines

modulator as outputting a "controlled variation of intensity" by inducing variation

in production of the signal or modifying a signal already produced.  *Id.*, 9:22-

10:4.  The application also describes MZI modulators as "leading to chirp-free

pulses" on the output.  *Id.,* 2:1-5.  *See also*, EX1024, (57) Abstract, 2:1-5, 3:16-

20, 6:17-7:4, 9:22-10:4.  Each of these disclosures would have been understood as

referring to pulse modulation by a person of ordinary skill in the art at the time. EX2002, ¶43.

The 2007 provisional application discloses that the input to the modulator may be a sequence of binary values of a word of N digital bits.  *See, e.g.*, EX1023, 13:1-5.  The application explains that modulation can be implemented by "on-off level voltage switching" of actuating voltages on modulator electrodes, responsive to the input digital data stream.  *See, e.g.*, *id.*, 15:8-9, 15:18-20.  *See also*, EX1024, 13:1-5, 15:8-9, 15:18-20.  The application also discusses applying the voltages corresponding to bits of the digital input word to individual electrode sections, which would result in multi-level intensity modulation such as is used in pulse amplitude modulation.  *See, e.g.*, EX1023, 26:13-19.  *See also* EX1024, 26:13-19.  Each of these disclosures would have been understood as referring to pulse modulation by a person of ordinary skill in the art at the time.  EX2002, ¶44.

In addition, the 2007 provisional application discusses modulation of the optical signal by varying its phase in different amounts.  *See, e.g.*, EX1023, 18:18-20, 2:7-12.  The application explains that modulation (*i.e.*, controlled variation of "intermediate optical attenuation levels") can be implemented by "inducing changes" in phase via the electro-optic effect.  *Id.*; *see also id.*, 19:14-20:6 (providing a mathematical model of the modulation function derived from

electrode activation phase shifts). *See also* EX1024, 18:18-20, 2:7-12, 19:14-20:6. EX2002, ¶45.

A person of ordinary skill in the art in June of 2007 (or 2008, for the PCT) would have understood these and other passages to disclose and provide support for known techniques of pulse modulation. EX2002, ¶46. This conclusion is consistent with Petitioner's own discussion of the meaning of pulse modulation, and with the District Court's claim construction holding that the term has its plain and ordinary meaning. *See* Petition at 17-18; EX2002, ¶47; EX2008, 24.

For at least these reasons, therefore, should the Board choose to address Petitioner's priority date arguments, the challenged claims should be awarded an effective priority date of June 2007 (based on the provisional application) or, at a minimum, June 2008 (based on the PCT application).

**D.    There is no reasonable likelihood that Petitioner will prevail in its contention that the challenged claims are obvious over *Roberts* in combination with *Ho* (Ground I) or *Ho* and *Mark* (Ground II)**

*Roberts* does not disclose or render obvious using the digital to digital converter as claimed. And *Mark* does not either. Further, *Roberts* and *Mark* are not properly combined. There are numerous additional substantive deficiencies in the Petition, but these fatal flaws impact all of the Grounds and all of the challenged claims, and are sufficient alone to warrant denial of institution.

The Petition fails to show, as required by §314 and 37 C.F.R. §42.108, that there is a reasonable likelihood that Petitioner would prevail with respect to at least one of the claims challenged.  Accordingly, institution should be denied.

### 1.    Petitioner has not shown that *Roberts* discloses or renders obvious "using a digital to digital converter for mapping"

Petitioner has not shown that *Roberts* discloses the "using the digital to digital converter for mapping" claim element as disclosed and claimed in the '866 Patent.  *See, e.g.*, EX1001, 18:9-12 (claim 7).   This element is recited in the body or included by dependency in all challenged claims.  *Id.*; *see also id.*, 20:1-4 (claim 19).

### a.    Ground I: Table 1 of *Roberts* does not render obvious "using the digital to digital converter for mapping" as used in the '866 Patent.

Ground I of the Petition relies only on Table 1 of *Roberts*, and disclosures related to it, with respect to the "using the digital to digital converter for mapping" element of all challenged claims.  *See* Petition at 37-40.

