# EXHIBIT S

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

CISCO SYSTEMS, INC.,
Petitioner,
v.

RAMOT AT TEL AVIV UNIVERSITY LTD.,
Patent Owner.


_____

Case IPR2022-00575 & IPR2022-00576
Patent 11,133,872

_____



**DECLARATION OF JOHN DALLESASSE IN SUPPORT OF
PATENT OWNER'S PRELIMINARY RESPONSE**

IPR2022-00575 & -00576
Patent No. 11,133,872

I, John Dallesasse, declare as follows:

## INTRODUCTION

1.      My name is John Dallesasse.  I have been retained to provide information and assistance regarding U.S. Patent No. 11,133,872 ("'872 Patent"). Specifically, I have been asked by Ramot at Tel Aviv University Ltd. ("Ramot") to consider the Petitions for *Inter Partes* Review numbered IPR2022-00575 and IPR2022-00576 ("Petitions") regarding the '872 Patent, and specifically the Declaration of Professor Daniel Blumenthal (EX1003) that accompanies them.

2.      For the purposes of this declaration, I have been asked to provide information and opinions about the state of the art and knowledge of a person of ordinary skill in the art, what such a person would be motivated to consider or would find obvious (or not), the prior art references relied on in the Petitions, and related issues in response to the opinions expressed by Dr. Blumenthal.

3.      I have personal knowledge of the facts and opinions set forth in this declaration, and, if called upon to do so, I would testify competently thereto.

4.      I am currently Professor, Electrical and Computer Engineering, at the University of Illinois at Urbana-Champaign and also serve as the Associate Dean for Facilities and Capital Planning in the Grainger College of Engineering.  I hold Ph.D., Master of Science, and Bachelor of Science degrees in Electrical and

IPR2022-00575
Ramot EX2018

IPR2022-00575 & -00576
Patent No. 11,133,872

Computer Engineering from the University of Illinois at Urbana-Champaign, and have over 30 years of experience in optoelectronics, both in industry and academia. I am also a named inventor on 51 issued patents on optoelectronics and related technologies.  My experience will be described further below under Qualifications and Background.

5.    I am being compensated for my work in connection with this matter at my standard hourly consulting rate.  My compensation for my work in this matter is not dependent in any way on my conclusions and opinions, the contents of this declaration, the substance of any further opinions or testimony that I may provide, or the outcome of this matter or any matter involving the '872 Patent.

6.    The materials I have reviewed in forming the opinions in this declaration include the following:

  a.  The '872 Patent (EX1001) and its prosecution history (EX1002).

  b.  The *Roberts* (EX1005), *Taraschuk* (EX1006), and *Wright* (EX1009) references cited in the Petition.

  c.  The Declaration of Professor Blumenthal (EX1003) and the materials discussed therein.

  d.  The Petitions and their remaining exhibits.

  e.  Other papers in these proceedings and their exhibits, including Ramot's Preliminary Patent Owner Response, the Decisions on

-2-

IPR2022-00575
Ramot EX2018

Institution from the Board, and Ramot's Requests for Rehearing.

7.      In addition, I have considered the relevant legal standards, as they have been explained to me by counsel and as I understand them.  I have also considered the knowledge and understanding of a person of ordinary skill at the time of the '872 Patent.

8.      I have previously submitted declarations about other Ramot patents in the same family as the '872 Patent, including in IPR2020-00122, IPR2020-00123, and IPR2020-00484.  Some sections of this declaration were taken and adapted from those prior declarations.

## QUALIFICATIONS AND BACKGROUND

9.      My education and professional background is in Electrical and Computer Engineering, with a particular focus on optoelectronic systems and technologies.  I hold Ph.D. (1991), Master of Science (1987), and Bachelor of Science (1985) degrees in Electrical and Computer Engineering from the University of Illinois at Urbana-Champaign.

10.      I received my Ph.D. degree under the direction of Professor Nick Holonyak, Jr., the inventor of the red LED.  While working in Professor Holonyak's group, I was involved in the demonstration of red lasers in the InAlGaP-GaAs material system and developed the III-V oxidation process used to make Vertical-Cavity Surface-Emitting Lasers (VCSELs).  Oxide-confined

IPR2022-00575
Ramot EX2018

VCSELs are used in optical transceivers for enterprise networks and data centers, optical "mice," and in the facial recognition systems used in smart phones. For my work on III-V Oxidation, I was elected a Fellow of both Optica and the Institute of Electrical and Electronics Engineers (IEEE).

11.    I have served as an Associate Editor for the IEEE Journal of Quantum Electronics, was appointed to the Steering Committee for the IEEE Journal of Lightwave Technology and currently serve as the Chair of that committee, have served as the Chair of the Steering Committee for the IEEE Transactions on Semiconductor Manufacturing, have served as the Optoelectronic Devices Technical Committee Chair for the IEEE Electron Devices Society (EDS), was elected to the Board of Governors for the IEEE Electron Devices Society, and was elected to serve as the Vice President of Technical Committees for EDS.

12.    I have 51 awarded patents, over 50 publications in peer-reviewed journals, have contributed to a book chapter, and have over 90 presentations, papers in conference proceedings, and other publications including invited and plenary talks.

13.    Over the course of my career, I have been directly involved in the development of optical transceiver devices, technologies, and products. At Amoco Technology Company (1991-1994), I was involved in the development of integrated assemblies for high-speed (1-3 Gbps) optical communications. This

IPR2022-00575
Ramot EX2018

IPR2022-00575 & -00576
Patent No. 11,133,872

program, funded by DARPA and in conjunction with E-Systems, developed photonic components and assembly techniques for producing an integrated monitor photodiode – laser – external absorption modulator on silicon optical bench assembly.

14.    While at Molex Fiber Optics (1999 – 2003), I was responsible for managing the engineering team designing optical transceivers for Ethernet and Fibre Channel in the 1 – 10 Gbps speed range. I was also an active participant in the development of the IEEE 802.3 Standard. During this time I was involved in evaluating optical networking technologies and determining the strategic direction of our product development.

15.    While at Emcore Corporation (2003 – 2009) I had a wide range of responsibilities that included optical component and transceiver design. In addition, I was involved in technical due diligence on companies Emcore was considering acquiring. This included companies working on 40 Gbps optical transceivers and transceiver technologies using externally modulated lasers.

