IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CISCO SYSTEMS, INC. and ACACIA COMMUNICATIONS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C. A. No. 21-1365 (GBW) |
| RAMOT AT TEL AVIV UNIVERSITY LTD., | ) ) ) | |
| Defendant. | ) | |
| CISCO SYSTEMS, INC. and ACACIA COMMUNICATIONS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C. A. No. 22-674 (GBW) (Consolidated) |
| RAMOT AT TEL AVIV UNIVERSITY LTD., | ) ) ) | |
| Defendant. | ) | |

## JOINT CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Plaintiffs*

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant*

July 18, 2024

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................1

    A.   Ramot's Introduction ................................................................. 1

    B.   Cisco's Introduction................................................................... 1

    C.   Ramot's Introduction Reply ....................................................... 2

II.  AGREED-UPON CONSTRUCTIONS ..............................................................2

III. DISPUTED CONSTRUCTIONS - ISSUE #1........................................................3

    A.   Ramot's Opening Position ......................................................... 3

        1.   "wherein a digital-to-digital mapping maps …" in
            combination with other elements ..................................... 3

        2.   "wherein the N bits of the N bit digital input data word
            are mapped …" in combination with other elements................................. 8

    B.   Cisco's Responsive Position ...................................................... 10

        1.   "wherein a digital-to-digital mapping maps …"
            (Claims 1, 4, 6-15, 58 and 61-63) ..................................... 12

            a.   Indefiniteness Under *Rembrandt* ...................................12

            b.   Indefiniteness Under *Nautilus*........................................14

        2.   "wherein the N bits of the N bit digital input data word are mapped …"
            (Claims 45-47 and 49-54) ................................................. 16

    C.   Ramot's Reply Position .............................................................. 17

        1.   "wherein a digital-to-digital mapping maps …"....................................... 19

        2.   "wherein the N bits of the N bit digital input data word are mapped …" 21

    D.   Cisco's Sur-Reply Position ..................................................... 22

IV.  DISPUTED CONSTRUCTIONS - ISSUE #2....................................................24

    A.   Ramot's Opening Position ......................................................... 24

1. "digital-to-digital mapping maps … to a set of M digital output data bits associated with a plurality of voltage values" .......................... 24

    a. The claim language and other intrinsic evidence do not support Cisco's limitation ............................................. 30

    b. There has been no disclaimer of scope for these claims ............... 30

2. "mapped to a set of M output bits corresponding to a set of voltage values" ............................................. 31

3. "digital-to-digital mapping maps … to M digital output data bits" .......... 31

4. "converting, based on a digital-to-digital mapping, … to M digital output data bits associated with M drive voltage values" ..... 31

5. "mapping, based on a digital-to-digital mapping, … o a first digital output associated with M drive voltages" ...................... 32

B. Cisco's Responsive Position ...................................................... 32

  1. Introduction ............................................................ 32

  2. Background ........................................................... 34

  3. Cisco's Proposed Constructions Are Correct .......................... 38

    a. Ramot's IPR Disclaimers ......................................... 38

    b. The Specification ............................................... 46

    c. Ramot's Other Arguments Fail ................................... 47

  4. Ramot's Constructions Are Wrong ..................................... 49

C. Ramot's Reply Position ............................................................ 49

  1. The claims here are materially different from those alleged to be disclaimed ........................................................... 53

  2. The alleged disclaimers do not concern the "converting" limitation ........ 56

  3. The alleged disclaimers do not concern Ramot's "invention as a whole" ........................................... 58

  4. The specification does not limit the claims ............................ 60

D. Cisco's Sur-Reply Position ........................................................ 61

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*10x Genomics, Inc. v. NanoString Technologies, Inc.*,
   No. 21-cv-653-MFK, 2023 WL 5805585 (D. Del. Sept. 7, 2023)............................................8

*3G Licensing, S.A. v. Blackberry Ltd.*,
   No. 17-82-LPS-CJB, 2018 WL 4375091 (D. Del. Sept. 13, 2018) ....................................4, 16

*3M Innovative Props. Co. v. Tredegar Corp.*,
   725 F.3d 1315 (Fed. Cir. 2013)........................................................................................28

*Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd.*,
   No. 22-1387-GBW, 2023 WL 8622111 (D. Del. Dec. 13, 2023)................................... *passim*

*Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.*,
   265 F.3d 1294 (Fed. Cir. 2001).......................................................................................29

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007).......................................................................................64

*Aylus Networks, Inc. v. Apple Inc.*,
   856 F.3d 1353 (Fed. Cir. 2017).......................................................................................39

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017)...............................................................................4, 14, 19

*Bayer Pharma AG v. Watson Labs., Inc.*,
   No. 12-1726-LPS-CJB, 2014 WL 4954617 (D. Del. Sept. 30, 2014) ......................................6

*Gentex Corp. v. Revision Mil. Ltd.*,
   No. CV 19-921 (MN), 2020 WL 1875529 (D. Del. Apr. 15, 2020)........................................49

*HID Global Corporation v. Vector Flow, Inc.*,
   No. 21-1769-GBW, 2023 WL 2655117 (D. Del. Mar. 27, 2023) ........................25, 26, 27, 28

*HTC Corp. v. IPCom GmbH & Co., KG*,
   667 F.3d 1270 (Fed. Cir. 2012)................................................................................. *passim*

*In re Fuetterer*,
   319 F.2d 259 (C.C.P.A. 1963) .........................................................................................15

*In re Katz Interactive Call Processing Patent Litigation*,
   639 F.3d 1303 (Fed. Cir. 2011).................................................................................6, 10, 15

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001).......................................................................................54

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005)................................................................ *passim*

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004)...................................................................25, 60

*LifeNet Health v. LifeCell Corp.*,
    837 F.3d 1316 (Fed. Cir. 2016)...........................................................................7

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005).........................................................................24

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
    814 F.3d 1343 (Fed. Cir. 2016).........................................................................47

*Markem-Imaje Corp. v. Zipher Ltd. & Videojet Tech., Inc.*,
    No. 07-cv-00006-PB, 2012 WL 3263517 (D.N.H Aug. 9, 2012)........................15

*MasterMine Software, Inc. v. Microsoft Corp.*,
    874. F.3d 1307, 1315 (Fed. Cir. 2017).............................................................15

*MasterMine Software, Inc. v. Microsoft Corporation*,
    874 F.3d 1307 (Fed. Cir. 2017)....................................................... *passim*

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
    520 F.3d 1367 (Fed. Cir. 2008).................................................................6, 21, 24

*Microsoft v. Multi-Tech Sys*,
    357 F.3d 1340 (Fed. Cir. 2004).................................................................62, 63, 64

*Mobile Telecom. Techs. LLC v. Time Warner Cable, Inc.*,
    265 F. Supp. 3d 454 (D. Del. 2017)..................................................................49

*Nautilus Inc. v. Biosig Instruments, Inc.*,
    134 S.Ct. 2120 (2014).................................................................... *passim*

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014).........................................................................21, 22

*Ormco Corp. v. Align Tech., Inc.*,
    498 F.3d 1307 (Fed. Cir. 2007)....................................................... *passim*

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)........................................................25, 28, 60

*Poly-America, L.P. v. API Indus., Inc.*,
    839 F.3d 1131 (Fed. Cir. 2016).........................................................................47

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006)..................................................................39

*Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*,
    No. 2:19-cv-00225-JRG, D.I. 83 (Appx. Ex. 1) ......................................19

*Regents of University of Minnesota v. AGA Medical Corp.*,
    717 F.3d 929 (Fed. Cir. 2013)........................................................ *passim*

*Rembrandt Data Techs., LP v. AOL, LLC, et al.*,
    641 F.3d 1331 (Fed. Cir. 2011)........................................................ *passim*

*Rembrandt Data Techs., LP v. AOL, LLC, et al.*,
    673 F. Supp. 2d 420 (E.D. Va. 2009) ....................................17, 18, 20

*Sanofi v. Glenmark Pharmaceuticals Inc., USA*,
    204 F. Supp. 3d 665 (D. Del. 2016)...........................29, 30, 44, 45

*Sanofi v. Watson Labs. Inc.*,
    875 F.3d 636 (Fed. Cir. 2017)....................................................45

*Saunders Grp. v. Comfortrac, Inc.*,
    492 F.3d 1326 (Fed. Cir. 2007)................................................53

*Sequoia Technology, LLC v. Dell, Inc.*,
    No. 18-1127-LPS-CJB, 2020 WL 5835129 (D. Del. Oct. 1, 2020) .........................7

*Tech. Props. Ltd. v. Huawei Techs.*,
    849 F.3d 1349 (Fed. Cir. 2017)..................................................64

*TMC Fuel Injection Sys., LLC v. Ford Motor Co.*,
    682 F. App'x 895 (Fed. Cir. 2017) ..............................................63

*TQ Delta, LLC v. 2WIRE, Inc.*,
    No. 1:13–cv–01835–RGA, 2017 WL 6435334 (D. Del. Dec. 18, 2017) ...............29

*UltimatePointer, L.L.C. v. Nintendo Co.*,
    816 F.3d 816 (Fed. Cir. 2016)........................................................ *passim*

*Verizon Services Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 ....................................................................54, 67

*Vitaworks IP, LLC v. Gianbia Nutritionals (NA), Inc.*,
    No. 19-2259-GBW, 2023 WL 356160 (D. Del. Jan. 23, 2023)...........39, 43, 58, 66

**Statutes**

35 U.S.C. § 282(a) ....................................................................4

## I.    INTRODUCTION

### A.    Ramot's Introduction

The Asserted Claims of the '872 and '998 Patents come to *Markman* proceedings in this Court after Cisco's three latest IPR challenges were denied on their lack of merit by the USPTO.[1] In those IPRs, Cisco told the Office that no limiting claim construction was necessary to decide validity.  Now, Cisco wants this Court to break the claims through misinterpretation.  It presents two issues, both of which fail under a proper reading of the claim language and a correct application of the law of indefiniteness and of alleged disclaimer.

Cisco cannot meet the high burden required to overcome the presumption of validity and destroy these well-examined and reaffirmed claims.  The '998 Patent claims Cisco incorrectly argues are indefinite, for allegedly including both apparatus and user method elements, simply do not—instead merely including permissible functional description of the capability of the apparatus. And Cisco's transparent attempt to graft a custom non-infringement element onto each and every claim is improper—there is no global disclaimer to be found here that could justify it.

### B.    Cisco's Introduction

For the reasons set forth below, the Court should adopt Cisco's proposed constructions for all terms.[2]

---

[1] *See, e.g.*, IPR2022-00575, Final Written Decision, Paper 33 (P.T.A.B. Sept. 29, 2023); *Id.*, Decision Denying Rehearing, Paper 38 (P.T.A.B. March 5, 2024); IPR2022-00576, FWD, Paper 41 (P.T.A.B. Oct. 3, 2023); *Id.*, Decision Denying Rehearing, Paper 46 (P.T.A.B. February 29, 2024); IPR2022-01283, FWD, Paper 32 (P.T.A.B. February 20, 2024).  Cisco appealed these denials to the Federal Circuit.  Cisco also lost three more IPRs, three Federal Circuit appeals and a *Mandamus* petition, and seven *ex parte* reexaminations of parent patents.

[2] Ramot's characterization in its Introduction that "Cisco lost" various IPRs and *ex parte* reexaminations of parent patents is ironic.  Joint Br., 1.  Ramot's disclaimers that were required to "win" the IPRs are the very disclaimers Ramot now tries to avoid on the second issue in this brief,

C.      Ramot's Introduction Reply[3]

II.      **AGREED-UPON CONSTRUCTIONS**

The following constructions are agreed to by the parties:

| Claim Term/Claims | Construction |
|---|---|
| **"modulator"**<br><br>'998 Patent:  claims 1, 4, 6, 49, 50, 58, 61<br><br>'872 Patent: claims 1, 2, 3, 6, 7, 10, 11, 12, 13, 15, 16, 18, 20, 21, 23, 25, 26, 27 | any device which outputs an optical signal with controlled variation of intensity, whether the variation is induced during production of the signal (such as in a semiconductor laser) or whether a signal input from another source is modified |
| **"mapping/map/mapped/converting"**<br><br>'998 Patent:  claims 1, 13, 14, 45, 46, 47, 49, 58, 63<br><br>'872 Patent: claims 1, 11, 13, 15, 23, 27 | selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical<br><br>translating from one representation format to another representation format is not mapping/converting |

---

because they all but ensure that Ramot should lose this infringement proceeding.  Likewise, Ramot had to amend its claims to survive the *ex parte* reexaminations.

[3] There is no support for Cisco's footnoted assertion that any alleged disclaimer was dispositive to any IPR.

III.    **DISPUTED CONSTRUCTIONS - ISSUE #1**

A.    **Ramot's Opening Position**

1.    **"wherein a digital-to-digital mapping maps …" in combination with other elements**

The '998 Patent claims embodiments of optical "modulator device[s] for converting digital data into analog modulation of an optical signal."  JCCC at 7:7-8:31, 17:23-55 (claim 1), 23:51-24:19 (claim 58), Fig. 1; *see also* C.A. 22-674, D.I. 10 (Infringement Counterclaim), ¶¶114-117.[4] One of the inventive aspects claimed is the use of a "digital-to-digital converter" to implement a digital logic "mapping" of input bits into a number of converter output bits, this mapping providing an occasion to perform corrections for various errors (*e.g.*, non-linearities) that would otherwise be introduced by the system.  *See, e.g.*, JCCC at 5:1-9 (defining "digital-to-digital converter"); JCCA at 4 (agreed definition of "mapping" as "selecting or generating a digital output…" of a converter). Befitting this error correction purpose, the mapping output of the digital-to-digital converter is of course required to be "not identical" to the digital input to the converter.  *Id.*

Cisco challenges the "mapping" claim limitation for allegedly being a method step out of place in an apparatus claim—not so.  Reading the parties' agreed "mapping" construction into the challenged term, the "digital-to-digital [selecting or ***generating*** a digital output…for a given digital input…]" that is "not identical," claim language clearly describes the functional capability of the digital-to-digital converter in the system.  The claimed "mapping" is a thing, a noun not a verb—it is designed / programmed into the device and operates automatically during operation.  *See, e.g.*, JCCC at 7:66-8:12, 9:55-61, 11:34-35, 15:22-28.  It is not a method step performed by an end-user, as Cisco now alleges—instead the mapping is claimed as a capability of, and indeed part of, the

---

[4] Unless otherwise noted, "JCC__" refer to the corresponding exhibit attached to the Joint Claim Construction Chart (*see* C.A. No. 21-1365, D.I. 99 or C.A. No. 22-674, D.I. 88).

made and sold optical modulation system that is the Accused Product.