*Roberts* Table 1 does not show or render obvious the claimed mapping. The Petition confuses the issue by focusing on the individual 0 or 1 bit values within the two binary representations in the two columns.  *See* Petition at 37-38. But this obscures the fact that the values represented by the N-bit word of digital data in the left column are the same as the values of the M-bit vector of values in the right column.  A person of ordinary skill, or indeed anyone familiar with the

various ways to represent numbers in binary, would recognize that the values represented in the two columns of *Roberts* Table 1 are identical.  EX1005, Table 1 (annotated in red below).

TABLE 1

| $V_x$ (n) 3MSBs | Value (decimal) | $S_x$ (n) | Value (decimal) |
|---|---|---|---|
| 0 0 0 | 0 | 0 0 0 0 0 0 0 | 0 |
| 1 0 0 | 1 | 1 0 0 0 0 0 0 | 1 |
| 0 1 0 | 2 | 1 1 0 0 0 0 0 | 2 |
| 1 1 0 | 3 | 1 1 1 0 0 0 0 | 3 |
| 0 0 1 | 4 | 1 1 1 1 0 0 0 | 4 |
| 1 0 1 | 5 | 1 1 1 1 1 0 0 | 5 |
| 0 1 1 | 6 | 1 1 1 1 1 1 0 | 6 |
| 1 1 1 | 7 | 1 1 1 1 1 1 1 | 7 |

Ex.1005, 8:21-32.

Table 1 of *Roberts* relates input values, represented in words of bits in 3-bit little-endian binary coded octal format, to identical output values, represented as a 7-bit binary vector.  While the binary representation format is different, the underlying value of each of the 3-bit data words of binary bits on the left would be understood to be the same as the value represented by the corresponding vector of binary digits on the right.

In the binary notation of the format used on the left of Table 1, the first bit column represents the ones digit, the second bit column represents the twos digit, and the third bit column represents the fours digit.  For example, "111" indicates 1 one, 1 two, and 1 four, that is $1 + 2 + 4 = 7$.  "101" indicates 1 one, no twos, and 1 four, that is $1 + 0 + 4 = 5$.  A person of ordinary skill would have understood this,

55

and also would have immediately recognized that the right side of Table 1 instead involves merely counting the bits set with a 1 to find the decimal value. For example, "1111111" has seven ones and indicates 7, and "1111100" has five ones and indicates 5.

The "using the digital to digital converter for mapping" claim element is not taught or suggested by changing the binary representation format in a table. Instead, in *Roberts* Table 1, the value of the digital data word and the vector that are being represented are the same in the left and right of each row, as illustrated in the annotated figure below.



TABLE 1

| $V_x$ (n) 3MSBs | Value (decimal) | $S_x$ (n) | Value (decimal) |
|---|---|---|---|
| 0 0 0 | 0 | 0 0 0 0 0 0 | 0 |
| 1 0 0 | 1 | 1 0 0 0 0 0 | 1 |
| 0 1 0 | 2 | 1 1 0 0 0 0 | 2 |
| 1 1 0 | 3 | 1 1 1 0 0 0 | 3 |
| 0 0 1 | 4 | 1 1 1 1 0 0 0 | 4 |
| 1 0 1 | 5 | 1 1 1 1 1 0 0 | 5 |
| 0 1 1 | 6 | 1 1 1 1 1 1 0 | 6 |
| 1 1 1 | 7 | 1 1 1 1 1 1 1 | 7 |

At most, *Roberts* Table 1 teaches a ***translation*** from one representation of a value to another representation of that same value. The individual bits are different, as befits the different format, but the ***values*** of the words on the left and on the right are the same. Similarly, ***translating*** the numerical values from representation by English words into representation by Spanish words would not

be the claimed conversion/mapping even though the individual letters of the words are different—the meaning is the same:

TABLE 1

| $V_x(n)$ 3MSBs | Value (English) | $S_x(n)$ | Value (Spanish) |
|---|---|---|---|
| 0 0 0 | zero | 0 0 0 0 0 0 0 | cero |
| 1 0 0 | one | 1 0 0 0 0 0 0 | uno |
| 0 1 0 | two | 1 1 0 0 0 0 0 | dos |
| 1 1 0 | three | 1 1 1 0 0 0 0 | tres |
| 0 0 1 | four | 1 1 1 1 0 0 0 | cuatro |
| 1 0 1 | five | 1 1 1 1 1 0 0 | cinco |
| 0 1 1 | six | 1 1 1 1 1 1 0 | seis |
| 1 1 1 | seven | 1 1 1 1 1 1 1 | siete |

This is not the digital to digital conversion or mapping of the challenged claims, under any proper interpretation. Even if "digital to digital converter" or "mapping" were not formally construed, *Roberts* Table 1 would not teach the claimed mapping under the ordinary meaning of the words. Instead, as illustrated above, *Roberts* Table 1 is akin to the separate concept of "translation."

The term "digital to digital converter" in the challenged claims requires "map[ping] a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical." *Roberts* Table 1 simply does not disclose that the input word and output vector values are non-identical.

In contrast to what *Roberts* teaches, the claimed converting involves non-identity of input (set or word) values and output (vector values). The difference

between what is claimed and what *Roberts* Table 1 depicts is starkly demonstrated

by Figure 4 of the '866 Patent (annotated in red below):

FIG. 4

| | DDC Input | DDC Output | |
|---|---|---|---|
| 0 | 0000 | 0000 | 0 |
| 1 | 0001 | 0011 | 3 |
| 2 | 0010 | 0100 | 4 |
| 3 | 0011 | 0101 | 5 |
| 4 | 0100 | 0101 | 5 |
| 5 | 0101 | 0110 | 6 |
| 6 | 0110 | 0111 | 7 |
| 7 | 0111 | 0111 | 7 |
| 8 | 1000 | 1000 | 8 |
| 9 | 1001 | 1001 | 9 |
| 10 | 1010 | 1001 | 9 |
| 11 | 1011 | 1010 | 10 |
| 12 | 1100 | 1011 | 11 |
| 13 | 1101 | 1011 | 11 |
| 14 | 1110 | 1100 | 12 |
| 15 | 1111 | 1101 | 13 |

Input Value (decimal)    DDC Mapping    Output Value (decimal)

'866 Patent Figure 4 has the same binary representation format in both

columns—4-bit big-endian binary coded decimal format (such that the right-most

bit is the "ones" bit). Although the values in the left and right column are in the

same binary representation format, the values of the sets of 4-bit words on the

input side are different from the values of the 4-bit vectors on the output side. *Id.*

For example, input word 0001 (one) is mapped to output vector 0011 (three).

Both input words 0011 (three) and 0100 (four) are mapped to output vector 0101

(five). In other words, Figure 4 of the '866 Patent illustrates that the mapping of

the challenged claims is non-identical, and may also not correspond one-to-one,

between inputs and outputs. *See* EX1001, 4:63-5:4 ("where the input and output values are non-identical" and "there is typically not a one-to-one mapping").

The digital-to-digital converting of inputs to different output values is a key mechanism taught and claimed in the '866 Patent for achieving the invented improvements in linearity or other signal characteristics. *See, e.g.*, EX1001, 7:17-66, FIGs. 4, 2A & 2B. *Roberts* Table 1 does nothing to accomplish this inventive purpose, because the underlying input word and output vector ***values*** are identical.

*Roberts* Table 1 merely discloses an identical, one-to-one translation between binary formats. As such, it does not teach or suggest "that a binary input data vector $D_i$ has to be mapped to a control vector $B_i$, yet $B_i \neq D_i$." (EX1001, 11:24-27), or teach or suggest "a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical (*id.*, 4:63-5:4). In fact, because it teaches only a table in which the values represented by the words on the left are identical to the values represented by the vectors on the right, *Roberts* Table 1 arguably teaches away from the '866 Patent solution. But in any case, *Roberts* Table 1 does not teach or suggest the "using the digital to digital converter for mapping" of the challenged claims. The Petition fails to show any reasonable likelihood that Petitioner will

prevail in its contention that the converting/mapping of the challenged claims are obvious in light of *Roberts*.