16.    My current research includes work on Mach-Zehnder modulators for communication applications, and on optical phase control for phased arrays.

17.    EX2019 contains a true and correct copy of my *Curriculum Vitae* further describing my background and experience.

## THE '872 PATENT

IPR2022-00575
Ramot EX2018

18.    I have reviewed the '872 Patent (EX1001) and its file history (EX1002).  The '872 Patent issued from U.S. Patent Application No. 16/532,567, which was filed on August 6, 2019, and claims priority to Provisional Application No. 60/943,559, filed June 13, 2007.

19.    The '872 Patent is one of a family of patents that teach and claim methods for achieving high-speed modulation of digital data onto optical streams. *See, e.g.*, EX1001 at Abstract.  Electrical to optical modulators are used in many high-speed data communication applications such as cable TV, phone, and data networks, or in connections between servers in and among datacenters.  And as the patent acknowledges, there is an ever-increasing need for improvements in performance and bandwidth.  *Id.*, 1:36-55.  Known optical modulators at the time of the '872 Patent had characteristics that limited their performance, such as non-linear response.  *Id.*, 1:62-2:3, Figure 2A.  And known modulation systems also had various undesirable complexities or performance limits.  *See, e.g.*, *id.*, 2:3-31.

20.    As the specification of the patent indicated to a person of skill in the art at the time, the inventors of the '872 Patent came up with methods to improve upon existing electro-optical modulators.  For example, the patent described and claimed using a digital-to-digital converter to map input digital data into digital output data, in the form of digital vectors that could be selected from those available in order to cause corrections and alterations to the output response curve.

IPR2022-00575
Ramot EX2018

*Id.*, Abstract, 7:5-25, Figure 1 ("DDC"):



21.     According to the '872 Patent, this digital-to-digital mapping / conversion allowed for efficient, fast signal corrections via mapping of input values to different output values in the digital domain. *Id.*, 7:21-25, 7:31-62. This mapping could compensate for modulator non-linearity or other undesirable signal characteristics in a way that was both simpler and faster than prior solutions. *See, e.g.*, *id.*, 7:60-62. A person of skill in the art would have understood that the approach of the '872 Patent was advantageous because it did not require the output range restrictions, complicated analog signal conditioning, or other undesirable configurations of previous known systems. *See, e.g.*, *id.*, 2:3-34. The digital-to-digital mapping solution of the '872 Patent could improve "linearity of response without sacrificing efficiency or dynamic range" as prior solutions required. *Id.*

**ONE OF ORDINARY SKILL**

22.     I have been asked to provide my opinion of the level of education and

IPR2022-00575
Ramot EX2018

experience that would have been possessed by one of ordinary skill in the art at the time of the '872 Patent, which I take for purposes of this declaration to be as of the current earliest undisputed priority date on June 13, 2007.  In forming my opinion, I have reviewed the level of experience of the person of ordinary skill in the art as described and applied in the Petition and by Dr. Blumenthal in his declarations.  I have also previously considered and given an opinion on this question with respect to related Ramot patents in other IPRs, and in the district court case between Ramot and Cisco, and my opinion has not changed.

23.     In my opinion, a person of ordinary skill in the art would have at least a Master of Science degree in Electrical Engineering or Electrical and Computer Engineering, with at least two years of academic or professional engineering experience in the analysis and design of optoelectronic systems for optical communications.

24.     For example, as the patent describes, various modulators such as Mach-Zehnder Interferometers (MZI) and Electro-Absorption Modulators (EAM) were known at the time.  *See, e.g.*, '872 Patent at 1:56-32, 13:6-12.  Details of these modulators are often taught at a graduate level as part of an Electrical Engineering degree specializing in Opto-Electronics.  *See, e.g.*, https://ece.illinois.edu/academics/courses/ece536.  This was also the case in 2007. In my opinion, an ordinary Engineer at the time would need at least this

IPR2022-00575 & -00576
Patent No. 11,133,872

instruction, plus some years working in the analysis and design of optoelectronic systems for optical communications, in order to be familiar and comfortable with the level of theory and implementation detail described in the patent.

25.     As described above, I obtained my Ph.D. in Electrical and Computer Engineering in 1991, and had more than fifteen years of professional experience in the analysis and design of optoelectronic devices and systems for optical communications prior to the date of the '872 Patent.  I believe that my own education and experience exceeds that of a person of ordinary skill in the art, under my definition or the Petition's definition, today and as of the current earliest undisputed priority date of the '872 Patent (June 13, 2007).

26.     I understand that Dr. Blumenthal's declaration gives a definition of a Person of Ordinary Skill in the Art that is similar to mine.  EX1003, ¶24.  I disagree with Dr. Blumenthal, however, about his opinions concerning what a person of ordinary skill would be motivated to combine, or would find obvious, as detailed below.

## CLAIM CONSTRUCTION

27.     I understand that in claim construction for an *Inter Partes* Review proceeding, the claim terms are to be construed in accordance with the *Phillips* standard that is also used in district court.  I understand that the proper construction of a disputed term under that standard is the meaning that would be understood by

a person of ordinary skill in the art at the time of the patent, considered in the context of the patent specification.

28.    I have read the Board's discussion of claims that include the phrase "determined based on a pattern for actuating drive voltages that alters the linearity . . ." *See* IPR2022-00575, Decision, Paper 10 at 24-25.  I understand that the Board took this claim language to mean "the mapping being determined so as to *obtain*, a *desired* 'pattern for actuating drive voltages that alters the linearity . . .'." *Id.*  I have been asked to consider what a person of ordinary skill in the art would understand this claim language to mean.

29.    The '872 Patent uses the word "pattern" to refer to the M-bit digital word output from the digital-to-digital converter.  *See, e.g.*, '872 Patent at 7:54-57 ("An output pattern of 0101 is thus chosen to correspond to an input of 0011.").  In some embodiments this pattern "corresponds to the electrode actuation pattern." *See, e.g.*, *id.* at 6:7-11.  In others, the pattern corresponds to a "constellation point" within a complex modulation.  *See, e.g.*, *id.* at 6:48-49.

30.    The '872 Patent describes determining or choosing an output word value for a particular input word that is "most closely approximating the corresponding theoretical linear response" or "much more closely approximates to a linear response" or "best approximates a desired ideal output for the given input." *See, e.g.*, *id.* at 7:21-25; 7:41-57.