The Asserted Claims—and their elements requiring a converter within an optical modulation system for "…selecting or *generating*…" a map—"merely use permissible functional language to describe the capabilities of the claimed system," and are definite and valid, because "it is clear that infringement occurs when [Cisco] makes, uses, offers to sell, or sells the claimed system." *MasterMine Software, Inc. v. Microsoft Corporation*, 874 F.3d 1307, 1309-10, 1316 (Fed. Cir. 2017) (upholding claims with an element requiring the system "*generate* a pivot table");[5] *see also UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 827-28 (Fed. Cir. 2016) ("the '*generating data*' limitation reflects the capability of that structure rather than the activities of the user," and claims "an apparatus with particular capabilities"); *3G Licensing, S.A. v. Blackberry Ltd.*, No. 17-82-LPS-CJB, 2018 WL 4375091, at *10 (D. Del. Sept. 13, 2018) (upholding claim to a "mobile station" "wherein" a processor "*select[s]*" a data record from a "plurality of data records"). By direct analogy to these multiple cases with similar claims that were upheld as definite, the Asserted Claims challenged here are also definite.

Patent claims are presumed valid. *See, e.g.*, 35 U.S.C. §282(a). The standard Cisco must meet to prove indefiniteness is accordingly set high—requiring clear and convincing evidence. *See, e.g.*, *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). Cisco cannot meet this burden consistent with the claim and specification language, or in light of the cases analyzing and holding similar claims as definite.

The language of independent claims 1 (and 58) challenged here reads in part as follows:

1. *An optical modulation system*, the system comprising:
an input for a plurality of N digital input data bits;
an input optical signal;

---

[5] All *bold italic* emphasis added.

4

a modulator for modulating the input optical signal responsively to the plurality of N digital input data bits …; and

***wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits*** associated with a plurality of voltage values;

wherein the input optical signal is modulated based on the plurality of voltage values;

wherein the digital-to-digital mapping comprises, … .

58. ***An optical modulation system***, the system comprising:

an input for a plurality of N digital input data bits;

an input optical signal;

***wherein a digital-to-digital mapping maps the plurality of N digital input data bits to M digital output data bits***;

wherein the digital-to-digital mapping comprises, …

…

wherein the optical modulation system further comprises a modulator for modulating the input optical signal responsively to the M digital output data bits, … .

The claimed "digital-to-digital mapping," construed by agreement as "selecting or generating a digital output ... for a given digital input …," is self-evidently a digital logic capability of the optical modulation system. *UltimatePointer*, 816 F.3d at 827 ("the claims at issue here make clear that the 'generating data' limitation reflects the capability of that structure rather than the activities of the user").

Every disclosure of the patent specification supports the understanding that the mapping is a function and capability of the claimed system. For example, the claims do not simply require "mapping," they recite "an optical modulation system" "wherein" "a digital-to-digital mapping" to a "map" exists. JCCC at 17:23-41 (claim 1). Beginning with the Abstract, the specification is consistent in this description of mapping as a logical operation of the circuitry of the system. *See, e.g.*, *id.* at Abstract ("A digital-to-digital converter provides a mapping"), 5:1-9 ("'digital-to-digital converter' is used to refer to a device which maps"), 7:66-8:12 ("implemented from … logic

components" and "implemented using commercially available [integrated circuits], as will be clear to one ordinarily skilled in the art"), 9:58-61 ("look-up table"), 11:29-30 ("DDC, implemented as all-electronic, shall perform this mapping operation").

The Examiner also understood the claims this way—as claiming a map implemented in digital processing and logic of the system.  *See, e.g.*, JCCL at 2 ("an optical modulation **system in which** a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output bits…").

In *UltimatePointer*, the Federal Circuit distinguished claims that had been deemed impermissibly mixed in their claim categories—because they included "user" steps—from claims requiring electronic processing to generate data.  816 F.3d at 819, 827 (*citing IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) ("the user uses the input means") and *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) ("individual callers digitally enter data")).  There, the data generated was a distance measure, here, it is a map.  *Id.*  The Federal Circuit applied a simple rubric, comparing claims to prior cases to determine whether the "limitation reflects the capability of that structure rather than the activities of the user."  *Id.*; *see also MasterMine*, 874 F.3d at 1315-16 ("these verbs represent permissible functional language used to describe capabilities" not "activities performed by the user").

The *IPXL Holdings* ruling on mixed-category claims that Cisco seeks to rely on "has been repeatedly recognized to be a narrow one."  *See, e.g.*, *Bayer Pharma AG v. Watson Labs., Inc.*, No. 12-1726-LPS-CJB, 2014 WL 4954617, at *6 (D. Del. Sept. 30, 2014) (citing cases).  Functional language is permitted in a variety of claims—ordinary apparatus claims, means-plus-function claims, or claims construed as such.  *See, e.g.*, *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008)  Again, courts in this district and elsewhere

"focus on whether the claim language is directed to user actions rather than system capabilities"—invalidating only claims that mix structure with user-performed steps. *Sequoia Technology, LLC v. Dell, Inc.*, No. 18-1127-LPS-CJB, 2020 WL 5835129, at *16 (D. Del. Oct. 1, 2020) ("the rule applies to claims describing a system that ***also require the user of the recited system to take specific action***").

There is no disclosure or suggestion in the claims challenged here that "mapping" is a user action. "Mapping" is instead claimed as a thing—a programmed- or designed-in function of the claimed "optical modulation system." JCCC at 17:23-41 (claim 1: "An optical modulation system … wherein a digital-to-digital mapping maps…"). The other elements of the claim are in accord, describing characteristics of the mapping as a thing rather than as user steps performed. *Id.* at 17:42-55 (claim 1), 23:55-24:20 (claim 58) ("wherein the digital-to-digital mapping comprises…"). And the specification is in accord, describing the mapping as a thing implemented in electronics / digital logic / a look-up table within the digital-to-digital converter of the claimed optical modulation system. *See, e.g.*, *id.* at Abstract, 5:1-9, 7:66-8:12, 9:58-61, 11:29-30. The claimed "mapping" is present as the product is made, sold, installed, and used, and is "met without action by a third party." *See LifeNet Health v. LifeCell Corp.*, 837 F.3d 1316, 1326-27 (Fed. Cir. 2016) ("no later action by a user … is necessary").

Cisco may argue that these claims do not include the word "converter" after "digital-to-digital," while others in the patent family do. *Compare* JCCC at 17:23-41 ("digital-to-digital mapping maps") *with* JCCM at 17:19-24 ("digital-to-digital converter is enabled to map"). But this is a red herring, as the cases do not turn on whether the apparatus capability that is functionally claimed is part of a "processor," "converter," "optical modulation system," "mobile station," "module," or other specific structure. *See, e.g.*, *MasterMine*, 874 F.3d at 1314-16. Instead,

definiteness comes from the ability to discern "whether infringement ... occurs when one creates a[n infringing] system, or whether infringement occurs when the user actually uses [the system in an infringing manner]"—and the test for system claims accused of having impermissible user method steps is whether "the claims merely use permissible functional language to describe the capabilities of the claimed system." *Id.* at 1316.

Here there is no reasonable interpretation of the challenged claims and patent disclosures that could convert the claimed "mapping" from a digital-to-digital logic function of the system to a user method step. *See, e.g.*, JCCC at 5:1-9 ("'**digital-to-digital** converter' is used to refer to a ***device which maps***"). Applying the cases cited above to the "mapping" / "selecting or generating" steps of these claims clearly demonstrates that they do not mix claim categories and are definite. "[T]he claims [ ] do not claim activities performed by the user," and "[t]here is therefore no uncertainty regarding when infringement occurs." *10x Genomics, Inc. v. NanoString Technologies, Inc.*, No. 21-cv-653-MFK, 2023 WL 5805585, at *3 (D. Del. Sept. 7, 2023) (*citing MasterMine*, 874 F.3d at 1316). Cisco cannot meet its burden to establish indefiniteness of these presumptively valid claims.

### 2. "wherein the N bits of the N bit digital input data word are mapped …" in combination with other elements

As with the term analyzed in the section above, this claim language merely describes the functional capability of the digital-to-digital converter of the claimed optical modulation system—and presents no indefiniteness concerns under application of settled law. In context, the challenged independent claim 45 element reads:

> 45. ***An optical modulation system*** for converting a plurality of input digital data words into a modulated optical output stream for transmission over an optical fiber, the modulation system comprising:
> an input configured to receive an input digital data word having N bits, where N>1;
> one or more electro-absorption signal generation devices, each configured for generating an optical signal output;

> ***wherein the N bits of the N bit digital input data word are mapped to a set of M output bits*** corresponding to a set of voltage values; … .

Here, as above, the "are mapped" language self-evidently describes a functional capability of the claimed optical modulation system to which it is linked by "wherein"—namely, an "optical modulation system for converting… wherein the N bits of the N bit digital input data word are mapped."  Again, the disclosures and the Examiner allowance cited in the section above all support this understanding of the claim.  *See also*, JCCC at 13:30-32 ("electrode actuating device 20 serves as a Digital-To-Digital Converter is employed to map"), Fig. 8:



Cisco cannot meet its burden to show that this claim language is indefinite, because there is no reasonable interpretation of a "system … wherein … bits of the N bit input data word are mapped," in which the mapping is not a functional capability of the delivered system.  There is no suggestion of user action in this element or the '998 Patent specification—and the claim is therefore definite under *MasterMine*, *UltimatePointer*, and the many other cases cited above.  *See, e.g.*, *MasterMine*, 874 F.3d at 1315 ("the 'generating data' limitation reflects the capability of that structure rather than the activities of the user").  The challenged claims are presumptively definite, and Cisco cannot show otherwise.

### B.    Cisco's Responsive Position

Each '998 Patent Asserted Claim is invalid as indefinite because each recites, in the same claim, **both** an apparatus **and** a method.  In the 2005 *IPXL* case, the Federal Circuit addressed "[w]hether a single claim covering both an apparatus and a method of use of that apparatus is invalid," and held that if a claim "recites both a system and the method for using that system, it does not apprise a person of ordinary skill in the art of its scope, and it is invalid under section 112, paragraph 2."  *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). The reason why reciting both a system and a method renders a claim indefinite is that an apparatus claim (whether a system or device) is infringed <u>regardless</u> of whether the apparatus is used to perform any action.  In contrast, a method claim is infringed <u>only if</u> the steps are actually performed.  *Id.*

Of course, an apparatus claim can use **functional language** to describe the **capabilities** of a specific component.  For example, an apparatus element in claim 1 of the '998 Patent recites "a modulator for modulating the input optical signal . . . ."  The "for modulating" language (which recites the function of "modulating") is permissible because it merely describes the function that the identified device (the "modulator") must be capable of performing.  Critically, however, this element does not require that "modulating" actually be performed.

The same is not true when an element within a claimed apparatus simply recites a method with functional language *divorced* from claimed structure.  *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 828 (Fed. Cir. 2016) ("Unlike the claims in *IPXL* and *Katz* [that were found invalid], the claims do not recite functionality divorced from the cited structure.").  This occurs in the next element in claim 1 of the '998 Patent: "wherein a digital-to-digital **mapping maps** the plurality of N digital input data bits . . . ."  This limitation—a method limitation per the parties'

agreed construction of "mapping" and "map"—is untethered to any structural component, rendering the claim invalid.

The Federal Circuit's decision in *Rembrandt* is instructive. It invalidated the following claim because it includes a method step (red) in what is otherwise an apparatus claim:

3. <mark>A data transmitting device</mark> for transmitting signals corresponding to an incoming stream of bits, comprising:

<mark>first buffer means</mark> for partitioning said stream into frames of unequal number of bits and for separating the bits of each frame into a first group and a second group of bits;

<mark>fractional encoding means</mark> for receiving the first group of bits of each frame and performing fractional encoding to generate a group of fractionally encoded bits;

<mark>second buffer means</mark> for combining said second group of bits with said group of fractionally encoded bits to form frames of equal number of bits;

<mark>trellis encoding means</mark> for trellis encoding the frames from said second buffer means; and

<mark>transmitting</mark> the trellis encoded frames.

*Rembrandt Data Techs., LP v. AOL, LLC, et al.*, 641 F.3d 1331, 1339 (Fed. Cir. 2011). The preamble recites that the claim is directed to an apparatus ("**a data transmitting device**"), and the claim then recites four structural elements (the four **means** elements). The problem was that those four structural elements were followed by a single method step ("**transmitting the trellis encoded frame**") that stood alone, divorced from the preceding structural elements. Rembrandt argued that the Federal Circuit should essentially "insert 'transmitter section for' into the final element …, thereby adding an apparatus and rendering the claim valid." *Id.* The Court declined to "redraft" the claim to include an unrecited structure (e.g., a "transmitter section") that performed the recited method step. *Id.* at 1339-40. Ramot's claims present the same issue.

11

1.     **"wherein a digital-to-digital mapping maps ..." (Claims 1, 4, 6-15, 58 and 61-63)**

a.     **Indefiniteness Under *Rembrandt***

Like *Rembrandt*, Claims 1 and 58 recite **both** an apparatus (with structural elements) **and** a method step divorced from any structure. The method step is "wherein a digital-to-digital **mapping maps** the plurality of N digital input data bits . . . ." Critically, the parties agree that the words "mapping" and "map" both mean "**selecting** or **generating** a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical." JCCA at 4. That is a method, *i.e.*, the action of "selecting" or "generating." Importantly, the "wherein" limitation is not tied to any of the preceding structural limitations.

A side-by-side comparison of the indefinite *Rembrandt* claim with Ramot's claim 1 shows that *Rembrandt* controls:

| ***Rembrandt* Indefinite Claim** | **Ramot's Claim 1** |
|---|---|
| 3. A data transmitting device for transmitting signals corresponding to an incoming stream of bits, comprising:<br><br>first buffer means for partitioning ...;<br><br>fractional encoding means for receiving ...;<br><br>second buffer means for combining ...;<br><br>trellis encoding means for trellis encoding ...; and<br><br>transmitting the trellis encoded frames. | 1. An optical modulation system, the system comprising:<br><br>an input for a plurality of N digital input data bits;<br><br>an input optical signal;<br><br>a modulator for modulating the input optical signal responsively to the plurality of N digital input data bits ...; and<br><br>wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values; ... |

12

Ramot's claim has the same invalid form as *Rembrandt,* with both claims reciting structural elements followed by a method step.

Ramot argues that the "wherein" element (red) is not a method step at all, but "clearly describes the functional capability of the digital-to-digital converter in the system," going so far as to contend the claimed "mapping" is "a thing, a noun not a verb—it is designed/programmed into the device and operates automatically during operation."  Joint Br., 3.  But the agreed claim construction resolved this: the claim element recites an action and nothing else.  Indeed, substituting the agreed construction of both "map" and "mapping" ("selecting or generating a digital output…") provides "digital-to-digital [*selecting or generating* a digital output …]".  Though awkwardly worded, this recitation is clearly an action.  As *Rembrandt* confirmed, appending an action/verb into a claim directed to an apparatus does not transform that action/verb into a structure.  *Rembrandt*, 641 F.3d at 1339-40.[6]

Ramot next suggests that "mapping"—even if it is an action/verb—is a limitation on the "optical modulation system" in the preamble, and so it is just a capability of the claimed "optical modulation system."  Joint Br., 5-6.  But if Ramot were correct, then *Rembrandt* would necessarily have been decided the other way.  As seen in the comparison, the structure in the Rembrandt preamble (a "**data transmitting device**")—was *more* tied to the offending "**transmitting**" method limitation, but it was still invalid.