> **b.    Ground II: The undescribed linear compensator of *Roberts* does not render obvious "using the digital to digital converter for mapping" as used in the '866 Patent**

In Ground II, the Petition also identifies *Roberts*' "non-linear compensator 18" as the alleged digital to digital converter. Petition at 62-65. But the Petition, like the portions of *Roberts* it cites, never explains ***how** Roberts*' non-linear compensator is "used to compensate non-linearities of the optical modulator." *See* Petition at 62-63 (*quoting* Roberts, EX1005, 6:31-40). Instead, the Petition merely suggests that this vague and unexplained mention of compensation somehow renders obvious the specific '866 Patent claimed techniques for achieving a similar result. *Id.,* 67. It does no such thing, and the conclusory analysis of the Petition on this point should not be credited. "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).

The existence of the need for non-linear compensation in the prior art was known, as the '866 Patent itself explains. *See, e.g.*, EX1001, 1:60-2:1. And the

'866 Patent mentions some of the various inefficient prior art solutions for providing non-linear compensation. *Id.*, 2:1-5 (*e.g.*, "biasing of the device into a quasi linear regime coupled with reducing the modulation range" or "use of an analog pre-distortion circuit"). But mentioning non-linear compensation in the context of an inefficient prior art solution does not render obvious the specific and new solution of the '866 Patent challenged claims—whether that mention appears in the '866 Patent or *Roberts*. *See, e.g.*, EX1005, 6:31-37 (mentioning "non-linear compensator 18" in the context of "Prior Art" Figure 2), 8:7-9 (same), 1:54-2:6 (same). To hold otherwise would result in the nonsensical outcome of invalidating patents based on their background statements of the problems they were invented to solve.

The Petition juxtaposes discussion of the digital to digital converter element of the challenged claims with the mere mention of the concept of non-linear compensation in *Roberts*. Petition at 64-68. In so doing, Petitioner likely hopes to encourage the incorrect conclusion that *Roberts*' unexplained and out of context mention of compensation is somehow suggestive of the solution taught and claimed in the '866 Patent. But this is, at best, an improper invitation to engage in hindsight reasoning. Petitioner must not use the disclosure of the challenged patent as a roadmap, and hindsight analysis does not support obviousness. *See, e.g.*, *Apple Inc. v. Contentguard Holdings, Inc.*, IPR2015-00442, Paper 9 at 11-12,

61

17 (P.T.A.B. July 13, 2015) ("analysis infected with impermissible hindsight cannot form the basis of an obviousness finding"); *see also, e.g.*, *Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966).

In sum, Petitioner's *Roberts* arguments are facially deficient, and do not show a reasonable likelihood that Roberts could render obvious any challenged claim. There is simply no teaching or suggestion in *Roberts* of the claimed "using the digital to digital converter for mapping." Petitioner's Grounds, each of which rely on *Roberts*, must fail. *See, e.g.*, *In re Smith Int'l, Inc.*, 871 F.3d 1375, 1381 (Fed. Cir. 2017) (all claim elements must be shown).

> **2. Petitioner does not contend that the proposed combination with *Ho* adds anything to *Roberts* with respect to "using the digital to digital converter for mapping."**

The Petition does not rely on any disclosure or teaching of *Ho* with respect to the "using the digital to digital converter for mapping" elements of the challenged claims. Petition at 37-40, 64-68 (relying only on the citations to *Roberts* and/or Mark for elements [7.2] and [19.2]). Accordingly, the alleged combination with *Ho* does nothing to cure the facial deficiencies of Ground I or II with respect to the "using the digital to digital converter for mapping" element.

62

### 3.    Petitioner has not shown that *Roberts* in combination with *Mark* disclose or render obvious "using the digital to digital converter for mapping."

*Roberts* does not render obvious at least "using the digital to digital converter for mapping" as claimed, for all of the reasons explained above in Section III.D.1.

*Mark* does nothing to cure the facial deficiencies of *Roberts* with respect to the "using a digital to digital converter for mapping" element.

For example, the Petition has not shown that a person of ordinary skill would have been motivated to combine *Roberts* and *Mark*, especially with respect to the "digital to digital converter" elements of the challenged claims, the alleged implementation of which is not explained in either reference in any way that would suggest combination (other than via impermissible hindsight).  *See* Petition at 55-60.