-10-

31.    Figures 2A, 2B, and 4 illustrate this determining process in a simple example.  *Id.*  But the '872 Patent also describes and illustrates the mathematics of determining a mapping as a general "optimization" problem, which can be applied even to complicated modulation schemes such as 64-QAM.  *See, e.g.*, *id.* at 11:3-12:18 (optimization based on applying "the root mean square error (RMSE) between an ideal output, represented by a straight line, and the converter output"), 15:15-21 ("digital mappings may be derived either by analytical methods or numerically").

32.    It is important to note, and a person of ordinary skill in the art would understand, that what is being optimized for these claims is the output of the digital-to-digital converter.  *See, e.g.*, *id.* at 11:3-6 ("the control vectors B be optimized"), 11:30-32 ("the converter output").  For a particular input word, "a given plurality of N digital input data bits," a digital output word / constellation point is determined or chosen based on an ideal or desired response.  *See, e.g.*, *id.* at 7:54-57.  The "determined based on" claims here describe a digital-to-digital mapping based on optimizing the digital output of the converter, in order to produce a more linear response.  *See, e.g.*, *id.* at claim 1 ("wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator").

IPR2022-00575
Ramot EX2018

33.     In my opinion, a person of ordinary skill in the art reading the patent would understand that this claimed approach of mapping, based on the converter output pattern, differs from pre-distortion based on real-time measured analog modulator output.  *Id.* at 2:3-7 (disparaging "use of an analog pre-distortion circuit to feed the modulator"); *see also* EX1006 at 7:67–8:5 ("a detected sample of the modulator output"), Fig. 6; EX1005 at 2:53 ("pre-distorted signal").

34.     There may be solutions that use a mapping, but not one "determined based on a pattern" for a digital converter output.  For example, the cited prior art embodiment of *Taraschuk* uses an analog sample of the *modulator output*, to determine and apply a corrective pre-distortion to the particular corresponding *input word*.  EX1006 at 7:67–8:5, 7:7-11, 7:34-39, Fig. 6.  This applies a feedback correction from the sampled *modulator output* to the *input word* in order to make the intended input appear at the *modulator output*.  *Id.*  In my opinion, *Taraschuk*'s approach is not mapping "determined based on a pattern" of a digital converter output.

35.     I have considered the Board's proposed understanding of this claim language in its Decision on institution.  I do not agree that it represents the best way to paraphrase the meaning of the claim language to one of ordinary skill in the art.  The Board's proposed understanding of "determined based on a pattern" as "determined so as to *obtain*, a *desired* pattern" seems to eliminate or the "based

-12-

on" aspect of the claim language.  The Board's language might be taken to apply to anything that resulted in such a pattern, even if it was obtained with no consideration or knowledge of that pattern, which would be incorrect in my opinion.  For example, the Board's application of this language seems to have caused it to miss or not understand the distinction that Ramot argued and that I described above, between the claimed language and the real-time analog sample feedback approach cited from the background of the '872 Patent or *Taraschuk*. *See* IPR2022-00575, Paper 10, at 24-26.

## ROBERTS

36.     I have reviewed EX1005, U.S. Patent No. 7,277,603 ("*Roberts*").  I have also previously submitted declarations about this patent in connection with other proceedings brought by Cisco against other related Ramot patents.

37.     *Roberts* describes an optical modulator.  EX1005 at 1:15-17.  It discusses embodiments that each perform modulation by varying the "effective length of a control region" of the modulator.  *Id.* at 4:53-57, Fig. 4, 7.  In other words, *Roberts* uses multiple electrodes to vary how much of the length of a waveguide arm of a (for example, Mach-Zehnder) modulator is activated:

IPR2022-00575
Ramot EX2018

IPR2022-00575 & -00576
Patent No. 11,133,872



38.    In one of the embodiments shown above, "Logic 46" translates a 3-bit input format to a 7-bit thermometer-encoded representation of the same value. *Id.* at 8:13-19, Table 1. That encoding is used to vary the length of the modulator control arm that is activated, by turning on successively more or less of the electrodes. *Id.*; *see also id.* at Fig. 7.

39.    In other proceedings, Cisco has claimed that Table 1 of *Roberts* showed a digital-to-digital mapping as in the Ramot patents. I provided declarations explaining why it did not. *See, e.g.*, IPR2020-00123, EX2002. I understand that Cisco is no longer claiming this in new proceedings. *See* IPR2022-00575, Paper 10 (Decision) at 36 ("Petitioner does not appear to rely on Roberts' teaching of mapping $V_X$ (n) to $S_X$ (n)"). I agree that *Roberts*' teaching with respect to Table 1 and Logic 46 does *not* disclose or suggest to a person of ordinary skill the mapping according to the claims here, as I have explained in past declarations.

40.    *Roberts* does not teach digital mapping according to the claims at all. It does mention a "linear compensator 18," but in the context of an incorporated

**IPR2022-00575
Ramot EX2018**

background embodiment, and far from the main purpose or supposedly new aspects of *Roberts*. *See, e.g.*, EX1005 at 1:55-59. *Roberts* says almost nothing about how the prior art "linear compensator 18" works. *See id.* at 6:34-37 ("the non-linear compensator 18 used to compensate non-linearities"). Dr. Blumenthal does not point to *Roberts*' compensator as allegedly performing the "mapping … determined based on a pattern for actuating drive voltages that alters the linearity" or "deltas" elements of the claims. I agree that *Roberts*, including in the brief discussion of a known compensator, does not teach or suggest the claimed mappings.

41.    *Roberts* does not describe a linearization mapping, it merely shows that more significant bits in a binary word can be effected by actuating more electrodes. While *Roberts* mentions a linear compensator, no description of such a device or how it would work are presented. This is in stark contrast to the '872 Patent, which describes the "'digital-to-digital converter' employed by certain embodiments of the present invention [as] a non-trivial converter in which there is typically not a one-to-one mapping between bits of the input data and bits of the output data, as will be clear from the description following," and then, in columns 9-12, gives a detailed description of how this non-trivial mapping is performed.