---

[6] Ramot also argues that the claims do not simply require "mapping" but rather that "'a digital-to-digital mapping' to a 'map' exists" in the "optical modulation system".  Joint Br., 5-6.  But that is not what the claims says.  The claim recites "mapping ***maps***" and not a "map".  The parties agreed on what both of those words mean.  The other elements of claim 1 do not help Ramot. The "input" is for the N digital input data bits and does not map.  The "input optical signal" is a signal and does not map.  And the "modulator" is for "modulating the input optical signal", not mapping inputs bits to output bits.

Ramot's basic problem is that it asks the Court to redraft the claim to add something new: a "converter" or "elements requiring a converter". Joint Br., 4. *Rembrandt* forbids this. 641 F.3d at 1339-40. Indeed, Ramot recited a "converter" in the earlier '872 Patent, but did not do so here. JCCB at 17:15-27 (claim 1) ("a modulation system … comprising … a **converter** for: converting, based on a digital-to-digital mapping…"), 19:6-17 (claim 15) (same). Likewise, Ramot's argument that the specification would be "consistent" with such a correction is irrelevant to this inquiry. Joint Br., 5-6.

Finally, Ramot is wrong that *IPXL* is relevant only if a claim recites "user action." While *IPXL* addressed such a claim, the rule of law did not—which is why the Federal Circuit later found the *Rembrandt* claim invalid even though it did not recite any "user action."

### b. Indefiniteness Under *Nautilus*

Even if the Court were to agree with Ramot that the "mapping maps" element is not a method step—but instead specifies the functionality or capability of some structure—the claim still would be indefinite under the Supreme Court's *Nautilus* decision. This is because the claim recites no structure for performing the recited function of "mapping maps …." What is left is purely functional claiming – i.e., *any* structure that performs the function would be covered— which still is invalid. *Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2129 (2014).[7]

In other words, if Ramot prevailed on the argument that "mapping" (despite its agreed construction) is a limitation on some sort of structure, the structure would be *anything* that maps.

---

[7] While the "*Nautilus* standard of 'reasonable certainty' does not exclude claim language that identifies a product by what it does.… [w]hat is needed is a context-specific inquiry into whether particular functional language actually provides the required reasonable certainty." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d. 1360, 1367 (Fed. Cir. 2017). The important "context" here includes: (i) the claims recite no structure at all tied to the recited bare functionality; and (ii) incorporating such structure would amount to improper redrafting of the claim.

But such overly broad functional claiming—divorced from any specific structure—is not "permissible functional language." *UltimatePointer*, 816 F.3d at 828 ("Unlike the claims in *IPXL* and *Katz* [that were found invalid], the claims do not recite functionality divorced from the cited structure."); *Markem-Imaje Corp. v. Zipher Ltd. & Videojet Tech., Inc.*, No. 07-cv-00006-PB, 2012 WL 3263517, at *8 (D.N.H Aug. 9, 2012) (claim indefinite when functional claiming "implies some additional unidentified structure that is required to perform the claimed function" and "the purely functional claim language broadly and impermissibly 'covers any means which anyone may ever discover of producing the result'") (quoting *In re Fuetterer*, 319 F.2d 259, 263 (C.C.P.A. 1963)).

Ramot argues that substituting the agreed "mapping" construction into the claim limitation (i.e., "selecting or generating a digital output …") reveals that the "claim language clearly describes the functional capability of the digital-to-digital converter in the system" and the mapping "is designed/programmed into the device and operates automatically during operation." Joint Br. 3. But that runs head-long into *Nautilus* because claim 1 fails to tie the "a digital-to-digital mapping maps …" functionality to *any* structure in the claimed modulation system for performing the recited functionality. There is no recitation of a "digital-to-digital converter" as a structural element of the claimed modulation system. There is also no recited structure (e.g., processor, memory, etc.) through which the "mapping" can be "designed/programmed into the device to operate automatically during operation" as Ramot argues. The result is there is no reasonable certainty as to the scope of the claims, specifically what **structure** is required for performing the "mapping maps" functionality. That was not the situation in the cases Ramot cites (*see* Joint Br., 4), which show examples of permissible functional claiming; none of them dealt with a claim reciting bare functionality divorced from any structure. *See MasterMine Software,*

*Inc. v. Microsoft Corp.*, 874. F.3d 1307, 1315 (Fed. Cir. 2017) ("generates a pivot table" functionality tied to "reporting module installed within the CRM software application"); *UltimatePointer*, 816 F.3d at 828 ("data generating" functionality tied to "image sensor, said image sensor generating data"); *3G Licensing, S.A. v. Blackberry Ltd.,* No. 17-82-LPS-CJB, 2018 WL 4375091, at *10 (D. Del. Sept. 13, 2018) ("select" functionality tied to "processor" element).

Finally, Ramot's citation to the prosecution is unavailing. Joint Br., 6 (citing JCCL at 2). As the cited document reflects, the Examiner simply parroted back the claim language near-verbatim, substituting "in which" for "wherein". The Examiner did not refer to any "digital processing and logic of the system" (*see* JCCL at 2), as the claim is devoid of any such structure. Nor does the transitional term "wherein" (or "in which") add any specific structure, and Ramot cites no case suggesting it is an exception from *IPXL*.

### 2.    "wherein the N bits of the N bit digital input data word are mapped …" (Claims 45-47 and 49-54)

Claim 45 and its dependent claims are invalid for all of the reasons discussed above for claims 1 and 58.

Ramot repeats its assertion that the claim limitation "self-evidently describes the functional capability of the claimed optical modulation system to which it is linked by 'wherein'." Joint Br., 9. But claim 45 does not even recite the "digital-to-digital mapping maps" limitation of claims 1 and 58. Rather, the "wherein" clause at issue (**red**) recites only the passive verb clause "are mapped". Claim 45 recites (in part):

45.    **An optical modulation system** for converting a plurality of input digital data words into a modulated optical output stream for transmission over an optical fiber, the modulation system comprising:

**an input** configured to receive an input digital data word having N bits, where N> 1;

==one or more electro-absorption signal generation devices==, each configured for generating an optical signal output;

wherein ***the N bits of the N bit digital input data word are mapped*** to a set of M output bits corresponding to a set of voltage values; …

Claim 45's recitation of an apparatus (==yellow==) with structural components (==green==) followed by a clear method step limitation (==red==) makes the claim invalid for the same reasons as discussed above for claim 1.  *See Rembrandt*, 641 F.3d at 1339-40.

Finally, even if the "are mapped" limitation is not considered a method step, the claim is indefinite because the claim is devoid of any structure for performing the operation.  *See Nautilus*, 134 S.Ct. at 2129.

### C.    Ramot's Reply Position

There are no user action steps in the claims of the '998 Patent.  Cisco, Acacia, and a person of skill in the art, reading the claims in light of the '998 Patent specification, each understand what a digital-to-digital mapping is in the claims.  Because there is no user action, and no confusion as to how the claim is infringed, the entire rationale of the *IPXL* line of indefiniteness cases does not apply.  *See, e.g.*, *UltimatePointer*, 816 F.3d at 827-28.  Here, infringement occurs when the digital mapping logic is built into the system, and the claims are definite.  *See, e.g.*, JCCC, 11:34-35 ("The DDC, implemented as all-electronic, shall perform this mapping operation.").

Cisco's Response focuses almost exclusively on color highlighting claims—so that they look more like one claim in *Rembrandt*.  This is not the proper analysis.  In doing so, Cisco ignores *MasterMine*, the claims of other cases discussed therein, *Ultimate Pointer*, and all of the rest of the post-*Rembrandt* authorities that Ramot cited in its Opening.

Cisco also fails to mention that the patentee in *Rembrandt* **admitted that there had been an error and that "transmitting …" was a method step**.  *See Rembrandt Data Techs., LP v. AOL, LLC, et al.*, 673 F. Supp. 2d 420, 426, 426 n.3 (E.D. Va. 2009).  Neither the district court nor the

Federal Circuit questioned or tested this admission, but merely determined that the requested correction to the claim would not be done. *Id.,* 427-28; 641 F.3d at 1339-40 .

Rembrandt's admission explains that case's outlier status among those discussed by Ramot. Rembrandt would not have admitted error if it had the benefit of reading the subsequent *HTC*, *UltimatePointer*, and *MasterMine* decisions on permissible functional language in system claims. *See, e.g.*, *MasterMine* , 874 F.3d at 1314-16 (discussing cases and claims). And more to the immediate point, Ramot makes no such admissions here. There are no method steps in the asserted claims of the '998 Patent.

And there is no lack of structure in the claims of the '998 Patent. "[A] digital-to-digital mapping" is a structure, as is "[a]n optical modulation system" comprising "a digital-to-digital mapping." "An optical modulation system for converting a plurality of input digital data words … wherein the N bits of the N bit digital input data word are mapped" is a structure. Examples of these structures are described in the specification. *See, e.g.*, JCCC, 5:1-9 ("digital-to-digital converter"), 7:66-8:12 ("implemented from … logic components"), 9:55-61 ("a look-up table"), 10:44-47, 12:7-20 (generating output via formula (5)), Figs. 1, 4:

FIG. 4

| DDC Input | DDC Output |
|-----------|-----------|
| 0000 | 0000 |
| 0001 | 0011 |
| 0010 | 0100 |
| 0011 | 0101 |
| 0100 | 0101 |
| 0101 | 0110 |
| 0110 | 0111 |
| 0111 | 0111 |
| 1000 | 1000 |
| 1001 | 1001 |
| 1010 | 1001 |
| 1011 | 1010 |
| 1100 | 1011 |
| 1101 | 1011 |
| 1110 | 1100 |
| 1111 | 1101 |



As discussed in Ramot's Opening brief and further below, each independent asserted claim of the '998 Patent is definite, and Cisco has failed its high burden to show otherwise. *See, e.g.*, *BASF*, 875 F.3d at 1365 ("burden of proving indefiniteness by clear and convincing evidence"). The Court should reject Cisco's arguments—which provide no basis to invalidate the claims.

### 1.    "wherein a digital-to-digital mapping maps …"

As explained in Ramot's Opening, independent claims 1 and 58 are directed to an "optical modulation system" that further contains "a digital-to-digital mapping" logic structure that "maps" input words to different output words.  JCCC, 17:23-55, 23:51-24:19.  The "wherein" ties the "digital-to-digital mapping" structure as an element of the "optical modulation system" structure.

Ramot agreed to a construction of mapping here—based on the Texas district court's construction—to clarify that the mapping can originate from logic implementing "selecting," such as from a look-up table, or "generating," such as from a function.  JCCA at 4; *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, No. 2:19-cv-00225-JRG, D.I. 83 (Appx. Ex. 1) at 13-19 (E.D. Tex. May 15, 2020) ("2019 Texas Action") (construing "mapping").  "Selecting" and "generating" are merely different functional verbs alternatively describing the capabilities of the digital-to-digital

19

mapping logic structure. Choosing "selection" or "generation" word forms might have been less "awkwardly worded." But in either case, there is no ambiguity about what performs the mapping / selecting / generating—digital logic within the optical modulation system—and hence no indefiniteness concern. *See, e.g.*, *MasterMine*, 874 F.3d at 1315 ("'…clear that the 'generating data' limitation reflects the capability of that structure rather than the activities of the user,' and 'do[es] not reflect an attempt to claim both an apparatus and a method, but instead claim[s] an apparatus with particular capabilities'") (*quoting UltimatePointer*, 816 F.3d at 827-28). The issue is not whether "active verbs" exist in the claim, but that "these verbs represent permissible functional language used to describe capabilities" of the system. *Id.*

Cisco's suggestion that *Rembrandt* was decided because "transmitting" was "divorced from the preceding structural elements" is mere fiction. Neither the district court nor the Federal Circuit came to any such conclusion. Again, Rembrandt said that its own claim was error, and then asked for a correction—one that both courts deemed inappropriate. *Rembrandt*, 673 F. Supp. 2d at 428 ("Edits by district courts are generally made in instances where the change is extremely minor and/or obvious. This is neither."); 641 F.3d at 1339-40. Cisco argues inconsistency with *Rembrandt*, but fails to acknowledge that Cisco's interpretation of the claims here is inconsistent with every other case Ramot cited from this line.

Before and after *Rembrandt*, the Federal Circuit clarified in a series of cases that functional language like "transmitting"—or "mapping," "selecting," or "generating"—is perfectly acceptable when describing the capabilities of a system. *See MasterMine*, 874 F.3d at 1314 ("a reporting module …" "presents," "receives from the user a selection," "generates"); *UltimatePointer*, 816 F.3d at 819 ("a handheld device including:" "generating data"); *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1273 (Fed. Cir. 2012) ("A mobile station for …" "storing," "holding,"

20

"maintaining," "causing," "deleting," "reactivating"); *Microprocessor Enhancement*, 520 F.3d at 1375 ("A pipelined processor for …" "performing," "producing," "enabling," "disabling," "determining"). As in these cases, the verbs in the claims Cisco challenges here simply refer to functionality of the claimed system—here the "optical modulation system" of independent claims 1, 45, and 58. These are not method steps, as the claims and the context of the '998 patent make clear.

Cisco's generalized appeal to indefiniteness under *Nautilus* similarly fails—both on its lack of merit and Cisco's failure to meet its burden with evidence about the understanding of one of ordinary skill. The '998 Patent does not imply an "unidentified structure," but rather contains detailed explanatory and example disclosures. The "digital-to-digital mapping" structure of the claims, "read in light of the patent's specification and prosecution history" refers to digital logic implementing a mapping, in the manner described and with the additional elements claimed. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 908 (2014). There is far more than "reasonable certainty" here, and Cisco completely failed to meet its burden to establish indefiniteness of these presumptively valid claims.

## 2.    "wherein the N bits of the N bit digital input data word are mapped …"

Although the claim 45 language is different, Cisco's faulty and unsupported indefiniteness argument similarly fails. Claim 45 requires "An optical modulation system for converting … wherein the N bits of the N bit digital input data word are mapped to…" an output. JCCC, 22:22-47. This is not a method step on any reasonable reading. On its own language, this refers to an aspect of a system, in which, digital bits "are mapped."

The "optical modulation system for converting" of the claim here is similar to the "mobile station for use with a network" of the claim in *HTC* or the "pipelined processor for executing" of the claim in *MEC*. *MasterMine*, 874 F.3d at 1315-16. As above, in the context of the claims and specification there is no ambiguity about how the digital mapping is done or that infringement occurs when the optical modulation system in which the digital bits "are mapped" is created.

In sum, Cisco has failed to show that the claims of the '998 Patent do not provide "reasonable certainty" to one of ordinary skill in the art. *Nautilus*, 572 U.S. at 910. The claims are definite.

### D.    Cisco's Sur-Reply Position

First, Ramot is wrong again that *IPXL* indefiniteness is limited to claims reciting "user action." *MasterMine*, 874. F.3d at 1314 ("We also applied this [*IPXL*] doctrine in *Rembrandt* …, where … the claims at issue did not claim user action.").