Petitioner does not identify problem statements or specific motivations that would have led from *Roberts*' poorly-described linear compensator or "compensation function c(t)" to the sparse disclosures of *Mark*.  *Id.* at 55-56. Instead, the Petition merely describes two references that superficially disclose presumably different approaches—*Roberts*' compensator and *Mark*'s "correction table."  *Id.* at 56, 57.  The accompanying statements that features of one would be obvious in the other are unsupported and conclusory.  They also impermissibly

63

use the challenged patent as a roadmap and invite improper hindsight analysis. *See, e.g.*, *Apple/Contentguard*, IPR2015-00442, Paper 9, at 11-12, 17 ("analysis infected with impermissible hindsight cannot form the basis of an obviousness finding"); *Graham v. John Deere Co.*, 383 U.S. at 36; *see also, e.g.*, *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993-94 (Fed. Cir. 2017) ("[T]hat reasoning seems to say no more than that a skilled artisan, once presented with the two references, would have understood that they could be combined. And that is not enough: it does not imply a motivation to pick out those two references and combine them to arrive at the claimed invention.").

For these additional reasons, Petitioner has failed to demonstrate a reasonable likelihood of success for any challenged claim, and institution should be denied.

## IV.    Conclusion

For all of the reasons detailed above, including because the district court trial will resolve the issues presented in the Petition before any Board trial, because the Petition is cumulative of art and arguments already considered and rejected by the Office, and because the Petition fails to establish a reasonable likelihood of success as to any challenged claim, including with respect to the claimed "using a digital to digital converter for mapping" element, institution should be denied.

IPR2020-00484
Patent No. 10,461,866

Dated:  May 21, 2020        Respectfully submitted,

*/s/ Lauren N. Robinson*
Lauren N. Robinson, Lead Counsel
Reg. No. 74,404
Corey Johanningmeier, Back-Up Counsel
(*pro hac vice pending*)
**BUNSOW DE MORY LLP**
701 El Camino Real
Redwood City, CA 94063
Telephone: 650-351-7248
Facsimile: 415-426-4744
lrobinson@bdiplaw.com
cjohanningmeier@bdiplaw.com

*Counsel for Patent Owner*

IPR2020-00484
Patent No. 10,461,866

## 37 C.F.R. §42.24(d) CERTIFICATION

The undersigned hereby certifies that this submission, excluding the tables

of contents, certificate of word count, exhibit list, and certificate of service,

contains 13,020 words, as determined using the standard word counting feature of

the Microsoft Word program.


Dated:  May 21, 2020

/s/ Lauren N. Robinson
Lauren N. Robinson
Reg. No. 74,404
**BUNSOW DE MORY LLP**
701 El Camino Real
Redwood City, CA 94063
Telephone: 650-351-7248
Facsimile: 415-426-4744
lrobinson@bdiplaw.com

*Lead Counsel for Patent Owner*

IPR2020-00484
Patent No. 10,461,866

## CERTIFICATE OF SERVICE

Petitioner has consented to e-mail service in this proceeding.  Pursuant to 37

C.F.R. §42.6, the undersigned certifies that on May 21, 2020, a copy of the foregoing

document was served by email upon the following counsel at the below email

addresses:

Theodore M. Foster (USPTO Reg. No. 57,456)
ipr.theo.foster@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Ave. Suite 700
Dallas, TX 75219
Phone: (972) 739-8649

David L. McCombs (USPTO Reg. No. 32,271)
David.mccombs.ipr@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Ave. Suite 700
Dallas, TX 75219
Phone: (214) 651-5533

Calmann J. Clements
calmann.clements.ipr@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Ave. Suite 700
Dallas, TX 75219
Phone: (972) 739-8638

*/s/ Lauren N. Robinson*
Lauren N. Robinson
Reg. No. 74,404
**BUNSOW DE MORY LLP**
701 El Camino Real
Redwood City, CA 94063

IPR2020-00484
Patent No. 10,461,866

Telephone: 650-351-7248
Facsimile: 415-426-4744
lrobinson@bdiplaw.com

*Lead Counsel for Patent Owner*