## TARASCHUK

42.    I have reviewed EX1006, U.S. Patent No. 6,781,537 ("*Taraschuk*").

IPR2022-00575 & -00576
Patent No. 11,133,872

*Taraschuk* is about a "high speed digital to analog converter," and specifically, about "phase aligner" and "vector addition" aspects of such a device. *See, e.g.*, EX1005 at Title, Abstract, 1:14-16, 2:44-52 ("phase aligner operates to ensure precise phase alignment"), Fig. 2:



43.    *Taraschuk*'s phase aligner compensates for phase differences between individual bits of a parallel digital signal. It does this using, for example, a set of delay lines to align the phase of each bit with the others. *See, e.g.*, *id.* at 3:60-4:50, Figs. 3a & 3b:



44.    *Taraschuk*'s vector addition block compensates for logic level

IPR2022-00575
Ramot EX2018

mismatches between bits of a parallel digital signal.  It does this using, for

example, a set of weighted attenuators to even out the contribution from each

digital bit to the final analog output.  *See, e.g.*, *id.* at 4:51-46:55, Figs. 4a & 4b:



45.    These compensations arise from and address distortions in the circuit

design of a typical digital-to-analog converter.  It is necessary to precisely correct

for these issues to increase the speed at which accurate conversion could occur.  As

*Taraschuk* notes, at the time, "no known devices" were "capable of providing

accurate D/A conversion at" speeds above 10 GB/s.  *Id.* at 2:29-33.

46.    These phase alignment and vector summation embodiments of

*Taraschuk* do not discuss optical modulators at all.  There is a brief mention of use

of a pre-distortion signal in optical modulation in the background section (*id.* at

2:16-25), disparaged as not working at high speed (*id.* at 2:29-33).  The '872 Patent

background also mentions this prior approach.  EX1001 at 2:3-7.  The first mention

of an application of *Taraschuk*'s D/A converter to an optical modulator occurs in

IPR2022-00575
Ramot EX2018

column 6 of the detailed description. EX1006 at 6:44-45. The discussion then goes on to cover the use of a "linearizer 44" to compensate for "logic level mismatches across the bits" of the parallel digital signal. *Id.* at 6:56-7:52, Fig. 5. Again this is talking about bitwise adjustments between individual bits of a parallel digital signal, not compensating for any modulator effects.

47.    Unlike *Roberts*, which operates by varying active electrode length of a modulator, *Taraschuk* is primarily concerned with aligning phase and level mismatches between bits in a parallel digital signal. These initial disclosures and embodiments of *Taraschuk* would not be understood by a person of ordinary skill in the art to add anything to the discussion of optical modulation in *Roberts*, even if there were some reason motivating such a person to look at both references. As discussed below, in my opinion there would not be any such reason. Neither the title nor the abstract imply that there is an application for optical modulators. The figure on the cover page does not depict or suggest an optical modulator. None of the summary or the embodiments discussed first in the detailed description depict or suggest an optical modulator. There would be no motivation for a person of ordinary skill to look further into *Taraschuk* for a solution for optical modulator linearization.

48.    Finally, beginning at column 7, line 53 of *Taraschuk*, there is a paragraph on using the "analog signal output from the D/A converter" to drive an

-18-

IPR2022-00575 & -00576
Patent No. 11,133,872

optical modulator. That discussion states that "in principle" a mapping can be defined to compensate for "the combined non-linear effects" of logic level mismatches and "the sinusoidal response of the modulator." *Id.* at 7:61-8:5. These two sentences say only that the mapping can be obtained by comparing the *input* word to a sample of the *analog output* of the modulator. *Id.* In other words, this particular embodiment of *Taraschuk* applies a pre-distortion to the input word, based on feedback of an analog sample of the output of the modulator. *Id.*; *see also id.* at 7:34-39, Fig. 6.

49.    There is no disclosure in *Taraschuk* about the possibility of compensating the "sinusoidal response of the modulator" alone, as Dr. Blumenthal does in his calculations in his declaration. *See* EX1003 at ¶¶ 250-256. And of course, there is no disclosure of any of the approach or math that Dr. Blumenthal uses there. For these and other reasons, as I explain more fully below, in my opinion a person of ordinary skill in the art would not have been motivated to, or found it obvious to, apply Dr. Blumenthal's calculation method. For example, the only method of calculating a compensation value mentioned anywhere in the cited references is a sentence describing comparing and subtracting the difference, between a fed-back analog output sample and a corresponding input, from that input. EX1006 at 7:34-39.

**WRIGHT**

-19-

**IPR2022-00575**
**Ramot EX2018**

IPR2022-00575 & -00576
Patent No. 11,133,872

50.    I have reviewed EX1009, U.S. Patent No. 7,058,369 ("*Wright*").

Wright is about electrical signal power amplifiers used in, for example, radio

frequency (RF) communications in cellular networks.  *See, e.g.*, EX1009 at 1:15-

18.  Specifically, it concerns digital pre-distortion to make the gain response curve

of the power amplifier more linear.  *Id.* at 3:7-15, 6:27-29 ("generating a

predistortion function to be applied by a real-time predistortion engine to reduce

distortion in a RF power amplifier").  A typical response curve for such an

electrical power amplifier is shown in Figure 6A:



*FIG. 6A*

51.    Notably, this curve is not sinusoidal.  *Wright* contains no discussion of

optics or optical modulation.  In my opinion, as further detailed below, *Wright* is

not analogous or relevant to the other references discussed above or the problem

solved by the claimed systems and methods of the '872 Patent.  I disagree with Dr.

Blumenthal's statement that the techniques of *Wright* would be within the

"background knowledge" of a person of ordinary skill in the art in the field of

optical communications and modulation of optical signals.

IPR2022-00575
Ramot EX2018

52.    *Wright* is not in the same field (optical communication as Dr.
Blumenthal refers to it) as the '872 Patent or the other references here.  And I do
not agree with Dr. Blumenthal's opinion that *Wright* was addressed to the same
problem.  EX1003 at ¶ 325.  The techniques and devices used in wireless
amplifiers were very different from those in optical modulators.  And a person of
ordinary skill in the art of optical communication would not be motivated to look
at, and would not find reasonably pertinent, discussions of distortion in wireless
power amplifier circuits in *Wright*.

## UNDERSTANDING OF RELEVANT LEGAL STANDARDS

53.    In forming my opinions here, I have applied the following
understanding of certain legal concepts related to obviousness, combinations of
references, and knowledge of one of ordinary skill in the art.  This understanding
was supplied to me by counsel.