Second, Cisco showed that the *MasterMine* and *Ultimate Pointer* claims involved permissible functional claiming because the critical language was tied to a specific structure, making the language a ***capability*** of that structure. Joint Br., 15-16. Ramot incorrectly characterizes the *UltimatePointer* claim as "'a handheld device including:' 'generating data'" (Joint Br., 20-21); but the element recited a specific structure for performing the function: "**an image sensor** … generating data ...." 816 F.3d at 828. Likewise, the *MasterMine* claim recited a "system" including a specific structure—"reporting module installed within the CRM software application"—performing the functions of "presents, receives and generates." 874. F.3d at 1315.

Ramot argues that the *HTC* court found the following claim structure "perfectly acceptable" under *IPXL*: "'A mobile station for ...' 'storing,' 'holding,' 'maintaining,' 'causing,' 'deleting,' 'reactivating'". Joint Br., 21. Not true. The court said the opposite—if the claim were as Ramot represents, it would be invalid:

> If the mobile station implements the functions, the claims are indefinite because they recite both an apparatus—the mobile station—and method steps—the functions enumerated in paragraphs 2-7.

667 F.3d at 1274.  The *HTC* claim was valid for a different reason.  The claim's preamble was "a mobile station for use with a network …" and the claim then recited the functions Ramot quoted.  *Id.*  The Court construed these functions as part of the "network environment" in which the mobile station operated, and found the claim valid because the mobile station did ***not*** perform the functions.  *Id.* at 1275-76 ("They do not recite a mobile station and then have the mobile station perform the six enumerated functions.").

Third, Ramot asserts *Rembrandt* was not based on that claim's recital of a method ("transmitting") divorced from structure.  Joint Br., 20.  But that is exactly what *Rembrandt* said:

> The first four elements . . .  recite apparatus elements. . . . The final element is a method: 'transmitting the trellis encoded frames.'" . . . . This court has held that "reciting both an apparatus and a method of using that apparatus renders a claim indefinite under section 112, paragraph 2." [citing *IPXL*].  Applying this doctrine, the district court correctly held [the claims] invalid for indefiniteness.

641 F.3d at 1339.  Ramot downplays *Rembrandt* as an "outlier," arguing it turned on an admission regarding a claim error that the plaintiff would not have made if it had the benefit of *HTC, MasterMine* and *UltimatePointer*.  Joint Br., 17-20.  Ramot's speculation is implausible.[8]  The subsequent cases are aligned with *Rembrandt*:  a claim is not valid unless a function is tied to a specific claimed structure.

Fourth, Ramot declares there is "no lack of structure in the claims."  Joint Br., 21.  Exactly.  There *must be* structure in a claim to trigger *IPXL*; here, the problem is that there is *both* a structure *and* a method untethered to that structure.  Relatedly, Ramot asserts that "a digital-to-digital mapping" is structure.  But Ramot agreed that "mapping" means "selecting or generating a digital

---

[8] The "transmitting" step could not be a function of the recited structures (first/second "***buffer*** means"; "fractional ***encoding*** means").  *Rembrandt*, 641 F.3d at 1339.

output....." JCCA, 4. Ramot acknowledged that "'[s]electing' and 'generating' are merely different functional verbs...." Joint Br., 19-20. Verbs are not structure, and the issue goes beyond the claims being just "awkwardly worded." *Id.* Ramot cannot read unclaimed structure into this verb-only construction. Ramot also would be estopped from doing so by its agreement. *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1341 (Fed. Cir. 2005).

Fifth, Ramot likens claim 45 to its misstatements of the *HTC* claims (addressed above) and *Microprocessor Enhancement* claims, where the Court actually found that claim 7 recited a pipelined processor "***possessing the recited structure*** and capable of performing the recited functions, and is thus not indefinite under *IPXL Holdings*." 520 F.3d. at 1375.

Finally, Ramot's response to indefiniteness under *Nautilus* fails, as it imports "***digital logic implementing*** a mapping" when no such structure is recited.

## IV.    DISPUTED CONSTRUCTIONS - ISSUE #2

### A.    Ramot's Opening Position

#### 1.    "digital-to-digital mapping maps ... to a set of M digital output data bits associated with a plurality of voltage values"

For the next five terms, Cisco has taken the language of each set of independent claims, and unabashedly tacked on a negative limitation (in red below) derived from a single embodiment.

| digital-to-digital mapping maps … to a set of M digital output data bits associated with a plurality of voltage values<br><br>for directly driving electrodes of the modulator without any mediating digital-to-analog converter | mapped to a set of M output bits corresponding to a set of voltage values<br><br>for directly driving electrodes of the modulator without any mediating digital-to-analog converter | digital-to-digital mapping maps … to M digital output data bits<br><br>for directly driving electrodes of the modulator without any mediating digital-to-analog converter | converting, based on a digital-to-digital mapping, … to M digital output data bits associated with M drive voltage values<br><br>for directly driving electrodes of the modulator without any mediating digital-to-analog converter | mapping, based on a digital-to-digital mapping, … to a first digital output associated with M drive voltages<br><br>for directly driving electrodes of the modulator without any mediating digital-to-analog converter |
|---|---|---|---|---|
| '998 cl. 1 | '998 cl. 45 | '998 cl. 58 | '872 cl. 1, 15 | '872 cl. 13, 23 |

Cisco's desire to write a customized limitation into each and every one of the Asserted Claims violates basic principles of claim construction. *See, e.g.*, *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited"); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005) (en banc) ("one of the cardinal sins of patent law—reading a limitation from the written description into the claims"). This Court has often acknowledged and applied these principles—refusing to limit claims "unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *See, e.g.*, *HID Global Corporation v. Vector Flow, Inc.*, No. 21-1769-GBW, 2023 WL 2655117, *2 (D. Del. Mar. 27, 2023).

No such exclusionary expression has occurred here. Each of the independent claims Cisco seeks to limit are instead open-ended "comprising" claims, infringed when every element is present,

regardless of whether other unclaimed elements are present in the system.  Each is agnostic as to whether a driver, or digital-to-analog converter, or other mediating circuitry exists in-between the output of the digital-to-digital mapping and the electrode(s) of the modulator.  And while "Direct Digital Driving" is a preferred embodiment of the specification, none of these claims have any language restricting the claims to that embodiment, or excluding other indirect driving structures.

For example, claim 1 of the '998 Patent requires only that "a set of M digital output data bits" is "associated with" one or more "voltage values," and that modulation is "based on the plurality of voltage values."  *See, e.g.*, JCCC at 17:32-36.  There are no structural limitations on how the bits are to be "associated with" one or more voltages—or on how the modulation may be "based on" those values.  This claim covers, *inter alia*, the disclosed embodiment wherein the modulator is driven via the "use of multiple actuating voltage levels" on one, or more, electrodes. *See id.* at 8:21-31.

A known way of associating multiple digital bits with levels of a single variable voltage is through a digital-to-analog converter—as even Cisco's expert here acknowledges.  JCCQ, ¶¶117-119 ("a POSITA would have recognized that Taraschuk's linearizer teaching could be applied to modulators with one or more electrodes, where direct drive would be used for a multi-electrode modulator *or a DAC would be used with a single-electrode modulator*"); *see also* JCCP at 163:1-164:10 ("directly *or indirectly* drive").[9]

Other claims have different language but are also open-ended with respect to modulator electrode configuration and driving circuitry.  *See, e.g.*, JCCC at 24:15-17 (claim 58) ("modulating … responsively to the M digital output data bits").  These particular claims primarily address the

---

[9] *See also* 2019 Texas Action, D.I. 159 at 1 (*quoting* Cisco's expert in that case: "A POSITA would have understood at the time of the Asserted Patents that an optical modulator can be controlled with analog drive (or control) signals or digital drive (or control) signals.").

"digital-to-digital" mapping inventive aspects of the Asserted Patents—and as such are intentionally broad *vis a vis* structure and configuration of the modulator driver. In fact, Cisco has alleged in its Amended Answer here that: "Ramot drafted the claims of the '998 Patent in an attempt to cover a system that allows for pure digital manipulation of data, followed by a digital-to-analog conversion to provide analog drive signal(s) for a modulator." No. 22-cv-674, D.I. 80, ¶37. It is far from clear how Cisco intends to suggest that Ramot both drafted claims to cover, and disclaimed coverage of, this configuration.[10]

Cisco's improper limitation originates from a disclaimer argument that Cisco made four years ago in the Eastern District of Texas—with respect to one claim *of a different patent* at issue in that prior case. Cisco's global limitation assertion here ignores the specificity of that argument, and alleged disclaimer, to the different claim and the proceeding in which it was made. There was then, and is now, absolutely no basis to confine Ramot's entire patent family to just one of the embodiments disclosed and claimed therein. The claims here are different—from each other and from those at issue in the prior case—and the claims and other intrinsic evidence here do not support the limitation Cisco seeks to blanket the patents with.

Indeed, Judge Gilstrap found four years ago that the different prior claim—requiring "driving … electrodes"—was *not limited* by the embodiments and disclosures of the specification alone to direct driving "without any mediating circuits." 2019 Texas Action, D.I. 83 (Appx. Ex. 1) at 27 ("not definitional of the claimed invention"). Claims were not, and are not, limited by

---

[10] Cisco drops a footnote attempting to qualify its arguing on both sides of this issue. *Id.* at p. 39, fn. 1. Ramot did not draft claims for this litigation or with the knowledge Cisco now alleges. And Cisco cannot fairly claim surprise or reliance for laches in view of the long history of this particular dispute between the parties. *See, e.g.*, 2019 Texas Action, D.I. 135, 159 (opposition and sur-reply to Cisco's Motion for Partial Summary Judgment of Non-Infringement by Products Driven by Analog Signals). But setting these arguments against laches aside, Cisco's Amended Answer is in fact correct about the scope of the claims here relative to modulator driving structures.

specification disclosure that: "The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as 'Direct Digital Driving.'" *Id.* ("The '465 Patent does not redefine 'driving' electrodes 'responsively' to a vector of voltages to require direct application of the voltages on the electrodes"). Again, this is basic Claim Construction 101—embodiments, even preferred or only embodiments, do not limit claims. *Phillips*, 415 F.3d at 1320.

Judge Gilstrap did limit the term: "driving at least M electrodes of the optical modulator ... responsively to the M voltage values" of claim 1 of the '465 Patent to "direct driving"—but did so based instead only on statements made about that claim in an IPR pleading related to that patent. 2019 Texas Action, D.I. 83 (Appx. Ex. 1) at 28-30. None of the other asserted claims of the '535 or '866 patents in that case were so limited—including because ***Cisco did not even argue disclaimer or suggest this limitation for the different language of those claims***. *See id.* at 4 ('535 patent claim 1: "coupling the M drive voltage values to the unmodulated optical signal" and '866 patent claim 7: "coupling the drive voltage values corresponding to the digital drive vector to the electrically controllable optical modulator, enabled to modulate … responsively to the drive voltage values"). As mentioned above, Cisco did try at summary judgment to expand upon the limited disclaimer Judge Gilstrap had applied to one claim during *Markman*—but that meritless motion was not decided prior to the pre-trial stay of that case. 2019 Texas Action, D.I. 135, 159.

Ramot disagrees with the conclusion that the preliminary statements from non-instituted IPR2020-00484 show the required "clear and unmistakable" surrender of claim scope with respect to claim 1 of the '465 Patent. *See, e.g.*, *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013) ("Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable."). But that is beside the point here,

because none of the relevant claim terms from the 2019 Texas Action are at issue in these cases, and the Asserted Claims here have substantially different, broader elements—to also cover different embodiments than those the Texas court limited the '465 Patent claim to.

An alleged disclaimer during prosecution of a parent patent is only relevant to the extent that "it addresses a limitation in common with the patent in suit." *Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305-06 (Fed. Cir. 2001) ("Notably, there are no common claim terms in dispute. Indeed, the present case involves the absence of a claim term. The patentee's whole point in filing the application that resulted in the [later] patent was to secure broader claims"); *Regents of University of Minnesota v. AGA Medical Corp.*, 717 F.3d 929, 943-945 (Fed. Cir. 2013) (discussing rule and citing cases: "The proper inquiry is whether the scope of the claim limitation is substantially the same in the subsequent application as it was in the earlier application"); *TQ Delta, LLC v. 2WIRE, Inc.*, No. 1:13–cv–01835–RGA, 2017 WL 6435334, at *7 (D. Del. Dec. 18, 2017) (purported disclaimer "directed to specific claim terms that have been omitted or materially altered" does not apply).

Here, the limitations to which Cisco wants to apply a purported disclaimer are demonstrably different and broader than the "driving … electrodes" term that was deemed disclaimed to "direct driving" of the electrodes in the 2019 Texas Action. *See, e.g.*, JCCC at 17:32-36 ("associated with" "based on"). It "would be improper" here "to add an entire limitation to claim 1 of the ['998] patent based on the file history of the ['465] patent." *Sanofi v. Glenmark Pharmaceuticals Inc., USA*, 204 F. Supp. 3d 665, 702-703 (D. Del. 2016) ("Instead, the applicant deliberately chose to write different, broader claims—which the applicant was entitled to do"). Cisco cannot show disclaimer with respect to the different terms of each of the different claims of the Asserted Patents here. And absent any disclaimer, Cisco's proposed limitation must be rejected—because as the Texas court

already found, the claims and specification themselves do not support limiting the claims to just one of many embodiments.  2019 Texas Action, D.I. 83 (Appx. Ex. 1) at 27.

### a.  The claim language and other intrinsic evidence do not support Cisco's limitation

As explained above, claim 1 of the '998 Patent contains no express restriction or exclusionary language that could justify the limitation that Cisco seeks to tack on.  And as explained further in the sections below, none of the other claims do either.  Cisco's proposed construction could only be based on carry-over of alleged disclaimer from another prosecution, and for the reasons discussed herein, cannot stand on that basis either.

### b.  There has been no disclaimer of scope for these claims

As explained above, even if statements from the prosecution of parent patents were deemed to disclaim scope for those parent claims, the Asserted Claims here are materially different.  Any disclaimer would not carry over to these patents and claims.  *See, e.g.*, *Sanofi*, 204 F. Supp. 3d at 702-703.

Cisco fails to cite anything from direct prosecution history of these Asserted Claims in support of its argument here.  In the three IPRs Cisco filed against these claims, it notably did not seek to add this limitation—telling the USPTO that no construction was required at all.  Cisco relied on prior art embodiments that included the latter configuration.  JCCQ, ¶118.  And Ramot declined to distinguish that art on that basis—believing all along that these claims read on, *inter alia*, driving through a DAC.  Cisco at least conditionally agrees that they do.  No. 22-cv-674, D.I. 80, ¶37.

With nothing from the prior IPRs carrying over to the materially different claims here, and no disclaimer even alleged in the prosecution of the Asserted Patents, Cisco's argument for negative limitation by disclaimer fails.  The Court should reject Cisco's improper attempt to limit claim 1 of the '998 patent, its dependents, and the claims further discussed below.