54.    I understand that a patent may be invalid if the differences between
the claimed subject matter and the prior art are such that the subject matter as a
whole would have been obvious at the time the invention was made to a person of
ordinary skill in the pertinent art.

55.    I understand that a person of ordinary skill in the art provides a
reference point from which the prior art and claimed invention should be viewed.
This reference point prevents one from using his or her own insight or hindsight in

IPR2022-00575 & -00576
Patent No. 11,133,872

deciding whether a claim is obvious.

56.     I also understand that an obviousness determination includes the consideration of various factors such as (1) the scope and content of the prior art; (2) the differences between the prior art and the asserted claims; (3) the level of ordinary skill in the pertinent art; and (4) the existence of secondary considerations such as commercial success, long-felt but unresolved needs, failure of others, etc.

57.     I understand that in considering the scope and content of the prior art, references must be reasonably related (i.e., analogous) to the claimed invention of that patent.

58.     I understand that the test for determining whether a prior art reference constitutes analogous art to the claimed invention is (1) whether the reference is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem the inventor is trying to solve.

59.     I also understand that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness of the combination of those elements, and that inventions usually rely on building blocks of prior art.

60.     I understand that one may consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art

IPR2022-00575
Ramot EX2018

IPR2022-00575 & -00576
Patent No. 11,133,872

in the relevant field to combine the known elements in the way the claimed

invention does.  The reason could come from the prior art, the background

knowledge of one of ordinary skill in the art, the nature of the problem to be

solved, market demand, or common sense.  But it cannot come from hindsight.

61.    I understand that in considering whether a claimed invention is

obvious, one may but is not required to find obviousness if at the time of the

claimed invention there was a reason that would have prompted a person having

ordinary skill in the field of the invention to combine the known elements in a way

the claimed invention does, taking into account such factors as: (1) whether the

claimed invention was merely the predictable result of using prior art elements

according to their known function(s); (2) whether the claimed invention provides

an obvious solution to a known problem in the relevant field; (3) whether the prior

art teaches or suggests the desirability of combining elements claimed in the

invention; (4) whether the prior art teaches away from combining elements in the

claimed invention; (5) whether it would have been obvious to try the combinations

of elements, such as when there is a design need or market pressure to solve a

problem and there are a finite number of identified, predictable solutions; and (6)

whether the change resulted more from design incentives or other market forces.

To find it rendered the invention obvious, the prior art must provide a reasonable

expectation of success.  Obvious to try is not sufficient in unpredictable

**IPR2022-00575
Ramot EX2018**

IPR2022-00575 & -00576
Patent No. 11,133,872

technologies.

62.    I understand that each claim must be evaluated separately for obviousness, and that it is improper to use hindsight.  In other words, one must consider only what was known at the time of the invention.

63.    I understand that, when present, secondary indicia of non-obviousness must always be considered and can serve as an important check on hindsight bias. These factors may include (1) a long felt but unmet need in the prior art that was satisfied by the invention of the patent; (2) commercial success or lack of commercial success of processes covered by the patent; (3) unexpected results achieved by the invention; (4) recognition and praise of the invention by others skilled in the art; (5) taking of licenses under the patent by others; (6) skepticism, disbelief in or incredulity on the part of those skilled in the art that the patentee's approach worked; (7) rapid replacement of the prior art devices in the industry; (8) unsuccessful attempts by those skilled in the art to make the invention; (9) teaching away by those skilled in the art; and (10) deliberate copying of the invention.  I also understand that there must be a relationship, or nexus, between any such secondary indicia and the invention.

64.    I have been informed and understand that the obviousness analysis requires a comparison of the properly construed claim language to the prior art on a claim-by-claim basis.

IPR2022-00575
Ramot EX2018

IPR2022-00575 & -00576
Patent No. 11,133,872

65.    I understand that obviousness must be proven by clear and convincing evidence.  For an obviousness combination, obviousness must be proven by clear and convincing evidence such that a person of ordinary skill in the art at the time of the alleged invention would have had a reason (or reasons) for combining the teachings of those prior art references to achieve the claimed invention, and that same person of ordinary skill in the art would have had a reasonable expectation of success from combining those teachings.

66.    I understand that the disclosures in a patent or prior art reference are viewed from the perspective of a person of ordinary skill in the art.

67.    I understand that a person having ordinary skill in the art is a hypothetical person and the concept is used to analyze the relevant art without the benefit of hindsight.  A person of ordinary skill in the art is presumed to be one who thinks along the lines of conventional wisdom in the art.  I understand that the hypothetical person of ordinary skill is presumed to have knowledge of all references that are sufficiently related to one another and to the pertinent art, and to have knowledge of all arts reasonably pertinent to the particular problem that the claimed invention addresses.

**SPECIFIC RESPONSES TO DR. BLUMENTHAL**

68.    Below I provide some additional specific responses to some of the opinions expressed by Dr. Blumenthal.

-25-

IPR2022-00575
Ramot EX2018

IPR2022-00575 & -00576
Patent No. 11,133,872

### Combination of *Roberts* and *Taraschuk*

69.    In my opinion, a person of ordinary skill in the art, understanding the disclosures of *Roberts*, would not be motivated to combine *Roberts* with *Taraschuk* to solve the problem eventually solved by the inventors of the '872 Patent.  In my opinion, Dr. Blumenthal's analysis of this issue demonstrates improper hindsight reasoning, focusing on minor aspects of the references that seem relevant to the invention because the invention is already known.  These aspects would not have seemed obvious to an engineer of ordinary skill, reviewing *Roberts* with no advance knowledge of the inventive solution.  For that person, I do not see any reason to look from one reference to another.

70.    For instance, while both *Roberts* and *Taraschuk* may relate to the field of optical communications, neither is "directed to" linear compensation as Dr. Blumenthal claims.  EX1003 at ¶ 109.  As I describe above, *Roberts* merely mentions "linear compensator 18" in passing, and *Taraschuk*'s optical modulator embodiment is buried deep in the disclosure.  Each are primarily directed to different problems, each of which is different from compensating for optical modulator non-linearities.