### 2. "mapped to a set of M output bits corresponding to a set of voltage values"

Claim 45 of the '998 Patent is also not limited to any direct digital driving embodiment—its relevant language requires only "a set of M output bits *corresponding to* a set of voltage values …" and modulation "based on at least a subset of the set of voltage values." JCCC at 22:21-46. Dividing or combining the voltage values into subsets in order to effect the modulation could very well involve some driver or analog conversion circuitry. *See, e.g.*, JCCQ at 117 ("a DAC would be used with a single-electrode modulator."). There is nothing identified in the intrinsic evidence to limit this claim as Cisco desires, and it is materially different from any claim where an IPR disclaimer has been alleged.

### 3. "digital-to-digital mapping maps … to M digital output data bits"

As also explained above, claim 58 of the '998 Patent is also not limited to any direct digital driving embodiment—requiring only "modulating … *responsively to* the M digital output data bits." JCCC at 23:50-24:20. There are no structural limitations on, or even mention of, how any electrodes of a modulator may be driven, and no language that could be deemed to exclude mediating circuitry as part of modulating "responsively" to the digital bits. The claim is also materially different from any claim where an IPR disclaimer has been alleged.

### 4. "converting, based on a digital-to-digital mapping, … to M digital output data bits associated with M drive voltage values"

Independent claims 1 and 15 of the '872 patent also contain no restrictive or exclusionary language, and are materially different from any claims where an IPR disclaimer has been alleged. They require only that M digital output bits be "associated with" M drive voltage values, and "providing the M drive voltage values to the modulator." JCCB at 17:15-37, 19:6-27. Again, these claims contain no structural limitations on how the bits are "associated with" values—other than the number (M) of each set—or on how the values are provided to the modulator. Intervening

driver or converter circuitry is neither required by, nor excluded by, the plain language of the claims.

>    **5.    "mapping, based on a digital-to-digital mapping, … to a first digital output associated with M drive voltages"**

Independent claims 13 and 23 of the '872 patent also contain no restrictive or exclusionary language, and are materially different from any allegedly disclaimed claims. They require only that a digital output be "associated with" M drive voltages, and are otherwise silent about how the modulator is to be driven. JCCB at 18:40-67, 19:58-26. Cisco cannot justify its proposed limitation of this or any other claim on the intrinsic evidence—and no disclaimer carries over to these different claims that broadly cover digital mapping aspects of the inventions.

>    **B.    Cisco's Responsive Position**

>    **1.    Introduction**

The chart below shows Cisco's proposed constructions. Each construction starts with the claim language that recites a mapping (or converting) with a digital output (the claim language in yellow), and then Cisco adds language (**bold**) that tracks Ramot's statements in IPRs on related patents.

|  | '872: 1, 11, 15 | '872: 13, 23 | '998: 1 | '998: 45 | '998: 58 |
|---|---|---|---|---|---|
| Cisco's Constructions | converting, based on a digital-to-digital mapping, … to M **digital output data bits** associated with M drive voltage values **for directly driving electrodes of the modulator without any mediating digital-to-analog converter** | mapping, based on a digital-to-digital mapping, … to a first **digital output data bits** associated with M drive voltages **for directly driving electrodes of the modulator without any mediating digital-to-analog converter** | digital-to-digital mapping maps … to a set of M **digital output data bits** associated with a plurality of voltage values **for directly driving electrodes of the modulator without any mediating digital-to-analog converter** | mapped to a set of M **output bits** corresponding to a set of voltage values **for directly driving electrodes of the one or more electro-absorption signal generation devices without any mediating digital-to-analog converter** | digital-to-digital mapping maps … to M **digital output data bits** for directly driving electrodes of the modulator without any mediating digital-to-analog converter |

As highlighted in yellow, all claims require mapping/converting to a digital "output"—each claim either uses the word "digital" (in "digital output" or "digital output data bits") or refers to "output bits" (which are, by definition, digital). The parties agree that this digital output is eventually used—in some form—to drive an optical modulator. The dispute is whether: (i) this digital output (in the form of a digital signal) must directly drive the modulator (as Ramot insisted during IPRs, and as the specification repeatedly confirms); or (ii) this digital output can first be converted into an **analog signal** (using a device known as a "digital-to-analog converter" or a "DAC"), and then the analog signal can drive the modulator. This dispute tracks the distinction between two basic types of optical modulators: (1) modulators that are directly driven by digital signals (which are the subject of Ramot's invention); versus (2) modulators that are driven by an

33

analog signal, i.e., driven by a signal produced using a DAC, which was a well-known prior art technology at the time of Ramot's invention.

Ramot relied on this difference to distinguish prior art in IPRs on related patents. In doing so, Ramot made statements that were broadly directed to the invention as a whole. For example, in describing the categorical difference between the invention (related to digital-driven modulators) and the "Burchfiel" prior art (related to analog-driven modulators), Ramot stated:

> [T]he *Burchfiel* reference employs an admitted prior art solution using a look up table to relate input digital symbols to stored representations of analog voltage levels, which are driven onto electrodes of a modulator via a digital-to-analog converter (DAC)… But both **the '535 Patent** and Petitioner's cited *Roberts* art **teach away from and disparage solutions such as *Burchfiel*'s that use DAC circuits as electrode drivers**. For example, **the '535 Patent discusses the advantage of operating "without any mediating [DAC] circuits**."

JCCG at 8 (internal citations omitted; insertion of "[DAC]" after "mediating" by Ramot in original; bolded added). Likewise, Ramot stated:

> The **'535 Patent discloses and claims a completely different system** that overcomes the disadvantages of using analog signal conditioning **or DACs**—such as by **directly driving the modulator with digital signal vectors** . . . .

JCCG at 7 (bold added). Cisco's constructions use this language to confirm that the claims do not cover analog-driven modulators.

The law requires carrying disclaimers forward from familial patents when either (i) the statements are directed to the invention as a whole (as these statements are) or (ii) the statements are directed to claimed subject matter that is the same (which also is the case here). Finally, the specification's description of "the invention" fully aligns with these statements.

### 2.    Background

The following background explains the distinction at the heart of this dispute.

<u>Optical Modulators</u>.  An "optical modulator" is a basic component in any optical communication system.  The optical modulator transmits information by changing the intensity of the light that is transmitted over a fiber.[11] This demonstrative image shows light (a light wave from a laser) entering a modulator from the left, and then shows light with a differing intensity (depicted as a change in the amplitude) exiting on the right.



The specific change in the light's intensity represents the digital data at the top of the image.  The example of such digital data in the specification is a 4-bit digital "word", which just means a combination of 4 "bits" (e.g., 1100 or 1011 or 0001, etc.).  There are 16 such possible combinations of 4 bits.  Each of these 16 combinations would correspond to a different intensity of light that is output by the modulator.

Drilling down another layer, an "electrode" is the component of the optical modulator through which the change in the intensity of the light is controlled.  *See* JCCB, 5:12-14. The electrode is surrounded by a yellow highlight in this image.  For example, a voltage signal (shown as a blue arrow) can



be applied to the electrode to control the amount by which the modulator varies the intensity of the light.

<u>Analog-Driven Modulators *versus* Digital-Driven Modulators</u>.  The parties' dispute boils down to the nature of the electrical signal (e.g., the signal shown in blue above) that drives the

---

[11] *See* JCCA at 4 (agreed construction of "modulator"); JCCB, 5:33-37 (defining "modulator").

modulator. Cisco's constructions require this signal be digital, not analog, meaning the claims apply only to digitally-driven modulators.

As a threshold matter, both types of optical modulators change the light's intensity to represent digital data bits, and can impart the same changes of intensity to the light (e.g., by creating 16 different light intensities to represent each of the 16 possible 4-bit digital words). There are, however, categorical differences on how they do this.

Analog-driven modulators are driven by an analog electrical signal that supplies a particular analog voltage level to the electrode, shown as the blue arrow.[12] The specification explains, "'analog' refers to a form of data in which values are represented by different levels are represented by different levels within a range of values of an essentially continuously variable parameter." JCCB, 4:59-62. In other words, an analog signal can be *any value* within a range of values (e.g., any voltage level from 0 to 15 volts).



Importantly, analog-driven modulators are paired with a Digital-to-Analog Converter ("DAC") to convert the inputted digital data into the analog drive signal that drives the modulator electrode, as shown at the top of the image. This is because the digital data at the top left of the

---

[12] This image shows the optical modulator as a known "Mach-Zehnder Interferometer" (also, "MZI modulator" or "MZ modulator" or "MZM"). All images of modulators in the specification (Figures 1, 10, 14) are MZMs. An MZM is an optical modulator in which light enters and is split into two waveguide branches (or paths). An example is shown in Figure 14, where light on one path is changed by a voltage drive signal applied to the electrodes; and then the light from the two branches are recombined before the light exits. The MZM structure can be used either with an analog-drive modulator (as shown in the image above) or a digital-driven modulator like Figure 14.

image ("Digital Signal In") is binary, meaning that each digital bit is represented using only two options (e.g., 0 or 1).[13]  The DAC in the image "converts" that digital data into an analog electrical signal to drive the electrode.  Using the example of a 4-bit digital word (e.g., 1100 or 1011 or 0001, etc.), each of the 16 possible 4-bit digital words would have its own corresponding analog voltage level (e.g., a voltage signal that varies between 0 and 15 volts, depending on the specific 4-bit digital word).  For any given digital word, therefore, the DAC will output the corresponding analog voltage signal to drive the electrode, which will cause the corresponding change to the light intensity.

In contrast, digital-driven modulators are driven by digital signals.  For this to work, digital-driven modulators use a <u>segmented</u> electrode that consists of multiple electrodes.  This is shown in the image to the right, with the modulator having 4 electrode segments (instead of the single electrode in the analog image).  Each of the 4 electrode segments is driven by a respective digital signal, and each of those 4 signals corresponds to one of the bits in the 4-bit digital word.  Depending on the given bit, the



corresponding digital signal is no voltage (e.g., 0V) when the digital bit is a "0", or a set voltage (e.g., 5V) when the digital bit is a "1".  Because the signals remain digital throughout—and because the electrodes are driven with a digital (i.e., binary) signal—the digital data signals are <u>not</u> (and need not be) converted to an analog electrical drive signal by a DAC for driving the modulator.  In

---

[13] The term "'digital' refers to a form of data where values are stored or processed numerically, typically broken up into bits of a binary number for machine processing" (JCCB, 4:56-59) and "[t]he term 'binary' is used to refer to values, voltages or other parameters which assume one or other of only two possible values, and modes of operation which use such parameters."  JCCB, 5:5-8.

sum, there is no need for a device (like a DAC) that changes (i) an electrical data signal that is digital into (ii) an electrical drive signal for the modulator that is analog—because the modulator is just driven with the digital signal.  That is the point reflected in Cisco's constructions.

### 3.  Cisco's Proposed Constructions Are Correct

Cisco begins with the IPR disclaimers given their centrality to this dispute and then turns to the specification.

### a.  Ramot's IPR Disclaimers

The Asserted Patents are direct descendants through a line of continuation applications from Patent No. 10,270,535 (the "'535 Patent") (Appx. Ex. 3).[14]  The '535 Patent shares the same specification with the Asserted Patents.  The discussion below focuses on the '535 Patent IPR.[15]

Ramot made clear and unmistakable disclaimers that the **digital output** of the "mapping" or "converting" elements is for **directly driving the electrodes of the modulator, without any mediating digital-to-analog converter**.  This is the language reflected in Cisco's constructions. Ramot made these statements repeatedly, creating disclaimers in the Asserted Patents for two independent reasons: (1) many statements using this language were directed to the "invention as a whole", such that they are immediately applicable to the Asserted Patents (and even a single such statement would compel Cisco's constructions); and (2) other statements were directed to the same subject matter (converting/mapping) as the converting/mapping limitations at issue in the Asserted Claims.

---

[14] *See* JCCB, cover at (63); JCCC, cover at (63).  The Asserted Patents are also in the same family as related U.S. Patent No. 10,033,465 (the "'465 Patent") (Appx. Ex. 2), sharing a common priority Patent 9,479,191 and its parent patents and applications.

[15] While Cisco focusses on the '535 Patent IPR, Ramot made corresponding disclaimers in the '465 Patent IPR.  JCCH at 7, 8, 18, 25-28, 32-33, 37, 61, 63.

### i.    The Law

"Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim

term by making a clear and unmistakable disavowal of scope during prosecution." *Vitaworks IP,*

*LLC v. Gianbia Nutritionals (NA), Inc.*, No. 19-2259-GBW, 2023 WL 356160, *5 (D. Del. Jan.

23, 2023) (quoting *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir.

2006)).  Patent owner statements during an *inter partes* review (IPR) form part of the prosecution

history of the IPR patent and create disclaimers based on the same standards.  *Aylus Networks, Inc.*

*v. Apple Inc.*, 856 F.3d 1353, 1359-61 (Fed. Cir. 2017).  For later, related patents (such as the

patents here), "statements from the prosecution of patents in the same family are relevant when

the statements 'relat[e] to the same subject matter as the claim language at issue in the patent being

construed.'" *Vitaworks*, 2023 WL 356160, *7 (quoting *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d

1307, 1314 (Fed. Cir. 2007)).

There is also an exception to the "same subject matter" requirement:  a disclaimer from

prosecution of a related patent can carry forward "when it was directed to the invention as a whole,

not a particular claim." *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 943 n.8

(Fed. Cir. 2013) (citing *Ormco,* 498 F.3d at 1314-15 ("[T]he patentee's statements 'w[ere] not

associated with particular language from [the] claims' but were instead directed to the 'present

invention' and the 'overall method' claimed.")).

### ii.    Ramot's IPR Statements

After Cisco petitioned for *inter partes* review of the '535 Patent, Ramot filed its Patent

Owner's Preliminary Response.  *See* JCCG.  Ramot argued throughout its POPR that its invention

as a whole was limited to directly driving electrodes of the modulator without any mediating

digital-to-analog converter.  When Ramot also focused on specific claim language, Ramot applied

its arguments to the "converting" limitation of the '535 Patent claims, which is the same subject matter as the disputed claim limitations here.[16]

The first two POPR quotes—set forth in subsection IV.B.1 above (the Introduction, quoting JCCG at 7-8)—are sufficient for Cisco to prevail. *Regents*, 717 F.3d at 943 n.8. To set those up, Ramot argued that prior art that drove optical modulators with analog voltage levels (i.e., art that used a DAC in connection with an analog-driven modulator) was categorically irrelevant. Ramot started by characterizing the "Roberts" prior art reference as "a prior art solution that employed complex **digital-to-analog converters (DACs) to drive analog voltage levels onto the electrodes of a modulator**." JCCG at 4 (emphasis added). As quoted above, Ramot then:

- argued that the '535 Patent was different than Roberts (and other prior art) because "the '535 Patent"—as a whole—directly drives the modulator with digital signals, and Ramot even bolded and italicized language that Cisco now proposes in its constructions; and

- Ramot distinguished "the '535 Patent" (as a whole) from the "Burchfiel" prior art reference by again disclaiming the use of non-digital, analog drive techniques and mediating DACs.

Ramot went on to use all-encompassing language to distinguish the "'535 Patent" (as a whole) from the use of DACs to create (or "condition") analog driver signals:

> *[D]igital-to-analog conversion* and *analog driver signal* conditioning has nothing to do with, and arguably teaches away from, the '535 Patent approach and its claimed digital-to-digital "converting" to produce digital voltage values for driving modulator electrodes.