71.    Even if a person of skill were curious how the pre-distortion signal compensation mentioned in *Roberts* (*e.g.*, EX1005 at 2:50-55) might function, there is nothing in *Roberts* that would send them to *Taraschuk*, a patent about

IPR2022-00575
Ramot EX2018

phase alignment in D/A converters.  And if they did somehow read far enough into *Taraschuk* to encounter discussion of modulator non-linearity, they would merely find an approach based on analog feedback from the output of the modulator deriving input pre-distortion.  EX1006 at 7:61-8:5, Fig. 6.  The '872 Patent itself says that "use of an analog pre-distortion circuit to feed the modulator" was known and a flawed solution.  EX1001 at 2:3-7.  *Taraschuk*'s disclosure does not teach or render obvious the digital-to-digital mapping "determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator" of the claims.

72.      Dr. Blumenthal notes that inventor Kim B. Roberts was also an inventor on *Taraschuk*, but *Roberts* doesn't cite or refer to *Taraschuk*.  Also, Kim Roberts was a pioneer in coherent optics, with many patents and significantly more than ordinary skill in the art.  *See, e.g.*,

https://www.ciena.com/insights/articles/Honoring-Cienas-Kim-Roberts-recipient-of-the-2019-John-Tyndall-Award.html.  The fact that Mr. Roberts was an inventor on both patents does not illuminate whether they are related in a relevant way or whether a person of *ordinary* skill would be motivated to combine them.

73.      In his paragraph 112, Dr. Blumenthal mischaracterizes *Taraschuk*, which does not state that "logic level mismatches" are a non-linear effect "with respect to the modulator."  EX1003 at ¶ 112.  The cited portion of *Taraschuk* refers

IPR2022-00575
Ramot EX2018

separately to logic level mismatches "through the D/A converter 12," and to "the sinusoidal response of the modulator 52."  None of the prior discussion in *Taraschuk* of "logic level mismatches" in the electronic circuitry of the D/A converter and their correction would be seen as relevant to the problem of modulator linearity addressed by the mapping of the '872 Patent.

74.     Dr. Blumenthal repeatedly refers to the "known" mapping technique of *Taraschuk*, without specifying any details that were allegedly known.  But the actual discussion of the mapping in *Taraschuk*, as it relates to the combined distortion including "the sinusoidal response of the modulator," is all of one sentence long.  EX1006 at 7:67-8:5.  There is nothing in *Roberts* that would lead a person of ordinary skill to look for, find, or appreciate this sentence of *Taraschuk*. In my opinion the references would not be combined without the hindsight benefit of knowing the solution in advance, as Dr. Blumenthal does.

75.     In my opinion, for all the reasons given herein, a person of ordinary skill in the art would not be motivated to combine *Taraschuk's* brief mention of mapping with *Roberts*.  There is no suggestion in either reference that would lead such a person to the other.

**Whether *Taraschuk* renders the claim elements obvious**

76.     As I explained above, in my opinion the claim elements requiring mapping "determined based on a pattern for actuating drive voltages that alters the

IPR2022-00575 & -00576
Patent No. 11,133,872

linearity of an optical response of the modulator" are not taught or rendered

obvious to a person of ordinary skill by *Taraschuk*.

77.    I disagree with Dr. Blumenthal on this, including because he never

describes what *Taraschuk*'s mapping is "based on" in discussing these elements.

*See, e.g.*, EX1003 at ¶¶ 167-170.  The extremely sparse discussion in *Taraschuk* on

"mapping" only mentions input pre-distortion based on feedback of an analog

modulator output sample.  *See, e.g.*, EX1006 at 7:34-39, 7:67-8:5.  In my opinion

this wouldn't render obvious mapping "determined based on a pattern" of the

converter output.

78.    I note from the prosecution history of the '872 patent that when

Ramot changed "correct for non-linearities" to the more specific language

"determined based on a pattern for actuating drive voltages that alters the linearity

of an optical response of the modulator," the Examiner then allowed the claims

over a rejection based on *Roberts*.  EX2009 at 2; EX2003.  This suggests that there

are ways to "correct for non-linearities" that do not meet the amended claims, as

the '872 Patent itself admits.  EX1001 at 2:3-7.  And of course it also shows that

the Examiner did not think the basic unexplained mention of a "linear

compensator" in *Roberts* taught or rendered obvious the amended language, or he

wouldn't have allowed the claims.  I agree with the Examiner that *Roberts* does not

teach or make obvious this amended element.

-29-

79.     In my opinion, the sparse discussion in *Taraschuk* of applying an unexplained "linearizer" to an optical modulator also does not teach or render obvious this amended language.  There is nothing in *Taraschuk* to suggest to a person of ordinary skill a mapping "determined based on a pattern for actuating drive voltages."  *Taraschuk* says that "in principle a mapping may be defined." EX1006 at 7:61-67.  But then the only explanatory discussion of *Taraschuk*'s mapping suggests that it is instead determined based on "calculating a difference between the received M-bit word and the sampled analog output signal level (S)." EX1006 at 7:34-39, 7:67-8:5, Fig. 6.  In other words, if the *Taraschuk* mapping is "determined based on" anything, it is the real-time sampled analog modulator output.

80.     A person of ordinary skill reading this explanation of the mapping in *Taraschuk*, consisting of a sample of the analog modulator output fed back to alter the input, would likely equate it with the prior art "use of an analog pre-distortion circuit to feed the modulator" solution mentioned in the '872 Patent background. *See* EX1001 at 2:3-7.

81.     As I explain above in the section about claim construction, the description and these claims of the '872 patent describe optimization of the control vectors at the output of a digital-to-digital converter.  The mapping is "determined based on" a pattern for that output "that alters the linearity of an optical response of

IPR2022-00575 & -00576
Patent No. 11,133,872

the modulator." EX1001 at claim 1. That would not have been obvious to a person of ordinary skill in the art at the time from the few sentences on mapping in *Taraschuk*.

82.    In my opinion, *none* of claims 1, 11, 15, or their dependent claims, which all have the "determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator" element, would be rendered obvious by *Taraschuk*.

83.    In my opinion the claim elements requiring mapping such that "deltas between numerical values of digital outputs … decrease/increase" (claims 13, 23, and their dependent claims) are also not taught or rendered obvious by *Taraschuk*.

84.    Dr. Blumenthal attempts to show this element obvious by computing a whole series of values to offset (by its complement) a sinusoidal response function. EX1003 at ¶¶ 243-267. As discussed below, I do not agree that applying this calculation, or the *Wright* reference, would have been within the background knowledge of a person of ordinary skill.