---

[16] This is why Cisco appends Ramot's disclaimer to the "mapping"/"converting" constructions. The parties agree that "mapping" and "converting" mean the same thing in the Asserted Patents. *See* JCCA at 4 (agreed construction of "mapping/map/mapped/converting"); JCCG at 43 ("[Ramot] … used converting and mapping interchangeably here.").

JCCG at 61.  In addition to distinguishing "the '535 Patent approach," Ramot <u>also</u> distinguished "its claimed digital-to-digital converting," which by itself would trigger the disclaimer because that is the same subject matter as the claim limitations at issue.

Then, Ramot again distinguished the use of DAC-created analog signals: "generating analog 'pre-programmed voltages' at the output of a digital-to-analog converter … [is a] known approach that is **explicitly distinguished as undesirable** by the '535 Patent." JCCG at 63-64 (citing patent disclosure that "[t]he application of electrical signals is preferably directly upon the modulator *without any mediating [e.g., DAC] circuits*." (emphasis and "[e.g., DAC] provided <u>by</u> Ramot)).

Ramot likewise broadly stated that "the '535 specification" (as a whole) disparaged the use of "DAC circuits of prior solutions":

> As discussed below, the '535 Patent specification makes clear that this converting occurs in the digital-to-digital domain, and results in the sets of input and selected output values being non-identical. This non-identical digital-to-digital converting enables the invented system to correct for non-linearities or other undesirable signal characteristics, *and to do so without employing the complex, slow, and power-hungry DAC circuits of prior solutions*.

JCCG at 37-38 (emphasis added); *see also id.* at 8 ("*Roberts* discusses a prior art system using DACs, including its disadvantages.").

Ramot even argued that the Board should exercise its discretion to not institute the IPR because the Petition's Roberts and Burchfiel references were cumulative with "other references that used DACs to drive modulator electrodes with analog voltages … were specifically discussed and distinguished [by Ramot] with the Examiner during related family prosecution."  JCCG at 18. Ramot argued that "*Burchfiel* disclosed a system that relied on digital to analog converter (DAC) circuits to drive analog voltage levels onto the electrodes of the disclosed MZI modulator" and "[i]n this regard, *Burchfiel* is therefore substantially the same as *Price*, which also used analog

signals to drive the electrodes of a MZI modulator." JCCG at 25-26.  Ramot confirmed that the use of an analog-driven modulator was the key distinction:  "During prosecution related to the '465 Patent, the Applicant overcame a rejection over *Price* on the basis of this same analog characteristic." JCCG at 27.  Ramot included the following diagram to illustrate its point, emphasizing the use of DACs and analog drives signals in the prior art—the fundamental structure it was distinguishing:



JCCG at 28.

Finally, Ramot made these same characterizations of "the invention of the '535 Patent" when arguing that the Petition should be denied because it did not have a reasonable expectation of success:

> [T]he invention of the '535 Patent achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead directly driving the modulator with digital signal vectors and using the optical modulator itself to effect a faster digital-to-analog conversion.

JCCG at 34.

42

### iii.    Ramot's IPR Disclaimers Apply to the Asserted Patents

Ramot's disclaimers apply to the Asserted Patents for two reasons.

<u>First</u>, most of Ramot's disclaimer arguments were "directed to the invention as a whole", and thus carry forward to the Asserted Patents. *Regents*, 717 F.3d at 943 n.8.

<u>Second</u>, Ramot also tied its disclaimer arguments to the "converting"/"mapping" limitations that are the same subject matter (indeed, some of the very terms) as the Asserted Claims. *Vitaworks*, 2023 WL 356160, *7; *Ormco*, 498 F.3d at 1314. The Asserted Patents and the related '535 and '465 Patents share the same specification, and they all share the common claim terms "mapping" and "converting". Ramot tied its disclaimer arguments to the "converting" and "mapping" limitations recited in the claims challenged in the IPRs. Each Asserted Claim recites a "mapping" or "converting" limitation, and thus Ramot's arguments relate to the "same subject matter" as the "mapping" and "converting" claim language offered for construction here. *Vitaworks*, 2023 WL 356160, *7. In addition to the examples identified above, Ramot argued that neither the Roberts nor Burchfiel reference "relied on [in the Petition] with respect to the 'converting' elements of all challenged claims, disclose, suggest, or otherwise could have rendered obvious 'converting' as used in the '535 Patent." JCCG at 3; *see also id.* at 8 (discussing "converting" limitation), 21-24 and 30-32 (same). Ramot also argued that the "*Roberts* citations relied on by the Petition with respect to the 'converting' element refer to aspects of a prior art solution that employed complex digital-to-analog converters (DACs) to drive analog voltage levels onto the electrodes of a modulator." JCCG at 4.

### iv.    Ramot's Contrary Arguments Fail

Ramot tries to navigate its IPR disclaimers by making the circular argument that the claims of the Asserted Patents do not already include the words of the disclaimer.  Joint Br., 25.  Ramot's position fails because many of its IPR statements were directed to the invention as a whole.

A comparison of a '535 Patent claim (the subject of Ramot's disclaimers) with exemplary Asserted Claims also shows that Ramot's arguments regarding the '535 claims apply to the Asserted Claims because of the "same subject matter" test:

| '535, claim 1 | '872, claim 1 | '998, claim 1 |
|---|---|---|
| 1. A method of modulating and transmitting an optical signal over an optical fiber in response to N bits of digital data in parallel, the method comprising: … converting the N bits of digital data to M drive voltage values, where M>N and N>1; coupling the M drive voltage values to the unmodulated optical signal, said coupling enabling pulse modulation of the unmodulated optical signal, thereby generating a pulse modulated optical signal; . . . | 1. A modulation system, the system comprising: … and a converter for: converting, based on a digital-to-digital mapping, the plurality N digital input data bits to M digital output data bits associated with M drive voltage values, and providing the M drive voltage values to the modulator for the modulating, … | 1. An optical modulation system, the system comprising: … wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values; wherein the input optical signal is modulated based on the plurality of voltage values; … |

All claims recite (yellow) substantially the same "converting" limitation where the result of converting N-bits of digital data is "M drive voltage values" (or a "plurality of voltage values") and recite (green) the M drive voltage values/plurality of voltage values are used for modulating the optical signal.

Finally, Ramot relies on *Sanofi v. Glenmark Pharmaceuticals Inc., USA,* 204 F. Supp. 3d 665 (D. Del. 2016) for the proposition that a disclaimer from a parent patent does not carry over

when the claims are "materially different" because the patentee is entitled to draft "different, broader claims." (Joint Br., 29-30). As a threshold matter, *Sanofi* did not involve statements that were broadly directed to the invention as a whole.

Moreover, in order to gain allowance, the parent claims in *Sanofi* were <u>amended</u> to add an express limitation that the composition "does not contain a polysorbate surfactant." *Sanofi*, 204 F. Supp. 3d at 701. However, the claims of the *Sanofi* child patent did not include this negative limitation, and included several other differences from the parent claims. *Id.* at 702. The Court found that "by not including that explicit language of exclusion" in the claims of the child patent, prosecution disclaimer did not apply to prevent the patentee from "recaptur[ing] *through claim interpretation* specific meaning disclaimed during prosecution." *Id.* at 703 (emphasis in original). The Federal Circuit confirmed the narrow basis of the district court's holding in *Sanofi* holding:

> In these circumstances, the process in this case fit a familiar pattern: an applicant adopts an explicit claim-narrowing limitation to achieve immediate issuance of a patent containing the narrowed claims and postpones to the prosecution of a continuation application further arguments about claims that lack the narrowing limitation. Without more than exists here, that process does not imply a disclaimer as to claims, when later issued in the continuation, that lack the first patent's express narrowing limitation.

*Sanofi v. Watson Labs. Inc.*, 875 F.3d 636, 650 (Fed. Cir. 2017).

While the specific wording across Ramot's claims may vary slightly, the dispositive facts are different than *Sanofi* because:

(i)     each Asserted Claim includes the "mapping"/"converting" limitation in common with the parent/related patents in connection with which Ramot made its disclaiming arguments;

(ii)    none of the claims in the parent/related patents includes the language of the disclaimer; and

(iii)    the disclaimer is not based on an amendment.

In summary, Ramot's IPR statements clearly "relate to the same subject matter as the claim language at issue." *See Ormco*, 498 F.3d at 1314.

### b.    The Specification

The specification provides additional support for Cisco's constructions, which can be considered together with the IPR statements. *Ormco*, 498 F.3d at 1314.

The specification confirms there were two known classes of modulator for modulating an optical signal with data: (1) those driven by analog signals provided by DACs (which are the subject of Ramot's IPR disclaimers) and (2) those driven directly with digital drive voltages without the use of DACs. *See* JCCB at 2:6-7 (analog-driven modulator); 2:11-13 (first digital "multi-electrode MZI modulator"), 6:60-61 (prior art digital modulator of FIG. 14). "The invention" in the specification is directed only to the second class of modulator.

The type of prior art modulator that the invention improves is the digitally-driven modulator of Figure 14 (right), with the "4-bits data" driving directly 4 corresponding electrodes. The specification describes it as a "prior art Mach-Zehnder modulator **configured as a DAC**." JCCB at 6:60-61.[17]   As with all



FIG. 14 (PRIOR ART)

digitally-driven modulators, the modulator *itself* is "configured as a DAC" because its electrodes are driven directly with digital drive voltages representing the "4-bits data" and the modulator converts those ***digital*** drive voltages to an ***analog*** optical signal output.

---

[17] The electrodes increase in size (by a power of two) from left to right to match the relative weights of the bits. *See, e.g.*, JCCB, 2:11-15.

The specification consistently describes "the invention" as being directed to digitally driven modulators that are configured as a DAC, i.e., that convert digital drive voltages to an analog optical signal output: "The present invention relates to optical modulators" and "in particular a linearized **optical digital-to-analog modulator**."  JCCB, 1:33-35; *also* JCCB, Title ("Linearized Optical Digital-to-Analog Modulator").  That is, the invention uses the optical modulator itself to perform the digital-to-analog conversion (which is the hallmark of a digital-driven modulator) instead of using "mediating circuitry" to change the digital data into an analog drive signal (*i.e.*, using a DAC to covert a digital electrical signal into an analog electrical signal to drive the electrodes, which is the hallmark of an analog-driven modulator).  Put another way, with a digital-driven modulator, *digital* drive signals control electrodes of the modulator that produces an *analog* optical signal output.  This description of "the present invention"—as a "linearized **optical digital-to-analog modulator"**—is thus unambiguous.  But the specification repeats twice that "the invention" is a digital-driven modulator (i.e., a "digital-to-analog optical modulator"):

- "the *present invention* has been presented as *a digital-to-analog optical modulator*" (JCCB, 16:44-45); and

- "The *present invention* is applicable to other devices *where digital information carried by voltage or current is translated into analog optical signals* in the form of optical power." (JCCB, 13:35-38).

These statements limit the claim scope.  *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016); *Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016).

### c.    Ramot's Other Arguments Fail

First, Ramot points to language in claim 1 of the '998 Patent that Ramot says allows for an indirect "association" between "a set of M digital output data bits" and "a plurality of voltage

values" and that modulation is "based on" the plurality of voltage values. Joint Br., 26. Ramot combines this language with an assertion that it was known to "associate" digital bits "with a single variable voltage" through a DAC, i.e., the known process of using a DAC and then driving an electrode with an analog signal. *Id.*[18] But Ramot's invention is not directed to such modulators; the invention is directed only to modulators with digital-driven electrodes (such that the modulator itself operates as the DAC, i.e., a "digital-to-analog optical modulator")—as set forth in the specification and as made clear in the IPR disclaimers discussed above. Ramot suggests there are many embodiments in the specification, Joint Br., 27-30, but all embodiments directly drive the electrodes of the modulator with digital drives signals, without the use of a mediating DAC. *See* JCCB, FIGS. 1, 8, 9 and 10.

Second, Ramot argues that Cisco's prosecution laches defense in its Amended Answer (D.I. 159) supports Ramot's position that the claims permit the use of mediating DACs to provide analog drive signals. Joint Br., 26-27. However, Cisco's Amended Answer is clear that it "do[es] not agree that these claims, properly construed, cover analog-driven products" and that its laches defense is dependent on a "find[ing] that these claims do cover analog-driven modulator products." D.I. 159 at 39, n.1.

Third, Ramot's reliance on the claim construction proceedings in Texas, Joint Br., 28, fails because there Cisco moved for summary judgment that products using analog drive techniques using mediating DACs do not infringe all three of the patents asserted there (i.e., '535,'465 and 10,461,866 Patents). 2:19-cv-00225-JRG, D.I. 114 ("Cisco's Motion for Partial Summary

---

[18] Ramot cites the specification at 8:21-31, Joint Br., 26, but that citation does not suggest the use of an analog signal to drive the modulator, much less a mediating DAC circuit to provide an analog drive signal for the modulator.

Judgment as to Non-Infringement by Products Driven by Analog Signals"). Judge Gilstrap has not decided the motion because the case is stayed.

Fourth, Ramot argues that a disclaimer found by Judge Gilstrap with respect to a "driving … electrodes" term in the '465 Patent claims does not apply here because that specific claim language is not used in the Asserted Claims. Joint Br., 30-31. This argument is a red herring. As described above, in addition to describing the invention as a whole in the IPR prosecution, which provides sufficient reason to apply disclaimer here, Ramot also tied its disclaimer arguments upon which Cisco relies to the "mapping"/"converting" limitations, which provides an additional reasons to apply the disclaimer.

### 4.    Ramot's Constructions Are Wrong

For some of the mapping/converting limitations (JCCA, Terms 3 to 7), Ramot adds broadening constructions.

For Terms 3 and 4, Ramot asserts "a set of M [digital] output bits" means "M [digital] output bits." If Ramot is proposing that "a set" (plural) encompasses just one (singular) output bit, that defies the claim language and specification. *Mobile Telecom. Techs. LLC v. Time Warner Cable, Inc.*, 265 F. Supp. 3d 454, 469-70 (D. Del. 2017) ("set of transmitters" requires plural transmitters). For Term 4, Ramot proposes "a set of voltage values" means "one or more voltage values," which fails for the same reason.

Ramot also asserts for Term 3 that "a plurality of voltage values" means "one or more voltage values". JCCA at 7. However, "plurality of" means "two or more". *Gentex Corp. v. Revision Mil. Ltd.*, No. CV 19-921 (MN), 2020 WL 1875529, at *5 (D. Del. Apr. 15, 2020) ("'a plurality' means 'two or more'").

### C.    Ramot's Reply Position

Cisco's seventeen-page prosecution disclaimer argument is missing something very

conspicuously.  ***There is not a single reference to the prosecution history of the asserted '872 or '998 Patents***—including no reference to the three IPRs of claims of those patents that Cisco brought, and then lost after Board trials, without invalidating a single claim.  Cisco is instead relying entirely on statements from the preliminary response to its earlier non-instituted IPR directed instead to the '535 Patent.  These are statements that are at most only about the invention claimed in the '535 Patent.  They were not the basis for any decision by the Board.  They were made before the '872 Patent issued, and before the '998 Patent was filed.  And they are taken so far out of context in service of the argument Cisco wants to make here, as to lose all connection to their original meaning and purpose.