85.    But even more basically, there is no suggestion in *Taraschuk* that would lead a person of ordinary skill to even attempt to derive such a calculation. Dr. Blumenthal starts with the premise that all that is required is deriving a complementary function to the sinusoidal response. EX1003 at ¶ 245. But this ignores that the disclosure of *Taraschuk* describes compensating "the sinusoidal

**IPR2022-00575**
**Ramot EX2018**

response of the modulator" *and* "logic level mismatches through the D/A converter" *together*. EX1006 at 7:61-67. Dr. Blumenthal's complementary sinusoidal correction curve won't do that. The combined non-linearity from the multiple sources likely won't simply be evenly sinusoidal. *Taraschuk* does not disclose, or in my opinion render obvious, any pre-calculation solution. (*Taraschuk* mentions a real-time analog feedback loop to pre-distort, which would not involve pre-calculation.) And it certainly does not suggest one that could deal with the combined and likely complex non-linearities described.

86. A person of ordinary skill reading *Taraschuk* would expect the combined nonlinearities through the electronics of the D/A converter and from the uneven response of the modulator together to present a complex response curve. This would tend to discourage attempts to pre-calculate a complementary function. Reading *Taraschuk*, they would eventually be told to use sampled analog feedback to pre-distort the input words. EX1006 at 7:67-8:5. This also points away from attempts to mathematically pre-calculate a complementary function.

87. In my opinion, *Taraschuk*'s combined non-linearity approach teaches away from Dr. Blumenthal's separate sinusoidal calculation, which wouldn't be obvious to apply here to a person of skill in the art in the first place. I note that while the '872 Patent has many columns of formulas and descriptions relating to how to optimize the output pattern control vectors (*e.g.*, EX1001 at 9:25-16:10),

IPR2022-00575 & -00576
Patent No. 11,133,872

*Taraschuk* has nothing like that.

88.     Dr. Blumenthal's decision to provide a calculation example seems to be trying to fill in for the lack of explanation in *Taraschuk*.  And it may be the case that after reading Dr. Blumenthal's description of how he performed the calculation, the idea of correcting non-linearities with a pre-calculated complementary function might seem obvious.  But if so, that is evidence only that Dr. Blumenthal can teach, not evidence of what a person of ordinary skill could understand from *Taraschuk* on their own in 2007.  None of his declaration demonstration is in *Taraschuk*, or *Roberts* or even *Wright*.  EX1003 at ¶¶ 249-256.

89.     The few sentences of *Taraschuk* that discuss how to calculate a mapping, refer only to measuring samples at the modulator output and using them to pre-distort the digital input word.  EX1006 at 7:34-39, 7:67-8:5.

90.     In my opinion, the alleged combination of *Roberts* and *Taraschuk* does not teach or render obvious the "deltas between numerical values of digital outputs … decrease/increase" elements of claims 13, 23, and their dependent claims.

## **Dependent claims**

91.     Certain dependent claims of the '872 Patent have elements requiring that the mapping of the digital-to-digital converter correct for, *e.g.*, "distortion introduced by non-linear characteristics of optical fibers" or "non-linearities due to

-33-

IPR2022-00575 & -00576
Patent No. 11,133,872

non-linear characteristics of the one or more optical fibers" during transmission. *See, e.g.*, EX1001 at claims 2, 6, 8, 9, 17, 18, 22, and 26. Neither *Roberts* nor *Taraschuk* teach or render obvious a system that could meet these elements of the dependent claims.

92. For example, *Taraschuk* mentions using an analog sample of the optical modulator output, which is sampled *before* the optical fiber transmission. *See* EX1006 at 7:67-8:5, Fig. 6. A person of skill in the art would immediately know that a measurement taken *before* the fiber and fed back to the input cannot be used to correct for distortion through the fiber. And there is no mechanism discussed or suggested in *Taraschuk* (or *Roberts*) for taking a sample from the far end of the fiber, which could be kilometers away. Indeed, Dr. Blumenthal doesn't even argue that these elements are disclosed or suggested in *Taraschuk*. *See, e.g.*, EX1003 at ¶¶ 173-174.

93. Dr. Blumenthal doesn't identify any discussion in *Taraschuk* or *Roberts* specific to correcting for non-linearities in the transmission fiber. *Id.* He points only to the mention of "compensation function c(t)" in *Roberts*, which as I have already noted lacks any explanation. *Id. Roberts* says only that this function results in a "pre-distorted signal," that somehow compensates for some impairments of the link. EX1005 at 2:50-55. It does not say which impairments are compensated for, and it does not say how any of it is accomplished.

IPR2022-00575
Ramot EX2018

94.     Given the total lack of explanation of the reach or method of the compensation function in *Roberts*, and the impossibility of using *Taraschuk*'s samples taken before the fiber to measure and correct for distortion in the fiber, in my opinion a person of ordinary skill in the art would not find claim elements requiring correction of optical fiber non-linearities to be obvious from *Roberts* or *Taraschuk*.

### Combination of *Roberts*, *Taraschuk*, and "Background Knowledge"

95.     I do not agree with Dr. Blumenthal's statements about the scope of the "background knowledge" of a person of skill in the art. *See, e.g.*, EX1003 at ¶¶ 246, 249, 257. I do not think that a person of ordinary skill who had not already been told about the invention would undertake to perform the calculations he demonstrates in his declaration. As I have said above, there is nothing in *Roberts* or *Taraschuk* to suggest doing so. And as for *Wright*, an ordinarily skilled engineer at the time would not have turned to wireless RF amplifier patents looking for solutions to problems in the field of optical modulators for fiber optic communications. Again, there is nothing in *Roberts* or *Taraschuk* to suggest doing so.

96.     At several places in his declaration, Dr. Blumenthal refers to optical links as "radio frequency" or "analog RF." In my experience this is not ordinary usage. I believe he does this to try and make the non-analogous *Wright* reference,

IPR2022-00575
Ramot EX2018

which is in the different field of wireless RF communications, seem like something a person of ordinary skill in optics would turn to. But in my opinion, they would not. Light and radio are on the same EM spectrum, but it was not ordinary to refer to optical links as RF links—outside of a few high-level applications that are not germane to the '872 Patent.