This Court needn't decide the alleged disclaimer effect of Ramot's '535 Patent IPR statements on the *unasserted* '535 Patent.  And the Court *shouldn't* decide that issue—because Cisco raised, and the parties fully briefed, that issue on a pending summary judgment motion in the 2019 Texas Litigation, before Cisco convinced the Texas court to stay that case in January of 2021.  The question of what, if anything, the alleged disclaimer statements mean *to the '535 Patent* is waiting for Judge Gilstrap to decide on the developed record there.[19]  The Court need not, and should not, indulge Cisco's invitation to render an advisory opinion on an unasserted patent.

Cisco's disclaimer argument here fails on its own, because the Asserted Claims of the '872 Patent and '998 Patent claim materially different inventions than the predecessor '535 Patent.  As

---

[19] Ramot did assert the '535 Patent in non-consolidated case C.A. 21-295-GBW here, but Cisco again requested and was granted a stay pending reexamination.  Cisco's first two *ex parte* reexaminations for the '535 Patent were eventually dismissed after an Appeal to the PTAB, and then Cisco immediately filed a third request.  *See* C.A. 21-295, D.I. 32.  These proceedings contain hundreds of pages describing the patent and distinguishing the references in ways unrelated to the alleged disclaimer statements—none of which Cisco has identified as supporting its argument.  A full and fair treatment of alleged disclaimer in the prosecution of the '535 Patent is beyond the scope of this brief.  Cisco fought to stay both cases where it could have been treated.

this Court has recently explained, "the doctrine of prosecution disclaimer generally does not apply when the claim term in the descendant patent uses different language." *Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd.*, No. 22-1387-GBW, 2023 WL 8622111, *3-4 (D. Del. Dec. 13, 2023). As explained in Ramot's Opening Position and further below, Cisco cannot link the alleged disclaimer statements to the claims here. Regardless of whether they worked a "clear and unmistakable" disavowal of *'535 Patent* scope—which Ramot contests—they cannot do so here under controlling precedent.

As explained in Ramot's Opening Position, disclaimers only extend to subsequent patents when the terms disclaimed are in common with, or are only immaterially changed from, the parent patent. *See, e.g.*, *Regents*, 717 F.3d at 943-945 ("Our requirement that the patents share 'limitations in common' is not a mere technicality: it is necessary to support the inference that the patentee's earlier arguments are also applicable to the claim limitations of the patent-in-suit"). Cisco does not even attempt this showing of immaterial change here—instead trying to recast the alleged disclaimer as relating to the converting elements, which it simply is not, as discussed further below.

In *Regents*, the Federal Circuit reaffirmed its holding that "it is permissible for a patentee to take a different approach to claiming an invention in subsequent patents"—and when they do, prosecution disclaimer doesn't follow to the new claims. 717 F.3d at 944-45.

Here, the Asserted Claims of the '872 and '998 Patents are directed to embodiments of the specification that disclose *indirect* (*e.g.*, analog) driving of modulator electrodes. *See, e.g.*, JCCC, 8:23-28 ("use of multiple actuating voltage levels"), 8:29-31 ("One option for further modification of the output is to modify the actuating voltage applied to each electrode, such as by switching between different distinct voltage levels"). These embodiments, involving driving electrodes with multiple voltage levels, are precisely the application that a person of ordinary skill would have

51

addressed with a digital-to-analog converter—as Cisco acknowledges. *See, e.g.*, JCCQ, ¶¶117-119 ("a DAC would be used with a single-electrode modulator"); Response ("For any given digital word, therefore, the DAC will output the corresponding analog voltage signal to drive the electrode").

An illustrative example of multi-level "PAM4" modulation, where two-bit digital words are converted to one of four actuating voltage levels by, *e.g.*, a digital-to-analog converter, is shown below (as found via Google searches):



Comparison of NRZ and PAM4 (logic and eye diagram):



The Asserted Patents discuss higher-order examples such as QAM modulation, where 16 or more levels can by driven by, *e.g.*, multiple electrodes driven to two levels each, as disclosed and as in the "NRZ" example in the image above, or by converting the digital words into analog voltage levels and driving multiple voltage levels as in the "PAM4" example above. *See, e.g.*, JCCC, 2:66-3:10 (16-QAM), 6:51-64, Fig. 11A, Fig. 12A ("64-QAM"), Fig. 12B ("256-QAM"), 8:13-28 (describing "use of multiple actuating voltage levels")

And because the Asserted Claims here encompass different embodiments, they are

materially different—both broader in some aspects and perhaps narrower in others—from any claim cited as the subject of Ramot's alleged disclaimer statements. The material differences alone defeat application of Cisco's alleged limitation. *See, e.g.*, *Acadia*, 2023 WL 8622111, \*3-4 ("When a patentee disclaims claim scope in a predecessor patent, that disclaimer binds the patentee's subsequent patents *only if the subsequent patent has the same, or immaterially different, claim limitations as its predecessor*") (emphasis added); *Saunders Grp. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) (collecting cases). Here, there is no real dispute that the modulator-driving elements are materially different from those alleged to have been disclaimed.

### 1. The claims here are materially different from those alleged to be disclaimed

Ramot's optical modulator patent family—containing the '872 and '998 Patents asserted here—consists of twelve issued U.S. Patents. The various claims, each of which necessarily defines its own invention, cover different aspects and embodiments of the multiple inventions disclosed in the shared specification. "Direct Digital Driving" is just one preferred aspect of those inventions. JCCC, 15:15-20. And again, direct digital driving with the binary levels of each converter output bit is not the only disclosed way to drive electrode(s) of the various modulator types described. *See, e.g.*, *id.,* 8:23-28 ("multiple actuating voltage levels"), 8:29-31 ("switching between different distinct voltage levels"), 22:38-42 (claim 45: "a subset of the set of voltage values").

The five independent Asserted Claims of the '872 and '998 Patents each have different, indirect language for relating the digital output of the digital-to-digital mapping to "voltage values," and then providing those voltage values to the various modulators. And each have such language materially different from both the claim language in the '465 Patent found disclaimed to

"directly driving," and the '535 patent claim language that Cisco now alleges was disclaimed.

For example, rather than "driving at least M electrodes" as in claim 1 of the '465 Patent, claim 1 of the '998 Patent requires "associating" the digital output bits with "a plurality of voltage values"—and then applies any modulation "based on" those one or more voltage values. JCCC, 17:22-55. Whether "plurality" means "one or more"[20]—or "two or more," such as in the case where each dual arm of a MZI modulator has one or more electrodes—this language plainly encompasses an implementation where the digital output bits are ***associated with*** one of multiple voltage values, such as via a DAC. *See also Id.,* 8:23-28 ("multiple actuating voltage levels"); 22:38-42 (claim 45, "voltage values" "corresponding to" the digital output bits, and modulation "based on" a "subset" of those values).

Similarly, the independent Asserted Claims of the '872 Patent each require the digital output bits from the digital-to-digital mapping step be "associated with" drive "voltage values" or "voltages." JCCB, 17:15-37, 19:6-27, 18:40-67, 19:58-20:25. Those voltages are indirectly or directly "provided to" the modulator for claims 1 and 15, while claims 13 and 23 don't even recite a limitation on how the drive voltages are used. *Id.*; *see also* JCCC, 23:50-24:19 (claim 58: requiring only that modulation occur indirectly or directly "responsively to" the digital output bits).

This agnosticism about how the modulator is driven is not a flaw in the claims, but simply an indication that the claims here are directed instead to different novel aspects of the shared specification. In particular, the Asserted Claims here are primarily directed to various inventive specifics of the digital-to-digital mapping elements—the novelty of which Cisco tested and Ramot

---

[20] The Federal Circuit has "held that a limitation requiring a 'plurality' may be satisfied by a single object." *See, e.g.*, *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1309 (Fed. Cir. 2007 (*citing Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1335 (Fed. Cir. 2001).

demonstrated to the PTAB, leading to all challenged claims being upheld in IPR2022-00575 ('872 Patent claims 1, 15), IPR2022-00576 ('872 Patent claims 13, 23), and IPR2022-01283 ('998 Patent). Notably, those three proceedings went all the way through Board trials without any statements by Ramot that Cisco could cite in its Response as alleged disclaimers—even though in all three IPRs Cisco relied on two references that disclosed driving a modulator through a digital-to-analog converter.[21]  *See, e.g.*, JCCR (showing Figure 2 of *Roberts* and Figure 6 of *Taraschuk*):



If the "whole invention" of Ramot's twelve-patent family were limited to not using DACs, then Ramot could have defeated these three IPRs with the disclaimer Cisco is now seeking to import.  That Ramot did not do so—because the Asserted Claims absolutely do encompass various driving schemes including the use of DACs—should be dispositive here.

Cisco makes little to no effort to compare the claims on the modulator-driving elements that are the subject of its alleged disclaimers—providing two sentences and an oddly highlighted chart of some of them.  This cannot meet the "substantially the same" limitation requirement for

---

[21] Unlike Ramot, Cisco is not subject to prosecution disclaimer and has taken inconsistent positions before the Board and the district courts—such as by asserting that DAC based prior art invalidates claims that it now says exclude the use of DACs.  But district courts don't have to credit these inconsistent arguments.  *See, e.g.*, 2019 Texas Litigation, D.I. 83 (Appx. Ex. 1) at 23-24 ("Defendant's explanation of the inconsistency between its position before the PTAB and its position before the Court is not credible").

finding disclaimer. *See Regents,* 717 F.3d at 944-45. As discussed in Ramot's Opening, disclaimer was found by Judge Gilstrap for one claim of the '465 Patent—after concluding that the specification alone did not limit the claim. The chart below makes the material differences discussed above plain:

| Claim | Language re: modulator | Determination |
|-------|------------------------|---------------|
| '465, cl. 1 | ***driving at least M electrodes*** of the optical modulator | Construed as disclaimed to "directly driving" |
| '535, cl. 1, 2 | coupling the M drive voltage values to the unmodulated optical signal | Not construed, MSJ stayed |
| '998, cl. 1 | a set of M digital output data bits associated with a plurality of voltage values; wherein the input optical signal is modulated based on the plurality of voltage values | |
| '998, cl. 45 | a set of M output bits corresponding to a set of voltage values; … modulated based on at least a subset of the set of voltage values | |
| '998, cl. 58 | modulating the input optical signal responsively to the M digital output data bits | |
| '872, cl. 1, 15 | M digital output data bits associated with M drive voltage values, and providing the M drive voltage values to the modulator for the modulating | |
| '872, cl. 13, 23 | digital output associated with M drive voltages | |

### 2. The alleged disclaimers do not concern the "converting" limitation.

Unable to argue that the claim language above contains the same, or immaterially different, limitations as those elements alleged to be disclaimed—Cisco turns to arguing that every claim has a converting or mapping element—a true but truly irrelevant fact. None of the alleged disclaimer statements dealt with or limited the converting element of the '535 Patent. Cisco never explains its argument attempting to link alleged disclaimers about direct digital driving to the

converting step.  In section IV.B.3.a.iii of its Response, Cisco cites to some page numbers, but offers nothing to back its bare statement that there is some connection.  There is simply not a connection to the converting element, as the context of Ramot's preliminary IPR response makes clear.  *See* JCCG.

All of Cisco's alleged '535 Patent disclaimers relate to: 1) general description of the '535 Patent that refers to its discussion of advantages of the preferred digital drive embodiment (*see* JCCG, 3-4: "***could be*** directly driven," 32: "suitable for"); 2) arguments that the references wouldn't be put in an obviousness combination because they didn't use that preferred embodiment (*see id.*, 7-8, 61-66); or 3) arguments that the Board shouldn't institute because the references are similar to art already before the Examiner (*see id.,* 21-24, 30).

None of the statements directly distinguish over a reference—instead arguing non-obviousness *vis a vis* the teachings concerning the preferred embodiment of the '535 Patent. Ramot did not even dispute the "coupling the M drive voltage values to the unmodulated optical signal" elements of the '535 Patent claims in Cisco's IPR2020-00123.  And as for "converting," Ramot made a completely different, unrelated, distinction—one which, across four years of PTO proceedings, five different PTAB panels and Examiner crews in seven *ex parte* reexaminations ultimately endorsed—that Table 1 of *Roberts* doesn't show a digital-to-digital conversion because it is merely translating the same values from one digital representation format to another.  *See* JCCG, 51-57.

In short, the alleged disclaimer statements are related to how the modulator was driven in prior art references and in the preferred embodiment of the '535 Patent.  The argument was that because the prior art used analog driving techniques, like art already before the Examiner and unlike the '535 Patent preferred embodiment—a person of ordinary skill wouldn't have been

motivated to look at it.  As discussed above, whether this is enough to work a "clear and unmistakable" disclaimer of claim scope is a separate question—and Cisco has twice stayed cases before that could be decided.  But here the claims are different.  They don't contain the allegedly disclaimed modulator driving element language, and there is no connection or limitation to the digital-to-digital converting element.

And in the end, Cisco does not have any authority for its suggestion that a connection to an element *other than the one alleged to be limited in scope* would be relevant to the analysis.  Cisco's sole case cited here, this Court's *Vitaworks* decision, concerned "a process" being disclaimed to "a one-pot process," where the subsequent patent also included the same "a process" limitation, and so was also deemed disclaimed.  *Vitaworks IP, LLC v. Gianbia Nutritionals (NA), Inc.*, No. 19-2259-GBW, 2023 WL 356160, *6-7 (D. Del. Jan. 23, 2023).  When subsequently asked to rule on patent claims that were different with respect to allegedly disclaimed elements, this Court has declined to import disclaimers from prior patents.  *Acadia*, 2023 WL 8622111, *4.

### 3.    The alleged disclaimers do not concern Ramot's "invention as a whole"

Again, Ramot's patent family includes twelve issued patents, of which two—the '872 and '998 Patents, are asserted here.  As shown in the chart above, seven independent claims are asserted here, containing five variations on claim language relating to driving modulators.  The earlier '535 Patent includes two claims, identical in relevant part to each other but different from those asserted here.

All of Cisco's alleged disclaimer statements refer to the '535 Patent, explicitly, with the broadest language being one reference to: "the invention of the '535 Patent," which "achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead directly driving the modulator with digital signal vectors."  Excerpted out of context

in Cisco's Response, this may look bad, because it seems to lack qualifying reference to this being only a *preferred* embodiment, or to there being any *other* inventive aspects to the '535 Patent. Of course, in context, the full statement ***has both of those things***. JCCG, 34 (emphases added):

> Accordingly, the invention of the '535 Patent achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead directly driving the modulator with digital signal vectors and using the optical modulator itself to effect a faster digital-to-analog conversion. *See, e.g.*, EX1001, 15:16-18 ("The application of the electrical signals is ***preferably*** directly upon the modulator without any mediating circuits, referred to herein as 'Direct Digital Driving'"). ***The claimed techniques also more efficiently correct*** for the known problem of non-linear response in optical modulators operated at high transmission speeds—***by the novel digital-to-digital mapping of the challenged claims***. *See, e.g.*, *id.*, 7:33-66.