97.    I do not agree that an ordinary researcher in optics at the time would apply alleged background knowledge related to pre-calculating complementary sinusoidal compensation functions or to gain distortion in wireless RF power amplifiers to find the novel inventive aspects of the '872 patent obvious.

98.    I understand the question of obviousness to turn on what a person of ordinary skill, here an engineer with at least two years of experience in optics and a Master of Science degree, would look to and find obvious. Opto-electronics and wireless RF electronics are typically taught (at the time and today) within separate specialties within Electrical Engineering, with different courses.

99.    For example, at the University of Illinois I supervise and teach a graduate level course, ECE 536 - Integrated Optics and Optoelectronics, which covers many of the optical communication and modulation topics needed to understand the '872 Patent. https://ece.illinois.edu/academics/courses/ece536. This course is recommended for students specializing in "Optics and Photonics Systems" within the "Electromagnetics and Remote Sensing" area of

IPR2022-00575
Ramot EX2018

specialization.  *See* https://ece.illinois.edu/academics/grad/msphd-manual/electro.

In contrast, electronic operational amplifiers for RF communication applications like those described in *Wright*, have typically been and are taught as part of an "analog circuits" or "linear circuits" course path.  For example, at the University of Illinois we have a senior level course, ECE 483 - Analog IC Design, that covers such topics as would be needed to understand *Wright*.

https://ece.illinois.edu/academics/courses/ece483.  This course is recommended for students specializing in the "Integrated Circuits" area of specialization.  *See* https://ece.illinois.edu/academics/grad/msphd-manual/circuits.  Because these different fields within Electrical Engineering are taught on different well-defined course paths, engineers of ordinary skill taught from one path are unlikely to be familiar with the other, and can and do become conditioned against looking across specializations to research done in other areas.  In my practical experience, synthesis across specializations is much more common at higher levels of education and experience, such as in post-doctoral or professorial research.

100.    In my experience and opinion, it would not have been ordinary for a researcher in optics to survey the wireless RF literature seeking to solve problems like those addressed in the '872 Patent.  Also, *Roberts* and *Taraschuk* do not discuss RF electronics, or suggest any analogies to them.

101.    The Wright patent is in a different field of endeavor than *Roberts* and

IPR2022-00575
Ramot EX2018

IPR2022-00575 & -00576
Patent No. 11,133,872

*Taraschuk*.  Dr. Blumenthal does not claim otherwise.  EX1003 at ¶ 325.  And as I stated above, I do not think that *Wright* is analogous art under the legal test as I understand it, because it is not reasonably pertinent to the problem of optical modulator linearization being solved in the '872 Patent.

102.   As I described above, *Wright* concerns RF power amplifiers and linearizing gain.  The distortion appearing in an amplifier response curve comes from a different source, and has different characteristic curves than non-linearities appearing in opto-electronic modulators such as Mach-Zehnder Interferometers.  *See* EX1009 at Fig. 6A.  For example, electronic power amplifier gain response curves are not sinusoidal.  *Id.*

103.   I do not see, and I do not believe that Dr. Blumenthal has identified in *Roberts* or *Taraschuk*, any motivation to combine with *Wright*.  The *Wright* reference is not in the same field of endeavor or reasonably pertinent to linearization of optical modulators.  Dr. Blumenthal points to a sentence of *Taraschuk* suggesting that a mapping can be accomplished in the "known manner" of a look-up table.  EX1003 at ¶ 327.  But this is not a direction or suggestion with respect to how to derive the actual mapping.  *Id.*  As I detailed above, on the subject of calculating the mapping, *Taraschuk* mentions only measuring analog modulator output.  EX1006 at 7:67-8:5, Fig. 6.

104.   None of the references disclose or render obvious the "deltas"

**IPR2022-00575
Ramot EX2018**

elements of the '872 Patent claims.  Dr. Blumenthal's graphs and calculations do not come from any of *Roberts*, *Taraschuk*, or *Wright*, but instead simply come from Dr. Blumenthal.  *See, e.g.*, EX1003 at ¶ 249 ("As an example of how a POSITA would have done this, I have drawn and outlined below the step-by-step process of calculating a non-linear compensation function").

105.   I do not agree that a motivation to apply Dr. Blumenthal's calculation would have been part of the "background knowledge" of an ordinary optics engineer at the time.  *Id.* at ¶ 246.  But more to the point of an obviousness analysis, in my opinion there is nothing in *Roberts*, *Taraschuk*, or *Wright* to suggest doing it.  Dr. Blumenthal simply declares that a person of ordinary skill would know to do it.  Id. at ¶ 248.  For all the reasons given above, I disagree.

106.   As further evidence that the inventions of the '872 Patent are not obvious, I note that the United States Patent Office has issued eleven patents so far based on the specification that the '872 Patent shares.  *See, e.g.*, EX1001 at pg. 1-2 ("Related U.S. Application Data"); U.S. Patent No. 11,342,998; U.S. Patent No. 10,033,465.  This includes repeated issuance of patents after *Roberts* and *Taraschuk* were cited to the Examiners.  EX2002; EX2010-2017.

107.   As further evidence that the inventions of the '872 Patent are not obvious, I note that the research the led to the patent applications was published in peer-reviewed journals and conference proceedings.  *See, e.g.*, Ehrlichman, *et al.*,

"*Improved Digital-to-Analog Conversion Using Multi-Electrode Mach–Zehnder Interferometer*," IEEE Journal of Lightwave Technology, vol. 26, no. 21, pp. 3567-3575, Nov. 1, 2008; Ehrlichman *et al.*, "*Generation of M-ary Signals Using a Single Mach Zehnder Interferometer*," SPIE Proc., 7218, Integrated Optics: Devices, Materials, and Technologies XIII, 72180L, Feb. 9, 2009.  Such publications strive to avoid publishing research that would be obvious to ordinary researchers in the optics field.

108.    For all of the reasons given herein, and in my prior declarations concerning related patents to the '872 patent, in my opinion the challenged claims of the '872 Patent are not obvious.

## CONCLUSION

109.   This declaration and the opinions and statements herein are made to the best of my knowledge and understanding, based on the material available to me at the time.  All statements made on my knowledge herein are true and all statements made on my belief are believed to be true.


Executed this 19th day of January, 2023 in Champaign, Illinois.

By: _____
John Dallesasse, Ph.D

IPR2022-00575
Ramot EX2018