Ramot's references to direct driving as a preferred solution, an advantage, or as an example or option, do not disclaim the '535 Patent "invention as a whole"—and its references to *other* novel aspects such as the digital-to-digital mapping elements further confirm this. *Id.*; *see also id.*, 7 ("such as by"), 8 (the advantage of"), 37-38 ("enables" correction without need for "employing"). Further, Cisco confusingly includes references to discussion of, *e.g.*, "analog … signal conditioning," which is a separate aspect of the prior art. *Id.,* 61.

And as above, in the end, Cisco does not cite to any authority that would apply a disclaimer—explicitly limited to "the '535 Patent" and its claims, as the alleged disclaimers here are—to an entire family containing claims that are materially different in relevant ways. *See, e.g.*, *id.,* 7 ("The '535 Patent discloses and claims …"). In *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314-15 (Fed. Cir. 2007), the only cited case actually applying the "as a whole" exception, the statements were made in an Office Action directly overcoming prior art, and included phrases like "[t]he present invention of applicants…" and "[i]n applicants' overall method … ." There, "[n]one of the prior statements in the Response were limited to particular claims." *Id.,* 1315. That court also declined to apply, and reversed the district court for applying, the disclaimers to *other*

*claims that were materially different. Id.,* 1317.

Here, the alleged disclaimers are, at most, limited by their own text to "the '535 Patent" and its two claims. The '872 Patent and '998 Patent Asserted Claims here are all materially different from the ones Cisco alleges were disclaimed. Cisco has not shown that any alleged disclaimer applies to the materially different claims here. And Cisco has failed to address the numerous cases cited by Ramot, including from this district and this Court, that refuse to apply disclaimers from prior family prosecutions to materially different claims such as these. Cisco's proposed additional claim elements should not be tacked on to these claims, for all of the reasons given in Ramot's Opening Position and herein.

### 4.    The specification does not limit the claims.

At the end of its Response, Cisco adds a section titled "The Specification" in which it concludes with the assertion: "These [specification] statements limit the claim scope."

As noted in Ramot's Opening, this violates basic principles of claim construction and directly invites error. *See, e.g.*, *Liebel-Flarsheim*, 358 F.3d at 913 ("it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment"); *Phillips*, 415 F.3d at 1320  (en banc) ("one of the cardinal sins of patent law").

This argument also ignores the fact that Judge Gilstrap correctly found four years ago that the embodiments and disclosures of the specification alone did not limit the claims of the '465 Patent to direct driving "without any mediating circuits." 2019 Texas Action, D.I. 83 (Appx. Ex. 1) at 27 ("***not definitional of the claimed invention***"). This finding—that statements about the advantages of the preferred embodiment were not "not definitional of the claimed invention" of the '465 Patent—may have motivated Cisco to focus instead on the '535 Patent in its Response. But Cisco offers no analysis of the different claim language of the '872 Patent or '998 Patent here that

60

would suggest a different conclusion. The specification statements here are not definitional of the claimed inventions here.

And Cisco also fails to account for the tension between Judge Gilstrap's finding—that specification statements about the preferred embodiment are "not definitional of the claimed invention"—and Cisco's argument that somehow the same or similar statements are definitional of "the invention as a whole" when made in a preliminary response to a non-instituted IPR. They weren't and aren't definitional in either context.

As shown above, Cisco's assertion that "all embodiments directly drive the electrodes" is just wrong. Disclosed embodiments discuss driving "multiple actuating voltage levels" and/or using only pluralities or subsets of the voltage values "associated with" the digital output of the mapping—all of which would call for mediating circuitry such as digital to analog converters or linear drivers. *See, e.g.*, JCCC, 8:23-31.

In sum, Cisco has failed to show disclaimer relevant to the claims here, and its proposed limitations should not be grafted onto them.

### D.    Cisco's Sur-Reply Position

#### 1.    Ramot's Opening Points Are Irrelevant

First, Ramot trumpets that Cisco did not cite the prosecution of the Asserted Patents. Correct; that is why Cisco relies on the law for carrying forward disclaimers from familial patent prosecutions. Ramot then argues that "[i]f the whole invention of Ramot's twelve-patent family were limited to not using DACs, then Ramot **could have defeated these three IPRs** with the disclaimer Cisco is now seeking to import." Joint Br., 55. Ramot's argument ignores that while the IPR art disclosed both analog and digital modulators, the petitions applied the art's multi-electrode ***digitally-driven*** modulators:



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶ 155.**

Appx. Ex. 4, 48; Appx. Ex. 5, 41.[22]    Thus, the IPRs align with the scope of the patents as disclaimed.

Second, Ramot argues its disclaimers "were not the basis for any decision by the Board." Joint Br., 50.  Even if true—which it is not—this is irrelevant.  *Microsoft v. Multi-Tech Sys*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) ("[P]atentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation.").

Third, Ramot is wrong that Cisco seeks an "advisory opinion" in view of the 2019 Texas Action.  Judge Gilstrap stayed that case before issuing a decision on the referenced summary judgment motion.  Cisco's constructions would resolve the cases before this Court for the vast majority of accused products.

Likewise, the earlier Texas *Markman* Order fully supports Cisco.  Ramot's table at page 12 omits the key bolded language for the '465 Patent:  "driving at least M electrodes of the optical

---

[22] Ramot argues Cisco was inconsistent "by asserting that DAC based prior art invalidates claims that it now say excludes the use of DACs." Joint Br., 55, n.21.  There is no inconsistency. The IPR Petitions applied digital modulator teachings from the IPR art.  And the Texas Court's comment regarding "inconsistency" related to a "pulse modulation" limitation not at issue here. 2019 Texas Litigation (Appx. Ex. 1), 24.

modulator . . . **responsively to the M voltage values**".  2019 Texas Litigation (Appx. Ex. 1) at 24.   Like here, Ramot's argument was that the word "responsively" was broad enough to encompass *indirectly* driving the electrodes with the output of the converting/mapping (i.e., "responsively to …"). Similar to what Cisco seeks here, Judge Gilstrap found disclaimer and limited the claim to direct driving:  "While the '465 Patent itself supports a plain and ordinary meaning of 'driving at least M electrodes of the optical modulator … responsively to the M voltage values,' Plaintiff's representation to the PTAB in IPR of the '465 Patent requires a narrower meaning."  *Id.*, 28.

### 2.    Ramot's IPR Disclaimers Apply For Two Independent Reasons

#### a.    Ramot's IPR Disclaimers Were Directed to the Invention as a Whole

Ramot argues it used the phrase "the invention" once.  There is no rule that *each* sentence must use that phrase to satisfy the invention-as-a-whole standard.  *Microsoft*, 357 F.3d at 1349 (invoking invention-as-a-whole disclaimer because "Multi–Tech's statement was expressly directed to the 'communications system' disclosed 'in the specification.'").  In *Microsoft*, the applicant—like Ramot—interchangeably referred to the specification and "the invention".  And "once" is still enough.  Ramot acknowledges the POPR statement "may look bad," but then tries to downplay the disclaimer by retreating to the next POPR sentence that cites a specification quote with the word "preferably."  That fails for two reasons.

First, Ramot cites no law that its statement regarding "the invention" is any less binding because the next sentence cites a specification example.  The point of prosecution disclaimer is that *even if* the specification would not have limited the claims, the applicant is bound by its disclaimer.  *TMC Fuel Injection Sys., LLC v. Ford Motor Co.*, 682 F. App'x 895, 899 (Fed. Cir. 2017) ("[E]ven if there is claim language that might have otherwise left open the option of using

pressure regulators in the claimed fuel systems, TMC's statements during prosecution definitively closed that door. This is precisely the point of prosecution disclaimer.").  Ramot's statement—characterizing "the invention of the '535 Patent" as not using DACs, "instead directly driving the modulator with digital signal vectors"—cannot be undone, regardless of whether Ramot needed to say it.  *Tech. Props. Ltd. v. Huawei Techs.*, 849 F.3d 1349, 1359 (Fed. Cir. 2017) ("[S]cope of surrender is not limited to what is absolutely necessary to avoid a prior art reference . . . [W]e hold patentees to the actual arguments made, not the arguments that could have been made.").

Second, Ramot repeatedly made broad characterizations about the disclosed invention, disparaging what it now attempts to capture, such as:

- "generating analog 'pre-programmed voltages' at the output of a digital-to-analog converter … [is a] known approach that is **explicitly distinguished as undesirable** by the '535 Patent." JCCG, 63-64.

- "both the '535 Patent and Petitioner's cited *Roberts* art teach away from and disparage solutions such as *Burchfiel*'s that use DAC circuits as electrode drivers. For example, the '535 Patent discusses the advantage of operating 'without any mediating [DAC] circuits.'" JCCG, 8.

This is why Ramot cannot ignore the rest of its statements.  *Microsoft*, 357 F.3d at 1349.

Ramot's other point about its "the invention" statement—that Ramot "***also***" made other distinctions about the claimed mapping technique two sentences later—is irrelevant.  *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("An applicant's invocation of multiple grounds for distinguishing a prior art reference does not immunize each of them from being used to construe the claim language.").

### b.    The Claims Share the Same Subject Matter

#### i.    "converting"/"mapping"

Cisco detailed why the disclaimers are linked to the converting/mapping limitations, with many examples.  Joint Br., 40-43.

The Reply ignores that Ramot's arguments were not based on the specific wording of "mapping" elements. The POPR twice noted that "[t]he term 'converting,' [] is used in the '535 Patent interchangeably with 'mapping,' . . . ." (JCCG, 39-40, 41), and represented that the specific formulation of the claim element is irrelevant:

> Whether explicitly included in the claim language (as in the '417 application), or incorporated therein through the definition of "converting" given in the patent (as in the challenged claims), the meaning and effect of these disclosures is consistent and clear.

*Id.*, 44.

### ii.    Ramot Cannot Show "Material Differences"

#### a)  There are no analog-drive embodiments

Ramot insists the Asserted Claims, unlike the claims subject to Ramot's disclaimers, are "directed to specification embodiments of ***indirect*** (e.g., analog) driving of modulator electrodes." Joint Br., 51-52. Neither the specification nor the Asserted Claims use the word "indirect" to describe how the modulator's electrodes are driven. Indeed, the specification discloses *no* embodiments of an analog-driven modulator (*i.e.*, an analog drive signal from a DAC).

The only specification support Ramot musters is a reference to "multiple actuation voltage levels" in the following passage:

> Where uniqueness of the output values is required, or where a higher degree of linearity is needed, further modification may be required. Various forms of further modification may be employed including, but not limited to: **use of multiple actuating voltage levels**; use of modified electrode lengths; and addition of additional electrodes (i.e., M>N). These different options will be discussed below.

> One option for further modification of the output is to modify the actuating voltage applied to each electrode, such as by switching between different distinct voltage levels.

JCCC, 8:21-31 (emphasis added). But this passage describes a "further modification" of the 4-electrode digital modulator of the preceding paragraphs, which uses an "electrode actuating device" that performs "digital-to-digital mapping to generate the output of FIG. 2B." *Id.,* 7:66-

67.[23] Then, the passage recites the hallmarks of a digital modulator. The modulator has "multiple" electrodes (i.e., "the actuating voltage applied **to each electrode**"). And the drive voltages are described in digital (i.e., binary) terms: "**switching between** … **distinct** voltage levels". This is not an analog range, but a binary choice "between" voltages.

The "modification" is to fine-tune control of the digital modulator by using a different digital drive voltage on each electrode ("modify the actuating voltage applied to each electrode"). An example would be switching between 0V (logical "0"/off signal) and **5V** (logical "1"/on signal) on one electrode, but between 0V and **5.1V** on a second electrode. For Ramot to be correct—and for this modulator to instead drive the electrode with an analog signal—there would first have to be a **digital-to-analog** converter (DAC) before the drive signal,[24] but there is only a "**digital-to-digital** mapping." *Id.*, 7:66-67.

### b) There Are No "Material Differences"

The use of slightly different claim language does not mean the claims are directed to different subject matter. *Ormco*, 498 F.3d at 1314; *Vitaworks*, 2023 WL 356160, *7.

Ramot argues that the differences are "material" because claim 1 hypothetically could apply to an analog modulator using "one … voltage value" and "one … electrode". Joint Br., 54. Wrong. The claim defines the output of the mapping as a *plurality* of voltage values: "maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values". JCCC, 17:33-34. These "plurality of voltage values" drive the corresponding plural electrodes. *See, e.g.,* FIGS. 1, 8, 9 and 10. "Plurality" does not mean "one or more"—it

---

[23] Figure 2B illustrates the response of a digital modulator. JCCC, 5:63-68.
[24] This is the point of the IPR Expert Declaration that Ramot cites (Joint Br., 52), but there are no DACs and no analog single electrode modulators in the specification.

means "more than one."[25]  Regardless, Ramot would be wrong because a modulator that had just one voltage value and one electrode would be a very basic *digital* modulator without converting/mapping.  It could represent a single bit at a time by switching its single voltage value on ("1") or off ("0").[26]

Ramot also distinguishes the Asserted Claims as reflecting "agnosticism about how the modulator is driven."  Joint Br., 54.  But mere agnostic claim language—as opposed to claim language expressly precluding application of the disclaimer—does not bar application of the disclaimer.  *See Acadia*, 2023 WL 8622111, *3-4 (claims *expressly* allowed "pharmaceutically acceptable expedients", which would have been precluded by the proposed disclaimer).

### 3.    The Specification

Cisco's point with respect to the specification is that—at a minimum—the specification supports Cisco's constructions when considered together with the IPR statements.  Joint Br., 46-47.

---

[25] *Verizon* did not construe the claim term "plurality" as "one or more." The Court construed "localized wireless gateway system" and commented that in connection with the *specification's* description of that system including "a plurality of base station transceivers" that "a limitation requiring a 'plurality' may be satisfied by a single object'".  *Verizon*, 503 F.3d at 1308-09.

[26] Ramot is wrong if it suggests that M voltage values means an analog drive signal with M different drive voltage levels.  Joint Br., 54.  A DAC converting an M-bit digital word provides an analog signal having $2^M$ values, not M values (e.g., a 4-bit digital signal can represent 16 ($2^4$) not 4 different values).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Plaintiff*

OF COUNSEL:

L. Norwood Jameson
Matthew C. Gaudet
Sajid Saleem
Daniel Mitchell
DUANE MORRIS LLP
1075 Peachtree Street NE, Suite 1700
Atlanta, GA 30309-3929
(404) 253-6900

Joseph A. Powers
Aleksander J. Goranin
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196
(215) 979-1000

Holly E. Engelmann, P.C.
DUANE MORRIS LLP
Terrace 7
2801 Via Fortuna, Suite 200
Austin, TX 78746-7567
(214) 257-7226

July 18, 2024

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____

John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant*

OF COUNSEL:

Denise De Mory
Corey Johanningmeier
BUNSOW DE MORY LLP
701 El Camino Real
Redwood City, CA 94063
(650) 351-7248