IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CISCO SYSTEMS, INC. and<br>ACACIA COMMUNICATIONS, INC., | ) ) ) | |
| Plaintiffs, | ) ) ) | C. A. No. 21-1365 (GBW) |
| v. | ) ) | |
| RAMOT AT TEL AVIV UNIVERSITY LTD., | ) ) ) | |
| Defendant. | ) | |
| CISCO SYSTEMS, INC. and<br>ACACIA COMMUNICATIONS, INC., | ) ) ) | |
| Plaintiffs, | ) ) ) | C. A. No. 22-674 (GBW)<br>(Consolidated) |
| v. | ) ) | |
| RAMOT AT TEL AVIV UNIVERSITY LTD., | ) ) ) | |
| Defendant. | ) | |

## APPENDIX IN SUPPORT OF JOINT CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Plaintiffs*

*Attorneys for Defendant*

July 18, 2024

| Exhibit | Description |
|---------|-------------|
| 1 | Claim Construction Memorandum Opinion and Order, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, C.A No. 2:19-cv-00225-JRG dated May 15, 2020 (D.I. 83) |
| 2 | U.S. Patent No. 10,033,465 (Ehrlichman et al.) |
| 3 | U.S. Patent No. 10,270,535 (Ehrlichman et al.) |
| 4 | Petition for *Inter Partes* Review Under 35 U.S.C. § 312 and 37 C.F.R. § 42.104, IPR 2022-00575 (Feb. 16, 2022) |
| 5 | Petition for *Inter Partes* Review Under 35 U.S.C. § 312 and 37 C.F.R. § 42.104, IPR 2022-01283 (July 20, 2022) |

EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| RAMOT AT TEL AVIV UNIVERSITY LTD., | |
| *Plaintiff,* | |
| v. | Case No. 2:19-cv-00225-JRG |
| CISCO SYSTEMS, INC., | |
| *Defendant.* | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

Before the Court is the opening claim construction brief of Ramot at Tel Aviv University Ltd. ("Plaintiff") (Dkt. No. 66, filed on April 7, 2020),[1] the response of Cisco Systems, Inc. ("Defendant") (Dkt. No. 71, filed on April 21, 2020), and Plaintiff's reply ( Dkt. No. 74, filed on April 28, 2020). The Court held a hearing on the issues of claim construction and claim definiteness on May 11, 2020. Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, the Court issues this Order.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

**Table of Contents**

I.      BACKGROUND ........................................................................................ 3

II.     LEGAL PRINCIPLES ............................................................................. 4

        A.      Claim Construction ..................................................................... 4

        B.      Departing from the Ordinary Meaning of a Claim Term ....................................... 7

III.    AGREED CONSTRUCTIONS ................................................................. 9

IV.     CONSTRUCTION OF DISPUTED TERMS ............................................. 9

        A.      "mapping" and "converting" ...................................................... 9

        B.      "pulse modulated" ........................................................................ 20

        C.      "driving at least M electrodes of the optical modulator … responsively to
                the M voltage values" ........................................................... 24

V.      CONCLUSION ...................................................................................... 30

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 3 of 269 PageID #:
2229
Case 2:19-cv-00225-JRG   Document 83   Filed 05/18/20   Page 3 of 32 PageID #: 2059

## I.     BACKGROUND

Plaintiff alleges infringement of three U.S. Patents: No. 10,033,465 (the "'465 Patent"),

No. 10,270,535 (the "'535 Patent"), and 10,461,866 (the "'866 Patent") (collectively, the

"Asserted Patents"). The Asserted Patents are related to each other through continuation

applications and each lists an earliest priority claim to an application filed on June 13, 2007.

In general, the Asserted Patents are directed to technology for modifying the response of an

optical modulator from its natural response to a different response.

The abstracts of the '465 and '535 Patents are identical and provide:

> A system for converting digital data into a modulated optical signal, comprises an
> electrically controllable device having M actuating electrodes. The device provides
> an optical signal that is modulated in response to binary voltages applied to the
> actuating electrodes. The system also comprises a digital-to-digital converter that
> provides a mapping of input data words to binary actuation vectors of M bits and
> supplies the binary actuation vectors as M bits of binary actuation voltages to the
> M actuating electrodes, where M is larger than the number of bits in each input data
> word. The digital-to-digital converter is enabled to map each digital input data word
> to a binary actuation vector by selecting a binary actuation vector from a subset of
> binary actuation vectors available to represent each of the input data words.

The abstract of the '866 Patent provides:

> In a modulation system that modulates and transmits an optical signal over at least
> one optical fiber in response to an input digital data word of N bits, there is an input
> enabled for receiving the digital data word; an electrically controllable modulator
> having one or more waveguide branches, where each branch receives an input of
> an unmodulated optical signal; and a digital to digital converter enabled for
> converting the N bits to a digital drive vector corresponding to M drive voltage
> values, where M>N and N>1. The electrically controllable modulator couples the
> drive voltage values to the unmodulated optical signal(s). The coupling enables
> pulse modulation of the unmodulated optical signal(s) thereby generating pulse
> modulated optical signal(s). The electrically controllable modulator outputs the
> pulse modulated optical signal(s) to one or more outputs that are enabled for
> transmitting the pulse modulated optical signal(s) over at least one optical fiber.

Claim 1 of the '465 Patent, Claim 1 of the '535 Patent, and Claim 7 of the '866 Patent,

exemplary asserted claims, recite as follows (with disputed terms emphasized):

3

**'465 Patent Claim 1**. A method for converting digital electrical data into modulated optical streams, said method comprising

    inputting into an optical modulator N bits of digital data in parallel, N being larger than 1;

    ***mapping*** a set of N input values corresponding to said N bits of digital data to a vector of M voltage values where M is equal to or larger than N;

    ***driving at least M electrodes of the optical modulator, enabled to pulse modulate at least an input optical stream, responsively to the M voltage values***, to provide at least a ***pulse modulated*** output optical stream.

**'535 Patent Claim 1**. A method of modulating and transmitting an optical signal over an optical fiber in response to N bits of digital data in parallel, the method comprising:

    inputting the N bits of digital data into an optical modulator having a plurality of waveguide branches, where each branch has an input of an unmodulated optical signal;

    ***converting*** the N bits of digital data to M drive voltage values, where M>N and N>1;

    coupling the M drive voltage values to the unmodulated optical signal, said coupling enabling pulse modulation of the unmodulated optical signal, thereby generating a pulse modulated optical signal; and transmitting the ***pulse modulated*** optical signals over an optical fiber.

**'866 Patent Claim 7**. A method for converting digital electrical data into one or more modulated optical streams using a modulation system, said method comprising:

    inputting into a digital to digital converter coupled to an electrically controllable optical modulator N bits of a digital data word, N being larger than 1;

    using the digital to digital converter for mapping a set of N input values corresponding to the N bits of digital data word to a digital drive vector corresponding to M drive voltage values where M is larger than N;

    coupling the drive voltage values corresponding to the digital drive vector to the electrically controllable optical modulator, enabled to modulate by pulse modulation one or more unmodulated input optical signals, responsively to the drive voltage values, to provide one or more ***pulse modulated*** output optical signals.

## II.    LEGAL PRINCIPLES

### A.    Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard,* 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

6

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

**B.      Departing from the Ordinary Meaning of a Claim Term**

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the

specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

8

## III.    AGREED CONSTRUCTIONS

The parties have agreed to the following constructions set forth in their P.R. 4-5(d) Joint Claim

Construction Chart ( Dkt. No. 75).

| Term[3] | Agreed Construction |
|---|---|
| "modulator"<br><br>• '465 Patent Claims 1, 4<br>• '535 Patent Claims 1, 2<br>• '866 Patent Claims 7, 19 | any device which outputs an optical signal with controlled variation of intensity, whether the variation is induced during production of the signal (such as in a semiconductor laser) or whether a signal input from another source is modified |
| "electrode"<br><br>• '465 Patent Claims 1, 4 | the electrical connections of an optical modulator device through which the device is controlled |
| "digital to digital converter"<br><br>• '866 Patent Claims 7, 19 | a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical |

Having reviewed the intrinsic and extrinsic evidence of record, the Court hereby adopts the

parties' agreed constructions.

## IV.    CONSTRUCTION OF DISPUTED TERMS

### A.    "mapping" and "converting"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "mapping"<br><br>• '465 Patent Claims 1, 4 | converting a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical | choosing a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs to produce a desired response by the modulator for the given input |

---

[3] For all term charts in this order, the claims in which the term is found are listed with the term but: (1) only the highest-level claim in each dependency chain is listed, and (2) only asserted claims identified in the parties' P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 75) are listed.

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "converting"<br><br>• '535 Patent Claims 1, 2 | mapping a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical | choosing a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs to produce a desired response by the modulator for the given input |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### **The Parties' Positions**

Plaintiff submits: The terms "mapping" and "converting" are used synonymously in the Asserted Patents to refer to the inventor-defined function of the inventor-defined "digital-to-digital converter," namely, "to refer to a digital-to-digital mapping or conversion that produces output values that are non-identical with the input values" (citing, *inter alia*, '465 Patent col.4 l.62 – col.5 l.3). "Mapping" and "converting" are used consistently throughout the Accused Patents in accord with this definition. Further, during prosecution of the '465 Patent (and related patents), Plaintiff equated the terms with the function of the digital-to-digital converter. Finally, Defendant's proposed construction improperly allows for the output to be identical to the input, and thus lacks any "mapping" or "converting" and would not serve the stated purpose of the invention, "improved linearity of response" (quoting '465 Patent col.2 ll.27–29). Dkt. No. 66 at 9–18.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '465 Patent, at [57] Abstract, figs. 1, 2A, 2B, 4, 8–10, col.2 ll.27–29, col.4 l.62 – col.5 l.3, col.5 ll.49–59, col.6 ll.5–9, col.7 ll.17–25, col.7 ll.33–67, col.11 l.20 – col.12 l.17, col.13 ll.23 – 31, col.13 ll.62–65, col.15 ll.16–22; '535 Patent col.4 l.62 – col.5 l.3; '866 Patent, at [57] Abstract, col.4 l.62 – col.5 l.4; '465 Patent File Wrapper October 20, 2016 Application at 27

(Plaintiff's Ex. 4, Dkt. No. 66-4 at 145–76, 171), August 14, 2017 Office Action (Plaintiff's Ex. 4, Dkt. No. 66-4 at 109–19), February 14, 2018 Response at 2, 7–8 (Plaintiff's Ex. 4, Dkt. No. 66-4 at 50–60, 51, 56–57); '417 Patent[4] File Wrapper January 30, 2015 Response at 2, 9 (Plaintiff's Ex. 5, Dkt. No. 66-5 at 40–57, 41, 48); '191 Patent[5] col.17 ll.4–24 (Plaintiff's Ex. 6, Dkt. No. 66-6).

Defendant responds: The terms "mapping" and "converting" are not defined in the Asserted Patents by association with the digital-to-digital converter. Rather, the Asserted Patents are aimed broadly at producing a desired modulator response for a given input. The "mapping" and "converting" processes do this by "choosing" a specific desired output for a specific input, such as through a lookup table associating inputs with outputs. Plaintiff confirmed this meaning in a recent IPR submission, where it characterized the '465 Patent as directed to methods "to derive the best approximated selection of output value for a given input value" and distinguished a prior-art reference for failing to teach "mapping by 'selecting a binary actuation vector' from among available output voltage vectors" (quoting IPR Preliminary Response[6] at 33, 56, Dkt. No. 71-2 at 40, 63). Further, Plaintiff's use of "set" and "values" in its proposed construction conflicts with the use of those terms in the claims, and therefore generates ambiguity. For example, the output of the mapping of '465 Patent Claim 1 has "M voltage values" based on an input of "N input values" while Plaintiff suggests that the inputs and outputs are themselves "values." Similarly, Plaintiff's use of "possible" in the claims conflicts with the claim language by suggesting the claimed

---

[4] U.S. Patent No. 9,031,417. The Asserted Patents are related to the '417 Patent through a series of continuation applications. *See, e.g.*, '465 Patent, at [63] Related U.S. Application Data.
[5] U.S. Patent No. 9,479,191. The Asserted Patents are to the '191 Patent through one or more continuation applications. *See, e.g.*, '465 Patent, at [63] Related U.S. Application Data.
[6] Patent Owner's Preliminary Response Under 37 C.F.R. §42.107, *Cisco Systems Inc. v. Ramot at Tel Aviv University Ltd.*, IPR2020-00122 ('465 Patent) (P.T.A.B. Feb. 18, 2020), Paper 9. This appears to be the same document submitted by Plaintiff as Exhibit 14, Dkt. No. 66-14.

mapping/converting works on "multiple possible" inputs and outputs when the claims recite mapping/converting a singular input (of N values) to a singular output (of M values). Finally, a situation in which the input and output are identical would "render[] the claimed mapping/converting unnecessary." Dkt. No. 71 at 5–18.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '465 Patent, at [57] Abstract, figs.1, 2A, 2B, 4, col.1 ll.56–64, col.3 ll.25–30, col.5 ll.49–54, col.7 ll.5–17, col.7 ll.21–25, col.7 ll.33–39, col.7 ll.45–55, col.8 ll.54–67, col.9 ll.47–56, col.11 ll.55–56; IPR Preliminary Response at 33, 35, 56 (Defendant's Ex. 2, Dkt. No. 71-2 at 40, 42, 63); '465 Patent File Wrapper February 14, 2018 Response at 2 (Defendant's Ex. 3, Dkt. No. 71-3 at 3).

Plaintiff replies: Including "values" as in Plaintiff's proposed construction poses no threat of confusion. While the individual elements of the input or output have "values" so to do the sets of possible inputs and outputs and "[a] person of ordinary skill would be familiar with binary bits and words and vectors and would have no trouble understanding these concepts or explaining them to a jury." Defendant fails to take a position on whether the claimed "mapping" and "converting" encompasses the situation where the set of possible outputs is identical to the set of possible inputs, and this should be clarified. Finally, the claimed "mapping"/"converting" is not limited to "choosing" but encompasses, for example, using an algorithm to determine the output based on the input. Dkt. No. 74 at 4–8.

Plaintiff cites further **intrinsic evidence** to support its position: '465 Patent col.2 ll.39–40, col.3 ll.48–55, col.5 ll.4–7, col.9 l.67 – col.10 l.1, col.10 ll.36–39, col.11 l.3 – col.12 l.62, col.16 l.1.

## Analysis

There appear to be three main issues in dispute. First, whether "mapping"/"converting" inputs to outputs necessarily requires a non-identical association between inputs and outputs. It does. Second, whether the "mapping"/"converting" necessarily proceeds by "choosing" from among a prepopulated set of possible outputs. It does not. Third, whether the output derived from the input is necessarily the "desired" output. While "mapping" and "converting" plainly involve a purposeful, non-identical transformation from input to output, the Court declines to read in a "desired" limitation that threatens to exclude less-than-ideal outputs and clarifies little.

The claims provide significant context that informs the meanings of "mapping" and "converting." For instance, Claim 1 of the '465 Patent recites:

> 1. A method for converting digital electrical data into modulated optical streams, said method comprising
> inputting into an optical modulator N bits of digital data in parallel, N being larger than 1;
> ***mapping a set of N input values corresponding to said N bits of digital data to a vector of M voltage values*** where M is equal to or larger than N;
> driving at least M electrodes of the optical modulator, enabled to pulse modulate at least an input optical stream, responsively to the M voltage values, to provide at least a pulse modulated output optical stream.

'465 Patent col.17 ll.4–14. This claim provides the input to the mapping, "a set of N input values corresponding to said N bits of digital data," and the output from the mapping, "a vector of M voltage values." Thus a specific input "set" is mapped to a specific output "vector." A plain reading of the claim suggests that Plaintiff's proposed "set of possible digital output values" language is superfluous or misleading. For example, is a vector necessarily a set? A plain reading of the claim also suggests that Plaintiff's proposed "possible" language is misplaced. For example, one might interpret Plaintiff's proposal as Claim 1 requiring an input set of sets (multiple inputs, each a set) and a output set of vectors (multiple outputs, each a vector). A requirement of multiple inputs and outputs is not supported by the claim language.

13

"Mapping" and "converting" are not defined in the Asserted Patents by association with the digital-to-digital converter, as Plaintiff posits. Specifically, the Accused Patents provide the following definition of "digital-to-digital converter":

> The phrase "digital-to-digital converter" is used to refer to a device which **_maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical_**. The "digital-to-digital converter" employed by certain embodiments of the present invention is a non-trivial converter in which there is typically not a one-to-one mapping between bits of the input data and bits of the output data, as will be clear from the description following.

'465 Patent col.4 l.62 – col.5 l.3 (emphasis added). The function here is a broad association of multiple possible inputs to multiple possible outputs. An example of such a broad association is provided in Figure 4 of the patents (reproduced here), which presents an "implementation of the digital-to-digital mapping." *Id.* at col.7 ll.58–66. This table associates a set of possible inputs ("DDC Input" column) with a set of possible outputs ("DDC Output" column). "[T]he input corresponds to the input data word and the output corresponds to the electrode actuation pattern for generating the outputs." *Id.* at col.6 ll.5–9. In other words, a singular input (an input data word) is associated with a singular output (an actuation pattern) through the table which includes multiple such associations. The "mapping" of Claim 1 of the '465 Patent, for example, uses a singular input (e.g., "0010") to create a singular output (e.g., "0100") with which to drive "at least M electrodes of the optical modulator." It does not refer to a

## FIG. 4

| DDC Input | DDC Output |
|-----------|------------|
| 0000 | 0000 |
| 0001 | 0011 |
| 0010 | 0100 |
| 0011 | 0101 |
| 0100 | 0101 |
| 0101 | 0110 |
| 0110 | 0111 |
| 0111 | 0111 |
| 1000 | 1000 |
| 1001 | 1001 |
| 1010 | 1001 |
| 1011 | 1010 |
| 1100 | 1011 |
| 1101 | 1011 |
| 1110 | 1100 |
| 1111 | 1101 |

Case 1:22-cv-00674-GBW   Document 83-1   Filed 07/08/24   Page 18 of 269 PageID #:
Case 2:19-cv-00225-JRG   Document 83-1   Filed 05/19/20   Page 18 of 32 PageID #: 2074
2241

generalized mapping scheme as depicted in Figure 4, and as contemplated in the definition of

"digital-to-digital converter," with which specific input-to-output mapping is accomplished.

The Asserted Patents elsewhere clarify that "mapping" and "converting" may be used to

denote the generation or selection of a singular output based on a singular input. For instance, the

patents provide:

> There is also provided according to the teachings of the present invention, a method
> for ***converting*** a digital data input word of N bits into an analog signal comprising:
> (a) ***processing the digital data input word to generate an electrode actuation
> vector of M values*** where M≥N; and (b) applying M voltage values corresponding
> to the actuation vector values to M actuating electrodes of an electrically
> controllable modulator for modulating the intensity of an optical signal, wherein at
> least one value of the actuation vector varies as a function of values of more than
> one bit of the input data word.

'465 Patent col.3 ll.48–58 (emphasis added). This passage refers to generating a singular output

("an electrode actuation vector of M values") using a singular input ("the digital data input word").

In another example, the patents provide:

> In the case described above of FIG. 1, a 4-bit Digital-to-Analog Converter, based
> on a Multi-Electrode (ME) Mach-Zehnder Interferometer, is presented. The input
> to the device consists of 4 bits. ***Using the Digital-to-Digital converter, which may
> be thought of as a look-up table***, the ***4 data bits are _mapped_ to 5 electrodes*** as this
> realization is equipped with a single excess electrode. According to one option, if
> an electrical rather than optical output is desired, the optical signal at the output is
> detected and converted to an electrical (analog) signal.

*Id.* at col.9 ll.47–56 (emphasis added). Again, this refers to selecting a singular output (values for

the "5 electrodes") based on a singular input (the "4 data bits"). Ultimately, the definition of

"digital-to-digital converter" defines the capability of that converter, namely, the broad mapping

(a scheme that associates each of multiple inputs with an output) that may be used to map an input

to an output, rather than defining "mapping" or "converting" which is used elsewhere in the

patents, including in the claims, in a slightly different sense.

15

The "mapping"/"converting" is not necessarily a "choosing." As the Court understands Defendant's proposed construction, the "mapping" or "converting" must necessarily proceed by selecting from among preexisting outputs such as listed in a lookup table. This type of "mapping"/"converting" is supported by the disclosure of the Asserted Patents. For example, as set forth above, the patents note the use of a lookup table like Figure 4. Further, the Accused Patents provide: "The digital-to-digital converter is enabled to map each digital input data word to a binary actuation vector ***by selecting a binary actuation vector from a subset of binary actuation vectors available*** to represent each of the input data words." '465 Patent, at [57] Abstract (emphasis added). The patents do not, however, mandate that all "mapping" or "converting" must be by selecting. For example, as set forth above, the patents specifically disclose "processing the digital data input word to ***generate*** an electrode actuation vector of M values." *Id*. at col.9 ll.47–56 (emphasis added). The patents explain how one might generate an actuation vector, $B_i$, based on an input, $D_i$:

> Let $D_i$ denote a digital binary input vector of length N, where i=l, ... , $2^N$. For each digital vector $D_i$, the DDC component in FIG. 1 ***produces*** a corresponding binary vector $B_i$, of length M. $B_i$ multiplied by v, represents the actual (internal) vector of voltages controlling the M electrodes.

*Id*. at col.10 ll.37–42 (emphasis added, ellipsis in original). Defining "$U_i$" as "the ideal analog value required for representing the digital input $D_i$," the patents teach that the actuation vector $B_i$ that corresponds to $D_i$ can be generated using the following equation, which defines the set of possible actuation vectors:

$$B_i = Dec2Bin_M(\frac{2}{\pi} \arccos (\sqrt{U_i})).$$

*Id*. at col.11 ll.33–40, col.12 ll.1–13. Thus, the patents contemplate that given an input, say $D_2$, it is possible to generate an output, $B_2$, other than by selecting it from a set of preexisting vectors, or "choosing" it, as Defendant posits.

16

As set forth in the Asserted Patents, the "mapping" or "converting" of input to output is more than simply equating the input and output for all possible inputs. To begin, it appears that the parties may not actually dispute this issue. For example, Defendant represents that if the set of possible outputs was identical to the set of possible input values, this would "render[] the claimed mapping/converting unnecessary." Dkt. No. 71 at 16–17. Further, the patents are directed to curing defects of driving a modulator with the input values, which corresponds to using an output that is necessarily the same as the input. *See, e.g.*, '465 Patent col.1 ll.50–64 (disparaging prior art in which a "serious problem is encountered due to the inherent ***non-linear response*** of the modulator"), col.2 ll.33–34 ("The present invention is a ***linearized*** optical digital-to-analog modulator."). The patents explain that the invention is broadly directed to transforming the response of a modulator from its "natural" response function to a "different" response function:

> Parenthetically, although the present invention is described herein in the context of a preferred example of linearization of a modulator device which inherently has a non-linear response, ***the principles of the present invention may equally be applied to any case where a natural response of a modulator provides a <u>first function</u> and a desired response is a <u>different second function</u>*** which may be linear or non-linear.

'465 Patent col.8 ll.54–61 (emphasis added). This encompasses transforming a non-linear response to something that is closer to a linear response. *See, e.g.*, *id.* at figs.2A–2B, col.7 ll.31–57 (noting that Figure 2A depicts the prior-art "marked deviation from linearity" and that Figure 2B depicts a mapping "according to the teachings of the present invention" in which the output "much more closely approximates to a linear response"). Indeed, this encompasses transforming the natural response to practically any form, as Defendant suggests. *Id.* at col.11 ll.51–58 ("the desired output response function itself may take any desired form"). The invention, however, is directed to transforming the natural response of the modulator to a different response; thus, the mapping/converting set of possible outputs (which may be preexisting or calculable) is necessarily

17

different in some respect from the set of possible inputs—the set of possible outputs is not identical to the set of possible inputs.

Plaintiff's IPR argument notes that the "mapping" of the claims is based on a set of possible outputs that is not identical to the set of possible inputs, but does not restrict the "mapping" or "converting" to "choosing." For example, Plaintiff submitted the following to the PTAB:

> The digital-to-digital mapping of inputs to different output values is a key mechanism taught and claimed in the '465 Patent for achieving the invented improvements in linearity or other signal characteristics. *See, e.g.,* EX1001, 7:17-66, Figs. 4, 2A & 2B. *Roberts* Table **1** does nothing to accomplish this inventive purpose, because the input values and output *values* are identical.
>
> *Roberts* Table **1** merely discloses an identical, one-to-one translation between binary formats. *See also* EX2002, ¶39. As such, it does not teach or suggest "that a binary input data vector $D_i$ has to be mapped to a control vector Bi, yet $B_i \neq D_i$." (EX1001, 11:25-27), or teach or suggest mapping by "selecting a binary actuation vector" from among available output voltage vectors *(id.,* Abstract), or teach or suggest "a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical *(id.,* 4:62-65). In fact, because it teaches only a table in which the values represented by the sets on the left are identical to the values represented by the vectors on the right, *Roberts* Table **1** arguably teaches away from the '465 Patent solution. But in any case, *Roberts* Table **1** does not teach or suggest the "mapping" of the challenged claims.

IPR Preliminary Response at 56 (emphasis in original), Dkt. No. 71-2 at 63. While this clearly sets forth that "mapping" in the patents is not a simple identity of input and output, this does not rise to the exacting standard required to limit "mapping" to "choosing."

Finally, the Court declines to include Defendant's proposed "desired" limitation. The Court recognizes that the Asserted Patents use "desired" to refer to the output of the mapping/converting process that transforms the natural response of the modulator to a different response. *See, e.g.*, '465 Patent col.8 ll.54–61 ("the principles of the present invention may equally be applied to any case where a natural response of a modulator provides a first function and a ***desired*** response is a different second function"). The patents also note that the "ideal" response is the "desired"

18

response. *See, e.g., id.* at col.7 ll.21–25 ("choose the electrode actuation pattern which best approximates a ***desired ideal*** output for the given input" (emphasis added)), col.7 ll.49–50 ("By way of example, in FIG. 2A, it will be noted that output point 22 corresponding to an input of 0011 is higher than ***desired*** for the ***ideal*** linear response." (emphasis added)). It is clear, however, that the invention is not limited to achieving the "ideal" response but rather is aimed at purposefully changing the response, even if the ideal is not reached. *See, e.g., id.* at col.7 ll.54–57 ("An output pattern of 0101 is thus chosen [according to the invention] to correspond to an input of 0011. The overall result is an output which much ***more closely approximates*** to a linear response as shown." (emphasis added)), col.8 ll.14–15 ("where a ***higher degree of linearity*** is needed, further modification may be required" (emphasis added)). Ultimately, including "desired" in a construction threatens to confuse, rather than clarify, claim scope.

Accordingly, the Court construes these terms as follows:

- "mapping" means "selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, where the set of possible digital outputs and the set of possible digital inputs are not identical" and

- "converting" means "selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, where the set of possible digital outputs and the set of possible digital inputs are not identical."

Case 1:23-cv-00675-GBW   Document 101   Filed 07/08/24   Page 23 of 269 PageID #:
2246
Case 2:19-cv-00225-JRG   Document 83-1   Filed 05/19/20   Page 20 of 32 PageID #: 2076

## B. "pulse modulated"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "pulse modulated"<br><br>• '465 Patent Claim 1<br>• '535 Patent Claim 1<br>• '866 Patent Claim 7, 19 | plain and ordinary meaning | return-to-zero format |

**<u>The Parties' Positions</u>**

Plaintiff submits: The customary meaning of "pulse modulated," as known in the art, is not limited to a "return-to-zero format." For example, under its customary meaning, "pulse modulated" encompasses both return-to-zero ("RZ") and non-return-to-zero ("NRZ") formats. Rather than defining "pulse modulated" as necessarily RZ format, the Asserted Patents expressly note that RZ format is "**a** pulsed modulation" (quoting '465 Patent col.16 ll.28–30, Plaintiff's emphasis). The patents also disclose NRZ format (citing *id*. at col.16 ll.24–42) and other forms of pulse modulation, such as "use of multiple actuating voltage levels" (quoting *id*. at col. ll.15–20). Further, related and incorporated patents expressly claim "return-to-zero," suggesting that such a limitation should not be read in when not recited, and expressly claim "Pulse Amplitude Modulation," which is typically not RZ format. Finally, in a copending IPR, Defendant proposed a plain-and-ordinary meaning construction of "pulse modulation" that would encompass "encoding of information by varying the basic characteristics of a sequence of pulses, such as width, duration, amplitude, phase or the number of pulses" (quoting IPR Petition[7] at 19–20, Dkt. No. 66-11 at 20–21). Dkt. No. 66 at 19–25.

---

[7] Petition For Inter Partes Review, *Cisco Systems Inc. v. Ramot at Tel Aviv University Ltd.*, IPR2020-00122 ('465 Patent) (P.T.A.B. Nov. 5, 2019), Paper 2.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '465 Patent figs.1, 10, col.1 ll.6–22, col.2 l.64 – col.3 l.8, col.8 ll.5–9, col.8 ll.15–20, col.13 ll.42–60, col.16 ll.24–42; '835 Patent[8] col.17 ll.9–18 (Plaintiff's Ex. 7, Dkt. No. 66-7); '417 Patent col.19 ll.21–23 (Plaintiff's Ex. 8, Dkt. No. 66-8); '425 Patent[9] col.17 ll.9–10 (Plaintiff's Ex. 9, Dkt. No. 66-9). **Extrinsic evidence**: Blumenthal IPR Decl.[10] ¶¶ 55, 60–61 (Plaintiff's Ex. 10, Dkt. No. 66-10); IPR Petition at 19–20 (Plaintiff's Ex. 11, Dkt. No. 66-11 at 20–21);[11] *IEEE 100 The Authoritative Dictionary of IEEE Standard Terms* at 891 (7th ed. 2000) (Plaintiff's Ex. 12, Dkt. No. 66-12 at 7).

Defendant responds: "[T]he specification only ever uses the term 'pulse modulated' to refer to signals in 'return-to-zero format.'" This is presented in the Asserted Patents as an improvement over NRZ format. Thus, the term should be construed as "return-to-zero format" since "that corresponds to the only disclosure of pulse modulation in the specification, and aligns with the allegedly inventive distinction over NRZ format." Further, recitation of "return-to-zero" format in a related-patent claim is irrelevant as that claim depends from one that is directed to modulation other than "pulse modulation." Similarly, recitation of "Pulse Amplitude Modulation" in a related-

---

[8] U.S. Patent No. 8,044,835. The Asserted Patents are related to the '835 Patent through a series of continuation applications. *See, e.g.*, '465 Patent, at [63] Related U.S. Application Data.

[9] U.S. Patent No. 9,203,425. The Asserted Patents are related to the '835 Patent through a series of continuation applications. *See, e.g.*, '465 Patent, at [63] Related U.S. Application Data.

[10] Declaration of Daniel Blumenthal, Under 37 C.F.R. § 1.68 In Support Of Petition For Inter Partes Review, *Cisco Systems Inc. v. Ramot at Tel Aviv University Ltd.*, IPR2020-00122 ('465 Patent) (P.T.A.B. Nov. 4, 2019), Exhibit 1003.

[11] The Court treats petitioner's submissions in an Inter Partes Review as extrinsic evidence because these submissions do not necessarily reflect the patent owner's or the PTO's understanding of the patent. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359–61 (Fed. Cir. 2017) (holding that "***statements made by a patent owner*** during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer" (emphasis added)); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc) ("Like the specification, the prosecution history provides evidence of ***how the PTO and the inventor understood the patent***." (emphasis added)).

patent claim is irrelevant as "that is not the term that is being construed here." Finally, Defendant's IPR plain-and-ordinary-meaning position is irrelevant since a construction "was not necessary to resolve the dispute in the IPRs." Dkt. No. 71 at 18–23.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '465 Patent figs. 1, 10, col.2 l.64 – col.3 l.9, col.8 ll.5–9, col.14 ll.8–14, col.14 ll.22–24, col.16 ll.24–41; International Publication No. WO 2008/152642[12] (Defendant's Ex. 6, Dkt. No. 71-6); '835 Patent (Defendant's Ex. 7, Dkt. No. 71-7).

Plaintiff replies: The Asserted Patents disclose both RZ and NRZ formats, and multiple pulse-modulation forms, including those that do not use RZ format. Even if the patents disclosed only RZ-format pulse modulation, that would not be enough to limit the claims to RZ format. Dkt. No. 74 at 8–10.

Plaintiff cites further **extrinsic evidence** to support its position: *IEEE 100 The Authoritative Dictionary of IEEE Standard Terms* at 886 (7th ed. 2000) (Plaintiff's Ex. 12, Dkt. No. 66-12 at 8).

### Analysis

The issue in dispute distills to whether "pulse modulated" has a special meaning in the Asserted Patents that differs from its customary meaning in the art. It does not.

Nothing Defendant identifies rises to the exacting standard required to alter the customary meaning of "pulse modulate" to "return-to-zero format." Indeed, the patents specify only that RZ format is "a" pulse modulation:

> A simple implementation of this embodiment described thus far generates Non-Return-to-Zero (NRZ) signals. NRZ permits constant intensity for similar

---

[12] The publication is of PCT Application No. IL/2008/000805, which is related to the Asserted Patents through a continuation-in-part application earlier than the Asserted Patents in the priority chain and through a common priority claim to a provisional application filed on June 13, 2007. *See, e.g.*, '465 Patent, at [63] Related U.S. Application Data; WO 2008/152642, [30] Priority Data, Dkt. No. 71-6 at 2.

> consecutive bits, and is thus more susceptible to Inter-Symbol-Interference and
> other nonlinear propagation distortions. ***Return-to-Zero (RZ) format is <u>a</u> pulsed
> modulation*** where the signal "returns to zero" after every bit. This format provides
> better performance than NRZ**,** but usually requires additional hardware, such as a
> pulse carver.

'465 Patent col.16 ll.24–32 (emphasis added). This is not lexicography. Further, even if the only

embodiment of pulse modulation disclosed in the patents is RZ format, that is not sufficient to

limit the customary meaning of the term. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d

1362, 1366 (Fed. Cir. 2012) ("It is likewise not enough that the only embodiments, or all of the

embodiments, contain a particular limitation. We do not read limitations from the specification

into claims; we do not redefine words. Only the patentee can do that."); *SRI Int'l v. Matsushita

Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) ("The law does not require the

impossible. Hence, it does not require that an applicant describe in his specification every

conceivable and possible future embodiment of his invention."). In fact, Defendant, in its IPR

petition, expressly recognized that "pulse modulation" has a broad customary meaning and is not

limited to RZ format in the patents:

> The specification of the '465 Patent provides little further guidance. The
> specification (in material added with the '805 continuation-in-part application)
> gives one example of a pulsed modulation: "Return-to-Zero (RZ) format is **a pulsed
> modulation** where the signal 'returns to zero' after every bit." Ex.1001, 16:28-30.
> ***Claim 1, however, does not refer specifically to an RZ pulse technique***. A POSITA
> would understand, therefore, that ***the term "pulse modulate" as claimed refers to
> the plain and ordinary meaning***. Ex.1003, ¶ 92.

> The plain and ordinary meaning of pulse modulation, as recognized by a POSITA,
> would include its dictionary definition: "The encoding of information by varying
> the basic characteristics of a sequence of pulses, such as width, duration, amplitude,
> phase or the number of pulses." Ex.1009, p. 891; Ex.1003, ¶ 93.

IPR Petition at 19–20 (bold emphasis in original, bold-italic emphasis added), Dkt. No. 66-11 at

20–21. Defendant's expert echoed this statement in his sworn Declaration:

> [T]he specification gives one example of a pulsed modulation: "Return-to-Zero
> (RZ) format is a pulsed modulation where the signal 'returns to zero' after every

bit." . . . However, the claim does not recite the specific example of an RZ pulse technique, thus leaving a POSITA to understand the term "pulse modulate" as claimed refers to the plain and ordinary meaning.

Blumenthal IPR Decl. ¶ 92, Dkt. No. 66-10 at 69.

Defendant's explanation of the inconsistency between its position before the PTAB and its position before the Court is not credible. Notably, Defendant did not simply argue to the PTAB that a construction of "pulse modulated" is unnecessary to resolve the invalidity dispute presented in the IPR. Rather, Defendant affirmatively presented "plain and ordinary meaning" as the proper construction, and even provided a dictionary definition that would be encompassed by the plain and ordinary meaning, which dictionary definition lacks any mention of "return to zero." Further, Defendant represented to the PTAB that—in the '465 Patent—the RZ format is simply "one example of a pulsed modulation." Finally, Defendant submitted studied and sworn expert testimony to the PTAB, with the expert testifying that "pulse modulate" has a customary meaning, as evinced by the dictionary definition, and that it is used according to this "plain and ordinary meaning" in the '465 Patent. Blumenthal IPR Decl. ¶¶ 4–5, 92–94, 222, Dkt. No. 66-10 at 6–8, 69, 136. Defendant's nose-of-wax approach to claim construction is not justified.

Accordingly, the Court rejects Defendant's proposed construction and determines that "pulse modulated" has its plain and ordinary meaning without the need for further construction.

### C.    "driving at least M electrodes of the optical modulator . . . responsively to the M voltage values"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "driving at least M electrodes of the optical modulator . . . responsively to the M voltage values"<br><br>• '465 Patent Claims 1, 4 | plain and ordinary meaning | directly applying the M voltage values to the M electrodes of the optical modulator |

**The Parties' Positions**

Plaintiff submits: The Asserted Patents describe an exemplary embodiment in which the electrodes are "directly" driven by the digital-to-digital converter, but this is labeled "Direct Digital Driving," not simply "driving" as recited in the claims. Thus, the claims are not limited to "direct" driving and allow for customary intervening driver circuitry such as scaling amplifiers or bias circuits. In fact, Defendant presented to the PTAB that the use of such driver circuits in the art is "normal." Dkt. No. 66 at 25–30.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '465 Patent col.1 l.64 – col.2 l.29, col.15 ll.10–12, col.15 l.65 – col.16 l.11, col.16 l.66 – col.17 l.2; IPR Preliminary Response[13] at 26–27 (Plaintiff's Ex. 14, Dkt. No. 66-14 at 33–34). **Extrinsic evidence**: *IEEE 100 The Authoritative Dictionary of IEEE Standard Terms* at 336 (7th ed. 2000) (Plaintiff's Ex. 13, Dkt. No. 66-13 at 4); IPR Petition at 28 (Plaintiff's Ex. 11, Dkt. No. 66-11 at 29); Blumenthal IPR Decl. ¶¶ 28–29, 111, 138 (Plaintiff's Ex. 10, Dkt. No. 66-10); U.S. Patent No. 7,277,604[14] ("*Roberts*") figs.1–2, col.1 l.64 – col.2 l.2 (Plaintiff's Ex. 15, Dkt. No. 66-15).

Defendant responds: As set forth in the claims, described in the patent, and explained by Plaintiff in an IPR, the claimed "driving" requires directly applying the M voltage values to the electrodes. The claims state "driving at least M electrodes . . . responsively to the M voltage

---

[13] Patent Owner's Preliminary Response Under 37 C.F.R. §42.107, *Cisco Systems Inc. v. Ramot at Tel Aviv University Ltd.*, IPR2020-00122 ('465 Patent) (P.T.A.B. Feb. 18, 2020), Paper 9.

[14] Plaintiff submitted a copy that Defendant submitted to the PTAB as Ex. 1005 to Defendant's IPR Petition. The Court lists this here as "extrinsic evidence" though it is part of the IPR record because it was there submitted by Defendant and the IPR is still in its preliminary phase. That said, it appears that *Roberts* is related through a divisional application to U.S. Patent Application Publication No. 2017/0212076 which is listed on the face of each of the Asserted Patents and is thus intrinsic evidence. *See, e.g.*, '465 Patent, at [56] References Cited; IPR Preliminary Response at 18–19, Dkt. No. 71-2 at 25–26.

values," which indicates that voltage values are used to drive the electrodes. "[E]very embodiment disclosed in the specification explains that the output of the DDC, vector B, is directly applied to electrodes." Further, "the only discussion of 'driving' anywhere in the specification" notes that "'application of the electrical signals is preferably directly upon the modulator without any mediating circuits'" (quoting '465 Patent col.15 ll.10–12). Finally, Plaintiff represented to the PTAB that "directly driving" the electrodes with the actuator vectors is an essential characteristic of the invention. Dkt. No. 71 at 23–31.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '465 Patent, at [57] Abstract, figs.1, 8, 10, col.3 ll.14–16, col.3 ll.48–58, col.7 ll.14–17, col.13 ll.20–22, col.15 ll.10–12; IPR Preliminary Response at 3, 7, 32–33, 61 (Defendant's Ex. 2, Dkt. No. 71-2 at 10, 14, 39–40, 68); '465 Patent File Wrapper February 14, 2018 Response at 7 (Defendant's Ex. 3, Dkt. No. 71-3 at 8).

Plaintiff replies: The claims require driving "responsively to" the M voltage values, which allows that the "voltage values are inputs to a driver circuit that drives the electrodes." Further, the Asserted Patents describe "'applying M *voltage values corresponding to the actuation vector values* to M actuating electrodes,'" which allows the customary use of "intervening driver circuitry to create the voltage values 'corresponding to' the binary actuation vector values" (quoting '465 Patent col.3 ll.48–62). Finally, the Plaintiff's IPR statements do not rise to a clear disclaimer of intervening driver circuitry. Dkt. No. 74 at 10–13.

Plaintiff cites further **intrinsic evidence** to support its position: '465 Patent col.3 ll.48–62; IPR Preliminary Response at 61–62 (Plaintiff's Ex. 14, Dkt. No. 66-14 at 68–69).

## Analysis

The issue in dispute distills to whether "driving" electrodes "responsively" to voltage values in the '465 Patent necessarily means "directly applying" the voltage values to the electrodes. While the patent's disclosure presents "application [of the voltages] directly upon the modulator without any mediating circuits" as a preferable, and therefore non-limiting, embodiment, Plaintiff represented to the PTAB that driving the voltages directly onto the electrodes is an essential attribute of the claimed invention. The Court holds Plaintiff to that representation.

The '465 Patent does not redefine "driving" electrodes "responsively" to a vector of voltages to require direct application of the voltages on the electrodes. Specifically, the patent provides as follows:

> The application of the electrical signals is ***preferably*** directly upon the modulator without any mediating circuits, referred to herein as "Direct Digital Driving". The modulator can be regarded as a 2D Digital-to-Analog (DIA) converter, that converts a digital word into an optical vector signal.

'465 Patent col.15 ll.10–15 (emphasis added). The use of "preferably" here clearly indicates that this feature is not coextensive with the claimed invention. Similarly, the patent's description of application of the voltages to the electrodes as "according to the teachings of the present invention" or as a "feature of the present invention" is not definitional of the claimed invention. Rather, these phrases in the patent refer to aspects or embodiments of the invention, not essential attributes. *See, e.g.*, '465 Patent col.2 ll.53–58 (listing "feature[s] of the present invention" that are different, alternative embodiments of the invention). The patent also teaches that a binary output vector ($B_i$) generated from an input ($D_i$) using the DDC may be multiplied by voltages such that the output vector components ($B_{ij}$) are each associated with an electrode-drive voltage ($V_j$) that is in turn applied to the $j^{th}$ electrode. *Id.* at col.9 l.65 – col.10 l.46 ("$B_i$ multiplied by v, represents the actual (internal) vector of voltages controlling the M electrodes"). In other words, Defendant's statement

27

that "every embodiment disclosed in the specification explains that the output of the DDC, vector B, is directly applied to electrodes," Dkt. No. 71 at 24, is incorrect. The output of the DDC, vector B, may first be multiplied by voltages to generate the voltages that are applied to the electrodes.

While the '465 Patent itself supports a plain and ordinary meaning of "driving at least M electrodes of the optical modulator … responsively to the M voltage values" Plaintiff's representation to the PTAB in IPR of the '465 Patent requires a narrower meaning. Specifically, Plaintiff clearly represented the claimed "driving" of the electrodes of the '465 Patent is "directly driving" the electrodes with the vector of M voltage values. For instance, Plaintiff explained the claimed invention as follows:

> As discussed above, the '465 Patent discloses and claims techniques for fast modulation of digital data onto optical streams-which is useful in a variety of high-performance, high-bandwidth optical communications applications. *See, e.g.,* EX100l at Abstract, 1:30-49. ***The claimed techniques included "a digital-to- digital converter that provides a mapping of input data words to binary actuation vectors" suitable for driving the electrodes of an electro-optical modulator device***. *Id.,* Abstract.

> Known optical modulators at the time of the patent had characteristics that limited their performance, such as non-linear response. *Id.*, 1:56-64, Figure 2A. And known solutions for these problems were inefficient and complicated. *Id.*, 1:64-2:29. They often required complex and power-hungry digital to analog converter (DAC) circuits to drive electrodes of the modulator, which were limited in speed. *Id.*, 1:64-2:4; *see also* EX1005, 3:8-13. Existing solutions that employed digital signals to drive the electrodes did not correct for problems like modulator non-linearity, or else were needlessly complicated and inefficient. EX1001, 2:5-29.

> The '465 Patent ***inventors instead taught and claimed a digital-to-digital converter to map input digital data into digital output data—in the form of digital vectors that could be directly driven onto the electrodes of existing electro-optical modulators***. *Id.*, Abstract, 7:5-25, Figure 1 ("DDC"): …

> Accordingly, ***the invention of the '465 Patent*** achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead ***directly driving the modulator with digital signal vectors*** and using the optical modulator itself to effect a faster digital-to-analog conversion. *See, e.g.*, EX1001, 15:10-12 ("The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as 'Direct Digital Driving'").

Case 1:23-cv-00624-GBW   Document 101   Filed 07/18/24   Page 32 of 269 PageID #:
Case 2:19-cv-00225-JRG   Document 83-1   Filed 05/19/20   Page 29 of 32 PageID #: 2085
2255

IPR Preliminary Response at 32–33 (emphasis added), Dkt. No. 71-2 at 39–40. This is a clear

representation that the actuation vectors of the claimed invention of the '465 Patent are used to

directly drive the modulator. Similarly, Plaintiff further explained:

> The Petition does not cite this discussion from *Roberts* here. *See* Petition at 39. And this explanation of **digital-to-analog** conversion and **analog driver signal** conditioning has nothing to do with, and arguably teaches away from, the '465 Patent approach and its **claimed digital-to-digital "mapping" to produce digital voltage values for driving modulator electrodes**. *See, e.g.,* EX1001, 15:10-12. Because the only explanation of "non-linear compensator 18" in *Roberts* refers to a compensation function producing **analog voltage levels** for driving electrodes via a DAC circuit, a person of ordinary skill would not find any teaching or suggestion of the digital-to-digital mapping to digital voltage vectors of the challenged claims.
>
> The outputs of the *Roberts* compensation function are not ***the digital "vector[s] of M voltage values" suitable for "driving at least M electrodes of the optical modulator" of the challenged claims***. *See, e.g.,* EX100l, 17:8-14. Rather, the outputs of the *Roberts* compensation function are "ample streams" computed to cause a digital-to-analog converter to output analog voltages which, after additional filtering, yield analog electrode drive voltages. EX1005, 1:54-2:6. To the extent the Petition suggests that this sample stream could instead be ***directly driven onto electrodes***, the Petition does not cite to any explanation of ***how***—nor does it identify any teaching of *Roberts* that would teach or suggest mapping in that context. *See* Petition at 39.

*Id.* at 61 (bold emphasis in original, bold-italic emphasis added), Dkt. No. 71-2 at 68. Again, this

is a clear representation that the actuation vectors of the claims are "directly driven onto the

electrodes."

Plaintiff's statements to the PTAB clearly denote claim scope. These statements "represent[]

an ongoing negotiation between the PTO and the [patent owner], rather than the final product of

that negotiation" and therefore may "lack[] the clarity of the specification and thus [may be] less

useful for claim construction purposes." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir.

2005) (en banc). The potential lack of clarity is exacerbated in this instance because the IPR is still

in its preliminary stage and there is no "final product" of the negotiation between the PTO. Thus,

the Court lacks the full context that may inform the meaning of Plaintiff's statements. *See, e.g.,*

*Laitram Corp. v. Morehouse Indus.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998) (noting that when a "snap-shot of the prosecution history is scrutinized in [the] context" of other prosecution-history events, the meaning of the snap-shot may differ). That said, however, "[t]he public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344 (Fed. Cir. 2015). Here, Plaintiff made clear (albeit preliminary) representations of claim scope to the PTAB. "[S]tatements made by a patent owner during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359–61 (Fed. Cir. 2017). Even if these statements represent a claim-scope narrowing beyond that necessary, "the question is what a person of ordinary skill would understand the patentee to have disclaimed during prosecution, not what a person of ordinary skill would think the patentee needed to disclaim during prosecution." *Ajinomoto Co. v. ITC*, 932 F.3d 1342, 1351 (Fed. Cir. 2019) (quotation and modification marks omitted). Ultimately, Plaintiff represented to the PTAB—and the public—that the actuation vector, the "vector of M voltage values," is directly driven onto electrodes. The Court here must hold Plaintiff to this representation.

Accordingly, the Court construes this term as follows:

- "driving at least M electrodes of the optical modulator . . . responsively to the M voltage values" means "directly driving at least M electrodes of the optical modulator . . . with the M voltage values."

## V.    CONCLUSION

The Court adopts the constructions set forth above, as summarized in the following table. The parties are **ORDERED** that they may not refer, directly or indirectly, to each other's claim

construction positions in the presence of the jury. Likewise, the parties are **ORDERED** to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim-construction proceedings is limited to informing the jury of the definitions adopted by the Court.

The parties are hereby **ORDERED** to file a Joint Notice within fourteen (14) days of the issuance of this Memorandum Opinion and Order indicating whether the case should be referred for mediation. If the Parties disagree about whether mediation is appropriate, the Parties should set forth a brief statement of their competing positions in the Joint Notice.

| Section | Term | Construction |
|---|---|---|
| **A** | "mapping"<br><br>• '465 Patent Claims 1, 4 | selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, where the set of possible digital outputs and the set of possible digital inputs are not identical |
| | "converting"<br><br>• '535 Patent Claims 1, 2 | selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, where the set of possible digital outputs and the set of possible digital inputs are not identical |
| **B** | "pulse modulated"<br><br>• '465 Patent Claim 1<br>• '535 Patent Claim 1<br>• '866 Patent Claim 7, 19 | plain and ordinary meaning |
| **C** | "driving at least M electrodes of the optical modulator . . . responsively to the M voltage values"<br><br>• '465 Patent Claims 1, 4 | directly driving at least M electrodes of the optical modulator . . . with the M voltage values |

| Section | Term | Construction |
|---------|------|--------------|
| **AGREED** | "modulator"<br><br>• '465 Patent Claims 1, 4<br>• '535 Patent Claims 1, 2<br>• '866 Patent Claims 7, 19 | any device which outputs an optical signal with controlled variation of intensity, whether the variation is induced during production of the signal (such as in a semiconductor laser) or whether a signal input from another source is modified |
| | "electrode"<br><br>• '465 Patent Claims 1, 4 | the electrical connections of an optical modulator device through which the device is controlled |
| | "digital to digital converter"<br><br>• '866 Patent Claims 7, 19 | a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical |

**So ORDERED and SIGNED this 15th day of May, 2020.**


_____
RODNEY   GILSTRAP
UNITED STATES DISTRICT JUDGE

EXHIBIT 2

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 37 of 269 PageID #: 2260



US010033465B2

(12) **United States Patent**  
Ehrlichman et al.

(10) Patent No.: **US 10,033,465 B2**  
(45) Date of Patent: **Jul. 24, 2018**

(54) **LINEARIZED OPTICAL DIGITAL-TO-ANALOG MODULATOR**

(71) Applicant: **Ramot at Tel-Aviv University Ltd.**, Tel-Aviv (IL)

(72) Inventors: **Yossef Ehrlichman**, Nazareth Ilit (IL); **Ofer Amrani**, Tel Aviv (IL); **Shlomo Ruschin**, Herzliya (IL)

(73) Assignee: **Ramot at Tel-Aviv University Ltd.**, Tel-Aviv (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/298,327**

(22) Filed: **Oct. 20, 2016**

(65) **Prior Publication Data**

US 2017/0294968 A1      Oct. 12, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/922,165, filed on Oct. 25, 2015, now Pat. No. 9,479,191, which is a (Continued)

(51) **Int. Cl.**  
*H03M 1/20* (2006.01)  
*H04B 10/516* (2013.01)  
(Continued)

(52) **U.S. Cl.**  
CPC .......... *H04B 10/516* (2013.01); *H03M 1/002* (2013.01); *H04B 10/2504* (2013.01)

(58) **Field of Classification Search**  
CPC ...... H03M 1/70; H04B 10/541; H04B 10/516  
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,288,785 A      9/1981   Papuchon et al.  
4,613,204 A      9/1986   Verber et al.  
(Continued)

FOREIGN PATENT DOCUMENTS

DE      602005000276      5/2007  
EP      0020216      12/1980  
(Continued)

OTHER PUBLICATIONS

Applicant-Initiated Interview Summary dated Jul. 29, 2015 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/662,343.  
(Continued)

*Primary Examiner* — Jean B Jeanglaude

(57)      **ABSTRACT**

A system for converting digital data into a modulated optical signal, comprises an electrically controllable device having M actuating electrodes. The device provides an optical signal that is modulated in response to binary voltages applied to the actuating electrodes. The system also comprises a digital-to-digital converter that provides a mapping of input data words to binary actuation vectors of M bits and supplies the binary actuation vectors as M bits of binary actuation voltages to the M actuating electrodes, where M is larger than the number of bits in each input data word. The digital-to-digital converter is enabled to map each digital input data word to a binary actuation vector by selecting a binary actuation vector from a subset of binary actuation vectors available to represent each of the input data words.

**13 Claims, 13 Drawing Sheets**



## Related U.S. Application Data

continuation of application No. 14/662,343, filed on Mar. 19, 2015, now Pat. No. 9,203,425, which is a continuation of application No. 14/325,486, filed on Jul. 8, 2014, now Pat. No. 9,031,417, which is a continuation of application No. 13/280,371, filed on Oct. 25, 2011, now Pat. No. 8,797,198, which is a continuation of application No. 12/636,805, filed on Dec. 14, 2009, now Pat. No. 8,044,835, which is a continuation-in-part of application No. PCT/IL2008/000805, filed on Jun. 12, 2008.

(60) Provisional application No. 60/943,559, filed on Jun. 13, 2007.

(51) **Int. Cl.**
  *H03M 1/00*     (2006.01)
  *H04B 10/25*     (2013.01)

(58) **Field of Classification Search**
  USPC .................. 341/131; 356/464; 398/115, 186
  See application file for complete search history.

(56)          **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,137,359 A | 8/1992 | Steele | |
| 5,543,952 A | 8/1996 | Yonenaga et al. | |
| 5,694,504 A | 12/1997 | Yu et al. | |
| 5,724,178 A | 3/1998 | Grandpierre et al. | |
| 5,917,638 A | 6/1999 | Franck et al. | |
| 6,760,111 B1 * | 7/2004 | Mark .................. | G01C 19/726 |
| | | | 356/464 |
| 6,781,537 B1 | 8/2004 | Taraschuk et al. | |
| 6,781,741 B2 * | 8/2004 | Uesaka .................. | G02F 1/225 |
| | | | 359/237 |
| 7,061,414 B2 | 6/2006 | Chen et al. | |
| 7,203,552 B2 | 4/2007 | Solomon | |
| 7,212,292 B2 | 5/2007 | Van Brockl et al. | |
| 7,403,711 B2 | 7/2008 | Chen et al. | |
| 7,483,597 B2 | 1/2009 | Shastri et al. | |
| 7,536,112 B2 | 5/2009 | Yonenaga et al. | |
| 7,792,398 B2 | 9/2010 | Tanaka et al. | |
| 7,978,390 B2 | 7/2011 | Kikuchi | |
| 8,044,835 B2 | 10/2011 | Ehrlichman et al. | |
| 9,031,417 B2 | 5/2015 | Ehrlichman et al. | |
| 9,203,425 B2 | 12/2015 | Ehrlichman et al. | |
| 2004/0213170 A1 | 10/2004 | Bremer | |
| 2007/0212076 A1 | 9/2007 | Roberts et al. | |
| 2010/0156679 A1 | 6/2010 | Ehrlichman et al. | |
| 2014/0321857 A1 | 10/2014 | Ehrlichman et al. | |
| 2015/0194982 A1 | 7/2015 | Ehrlichman et al. | |
| 2016/0043732 A1 | 2/2016 | Ehrlichman et al. | |
| 2017/0302291 A1 | 10/2017 | Ehrlichman et al. | |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0957596 | 11/1999 |
| EP | 1036302 | 9/2000 |
| EP | 2896993 | 7/2015 |
| WO | WO 2004/074914 | 9/2004 |
| WO | WO 2008/152642 | 12/2008 |

### OTHER PUBLICATIONS

Brief Communication Oral Proceedings on Sep. 18, 2014 dated Aug. 25, 2014 From the European Patent Office Re. Application No. 08763563.7.

Brief Communication: Oral Proceedings on Sep. 18, 2014 dated Aug. 25, 2014 From the European Patent Office Re. Application No. 08763563.7.

Communication Pursuant to Article 94(3) EPC dated Jul. 12, 2013 From the European Patent Office Re. Application No. 08763563.7.

Communication Pursuant to Article 94(3) EPC dated Apr. 26, 2010 From the European Patent Office Re. Application No. 08763563.7.

European Search Report and the European Search Opinion dated Apr. 9, 2015 From the European Patent Office Re. Application No. 15157901.8.

International Preliminary Report on Patentability dated Dec. 7, 2009 From the International Bureau of WIPO Re. Application No. PCT/IL2008/000805.

International Search Report and the Written Opinion dated Nov. 3, 2008 From the International Searching Authority Re. Application No. PCT/IL2008/000805.

Official Action dated Nov. 4, 2013 From the US Patent and Trademark Office Re. U.S. Appl. No. 13/280,371.

Official Action dated Dec. 14, 2015 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/922,165.

Official Action dated Feb. 16, 2011 From the US Patent and Trademark Office Re. U.S. Appl. No. 12/636,805.

Official Action dated May 22, 2015 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/662,343.

Official Action dated Oct. 24, 2017 From the US Patent and Trademark Office Re. U.S. Appl. No. 15/298,373. (18 pages).

Official Action dated Oct. 30, 2014 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/325,486.

Provision of the Minutes in Accordance With Rule 124(4) EPC dated Sep. 30, 2014 From the European Patent Office Re. Application No. 08763563.7.

Summons to Attend Oral Proceedings Pursuant to Rule 115(1) EPC dated Apr. 28, 2014 From the European Patent Office Re. Application No. 08763563.7.

Ehrlichman et al. "Generation of M-Ary Signals Using a Single Mach Zehnder Interfrometer", SPIE Digital Library, 7218, Integrated Optics: Devices, Materials, and Technologies XIII, 72180L, 5 Pages, Feb. 9, 2009.

Ehrlichman et al. "Generation of M-Ary Signals Using a Single MZI", School of Electrical Engineering Tel Aviv University, Israel,: 14 Pages, Presented at Photonics West 2009.

Ehrlichman et al. "Improved Digital-to-Analog Conversion Using Multi-Electrode Mach-Zehnder Interferometer", Journal of Lightwave Technology, 26(21): 3567-3575, Nov. 1, 2008.

Ehrlichman et al. "Multi-Electrode Approach for Interfacing Optical Computing Devices", School of Electrical Engineering Tel Aviv University, Israel, p.1-25, Published in Vienna, Austria, Aug. 28, 2008.

Leven et al. "A 12.5 GSample/s Optical Digital-to-Analog Converter With 3.8 Effective Bits", The 17th Annual Meeting of the IEEE, Lasers and Electro-Optics Society 2004, LEOS 2004, 1: 270-271, Nov. 2004.

Vawter et al. "Digital Optical Phase Control in Ridge-Waveguide Phase Modulators", IEEE Photonics Technology Letters, XP000362933, 5(3): 313-315, Mar. 1, 1993.

Wang et al. "Research on the Modulation Phase Distortion Error Character of Y Wave-Guide in Fiber Optic Gyroscope", Proceedings of the 2008 International Symposium on Intelligent Information Technology Applications Workshop, IITAW '08, Shanghai, China, Dec. 21-22, 2008, p. 847-850, Dec. 21, 2008.

Yacoubian et al. "Digital-to-Analog Conversion Using Electrooptic Modulators", IEEE Photonics Technology Letters, 15(1): 117-119, Jan. 2003.

Zumbahlen "Basic Linear Design: Digital-to-Analog Converter Architectures: Intentionally Nonlinear DACs", Analog Devices Ltd., Section 6.1: 6.37-6.39, 2007.

Official Action Dated Jun. 7, 2018 From the US Patent and Trademark Office U.S. Appl. No. 15/298,373. (10 pages).

* cited by examiner

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 39 of 269 PageID #: 3262



FIG. 1

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 40 of 269 PageID #: 3263



FIG. 2A
(PRIOR ART)

FIG. 2B

FIG. 2C

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 41 of 269 PageID #: 2264



FIG. 3A

FIG. 3B

FIG. 4

| DDC Input | DDC Output |
|-----------|------------|
| 0000 | 0000 |
| 0001 | 0011 |
| 0010 | 0100 |
| 0011 | 0101 |
| 0100 | 0101 |
| 0101 | 0110 |
| 0110 | 0111 |
| 0111 | 0111 |
| 1000 | 1000 |
| 1001 | 1001 |
| 1010 | 1001 |
| 1011 | 1010 |
| 1100 | 1011 |
| 1101 | 1011 |
| 1110 | 1100 |
| 1111 | 1101 |

FIG. 5

| N=4 | | | N=8 | | | |
|-----|-----|-----|-----|-----|-----|-----|
| U | O | | U | O | | |
| M=4.5 | M=4 | M=5 | M=8-10 | M=8 | M=9 | M=10 |
| 0.5 | 0.4073 | 0.4957 | 0.5 | 0.3871 | 0.5001 | 0.5 |
| 0.25 | 0.2443 | 0.2451 | 0.25 | 0.2243 | 0.25 | 0.2501 |
| 0.125 | 0.1506 | 0.1304 | 0.125 | 0.1311 | 0.125 | 0.1249 |
| 0.0625 | 0.0989 | 0.0527 | 0.0625 | 0.0799 | 0.0625 | 0.0625 |
| 0.0313 | | 0.038 | 0.0313 | 0.0527 | 0.0313 | 0.0312 |
| | | | 0.0156 | 0.0385 | 0.0155 | 0.0156 |
| | | | 0.0078 | 0.0312 | 0.0078 | 0.0079 |
| | | | 0.0039 | 0.0275 | 0.0038 | 0.004 |
| | | | 0.002 | | 0.002 | 0.0019 |
| | | | 0.001 | | | 0.001 |

N=4 U: M=4: 0.9375; M=5: 0.9688
N=4 O: M=4: 0.9011; M=5: 0.9619
N=8 U: M=8: 0.9961; M=9: 0.9981; M=10: 0.9991
N=8 O: M=8: 0.9723; M=9: 0.998; M=10: 0.9991

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 43 of 269 PageID #: 2266



FIG. 6A
(PRIOR ART)

FIG. 6B

FIG. 6C

Case 1:22-cv-00674-GBW Document 101 Filed 07/18/24 Page 44 of 269 PageID #: 2257



FIG. 7A

FIG. 7B

Case 1:22-cv-00674-GBW    Document 101    Filed 07/18/24    Page 45 of 269 PageID #: 3288



FIG. 8

Case 1:22-cv-00674-GBW    Document 101    Filed 07/18/24    Page 46 of 269 PageID #: 2269



FIG. 9

Case 1:22-cv-00674-GBW    Document 101    Filed 07/18/24    Page 47 of 269 PageID #: 2270



FIG. 10



FIG. 11B

FIG. 11A

Case 1:22-cv-00674-GBW    Document 101    Filed 07/16/24    Page 49 of 269 PageID #: 2272

FIG. 12A

FIG. 12B



64-QAM

256-QAM

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 50 of 269 PageID #: 2273



FIG. 13A

FIG. 13B

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 51 of 269 PageID #: 2274

FIG. 14 (PRIOR ART)



US 10,033,465 B2

1

# LINEARIZED OPTICAL DIGITAL-TO-ANALOG MODULATOR

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/922,165 filed on Oct. 25, 2015, which is a continuation of U.S. patent application Ser. No. 14/662,343 filed on Mar. 19, 2015, now U.S. Pat. No. 9,203,425, which is a continuation of U.S. patent application Ser. No. 14/325, 486 filed on Jul. 8, 2014, now U.S. Pat. No. 9,031,417, which is a continuation of U.S. patent application Ser. No. 13/280,371 filed on Oct. 25, 2011, now U.S. Pat. No. 8,797,198, which is a continuation of U.S. patent application Ser. No. 12/636,805, filed on Dec. 14, 2009, now U.S. Pat. No. 8,044,835, which is a continuation-in-part of PCT Patent Application No. PCT/IL2008/000805 filed on Jun. 12, 2008, which claims the benefit of priority of U.S. Provisional Patent Application No. 60/943,559 filed on Jun. 13, 2007.

The contents of the above applications are all incorporated by reference as if fully set forth herein in their entirety.

## FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to optical modulators and, in particular, it concerns a linearized optical digital-to-analog modulator.

There is a tangible need for high-performance and large bandwidth digital to analog signal conversion. Furthermore, as the RF and digital domains converge, entirely new solutions will be needed to enable multi-GHz mixed-signal systems. Probably the most prominent area to benefit is the wireless communication industry. The ever increasing thirst for bandwidth will require data converters to deliver greatly increased performance. For example, analog signals are transmitted in cable television (CATV) via optical fibers and the demand for increasing bandwidth is driving technology to speed-up the processing of signals as well as the transmission. High performance digital to analog conversion is also required to address the growing demands of wireless carriers for supporting the heavy traffic expected in the base station. Additional specific areas to benefit include: the defense and government industries that concentrate on deploying multi-function, dynamically reconfigurable systems (RADAR, electronic warfare, and surveillance applications); medical imaging; and hyper/super-computer communications.

One of the most widely deployed devices for analog optics modulation is the Mach-Zehnder Interferometer modulator (MZI). For binary digital signals, it is today the preferred device for long-haul fiber-optic communication, leading to chirp-free pulses which can reach hundreds of kilometers in optical fibers without the need for regeneration. For analog applications, however, a serious problem is encountered due to the inherent non-linear response of the modulator. Specifically, since the modulating voltage via the electro-optic effect controls the optical phase delay in a basically linear fashion and the attenuation varies as the cosine of the phase difference between the two branches of the device, a linear variation in phase difference and thus in applied voltage results in a cosine-shaped output variation, as seen in the pattern of points in FIG. 2A. The common solutions for this problem are either the biasing of the device to a quasi linear regime coupled with reducing the modulation range to reduce distortion, or use of an analog

2

pre-distortion circuit to feed the modulator. Since in practically all present signals signals are processed digitally, a multi-bit Digital-to-Analog Converter (DAC) device is needed with fast processing capabilities.

A DAC based on a multi-electrode MZI modulator concept was proposed many years ago by Papuchon et al. and is described in U.S. Pat. No. 4,288,785. In that device, the electrodes' sectioning length followed a conventional power-of-two digital sequence, which did not solve the non-linearity problem, and thus suffered from severe limitation in the dynamic range, and subsequently the attainable resolution. More recently, much more complex devices have been presented to cope with these problems: Yacoubian et al. ("*Digital-to-analog conversion using electrooptic modulators*," IEEE Photonics Technology Letters, vol. 15, pp. 117-119, January 2003), proposed the employment of one MZI modulator for each and every bit. A recently reported design by Leven et al. ("*A 12.5 gsamples/s optical digital-to-analog converter with 3.8 effective bits*," Lasers and Electro-Optics Society, 2004. LEOS 2004. The 17th Annual Meeting of the IEEE, vol. 1, pp. 270-271, November 2004), also the subject of U.S. Pat. No. 7,061,414 entitled "Optical Digital-To-Analog Converter" to Y K Chen et al., employs a single modulator for every 2 bits and is highly nonlinear; it yields only 3.8 effective bits for a 6 bit design.

There is therefore a need for a digital to analog converter which would offer improved linearity of response without sacrificing efficiency or dynamic range.

## SUMMARY OF THE INVENTION

The present invention is a linearized optical digital-to-analog modulator.

According to the teachings of the present invention there is provided, a modulator device for converting digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits; (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating electrodes where M≥N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, wherein the electrode actuating device actuates at least one of the actuating electrodes as a function of values of more than one bit of the input data word.

According to a further feature of the present invention, the electrode actuating device includes a digital-to-digital converter.

According to a further feature of the present invention, the modulator is a modulated semiconductor light generating device. According to an alternative feature of the present invention, the modulator is an electro-absorption modulator. According to yet a further alternative, the modulator is a Mach-Zehnder modulator.

According to a further feature of the present invention, in the case of a Mach-Zehnder modulator, the modulator includes M actuating electrodes on each of two waveguide branches of the modulator. In certain preferred cases, M is greater than N.

According to a further feature of the present invention, in the case of a Mach-Zehnder modulator, the electrode actuating device is configured to actuate the first and second pluralities of actuating electrodes so as to modulate the

3

4

optical signal according to a QAM (Quadrature Amplitude Modulation) modulation scheme with at least 16 constellation points.

According to a further feature of the present invention, the electrode actuating device is configured to actuate the first and second pluralities of actuating electrodes so as to modulate the optical signal to a minimum amplitude for a return-to-zero signal between successive input data words.

According to a further feature of the present invention, the modulator has a maximum dynamic range, and wherein the electrode actuating device is configured to actuate the actuating electrodes so as to generate modulation of the optical signal spanning a majority of the dynamic range.

According to a further feature of the present invention, the electrode actuating device is configured to apply one of two common actuating voltages to the actuating electrodes.

According to a further feature of the present invention, the actuating electrodes have differing effective areas. According to one set of applications, the differing effective areas form a set, members of the set being interrelated approximately by factors of two. In other preferred cases, the set including at least one effective area which is not interrelated to others of the set by factors of two.

According to a further feature of the present invention, the modulator has a non-linear response, and the electrode actuating device is configured to actuate the actuating electrodes so as to generate an improved approximation to a linear modulation of the optical signal as a function of the input data word.

According to a further feature of the present invention, there is also provided an optical to electrical converter deployed so as to generate an electrical signal as a function of intensity of the modulated optical signal.

There is also provided according to a further feature of the present invention, an apparatus comprising a digital-to-analog converter, the converter comprising: (a) an electronic input for receiving an input data word of N bits; (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating electrodes where M≥N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, wherein the electrode actuating device actuates at least one of the actuating electrodes as a function of values of more than one bit of the input data word.

There is also provided according to the teachings of the present invention, a method for converting a digital data input word of N bits into an analog signal comprising: (a) processing the digital data input word to generate an electrode actuation vector of M values where M≥N; and (b) applying M voltage values corresponding to the actuation vector values to M actuating electrodes of an electrically controllable modulator for modulating the intensity of an optical signal, wherein at least one value of the actuation vector varies as a function of values of more than one bit of the input data word.

According to a further feature of the present invention, the electrode actuation vector is a binary vector, and wherein the M voltage values are selected from two voltage levels according to the M binary values.

According to a further feature of the present invention, the processing is performed by a digital-to-digital converter.

According to a further feature of the present invention, an electrical output is generated as a function of the intensity of the modulated optical signal.

There is also provided according to the teachings of the present invention, a modulator device for converting digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits; (b) a semiconductor light generating device for generating an optical signal of variable intensity, the semiconductor light generating device including M actuating electrodes where M≥N; and (c) an electrode actuating device associated with the electronic input and the semiconductor light generating device, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, thereby generating an output intensity corresponding substantially to the input data word.

According to a further feature of the present invention, the actuating electrodes have differing effective areas.

According to a further feature of the present invention, the differing effective areas form a set, members of the set being interrelated approximately by factors of two.

According to a further feature of the present invention, the differing effective areas form a set, the set including at least one effective area which is not interrelated to others of the set by factors of two.

According to a further feature of the present invention, M=N.

According to a further feature of the present invention, the semiconductor light generating device is a semiconductor laser.

According to a further feature of the present invention, the semiconductor laser further includes a threshold electrode configured to provide a threshold actuation current.

According to a further feature of the present invention, the semiconductor light generating device is a light emitting diode.

There is also provided according to the teachings of the present invention, a modulator device for converting digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits; (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating electrodes where M≥N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, wherein the actuating electrodes have differing effective areas, the differing effective areas forming a set, the set including at least one effective area which is not interrelated to others of the set by factors of two.

At this point, it will be useful to define various terminology as used herein in the description and claims. The terms "digital" and "analog" are used in their normal senses as common in the field. Specifically, "digital" refers to a form of data where values are stored or processed numerically, typically broken up into bits of a binary number for machine processing, whereas "analog" refers to a form of data in which values are represented by different levels within a range of values of an essentially continuously variable parameter.

The phrase "digital-to-digital converter" is used to refer to a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical. The "digital-to-digital converter" employed by certain embodiments of the present invention is a non-trivial converter in which there is typi-

US 10,033,465 B2

5

cally not a one-to-one mapping between bits of the input data and bits of the output data, as will be clear from the description following.

The term "binary" is used to refer to values, voltages or other parameters which assume one or other of only two possible values, and modes of operation which use such parameters. In this context, voltage levels are referred to as "common" to a number of electrodes if activation of the electrodes is performed by switching connection of each of the electrodes between the voltage values in question.

The term "electrode" is used to refer to the electrical connections of an optical modulator device through which the device is controlled. In the case of an electrode which applies an electric field to affect the optical properties of an adjacent material, reference is made to an "effective area" which is used as an indication of the relative influence of the electrode compared to that of other electrodes on the optical properties of the underlying waveguide if actuated by a similar voltage. In many cases, the actuating electrodes are all of the same effective width, for example where they overlie a long narrow waveguide. The "effective area" may then be referred to as an "effective length", corresponding to the length of waveguide overlaid by the corresponding electrode and related to the "effective area" by a constant scaling factor. This scaling factor will vary according to variations in shape, width, waveguide properties or other design parameters. Any part of the electrode not overlying the active part of the modulator device or otherwise ineffective for generating modulation of an optical signal is not included in the "effective area".

The term "modulator" is used to refer to any device which outputs an optical signal with controlled variation of intensity, whether the variation is induced during production of the signal (such as in a semiconductor laser) or whether a signal input from another source is modified.

The term "optical power" is used to refer to the quantitative manifestation of the analog optical signal.

BRIEF DESCRIPTION OF THE SEVERAL
VIEWS OF THE DRAWINGS

The invention is herein described, by way of example only, with reference to the accompanying drawings, wherein:

FIG. 1 is a schematic representation of a modulator device, constructed and operative according to the teachings of the present invention, for converting digital data into analog modulation of an optical or electrical signal;

FIG. 2A is a graph showing the intensity output generated by an unmodified Mach-Zehnder modulator employing four electrodes with lengths interrelated by factors of two and driven directly by corresponding bits of a digital input word, the output being shown relative to a line corresponding to an ideal linear response;

FIG. 2B is a graph showing an intensity output generated according to an implementation of the present invention employing a full-range Mach-Zehnder modulator with four electrodes of lengths interrelated by factors of two driven according to the teachings of the present invention;

FIG. 2C is a graph similar to FIG. 2B showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 3A is a graph showing the intensity output achieved by the modulator of the present invention implemented with five actuating electrodes for a four bit input word, where the five electrodes have lengths interrelated by factors of two;

6

FIG. 3B is a graph similar to FIG. 3A showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 4 is a table illustrating a digital-to-digital converter input and output where the input corresponds to the input data word and the output corresponds to the electrode actuation pattern for generating the outputs of FIGS. 2B and 2C;

FIG. 5 is a table illustrating unoptimized and optimized normalized electrode lengths for cases on input words of 4 and 8 bits and numbers of electrodes of 4, 5, 8, 9 and 10;

FIG. 6A is a graph showing the intensity output generated by an unmodified Mach-Zehnder modulator employing eight electrodes with lengths interrelated by factors of two and driven directly by corresponding bits of a digital input word, the output being shown relative to a line corresponding to an ideal linear response;

FIG. 6B is a graph showing an intensity output generated according to an implementation of the present invention employing a Mach-Zehnder modulator with eight electrodes of lengths interrelated by factors of two driven according to the teachings of the present invention;

FIG. 6C is a graph similar to FIG. 6B showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 7A is a graph showing the intensity output achieved by the modulator of the present invention implemented with nine actuating electrodes for an eight bit input word, where the nine electrodes have lengths interrelated by factors of two;

FIG. 7B is a graph similar to FIG. 7A showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 8 is a schematic representation of an alternative implementation of the present invention based upon an electro-absorption modulator (EAM);

FIG. 9 is a schematic representation of yet another alternative implementation of the present invention based upon a semiconductor laser;

FIG. 10 is a schematic representation of a modulator device, similar to the device of FIG. 1, implemented as a 16-QAM modulator;

FIG. 11A is a constellation diagram for the device of FIG. 10 illustrating a choice of constellation points, and corresponding electrode actuation patterns, for implementing a 16-QAM modulator;

FIG. 11B is a graph showing the symbol error rate performance for the devices of FIG. 12A implemented with different numbers of electrodes;

FIGS. 12A and 12B are simplified constellation diagrams showing only closest matching points for implementation of a 64-QAM using two sets of 7 electrodes and a 256-QAM using two sets of 10 electrodes, respectively;

FIGS. 13A and 13B are graphs showing the symbol error rate performance for the devices of FIGS. 12A and 12B, respectively; and

FIG. 14 is a schematic representation of a prior art Mach-Zehnder modulator configured as a DAC.

DESCRIPTION OF SPECIFIC EMBODIMENTS
OF THE INVENTION

The present invention is a modulator device for converting digital data into analog modulation of an optical signal.

Case 1:22-cv-00674-GBW Document 101 Filed 07/18/24 Page 55 of 269 PageID #: 2278

7
8

The principles and operation of modulator devices according to the present invention may be better understood with reference to the drawings and the accompanying description.

Referring now to the drawings, FIG. **1** shows schematically a modulator device, generally designated **10**, constructed and operative according to the teachings of the present invention, for converting digital data into analog modulation of an optical signal. Generally speaking, modulator device **10** has an electronic input **12** for receiving an input data word D of N bits and an electrically controllable modulator **14** for modulating the intensity of an optical signal represented by arrow **16**. Modulator **14** includes M actuating electrodes **18** where M≥N. Modulator device **10** also includes an electrode actuating device **20** responsive to the input data word D to supply an actuating voltage to the actuating electrodes **18**. It is a particular feature of a first aspect of the present invention that electrode actuating device **20** actuates at least one of actuating electrodes **18** as a function of values of more than one bit of the input data word D. In other words, at least one of the electrodes is actuated in a manner differing from a simple one-to-one mapping of data bits to electrode voltage, thereby providing freedom to choose the electrode actuation pattern which best approximates a desired ideal output for the given input. According to a second complementary, or alternative, aspect of the present invention, the effective areas of actuating electrodes are optimized so that at least some of the electrode effective areas differ from a simple factor-of-two series.

The basic operation of a first preferred implementation of modulator device **10** will be understood with reference to FIGS. **2**A and **2**B. FIG. **2**A shows the output intensity values which would be obtained by supplying a voltage sufficient to generate full dynamic range modulation to a set of four electrodes according to a direct mapping of each bit of a 4-bit input data word to a corresponding electrode. The full range of input values 0000 through 1111 and the corresponding output intensities have been normalized to the range 0-1. The marked deviation from linearity in the form of a cosine variation is clearly visible. In contrast, FIG. **2**B shows the output intensity using the same four electrodes after the input data has been mapped according to the teachings of the present invention to a pattern of electrode actuation approximating more closely to a linear response. In other words, for each input value, the output value from FIG. **2**A most closely approximating the corresponding theoretical linear response is determined, and the corresponding pattern of electrode actuation is applied. By way of example, in FIG. **2**A, it will be noted that output point **22** corresponding to an input of 0011 is higher than desired for the ideal linear response. The outputs generated by electrode actuation patterns corresponding to value 0100 (point **24**) is closer to the required value, and 0101 (point **26**) is even closer. An output pattern of 0101 is thus chosen to correspond to an input of 0011. The overall result is an output which much more closely approximates to a linear response as shown.

Most preferably, electrode actuating device **20** includes a digital-to-digital converter. It will be appreciated that such a converter may be implemented from very straightforward and high-speed logic components which make it feasible to employ the present invention in high frequency systems. Electronic input **12** may be simply the input pins of digital-to-digital converter **20**. FIG. **4** illustrates a preferred implementation of the digital-to-digital mapping employed to generate the output of FIG. **2**B. A digital-to-digital converter suitable for implementing the various embodiments of the present invention may readily be implemented using commercially available high-speed Application Specific Integrated Circuits ("ASIC"), as will be clear to one ordinarily skilled in the art.

The first implementation described thus far features N=M=4 with lengths of the electrodes retaining the conventional ratios of factors of two and employing simple on-off level voltage switching of a common actuating voltage to all currently actuated actuating electrodes. While such an implementation offers markedly improved linearity of response compared to the unmodified response of FIG. **2**A, it should be noted that the output intensity is not uniquely defined for each input value. Where uniqueness of the output values is required, or where a higher degree of linearity is needed, further modification may be required. Various forms of further modification may be employed including, but not limited to: use of multiple actuating voltage levels; use of modified electrode lengths; and addition of additional electrodes (i.e., M>N). These different options will be discussed below.

One option for further modification of the output is to modify the actuating voltage applied to each electrode, such as by switching between different distinct voltage levels.

An alternative preferred option for modifying the output to achieve a better approximation to a linear output is modification of the electrode lengths relative to the factor of two series assumed above. A non-limiting example of an approach for determining preferred electrode proportions will be presented below in the context of a Mach-Zehnder modulator. A corresponding practical example of electrode length values for N=M=4 is shown in the second column of FIG. **5**. FIG. **2**C illustrates the intensity output employing electrodes with lengths in the proportions listed. A comparison of the root-mean-square error from linearity for FIGS. **2**B and **2**C shows that the adjustment of electrode lengths results in an additional slight improvement to linearity.

A further option for modifying the performance of modulator device **10** is the addition of one or more additional electrodes, i.e., M>N. This provides an additional degree of freedom for correcting non-linearity of the response. In the case of unmodified electrode dimensions related by factors of two, each additional electrode is typically half the dimension of the previously smallest electrode. Where the electrode dimensions are further modified, the additional electrode dimension is preferably included within an optimization process in order to determine a preferred dimension for the additional electrode(s) along with the other electrodes. FIGS. **3**A and **3**B show outputs from the device of the present invention for an example of N=4 and M=5, with and without modification of the electrode dimensions, respectively. The electrode lengths are shown for the unmodified series in the first column of FIG. **5** and for the optimized length electrodes in the third column of FIG. **5**.

Parenthetically, although the present invention is described herein in the context of a preferred example of linearization of a modulator device which inherently has a non-linear response, the principles of the present invention may equally be applied to any case where a natural response of a modulator provides a first function and a desired response is a different second function which may be linear or non-linear. Thus, the present invention may be employed to convert a digital input into an analog output approximating to any desired response curve within the dynamic range of the modulator. Non-limiting examples include where a desired output response curve is sinusoidal or exponential, or where it is desired to increase the resolution or "contrast" of the output within a specific range of input values.

9

Clearly, the present invention is not limited to applications with 4-bit data input, and can be implemented with substantially any number of data bits commensurable with other limitations of the system, such as signal-to-noise requirements. By way of example, FIGS. 6A-6C, 7A and 7B illustrate a number of implementations with 8-bit input data words. Specifically, for purpose of reference, FIG. 6A shows the unmodified output of an 8-bit arrangement where each data bit is applied directly to a corresponding electrode, again showing the underlying cosine response of the modulator. FIG. 6B illustrates the output of an implementation according to the teachings of the present invention with N=M=8 and standard lengths of electrodes interrelated by factors of 2, as in the fourth column of FIG. 5. FIG. 6C shows output for a similar device where the electrode lengths have been modified according to the values shown in the fifth column of FIG. 5. FIGS. 7A and 7B show the output of similar devices for N=8 but with an extra electrode, i.e., M=9. In the case of FIG. 7A, the device has unmodified electrode lengths as shown in the fourth column of FIG. 5, while in the device of FIG. 7B, the electrode lengths are modified according to the proportions shown in the sixth column of FIG. 5.

Example I—Mach-Zehnder Modulator

By way of example, there will now be presented a theoretical treatment of one particularly preferred example of modulator device 10 implemented using a Mach-Zehnder modulator, also referred to as a Mach-Zehnder Interferometer or "MZI". This theoretical treatment is presented to facilitate an understanding of the present invention and as a suggested technique for calculating certain parameters. However, it should be noted that the invention as described above has been found to be effective, independent of the accuracy or otherwise of this theoretical treatment.

The Mach-Zehnder modulator is an active integrated waveguide device consisting of a higher index guide region that splits into two paths which are combined again after a certain distance. Each of these paths is referred to as a leg or branch. When used as a switch, the MZI may be turned "off" by raising or lowering the index of refraction in one of the legs. This is achieved by employing the electro-optic effect to produce a 180-degree change in phase by means of optical-path length. Intermediate optical attenuation levels can be obtained by inducing changes other than 180 degrees.

In the case described above of FIG. 1, a 4-bit Digital-to-Analog Converter, based on a Multi-Electrode (ME) Mach-Zehnder Interferometer, is presented. The input to the device consists of 4 bits. Using the Digital-to-Analog converter, which may be thought of as a look-up table, the 4 data bits are mapped to 5 electrodes as this realization is equipped with a single excess electrode. According to one option, if an electrical rather than optical output is desired, the optical signal at the output is detected and converted to an electrical (analog) signal.

It should be noted that, in the context of a MZI, it is common to split the electrodes to act in an opposite manner on the two legs of the device, for example, one side raising and the other lowering the refractive index of the material, thereby reducing the actuation voltage required. In such cases, the value M is the number of actuating electrodes on each of the two waveguide branches of the modulator.
Mathematical Description

The properties of the MZI may be described mathematically as follows. Let I denote a vector of electrode lengths. The number of elements in I is M. Also let V denote a

10

corresponding vector (of length M) of electrode control-voltages. When applying a voltage $V_j$ only to electrode $e_j$, whose length is $l_j$, the phase of light propagating in the modulating leg, shifts by

$$\pi \frac{V_j \cdot l_j}{v_\pi \cdot l_\pi},$$

where $V_\pi \cdot l_\pi$ corresponds to the voltage-length product leading to a $\pi$ shift in the phase. It is used as a merit figure of the MZI modulator. We define new normalized electrode length by:

$$L_j = \frac{l_j}{l_\pi} \qquad (1)$$

Gathering the total contribution from all electrodes, the following transmission function of the MZI is obtained:

$$T(V, L) = \cos^2\left(\frac{\pi}{2} - \frac{V \cdot L^T}{v_\pi}\right), \qquad (2)$$

where the superscript T denotes transposition. The contribution from each electrode $e_j$, $j=1, 2, \ldots M$, to the total phase shift, is permitted by applying some non-zero voltage $V_j=v$. We chose to work with binary values for all electrode voltages, $V_j=0$, v, a clearly desirable requirement which, moreover, makes the design simpler as discussed next. Note that by setting the lower voltage to a value greater than zero, the maximum output level of the MZI is decreased thus reducing the dynamic range. Let $D_i$ denote a digital binary input vector of length N, where $i=1, \ldots, 2^N$. For each digital vector $D_i$, the DDC component in FIG. 1 produces a corresponding binary vector $B_i$, of length M. $B_i$ multiplied by v, represents the actual (internal) vector of voltages controlling the M electrodes. When multiplying a real number, $B_i$ should be interpreted as binary vector whose elements are the real numbers {0,1}. With respect to (2), this means that when $V_j=v$, then $B_{ij}=1$, $V_j=0$. $B_{ij}=0$; $B_{ij}$ being the j-th element of the control vector $B_i$. At this time we define B to be a matrix of size $2^N \times M$ whose rows consist of the set of binary control vectors $B_i$, each of length M. Hence, (2) can be rewritten as

$$T(B_i, L) = \cos^2\left(\frac{\pi}{2} \frac{v}{v_\pi} \sum_{j=1}^{M} B_{ij} L_j\right) \qquad (3)$$

Without loss of generality $V=V_\pi$ will be assumed henceforth. (Preferably $V_j=v_\pi$ to ensure full coverage of the modulating range and efficient use of the input optical power.) When the number of electrodes equals the number of data bits, i.e. when M=N, an implementation in a standard approach according to the system of FIG. 10 while trying to exploit the dynamic range of the transfer function (3) to its fullest results in high nonlinearity errors. This is demonstrated in FIG. 2A for M=N=4. For this demonstration it is assumed that an unoptimized straightforward selection is made, where B is the set of all 16 binary 4-tuples, i.e. $B^T=\{0000, \ldots, 1111\}$ and L is taken as {0.5, 0.25, 0.125,

US 10,033,465 B2

11

0.0625}. In the next section, one suggested approach to optimizing L and B will be proposed.

Optimization of B and L

In order to improve the linearity as well as the dynamic range of the conversion process, we propose that the lengths of the elements of L and the control vectors B be optimized. As described above, it is possible to optimize one or both of B and L. In practice, optimization of L alone may provide a non-monotonic variation of output together with some improvement in linearity and dynamic range. This may be sufficient for applications in which the non-linearity is relatively small, such as the semiconductor laser embodiments to be discussed below. For more significantly non-linear devices, the options of optimized B with unoptimized L, and optimized B and L are typically more suitable.

We consider these options separately since their implementation require different hardware. An unoptimized set of electrode lengths L consists of

$L_j=2^{-j}$, with j=1 . . . M. An unoptimized matrix B will consist of $2^N$ all binary N-tuples. In that case, with a slight abuse of notations we have that $B_i=D_i$; i=0, 1, 2, . . . $2^N-1$. Hence, designs with optimized B require Digital-to-Digital conversion while designs with optimized L only do not. Whenever B is optimized, and for any number of electrodes M; M≥N, it is understood that a binary input data vector $D_j$ has to be mapped to a control vector $B_i$, yet $B_i \neq D_i$. The DDC, implemented as all-electronic, shall perform this mapping operation.

As the optimization criterion we shall use the root mean square error (RMSE) between an ideal output, represented by a straight line, and the converter output. Let

$$U_i = \frac{i}{2^N}$$

denote the ideal analog value required for representing the digital input $D_i$. The RMSE is defined as follows:

$$g(B, L) = \sqrt{\frac{1}{2^N} \sum_{i=1}^{2^N} \left[ U_i - \cos^2\left(\frac{\pi}{2} \sum_{j=1}^{M} B_{ij} L_j \right)\right]^2} \quad (4)$$

The optimization problem can now be formulated as minimizing the values of g(B,L) for all possible values of the matrix B and the vector L.

Note that this optimum solution is aimed at minimizing the average (squared) deviation between the desired output and the converter output. Clearly, this is only one non-limiting example, and various other linearity measures may equally be used. Similarly, as mentioned earlier, the desired output response function itself may take any desired form, and for each function, a suitable optimization criterion must be selected.

Approaching (4) as a global optimization problem with an order of $O(2^N \times M)$ variables, is quite involved, especially since the variables are of mixed type, B is binary while L is real. (It is related to a nonlinear mixed integer zero-one optimization problem.) It is therefore typically preferred to employ a near-optimum two-step approach. First, B is determined assuming an unoptimized set of electrodes L, $L_j 2^{-j}$, with j=1 . . . M. The obtained matrix is denoted by $\hat{B}$. Then, given $\hat{B}$, L is obtained such that (4) is minimized.

12

If L is an unoptimized set of electrodes, $L_j = 2^{-j}$. Then, the output of the converter as given by (3) is a function of the control $B_j$ only. Since one aims at obtaining a straight line, whose quantized values are given by $U_i$ then it is not difficult to verify that the best approximated selection of $\hat{B}_i$ is given by

$$B_i = Dec2Bin_M\left(\frac{2}{\pi} \arccos\left(\sqrt{U_i}\right)\right), \quad (5)$$

where the function $Dec2Bin_M(x)$ maps a real value x, 0<x≤1, to its closest M-bit binary representation. Note that this, in effect quantization, process may result in several input data vectors having the same analog representation. In applications in which this duplicate representation is considered problematic, it is effectively mitigated by choosing M>N.

Given $\hat{B}$, we proceed to optimize L. Assuming there exists a set of electrodes L such that

$$\cos^2\left(\frac{\pi}{2} \sum_{j=1}^{M} \hat{B}_{ij} L_j \right) \approx U_i; \forall i,$$

then as an alternative to (4), we may define an equivalent cost function, which is easier to handle mathematically:

$$h(L) = \left\{ \sum_{i=1}^{2^N} \left[ \frac{2}{\pi} \arccos\left(\sqrt{U_i}\right) - \sum_{j=1}^{M} B_{ij} L_j \right]^2 \right\}. \quad (6)$$

To minimize this cost function, one needs to differentiate h(L) with respect to L and equate to 0:

$$\frac{\partial h}{\partial L_k} = 2 \left\{ \sum_{i=1}^{2^N} \hat{B}_{ik} \left[ \frac{2}{\pi} \arccos\left(\sqrt{U_i}\right) - \sum_{j=1}^{M} \hat{B}_{ij} L_j \right] \right\} = 0; \quad (7)$$

$$\forall k.$$

The following equation (more precisely set of equations) is obtained

$$\sum_{i=1}^{2^N} \sum_{j=1}^{M} \hat{B}_{ik} \hat{B}_{ij} L_j = \sum_{i=1}^{2^N} \hat{B}_{ik} \frac{2}{\pi} \arccos\left(\sqrt{U_i}\right), \quad (8)$$

where k=1, 2 . . . M. In matrix notation the set of equation translates to a simple expression

$$L = \left(\hat{B}^T \hat{B}\right)^{-1} \frac{2}{\pi} \left[\arccos\left(\sqrt{U}\right)\hat{B}\right]^T, \quad (9)$$

where $\sqrt{U}$ amounts to a component-wise square root. The solution above grants us an optimized vector of lengths L.

Example II—Electro-Absorption Modulator

As mentioned earlier, the present invention is not limited to implementations based on Mach-Zehnder modulators,

US 10,033,465 B2

13

and can be implemented using any device which modulates light intensity as a function of applied voltage. By way of one additional non-limiting implementation, FIG. 8 shows an analogous implementation of the present invention using an electro-absorption modulator.

An electro-absorption modulator (EAM) is a semiconductor device which allows control of the intensity of a laser beam via an electric voltage. Its operational principle is typically based on the Franz-Keldysh effect, i.e., a change of the absorption spectrum caused by an applied electric field, which usually does not involve the excitation of carriers by the electric field.

By realizing N or more electrodes we can use the EAM as a high speed electro-optical Digital-to-Analog converter, in a similar fashion as we used the MZI. As in modulator device 10 described above, this device includes an electronic input 12 for receiving an input data word D of N bits and an electrically controllable modulator 14 with M electrodes for modulating the intensity of an optical signal represented by arrow 16. An electrode actuating device 20 is responsive to the input data word D to supply an actuating voltage to the actuating electrodes 18.

Here too, to mitigate the non-linear behavior of the device, electrode actuating device 20 serves as a Digital-To-Digital Converter is employed to map an N bit input to a set of M electrodes, determining which of the M electrodes is actuated for each input value. The particular mapping varies according to the response characteristic of the particular modulator, but the principles of operation are fully analogous to those described above in the context of the Mach-Zehnder modulator implementation.

Example III—Modulated Light Generation Device

The present invention is applicable also to other devices where digital information carried by voltage or current is translated into analog optical signals in the form of optical power. This includes also light generation devices like Light Emitting Diodes (LED) or semiconductor lasers. By way of illustration, FIG. 9 shows a semiconductor laser implementation of the present invention.

Specifically, FIG. 9 shows a semiconductor laser DAC device, generally designated 40, constructed and operative according to the teachings of the present invention. The actuating electrode, typically implemented as a single contiguous electrode, is here subdivided into a threshold electrode 42 and M actuating electrodes 18. The threshold electrode 42 is typically needed to reach a minimum activation current below which no significant output is generated. Actuating electrodes 18 are actuated as a function of the data bits of a digital input 12, in this case a 4-bit data word, to generate an analog optical signal output of intensity representing the digital input.

In the particularly simple implementation illustrated here, neither L nor B is optimized. In other words, each actuating electrode 18 is part of a set interrelated with effective areas in 2:1 relation, and each electrode is actuated as a function of corresponding single bit of the input data word. The actuating current is typically roughly proportional to the area of electrodes actuated. This case is in itself believed to be patentable, and is thought to be of practical importance. Optionally, a closer approximation to a linear response can be achieved by modifying L (electrode proportions) and/or B (by including a DDC, not shown), all according to the principles discussed in detail above.

It will be appreciated that a similar device may be implemented using other semiconductor light generating

14

devices, such as LEDs. Depending upon the details of the device used, threshold electrode 42 may not be necessary. This and any other necessary device-specific modifications will be self-evident to one ordinarily skilled in the art.

Example IV—QAM Transmitter

Although described above in the context of devices for intensity/amplitude modulation, it should be noted that various embodiments of the present invention are also effective for modifying the phase of an optical signal, and can therefore be used as highly compact and simple QAM (Quadrature Amplitude Modulation) modulators or transmitters.

Specifically, referring back to FIG. 1, it will be noted that, by configuring the digital-to-digital converter DDC 20 to apply different actuation patterns to the electrodes on the two branches of the Mach Zehnder Modulator (MZM), modulation of the output signal phase can be achieved. Such an implementation will now be described with specific reference to FIGS. 10-13B.

Turning now to FIG. 10, there is shown a modulator device, generally designated 100, implemented as a QAM modulator. Modulator device 100 is essentially similar to the device of FIG. 1, but has been relabeled to convey more clearly its function. Specifically, modulator device 100 has a first plurality $M_1$ of actuating electrodes 18a deployed in operative relation to a first waveguide branch of the modulator and a second plurality $M_2$ of actuating electrodes 18b deployed in operative relation to a second waveguide branch of the modulator. In this case, $M_1=M_2=5$, giving a total number of actuating electrodes M=10. The electrode actuating device is here shown as two distinct digital-to-digital converters 20a and 20b, which are configured to actuate the first and second pluralities of actuating electrodes 18a and 18b in response to a given input data word $D_i$ so as to additionally modulate the phase of the optical signal. Clearly, digital-to-digital converters 20a and 20b can alternatively be combined into a single DDC with M=10 outputs with suitable connections to the actuating electrodes on both branches of the waveguide.

It will be appreciated that modulator device 100 can serve as an optical 16-QAM transmitter based on a single multi-electrode MZM (ME-MZM). Each electrode is divided into 5 segments, separately driven by two voltage signals, 0 and V representing binary 0 and 1, respectively. The center electrode is a common ground for the active electrode segments. The role of the modulator is to generate a desired M-QAM constellation which is composed of complex optical field values. The modulator is expected to generate $2^M$ signals:

$$s_i = r_i e^{i\theta_i}, r_i > 0, 0 \le \theta_i \le 2\pi, i=1, \ldots, 2^M, \tag{10}$$

In our example of a 16-QAM, with two sets of 5 electrodes, as an input, the QAM transmitter accepts an electrical 4-bit digital imput word, denoted $D_i$. The input word is mapped by two Digital-to-Digital Converters (DDC) onto each of the 10 (electrode) segments, whose lengths are the vectors $L^{1,2}$. Each DDC outputs a 5-bit word, denoted as $B_i^1$ and $B_i^2$. The output of transmitter can be written as:

$$E_{out,i} = \frac{1}{\sqrt{2}} E_{in} \exp\left\{ j2\pi \sum_j^{N_1} B_{ij}^1 L_j^1 \right\} + \frac{1}{\sqrt{2}} E_{in} \exp\left\{ -j2\pi \sum_j^{N_2} B_{ij}^2 L_j^2 \right\} \tag{11}$$

US 10,033,465 B2

15

where $E_{in}$ the optical field amplitude entering the modulator and $N_1$, $N_2$ are the number of segments on each arm. The elements $L_j^{1,2} \in L^{1,2}$ represent normalized electrode lengths on each arm. The two-level $B_{ij}^{1,2}$ coefficients are elements of the matrices $B_i^{1,2}$ and represent whether voltage v was applied to the j-th segment, on the respective arm. The index j enumerates the electrodes, $j=\{1 \ldots N_{1,2}\}$ on each arm. The summation is normalized to span $0 \leq \sum_j^N B_{ij}^{1,2} L_j \leq 1$, such that each arm induces a phaseshift of $0 \leq \Delta \varphi \leq 2\pi$.

The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as "Direct Digital Driving". The modulator can be regarded as a 2D Digital-to-Analog (D/A) converter, that converts a digital word into an optical vector signal.

The design of the transmitter involves the setting of electrode lengths, $L^{1,2}$ and DDC mappings, $B_i^{1,2}$, that will generate all the required signals given in Eq. (10). An effective combination of the electrode lengths and digital mappings may be derived either by analytical methods or numerically. A simple numerical derivation will now be presented.

A ME-MZM with $N_{1,2}$ electrode segments on each arm is capable of generating $2^{(N_1+N_2)}$ signals. Thus, by choosing carefully the electrode lengths, and assuming the number of segments sufficient to generate at least $2^{(N_1+N_2)} > M$ different signals, all the required signals described by Eq. (10) can be picked out of the generated signals pool.

As an example, FIG. 11A shows the an ideal Square-16-QAM constellation, which is the required signal constellation, and a signal pool

As an example, FIG. 11A shows the an ideal Square-16-QAM constellation, which is the required signal constellation, and a signal pool which was generated with $\{5,5\}$ electrodes. The best matched signals at the pool are marked in figure. It can be seen that there is a good match between the ideal and the best matched generated constellations.

Table 1 compares between an ideal 16-QAM constellation and a generated constellation with different combinations of number of electrodes each arm. It presents the symbol minimum distance and the root mean square error. The latter provides a measure of agreement between the ideal and the generated constellations. Configurations with $\{2,2\}$, $\{2,3\}$ and $\{3,3\}$ electrodes provide less than 16 different signals (minimum distance of 0) and therefore cannot be used for generation of 16-QAM.

TABLE 1

| $N_1$, $N_2$ | Ideal | 4, 2 | 4, 3 | 4, 4 | 4, 5 | 5, 5 | 5, 6 | 6, 6 |
|---|---|---|---|---|---|---|---|---|
| Minimum Distance | 2 | 1.66 | 1.66 | 1.66 | 1.30 | 1.83 | 1.67 | 1.67 |
| RMSE | 0 | 4.64 | 4.64 | 4.53 | 4.42 | 4.64 | 4.52 | 4.57 |

FIG. 11B presents the Symbol Error Rate (SER) performance for a range of Signal to Noise Ratios (SNR) for an Additive White Gaussian Noise (AWGN) channel. It can be seen that when using $\{6,6\}$ electrodes, the performance graph closely matches that of ideal 16-QAM constellation. Using a higher number of electrodes can lower the SER ever further toward the ideal curve. SER performance can be slightly improved by further tuning the decoding hypothesis testing at the receiver side to the generated constellation.

The electrode lengths used for the generation of FIG. 11B follow a binary sequences, $L^{1,2}=2^{-j}$. Tweaking the electrode lengths has small impact on the modulator performance. In

16

Eq. (11), we assumed driving signals of 0 and $2V_{\pi}$. The high driving signal can be lowered by extending the total electrode length twice its size. The opposite signs in the exponents in the two terms of Eq. (11) are already implemented by the geometry of the electrode disposition of FIG. 10, when the signs of the voltages applied are the same, since then the electric fields have opposite directions. Other electrode dispositions exist for different cuts of the electro-optic crystals, and the appropriate way of applying the voltage with the right signs should be clear to a person skilled in the art.

Referring now to FIGS. 12A-13B, it will be appreciated that the proposed modulator is capable of generating high order QAM constellations. FIG. 12A depicts the ideal 64-QAM constellation together with one generated using a $\{7,7\}$ electrodes modulator, while FIG. 12B shows an ideal 256-QAM constellation together with the one generated using a $\{10,10\}$ electrodes modulator. It can be seen that there is a good match between the ideal and the generated constellations. FIGS. 13A and 13B show the Symbol Error Rate performance for the generated constellations of FIGS. 12A and 12B, respectively.

A simple implementation of this embodiment described thus far generates Non-Return-to-Zero (NRZ) signals. NRZ permits constant intensity for similar consecutive bits, and is thus more susceptible to Inter-Symbol-Interference and other nonlinear propagation distortions. Return-to-Zero (RZ) format is a pulsed modulation where the signal "returns to zero" after every bit. This format provides better performance than NRZ, but usually requires additional hardware, such as a pulse carver. A transmitter based on the modulator of an embodiment of the invention can readily be extended to produce RZ pulses with minimal if any additional hardware. By adding an RZ control line to the DDC, as shown in FIG. 10, which serves as a trigger determining whether the output optical amplitude should be zero or other, the whole modulator will be capable of generating RZ signals. When the added control line is high, the DDC will map the electrode actuation pattern to the pattern corresponding to the middle point of the constellation, which is zero.

For the constellation presented in FIG. 10, $B_1=\{00010\}$ and $B_2=\{01110\}$ will output zero (or minimum) power because it will generate a phase difference of $\pi$ between the two arms of the MZM.

While the present invention has been presented as a digital-to-analog optical modulator, it should be noted that each embodiment of the invention may be modified to provide analog electrical output by use of an optical-to-electrical (OLE) converter. This option is illustrated in FIG. 1 as optional OLE converter 30. If the OLE converter itself has a non-linear response function, the present invention may advantageously be used to optimize the system parameters to linearize the electrical output rather than the (intermediate) optical output. Analogously, any nonlinearity induced by the optical medium used for transmitting the signal (e.g. optical fiber) can be compensated for by using OLE converter 30 as a linearizing device.

The present invention is applicable to substantially all applications requiring a DAC with optical or electrical output. Examples of particular interest include, but are not limited to, wireless communications systems, fiber-optic communication systems, cellular telephone networks, cable television, military applications, medical applications and hyper/super computer communications.

It will be appreciated that the above descriptions are intended only to serve as examples, and that many other

US 10,033,465 B2

17

18

embodiments are possible within the scope of the present invention as defined in the appended claims.

What is claimed is:

**1**. A method for converting digital electrical data into modulated optical signals, said method comprising

inputting into an optical modulator N bits of digital data in parallel, N being larger than 1;

mapping a set of N input values corresponding to said N bits of digital data to a vector of M voltage values where M is equal to or larger than N;

driving at least M electrodes of the optical modulator, enabled to pulse modulate at least an input optical stream, responsively to the M voltage values, to provide at least a pulse modulated output optical stream.

**2**. The method of claim **1**, wherein the M electrodes are distributed over a plurality of waveguide branches of the optical modulator and are enabled to modulate unmodulated optical input streams coupled to the waveguide branches.

**3**. A method of modulating and transmitting at least an optical signal over at least an optical fiber in response to N bits of digital data in parallel, the method comprising:

inputting the N bits of digital data into an optical modulator having a plurality of waveguide branches, where each branch has an input of an unmodulated optical signal;

converting the N bits of digital data to M drive voltage values, where M≥N and N>1;

coupling the M drive voltage values to the unmodulated optical signal, said coupling enabling pulse modulation of the unmodulated optical signal, thereby generating a pulse modulated optical signal;

transmitting the pulse modulated optical signals over at least an optical fiber.

**4**. A method for converting digital electrical data into modulated optical streams, said method comprising

inputting into an optical modulator N bits of digital data in parallel, N being larger than 1;

mapping a set of N input values corresponding to said N bits of digital data to a vector of M voltage values where M is equal to or larger than N;

driving at least M electrodes of the optical modulator, enabled to modulate by QAM at least an input optical stream, responsively to the M voltage values, to provide at least a QAM modulated output optical stream.

**5**. The method of claim **4**, wherein the M electrodes are distributed over a plurality of waveguide branches of the optical modulator and are enabled to modulate unmodulated optical input streams coupled to the waveguide branches.

**6**. A method for converting N bits of digital data input to at least a modulated optical stream and transmitting at least the modulated optical stream, the method comprising:

inputting the N bits of digital data input in parallel into an optical modulator where N>1;

converting the N bits of digital data input to a vector of M voltage values, where M≥N;

inputting at least an unmodulated optical input stream into the optical modulator;

driving M electrodes that are enabled to pulse modulate at least the unmodulated optical input stream to generate at least a pulse modulated optical output stream responsive to the M voltage values; and

transmitting at least the pulse modulated optical output stream over at least an optical fiber.

**7**. The methods of claim **6**, wherein the M electrodes are distributed over a plurality of waveguide branches and are enabled to modulate at least the unmodulated optical input stream coupled to the waveguide branches.

**8**. The method of claim **6**, wherein each electrode of the M electrodes modulates at least the unmodulated optical input stream responsive to a single voltage value of the M voltage values.

**9**. A method of modulating one or more unmodulated optical signals according to one or more predetermined QAM constellations in response to N bits of parallel digital data input, and transmitting the one or more QAM modulated optical signals over one or more optical fibers, the method comprising:

inputting the N bits of digital data input into an optical modulator within a module also containing at least a light source, wherein the optical modulator comprises a plurality of waveguide branches for receiving one or more unmodulated optical signals and outputting one or more modulated optical signals;

converting the N bits of digital data input to M voltages, where M≥N and N>1 drive;

coupling the M drive voltages to the one or more unmodulated optical signals, using M actuating electrodes, said coupling causing modulation of the one or more unmodulated optical signals, wherein the optical modulator outputs one or more QAM modulated optical signals; and

transmitting the one or more QAM modulated optical signals over one or more optical fibers.

**10**. A method for converting N bits of digital data input to at least a modulated optical stream and transmitting at least the modulated optical stream, the method comprising:

inputting the N bits of digital data input in parallel into an optical modulator where N>1;

converting the N bits of digital data input to a vector of M voltage values, where M≥N;

inputting at least an unmodulated optical input stream into the optical modulator;

driving M electrodes that are enabled to modulate by QAM at least the unmodulated optical input stream to generate at least a QAM modulated optical output stream responsive to the M voltage values; and

transmitting at least the QAM modulated optical output stream over at least an optical fiber.

**11**. The methods of claim **10**, wherein the M electrodes are distributed over a plurality of waveguide branches and are enabled to modulate at least the unmodulated optical input stream coupled to the waveguide branches.

**12**. The method of claim **10**, wherein each electrode of the M electrodes modulates at least the unmodulated optical input stream responsive to a single voltage value of the M voltage values.

**13**. A method of modulating and transmitting at least an optical signal over at least an optical fiber in response to N bits of digital data in parallel, the method comprising:

inputting the N bits of digital data into an optical modulator having a plurality of waveguide branches, where each branch has an input of an unmodulated optical signal;

converting the N bits of digital data to M drive voltage values, where M≥N and N>1;

coupling the M drive voltage values to the unmodulated optical signal, said coupling enabling modulation of the unmodulated optical signal by QAM, thereby generating a QAM modulated optical signal;

transmitting the QAM modulated optical signals over at least an optical fiber.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.           : 10,033,465 B2                                    Page 1 of 1
APPLICATION NO.      : 15/298327
DATED                : July 24, 2018
INVENTOR(S)          : Yossef Ehrlichman et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:


     In the Claims

     In Claim 9, Column 18, at Lines 18-19:
     "converting the N bits of digital data input to M voltages, where $M \geq N$ and $N > 1$ drive;"
     Should be changed to:
     -- converting the N bits of digital data input to M drive voltages, where $M \geq N$ and $N > 1$; --


Signed and Sealed this
Fourth Day of September, 2018

*Andrei Iancu*

Andrei Iancu
*Director of the United States Patent and Trademark Office*

Case 1:22-cv-00674-GBW Document 101 Filed 07/16/24 Page 62 of 269 PageID #: 2285



US010033465C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (12431st)

# United States Patent
Ehrlichman et al.

(10) **Number:** US 10,033,465 C1
(45) **Certificate Issued:** Oct. 30, 2023

(54) **LINEARIZED OPTICAL DIGITAL-TO-ANALOG MODULATOR**

(71) Applicant: **Ramot at Tel-Aviv University Ltd.**, Tel-Aviv (IL)

(72) Inventors: **Yossef Ehrlichman**, Nazareth Ilit (IL); **Ofer Amrani**, Tel Aviv (IL); **Shlomo Ruschin**, Herzliya (IL)

(73) Assignee: **RAMOT AT TEL-AVIV UNIVERSITY LTD.**, Tel-Aviv (IL)

**Reexamination Request:**
No. 90/014,528, Jun. 9, 2020
No. 90/014,607, Nov. 10, 2020
No. 90/014,728, Apr. 13, 2021

**Reexamination Certificate for:**
Patent No.: **10,033,465**
Issued: **Jul. 24, 2018**
Appl. No.: **15/298,327**
Filed: **Oct. 20, 2016**

Certificate of Correction issued Sep. 4, 2018

### Related U.S. Application Data

(63) Continuation of application No. 14/922,165, filed on Oct. 25, 2015, now Pat. No. 9,479,191, which is a
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *H04B 10/516* | (2013.01) |
| *H04B 10/25* | (2013.01) |
| *G02F 1/01* | (2006.01) |
| *G02F 1/225* | (2006.01) |
| *G02F 7/00* | (2006.01) |
| *H03M 1/00* | (2006.01) |
| *H03M 1/70* | (2006.01) |
| *H04B 10/2575* | (2013.01) |
| *H04B 10/50* | (2013.01) |

| | |
|---|---|
| *H04B 10/54* | (2013.01) |
| *H04B 10/556* | (2013.01) |
| | (Continued) |

(52) **U.S. Cl.**
CPC .......... *H04B 10/516* (2013.01); *G02F 1/0121* (2013.01); *G02F 1/225* (2013.01); *G02F 7/00* (2013.01); *H03M 1/002* (2013.01); *H03M 1/70* (2013.01); *H04B 10/2575* (2013.01); *H04B 10/25891* (2020.05); *H04B 10/505* (2013.01); *H04B 10/541* (2013.01); *H04B 10/556* (2013.01); *G02F 1/015* (2013.01); *G02F 1/212* (2021.01); *G02F 2203/19* (2013.01); *H04B 10/5055* (2013.01)

(58) **Field of Classification Search**
CPC .. G02F 1/212; G02F 2203/19; H04B 10/2575
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceedings for Reexamination Control Numbers 90/014,528, 90/014,607 and 90/014,728, please refer to the USPTO's Patent Electronic System.

*Primary Examiner* — Anjan K Deb

(57) **ABSTRACT**

A system for converting digital data into a modulated optical signal, comprises an electrically controllable device having M actuating electrodes. The device provides an optical signal that is modulated in response to binary voltages applied to the actuating electrodes. The system also comprises a digital-to-digital converter that provides a mapping of input data words to binary actuation vectors of M bits and supplies the binary actuation vectors as M bits of binary actuation voltages to the M actuating electrodes, where M is larger than the number of bits in each input data word. The digital-to-digital converter is enabled to map each digital input data word to a binary actuation vector by selecting a binary actuation vector from a subset of binary actuation vectors available to represent each of the input data words.



**US 10,033,465 C1**

**Related U.S. Application Data**

continuation of application No. 14/662,343, filed on
Mar. 19, 2015, now Pat. No. 9,203,425, which is a
continuation of application No. 14/325,486, filed on
Jul. 8, 2014, now Pat. No. 9,031,417, which is a
continuation of application No. 13/280,371, filed on
Oct. 25, 2011, now Pat. No. 8,797,198, which is a
continuation of application No. 12/636,805, filed on
Dec. 14, 2009, now Pat. No. 8,044,835, which is a
continuation-in-part of application No. PCT/IL2008/
000805, filed on Jun. 12, 2008.

(60)   Provisional application No. 60/943,559, filed on Jun.
13, 2007.

(51)   **Int. Cl.**
     *G02F 1/21*         (2006.01)
     *G02F 1/015*     (2006.01)

**1**

# EX PARTE REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1**, **4** and **13** are determined to be patentable as amended.

Claims **2** and **5**, dependent on an amended claim, are determined to be patentable.

New claims **14** and **15** are added and determined to be patentable.

Claims **3** and **6-12** were not reexamined.

**1**. A method for converting digital electrical data into modulated optical streams, said method comprising

inputting into an optical modulator N bits of digital data in parallel, N being larger than 1;

mapping a set of N input values corresponding to said N bits of digital data to a vector of M voltage values where M is equal to or larger than N, *wherein mapping comprises selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical;*

driving at least M electrodes of the optical modulator, enabled to pulse modulate at least an input optical stream, responsively to the M voltage values, to provide at least a pulse modulated output optical stream.

**4**. A method for converting digital electrical data into modulated optical streams, said method comprising

inputting into an optical modulator N bits of digital data in parallel, N being larger than 1;

mapping a set of N input values corresponding to said N bits of digital data to a vector of M voltage values where M is equal to or larger than N, *wherein mapping*

**2**

*comprises selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical;*

driving at least M electrodes of the optical modulator, enabled to modulate by QAM at least an input optical stream, responsively to the M voltage values, to provide at least a QAM modulated output optical stream.

**13**. A method of modulating and transmitting at least an optical signal over at least an optical fiber in response to N bits of digital data in parallel, the method comprising:

inputting the N bits of digital data into an optical modulator having a plurality of waveguide branches, where each branch has an input of an unmodulated optical signal;

converting the N bits of digital data to M drive voltage values, where M>N and N>1, *and wherein the converting comprises selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical;*

coupling the M drive voltage values to the unmodulated optical signal, said coupling enabling modulation of the unmodulated optical signal by QAM, thereby generating a QAM modulated optical signal;

transmitting the QAM modulated optical signals over at least an optical fiber.

*14. The method of claim 2, wherein at least a first one of the M voltage values drives a first of the plurality of waveguide branches, at least a second one of the M voltage values drives a second of the plurality of waveguide branches, the first and second waveguide branches are coupled to each other to provide the modulated output optical stream.*

*15. The method of claim 5, wherein at least a first one of the M voltage values drives a first of the plurality of waveguide branches, at least second one of the M voltage values drives a second of the plurality of waveguide branches, the first and second waveguide branches are coupled to each other to provide the QAM modulated output optical stream.*

* * * * *

EXHIBIT 3



US010270535B1

(12) **United States Patent**
Ehrlichman et al.

(10) Patent No.: **US 10,270,535 B1**
(45) Date of Patent: ***Apr. 23, 2019**

(54) **LINEARIZED OPTICAL DIGITAL-TO-ANALOG MODULATOR**

(71) Applicant: **Ramot at Tel-Aviv University Ltd.**, Tel-Aviv (IL)

(72) Inventors: **Yossef Ehrlichman**, Nazareth Ilit (IL); **Ofer Amrani**, Tel Aviv (IL); **Shlomo Ruschin**, Herzliya (IL)

(73) Assignee: **Ramot at Tel-Aviv University Ltd.**, Tel-Aviv (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/234,635**

(22) Filed: **Dec. 28, 2018**

**Related U.S. Application Data**

(63) Continuation of application No. 15/298,373, filed on Oct. 20, 2016, now Pat. No. 10,205,527, which is a
(Continued)

(51) **Int. Cl.**
$\qquad$ **H03M 1/00** (2006.01)
$\qquad$ **H04B 10/516** (2013.01)
(Continued)

(52) **U.S. Cl.**
$\qquad$ CPC ......... **H04B 10/516** (2013.01); **G02F 1/0121** (2013.01); **G02F 1/225** (2013.01);
(Continued)

(58) **Field of Classification Search**
$\qquad$ CPC ...... H03M 1/70; H03M 1/002; H04B 10/516; H04B 10/541; H04B 10/505;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,288,785 A 9/1981 Papuchon et al.
4,613,204 A 9/1986 Verber et al.
(Continued)

FOREIGN PATENT DOCUMENTS

DE 602005000276 5/2007
EP 0020216 12/1980
(Continued)

OTHER PUBLICATIONS

Applicant-Initiated Interview Summary dated Jul. 29, 2015 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/662,343.
(Continued)

*Primary Examiner* — Jean B Jeanglaude

(57) **ABSTRACT**

A system for converting digital data into a modulated optical signal, comprises an electrically controllable device having M actuating electrodes. The device provides an optical signal that is modulated in response to binary voltages applied to the actuating electrodes. The system also comprises a digital-to-digital converter that provides a mapping of input data words to binary actuation vectors of M bits and supplies the binary actuation vectors as M bits of binary actuation voltages to the M actuating electrodes, where M is larger than the number of bits in each input data word. The digital-to-digital converter is enabled to map each digital input data word to a binary actuation vector by selecting a binary actuation vector from a subset of binary actuation vectors available to represent each of the input data words.

**2 Claims, 13 Drawing Sheets**



Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 66 of 269 PageID #: 5289

## Related U.S. Application Data

continuation of application No. 14/922,165, filed on Oct. 25, 2015, now Pat. No. 9,479,191, which is a continuation of application No. 14/662,343, filed on Mar. 19, 2015, now Pat. No. 9,203,425, which is a continuation of application No. 14/325,486, filed on Jul. 8, 2014, now Pat. No. 9,031,417, which is a continuation of application No. 13/280,371, filed on Oct. 25, 2011, now Pat. No. 8,797,198, which is a continuation of application No. 12/636,805, filed on Dec. 14, 2009, now Pat. No. 8,044,835, which is a continuation-in-part of application No. PCT/IL2008/000805, filed on Jun. 12, 2008.

(60) Provisional application No. 60/943,559, filed on Jun. 13, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *H04B 10/50* | (2013.01) |
| *G02F 1/225* | (2006.01) |
| *G02F 7/00* | (2006.01) |
| *H04B 10/556* | (2013.01) |
| *H04B 10/54* | (2013.01) |
| *H04B 10/2575* | (2013.01) |
| *H04B 10/25* | (2013.01) |
| *H03M 1/70* | (2006.01) |
| *G02F 1/01* | (2006.01) |
| *G02F 1/015* | (2006.01) |
| *G02F 1/21* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *G02F 7/00* (2013.01); *H03M 1/002* (2013.01); *H03M 1/70* (2013.01); *H04B 10/2504* (2013.01); *H04B 10/2575* (2013.01); *H04B 10/505* (2013.01); *H04B 10/541* (2013.01); *H04B 10/556* (2013.01); *G02F 1/015* (2013.01); *G02F 2001/212* (2013.01); *G02F 2203/19* (2013.01); *H04B 10/5055* (2013.01)

(58) **Field of Classification Search**
CPC ............ H04B 10/2504; H04B 10/2575; H04B 10/556; H04B 10/5055; G02F 1/225; G02F 1/0121; G02F 7/00; G02F 1/015; G02F 2203/19; G02F 2001/212
USPC .................................. 341/131, 137, 143, 155
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,137,359 | A | 8/1992 | Steele |
| 5,543,952 | A | 8/1996 | Yonenaga et al. |
| 5,694,504 | A | 12/1997 | Yu et al. |
| 5,724,178 | A | 3/1998 | Grandpierre et al. |
| 5,917,638 | A | 6/1999 | Franck et al. |
| 6,760,111 | B1 | 7/2004 | Mark et al. |
| 6,781,537 | B1 | 8/2004 | Taraschuk et al. |
| 6,781,741 | B2 | 8/2004 | Uesaka |
| 7,061,414 | B2 | 6/2006 | Chen et al. |
| 7,203,552 | B2 | 4/2007 | Solomon |
| 7,212,292 | B2 | 5/2007 | Van Brocklin et al. |
| 7,403,711 | B2 | 7/2008 | Chen et al. |
| 7,483,597 | B2 | 1/2009 | Shastri et al. |
| 7,536,112 | B2 | 5/2009 | Yonenaga et al. |
| 7,792,398 | B2 | 9/2010 | Tanaka et al. |
| 7,873,284 | B2 * | 1/2011 | Chen .................... H04B 10/505 |
| | | | 398/183 |
| 7,978,390 | B2 | 7/2011 | Kikuchi |
| 8,044,835 | B2 | 10/2011 | Ehrlichman et al. |

| | | | |
|---|---|---|---|
| 9,031,417 | B2 | 5/2015 | Ehrlichman et al. |
| 9,203,425 | B2 | 12/2015 | Ehrlichman et al. |
| 9,991,966 | B1 * | 6/2018 | Celo .................. G02B 6/29343 |
| 10,033,465 | B2 * | 7/2018 | Ehrlichman .......... G02F 1/0121 |
| 10,205,527 | B2 * | 2/2019 | Ehrlichman .......... G02F 1/0121 |
| 2003/0076570 | A1 * | 4/2003 | Schemmann .......... H04B 10/61 |
| | | | 398/202 |
| 2004/0208614 | A1 | 10/2004 | Price |
| 2004/0213170 | A1 | 10/2004 | Bremer |
| 2005/0238367 | A1 * | 10/2005 | Chen .................... H04B 10/505 |
| | | | 398/188 |
| 2007/0212076 | A1 | 9/2007 | Roberts et al. |
| 2010/0156679 | A1 | 6/2010 | Ehrlichman et al. |
| 2012/0301149 | A1 | 11/2012 | Pinguet et al. |
| 2014/0321857 | A1 | 10/2014 | Ehrlichman et al. |
| 2015/0194982 | A1 | 7/2015 | Ehrlichman et al. |
| 2016/0043732 | A1 | 2/2016 | Ehrlichman et al. |
| 2017/0294968 | A1 | 10/2017 | Ehrlichman et al. |
| 2017/0302291 | A1 | 10/2017 | Ehrlichman et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0957596 | 11/1999 |
| EP | 1036302 | 9/2000 |
| EP | 2896993 | 7/2015 |
| WO | WO 2004/074914 | 9/2004 |
| WO | WO 2008/152642 | 12/2008 |

### OTHER PUBLICATIONS

Brief Communication Oral Proceedings on Sep. 18, 2014 Dated Aug. 25, 2014 From the European Patent Office Re. Application No. 08763563.7.
Communication Pursuant to Article 94(3) EPC Dated Jul. 12, 2013 From the European Patent Office Re. Application No. 08763563.7.
Communication Pursuant to Article 94(3) EPC Dated Apr. 25, 2018 From the European Patent Office Re. Application No. 15157901.8. (4 Pages).
Communication Pursuant to Article 94(3) EPC Dated Apr. 26, 2010 From the European Patent Office Re. Application No. 08763563.7.
Communication Pursuant to Article 94(3) EPC Dated Jul. 30, 2018 From the European Patent Office Re. Application No. 15157901.8. (4 Pages).
European Search Report and the European Search Opinion dated Apr. 9, 2015 From the European Patent Office Re. Application No. 15157901.8.
International Preliminary Report on Patentability dated Dec. 7, 2009 From the International Bureau of WIPO Re. Application No. PCT/IL2008/000805.
International Search Report and the Written Opinion dated Nov. 3, 2008 From the International Searching Authority Re. Application No. PCT/IL2008/000805.
Official Action dated Nov. 4, 2013 From the US Patent and Trademark Office Re. U.S. Appl. No. 13/280,371.
Official Action dated Jun. 7, 2018 From the US Patent and Trademark Office Re. U.S. Appl. No. 15/298,373. (10 pages).
Official Action dated Aug. 14, 2017 From the US Patent and Trademark Office Re. U.S. Appl. No. 15/298,327. (12 Pages).
Official Action dated Dec. 14, 2015 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/922,165.
Official Action dated Feb. 16, 2011 From the US Patent and Trademark Office Re. U.S. Appl. No. 12/636,805.
Official Action dated May 22, 2015 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/662,343.
Official Action dated Oct. 24, 2017 From the US Patent and Trademark Office Re. U.S. Appl. No. 15/298,373. (18 pages).
Official Action dated Oct. 30, 2014 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/325,486.
Provision of the Minutes in Accordance With Rule 124(4) EPC Dated Sep. 30, 2014 From the European Patent Office Re. Application No. 08763563.7.
Summons to Attend Oral Proceedings Pursuant to Rule 115(1) EPC Dated Apr. 28, 2014 From the European Patent Office Re. Application No. 08763563.7.

Case 1:22-cv-00674-GBW    Document 101    Filed 07/18/24    Page 67 of 269 PageID #: 3290

(56)         **References Cited**

OTHER PUBLICATIONS

Ehrlichman et al. "Generation of M-Ary Signals Using a Single Mach Zehnder Interfrometer", SPIE Digital Library, 7218, Integrated Optics: Devices, Materials, and Technologies XIII, 72180L, 5 Pages, Feb. 9, 2009.

Ehrlichman et al. "Generation of M-Ary Signals Using a Single MZI", School of Electrical Engineering Tel Aviv University, Israel,: 14 Pages, Presented at Photonics West 2009.

Ehrlichman et al. "Improved Digital-to-Analog Conversion Using Multi-Electrode Mach-Zehnder Interferometer", Journal of Lightwave Technology, 26(21): 3567-3575, Nov. 1, 2008.

Ehrlichman et al. "Multi-Electrode Approach for Interfacing Optical Computing Devices", School of Electrical Engineering Tel Aviv University, Israel, p. 1-25, Published in Vienna, Austria, Aug. 28, 2008.

Leven et al. "A 12.5 GSample/s Optical Digital-to-Analog Converter With 3.8 Effective Bits", The 17th Annual Meeting of the IEEE, Lasers and Electro-Optics Society 2004, LEOS 2004, 1: 270-271, Nov. 2004.

Vawter et al. "Digital Optical Phase Control in Ridge-Waveguide Phase Modulators", IEEE Photonics Technology Letters, XP000362933, 5(3): 313-315, Mar. 1, 1993.

Wang et al. "Research on the Modulation Phase Distortion Error Character of Y Wave-Guide in Fiber Optic Gyroscope", Proceedings of the 2008 International Symposium on Intelligent Information Technology Applications Workshop, IITAW '08, Shanghai, China, Dec. 21-22, 2008, p. 847-850, Dec. 21, 2008.

Yacoubian et al. "Digital-to-Analog Conversion Using Electrooptic Modulators", IEEE Photonics Technology Letters, 15(1): 117-119, Jan. 2003.

Zumbahlen "Basic Linear Design: Digital-to-Analog Converter Architectures: Intentionally Nonlinear DACs", Analog Devices Ltd., Section 6.1: 6.37-6.39, 2007.

* cited by examiner

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 69 of 269 PageID #: 3292



FIG. 1

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 70 of 269 PageID #: 3293



FIG. 2A
(PRIOR ART)

FIG. 2B

FIG. 2C



FIG. 3A

FIG. 3B

## FIG. 4

| DDC Input | DDC Output |
|-----------|------------|
| 0000 | 0000 |
| 0001 | 0011 |
| 0010 | 0100 |
| 0011 | 0101 |
| 0100 | 0101 |
| 0101 | 0110 |
| 0110 | 0111 |
| 0111 | 0111 |
| 1000 | 1000 |
| 1001 | 1001 |
| 1010 | 1001 |
| 1011 | 1010 |
| 1100 | 1011 |
| 1101 | 1011 |
| 1110 | 1100 |
| 1111 | 1101 |

## FIG. 5

| N=4 | | | N=8 | | | |
|---|---|---|---|---|---|---|
| U | O | | U | O | | |
| M=4-5 | M=4 | M=5 | M=8-10 | M=8 | M=9 | M=10 |
| 0.5 | 0.4073 | 0.4957 | 0.5 | 0.3871 | 0.5001 | 0.5 |
| 0.25 | 0.2443 | 0.2451 | 0.25 | 0.2243 | 0.25 | 0.2501 |
| 0.125 | 0.1506 | 0.1304 | 0.125 | 0.1311 | 0.125 | 0.1249 |
| 0.0625 | 0.0989 | 0.0527 | 0.0625 | 0.0799 | 0.0625 | 0.0625 |
| 0.0313 | | 0.038 | 0.0313 | 0.0527 | 0.0313 | 0.0312 |
| | | | 0.0156 | 0.0385 | 0.0155 | 0.0156 |
| | | | 0.0078 | 0.0312 | 0.0078 | 0.0079 |
| | | | 0.0039 | 0.0275 | 0.0038 | 0.004 |
| | | | 0.002 | | 0.002 | 0.0019 |
| | | | 0.001 | | | 0.001 |
| M=4: 0.9375 M=5: 0.9688 | M=4: 0.9011 | M=5: 0.9619 | M=8: 0.9961 M=9: 0.9981 M=10: 0.9991 | M=8: 0.9723 | M=9: 0.998 | M=10: 0.9991 |

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 72 of 269 PageID #: 2295

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 73 of 269 PageID #: 3296



FIG. 6A
(PRIOR ART)

FIG. 6B

FIG. 6C

Case 1:22-cv-00674-GBW   Document 101   Filed 07/16/24   Page 74 of 269 PageID #: 2297



FIG. 7A

FIG. 7B

Case 1:22-cv-00674-GBW    Document 101    Filed 07/18/24    Page 75 of 269 PageID #: 3298



FIG. 8

Case 1:22-cv-00674-GBW    Document 101    Filed 07/18/24    Page 76 of 269 PageID #: 2299



FIG. 9

Case 1:22-cv-00674-GBW    Document 101    Filed 07/18/24    Page 77 of 269 PageID #: 3300



FIG. 10



FIG. 11A

FIG. 11B

Case 1:22-cv-00674-GBW    Document 101    Filed 07/18/24    Page 79 of 269 PageID #: 2302

FIG. 12B



256-QAM

FIG. 12A



64-QAM



FIG. 13A

FIG. 13B

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 81 of 269 PageID #: 2304



FIG. 14 (PRIOR ART)

Case 1:22-cv-00674-GBW Document 101 Filed 07/16/24 Page 82 of 269 PageID #: 2305

1

## LINEARIZED OPTICAL DIGITAL-TO-ANALOG MODULATOR

### RELATED APPLICATIONS

This application is a continuation of U.S. patent application. No. 15/298,373 filed on Oct. 20, 2016, which is a continuation of U.S. patent application Ser. No. 14/922,165 filed on Oct. 25, 2015, now U.S. Pat. No. 9,479,191, which is a continuation of U.S. patent application Ser. No. 14/662, 343 filed on Mar. 19, 2015, now U.S. Pat. No. 9,203,425, which is a continuation of U.S. patent application Ser. No. 14/325,486 filed on Jul. 8, 2014, now U.S. Pat. No. 9,031, 417, which is a continuation of U.S. patent application Ser. No. 13/280,371 filed on Oct. 25, 2011, now U.S. Pat. No. 8,797,198, which is a continuation of U.S. patent application Ser. No. 12/636,805, filed on Dec. 14, 2009, now U.S. Pat. No. 8,044,835, which is a continuation-in-part of PCT Patent Application No. PCT/IL2008/000805 filed on Jun. 12, 2008, which claims the benefit of priority of U.S. Provisional Patent Application No. 60/943,559 filed on Jun. 13, 2007.

The contents of the above applications are all incorporated by reference as if fully set forth herein in their entirety.

### FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to optical modulators and, in particular, it concerns a linearized optical digital-to-analog modulator.

There is a tangible need for high-performance and large bandwidth digital to analog signal conversion. Furthermore, as the RF and digital domains converge, entirely new solutions will be needed to enable multi-GHz mixed-signal systems. Probably the most prominent area to benefit is the wireless communication industry. The ever increasing thirst for bandwidth will require data converters to deliver greatly increased performance. For example, analog signals are transmitted in cable television (CATV) via optical fibers and the demand for increasing bandwidth is driving technology to speed-up the processing of signals as well as the transmission. High performance digital to analog conversion is also required to address the growing demands of wireless carriers for supporting the heavy traffic expected in the base station. Additional specific areas to benefit include: the defense and government industries that concentrate on deploying multi-function, dynamically reconfigurable systems (RADAR, electronic warfare, and surveillance applications); medical imaging; and hyper/super-computer communications.

One of the most widely deployed devices for analog optics modulation is the Mach-Zehnder Interferometer modulator (MZI). For binary digital signals, it is today the preferred device for long-haul fiber-optic communication, leading to chirp-free pulses which can reach hundreds of kilometers in optical fibers without the need for regeneration. For analog applications, however, a serious problem is encountered due to the inherent non-linear response of the modulator. Specifically, since the modulating voltage via the electro-optic effect controls the optical phase delay in a basically linear fashion and the attenuation varies as the cosine of the phase difference between the two branches of the device, a linear variation in phase difference and thus in applied voltage results in a cosine-shaped output variation, as seen in the pattern of points in FIG. 2A. The common solutions for this problem are either the biasing of the device

2

to a quasi linear regime coupled with reducing the modulation range to reduce distortion, or use of an analog pre-distortion circuit to feed the modulator. Since in practically all present systems signals are processed digitally, a multi-bit Digital-to-Analog Converter (DAC) device is needed with fast processing capabilities.

A DAC based on a multi-electrode MZI modulator concept was proposed many years ago by Papuchon et al. and is described in U.S. Pat. No. 4,288,785. In that device, the electrodes' sectioning length followed a conventional power-of-two digital sequence, which did not solve the non-linearity problem, and thus suffered from severe limitation in the dynamic range, and subsequently the attainable resolution. More recently, much more complex devices have been presented to cope with these problems: Yacoubian et al. ("Digital-to-analog conversion using electrooptic modulators," IEEE Photonics Technology Letters, vol. 15, pp. 117-119, January 2003), proposed the employment of one MZI modulator for each and every bit. A recently reported design by Leven et al. ("A 12.5 gsamples/s optical digital-to-analog converter with 3.8 effective bits," Lasers and Electro-Optics Society, 2004. LEOS 2004. The 17th Annual Meeting of the IEEE, vol. 1, pp. 270-271, November 2004), also the subject of U.S. Pat. No. 7,061,414 entitled "Optical Digital-To-Analog Converter" to Y K Chen et al., employs a single modulator for every 2 bits and is highly nonlinear; it yields only 3.8 effective bits for a 6 bit design.

There is therefore a need for a digital to analog converter which would offer improved linearity of response without sacrificing efficiency or dynamic range.

### SUMMARY OF THE INVENTION

The present invention is a linearized optical digital-to-analog modulator.

According to the teachings of the present invention there is provided, a modulator device for converting digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits; (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating electrodes where M≥N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, wherein the electrode actuating device actuates at least one of the actuating electrodes as a function of values of more than one bit of the input data word.

According to a further feature of the present invention, the electrode actuating device includes a digital-to-digital converter.

According to a further feature of the present invention, the modulator is a modulated semiconductor light generating device. According to an alternative feature of the present invention, the modulator is an electro-absorption modulator. According to yet a further alternative, the modulator is a Mach-Zehnder modulator.

According to a further feature of the present invention, in the case of a Mach-Zehnder modulator, the modulator includes M actuating electrodes on each of two waveguide branches of the modulator. In certain preferred cases, M is greater than N.

According to a further feature of the present invention, in the case of a Mach-Zehnder modulator, the electrode actuating device is configured to actuate the first and second pluralities of actuating electrodes so as to modulate the

US 10,270,535 B1

3

optical signal according to a QAM (Quadrature Amplitude Modulation) modulation scheme with at least 16 constellation points.

According to a further feature of the present invention, the electrode actuating device is configured to actuate the first and second pluralities of actuating electrodes so as to modulate the optical signal to a minimum amplitude for a return-to-zero signal between successive input data words.

According to a further feature of the present invention, the modulator has a maximum dynamic range, and wherein the electrode actuating device is configured to actuate the actuating electrodes so as to generate modulation of the optical signal spanning a majority of the dynamic range.

According to a further feature of the present invention, the electrode actuating device is configured to apply one of two common actuating voltages to the actuating electrodes.

According to a further feature of the present invention, the actuating electrodes have differing effective areas. According to one set of applications, the differing effective areas form a set, members of the set being interrelated approximately by factors of two. In other preferred cases, the set including at least one effective area which is not interrelated to others of the set by factors of two.

According to a further feature of the present invention, the modulator has a non-linear response, and the electrode actuating device is configured to actuate the actuating electrodes so as to generate an improved approximation to a linear modulation of the optical signal as a function of the input data word.

According to a further feature of the present invention, there is also provided an optical to electrical converter deployed so as to generate an electrical signal as a function of intensity of the modulated optical signal.

There is also provided according to a further feature of the present invention, an apparatus comprising a digital-to-analog converter, the converter comprising: (a) an electronic input for receiving an input data word of N bits; (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating electrodes where M N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, wherein the electrode actuating device actuates at least one of the actuating electrodes as a function of values of more than one bit of the input data word.

There is also provided according to the teachings of the present invention, a method for converting a digital data input word of N bits into an analog signal comprising: (a) processing the digital data input word to generate an electrode actuation vector of M values where M N; and (b) applying M voltage values corresponding to the actuation vector values to M actuating electrodes of an electrically controllable modulator for modulating the intensity of an optical signal, wherein at least one value of the actuation vector varies as a function of values of more than one bit of the input data word.

According to a further feature of the present invention, the electrode actuation vector is a binary vector, and wherein the M voltage values are selected from two voltage levels according to the M binary values.

According to a further feature of the present invention, the processing is performed by a digital-to-digital converter.

According to a further feature of the present invention, an electrical output is generated as a function of the intensity of the modulated optical signal.

4

There is also provided according to the teachings of the present invention, a modulator device for converting digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits; (b) a semiconductor light generating device for generating an optical signal of variable intensity, the semiconductor light generating device including M actuating electrodes where M N; and (c) an electrode actuating device associated with the electronic input and the semiconductor light generating device, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, thereby generating an output intensity corresponding substantially to the input data word.

According to a further feature of the present invention, the actuating electrodes have differing effective areas.

According to a further feature of the present invention, the differing effective areas form a set, members of the set being interrelated approximately by factors of two.

According to a further feature of the present invention, the differing effective areas form a set, the set including at least one effective area which is not interrelated to others of the set by factors of two.

According to a further feature of the present invention, M=N.

According to a further feature of the present invention, the semiconductor light generating device is a semiconductor laser.

According to a further feature of the present invention, the semiconductor laser further includes a threshold electrode configured to provide a threshold actuation current.

According to a further feature of the present invention, the semiconductor light generating device is a light emitting diode.

There is also provided according to the teachings of the present invention, a modulator device for converting digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits; (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating electrodes where M N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, wherein the actuating electrodes have differing effective areas, the differing effective areas forming a set, the set including at least one effective area which is not interrelated to others of the set by factors of two.

At this point, it will be useful to define various terminology as used herein in the description and claims. The terms "digital" and "analog" are used in their normal senses as common in the field. Specifically, "digital" refers to a form of data where values are stored or processed numerically, typically broken up into bits of a binary number for machine processing, whereas "analog" refers to a form of data in which values are represented by different levels within a range of values of an essentially continuously variable parameter.

The phrase "digital-to-digital converter" is used to refer to a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical. The "digital-to-digital converter" employed by certain embodiments of the present invention is a non-trivial converter in which there is typi-

US 10,270,535 B1

5

cally not a one-to-one mapping between bits of the input data and bits of the output data, as will be clear from the description following.

The term "binary" is used to refer to values, voltages or other parameters which assume one or other of only two possible values, and modes of operation which use such parameters. In this context, voltage levels are referred to as "common" to a number of electrodes if activation of the electrodes is performed by switching connection of each of the electrodes between the voltage values in question.

The term "electrode" is used to refer to the electrical connections of an optical modulator device through which the device is controlled. In the case of an electrode which applies an electric field to affect the optical properties of an adjacent material, reference is made to an "effective area" which is used as an indication of the relative influence of the electrode compared to that of other electrodes on the optical properties of the underlying waveguide if actuated by a similar voltage. In many cases, the actuating electrodes are all of the same effective width, for example where they overlie a long narrow waveguide. The "effective area" may then be referred to as an "effective length", corresponding to the length of waveguide overlaid by the corresponding electrode and related to the "effective area" by a constant scaling factor. This scaling factor will vary according to variations in shape, width, waveguide properties or other design parameters. Any part of the electrode not overlying the active part of the modulator device or otherwise ineffective for generating modulation of an optical signal is not included in the "effective area".

The term "modulator" is used to refer to any device which outputs an optical signal with controlled variation of intensity, whether the variation is induced during production of the signal (such as in a semiconductor laser) or whether a signal input from another source is modified.

The term "optical power" is used to refer to the quantitative manifestation of the analog optical signal.

BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

The invention is herein described, by way of example only, with reference to the accompanying drawings, wherein:

FIG. 1 is a schematic representation of a modulator device, constructed and operative according to the teachings of the present invention, for converting digital data into analog modulation of an optical or electrical signal;

FIG. 2A is a graph showing the intensity output generated by an unmodified Mach-Zehnder modulator employing four electrodes with lengths interrelated by factors of two and driven directly by corresponding bits of a digital input word, the output being shown relative to a line corresponding to an ideal linear response;

FIG. 2B is a graph showing an intensity output generated according to an implementation of the present invention employing a full-range Mach-Zehnder modulator with four electrodes of lengths interrelated by factors of two driven according to the teachings of the present invention;

FIG. 2C is a graph similar to FIG. 2B showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 3A is a graph showing the intensity output achieved by the modulator of the present invention implemented with five actuating electrodes for a four bit input word, where the five electrodes have lengths interrelated by factors of two;

6

FIG. 3B is a graph similar to FIG. 3A showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 4 is a table illustrating a digital-to-digital converter input and output where the input corresponds to the input data word and the output corresponds to the electrode actuation pattern for generating the outputs of FIGS. 2B and 2C;

FIG. 5 is a table illustrating unoptimized and optimized normalized electrode lengths for cases on input words of 4 and 8 bits and numbers of electrodes of 4, 5, 8, 9 and 10;

FIG. 6A is a graph showing the intensity output generated by an unmodified Mach-Zehnder modulator employing eight electrodes with lengths interrelated by factors of two and driven directly by corresponding bits of a digital input word, the output being shown relative to a line corresponding to an ideal linear response;

FIG. 6B is a graph showing an intensity output generated according to an implementation of the present invention employing a Mach-Zehnder modulator with eight electrodes of lengths interrelated by factors of two driven according to the teachings of the present invention;

FIG. 6C is a graph similar to FIG. 6B showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 7A is a graph showing the intensity output achieved by the modulator of the present invention implemented with nine actuating electrodes for an eight bit input word, where the nine electrodes have lengths interrelated by factors of two;

FIG. 7B is a graph similar to FIG. 7A showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 8 is a schematic representation of an alternative implementation of the present invention based upon an electro-absorption modulator (EAM);

FIG. 9 is a schematic representation of yet another alternative implementation of the present invention based upon a semiconductor laser;

FIG. 10 is a schematic representation of a modulator device, similar to the device of FIG. 1, implemented as a 16-QAM modulator;

FIG. 11A is a constellation diagram for the device of FIG. 10 illustrating a choice of constellation points, and corresponding electrode actuation patterns, for implementing a 16-QAM modulator;

FIG. 11B is a graph showing the symbol error rate performance for the devices of FIG. 12A implemented with different numbers of electrodes;

FIGS. 12A and 12B are simplified constellation diagrams showing only closest matching points for implementation of a 64-QAM using two sets of 7 electrodes and a 256-QAM using two sets of 10 electrodes, respectively;

FIGS. 13A and 13B are graphs showing the symbol error rate performance for the devices of FIGS. 12A and 12B, respectively; and

FIG. 14 is a schematic representation of a prior art Mach-Zehnder modulator configured as a DAC.

DESCRIPTION OF SPECIFIC EMBODIMENTS OF THE INVENTION

The present invention is a modulator device for converting digital data into analog modulation of an optical signal.

Case 1:22-cv-00674-GBW   Document 101   Filed 07/18/24   Page 85 of 269 PageID #: 3308

The principles and operation of modulator devices according to the present invention may be better understood with reference to the drawings and the accompanying description.

Referring now to the drawings, FIG. **1** shows schematically a modulator device, generally designated **10**, constructed and operative according to the teachings of the present invention, for converting digital data into analog modulation of an optical signal. Generally speaking, modulator device **10** has an electronic input **12** for receiving an input data word D of N bits and an electrically controllable modulator **14** for modulating the intensity of an optical signal represented by arrow **16**. Modulator **14** includes M actuating electrodes **18** where M≥N. Modulator device **10** also includes an electrode actuating device **20** responsive to the input data word D to supply an actuating voltage to the actuating electrodes **18**. It is a particular feature of a first aspect of the present invention that electrode actuating device **20** actuates at least one of actuating electrodes **18** as a function of values of more than one bit of the input data word D. In other words, at least one of the electrodes is actuated in a manner differing from a simple one-to-one mapping of data bits to electrode voltage, thereby providing freedom to choose the electrode actuation pattern which best approximates a desired ideal output for the given input. According to a second complementary, or alternative, aspect of the present invention, the effective areas of actuating electrodes are optimized so that at least some of the electrode effective areas differ from a simple factor-of-two series.

The basic operation of a first preferred implementation of modulator device **10** will be understood with reference to FIGS. **2**A and **2**B. FIG. **2**A shows the output intensity values which would be obtained by supplying a voltage sufficient to generate full dynamic range modulation to a set of four electrodes according to a direct mapping of each bit of a 4-bit input data word to a corresponding electrode. The full range of input values 0000 through 1111 and the corresponding output intensities have been normalized to the range 0-1. The marked deviation from linearity in the form of a cosine variation is clearly visible. In contrast, FIG. **2**B shows the output intensity using the same four electrodes after the input data has been mapped according to the teachings of the present invention to a pattern of electrode actuation approximating more closely to a linear response. In other words, for each input value, the output value from FIG. **2**A most closely approximating the corresponding theoretical linear response is determined, and the corresponding pattern of electrode actuation is applied. By way of example, in FIG. **2**A, it will be noted that output point **22** corresponding to an input of 0011 is higher than desired for the ideal linear response. The outputs generated by electrode actuation patterns corresponding to value 0100 (point **24**) is closer to the required value, and 0101 (point **26**) is even closer. An output pattern of 0101 is thus chosen to correspond to an input of 0011. The overall result is an output which much more closely approximates to a linear response as shown.

Most preferably, electrode actuating device **20** includes a digital-to-digital converter. It will be appreciated that such a converter may be implemented from very straightforward and high-speed logic components which make it feasible to employ the present invention in high frequency systems. Electronic input **12** may be simply the input pins of digital-to-digital converter **20**. FIG. **4** illustrates a preferred implementation of the digital-to-digital mapping employed to generate the output of FIG. **2**B. A digital-to-digital converter suitable for implementing the various embodiments of the present invention may readily be implemented using commercially available high-speed Application Specific Integrated Circuits ("ASIC"), as will be clear to one ordinarily skilled in the art.

The first implementation described thus far features N=M=4 with lengths of the electrodes retaining the conventional ratios of factors of two and employing simple on-off level voltage switching of a common actuating voltage to all currently actuated actuating electrodes. While such an implementation offers markedly improved linearity of response compared to the unmodified response of FIG. **2**A, it should be noted that the output intensity is not uniquely defined for each input value. Where uniqueness of the output values is required, or where a higher degree of linearity is needed, further modification may be required. Various forms of further modification may be employed including, but not limited to: use of multiple actuating voltage levels; use of modified electrode lengths; and addition of additional electrodes (i.e., M>N). These different options will be discussed below.

One option for further modification of the output is to modify the actuating voltage applied to each electrode, such as by switching between different distinct voltage levels.

An alternative preferred option for modifying the output to achieve a better approximation to a linear output is modification of the electrode lengths relative to the factor of two series assumed above. A non-limiting example of an approach for determining preferred electrode proportions will be presented below in the context of a Mach-Zehnder modulator. A corresponding practical example of electrode length values for N=M=4 is shown in the second column of FIG. **5**. FIG. **2**C illustrates the intensity output employing electrodes with lengths in the proportions listed. A comparison of the root-mean-square error from linearity for FIGS. **2**B and **2**C shows that the adjustment of electrode lengths results in an additional slight improvement to linearity.

A further option for modifying the performance of modulator device **10** is the addition of one or more additional electrodes, i.e., M>N. This provides an additional degree of freedom for correcting non-linearity of the response. In the case of unmodified electrode dimensions related by factors of two, each additional electrode is typically half the dimension of the previously smallest electrode. Where the electrode dimensions are further modified, the additional electrode dimension is preferably included within an optimization process in order to determine a preferred dimension for the additional electrode(s) along with the other electrodes. FIGS. **3**A and **3**B show outputs from the device of the present invention for an example of N=4 and M=5, with and without modification of the electrode dimensions, respectively. The electrode lengths are shown for the unmodified series in the first column of FIG. **5** and for the optimized length electrodes in the third column of FIG. **5**.

Parenthetically, although the present invention is described herein in the context of a preferred example of linearization of a modulator device which inherently has a non-linear response, the principles of the present invention may equally be applied to any case where a natural response of a modulator provides a first function and a desired response is a different second function which may be linear or non-linear. Thus, the present invention may be employed to convert a digital input into an analog output approximating to any desired response curve within the dynamic range of the modulator. Non-limiting examples include where a desired output response curve is sinusoidal or exponential, or where it is desired to increase the resolution or "contrast" of the output within a specific range of input values.

Case 1:22-cv-00074-GBW   Document 101   Filed 07/18/24   Page 86 of 269 PageID #: 3306

9

Clearly, the present invention is not limited to applications with 4-bit data input, and can be implemented with substantially any number of data bits commensurable with other limitations of the system, such as signal-to-noise requirements. By way of example, FIGS. 6A-6C, 7A and 7B illustrate a number of implementations with 8-bit input data words. Specifically, for purpose of reference, FIG. 6A shows the unmodified output of an 8-bit arrangement where each data bit is applied directly to a corresponding electrode, again showing the underlying cosine response of the modulator. FIG. 6B illustrates the output of an implementation according to the teachings of the present invention with N=M=8 and standard lengths of electrodes interrelated by factors of 2, as in the fourth column of FIG. 5. FIG. 6C shows output for a similar device where the electrode lengths have been modified according to the values shown in the fifth column of FIG. 5. FIGS. 7A and 7B show the output of similar devices for N=8 but with an extra electrode, i.e., M=9. In the case of FIG. 7A, the device has unmodified electrode lengths as shown in the fourth column of FIG. 5, while in the device of FIG. 7B, the electrode lengths are modified according to the proportions shown in the sixth column of FIG. 5.

### Example I—Mach-Zehnder Modulator

By way of example, there will now be presented a theoretical treatment of one particularly preferred example of modulator device 10 implemented using a Mach-Zehnder modulator, also referred to as a Mach-Zehnder Interferometer or "MZI". This theoretical treatment is presented to facilitate an understanding of the present invention and as a suggested technique for calculating certain parameters. However, it should be noted that the invention as described above has been found to be effective, independent of the accuracy or otherwise of this theoretical treatment. The Mach-Zehnder modulator is an active integrated waveguide device consisting of a higher index guide region that splits into two paths which are combined again after a certain distance. Each of these paths is referred to as a leg or branch. When used as a switch, the MZI may be turned "off" by raising or lowering the index of refraction in one of the legs. This is achieved by employing the electro-optic effect to produce a 180-degree change in phase by means of optical-path length. Intermediate optical attenuation levels can be obtained by inducing changes other than 180 degrees.

In the case described above of FIG. 1, a 4-bit Digital-to-Analog Converter, based on a Multi-Electrode (ME) Mach-Zehnder Interferometer, is presented. The input to the device consists of 4 bits. Using the Digital-to-Digital converter, which may be thought of as a look-up table, the 4 data bits are mapped to 5 electrodes as this realization is equipped with a single excess electrode. According to one option, if an electrical rather than optical output is desired, the optical signal at the output is detected and converted to an electrical (analog) signal.

It should be noted that, in the context of a MZI, it is common to split the electrodes to act in an opposite manner on the two legs of the device, for example, one side raising and the other lowering the refractive index of the material, thereby reducing the actuation voltage required. In such cases, the value M is the number of actuating electrodes on each of the two waveguide branches of the modulator.
Mathematical Description

The properties of the MZI may be described mathematically as follows. Let l denote a vector of electrode lengths. The number of elements in l is M. Also let V denote a

10

corresponding vector (of length M) of electrode control-voltages. When applying a voltage $V_j$ only to electrode $e_j$, whose length is $l_j$, the phase of light propagating in the modulating leg, shifts by

$$\pi \frac{V_j \cdot l_j}{v_\pi \cdot l_\pi},$$

where $v_\pi \cdot l_\pi$ corresponds to the voltage-length product leading to a $\pi$ shift in the phase. It is used as a merit figure of the MZI modulator. We define new normalized electrode length by:

$$L_j = \frac{l_j}{l_\pi} \tag{1}$$

Gathering the total contribution from all electrodes, the following transmission function of the MZI is obtained:

$$T(V, L) = \cos^2\left(\frac{\pi}{2} \frac{V \cdot L^T}{v_\pi}\right) \tag{2}$$

where the superscript T denotes transposition. The contribution from each electrode $e_j$, j=1, 2, . . . M, to the total phase shift, is permitted by applying some non-zero voltage $V_j$=v. We chose to work with binary values for all electrode voltages, $V_j$=0, v, a clearly desirable requirement which, moreover, makes the design simpler as discussed next. Note that by setting the lower voltage to a value greater than zero, the maximum output level of the MZI is decreased thus reducing the dynamic range. Let $D_i$ denote a digital binary input vector of length N, where i=1, . . . , $2^N$. For each digital vector $D_i$, the DDC component in FIG. 1 produces a corresponding binary vector $B_i$, of length M. $B_i$ multiplied by v, represents the actual (internal) vector of voltages controlling the M electrodes. When multiplying a real number, $B_i$ should be interpreted as binary vector whose elements are the real numbers {0,1}. With respect to (2), this means that when $V_j$=v, $B_{ij}$=1, and when $V_j$=0, $B_{ij}$=0; $B_{ij}$ being the j-th element of the control vector $B_i$. At this time we define B to be a matrix of size $2^N \times M$ whose rows consist of the set of binary control vectors $B_i$, each of length M. Hence, (2) can be rewritten as

$$T(B_i, L) = \cos^2\left(\frac{\pi}{2} \frac{v}{v_\pi} \sum_{j=1}^{M} B_{ij} L_j\right) \tag{3}$$

Without loss of generality v=$v_\pi$ will be assumed henceforth. (Preferably $v_j$=$v_\pi$ to ensure full coverage of the modulating range and efficient use of the input optical power.) When the number of electrodes equals the number of data bits, i.e. when M=N, an implementation in a standard approach according to the system of FIG. 10 while trying to exploit the dynamic range of the transfer function (3) to its fullest results in high nonlinearity errors. This is demonstrated in FIG. 2A for M=N=4. For this demonstration it is assumed that an unoptimized straightforward selection is made, where B is the set of all 16 binary 4-tuples, i.e. $B^T$={0000, . . . , 1111} and L is taken as {0.5, 0.25, 0.125,

Case 1:22-cv-00674-GBW    Document 101    Filed 07/18/24    Page 87 of 269 PageID #: 2310

11

0.0625}. In the next section, one suggested approach to optimizing L and B will be proposed.

Optimization of B and L

In order to improve the linearity as well as the dynamic range of the conversion process, we propose that the lengths of the elements of L and the control vectors B be optimized. As described above, it is possible to optimize one or both of B and L. In practice, optimization of L alone may provide a non-monotonic variation of output together with some improvement in linearity and dynamic range. This may be sufficient for applications in which the non-linearity is relatively small, such as the semiconductor laser embodiments to be discussed below. For more significantly non-linear devices, the options of optimized B with unoptimized L, and optimized B and L are typically more suitable.

We consider these options separately since their implementation require different hardware. An unoptimized set of electrode lengths L consists of

$L_j = 2^{-j}$, with $j=1 \ldots M$. An unoptimized matrix B will consist of all $2^N$ binary N-tuples. In that case, with a slight abuse of notations we have that $B_i = D_i$; $i=0, 1, 2, \ldots 2^N-1$. Hence, designs with optimized B require Digital-to-Digital conversion while designs with optimized L only do not. Whenever B is optimized, and for any number of electrodes M; M≥N, it is understood that a binary input data vector $D_j$ has to be mapped to a control vector $B_i$, yet $B_i \neq D_i$. The DDC, implemented as all-electronic, shall perform this mapping operation.

As the optimization criterion we shall use the root mean square error (RMSE) between an ideal output, represented by a straight line, and the converter output. Let

$$U_i = \frac{i}{2^N}$$

denote the ideal analog value required for representing the digital input $D_i$. The RMSE is defined as follows:

$$g(B, L) = \sqrt{\frac{1}{2^N} \sum_{i=1}^{2^N} \left[ U_i - \cos^2\left(\frac{\pi}{2}\sum_{j=1}^{M} B_{ij} L_j\right) \right]^2} \quad (4)$$

The optimization problem can now be formulated as minimizing the values of g(B,L) for all possible values of the matrix B and the vector L.

Note that this optimum solution is aimed at minimizing the average (squared) deviation between the desired output and the converter output. Clearly, this is only one non-limiting example, and various other linearity measures may equally be used. Similarly, as mentioned earlier, the desired output response function itself may take any desired form, and for each function, a suitable optimization criterion must be selected.

Approaching (4) as a global optimization problem with an order of $O(2^N \times M)$ variables, is quite involved, especially since the variables are of mixed type, B is binary while L is real. (It is related to a nonlinear mixed integer zero-one optimization problem.) It is therefore typically preferred to employ a near-optimum two-step approach. First, B is determined assuming an unoptimized set of electrodes L, $L_j = 2^{-j}$, with $j=1 \ldots M$. The obtained matrix is denoted by $\hat{B}$. Then, given $\hat{B}$, L is obtained such that (4) is minimized.

12

If L is an unoptimized set of electrodes, $L_j = 2^{-j}$. Then, the output of the converter as given by (3) is a function of the control $B_i$ only. Since one aims at obtaining a straight line, whose quantized values are given by $U_i$, then it is not difficult to verify that the best approximated selection of $\hat{B}_i$ is given by

$$\hat{B}_i = Dec2Bin_M\left(\frac{2}{\pi}\arccos\left(\sqrt{U_i}\right)\right), \quad (5)$$

where the function $Dec2Bin_M(x)$ maps a real value x, $0 < x < 1$, to its closest M-bit binary representation. Note that this, in effect quantization, process may result in several input data vectors having the same analog representation. In applications in which this duplicate representation is considered problematic, it is effectively mitigated by choosing M>N.

Given $\hat{B}$, we proceed to optimize L. Assuming there exists a set of electrodes L such that

$$\cos^2\left(\frac{\pi}{2}\sum_{j=1}^{M} \hat{B}_{ij} L_j\right) \approx U_i; \forall i,$$

then as an alternative to (4), we may define an equivalent cost function, which is easier to handle mathematically:

$$h(L) = \left\{ \sum_{i=1}^{2^N} \left[ \frac{2}{\pi}\arccos\left(\sqrt{U_i}\right) - \sum_{j=1}^{M} \hat{B}_{ij} L_j \right]^2 \right\}. \quad (6)$$

To minimize this cost function, one needs to differentiate h(L) with respect to L and equate to 0:

$$\frac{\partial h}{\partial L_k} = 2\left\{ \sum_{i=1}^{2^N} \hat{B}_{ik} \left[ \frac{2}{\pi}\arccos\left(\sqrt{U_i}\right) - \sum_{j=1}^{M} \hat{B}_{ij} L_j \right] \right\} = 0; \forall k. \quad (7)$$

The following equation (more precisely set of equations) is obtained

$$\sum_{i=1}^{2^N} \sum_{j=1}^{M} \hat{B}_{ik} \hat{B}_{ij} L_j = \sum_{i=1}^{2^N} \hat{B}_{ik} \frac{2}{\pi}\arccos\left(\sqrt{U_i}\right), \quad (8)$$

where k=1, 2 . . . M. In matrix notation the set of equation translates to a simple expression

$$L = \left(\hat{B}^T \hat{B}\right)^{-1} \frac{2}{\pi}\left[\arccos\left(\sqrt{U}\right)\hat{B}\right]^T, \quad (9)$$

where $\sqrt{U}$ amounts to a component-wise square root. The solution above grants us an optimized vector of lengths L.

Example II—Electro-Absorption Modulator

As mentioned earlier, the present invention is not limited to implementations based on Mach-Zehnder modulators,

US 10,270,535 B1

13

and can be implemented using any device which modulates light intensity as a function of applied voltage. By way of one additional non-limiting implementation, FIG. 8 shows an analogous implementation of the present invention using an electro-absorption modulator.

An electro-absorption modulator (EAM) is a semiconductor device which allows control of the intensity of a laser beam via an electric voltage. Its operational principle is typically based on the Franz-Keldysh effect, i.e., a change of the absorption spectrum caused by an applied electric field, which usually does not involve the excitation of carriers by the electric field.

By realizing N or more electrodes we can use the EAM as a high speed electro-optical Digital-to-Analog converter, in a similar fashion as we used the MZI. As in modulator device 10 described above, this device includes an electronic input 12 for receiving an input data word D of N bits and an electrically controllable modulator 14 with M electrodes for modulating the intensity of an optical signal represented by arrow 16. An electrode actuating device 20 is responsive to the input data word D to supply an actuating voltage to the actuating electrodes 18.

Here too, to mitigate the non-linear behavior of the device, electrode actuating device 20 serves as a Digital-To-Digital Converter is employed to map an N bit input to a set of M electrodes, determining which of the M electrodes is actuated for each input value. The particular mapping varies according to the response characteristic of the particular modulator, but the principles of operation are fully analogous to those described above in the context of the Mach-Zehnder modulator implementation.

Example III—Modulated Light Generation Device

The present invention is applicable also to other devices where digital information carried by voltage or current is translated into analog optical signals in the form of optical power. This includes also light generation devices like Light Emitting Diodes (LED) or semiconductor lasers. By way of illustration, FIG. 9 shows a semiconductor laser implementation of the present invention.

Specifically, FIG. 9 shows a semiconductor laser DAC device, generally designated 40, constructed and operative according to the teachings of the present invention. The actuating electrode, typically implemented as a single contiguous electrode, is here subdivided into a threshold electrode 42 and M actuating electrodes 18. The threshold electrode 42 is typically needed to reach a minimum activation current below which no significant output is generated. Actuating electrodes 18 are actuated as a function of the data bits of a digital input 12, in this case a 4-bit data word, to generate an analog optical signal output of intensity representing the digital input.

In the particularly simple implementation illustrated here, neither L nor B is optimized. In other words, each actuating electrode 18 is part of a set interrelated with effective areas in 2:1 relation, and each electrode is actuated as a function of corresponding single bit of the input data word. The actuating current is typically roughly proportional to the area of electrodes actuated. This case is in itself believed to be patentable, and is thought to be of practical importance. Optionally, a closer approximation to a linear response can be achieved by modifying L (electrode proportions) and/or B (by including a DDC, not shown), all according to the principles discussed in detail above.

It will be appreciated that a similar device may be implemented using other semiconductor light generating

14

devices, such as LEDs. Depending upon the details of the device used, threshold electrode 42 may not be necessary. This and any other necessary device-specific modifications will be self-evident to one ordinarily skilled in the art.

Example IV—QAM Transmitter

Although described above in the context of devices for intensity/amplitude modulation, it should be noted that various embodiments of the present invention are also effective for modifying the phase of an optical signal, and can therefore be used as highly compact and simple QAM (Quadrature Amplitude Modulation) modulators or transmitters.

Specifically, referring back to FIG. 1, it will be noted that, by configuring the digital-to-digital converter DDC 20 to apply different actuation patterns to the electrodes on the two branches of the Mach Zehnder Modulator (MZM), modulation of the output signal phase can be achieved. Such an implementation will now be described with specific reference to FIGS. 10-13B.

Turning now to FIG. 10, there is shown a modulator device, generally designated 100, implemented as a QAM modulator. Modulator device 100 is essentially similar to the device of FIG. 1, but has been relabeled to convey more clearly its function. Specifically, modulator device 100 has a first plurality $M_1$ of actuating electrodes 18a deployed in operative relation to a first waveguide branch of the modulator and a second plurality $M_2$ of actuating electrodes 18b deployed in operative relation to a second waveguide branch of the modulator. In this case, $M_1 = M_2 = 5$. giving a total number of actuating electrodes M=10. The electrode actuating device is here shown as two distinct digital-to-digital converters 20a and 20b, which are configured to actuate the first and second pluralities of actuating electrodes 18a and 18b in response to a given input data word $D_1$ so as to additionally modulate the phase of the optical signal. Clearly, digital-to-digital converters 20a and 20b can alternatively be combined into a single DDC with M=10 outputs with suitable connections to the actuating electrodes on both branches of the waveguide.

It will be appreciated that modulator device 100 can serve as an optical 16-QAM transmitter based on a single multi-electrode MZM (ME-MZM). Each electrode is divided into 5 segments, separately driven by two voltage signals, 0 and V representing binary 0 and 1, respectively. The center electrode is a common ground for the active electrode segments. The role of the modulator is to generate a desired M-QAM constellation which is composed of complex optical field values. The modulator is expected to generate $2^M$ signals:

$$s_i = r_i e^{i\theta_i}, \ r_i > 0, \ 0 \le \theta_i \le 2\pi, \ i = 1, \ldots, 2^M, \quad (10)$$

In our example of a 16-QAM with two sets of 5 electrodes, as an input, the QAM transmitter accepts an electrical 4-bit digital input word, denoted $D_i$. The input word is mapped by two Digital-to-Digital Converters (DDC) onto each of the 10 (electrode) segments, whose lengths are the vectors $L^{1,2}$. Each DDC outputs a 5-bit word, denoted as $B_i^1$ and $B_i^2$. The output of transmitter can be written as:

$$E_{out,i} = \frac{1}{\sqrt{2}} E_{in} \exp\left\{ j2\pi \sum_j^{N_1} B_{ij}^1 L_j^1 \right\} + \frac{1}{\sqrt{2}} E_{in} \exp\left\{ -j2\pi \sum_j^{N_2} B_{ij}^2 L_j^2 \right\} \quad (11)$$

US 10,270,535 B1

15

where $E_{in}$ the optical field amplitude entering the modulator and $N_1$, $N_2$ are the number of segments on each arm. The elements $L_j^{1,2} \in L^{1,2}$ represent normalized electrode lengths on each arm. The two-level $B_{ij}^{1,2}$ coefficients are elements of the matrices $B_j^{1,2}$ and represent whether voltage v was applied to the j-th segment, on the respective arm. The index j enumerates the electrodes, j={1 . . . $N_{1,2}$} on each arm. The summation is normalized to span

$$0 \leq \sum_j^N B_{ij}^{1,2} L_j \leq 1,$$

such that each arm induces a phaseshift of $0 \leq \Delta\varphi \leq 2\pi$.

The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as "Direct Digital Driving". The modulator can be regarded as a 2D Digital-to-Analog (D/A) converter, that converts a digital word into an optical vector signal.

The design of the transmitter involves the setting of electrode lengths, $L^{1,2}$ and DDC mappings, $B_j^{1,2}$, that will generate all the required signals given in Eq. (10). An effective combination of the electrode lengths and digital mappings may be derived either by analytical methods or numerically. A simple numerical derivation will now be presented.

A ME-MZM with $N_{1,2}$ electrode segments on each arm is capable of generating $2^{(N_1+N_2)}$ signals. Thus, by choosing carefully the electrode lengths, and assuming the number of segments sufficient to generate at least $2^{(N_1+N_2)} > M$ different signals, all the required signals described by Eq. (10) can be picked out of the generated signals pool.

As an example, FIG. 11A shows the an ideal Square-16-QAM constellation, which is the required signal constellation, and a signal pool

As an example, FIG. 11A shows the an ideal Square-16-QAM constellation, which is the required signal constellation, and a signal pool which was generated with {5,5} electrodes. The best matched signals at the pool are marked in figure. It can be seen that there is a good match between the ideal and the best matched generated constellations.

Table 1 compares between an ideal 16-QAM constellation and a generated constellation with different combinations of number of electrodes each arm. It presents the symbol minimum distance and the root mean square error. The latter provides a measure of agreement between the ideal and the generated constellations. Configurations with {2,2}, {2,3} and {3,3} electrodes provide less than 16 different signals (minimum distance of 0) and therefore cannot be used for generation of 16-QAM.

TABLE 1

| $N_1,N_2$ | Ideal | 4,2 | 4,3 | 4,4 | 4,5 | 5,5 | 5,6 | 6,6 |
|---|---|---|---|---|---|---|---|---|
| Minimum Distance | 2 | 1.66 | 1.66 | 1.66 | 1.30 | 1.83 | 1.67 | 1.67 |
| RMSE | 0 | 4.64 | 4.64 | 4.53 | 4.42 | 4.64 | 4.52 | 4.57 |

FIG. 11B presents the Symbol Error Rate (SER) performance for a range of Signal to Noise Ratios (SNR) for an Additive White Gaussian Noise (AWGN) channel. It can be seen that when using {6,6} electrodes, the performance graph closely matches that of ideal 16-QAM constellation. Using a higher number of electrodes can lower the SER ever

16

further toward the ideal curve. SER performance can be slightly improved by further tuning the decoding hypothesis testing at the receiver side to the generated constellation.

The electrode lengths used for the generation of FIG. 11B follow a binary sequences, $L^{1,2}=2^{-j}$. Tweaking the electrode lengths has small impact on the modulator performance. In Eq. (11), we assumed driving signals of 0 and $2V_\pi$. The high driving signal can be lowered by extending the total electrode length twice its size. The opposite signs in the exponents in the two terms of Eq. (11) are already implemented by the geometry of the electrode disposition of FIG. 10, when the signs of the voltages applied are the same, since then the electric fields have opposite directions. Other electrode dispositions exist for different cuts of the electro-optic crystals, and the appropriate way of applying the voltage with the right signs should be clear to a person skilled in the art.

Referring now to FIGS. 12A-13B, it will be appreciated that the present modulator is capable of generating high order QAM constellations. FIG. 12A depicts the ideal 64-QAM constellation together with one generated using a {7,7} electrodes modulator, while FIG. 12B shows an ideal 256-QAM constellation together with the one generated using a {10,10} electrodes modulator. It can be seen that there is a good match between the ideal and the generated constellations. FIGS. 13A and 13B show the Symbol Error Rate performance for the generated constellations of FIGS. 12A and 12B, respectively.

A simple implementation of this embodiment described thus far generates Non-Return-to-Zero (NRZ) signals. NRZ permits constant intensity for similar consecutive bits, and is thus more susceptible to Inter-Symbol-Interference and other nonlinear propagation distortions. Return-to-Zero (RZ) format is a pulsed modulation where the signal "returns to zero" after every bit. This format provides better performance than NRZ, but usually requires additional hardware, such as a pulse carver. A transmitter based on the modulator of an embodiment of the invention can readily be extended to produce RZ pulses with minimal if any additional hardware. By adding an RZ control line to the DDC, as shown in FIG. 10, which serves as a trigger determining whether the output optical amplitude should be zero or other, the whole modulator will be capable of generating RZ signals. When the added control line is high, the DDC will map the electrode actuation pattern to the pattern corresponding to the middle point of the constellation, which is zero.

For the constellation presented in FIG. 10, $B_1$={00010} and $B_2$={01110} will output zero (or minimum) power because it will generate a phase difference of $\pi$ between the two arms of the MZM.

While the present invention has been presented as a digital-to-analog optical modulator, it should be noted that each embodiment of the invention may be modified to provide analog electrical output by use of an optical-to-electrical (OLE) converter. This option is illustrated in FIG. 1 as optional OLE converter 30. If the OLE converter itself has a non-linear response function, the present invention may advantageously be used to optimize the system parameters to linearize the electrical output rather than the (intermediate) optical output. Analogously, any nonlinearity induced by the optical medium used for transmitting the signal (e.g. optical fiber) can be compensated for by using OLE converter 30 as a linearizing device.

The present invention is applicable to substantially all applications requiring a DAC with optical or electrical output. Examples of particular interest include, but are not limited to, wireless communications systems, fiber-optic

US 10,270,535 B1

**17**

communication systems, cellular telephone networks, cable television, military applications, medical applications and hyper/super computer communications.

It will be appreciated that the above descriptions are intended only to serve as examples, and that many other embodiments are possible within the scope of the present invention as defined in the appended claims.

What is claimed is:

**1**. A method of modulating and transmitting an optical signal over an optical fiber in response to N bits of digital data in parallel, the method comprising:

inputting the N bits of digital data into an optical modulator having a plurality of waveguide branches, where each branch has an input of an unmodulated optical signal;

converting the N bits of digital data to M drive voltage values, where M>N and N>1; coupling the M drive voltage values to the unmodulated optical signal, said coupling enabling pulse modulation of the unmodulated optical signal, thereby generating a pulse modulated optical signal; and

**18**

transmitting the pulse modulated optical signals over an optical fiber.

**2**. A method of modulating and transmitting an optical signal over an optical fiber in response to N bits of digital data in parallel, the method comprising:

inputting the N bits of digital data into an optical modulator having a plurality of waveguide branches, where each branch has an input of an unmodulated optical signal;

converting the N bits of digital data to M drive voltage values, where M>N and N>1; coupling the M drive voltage values to the unmodulated optical signal, said coupling enabling modulation of the unmodulated optical signal by QAM, thereby generating a QAM modulated optical signal; and

transmitting the QAM modulated optical signal over an optical fiber.

*    *    *    *    *



US010270535C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (12508th)

# United States Patent
Ehrlichman et al.

(10) **Number:** US 10,270,535 C1

(45) **Certificate Issued:** *Feb. 2, 2024

(54) **LINEARIZED OPTICAL DIGITAL-TO-AN-ANALOG MODULATOR**

(71) Applicant: **Ramot at Tel-Aviv University Ltd.,** Tel-Aviv (IL)

(72) Inventors: **Yossef Ehrlichman**, Nazareth Ilit (IL); **Ofer Amrani**, Tel-Aviv (IL); **Shlomo Ruschin**, Herzliya (IL)

(73) Assignee: **RAMOT AT TEL-AVIV UNIVERSITY LTD.,** Tel-Aviv (IL)

**Reexamination Request:**
No. 90/014,527, Jun. 9, 2020
No. 90/014,606, Nov. 10, 2020

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **10,270,535** |
| Issued: | **Apr. 23, 2019** |
| Appl. No.: | **16/234,635** |
| Filed: | **Dec. 28, 2018** |

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(63) Continuation of application No. 15/298,373, filed on Oct. 20, 2016, now Pat. No. 10,205,527, which is a (Continued)

(51) **Int. Cl.**

| | |
|---|---|
| *H03M 1/00* | (2006.01) |
| *H04B 10/516* | (2013.01) |
| *H03M 1/70* | (2006.01) |
| *H04B 10/2575* | (2013.01) |
| *G02F 1/225* | (2006.01) |
| *G02F 1/01* | (2006.01) |
| *H04B 10/54* | (2013.01) |
| *H04B 10/556* | (2013.01) |
| *G02F 7/00* | (2006.01) |
| *H04B 10/50* | (2013.01) |

| | |
|---|---|
| *H04B 10/25* | (2013.01) |
| *G02F 1/015* | (2006.01) |
| *G02F 1/21* | (2006.01) |

(52) **U.S. Cl.**
CPC ......... *H04B 10/516* (2013.01); *G02F 1/0121* (2013.01); *G02F 1/225* (2013.01); *G02F 7/00* (2013.01); *H03M 1/002* (2013.01); *H03M 1/70* (2013.01); *H04B 10/2575* (2013.01); *H04B 10/2589I* (2020.05); *H04B 10/505* (2013.01); *H04B 10/541* (2013.01); *H04B 10/556* (2013.01); *G02F 1/015* (2013.01); *G02F 1/212* (2021.01); *G02F 2203/19* (2013.01); *H04B 10/5055* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceedings for Reexamination Control Numbers 90/014,527 and 90/014,606, please refer to the USPTO's Patent Electronic System.

*Primary Examiner* — Henry N Tran

(57) **ABSTRACT**

A system for converting digital into a modulated optical signal, comprises an electrically controllable device having M actuating electrodes. The device provides an optical signal that is modulated in response to binary voltages applied to the actuating electrodes. The system also comprises a digital-to-digital converter that provides a trapping of input data words to binary actuation vectors of M bits and supplies the binary actuation vectors as M bits of binary actuation voltages to the M actuating electrodes, where M is larger than the number of bits in each input data word. The digital-to-digital converter is enabled to map each digital input data word to a binary actuation vector by selecting a binary actuation vector from a subset of binary actuation vectors available to represent each of the input data words.



**Related U.S. Application Data**

continuation of application No. 14/922,165, filed on
Oct. 25, 2015, now Pat. No. 9,479,191, which is a
continuation of application No. 14/662,343, filed on
Mar. 19, 2015, now Pat. No. 9,203,425, which is a
continuation of application No. 14/325,486, filed on
Jul. 8, 2014, now Pat. No. 9,031,417, which is a
continuation of application No. 13/280,371, filed on
Oct. 25, 2011, now Pat. No. 8,797,198, which is a
continuation of application No. 12/636,805, filed on
Dec. 14, 2009, now Pat. No. 8,044,835, which is a
continuation-in-part of application No. PCT/IL2008/
000805, filed on Jun. 12, 2008.

(60) Provisional application No. 60/943,559, filed on Jun.
13, 2007.

US 10,270,535 C1

# 1

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims **1** and **2** are determined to be patentable as
amended.

New claims **3-10** are added and determined to be
patentable.

**1**. A method of modulating and transmitting an optical
signal over an optical fiber in response to N bits of digital
data in parallel, the method comprising:

inputting the N bits of digital data into an optical modu-
lator having a plurality of waveguide branches, where
each branch has an input of an unmodulated optical
signal;

converting the N bits of digital data to M drive voltage
values, where M>N and N>1, *and wherein the con-
verting comprises selecting or generating a digital
output from a set of possible digital outputs for a given
digital input from a set of possible digital inputs,
wherein decimal values of the set of possible digital
outputs and decimal values of the set of possible digital
inputs are not identical*;

coupling the M drive voltage values to the unmodulated
optical signal, said coupling enabling pulse modulation
of the unmodulated optical signal, thereby generating a
pulse modulated optical signal;

transmitting the pulse modulated optical signals over an
optical fiber.

**2**. A method of modulating and transmitting an optical
signal over an optical fiber in response to N bits of digital
data in parallel, the method comprising:

inputting the N bits of digital data into an optical modu-
lator having a plurality of waveguide branches, where
each branch has an input of an unmodulated optical
signal;

converting the N bits of digital data to M drive voltage
values, where M>N and N>1, *and wherein the con-
verting comprises selecting or generating a digital

# 2

*output from a set of possible digital outputs for a given
digital input from a set of possible digital inputs,
wherein decimal values of the set of possible digital
outputs and decimal values of the set of possible digital
inputs are not identical*;

coupling the M drive voltage values to the unmodulated
optical signal, said coupling enabling modulation of the
unmodulated optical signal by QAM, thereby generat-
ing a QAM modulated optical signal; and

transmitting the QAM modulated optical signal over an
optical fiber.

*3. The method of claim 1, wherein at least a first one of
the M voltage values drives a first of the plurality of
waveguide branches, at least a second one of the M voltage
values drives a second of the plurality of waveguide
branches, the first and second waveguide branches are
coupled to each other to provide the modulated output
optical stream.*

*4. The method of claim 2, wherein at least a first one of
the M voltage values drives a first of the plurality of
waveguide branches, at least second one of the plurality of
waveguide branches, the first and second waveguide
branches are coupled to each other to provide the QAM
modulated output optical stream.*

*5. The method of claim 1, wherein the converting is
performed by a digital to digital converter.*

*6. The method of claim 2, wherein the converting is
performed by a digital to digital converter.*

*7. The method of claim 5, wherein the converting per-
formed by the digital to digital converter further comprises
converting the N bit digital data forming an N bit input
vector to an M bit output vector of the M drive voltage
values.*

*8. The method of claim 6, wherein the converting per-
formed by the digital to digital converter further comprises
converting the N bit digital data forming an N bit input
vector to an M bit output vector of the M drive voltage
values.*

*9. The method of claim 1, wherein the digital output is a
binary representation that when coupled to the optical
modulator via the M drive voltage values effects a linear
response from the optical modulator when compared to the
possible response of the optical modulator.*

*10. The method of claim 2, wherein the digital output is
a binary representation that when coupled to the optical
modulator via the M drive voltage values effects a linear
response from the optical modulator when compared to the
possible response of the optical modulator.*

\* \* \* \* \*

# EXHIBIT 4

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

CISCO SYSTEMS, INC.,
Petitioner

_____

IPR2022-00575
U.S. Patent No. 11,133,872

# PETITION FOR *INTER PARTES* REVIEW
# UNDER 35 U.S.C. § 312 AND 37 C.F.R. § 42.104

# Claims 1-12, 15-22, & 30

IPR2022-00575 Petition
*Inter Partes* Review of 11,133,872

## **TABLE OF CONTENTS**

PETITIONER'S EXHIBIT LIST ........................................................5

I.    INTRODUCTION ................................................................7

II.   GROUNDS FOR STANDING.....................................................8

III.  NOTE...........................................................................9

IV.   TECHNOLOGY BACKGROUND................................................9

    A.    Optical Modulation..................................................... 9

    B.    Mach-Zehnder Modulators............................................. 9

V.    SUMMARY OF THE '872 PATENT ..........................................11

    A.    Overview of the '872 Patent........................................... 11

    B.    Prosecution History of the '872 Patent. ............................. 13

VI.   LEVEL OF ORDINARY SKILL IN THE ART...............................14

VII.  CLAIM CONSTRUCTION ...................................................15

    A.    "digital" .................................................................. 15

    B.    "digital-to-digital mapping" ........................................... 15

    C.    "modulator" ............................................................. 16

    D.    Summary ................................................................. 16

VIII. RELIEF REQUESTED AND THE REASONS FOR THE
       REQUESTED RELIEF ......................................................16

IX.   DISCRETIONARY DENIAL WOULD BE INAPPROPRIATE................16

    A.    Discretionary denial under the *Fintiv* factors is not appropriate........ 16

B.    Discretionary denial under 35 U.S.C. § 325(d) is not appropriate .... 19

    1.    *Becton, Dickinson* Factor (c) ................................................... 20

    2.    *Becton, Dickinson* Factors (e) and (f): ................................... 22

C.    Discretionary denial under *General Plastic* is not appropriate .......... 23

X.    IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE .... 24

A.    Challenged Claims and Statutory Grounds for Challenge ................ 24

B.    Ground 1: Claims 1-12, 15-22, and 30 are obvious under 35 U.S.C. § 103(a) over Roberts and Taraschuk ..................................... 24

    1.    Summary of Roberts ...................................................... 24

    2.    Summary of Taraschuk .................................................. 27

    3.    Reasons to Combine Roberts and Taraschuk .......................... 29

    4.    Claim 1 ...................................................................... 35

    5.    Claim 2 ...................................................................... 52

    6.    Claim 3 ...................................................................... 55

    7.    Claim 4 ...................................................................... 56

    8.    Claim 5 ...................................................................... 57

    9.    Claim 6 ...................................................................... 59

    10.    Claim 7 ..................................................................... 61

    11.    Claim 8 ..................................................................... 62

    12.    Claim 9 ..................................................................... 62

    13.    Claim 10 ................................................................... 63

14.    Claim 11 ................................................................... 64

15.    Claim 12 ................................................................... 67

16.    Claim 15 ................................................................... 67

17.    Claim 16 ................................................................... 73

18.    Claim 17 ................................................................... 73

19.    Claim 18 ................................................................... 73

20.    Claim 19 ................................................................... 73

21.    Claim 20 ................................................................... 74

22.    Claim 21 ................................................................... 75

23.    Claim 22 ................................................................... 76

24.    Claim 30 ................................................................... 76

XI.    CONCLUSION ................................................................... 77

XII.    MANDATORY NOTICES ........................................................ 78

A.    Real Party-in-Interest ................................................... 78

B.    Related Matters .......................................................... 78

C.    Lead and Back-up Counsel and Service Information ........................ 79

CERTIFICATE OF WORD COUNT ........................................................ 81

CERTIFICATE OF SERVICE ........................................................... 82

IPR2022-00575 Petition
*Inter Partes* Review of 11,133,872

## PETITIONER'S EXHIBIT LIST

| Ex.1001 | U.S. Patent No. 11,133,872 to Ehrlichman et al. |
|---------|--------------------------------------------------|
| Ex.1002 | Prosecution History of U.S. 11,133,872 |
| Ex.1003 | Declaration of Dr. Daniel Blumenthal under 37 C.F.R. § 1.68 |
| Ex.1004 | *Curriculum Vitae* of Dr. Blumenthal |
| Ex.1005 | U.S. Patent No. 7,277,603 to Roberts et al. |
| Ex.1006 | U.S Patent No. 6,781,537 to Taraschuk et al. |
| Ex.1007 | *Phase-modulated Optical Communication Systems*, Keang-Po Ho ("Ho") |
| Ex.1008 | Reserved |
| Ex.1009 | Reserved |
| Ex.1010 | Reserved |
| Ex.1011 | Reserved |
| Ex.1012 | *Optical Fiber Telecommunications B: Systems and Networks*, Kaminow et al. ("Kaminow") |
| Ex.1013 | *Fundamentals of Photonics*, Saleh et al. ("Saleh") |
| Ex.1014 | *Bias Controllers for External Modulators in Fiber-Optic Systems*, Ackerman et al. ("Ackerman") |
| Ex.1015 | *Fiber-Optic Communication Systems*, Agrawal et al. ("Agrawal") |
| Ex.1016 | Reserved |
| Ex.1017 | *Comparison of Direct and External Modulation for CatV Lightwave Transmission at 1.5 pm Wavelength*, Gauck ("Gauck") |
| Ex.1018 | *Distortion in Linearized Electrooptic Modulators*, Bridges et al. ("Bridges") |

| Ex.1019 | U.S. Patent No. 4,649,505 to Zinser, Jr. et al ("Zinser") |
|---|---|
| Ex.1020 | U.S. Patent No. 5,418,976 to Iida ("Iida") |
| Ex.1021 | U.S. Patent No. 6,548,824 to Kurahashi et al. ("Kurahashi") |
| Ex.1022 | Claim Construction Memorandum Opinion and Order, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, No. 2:19-cv-00225, Dkt. 83 (E.D. Tex. May 15, 2020). |
| Ex.1023 | Answer and Counter-complaint, Cisco Systems, Inc. v. Ramot at Tel Aviv University Ltd., No. 1-21-cv-01365, Dkt. XX (D. Del. Feb. 7, 2022). |
| Ex.1024 | Reserved. |

## I.    INTRODUCTION

Pursuant to 35 U.S.C. §§ 311, 314(a), and 37 C.F.R. § 42.100, Cisco Systems, Inc. ("Petitioner") respectfully requests that the Board review and cancel as unpatentable under (pre-AIA) 35 U.S.C. §103(a) claims 1-12, 15-22, and 30 ("Challenged Claims") of U.S. Patent No. 11,133,872 ("'872 patent," Ex.1001).

The '872 Patent describes converting digital data into a modulated optical signal. *See* Ex.1001, abstract. This conversion process involves a digital-to-digital mapping between an *N*-bit input signal and an *M*-bit output signal, in which *M* is larger than *N*. This petition relies on Taraschuk, which describes a linearizer for an optical modulator that maps an input signal to a larger bit output signal, as shown below.



**Ex.1006, Fig. 5 (annotated).**

In this latest continuation patent of the '872 patent family, Patent Owner has obtained claims directed to the concept of a digital-to-digital mapping that addresses a non-linear response of an optical modulator. As shown in the figure above, Taraschuk teaches this same concept in the form of a linearizer that maps a six-bit signal to a larger eight-bit signal.

The claims of the '872 patent are similar to claims in family member patents, particularly, U.S. Patent No. 10,033,465 ("'465 patent"), U.S. Patent No. 10,270,535 ("'535 patent"), and U.S. Patent No. 10,461,866 ("'866 patent"). Each of these listed family member patents is currently under reexamination. *See infra* XII.B. In each of the reexaminations, Patent Owner has amended the claims in reexamination, conceding that the claims as originally issued were overbroad; even so, the claims currently stand rejected in each reexamination.

As shown below and confirmed in the Declaration of Dr. Blumenthal (Ex.1003), the features recited in this continuation patent were already known and combining them as claimed would have been obvious to a POSITA. *See generally*, Ex.1003. The references presented in this Petition render obvious the Challenged Claims, which should be canceled for unpatentability.

## II.    GROUNDS FOR STANDING

Petitioner certifies that the '872 Patent is eligible for IPR and that Petitioner is not barred or estopped from requesting IPR challenging the patent claims. 37

C.F.R. § 42.104(a).

## III.   NOTE

Petitioner cites to exhibits' original page numbers. Emphasis in quoted

material has been added.

## IV.   TECHNOLOGY BACKGROUND

Dr. Blumenthal describes relevant background technology predating the

priority date of the '872 Patent, which is partially summarized below. See Ex.1003,

¶¶ 28-86 (citing Ex.1014, Ex.1017, Ex.1018).

### A.   Optical Modulation

Optical modulation is the process by which electrical signals are converted

into optical signals. *See* Ex.1007, pp. 2-3. Specifically, electrical signals

representing digital data are applied to an optical modulator which modulates an

optical carrier signal for transmission through an optical medium (e.g., optical

fiber). *See* Ex.1005, 1:25-30; Ex.1003, ¶¶ 28-48.

### B.   Mach-Zehnder Modulators

One well known type of optical modulator is a Mach-Zehnder Interferometer

(MZI) optical modulator, also called a Mach-Zehnder modulator (MZM). *See*

Ex.1005, 1:35-37; *see also* Ex.1001, 1:56-58 & 9:29-31. An MZI modulator

includes a single input waveguide that splits into two separate waveguides

(referred to as arms or branches) which then recombine into a single waveguide.

*See* Ex.1007, p. 40. Both branches include electrical modulation electrodes that modulate the optical streams within the respective waveguides in response to voltages applied to the electrodes. *See id.,* pp. 40-41; *see also* Ex.1003, ¶¶ 49-74. Voltage applied to one or both arms of the MZM alters the waveguide characteristics, thereby affecting the intensity or phase of continuous or pulsed light passing through the MZM. Ex.1015, p.123; Ex.1003, ¶ 50. The relationship between voltage applied to the MZM arms and output intensity or phase-shift is represented by a sinusoidally shaped transfer function. *See e.g.*, Ex.1013, pp. 65 – 67; Ex.1012, p. 43; Ex.1007, p. 41; Ex.1003, ¶ 51.

While MZI modulators offer many benefits, there are technical challenges to overcome. For example, MZI modulators exhibit a non-linear relationship between the digital signal input and the modulated output. Ex.1003, ¶¶ 75-76. Specifically, for a given set of input voltages to the modulator, there is not a linear relationship with the corresponding output of the modulator (amplitude or phase variation of the carrier signal). *Id*. This non-linearity may limit the performance of an MZI modulator. *Id*. These limitations on MZI performance were known before 2007. *Id*. Thus, engineers (or "skilled artisans") used various known techniques to compensate for such non-linearities of optical modulators. *See e.g.,* Ex.1005, 1:61-62; 2:43-47 (describing a "non-linear compensator" and "taking into account non-linearities of the … MZ modulator"); *see also* Ex.1003, ¶¶ 49-86.

## V.    SUMMARY OF THE '872 PATENT

### A.    Overview of the '872 Patent

The '872 Patent relates to the use of a Mach-Zehnder Interferometer (MZI) to modulate an optical signal. *See* Ex.1001, 1:34-35 & 2:61-62. The patent acknowledges that MZI modulators were known in the prior art, describing them as "[o]ne of the most widely deployed devices for analog optics modulation" and a "preferred device for long-haul fiber-optic communication, leading to chirp-free pulses which can reach hundreds of kilometers in optical fibers without the need for regeneration." Ex.1001, 1:56-62. It was also known, however, that the optical output of an MZI does not scale linearly with the electrical input to the MZI. *See* Ex.1001, 1:62-64 (describing an "inherent non-linear response"); Ex.1003, ¶¶ 51-53, 87-88.

The '872 Patent describes techniques for addressing this non-linear characteristic of MZI modulators. *See* Ex.1001, 2:36-53. Specifically, the claims are directed to a modulation system that receives "an input data word D of N bits." Ex.1001, 7:9-13. The N-bit input data word is provided to a Digital-to-Digital Converter (DDC) 20 (also referred to as an electrode actuating device), as shown in Fig. 1. Ex.1001, 13:20-27; Ex.1003, ¶¶ 89-90.



**Ex.1001, Fig. 1 (annotated);** *see* **Ex.1003, ¶ 89.**

The "electrode actuating device 20 [is] responsive to the input data word D to supply an actuating voltage to the actuating electrodes 18." Ex.1001, 7:15-18. "[E]lectrode actuating device 20 serves as a Digital-To-Digital Converter [and] is employed to map an N bit input to a set of M electrodes" by "processing the digital data input word to generate an electrode actuation vector of M values." Ex.1001, 13:23-27, 3:51-55. The M values are also referred to as "voltage values." Ex.1001, 3:62-65 ("the electrode actuation vector is a binary vector, and … the M voltage values are selected from two voltage levels according to the M binary values."). Thus, for each of the M electrodes, there is a corresponding value in the vector of M voltage values. Ex.1003, ¶ 90. The number of electrodes M can be either equal to or greater than the number of input bits N. Ex.1001, 7:14.

12

As discussed further below, the concepts claimed in the '872 Patent were already known in the art. Ex.1003, ¶ 91.

### B.    Prosecution History of the '872 Patent.

The '872 Patent was filed August 6, 2019 and ultimately claims priority to a provisional application filed June 13, 2007. The Office initially issued an *Ex Parte Quayle* action that indicated all claims were allowed. Ex.1002, 749-53. The Applicant filed a Request for Continued Examination to amend the abstract and submit an Information Disclosure Statement (IDS). Ex.1002, 678-81. The Office then rejected all claims as being anticipated by U.S. Patent No. 7,609,935 to Burchfiel ("Burchfiel"). Ex.1002, 612-18. To overcome this rejection, the Applicant filed an affidavit under 37 C.F.R. 1.131 in an attempt to "swear behind" the Burchfiel reference. Without addressing the sufficiency of the Applicant's "swear behind" attempt, the Office instead rejected the claims as being anticipated by U.S. Patent No. 7,277,603 to Roberts ("Roberts").

To overcome the Roberts reference, the Applicant made various amendments to the claims. These amendments include adding the language "*wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator.*" Ex.1002, 163. Ex.1001, claim 1; *see also* claims 11, 15. The Applicant

13

also added new claims with new limitations, such as "*wherein, for a first subset of successively decreasing digital inputs in the set of 2N digital inputs specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital outputs corresponding to the successively decreasing digital inputs in the first subset decrease.*" Ex.1002, 168; Ex.1001, claim 13; *see also* claim 23.

In light of these amendments and additional claims, the Office issued a notice of allowance. Ex.1002, 10-12. The '872 Patent then issued on September 28, 2021. As discussed in further detail below, this petition presents prior art references to show that these newly added limitations were obvious and well-known as of the earliest claimed priority date of the '872 patent, June 13, 2007.[1]

## VI.    LEVEL OF ORDINARY SKILL IN THE ART

A Person of Ordinary Skill in The Art ("POSITA") in June of 2007 would have had a working knowledge of optical modulators and modulation schemes. A POSITA would have had a master's degree in electrical engineering, or an equivalent, and two years of professional experience relating to optical

---

[1] As all of the prior art applied in this petition predates the earliest claimed priority date, this petition does not analyze whether any claims are actually entitled to that priority date.

communications, and in particular, optical signal modulation. Lack of professional experience can be remedied by additional education, and vice versa. Ex.1003, ¶¶ 21-23.

## VII. CLAIM CONSTRUCTION

During IPR, claims are construed according to the "*Phillips* standard," as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). *See* 83 Fed. Reg. 51341 (Oct. 11, 2018). Accordingly, this Petition analyzes the claims consistent with their ordinary and customary meaning as would be understood by a POSITA in light of the specification. *Phillips*, 415 F.3d at 1314-17.

### A. "digital"

The specification of the '872 Patent explicitly defines this term as referring "to a form of data where values are stored or processed numerically, typically broken up into bits of a binary number for machine processing." Ex.1001, 4:55-59; Ex.1003, ¶ 93.

### B. "digital-to-digital mapping"

Claim 1 recites "converting, based on a digital-to-digital mapping." The specification of the '872 Patent explicitly defines "digital to digital converter" as "a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical." Ex.1001, 4:63-66; *see also* Ex.1022, p.19. A POSITA would have recognized that

the term "digital-to-digital mapping" refers to the mapping of the set of possible digital input values to the set of possible digital output values. Ex.1003, ¶ 94.

## C.    "modulator"

The specification of the '872 Patent explicitly defines this term as referring "to any device which outputs an optical signal with controlled variation of intensity, whether the variation is induced during production of the signal (such as in a semiconductor laser) or whether a signal input from another source is modified." Ex.1001, 5:33-37; Ex.1003, ¶ 95.

## D.    Summary

The terms *digital*, *digital-to-digital mapping*, and *modulator* are provided here for completeness. The analysis provided below is not dependent upon the express terms provided in the '872 Patent specification. In other words, regardless of whether these express definitions are read into the claims, the art provided below teaches the limitations recited in the claims. Ex.1003, ¶ 96.

## VIII.  RELIEF REQUESTED AND THE REASONS FOR THE REQUESTED RELIEF

Petitioner asks that the Board institute a trial for *inter partes* review and cancel the Challenged Claims in view of the analysis below.

## IX.    DISCRETIONARY DENIAL WOULD BE INAPPROPRIATE

### A.    Discretionary denial under the *Fintiv* factors is not appropriate

The six factors considered for § 314 denial strongly favor institution. *See*

*Apple Inc. v. Fintiv, Inc*., IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020)

(precedential). In the co-pending district court case, Petitioner Cisco Systems is

seeking declaratory judgment of non-infringement of the '872 patent. In an Answer

and Counterclaim filed on February 7, 2022, Patent Owner asserts "one or more

claims of the '872 Patent, including without limitation claim 1." Ex.1023, ¶ 154;

*see also id.* ¶ 135 ("…the '872 Accused Products comprise modulation systems

according to Claims 1 or 15…").

### 1. No evidence regarding a stay

No motion to stay has been filed, so the Board should not infer the outcome

of such a motion. *Sand Revolution II LLC v. Continental Intermodal Group –

Trucking LLC*, IPR2019-01393, Paper 24 at 7 (PTAB June 16, 2020)

(informative); *see also Dish Network L.L.C. v. Broadband iTV, Inc.*, IPR2020-

01359, Paper 15 (Feb. 12, 2021) ("It would be improper to speculate, at this stage,

what the Texas court might do regarding a motion to stay…"). Thus, this factor is

neutral on discretionary denial.

### 2. Parallel proceeding trial date

The district court has not yet set a trial date nor issued a scheduling order.

Without a trial date, this factor weighs heavily against discretionary denial.

### 3. Investment in the parallel proceeding

The co-pending litigation is in its very early stages, and the investment in it has been minimal. Discovery has not yet begun, and there is currently no case schedule. As of the filing of this IPR petition, Petitioner's Answer to the Patent Owner's counterclaim alleging infringement is not yet due. The lack of investment favors institution.

### 4. Overlapping issues with the parallel proceeding

There is no present overlap of prior art issues due to the early stage of district court litigation. As of the filing of this IPR petition, Petitioner's Answer to the Patent Owner's counterclaim alleging infringement is not yet due. Consequently, this factor favors institution.

### 5. Identity of parties

Petitioner is the plaintiff in the co-pending declaratory judgment action. This factor should not be a basis for denying institution.

### 6. Other circumstances

The prior art presented in this Petition renders the Challenged Claims unpatentable as obvious. The merits of Petitioner's arguments are strong, and this factor weighs against discretionary denial.

As such, because the *Fintiv* factors are either neutral or weigh against discretionary denial, and institution should not be denied on discretionary factors.

## B.    Discretionary denial under 35 U.S.C. § 325(d) is not appropriate

Denial under § 325(d) is not warranted because the challenges presented in

this petition are neither cumulative nor redundant to the prosecution of the '872

Patent. This petition challenges each of the claims using a combination of Roberts

and Taraschuk. The Examiner erred by overlooking the teachings of Taraschuk,

which was one of 79 references submitted by the Applicant in an IDS when the

'872 patent application was filed. Ex.1002, 940-43. This was "material" error

because the overlooked teachings of Taraschuk render obvious the limitations that

the Applicant later added to distinguish over Roberts. Discretionary denial is

therefore not appropriate. *Advanced Bionics, LLC v. MED-EL Elektromedizinische*

*Geräte GmbH*, IPR2019-01469, Paper 6 (PTAB Feb. 13, 2020) (precedential)

("*Advanced Bionics*").

Under the first prong of the *Advanced Bionics* framework, Petitioner

acknowledges that Roberts and Taraschuk were "previously presented to the

Office." *Advanced Bionics* at 7-8. Under the second prong, however, the evidence

shows that the Examiner "erred in a manner material to the patentability of

challenged claims." *Id.*  The second prong is guided by *Becton, Dickinson* factors

(c), (e), and (f):

> ▪ (c) the extent to which the asserted art was evaluated during
>    examination, including whether the prior art was the basis for

rejection;

- (e) whether petitioner has pointed out sufficiently how the examiner erred in its evaluation of the asserted prior art; and

- (f) the extent to which additional evidence and facts presented in the petition warrant reconsideration of the prior art or arguments.

*Id*. at 9-10, n. 10 (citing *Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17-18 (Dec. 15, 2017)). These factors weigh against exercising discretion.

## 1.     *Becton, Dickinson* Factor (c)

The proposed combination in this petition relies on a combination of Roberts and Taraschuk. While Roberts was cited by the Examiner during prosecution, it was never considered in combination with Taraschuk. The Applicant overcame Roberts by amending the claims and arguing that "Roberts does not disclose a 'digital-to-digital mapping,' where, 'for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator,' as recited in claim 1." Ex.1002, 162-74. The Examiner then allowed the claims, emphasizing also the claim requirement that "**M>N and N>1**." Ex.1002, 16 (emphasis in original).

Such digital-to-digital mapping techniques are described by Taraschuk: "The linearizer 44 is designed in a known manner (e.g., using a random access memory

lookup table) to **map an M-bit digital signal 46 into an N-bit parallel digital signal** 6…."[2] Ex.1006, 6:61-64; Ex.1003, ¶ 106; *see also* Ex.1006, 7:59-8:15 (teaching that the mapping can compensate for the non-linear effects of a optical modulator). Taraschuk further provides an example in which the input signal is 6-bits and the output signal is 8-bits (thus, "*M>N and N>1*"). *See* Ex.1006, Figs. 5-6 & 7:1-4.

The Office made a "material error" by overlooking the disclosure of Taraschuk that teaches the specific concepts that were added to the claims and argued by the applicant to gain allowance. The Office's oversight of Taraschuk's teaching is evidence that Taraschuk received little—if any—attention during prosecution. This is perhaps because the Taraschuk reference was introduced into the record as one of 79 references submitted by the Applicant earlier in prosecution. Ex.1002, 940-43. A reference merely being of record is not sufficient reason to exercise discretion. *See Navistar, Inc. v. Fatigue Fracture Tech., LLC*, IPR2018-00853, Paper 13 at 17 (Sept. 12, 2018) ("Under [Becton factors] (c), (d), and (f) . . . the fact that [references] were of record, but not applied in any rejection

---

[2] Taraschuk uses the letter M to represent the number of input bits (represented by "*N*" in the '872 Patent) and the letter N to represent the number of output bits (represented by "*M*" in the '872 Patent).

by the Examiner . . . provides little impetus for us to exercise our discretion to deny institution under § 325(d).")

Accordingly, because the Office overlooked the teachings of Taraschuk when allowing the '872 patent, factor (c) favors institution.

## 2. *Becton, Dickinson* Factors (e) and (f):

*Advanced Bionics* explains that "if the record of the Office's previous consideration of the art is not well developed or silent, then a petitioner may show the Office erred by overlooking something persuasive under factors (e) and (f)." *Advanced Bionics* at 10. Here, the Office's underdeveloped consideration of Taraschuk was "material error" because it overlooked Taraschuk's 6-bit to 8-bit linearizer teachings in relation to the claim amendments used to distinguish over the Roberts reference. *See* Ex.1002, 16; Ex.1006, 6:56-7:11, 7:56-67, Figs. 5-6; *see also Advanced Bionics* at 8 n.9 ("material error may include misapprehending or overlooking specific teachings of the relevant prior art where those teachings impact patentability of the challenged claims"). By allowing claims based on limitations that were taught in the cited art of record, the Office overlooked teachings that had a significant impact on patentability. This petition's grounds of unpatentability are not merely "a disagreement with a specific finding of record by the Office." *Advanced Bionics* at 10-11. Rather, this petition relies upon teachings in Taraschuk that were simply overlooked during prosecution.

The Board has consistently declined to discretionarily deny institution under similar facts. *See, e.g., DISH Network LLC v. Sound View Innovations, LLC*, IPR2020-01041, Paper 13, 22 (PTAB Jan 19, 2021) (granting institution where "Petitioner has sufficiently shown Examiner error by pointing out specific teachings of the [previously-asserted] prior art that the Examiner overlooked"); *Trans Ova Genetics, LC v. XY, LLC*, IPR2018-00250, Paper 9, 18-19 (PTAB June 27, 2018) (granting institution where "the Examiner manifestly failed to appreciate [disclosures]…from [the previously-cited art]").

With respect to factor (f), the Petition is supported by an expert declaration (Ex.1003) by Dr. Blumenthal explaining how a POSITA would have understood Taraschuk and the obviousness of combining its teachings with those of Roberts. *See, e.g.*, Ex.1003, ¶¶ 106-117; *see also* Ex.1004. This new evidence also weighs against discretionary denial. *See, e.g., Puma N. Am., Inc. v. Nike, Inc.*, IPR2019-01058, Paper 10, 19 (PTAB Oct. 31, 2019) (instituting where petition presented "new non-cumulative evidence…. probative to issues of patentability and helpful to our consideration of a prior art combination that was not before the Examiner").

Accordingly, the Board should not exercise its discretion to deny this petition under § 325(d).

## C.    Discretionary denial under *General Plastic* is not appropriate

The '872 patent has not been challenged in any prior IPR petition, so none of

*General Plastic* discretionary institution factors apply to this Petition. *See General Plastic Indus. Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 16 (PTAB Sept. 6, 2016) (Section II.B.4.i. precedential).

## X.    IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE

### A.    Challenged Claims and Statutory Grounds for Challenge

| Grounds | Claims | Basis |
|---------|--------|-------|
| #1 | 1-12, 15-22, 30 | 35 U.S.C. § 103 (Pre-AIA)[3] over Roberts and Taraschuk |

U.S. Patent No. 7,277,603 to Roberts et al. ("Roberts") was filed February 22, 2006. It issued and published on October 2, 2007. Roberts is thus prior art under 35 U.S.C. § 102(e) to the earliest claimed priority date.

U.S Patent No. 6,781,537 to Taraschuk et al. ("Taraschuk") was filed June 10, 2003. It issued and published on August 24, 2004. Taraschuk is thus prior art under 35 U.S.C. § 102(b) to the earliest claimed priority date.

### B.    Ground 1: Claims 1-12, 15-22, and 30 are obvious under 35 U.S.C. § 103(a) over Roberts and Taraschuk

#### 1.    Summary of Roberts

Like the '872 Patent, Roberts is in the technical field of optical

---

[3] The '872 Patent was prosecuted as a pre-AIA application. Ex.1002, 201. Roberts, Taraschuk, and Wright would also be prior art under post-AIA 35 U.S.C. § 102(a).

communications. Specifically, Roberts "relates to optical signal transmitters for optical communications systems, and in particular to integrated optical waveform modulation." Ex.1005, 1:15-17. In addition, Roberts is concerned with addressing the non-linear nature of MZI modulators (as in the '872 patent). *See* Ex.1005, 2:44-47; Ex.1003, ¶¶ 97-100. An embodiment of Roberts is shown below:



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶ 100.**

Roberts describes modulating an optical signal using a digital signal processor (DSP) 34 that receives an input digital data signal x(m) and produces two multi-bit sample streams ($V_L(n)$ and $V_R(n)$), referenced generically as $V_X(n)$. *See* Ex.1005, 1:58-63; 5:56-60. Multi-bit sample signals $V_X(n)$ "are representative of the desired phase modulation to be applied to each branch of the MZ modulator

4." Ex.1005, 5:58-60. "Each multi-bit sample stream $V_X(n)$ may be an N-bit parallel binary signal output from the DSP 34 on a corresponding N-bit data bus 36." Ex.1005, 6:40-42. Data bus lines are "connected to control a number of electrodes 40 corresponding to its binary weight." Ex.1005, 6:41-43; Ex.1003, ¶ 101.

The DSP outputs activate the electrodes. The "total phase delay experienced by light traversing each branch will vary directly with the number of active electrodes on that branch" Ex.1005, 7:41-44. A greater phase change (variation) is caused by a greater number of active electrodes. As described by Roberts, this process involves producing multiple voltage values to be applied to the multi-electrode optical modulator. Ex.1003, ¶ 102.

Additionally, like the '872 patent, Roberts recognizes that optical modulators exhibit non-linearities in the input to output transfer function—a phenomenon well known at the time. *See* Ex.1005, 2:43-47; Ex.1003, ¶ 105. Roberts explains that to address such non-linearities, "the DSP 34 may incorporate the functionality of the digital filter 16 and non-linear compensator 18 of the complex driver 14 described above with reference to FIG. 2." Ex.1005, 6:31-33. Roberts further provides that the "non-linear compensator 18 uses the I(n) and Q(n) components to compute multi-bit sample streams $V_R(n)$ and $V_L(n)$." Ex.1005, 1:61-64. Roberts expressly notes that "$V_R(n)$ and $V_L(n)$ can be computed taking

into account non-linearities of … the MZ modulator 4, such that … the output of the MZ modulator 4 closely matches the target E-field modulation computed by the digital filter 16." Ex.1005, 2:43-50. Put differently, Roberts' non-linear compensator 18 adjusts the drive signals provided to the MZ modulator 4 to achieve an amplitude and phase in the actual output signal that closely matches the amplitude and phase of the pre-computed desired output. Ex.1003, ¶ 103.

Roberts is analogous art to the '872 Patent because Roberts is both in the same field of endeavor and is directed to the same technical problem as the '872 Patent. Both Roberts and the '872 Patent are in the field of optical communications. *See* Ex.1001, abstract; Ex.1005, abstract. And, like the '872 Patent, Roberts is concerned with addressing the non-linear nature of MZI modulators: "The multi-bit sample values VR(n) and VL(n) can be computed taking into account non-linearities of the … MZ modulator 4." Ex.1005, 2:44-47. Thus, Roberts seeks to solve the same technical problem as the '872 Patent. Ex.1003, ¶ 104.

### 2.    Summary of Taraschuk

Like both Roberts and the '872 Patent, Taraschuk relates to optical communications. *See* Ex.1006, 7:54-56. Taraschuk teaches "driv[ing] an optical modulator 52 so as to modulate an optical signal generated by an optical source 54 such as, for example, a narrow band laser." Ex.1006, 7:54-56. Additionally, like

IPR2022-00575 Petition
*Inter Partes* Review of 11,133,872

the '872 Patent, Taraschuk addresses the non-linear nature of MZI modulators and provides "linearizer 44 can also be used to compensate non-linearities of the optical modulator 52 … such as for example, a Mach-Zehnder modulator." Ex.1006, 7:56-60, 8:49-53 ("**compensating non-linearities of** the A/D converter (and/or **the optical modulator** 52)"); Ex.1003, ¶ 105.

Taraschuk teaches that "a mapping can be defined between the M-bit input digital signal 46 and an N-bit signal 6…, which compensates for the combined non-linear effects of… the sinusoidal response of the modulator 52." Ex.1006, 7:61-67; Ex.1003, ¶ 106. An example featuring a 6-bit digital input signal mapped by a linearizer to an 8-bit digital output signal is shown in Taraschuk's Fig. 5:



**Ex.1006, Fig. 5 (annotated); Ex.1003, ¶ 106.**

28

Taraschuk notes that its techniques can be applied to a Mach-Zehnder modulator. *See* Ex.1006, 8:54-57. Taraschuk further notes "it will be appreciated that the [linearization] techniques described above … may equally be used to drive an optical signal source [i.e., a laser]." Ex.1006, 8:62-65; Ex.1003, ¶ 107.

Taraschuk is analogous art to the '872 Patent because Taraschuk is both in the same field of endeavor and is directed to the same technical problem as the '872 Patent. Ex.1003, ¶ 108. Both Taraschuk and the '872 Patent are in the field of optical communications. *See* Ex.1001, abstract; Ex.1006, 7:54-56. Also, like the '872 Patent, Taraschuk is concerned with addressing the non-linear nature of MZI modulators: "linearizer 44 can also be used to compensate non-linearities of the optical modulator 52 … such as for example, a Mach-Zehnder modulator." Ex.1006, 7:56-60. Accordingly, Taraschuk seeks to solve the same technical problem as the '872 Patent. Ex.1003, ¶ 108.

### 3. Reasons to Combine Roberts and Taraschuk

A POSITA would have found it obvious to combine the teachings of Roberts and Taraschuk for multiple reasons. Ex.1003, ¶ 109.

As a preliminary matter, Roberts and Taraschuk are analogous prior art in the same field of endeavor—optical communications—and are directed to solving the same technical problem: compensating for non-linearities in a Mach-Zehnder optical modulator. *See* Ex.1005, 1:15-17, 2:44-47; Ex.1006, 7:54-56, 7:56-60;

Ex.1003, ¶ 109.

The combination is merely a matter of applying a known technique—Taraschuk's look-up table—to a known device, method, or product—Roberts' DSP including a non-linear compensator—ready for improvement to yield predictable results. Ex.1003, ¶ 110. For example, application of Taraschuk's look-up table to Roberts' DSP would advantageously allow a mapping between input bits and output bits to be calculated in advance and further allow periodic recalculation of the mapping to compensate for changes over time. *See* Ex.1006, 7:15-23. The resulting combination provides the predictable benefits of permitting the non-linearity compensation to be calculated in advance, adjusted during device operation, or both. Ex.1003, ¶ 110.

Additionally, the combination of Roberts and Taraschuk is simply the use of a known technique—Taraschuk's mapping—to improve similar devices, method, or products in the same way. Ex.1003, ¶ 110.

Roberts describes a known method ready for improvement. Ex.1003, ¶ 111. Roberts describes a digital signal processor (DSP) with a non-linear compensator that receives an input digital data signal x(m) and produces multi-bit sample streams $V_L(n)$ and $V_R(n)$ representative of the desired phase modulation to be applied to each branch of an MZ modulator. *See* Ex.1005, 1:58-63; 5:56-60. The digital data signal x(m) is described generally in Roberts, thereby leaving

implementation details of the digital data signal x(m), e.g., signal format, to a

POSITA. Ex.1003, ¶ 111. Accordingly, a POSITA would have considered other

references that provide additional details regarding the contents of digital input

signals. Ex.1003, ¶ 111. Taraschuk would have been an obvious source of such

further information to a POSITA since it provides an example of such details.

Ex.1003, ¶ 111. For example, Taraschuk provides that an "input digital signal" is

an "M-bit" signal where "M=6." Ex.1006, 6:65-7:4. Moreover, Roberts and

Taraschuk share a common inventor—Kim B. Roberts—which confirms that

skilled practitioners (the named inventors of the Roberts and Taraschuk references)

were aware of both teachings. Ex.1003, ¶ 111. A skilled artisan aware of either

Roberts or Taraschuk would have quickly found the other by simply consulting

other patent disclosures with the same named inventors.

A POSITA would have been motivated to apply Taraschuk's mapping

techniques to Roberts' non-linear compensator to compensate for non-linear effects

of the modulator. Ex.1003, ¶ 112. Taraschuk notes that the mapping

advantageously "enables each M-bit word of the input digital signal 46 to be

mapped to a corresponding N-bit word which compensates for any logic level

mismatches." Ex.1006, 7:4-7. Taraschuk recognizes that one source of "non-linear

effects" with respect to the modulator is logic level mismatches. Ex.1006, 7:61-67.

Accordingly, compensating for logic level mismatches compensates for non-linear

effects of the modulator. Ex.1003, ¶ 112.

Furthermore, applying Taraschuk's mapping technique to the non-linear compensator of Roberts would have been within the capability of a POSITA. Ex.1003, ¶ 113. Taraschuk's mapping is performed by a linearizer described as being "designed in a known manner (e.g., using a random access memory look-up table) to map an M-bit digital signal 46 into an N-bit parallel digital signal." Ex.1006, 6:61-65. Taraschuk recognizes that the design of linearizers and use of look-up tables to map input digital signals to output digital signals was already well known and within the capability of a POSITA. Ex.1003, ¶ 113. Application of Taraschuk's mapping techniques to Roberts' DSP would have involved merely the use of known linearizer designs and known linearizer functionality since Roberts describes its DSP as incorporating a "non-linear compensator" (i.e., a linearizer). Ex.1003, ¶ 113.

A POSITA would have had a reasonable likelihood of success when applying the mapping techniques of Taraschuk to the non-linear compensator of Roberts' DSP. Ex.1003, ¶ 114. A POSITA would have had reason to believe that using Taraschuk's mapping technique with Roberts would have worked as expected because such mapping techniques were well-known for use with linearizers as recognized in Taraschuk itself. Ex.1003, ¶ 114.

In addition to implementing Taraschuk's mapping techniques into Roberts's

DSP, a POSITA would have found it obvious to implement known modulator variations as taught by Taraschuk. Ex.1003, ¶ 115. While Taraschuk notes that its optical modulator may be a Mach-Zehnder modulator, Taraschuk also notes that linearization techniques are applicable and useful for other types of modulators, particularly directly driven lasers: "[I]t will be appreciated that the [linearization] techniques described above … may equally be used to drive an optical signal source [i.e., a laser]." Ex.1006, 8:62-65; Ex.1003, ¶ 115.

Taraschuk references that its linearizer is "designed in a known manner," which would have confirmed to a POSITA that Taraschuk's linearizer is a general-purpose structure. Ex.1003, ¶ 116. That is, Taraschuk's linearizer is described as providing a multibit output to a digital-to-analog converter (DAC), which Taraschuk claims as its invention. *See* Ex.1006, 6:58-61, 3:34-37 & claim 1. But since the linearizer was "designed in a known manner," the linearizer's design was not specific to Taraschuk's DAC. Ex.1003, ¶ 116. Taraschuk also acknowledges this fact by disclosing an example in which the linearizer compensates for non-linearities of an optical modulator *alone*. Ex.1006, 8:49-52 ("compensating non-linearities of the A/D converter (and/**or the optical modulator** 52)"). Ex.1003, ¶ 117.

Thus, a POSITA would have recognized that Taraschuk's linearizer as readily adaptable (or even directly usable) in the context of Roberts, where the

linearizer's multibit output would be coupled to a digital multibit input of a device other than a DAC, specifically Roberts' Mach-Zehnder modulator. Ex.1003, ¶ 118. As previously noted, Roberts' DSP includes a "non-linear compensator" (i.e., a linearizer). Ex.1005, 6:31-37. Accordingly, a POSITA would have expected a reasonable likelihood of success when applying Taraschuk's linearizer mapping technique to Roberts' DSP having a non-linear compensator. Ex.1003, ¶ 118.

Applying Taraschuk's linearizer mapping technique to Roberts' DSP would have achieved the predictable result of compensating for non-linearities in a Mach-Zehnder optical modulator. Ex.1003, ¶ 119. This result is predictable because Taraschuk expressly teaches that its techniques are used to compensate for non-linearities of Mach-Zehnder optical modulators. Ex.1006, 7:56-60. Thus, the combination is merely a matter of applying a known technique (implementing Tarashuk's mapping) to a known device (Roberts' non-linear compensator of the DSP) to yield predictable results (compensating for non-linearities in a Mach-Zehnder optical modulator). Ex.1003, ¶ 119. The combination of Roberts and Taraschuk also represents use of a known technique (Taraschuk's linearizer mapping) to improve similar devices (Roberts' DSP, including a non-linear compensator) in the same way. Ex.1003, ¶ 119. Accordingly, a POSITA would have found it obvious for Roberts' DSP to map between an input digital signal and an output digital signal using the mapping techniques described by Taraschuk.

Ex.1003, ¶ 119.

The combinations described above permit but do not require physical incorporation of elements from Taraschuk into Roberts. Ex.1003, ¶ 120.

### 4.    Claim 1

**[1.0]** *A modulation system, the system comprising:*

To the extent the preamble is limiting, Roberts renders it obvious. Ex.1003, ¶ 121.

Roberts teaches modulation of optical waveforms within an optical communication system comprising an optical modulator and accompanying drive circuitry and signal sources ("*modulation system*"). Ex.1005, 1:15-17; Ex.1003, ¶ 122.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶ 122.**

Thus, Roberts renders obvious "*a modulation system*" as claimed. Ex.1003, ¶ 123.

**[1.1]** *an input for a plurality of N digital input data bits;*

**First**, Roberts teaches an "input digital data signal x(m)" received by a digital signal processor (DSP) having an *input*. Ex.1005, 1:32-33, Fig. 4; Ex.1003, ¶¶ 124-25.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶ 125.**

**Second**, it would have been obvious to a POSITA for Roberts' input digital data signal x(m) to include "*a plurality of N digital input data bits*" as claimed. Ex.1003, ¶ 126. Roberts' x(m) signal is used to "generate[] a pair of multi-bit sample streams V(n) which are representative of the desired phase modulation to be applied to each branch of an MZ modulator 4," which suggests that the x(m) signal is also multi-bit. Ex.1005, 6:57-59; Ex.1003, ¶ 126. Moreover, Roberts describes the x(m) signal as providing "input data." Ex.1005, 1:58-59. Since "data" is the plural form of "datum," a POSITA would have understood x(m) to include a plurality of bits. Ex.1003, ¶ 126.

Additionally, as discussed above, it would have been obvious to a POSITA for Roberts' DSP to implement Taraschuk's linearization mapping. *See supra*,

IPR2022-00575 Petition
*Inter Partes* Review of 11,133,872

§ X.B.3. When implementing Taraschuk's linearization mapping, it would have been obvious for a plurality of bits to be input to the DSP since Taraschuk expressly teaches a plurality of input bits. Ex.1003, ¶ 127. Specifically, Taraschuk teaches a 6-bit input signal. Ex.1006, 6:56-7:4.



**Ex.1006, Fig. 5 (annotated); Ex.1003, ¶ 127.**

Taraschuk identifies the input bits as "data bits." Ex.1006, 1:42-45. Thus, a POSITA would have understood that Taraschuk's 6-bit input digital signal includes *a plurality of N digital input data bits* (e.g., where N=6). Ex.1003, ¶ 127.

Since Roberts' DSP (comprising a "non-linear compensator") and Taraschuk's linearizer are both used to compensate for non-linearities of a Mach-Zehnder optical modulator, it would have been obvious to a POSITA for Roberts' DSP to receive a 6-bit digital input signal as taught by Taraschuk. Ex.1005, 6:34-

37; Ex.1006, 6:56-58, 7:59-67; Ex.1003, ¶¶ 128-29.

To the extent Patent Owner attempts to argue that Roberts' input digital data signal x(m) is a serial (rather than parallel) data stream, it was well known in the art (and would have been part of a POSITA's general background knowledge) to convert data streams from serial to parallel. Ex.1003, ¶ 127; *see, e.g.,* Ex.1019, 3:5-7 (describing that digital signals "are then converted from digital serial signals to digital parallel signals, for rapid processing in the digital-signal-processing means"); Ex.1020, claim 40 ("input means for converting serial data into parallel data"). Accordingly, it would have been obvious to convert a serial data signal to Taraschuk's 6-bit parallel input signal. Ex.1003, ¶ 130.

Thus, because Roberts teaches a DSP with an input that receives a digital input data signal, and because a POSITA would have found it obvious for a digital input data signal to be a multi-bit signal when implementing the non-linear compensation function of the DSP with the techniques of Taraschuk's linearizer, Roberts and Tarashuk render obvious "*an input for a plurality of N digital input data bits*" as claimed. Ex.1003, ¶131.

### [1.2] *an optical signal source for providing an input optical signal;*

Roberts teaches a laser ("*an optical signal source*") in communication with an optical modulator. Ex.1005, 1:23-24 & Fig. 4. Roberts' laser generates an optical carrier signal and provides it to the optical modulator ("*providing an input*

*optical signal*"). Ex.1005, 1:24-30, Fig. 4; Ex.1003, ¶¶ 132-33.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶ 133.**

Thus, because Roberts teaches a laser that generates an optical carrier signal that is provided to an optical modulator, Roberts renders obvious "*an optical signal source for providing an input optical signal*" as claimed. Ex.1003, ¶ 134.

**[1.3]** *a modulator for modulating the input optical signal to output a modulation of the power of the input optical signal, thereby*

**First**, as discussed at [1.2], Roberts teaches an optical modulator ("*a modulator*"). Ex.1003, ¶ 135-36. Roberts further teaches that the optical modulator "modulate[s] the amplitude and/or phase [of] the carrier signal" ("*modulating the input optical signal*"). Ex.1005, 1:26-30; Ex.1003, ¶ 136.

**Second**, it was well known that amplitude and power have a proportional relationship (i.e., altering amplitude also alters power). Ex.1003, ¶ 137.

40

**Third**, Roberts' modulating the amplitude of the optical carrier signal would have been understood by a POSITA to also result in a modulation of signal power ("*output a modulation of the power of the input optical signal*"). Ex.1003, ¶ 138.

Additionally, as discussed in Section V.B., the input-output transfer function of a Mach-Zehnder modulator moves between optical minimum and optical maximum output power responsive to changes in voltage applied to the modulator. Ex.1003, ¶ 139. In that regard, Roberts explains that adjustments are made to a drive voltage applied to the optical modulator in order to attain a desired modulation. *See* Ex.1005, 1:41-52. Since Roberts' optical modulator is a Mach-Zehnder modulator, changes in voltage applied to Roberts' modulator (e.g., changes resulting from adjustments to the drive voltage) trigger modulations of output power. Ex.1003, ¶ 139.

Thus, because Roberts teaches an optical modulator that modulates the amplitude and/or phase of an optical carrier signal through drive voltage adaptations, Roberts renders obvious "*a modulator for modulating the input optical signal to output a modulation of the power of the input optical signal, thereby*" as claimed. Ex.1003, ¶ 140.

**[1.4]** *generating one or more modulated optical signal outputs for transmission over one or more optical fibers; and*

**First**, Roberts teaches that the optical modulator "generate[s] the optical

41

communications signal" ("*generating one or more modulated optical signal outputs*") Ex.1005, 1:26-30; Ex.1003, ¶¶ 141-42. The optical communications signal is transmitted from the optical modulator ("*transmission*") as shown in Roberts' Fig 4 below.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶ 142.**

**Second**, it would have been obvious to a POSITA for Roberts' output optical communications signal to be transmitted over one or more optical fibers since such fibers had often been used in optical communications for decades. Ex.1003, ¶ 143; *see also id.* ¶¶ 28 (citing Ex.1019 & Ex.1015), 33 (citing Ex.1007), 35-39 (citing Ex.1013). Likewise, a POSITA would have known that optical modulators (such as that of Roberts) had for many years been a basic element of optic transmission links, including analog optical transmission links.

Ex.1003, ¶ 143.

Thus, because Roberts teaches that modulation by the optical modulator operates to generate an optical communications signal, and a POSITA would have found it obvious to transmit the optical communications signal via optical fibers, Roberts renders obvious "*generating one or more modulated optical signal outputs for transmission over one or more optical fibers*" as claimed. Ex.1003, ¶ 144.

**[1.5]** *a converter for: converting, based on a digital-to-digital mapping, the plurality N digital input data bits to M digital output data bits associated with M drive voltage values, and*

**First**, as discussed at [1.1], Roberts' digital signal processor (DSP) comprises a non-linear compensator. Ex.1003, ¶¶ 145-46. Roberts' DSP may be considered to be the claimed "*converter*." Alternatively, Taraschuk's linearizer (discussed below and implemented within Roberts' DSP) may be considered to be the claimed "*converter*." The combination teaches the claimed "*converter*" regardless of whether Taraschuk's linearizer or Roberts' DSP is specifically mapped to the "*converter*."

**Second**, Taraschuk teaches that "linearizer 44 is designed in a known manner (e.g., using a random access memory look-up table) to map an M-bit digital signal 46 into an N-bit parallel digital signal 6" where, in one embodiment,

"M=6 and N=8."[4]  Ex.1006, 6:56-7:4. Accordingly, Taraschuk teaches that a 6-bit digital input signal ("*plurality N digital input data bits*") is mapped to an 8-bit digital output signal ("*M digital output data bits*") by the linearizer. Ex.1003, ¶ 147. Taraschuk's mapping between the 6-bit and 8-bit signals would have been understood by a POSITA to be a *digital-to-digital mapping* since the input and the output signal are both "digital" signals. Ex.1003, ¶ 148. As shown in Taraschuk's Figure 5, the linearizer receives the 6-bit digital input signal and outputs the 8-bit digital signal:

---

[4] Taraschuk uses the letter M to represent the number of input bits (represented by "*N*" in the '872 Patent) and the letter N to represent the number of output bits (represented by "*M*" in the '872 Patent). Ex.1003, ¶ 147.



**Ex.1006, Fig. 5 (annotated); Ex.1003, ¶ 148.**

A POSITA would have thus understood that the 6-bit digital input signal is converted by the linearizer into the 8-bit digital output signal. Ex.1003, ¶ 149. A POSITA would have found it obvious for Roberts' DSP to map and convert an input signal (e.g., a 6-bit digital input signal) to an output signal (e.g., an 8-bit digital output signal) per the teachings of Taraschuk since both Taraschuk's linearizer and Roberts' DSP (having a non-linear compensator) are intended to compensate for the non-linear effects of a Mach-Zehnder optical modulator. Ex.1003, ¶ 149.

**Third**, Roberts teaches that the DSP outputs multi-bit $V_R(n)$ and $V_L(n)$ signals (represented generally as $V_X(n)$) and explains that the bits of those signals represent voltages to be applied to respective electrodes. Ex.1003, ¶ 150. Roberts

explains that "each multi-bit sample stream $V_X(n)$ may be an N-bit parallel binary signal output from the DSP 34 on a corresponding N-bit data bus 36" where "each line 38, of the N-bit bus 36 is connected to control a number of electrodes 40 corresponding to its binary weight." Ex.1005, 6:40-54. Roberts goes on to explain that the electrodes are controlled by the $V_X(n)$ streams where a voltage is applied to each electrode based on a corresponding binary value in the $V_X(n)$ streams. Ex.1005, 6:40-54, 7:35-44. For example, "each active electrode receives … [a] voltage (corresponding to logic state '1.'" Ex.1005, 7:39-40; 5:50-54. Ex.1003, ¶ 150.

Since each "1" in the binary values of the $V_X(n)$ streams corresponds to the voltage to be applied to an electrode of the optical modulator, the binary values of the $V_X(n)$ signal are (or are *associated with*) "*drive voltage values.*" *See* Ex.1005, 7:35-44; Ex.1003, ¶ 151. Put differently, the logical value of each bit of the $V_X(n)$ signal indicates the voltage that should be applied to a particular electrode by indicating whether a specific voltage value should be applied or not. Ex.1003, ¶ 151. In that regard, a logical '1' at a particular position in the binary signal indicates a particular voltage value, e.g., +Vdd, to be applied to a corresponding electrode while a logical '0' in the same position indicates a different voltage value, e.g., ground (GND), to be applied. Ex.1005, 7:60-65 ("a binary control signal (having voltages of GND and +Vdd)"), 1:49-52 ("the drive voltage is

adapted to achieve the desired amount of modulation").

The binary values of the $V_X(n)$ multi-bit parallel binary signals are no different than the "voltage values" described in the '872 Patent. Ex.1003, ¶ 152. The '872 Patent states "the electrode actuation vector is a binary vector, and wherein the M voltage values are selected from two voltage levels according to the M binary values." Ex.1001, 3:62-65; *see* Ex.1005, 3:42-44 (describing a "5 volt swing between binary '0' and '1' logic states"). Thus, the bits in Roberts' $V_X(n)$ signal are—or are *associated with—drive voltage values*. Ex.1003, ¶ 152.

Thus, Roberts and Taraschuk render obvious "*a converter for: converting, based on a digital-to-digital mapping, the plurality N digital input data bits to M digital output data bits associated with M drive voltage values, and*" as claimed. Ex.1003, ¶ 153.

**[1.6] *providing the M drive voltage values to the modulator for the modulating,***

As discussed at [1.5], Roberts' DSP outputs parallel binary signals including binary values ("*M drive voltage values*") that indicate voltages to be applied to particular electrodes of an optical modulator. Ex.1005, 7:39-40; Ex.1003, ¶¶ 154-55. That the parallel binary signals are *provid[ed] to the modulator for the modulating* is apparent from Roberts' Figure 4:



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶ 155.**

Thus, because Roberts teaches providing the binary values to electrodes of the optical modulator, Roberts renders obvious *"providing the M drive voltage values to the modulator for the modulating,"* as claimed. Ex.1003, ¶ 156.

**[1.7]** *wherein M>N and N>1,*

As discussed at [1.5], Taraschuk teaches that a 6-bit input signal ($N = 6$) is mapped to an 8-bit output signal ($M = 8$) by a linearizer. Ex.1006, 6:56-7:4. A POSITA would have understood that 8 ("*M*") > 6 ("*N*") and 6 ("*N*") > 1.[5] Ex.1003,

---

[5] The '872 patent uses the letter *N* to represent the number of input bits and the letter *M* to represent the number of output bits. Conversely, in Taraschuk, "M" represents the number of input bits and "N" the number of output bits.

¶¶ 157-158.

Thus, Roberts and Taraschuk render obvious "*wherein M>N and N>1*" as claimed. Ex.1003, ¶ 159.

**[1.8]** ***wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits,***

**First**, as discussed at [1.5], it would have been obvious to a POSITA for Roberts' DSP or Taraschuk's linearizer to map a certain number of digital input bits to a different number of digital output bits ("*digital-to-digital mapping*"). Ex.1003, ¶¶ 160-61.

**Second**, Taraschuk teaches "using a random access memory look-up table" for the mapping such that "each M-bit word of the input digital signal 46 [is] mapped to a corresponding N-bit word" ("*for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits*").[6] Ex.1006, 6:61-7:10; Ex.1003, ¶ 162. A POSITA would have understood Taraschuk's description of a mapping for "each" input bit word to suggest that multiple distinct ("*unique*") input bit words are possible. Ex.1003, ¶ 163. The term

---

[6] The '872 patent uses the letter *N* to represent the number of input bits and the letter *M* to represent the number of output bits. Conversely, in Taraschuk, "M" represents the number of input bits and "N" the number of output bits.

"look-up table" would suggest to a POSITA inclusion of multiple rows and columns of entries. Ex.1003, ¶ 163. In that regard, a POSITA would have found it obvious for Taraschuk's look-up table to include separate columns for input and output bit words such that entries within each column are representative of distinct combinations of possible bit values. Ex.1003, ¶ 163. Since Taraschuk expressly teaches mapping each input bit word to a corresponding output bit word, a POSITA would have found it obvious for Taraschuk's look-up table to be structured such that each distinct combination of input bits is mapped to a corresponding combination of output bits. Ex.1003, ¶ 163.

Thus, Roberts and Taraschuk render obvious "*wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits,*" as claimed. Ex.1003, ¶ 164.

**[1.9] *wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator.***

**First**, as discussed at [1.5] and [1.8], it would have been obvious to a POSITA for Roberts' DSP or Taraschuk's linearizer to map ("*the mapping*") a certain number of digital input bits ("*a given plurality of N digital input data bits*") to a different number of digital output bits ("*M digital output data bits*") using a

look-up table as taught by Taraschuk. Ex.1003, ¶¶ 165-66.

**Second**, a POSITA would have found it obvious for the bits of Roberts'

output signal to correspond to binary values since, as discussed at [1.5], Roberts

teaches that the DSP's output is a multi-bit "parallel binary signal." Ex.1005, 6:40-

42. A POSITA would have understood that the binary values would be made up of

a pattern of 1s and 0s ("*pattern for actuating drive voltages*"). Ex.1003, ¶ 167. As

discussed at [1.5], the binary value of each output bit indicates whether or not a

specific voltage value ("*drive voltage*") is to be applied to electrodes of an optical

modulator. Accordingly, a POSITA would have found it obvious to map input bits

to output bits within the look-up table such that the output bits correspond to

voltage values to be transmitted to electrodes of an optical modulator ("*mapping to

the corresponding M digital output data bits is determined based on a pattern for

actuating drive voltages*"). Ex.1003, ¶¶ 167-68.

**Third**, Taraschuk teaches that the mapping can be defined to compensate for

the non-linear effects of the optical modulator ("*alters the linearity of an optical

response of the modulator*"). Ex.1006, 7:59-8:15. Taraschuk recognizes that

"conventional optical modulators, such as for example, a Mach-Zehnder

modulator, display sinusoidal response to an input control signal" and notes that

"linearizer 44 can also be used to compensate non-linearities of the optical

modulator 52." Ex.1006, 7:56-61. Taraschuk explains that "a mapping can be

defined between the M-bit input digital signal 46 and an N-bit signal … which compensates for the combined non-linear effects of … the sinusoidal response of the modulator 52" such that the response of the optical modulator is "more nearly linear." Ex.1006, 7:61-67, 8:13-15; Ex.1003, ¶ 169.

A POSITA would have understood that the response of Taraschuk's modulator is an "*optical response*" since Taraschuk's modulator is an optical modulator. Ex.1003, ¶ 164. Accordingly, it a POSITA would have found it obvious that adjusting the optical modulator's response to be "more nearly linear" *alters the linearity of an optical response of the modulator.* Ex.1003, ¶ 169.

Thus, because a POSITA would have found it obvious for Roberts' DSP to map a given number of digital input bits to a different number of digital output bits using Taraschuk's look-up table where input bits are mapped to output bits such that the output bits compensate for the non-linear effects of the optical modulator, Roberts and Taraschuk render obvious "*wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator*" as claimed. Ex.1003, ¶ 170.

### 5.    Claim 2

**[2.1]** *The modulation system of claim 1, wherein the converter is enabled to correct for distortion introduced by non-linear characteristics of optical fibers during transmission and for distortion introduced by non-linear characteristics*

***of the modulator.***

**First**, as discussed at [1.5]-[1.9], it would have been obvious to a POSITA for Roberts' DSP ("*the converter*") to implement Taraschuk's mapping techniques to compensate for the non-linear effects of the optical modulator ("*correct for … distortion introduced by non-linear characteristics of the modulator*"). Ex.1003, ¶¶ 171-72; *see, e.g.*, Ex.1006, 7:56-61.

**Second**, Roberts teaches compensating for non-linearities of the optical fiber as well. Roberts teaches that a compensation function c(t) is used by the DSP to "compensate [for] impairments of an optical link" by generating a pre-distorted signal output "which will be transformed by the link impairments into a substantially undistorted optical signal at a receiver end of the link." Ex.1005, 2:50-55; Ex.1003, ¶ 173. The DSP's reception of c(t) is illustrated in Roberts' Figure 4 below:



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶ 173.**

A POSITA would have found it obvious for the "optical link" to include *optical fibers* since, as discussed at [1.4], such fibers had been used in optical communications for decades. Ex.1003, ¶ 173. Since the tendency of optical fibers to produce non-linear effects was well-known, a POSITA would have found it obvious to compensate for impairment resulting from *distortion introduced by non-linear characteristics of optical fibers during transmission. See, e.g.,* Ex.1015, pp. 23, 59-67; Ex.1003, ¶173.

Roberts explains that the DSP processes the compensation function c(t) to generate "a pre-distorted signal which will be transformed by the link impairments into a substantially undistorted optical signal at a receiver end of the link;" thus, the pre-distortion performed by the DSP compensates for (will "*correct for*") the

link impairments ("*non-linear characteristics of optical fibers*"). Ex.1005, 2:50-55; *see also* Ex.1005, 1:57-63, 6:31-33. Accordingly, a POSITA would have found it obvious for Roberts DSP to compensate for both the non-linear characteristics of the modulator and the non-linear characteristics of the optical fiber. Ex.1003, ¶ 174.

Thus, because Roberts' DSP uses compensation function c(t) to compensate for impairments of an optical link, and because a POSITA would have found it obvious for Roberts' DSP to implement Taraschuk's mapping techniques to compensate for the non-linear effects of the optical modulator, Roberts and Taraschuk render obvious "*wherein the converter is enabled to correct for distortion introduced by non-linear characteristics of optical fibers during transmission and for distortion introduced by non-linear characteristics of the modulator*" as claimed. Ex.1003, ¶ 175.

### 6.    Claim 3

**[3.1] *The modulation system of claim 1, wherein the modulator comprises one or more Mach-Zehnder interferometer (MZI) based modulators.***

As discussed above at X.B.1-3 and [1.0]-[1.9], Roberts and Taraschuk both refer to their modulators as "Mach-Zehnder" modulators. Roberts also expressly teaches that "the optical modulator 4 is provided by a well known Mach-Zehnder (MZ) interferometer." Ex.1005, 1:35-37. Thus, a POSITA would have found this

claim limitation to be obvious. Ex.1003, ¶¶ 176-178.

### 7.   Claim 4

**[4.1] *The modulation system of claim 1, wherein the converter comprises a digital to digital converter.***

The specification of the '872 Patent explicitly defines the term "*digital to digital converter*" as referring to "a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical." Ex.1001, 4:63-66. It would have been obvious to a POSITA for Roberts' DSP ("*the converter*") to comprise a *digital to digital converter* under this definition because, as explained above at [1.5], it would have been obvious for Roberts' digital signal processor ("*the converter*") to map and convert a certain number of digital input bits to a different number of digital output bits in the non-linear compensator as taught by Taraschuk. Ex.1003, ¶¶ 179-80. As noted in [1.5], Taraschuk's linearizer may alternatively be considered the claimed "*converter*." Taraschuk's linearizer employs a look-up table to map between digital input bits and digital output bits, which is the same technique as the '872 Patent's "preferred implementation" of a *digital to digital converter*. Ex.1006, 6:61-65; Ex.1001, 7:64-65.  Thus, Taraschuk's linearizer is a *digital to digital converter*. As discussed above, a POSITA would have found it obvious to apply Taraschuk's mapping techniques to Roberts' DSP. Ex.1003, ¶ 180.

Further, a POSITA would have recognized that converting from a certain number of digital input bits to a different number of digital output bits is a *digital-to-digital* conversion even without the '872 Patent's explicit definition. Ex.1003, ¶ 181. Because it would have been obvious to a POSITA for Roberts' DSP to perform such a conversion as taught by Taraschuk, it would have also been obvious to a POSITA for Roberts' DSP to comprise a *digital to digital converter* as claimed. Ex.1003, ¶ 181.

Thus, Roberts and Taraschuk render obvious "*wherein the converter comprises a digital to digital converter*" as claimed. Ex.1003, ¶ 182.

### 8. Claim 5

**[5.1] *The modulation system of claim 1, wherein the converter receives the N digital input data bits and provides the M digital output data bits that enable the one or more modulated optical signal outputs to be corrected for non-linearities introduced by the modulation system.***

As explained above at [1.5], it would have been obvious to a POSITA for Roberts' digital signal processor ("*the converter*") to receive a 6-bit digital input signal ("*receives the N digital input data bits*") and convert that signal into an 8-bit digital output signal ("*provides the M digital output data bits*") as taught by Taraschuk. Ex.1003, ¶¶ 183-84. Taraschuk goes on to teach that the 8-bit digital output signal "compensates for the combined non-linear effects of … the sinusoidal response of the modulator 52" such that the response of the optical

modulator is "more nearly linear." Ex.1006, 7:61-67, 8:13-15. The sinusoidal response of the modulator would have been understood by a POSITA to have been a source of non-linearities introduced by the modulator that affect the modulator's output (i.e., "*modulated optical signal outputs*"). Ex.1003, ¶ 185. Since the modulator is an element of a "*modulation system*," non-linearities introduced by the modulator are consequently "*introduced by the modulation system.*" Ex.1003, ¶ 185. It would have been obvious to a POSITA that by rendering the response more nearly linear and compensating for the non-linear effects of the sinusoidal response of the modulator, the 8-bit digital output signal *enable[s] the one or more modulated optical signal outputs to be corrected for non-linearities introduced by the modulation system.* Ex.1003, ¶ 185.

Thus, because a POSITA would have found it obvious for Roberts' digital signal processor to receive a 6-bit digital input signal and convert that signal into an 8-bit digital output signal that compensates for the non-linear effects of the sinusoidal response of the modulator such that the response is more nearly linear, as taught by Taraschuk, Roberts and Taraschuk render obvious "*wherein the converter receives the N digital input data bits and provides the M digital output data bits that enable the one or more modulated optical signal outputs to be corrected for non-linearities introduced by the modulation system*" as claimed. Ex.1003, ¶ 186.

Alternatively, if Taraschuk's linearizer is mapped to the claimed *converter*, then Taraschuk's description of using a 6-to-8 bit look-up table to compensate for nonlinearities of the modulator renders this limitation obvious. Ex.1003, ¶ 187.

### 9. Claim 6

**[6.1]** *The modulation system of claim 1, wherein the M digital output data bits correct non-linearities due to non-linear characteristics of the modulator and non-linearities due to non-linear characteristics of the one or more optical fibers transmitting the one or more modulated optical signal outputs.*

**First**, as discussed at [1.5]-[1.9], it would have been obvious to a POSITA for Roberts' DSP to map a certain number of digital input bits to a different number of digital output bits ("*M digital output data bits*") as taught by Taraschuk, the output bits corresponding to voltage values that compensate for the non-linear effects of the optical modulator ("*correct non-linearities due to non-linear characteristics of the modulator*"). Ex.1003, ¶¶ 187-88.

**Second**, as discussed at [2.1], Roberts teaches that the DSP uses a compensation function c(t) to "compensate [for] impairments of an optical link" by generating a pre-distorted signal output "which will be transformed by the link impairments into a substantially undistorted optical signal at a receiver end of the link." Ex.1005, 2:50-55; *see also* Ex.1005, 1:57-63, 6:31-33; Ex.1003, ¶ 189.

It would have been obvious to a POSITA for the "optical link" to include "*one or more optical fibers transmitting the one or more modulated optical signal*

*outputs"* since, as discussed at [1.4], [2.1], and [6.1], such fibers had been used in optical communications for decades. Ex.1003, ¶ 190. Since the tendency of optical fibers to produce non-linear effects was well-known, a POSITA would have found it obvious for the impairments Roberts' DSP compensates for to include "*non-linearities due to non-linear characteristics of the one or more optical fibers*." *See, e.g.,* Ex.1015, pp. 23, 59-67; Ex.1003, ¶ 190.

Since the output of the DSP is a number of digital output bits ("*M digital output data bits*," see *supra* [1.5] & [1.8]-[1.9]), a POSITA would have recognized that compensation for the link impairment is accomplished via the digital output bits ("*the M digital output data bits correct ... non-linearities due to non-linear characteristics of the one or more optical fibers transmitting the one or more modulated optical signal outputs*"). Ex.1003, ¶ 191.

Thus, because a POSITA would have found it obvious for Roberts' DSP to map a given number of digital input bits to a different number of digital output bits as taught by Taraschuk, where the output bits correspond to voltage values that compensate for the non-linear effects of the optical modulator, and because Roberts teaches that the DSP uses a compensation function c(t) to compensate for link impairments, Roberts and Taraschuk render obvious "*wherein the M digital output data bits correct non-linearities due to non-linear characteristics of the modulator and non-linearities due to non-linear characteristics of the one or more*

*optical fibers transmitting the one or more modulated optical signal outputs*" as
claimed. Ex.1003, ¶ 192.

### 10. Claim 7

**[7.1]** *The modulation system of claim 1, wherein the M digital output data bits correct non-linearities in the modulated optical signal outputs due to non-linear characteristics of the modulator.*

**First**, as explained above at [1.5], it would have been obvious to a POSITA for Roberts' digital signal processor to convert a digital input signal into an 8-bit digital output signal ("*M digital output data bits*") as taught by Taraschuk. Ex.1003, ¶¶ 193-94.

**Second**, as discussed at [5.1], Taraschuk further teaches that the 8-bit digital output signal "compensates for the combined non-linear effects of … the sinusoidal response of the modulator 52" such that the response of the optical modulator is "more nearly linear." Ex.1006, 7:61-67, 8:13-15. A POSITA would have recognized that the sinusoidal response results from *non-linear characteristics of the modulator* and is a source of non-linearities in the modulator's output (i.e., "*non-linearities in the modulated optical signal outputs*"). Ex.1003, ¶ 190. Accordingly, a POSITA would have understood that the 8-bit digital output signal *correct[s] non-linearities in the modulated optical signal outputs due to non-linear characteristics of the modulator* by compensating for the non-linear effects of the sinusoidal response of the modulator such that the

response is more nearly linear. Ex.1003, ¶ 195.

Thus, because a POSITA would have found it obvious for Roberts' digital signal processor to convert a digital input signal into an 8-bit digital output signal that compensates for the non-linear effects of the sinusoidal response of the modulator such that the modulator output is more nearly linear, as taught by Taraschuk, Roberts and Taraschuk render obvious "*wherein the M digital output data bits correct non-linearities in the modulated optical signal outputs due to non-linear characteristics of the modulator*" as claimed. Ex.1003, ¶ 196.

### 11.    Claim 8

**[8.1]** *The modulation system of claim 1, wherein the M digital output data bits correct non-linearities in the modulated signal outputs due to non-linear characteristics of the one or more optical fibers transmitting the one or more modulated optical signal outputs.*

Claim 8 recites a substantively identical limitation to one already discussed in [2.1] and  [6.1] above. Accordingly, claim 8 is rendered obvious for the same reasons. Ex.1003, ¶ 197.

### 12.    Claim 9

**[9.1]** *The modulation system of claim 1, wherein the converter is enabled to correct for distortion introduced by non-linear characteristics of optical fibers during transmission.*

Claim 9 recites a substantively identical limitation to one already discussed in [2.1] above. Accordingly, claim 9 is rendered obvious for the same reasons.

Ex.1003, ¶ 198.

### 13.    Claim 10

**[10.1]** ***The modulation system of claim 1, wherein the converter is enabled to correct for distortion introduced by non-linear characteristics of the modulator.***

**First**, as explained above at [1.5], it would have been obvious to a POSITA for Roberts' digital signal processor ("*the converter*") to convert a digital input signal into an 8-bit digital output signal as taught by Taraschuk. Ex.1003, ¶¶ 199-200.

**Second**, as discussed at [5.1], Taraschuk further teaches that the 8-bit digital output signal "compensates for the combined non-linear effects of … the sinusoidal response of the modulator 52" such that the response of the optical modulator is "more nearly linear." Ex.1006, 7:61-67, 8:13-15. A POSITA would have recognized that the sinusoidal response results from *non-linear characteristics of the modulator* and is a source of *distortion introduced by … the modulator*. Ex.1003, ¶ 201. Thus, a POSITA would have understood that outputting the 8-bit digital output signal to compensate for the non-linear effects of the sinusoidal response *correct[s] for distortion introduced by non-linear characteristics of the modulator.* Ex.1003, ¶ 201; *see also* Ex.1006, 2:23-25 ("**predistorting** an input binary signal, and then using the predistorted signal to drive optical modulators.").

63

Thus, because a POSITA would have found it obvious for Roberts' digital signal processor to convert a digital input signal into an 8-bit digital output signal that compensates for the non-linear effects of the sinusoidal response of the modulator such that the response is more nearly linear, as taught by Taraschuk, Roberts and Taraschuk render obvious "*wherein the converter is enabled to correct for distortion introduced by non-linear characteristics of the modulator*" as claimed. Ex.1003, ¶ 202.

### 14.    Claim 11

**[11.0] *A method for generating, outputting and transmitting one or more modulated optical signal outputs by a modulation system, the method comprising;***

Roberts describes a "method of modulating an optical carrier." Ex.1005, abstract. As described above at [1.4], Roberts describes a modulation system for "*generating one or more modulated optical signal outputs for transmission.*" *See supra,* [1.0]-[1.9]. A POSITA would have found it obvious that Roberts' modulator is "*outputting and transmitting*" the "optical communications signal 8 based on a drive signal 10 that encodes data to be transmitted" because *outputting and transmitting* is the purpose of a communication system. Ex.1005, 1:28-30. For these and the reasons provided above in [1.0]-[1.9], Roberts describes a "*method for generating, outputting and transmitting one or more modulated optical signal outputs by a modulation system*" as claimed. Ex.1003, ¶ 203.

**[11.1]** *receiving N digital input data bits at a first input to the modulation system,*

As explained above at [1.1], the prior art teaches an input for receiving N digital input data bits. For similar reasons, the prior art renders obvious "*receiving N digital input data bits at a first input to the modulation system*" as claimed. Ex.1003, ¶ 204.

**[11.2]** *the modulation system comprising one or more input optical signal sources, a modulator, a converter and one or more optical fibers;*

As explained above at [1.2], Roberts' system includes an optical source. As explained above at [1.3], Roberts's system includes a modulator. As explained above at [1.5], Roberts's system includes a converter. As explained above at [1.4], it would have been obvious for Roberts's system to include one or more optical fibers. For similar reasons, Roberts renders obvious "*the modulation system comprising one or more input optical signal sources, a modulator, a converter and one or more optical fibers*" as claimed. Ex.1003, ¶ 205.

**[11.3]** *converting, based on a digital-to-digital mapping, the N digital input data bits to M digital output data bits associated with M drive voltage values,*

See analysis at [1.5]. Ex.1003, ¶ 206.

**[11.4]** *wherein M>N and N>1,*

See analysis at [1.7]. Ex.1003, ¶ 207.

**[11.5]** *wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits,*

See analysis at [1.8]. Ex.1003, ¶ 208.

**[11.6]** *providing the M drive voltage values to the modulator;*

See analysis at [1.6]. Ex.1003, ¶ 209.

**[11.7]** *inputting one or more input optical signals into the modulator of the modulation system from the one or more input optical signal sources;*

As explained at [1.2], Roberts teaches an optical signal source for providing an input optical signal. For similar reasons, Roberts renders obvious "*inputting one or more input optical signals into the modulator of the modulation system from the one or more input optical signal sources*" as claimed. Ex.1003, ¶ 210.

**[11.8]** *modulating the one or more input optical signals responsive to the M drive voltages values, wherein said modulating the one or more input optical signals generates the one or more modulated optical signal outputs; and*

As explained above at [1.3], Roberts' modulator modulates the optical signals from the optical source. As explained above at [1.4] and [1.6], Roberts' system modulates the optical input signals to produce optical output signals. For similar reasons, Roberts renders obvious "*modulating the one or more input optical signals responsive to the M drive voltages values, wherein said modulating the one or more input optical signals generates the one or more modulated optical signal outputs*" as claimed. Ex.1003, ¶ 211.

**[11.9]** *coupling the one or more modulated optical signal outputs to one or more optical fibers for transmission.*

As explained above at [1.4], Roberts' system produces optical signal

outputs, which a POSITA would have found obvious to transmit over optical fibers. By transmitting the outputs over the optical fibers, the outputs are "*coupled*" to the optical fibers. Accordingly, Roberts renders obvious "*coupling the one or more modulated optical signal outputs to one or more optical fibers for transmission*" as claimed. Ex.1003, ¶ 212.

### 15.    Claim 12

**[12.1] *The method of claim 11, wherein the modulator comprises one or more Mach-Zehnder modulators.***

Claim 12 depends from claim 11 and recites substantively identical limitations as claim 3 that depends from claim 1. Accordingly, claim 12 is rendered obvious for the same reasons. Ex.1003, ¶ 213.

### 16.    Claim 15

**[15.0] *A modulation system, the system comprising:***

Element [15.0] is substantively identical to element [1.0] discussed above. As discussed with respect to [1.0], Roberts teaches the claimed "*modulation system.*" Ex.1003, ¶ 273. As discussed below, Roberts and Taraschuk render obvious the elements that *the system compris[es]*.

**[15.1] *an input for N digital input data bits;***

Element [15.1] recites a substantively identical limitation to one already discussed in [1.1] above. Accordingly, this limitation is rendered obvious for the same reasons. Ex.1003, ¶ 274.

**[15.2]** *a modulator that is a semiconductor light generating device*

As discussed at [1.2]-[1.4], Roberts' system includes a laser 2 that produces a continuous wave optical carrier signal, which is then modulated by an external optical modulator 4, such as a Mach-Zehnder interferometer. Ex.1005, 1:23-24, 1:35-37, & Fig. 4. Taraschuk contemplates a partially similar arrangement in Fig. 6, where an optical source 54 (such as a "laser") produces light that is then modulated by a separate modulator 52 (such as a "Mach-Zehnder modulator"). Ex.1006, 7:53-61 & Fig. 6. Taraschuk goes on to explain, however, that other approaches were known, including that a laser "can be directly controlled," and thus used "alone" (that is, without a separate, external modulator). Ex.1006, 8:54-65. Taraschuk notes that the linearization techniques it describes "may equally be used to drive an optical signal source."  Ex.1006, 8:62-6; Ex.1003, ¶ 275.

A POSITA would have found it obvious to follow Taraschuk's suggestion of replacing Robert's combination of a laser and separate modulator with a directly modulated laser. Ex.1003, ¶ 276. It was known in the art to directly drive a laser with digital bitstreams.  *See e.g.*, Ex.1015, 112-13 (noting that semiconductor lasers "exhibit low chirp under direct modulation" and that "the laser is typically biased close to threshold and modulated considerably above threshold to obtain optical pulses representing digital bits"). Since Roberts' modulator is driven with multiple digital inputs (as discussed above at [1.6]), it would have been obvious to

directly drive a laser modulator in similar fashion. Ex.1003, ¶ 276.  And since

Taraschuk contemplates using its linearization techniques for a directly driven

laser modulator, it would have been obvious for a directly modulated laser to be

driven by a pre-distorted input that compensates for the non-linearities of the

directly modulated laser. Ex.1003, ¶ 276. A POSITA would have had an

expectation of success in creating such a device because, as the '872 patent

assumes, the "details of the device" were "self-evident to one ordinarily skilled in

the art." Ex.1003, ¶ 276; Ex.1001, 14:1-4.

Accordingly, the obvious substitution of Roberts' separate laser and

modulator with a single directly modulated laser, as suggested by Taraschuk,

would have resulted in a "*modulator that is a ... light generating device*," as

claimed.  Roberts further explains that it was known to construct a laser using

semiconductor materials. *See* Ex.1005, 5:60-67 (describing electro-optical

components (e.g,. a laser) formed with InP or GaAs processes); Ex.1003, ¶ 277. A

POSITA would have recognized that InP (indium phosphide) and GaAs (gallium

arsenide) are semiconductor materials. *See* Ex.1021, 4:11-13, claim 2 (describing a

"semiconductor light emitting device" where the "semiconductor substrate is

composed of **GaAs**, **InP**, ZnSe, or GaN.").  Accordingly, a POSITA have found it

obvious for the directly driven laser suggested by the Roberts-Taraschuk

combination to be a semiconductor laser, and thus "*a semiconductor light*

*generating device*" as claimed. Ex.1003, ¶ 277.

Thus, the prior art renders obvious "*a modulator that is a semiconductor light generating device*" as claimed. Ex.1003, ¶ 278.

### [15.3] *[the modulator] enabled for directly generating, responsively to an input signal that is responsive to the N digital input data bits, one or more modulated optical signal outputs for transmission over one or more optical fibers; and*

**First**, as explained above at [1.4], Roberts renders obvious generating one or more optical signal outputs for transmission over one or more optical fibers. Ex.1003, ¶ 279.

**Second**, Roberts and Taraschuk render obvious that these outputs are "directly" generated. As explained above at [15.2], a POSITA would have found it obvious to replace Roberts' laser-modulator pair with a directly driven laser, as taught by Taraschuk. Further, POSITAs recognized that semiconductor lasers "exhibit low chirp under **direct modulation**" and that "the laser is typically biased close to threshold and modulated considerably above threshold to obtain optical pulses representing **digital bits**"). Ex.1015, 112-13. Roberts' Vx(n) signals from the DSP are collectively "*an input signal*" to the modulator's electrodes, as discussed above at [1.5]-[1.6]. Ex.1003, ¶ 280.

**Third**, consistent with the discussion above at [1.1]-[1.4], [1.6], and [1.9], Roberts and Taraschuk teach that the input to the modulator ("*input signal*") is the output of a non-linear compensator that receives an N-bit input signal and maps it

to an M-bit output. That output is then provided to the modulator. Accordingly, the output of the non-linear compensator ("*input signal*") is "*responsive to the N digital input data bits*" as shown in Fig. 4 below.  Ex.1003, ¶ 281.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶ 281.**

Thus, because Roberts describes a modulator that modulates an optical signal in response to a multi-bit input stream, and Taraschuk shows that it would have been obvious for the modulator to be a directly driven laser, Roberts and Taraschuk render obvious "*[the modulator] enabled for directly generating, responsively to an input signal that is responsive to the N digital input data bits, one or more modulated optical signal outputs for transmission over one or more optical fibers*" as claimed. Ex.1003, ¶ 282.

**[15.4]** *a converter for: converting, based on a digital-to-digital mapping, the N*

*digital input data bits to M digital output data bits associated with M drive voltage values, and*

As discussed at [1.5], Roberts' DSP produces an output signal Vx(n) ("*M drive voltage values*") that is applied to electrodes to drive an MZM modulator. Consistent with that analysis, where the modulator is a directly driven laser—as taught by Taraschuk and discussed at [15.2]—a POSITA would have found it obvious that the voltage drive signals would be applied to the directly driven laser to provide an electric current signal to the semiconductor laser. Ex.1003, ¶ 283; *see e.g.,* Ex.1006, 8:60-62 ("the optical power emitted by a narrow band laser is proportional to the input current."). Accordingly, Roberts and Taraschuk render obvious "*a converter for: converting, based on a digital-to-digital mapping, the N digital input data bits to M digital output data bits associated with M drive voltage values*." Ex.1003, ¶ 283.

**[15.5]** *providing the M drive voltage values to the modulator for the generating,*

**[15.6]** *wherein M>N and N>1,*

**[15.7]** *wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits,*

**[15.8]** *wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator.*

The remaining limitations of claim 15 are substantially the same as

limitations [1.6]-[1.9] and are rendered obvious for the reasons discussed above

regarding claim 1. Ex.1003, ¶¶ 284-287.

### 17.    Claim 16

**[16.1]** *The modulation system of claim 15, wherein the converter is enabled to correct for distortion introduced in the modulator to the one or more modulated optical signal outputs.*

Consistent with the analysis at [2.1], [7.1], and [10.1], Roberts and

Taraschuk render this claim obvious. Ex.1003, ¶ 288.

### 18.    Claim 17

**[17.1]** *The modulation system of claim 15, wherein the converter is enabled to correct for-distortions introduced in transmitting the or more modulated optical signal outputs.*

Consistent with the analysis at [2.1] and [9.1], Roberts and Taraschuk render

this claim obvious. Ex.1003, ¶ 289.

### 19.    Claim 18

**[18.1]** *The modulation system of claim 15, wherein the M drive voltage values correct for distortion including non-linearities introduced in the one or more modulated optical signal outputs transmitted due to non-linear characteristics of the modulator and non-linearities due to non-linear characteristics of the one or more optical fibers transmitting the one or more modulated optical signal outputs.*

Consistent with the analysis at [2.1] and [6.1], Roberts and Taraschuk render

this claim obvious. Ex.1003, ¶ 290.

### 20.    Claim 19

**[19.1]** *The modulation system of claim 15, wherein the converter comprises a*

73

***digital to digital converter.***

Consistent with the analysis at [4.1], Roberts and Taraschuk render this claim obvious. Ex.1003, ¶ 291.

### 21.    Claim 20

**[20.1]** ***The modulation system of claim 15, wherein the converter receives the N digital input data bits and provides the input signals to the modulator that generates the one or more modulated optical signal outputs of variable intensity.***

As discussed at [1.1] and [1.5]-[1.6], a POSITA would have found it obvious for the signal received by Roberts' DSP or Taraschuk's linearizer (either of which may be considered "*the converter*") to be a multi-bit signal ("*the N digital input data bits*"). Ex.1003, ¶ 292. As also discussed at [1.1] and [1.5]-[1.6], Roberts' DSP converts the received signal into binary voltage values that are then input ("*the input signals*"[7]) to electrodes of the optical modulator. As explained above at [15.4], Taraschuk states that in the case of direct drive lasers, "the optical power emitted by a narrow band laser is proportional to the input current." Ex.1006, 8:60-62. Because the output optical power varies as a function of input current, it represents "*one or more modulated optical signal outputs of variable intensity*."

---

[7] A POSITA would have understood that the output of the DSP (input to the modulator) produces a set of parallel signals that traverse a parallel set of lines ("*the input signal**s***") as shown in Roberts' Fig. 4; Ex.1003, ¶ 292.

Ex.1003, ¶ 292.

Referring to modulators generally, Roberts explains that the "intensity" of the modulator output "is proportional to the value of the digital control signal." Ex.1005, 4:8-13. Accordingly, a POSITA would have understood that a directly driven laser—as suggested by Taraschuk and discussed at [15.2]—produces "*outputs of variable intensity*" in response to the drive signals provided to it. Accordingly, a POSITA would have found this claim to be obvious. Ex.1003, ¶ 293.

Thus, because Roberts' DSP receives input digital data signal x(m), which a POSITA would have found obvious to be a multi-bit signal, and provides voltage values as an input to electrodes of an optical modulator, which Taraschuk suggests be a directly driver laser whose output is proportional to an input current, Roberts and Taraschuk render obvious "*wherein the converter receives the N digital input data bits and provides the input signals to the modulator that generates the one or more modulated optical signal outputs of variable intensity*" as claimed. Ex.1003, ¶ 294.

### 22.    Claim 21

**[21.1] *The modulation system of claim 15, wherein the M drive voltage values correct for distortion including non-linearities introduced in the one or more modulated optical signal outputs transmitted due to non-linear characteristics of the modulator.***

Consistent with the analysis at [6.1] and [7.1], Roberts and Taraschuk render this claim obvious. Ex.1003, ¶ 295.

### 23. Claim 22

**[22.1]** *The modulation system of claim 15, wherein the M drive voltage values correct for distortion including non-linearities due to non-linear characteristics of the one or more optical fibers transmitting the one or more modulated optical signal outputs.*

Consistent with the analysis at [6.1], Roberts and Taraschuk render this claim obvious. Ex.1003, ¶ 296.

### 24. Claim 30

**[30.1]** *The method of claim 11, wherein the one or more input optical signal sources includes a laser.*

As discussed at [1.2] above, Roberts teaches a "**laser**" ("*the one or more input optical signal sources includes a laser*") that provides an optical carrier signal ("*input optical signal*") to an optical modulator. Ex.1005, 1:23-24; Fig. 4; Ex.1003, ¶ 322.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶ 322.**

Thus, Roberts renders obvious "*wherein the one or more input optical signal sources includes a laser*" as claimed. Ex.1003, ¶ 323.

## XI.   CONCLUSION

Accordingly, Petitioner has established a reasonable likelihood that the Challenged Claims are unpatentable.

Respectfully submitted,

Dated: February 16, 2022
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Customer No. 27683

/Theodore M. Foster/
Theodore M. Foster
Lead Counsel for Petitioner
Registration No. 57,456

## XII.  MANDATORY NOTICES

### A.    Real Party-in-Interest

Pursuant to 37 C.F.R. § 42.8(b)(1), Petitioner certifies that the real parties-in-interest are Cisco Systems, Inc. and its subsidiary, Acacia Communications, Inc.

### B.    Related Matters

Pursuant to 37 C.F.R. § 42.8(b)(2), to the best knowledge of the Petitioner, the '872 Patent is or was involved in the following case:

| Case Heading | Number | Court | Date |
|---|---|---|---|
| *Cisco Systems, Inc. et al v. Ramot at Tel Aviv University Ltd.* | 1-21-cv-01365 | DDE | Sep. 28, 2021 |

The '872 Patent is also related to three patents that were the subject of previously-filed IPRs:

| Case Heading | Number | Patent |
|---|---|---|
| *Cisco Systems, Inc. v. Ramot at Tel-Aviv University Ltd.* | IPR2020-00484 | U.S. 10,461,866 |
| *Cisco Systems, Inc. v. Ramot at Tel-Aviv University Ltd.* | IPR2020-00122 | U.S. 10,033,465 |
| *Cisco Systems, Inc. v. Ramot at Tel-Aviv University Ltd.* | IPR2020-00123 | U.S. 10,270,535 |

These same three related patents are currently involved in the following ex parte reexamination proceedings.

78

IPR2022-00575 Petition
*Inter Partes* Review of 11,133,872

| Reexamination No. | Status | Patent |
|---|---|---|
| 90/014,526 merged w/ 90/014,608 | All challenged claims rejected | U.S. 10,461,866 |
| 90/014,528 merged w/ 90/014,607 & 90/014,728 | All challenged claims rejected | U.S. 10,033,465 |
| 90/014,527 merged w/ 90/014,606 | All challenged claims rejected | U.S. 10,270,535 |

The '872 Patent is also the subject of a concurrently filed petition in

IPR2022-00576. A separate paper explains why more than one petition is

necessary.

### C.    Lead and Back-up Counsel and Service Information

Lead Counsel
Theodore M. Foster                     Phone: (972) 739-8649
HAYNES AND BOONE, LLP                  Fax: (214) 200-0853
2323 Victory Ave. Suite 700            ipr.theo.foster@haynesboone.com
Dallas, TX 75219                       USPTO Reg. No. 57,456

Back-up Counsel
David L. McCombs                       Phone: (214) 651-5533
HAYNES AND BOONE, LLP                  Fax: (214) 200-0853
2323 Victory Ave. Suite 700            david.mccombs.ipr@haynesboone.com
Dallas, TX 75219                       USPTO Reg. No. 32,271

Calmann J. Clements                    Phone: (972) 739-8638
HAYNES AND BOONE, LLP                  Fax: (214) 200-0853
2323 Victory Ave. Suite 700            calmann.clements.ipr@haynesboone.com
Dallas, TX 75219                       USPTO Reg. No. 66,910

Please address all correspondence to lead and back-up counsel. Petitioner

consents to service in this proceeding by email at the addresses above.

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to 37 C.F.R. § 42.24(d), Petitioner hereby certifies, in accordance with and in reliance on the word count provided by the word-processing system used to prepare this Petition, that the number of words in this paper is 13,909.

Pursuant to 37 C.F.R. § 42.24(d), this word count excludes the table of contents, table of authorities, mandatory notices under § 42.8, certificate of service, certificate of word count, appendix of exhibits, and any claim listing.


Dated: February 16, 2022                    /Theodore M. Foster/
                                            Theodore M. Foster
                                            Lead Counsel for Petitioner
                                            Registration No. 57,456

IPR2022-00575 Petition
*Inter Partes* Review of 11,133,872

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, in accordance with 37 C.F.R. § 42.6(e) and

37 C.F.R. § 42.105, service was made on Patent Owner as detailed below.

| | |
|---|---|
| *Date of service* | February 16, 2022 |
| *Manner of service* | PRIORITY EXPRESS MAIL |
| *Documents served* | Petition for *Inter Partes* Review Under 35 U.S.C. § 312 and 37 C.F.R. § 42.104 of U.S. 11,133,872; Petitioner's Exhibit List; Exhibits 1001-1007, 1012-1015, 1017-1023; Petitioner's Power of Attorney; and Notice for Filing Two Petitions. |
| *Persons served* | Artegis Law Group, LLP John Carey 7710 Cherry Park Drive Suite T #104 Houston TX 77095 |

/Theodore M. Foster/
Theodore M. Foster
Lead Counsel for Petitioner
Registration No. 57,456

EXHIBIT 5

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

CISCO SYSTEMS, INC.,
Petitioner

_____

IPR2022-01283
U.S. Patent No. 11,342,998

# PETITION FOR *INTER PARTES* REVIEW
# UNDER 35 U.S.C. § 312 AND 37 C.F.R. § 42.104

# Claims 1-63

## TABLE OF CONTENTS

PETITIONER'S EXHIBIT LIST ................................................................5

I.     INTRODUCTION ........................................................7

II.    GROUNDS FOR STANDING........................................7

III.   NOTE ............................................................................7

IV.    TECHNOLOGY BACKGROUND..................................7

V.     SUMMARY OF THE '998 PATENT .............................7

       A.    Overview of the '998 Patent...............................7

       B.    Prosecution History of the '998 Patent. ..............9

VI.    LEVEL OF ORDINARY SKILL IN THE ART ............9

VII.   CLAIM CONSTRUCTION ..........................................10

VIII.  RELIEF REQUESTED AND THE REASONS FOR THE
       REQUESTED RELIEF ................................................10

IX.    DISCRETIONARY DENIAL IS INAPPROPRIATE. ................................11

       A.    *Fintiv* denial factors is not appropriate..............11

       B.    Discretionary denial under 35 U.S.C. § 325(d) is not appropriate .... 11

             1.    Ground 1 ...............................................12

             2.    Ground 2 ...............................................15

X.     IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE....17

       A.    Challenged Claims and Statutory Grounds for Challenge.................17

       B.    Ground 1 ............................................................17

1.    Roberts .................................................................................. 17

2.    Taraschuk ............................................................................ 20

3.    Reasons to Combine Roberts and Taraschuk .......................... 22

4.    Claim 1 ................................................................................ 27

5.    Claim 2 ................................................................................ 55

6.    Claim 3 ................................................................................ 59

7.    Claim 4 ................................................................................ 60

8.    Claim 5 ................................................................................ 61

9.    Claim 6 ................................................................................ 63

10.    Claim 7 ............................................................................... 64

11.    Claim 8 ............................................................................... 64

12.    Claim 9 ............................................................................... 65

13.    Claim 10 ............................................................................. 66

14.    Claim 11 ............................................................................. 66

15.    Claim 12 ............................................................................. 67

16.    Claim 13 ............................................................................. 69

17.    Claim 14 ............................................................................. 71

18.    Claim 15 ............................................................................. 73

19.    Claims 16-21 ....................................................................... 73

20.    Claim 22 ............................................................................. 74

21.    Claims 23-31 ....................................................................... 74

22.    Claim 32 ........................................................................... 75

23.    Claims 33-42 .................................................................... 82

24.    Claim 45 ........................................................................... 82

25.    Claims 46-57 .................................................................... 85

26.    Claims 58-63 .................................................................... 85

C.    Ground 2 ...................................................................................... 85

XI.    CONCLUSION ........................................................................................ 87

XII.    MANDATORY NOTICES .................................................................... 88

A.    Real Party-in-Interest ................................................................ 88

B.    Related Matters ........................................................................... 88

C.    Lead and Back-up Counsel and Service Information ..................... 90

CERTIFICATE OF WORD COUNT .................................................................. 91

CERTIFICATE OF SERVICE .............................................................................. 92

IPR2022-01283 Petition
*Inter Partes* Review of 11,342,998

## PETITIONER'S EXHIBIT LIST

| Ex.1001 | U.S. Patent No. 11,342,998 to Ehrlichman et al. |
|---------|--------------------------------------------------|
| Ex.1002 | Prosecution History of U.S. Patent No. 11,342,998 |
| Ex.1003 | Declaration of Dr. Daniel Blumenthal under 37 C.F.R. § 1.68 |
| Ex.1004 | *Curriculum Vitae* of Dr. Blumenthal |
| Ex.1005 | U.S. Patent No. 7,277,603 to Roberts et al. |
| Ex.1006 | U.S Patent No. 6,781,537 to Taraschuk et al. |
| Ex.1007 | *Phase-modulated Optical Communication Systems*, Keang-Po Ho ("Ho") |
| Ex.1008 | U.S. Patent No. 7,307,569 to Vrazel et al. ("Vrazel") |
| Ex.1009 | U.S. Patent No. 7,058,369 to Wright et al. ("Wright") |
| Ex.1010 | Prosecution History of U.S. Patent No. 11,133,872 |
| Ex.1011 | U.S. Patent No. 7,212,326 to Wooten et al. ("Wooten") |
| Ex.1012 | *Optical Fiber Telecommunications B: Systems and Networks*, Kaminow et al. ("Kaminow") |
| Ex.1013 | *Fundamentals of Photonics*, Saleh et al. ("Saleh") |
| Ex.1014 | *Bias Controllers for External Modulators in Fiber-Optic Systems*, Ackerman et al. ("Ackerman") |
| Ex.1015 | *Fiber-Optic Communication Systems*, Agrawal et al. ("Agrawal") |
| Ex.1016 | Reserved |
| Ex.1017 | *Comparison of Direct and External Modulation for CatV Lightwave Transmission at 1.5 pm Wavelength*, Gauck ("Gauck") |
| Ex.1018 | *Distortion in Linearized Electrooptic Modulators*, Bridges et al. ("Bridges") |

| Ex.1019 | U.S. Patent No. 4,649,505 to Zinser, Jr. et al ("Zinser") |
| --- | --- |
| Ex.1020 | U.S. Patent No. 5,418,976 to Iida ("Iida") |
| Ex.1021 | U.S. Patent No. 6,548,824 to Kurahashi et al. ("Kurahashi") |
| Ex.1022 | Complaint, *Cisco Systems, Inc. et al v. Ramot at Tel Aviv University Ltd.*, 1-22-cv-00674 (DDE) (May 24, 2022) |
| Ex.1023 | Complaint, *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, 2-22-cv-00168 (EDTX) (May 24, 2022) |
| Ex.1024 | Reserved |
| Ex.1025 | U.S. Patent No. 6,341,031 to McBrien ("McBrien") |
| Ex.1026 | U.S. Patent No. 6,480,277 to Nafie ("Nafie") |

## I.    INTRODUCTION

Pursuant to 35 U.S.C. §§ 311, 314(a), and 37 C.F.R. § 42.100, Cisco

Systems, Inc. ("Petitioner") respectfully requests that the Board review and cancel

as unpatentable under (pre-AIA) 35 U.S.C. §103(a) claims 1-63 ("Challenged

Claims") of U.S. Patent No. 11,342,998 ("'998 Patent," Ex.1001).

## II.    GROUNDS FOR STANDING

Petitioner certifies that the '998 Patent is eligible for IPR and that Petitioner

is not barred or estopped from requesting IPR challenging the patent claims. 37

C.F.R. § 42.104(a).

## III.    NOTE

Petitioner cites to exhibits' original page numbers. Emphasis in quoted

material has been added.

## IV.    TECHNOLOGY BACKGROUND

Dr. Blumenthal describes relevant background technology predating the

priority date of the '998 Patent. *See* Ex.1003, ¶¶28-87 (citing exhibits 1014, 1018,

and 1021).

## V.    SUMMARY OF THE '998 PATENT

### A.    Overview of the '998 Patent

The '998 Patent relates to the use of a Mach-Zehnder Interferometer (MZI)

to modulate an optical signal. *See* Ex.1001, 1:35-37, 2:61-62. The patent

acknowledges that MZI modulators were known in the prior art and that the optical output of an MZI does not scale linearly with the electrical input to the MZI. *See* Ex.1001, 1:62-64 (describing an "inherent non-linear response").

The '998 Patent describes techniques for addressing this non-linear characteristic of MZI modulators. *See* Ex.1001, 2:36-53. A modulation system receives "an input data word D of N bits." Ex.1001, 7:9-13. The N-bit input data word is provided to a Digital-to-Digital Converter (DDC) 20 (also referred to as an electrode actuating device), as shown in Fig. 1. Ex.1001, 13:20-27.



**Ex.1001, Fig. 1 (annotated); *see* Ex.1003, ¶90.**

The "electrode actuating device 20 [is] responsive to the input data word D to supply an actuating voltage to the actuating electrodes 18." Ex.1001, 7:15-18. "[E]lectrode actuating device 20 serves as a Digital-To-Digital Converter [and] is

employed to map an N bit input to a set of M electrodes" by "processing the digital data input word to generate an electrode actuation vector of M values." Ex.1001, 13:23-27, 3:51-55. The M values are also referred to as "voltage values." Ex.1001, 3:62-65. Thus, for each of the M electrodes, there is a corresponding value in the vector of M voltage values. The number of electrodes M can be either equal to or greater than the number of input bits N. Ex.1001, 7:14; Ex.1003, ¶88-92.

### B.    Prosecution History of the '998 Patent.

The '998 Patent was filed September 22, 2021, and ultimately claims priority to a provisional application filed June 13, 2007. The Office issued an *Ex Parte Quayle* action objecting to claims 11 and 16 for informalities but otherwise allowing all claims. Ex.1002, 130-35. The examiner's reason for allowance highlighted, in part, the claimed "digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values." Ex.1002, 131. In allowing the parent case (US11133872), the examiner had emphasized the limitations requiring "M>N" and "N>1," which similarly appear in some claims of the '998 Patent. Ex.1010, 16.

## VI.    LEVEL OF ORDINARY SKILL IN THE ART

A Person of Ordinary Skill in The Art ("POSITA") in June of 2007 would have had a working knowledge of optical modulators and modulation schemes. A POSITA would have had a master's degree in electrical engineering, or an

equivalent, and two years of professional experience relating to optical

communications, and in particular, optical signal modulation. Lack of professional

experience can be remedied by additional education, and vice versa. Ex.1003,

¶¶ 21-23.

## VII.  CLAIM CONSTRUCTION

During IPR, claims are construed according to the "*Phillips* standard," as set

forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). *See* 83

Fed. Reg. 51341 (Oct. 11, 2018). Accordingly, this Petition analyzes the claims

consistent with their ordinary and customary meaning as would be understood by a

POSITA in light of the specification. *Phillips*, 415 F.3d at 1314-17.

The specification of the '998 Patent provides explicit definitions for various

terms including *digital*, *digital-to-digital mapping*, and *modulator*. Regardless of

whether these express definitions are read into the claims, the art provided below

teaches the limitations recited in the claims. Ex.1003, ¶¶93-97.

## VIII.  RELIEF REQUESTED AND THE REASONS FOR THE REQUESTED RELIEF

Petitioner asks that the Board institute a trial for *inter partes* review and

cancel the Challenged Claims in view of the analysis below.

Case 1:22-cv-00674-GBW    Document 101    Filed 07/18/24    Page 188 of 269 PageID #: 2411

IPR2022-01283 Petition
*Inter Partes* Review of 11,342,998

## IX.    DISCRETIONARY DENIAL IS INAPPROPRIATE.

### A.    *Fintiv* denial factors is not appropriate.

There are two copending litigations, one each in the District of Delaware and the Eastern District of Texas. *See generally* Ex.1022, Ex.1023.

The Board's *Fintiv* factors favor institution. (1) No motion to stay has been filed, so the Board should not infer the outcome of such a motion. (2) No district court has set a trial date or issued a scheduling order. (3) The co-pending litigations are in early stages, and the parties' investments-to-date are minimal. Discovery has not begun. (4) There is presently no overlap of prior art issues due to the early stage of district court litigations. (5) Petitioner is involved in co-pending district court actions. This fact should not be a basis for denying institution. (6) The merits of Petitioner's arguments are compelling. *See* Director's Memo on Discretionary Denials at 4 (June 21, 2022). Because the *Fintiv* factors weigh against discretionary denial, institution should not be denied on discretionary factors.

### B.    Discretionary denial under 35 U.S.C. § 325(d) is not appropriate

Denial under § 325(d) is not warranted because the challenges presented in this petition are neither cumulative nor redundant to art considered in prosecution. Notably, Patent Owner chose not to provide the examiner with the detailed invalidity analysis of substantially similar claims in IPR2022-00575 and IPR2022-00576. Thus, the examiner was deprived of information that would have facilitated

11

evaluating the claims' unpatentability on grounds like those presented here.

Under the first prong of the *Advanced Bionics* framework, Petitioner acknowledges that Roberts and Taraschuk—but not Wright—were "previously presented to the Office." *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH,* IPR2019-01469, Paper 6 at 7-8 (Feb. 13, 2020) (precedential). Under the second prong, however, the evidence shows that the Examiner "erred in a manner material to the patentability of challenged claims." *Id*. The second prong is guided by *Becton, Dickinson* factors (c), (e), and (f). *Id*. at 9-10, n. 10 (citing *Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17-18 (Dec. 15, 2017)). These factors weigh against exercising discretion.

### 1.    Ground 1

Ground 1 relies on a combination of Roberts and Taraschuk. Neither Roberts nor Taraschuk were cited in a rejection during prosecution of the '998 Patent. While Roberts was cited by the Examiner during prosecution of a parent case (US11133872), Roberts was never considered in combination with Taraschuk. *See CODE200, UAB et al. v. Bright Data Ltd.* IPR2022-00353, Paper 8 at 10 (July 1, 2022) (art "not the basis of rejection… weighs strongly against exercising our discretion to deny institution…."). Additionally, Ground 1 relies on Roberts' embodiment of Fig. 4, which differs from the embodiment of Fig. 7 that was the principal subject of challenges against related patents in IPR2020-00122, IPR2020-

00123, and IPR2020-00484.

While Taraschuk was cited in an IDS during prosecution of the parent case, Taraschuk teaches the claim limitations that were argued to gain allowance. The Applicant overcame Roberts in the parent case by arguing that "Roberts does not disclose a 'digital-to-digital mapping,' where, 'the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator' as recited in claim 1." Ex.1010, 162-74. The examiner referenced similar concepts in allowing the '998 Patent. Ex.1002, 131-133. These claimed digital-to-digital mapping techniques are described by Taraschuk. *See* Ex.1006, Fig.6, 7:59-8:15 (teaching a 6-bit-to-8-bit linearizer to compensate for the non-linear effects of a optical modulator). Taraschuk also explains that the 8-bit output from the linearizer provides a "*pattern for actuating drive voltages*" since there is a "powers of two distribution between MSB [most significant bit] and the LSB [least significant bit] of the digital signal." Ex.1006, 5:36-37; *see also STMicroelectronics, Inc. v. The Trustees of Purdue Univ.,* IPR2022-00309, Paper 14 at 13 (July 6, 2022). ("Ueno discloses the subject matter that the Examiner found missing…, we determine that the Petition establishes that the Office erred…"). Here, the Office's underdeveloped consideration of Taraschuk was "material error" because it overlooked Taraschuk's 6-bit-to-8-bit linearizer teachings in relation to the claim

amendments used to distinguish over the Roberts reference—both in the parent case and in the '998 Patent. *See* Ex.1010, 16; Ex.1006, 6:56-7:11, 7:56-67, Figs. 5-6; *see also Advanced Bionics* at 8 n.9 ("material error may include misapprehending or overlooking specific teachings").

The Office's oversight of Taraschuk's teaching is evidence that Taraschuk received little—if any—attention during prosecution. *See* Ex.1010, 940-43 (IDS citing Taraschuk among 78 other references). A reference merely being of record is not sufficient reason to exercise discretion. *See Navistar, Inc. v. Fatigue Fracture Tech., LLC*, IPR2018-00853, Paper 13 at 17 (Sept. 12, 2018) ("…the fact that [references] were of record… provides little impetus… to deny institution under § 325(d)").

Regarding factor (f), the Petition is also supported by Dr. Blumenthal's declaration (Ex.1003) explaining how a POSITA would have understood Taraschuk and the obviousness of combining its teachings with those of Roberts. *See, e.g.*, Ex.1003, ¶¶110-121; *see also* Ex.1004. Dr. Blumenthal explains in detail a "known method" for populating Taraschuk's linearizer lookup table and shows how that results in mapping table entries having the recited "*deltas…increasing*" and "*deltas…decreasing*" features. Ex.1006, 6:61-65; Ex.1003, ¶¶75-83, 163-202. This new evidence weighs against discretionary denial. *See, e.g., Puma N. Am., Inc. v. Nike, Inc.*, IPR2019-01058, Paper 10, 19 (PTAB Oct. 31, 2019) (instituting

where petition presented "new non-cumulative evidence…. helpful to our consideration of a prior art combination that was not before the Examiner").

Regarding claims 45-57, the examiner mistakenly indicated that the prior art did not disclose modulating an optical signal by providing a "*set of voltage values*" to an "*electro-absorption signal generation device*." Ex.1002, 133-134. In this, the examiner overlooked Roberts' disclosure that "**Electro Absorptive Modulators (EAMs) can be used**" instead of a Mach-Zehnder modulator (driven by a voltages from a "multi-bit sample stream $V_x(n)$"). Ex.1005, 6:18-30, 7:35-44. Notably, the examiner searched only for the exact word "electro-absorption," whereas Roberts uses the related terms "Electro Absorptive" and "electro-absorptive." Ex.1002, 215; Ex.1005, 1:39, 6:23. Thus, the examiner overlooked Roberts' relevant disclosure.

In summary, the *Becton, Dickinson* factors for Ground 1 favor institution.

## 2.    Ground 2

Ground 2 relies in part on Wright, which was not considered by or submitted to the examiner at all during the prosecution of the '998 Patent. Wright explains the background knowledge of a POSITA with respect to creating lookup tables used to linearize the response curve of a device that naturally has a non-linear response curve. *See, e.g.*, Ex.1009, Fig. 6A, 13:6-37. Wright's disclosure is highly pertinent to the claim language regarding "*deltas… increasing*" and "*deltas…*

*decreasing*" that was noted by the examiner in allowing the '998 patent claims. See Ex.1002, 131-132. As Dr. Blumenthal explains, Wright shows that a suitably designed nonlinear compensation response curve is essentially a mirror image of the non-linear device's natural response curve over the desired linear response line. Ex.1003, ¶¶82-83. Since a Mach-Zehnder modulator produces a sinusoidal response to voltage inputs (e.g., Ex.1006, 8:9-14), it naturally follows from Wright's disclosure that a corresponding nonlinear compensation lookup table includes output values whose successive differences are numerically increasing or decreasing. Ex.1003, ¶¶193-194, 204-205. Dr. Blumenthal explains in detail how Wright's "known method" would have been obvious to use in populating Taraschuk's linearizer lookup table. Ex.1006, 6:61-65; Ex.1003, ¶¶75-83, 163-202.

The examiner never discussed Wright or any other reference describing the known-in-the-prior-art process of creating a nonlinear compensation lookup table for a non-linear device. Thus, under the first step of *Advanced Bionics*, discretionary denial under § 325(d) is not appropriate. *See Puma N. Am.,* IPR2019-01058, Paper 10, 19.

Accordingly, the Board should not deny this petition under § 325(d).

## X.    IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE

### A.    Challenged Claims and Statutory Grounds for Challenge

| Grounds | Claims | Basis |
|---------|--------|-------|
| #1 | 1-63 | 35 U.S.C. § 103 (Pre-AIA) over Roberts and Taraschuk |
| #2 | 1-63 | 35 U.S.C. § 103 (Pre-AIA) over Roberts, Taraschuk, and Wright |

US7277603 to Roberts ("Roberts") was filed February 22, 2006 and published on October 2, 2007. Roberts is prior art under 35 U.S.C. § 102(e).

US6781537 to Taraschuk ("Taraschuk") published on August 24, 2004.

US7058369 to Wright ("Wright") published on June 6, 2006.

Taraschuk and Wright are prior art under 35 U.S.C. § 102(b).

### B.    Ground 1

#### 1.    Roberts

Like the '998 Patent, Roberts is in the technical field of optical communications. Ex.1005, 1:15-17. Roberts addresses the non-linear nature of MZI modulators (as in the '998 Patent). *See* Ex.1005, 2:44-47. An embodiment of Roberts is shown below:



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶101.**

Roberts describes modulating an optical signal using a digital signal processor (DSP) 34 that receives an input digital data signal x(m) and produces two multi-bit sample streams ($V_L(n)$ and $V_R(n)$), referenced generically as $V_X(n)$. *See* Ex.1005, 1:58-63; 5:56-60. Multi-bit sample signals $V_X(n)$ "are representative of the desired phase modulation to be applied to each branch of the MZ modulator 4." Ex.1005, 5:58-60. "Each multi-bit sample stream $V_X(n)$ may be an N-bit parallel binary signal output from the DSP 34 on a corresponding N-bit data bus 36." Ex.1005, 6:40-42. Data bus lines are "connected to control a number of electrodes 40 corresponding to its binary weight." Ex.1005, 6:41-43.

The DSP outputs activate the electrodes. The "total phase delay experienced

18

by light traversing each branch will vary directly with the number of active electrodes on that branch" Ex.1005, 7:41-44. As described by Roberts, this process involves producing multiple voltage values to be applied to the multi-electrode optical modulator.

Additionally, like the '998 Patent, Roberts recognizes that optical modulators exhibit non-linearities in the input to output transfer function—a phenomenon well-known at the time. *See* Ex.1005, 2:43-47. Roberts explains that to address such non-linearities, "the DSP 34 may incorporate the functionality of the digital filter 16 and non-linear compensator 18 of the complex driver 14 described above with reference to FIG. 2." Ex.1005, 6:31-33. Roberts further provides that the "non-linear compensator 18 uses the I(n) and Q(n) components to compute multi-bit sample streams $V_R(n)$ and $V_L(n)$." Ex.1005, 1:61-64. Roberts expressly notes that "$V_R(n)$ and $V_L(n)$ can be computed taking into account non-linearities of … the MZ modulator 4, such that … the output of the MZ modulator 4 closely matches the target E-field modulation computed by the digital filter 16." Ex.1005, 2:43-50. Put differently, Roberts' non-linear compensator 18 adjusts the drive signals provided to the MZ modulator 4 to achieve an amplitude and phase in the actual output signal that closely matches the amplitude and phase of the pre-computed desired output. Ex.1003, ¶104.

Roberts is analogous art to the '998 Patent because Roberts is both in the

same field of endeavor and is directed to the same technical problem as the '998 Patent. Both Roberts and the '998 Patent are in the field of optical communications. *See* Ex.1001, abstract; Ex.1005, abstract. And, like the '998 Patent, Roberts is concerned with addressing the non-linear nature of MZI modulators. Ex.1005, 2:44-47. Ex.1003, ¶¶101-05.

### 2.    Taraschuk

Like both Roberts and the '998 Patent, Taraschuk relates to optical communications. *See* Ex.1006, 7:54-56. Taraschuk teaches "driv[ing] an optical modulator 52 so as to modulate an optical signal generated by an optical source 54 such as, for example, a narrow band laser." Ex.1006, 7:54-56. Additionally, like the '998 Patent, Taraschuk addresses the non-linear nature of MZI modulators and provides "linearizer 44 can also be used to compensate non-linearities of the optical modulator 52 … such as for example, a Mach-Zehnder modulator." Ex.1006, 7:56-60, 8:49-53 ("**compensating non-linearities of** the A/D converter (and/or **the optical modulator** 52)"); Ex.1003, ¶102.

Taraschuk teaches that "a mapping can be defined between the M-bit input digital signal 46 and an N-bit signal 6…, which compensates for the combined non-linear effects of… the sinusoidal response of the modulator 52." Ex.1006, 7:61-67. An example featuring a 6-bit digital input signal mapped by a linearizer to an 8-bit digital output signal is shown in Taraschuk's Fig. 5:



**Ex.1006, Fig. 5 (annotated); Ex.1003, ¶107.**

Taraschuk notes that its techniques can be applied to a Mach-Zehnder modulator. *See* Ex.1006, 8:54-57. Taraschuk further notes "it will be appreciated that the [linearization] techniques described above … may equally be used to drive an optical signal source [i.e., a laser]." Ex.1006, 8:62-65.

Taraschuk is analogous art to the '998 Patent because Taraschuk is both in the same field of endeavor and is directed to the same technical problem as the '998 Patent. Both Taraschuk and the '998 Patent are in the field of optical communications. *See* Ex.1001, abstract; Ex.1006, 7:54-56. Also, like the '998 Patent, Taraschuk is concerned with addressing the non-linear nature of MZI modulators: "linearizer 44 can also be used to compensate non-linearities of the

optical modulator 52 … such as for example, a Mach-Zehnder modulator."
Ex.1006, 7:56-60. Ex.1003, ¶¶105-09.

### 3.    Reasons to Combine Roberts and Taraschuk

A POSITA would have found it obvious to combine the teachings of Roberts and Taraschuk for multiple reasons. Ex.1003, ¶ 110.

As a preliminary matter, Roberts and Taraschuk are analogous prior art in the same field of endeavor—optical communications—and are directed to solving the same technical problem: compensating for non-linearities in a Mach-Zehnder optical modulator. *See* Ex.1005, 1:15-17, 2:44-47; Ex.1006, 7:54-56, 7:56-60; Ex.1003, ¶ 110.

The combination is merely a matter of applying a known technique—Taraschuk's look-up table—to a known device, method, or product—Roberts' DSP including a non-linear compensator—ready for improvement to yield predictable results. Ex.1003, ¶111. For example, application of Taraschuk's look-up table to Roberts' DSP would advantageously allow a mapping between input bits and output bits to be calculated in advance and optionally allow periodic recalculation of the mapping to compensate for changes over time. *See* Ex.1006, 7:15-23. The resulting combination provides the predictable benefits of permitting the non-linearity compensation to be calculated in advance, adjusted during device operation, or both. Ex.1003, ¶111.

Additionally, the combination of Roberts and Taraschuk is simply the use of a known technique—Taraschuk's mapping—to improve similar devices, method, or products in the same way. Ex.1003, ¶111.

Roberts describes a known method ready for improvement. Ex.1003, ¶112. Roberts describes a digital signal processor (DSP) with a non-linear compensator that receives an input digital data signal x(m) and produces multi-bit sample streams $V_L(n)$ and $V_R(n)$ representative of the desired phase modulation to be applied to each branch of an MZ modulator. *See* Ex.1005, 1:58-63; 5:56-60. The digital data signal x(m) is described generally in Roberts, thereby leaving implementation details of the digital data signal x(m), e.g., signal format, to a POSITA. Ex.1003, ¶112. Accordingly, a POSITA would have considered other references that provide additional details regarding the contents of digital input signals. Ex.1003, ¶112. Taraschuk would have been an obvious source of such further information to a POSITA since it provides an example of such details. Ex.1003, ¶112. For example, Taraschuk provides that an "input digital signal" is an "M-bit" signal where "M=6." Ex.1006, 6:65-7:4. Moreover, Roberts and Taraschuk share a common inventor—Kim B. Roberts—which confirms that skilled practitioners (the named inventors of the Roberts and Taraschuk references) were aware of both teachings. Ex.1003, ¶112. A skilled artisan aware of either Roberts or Taraschuk would have quickly found the other by simply consulting

other patent disclosures with the same named inventors.

A POSITA would have been motivated to apply Taraschuk's mapping techniques to Roberts' non-linear compensator to compensate for non-linear effects of the modulator. Ex.1003, ¶113. Taraschuk notes that the mapping advantageously "enables each M-bit word of the input digital signal 46 to be mapped to a corresponding N-bit word which compensates for any logic level mismatches." Ex.1006, 7:4-7. Taraschuk recognizes that one source of "non-linear effects" with respect to the modulator is logic level mismatches. Ex.1006, 7:61-67. Accordingly, compensating for logic level mismatches compensates for non-linear effects of the modulator. Ex.1003, ¶113.

Furthermore, applying Taraschuk's mapping technique to the non-linear compensator of Roberts would have been within the capability of a POSITA. Ex.1003, ¶114. Taraschuk's mapping is performed by a linearizer described as being "designed in a known manner (e.g., using a random access memory look-up table) to map an M-bit digital signal 46 into an N-bit parallel digital signal." Ex.1006, 6:61-65. Taraschuk recognizes that the design of linearizers and use of look-up tables to map input digital signals to output digital signals was already well known and within the capability of a POSITA. Ex.1003, ¶114. Application of Taraschuk's mapping techniques to Roberts' DSP would have involved merely the use of known linearizer designs and known linearizer functionality since Roberts

describes its DSP as incorporating a "non-linear compensator" (i.e., a linearizer). Ex.1003, ¶114. Taraschuk's mapping is compatible with Roberts' design because Taraschuk explains that the mapping may be "calculated in advance" or, alternatively, recalculated "periodically" using an optional feedback loop. Ex.1006, 7:11-39. Thus, Taraschuk's techniques could be used in Roberts either with or without a feedback loop.

A POSITA would have had a reasonable likelihood of success when applying the mapping techniques of Taraschuk to the non-linear compensator of Roberts' DSP. Ex.1003, ¶115. A POSITA would have had reason to believe that using Taraschuk's mapping technique with Roberts would have worked as expected because such mapping techniques were well-known for use with linearizers as recognized in Taraschuk itself. Ex.1003, ¶115.

In addition to implementing Taraschuk's mapping techniques into Roberts's DSP, a POSITA would have found it obvious to implement known modulator variations as taught by Taraschuk. Ex.1003, ¶116. While Taraschuk notes that its optical modulator may be a Mach-Zehnder modulator, Taraschuk also notes that linearization techniques are applicable and useful for other types of modulators, particularly directly driven lasers: "[I]t will be appreciated that the [linearization] techniques described above … may equally be used to drive an optical signal source [i.e., a laser]." Ex.1006, 8:62-65; Ex.1003, ¶116.

25

Taraschuk references that its linearizer is "designed in a known manner," which would have confirmed to a POSITA that Taraschuk's linearizer is a general-purpose structure. Ex.1003, ¶117. That is, Taraschuk's linearizer is described as providing a multibit output to a digital-to-analog converter (DAC), which Taraschuk claims as its invention. *See* Ex.1006, 6:58-61, 3:34-37 & claim 1. But since the linearizer was "designed in a known manner," the linearizer's design was not specific to Taraschuk's DAC. Ex.1003, ¶117. Taraschuk also acknowledges this fact by disclosing an example in which the linearizer compensates for non-linearities of an optical modulator *alone*. Ex.1006, 8:49-52 ("compensating non-linearities of the A/D converter (and/**or the optical modulator** 52)"). Ex.1003, ¶118.

Thus, a POSITA would have recognized Taraschuk's linearizer as readily adaptable (or even directly usable) in the context of Roberts, where the linearizer's multibit output would be coupled to a digital multibit input of a device other than a DAC, specifically Roberts' Mach-Zehnder modulator. Ex.1003, ¶119. As previously noted, Roberts' DSP includes a "non-linear compensator" (i.e., a linearizer). Ex.1005, 6:31-37. Accordingly, a POSITA would have expected a reasonable likelihood of success when applying Taraschuk's linearizer mapping technique to Roberts' DSP having a non-linear compensator. Ex.1003, ¶119.

Applying Taraschuk's linearizer mapping technique to Roberts' DSP would

have achieved the predictable result of compensating for non-linearities in a Mach-Zehnder optical modulator. Ex.1003, ¶120. This result is predictable because Taraschuk expressly teaches that its techniques are used to compensate for non-linearities of Mach-Zehnder optical modulators. Ex.1006, 7:56-60. Thus, the combination is merely a matter of applying a known technique (implementing Tarashuk's mapping) to a known device (Roberts' non-linear compensator of the DSP) to yield predictable results (compensating for non-linearities in a Mach-Zehnder optical modulator). Ex.1003, ¶120. The combination of Roberts and Taraschuk also represents use of a known technique (Taraschuk's linearizer mapping) to improve similar devices (Roberts' DSP, including a non-linear compensator) in the same way. Ex.1003, ¶120. Accordingly, a POSITA would have found it obvious for Roberts' DSP to map between an input digital signal and an output digital signal using the multibit digital-to-digital mapping techniques described by Taraschuk. Ex.1003, ¶120.

The combinations described above permit but do not require physical incorporation of elements from Taraschuk into Roberts. Ex.1003, ¶121.

### 4.    Claim 1

**[1.0]** *An optical modulation system, the system comprising:*

To the extent the preamble is limiting, Roberts renders it obvious.

Roberts teaches optical waveform modulation for optical communication

systems. Ex.1005, 1:15-17. Fig. 4 illustrates an optical modulator and associated

signal sources ("*optical modulation system*").



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶123.**

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶122-24.

**[1.1]** *an input for a plurality of N digital input data bits:*

**First**, Roberts teaches a digital signal processor (DSP) with an "*input*" that

receives an "input digital data signal x(m)" Ex.1005, 1:32-33; Fig. 4. Reception of

the signal by the DSP is illustrated in Roberts' Figure 4 shown below:

28



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶126.**

**Second**, a POSITA would have found it obvious for Roberts' input digital data signal x(m) to include "*a plurality of N digital input data bits*" as claimed. Ex.1003, ¶127. Roberts suggests that the x(m) signal is a plurality of data bits because it is used to "generate[] a pair of multi-bit sample streams V(n) which are representative of the desired phase modulation to be applied to each branch of an MZ modulator 4." Ex.1005, 5:57-59. Moreover, Roberts describes the x(m) signal as providing "input data." Ex.1005, 1:58-59. Because "data" is the plural form of "datum," a POSITA would have understood x(m) to include a plurality of bits. Ex.1003, ¶127.

Furthermore, in the case where Roberts's DSP implements a non-linear compensation function as taught by Taraschuk, it would have been obvious for the

input to the DSP to include a plurality of input bits as explicitly taught by

Taraschuk. In that regard, Taraschuk teaches a "linearizer 44" that receives "input

digital signal 46" that is an "M-bit digital signal" where "M=6."[1] Ex.1006, 6:56-

7:4. In other words, Taraschuk's input digital signal is a 6-bit signal.



**Ex.1006, Fig. 5 (annotated); Ex.1003, ¶128.**

Accordingly, a POSITA would have found it obvious that when

implementing the non-linear compensation function of Roberts' DSP with the

teachings of Taraschuk's linearizer, it would have been obvious for the input signal

---

[1] The '998 patent uses the letter N to represent the number of input bits and the

letter M to represent the number of output bits. Conversely, in Taraschuk, "M"

represents the number of input bits and "N" the number of output bits.

to be a plurality of digital input bits (six, for example) as taught by Taraschuk. A POSITA would have understood that a 6-bit input digital signal includes *a plurality of N digital input data bits*, where N in this case is 6. Ex.1003, ¶129. That the bits are *data bits* is evidenced by the fact that Taraschuk refers to input bits as "input data bits." Ex.1006, 1:42-45.

Because Roberts teaches that the DSP includes a "non-linear compensator 18" that, like Taraschuk's linearizer, is used to compensate for non-linearities of a Mach-Zehnder optical modulator, a POSITA would have found it obvious for Roberts' DSP to receive a 6-bit digital input signal as taught by Taraschuk. Ex.1005, 6:34-37; Ex.1006, 6:56-58, 7:59-67; Ex.1003, ¶130.

Thus, Roberts and Tarashuk render this limitation obvious. Ex.1003, ¶¶125-32.

**[1.2]** *an input optical signal;*

Roberts describes "a laser 2 coupled to an external optical modulator 4." Ex.1005, 1:23-24; Fig. 4. Roberts further describes that the laser generates an optical carrier signal ("*an input optical signal*") that is provided to the optical modulator. Ex.1005, 1:24-30; Fig. 4.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶133.**

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶133-34.

**[1.3]** *a modulator for modulating the input optical signal responsively to the plurality of N digital input data bits to output a modulation of the input optical signal,*

**First**, Roberts' modulation system includes an Mach-Zehnder modulator 4 ("*a modulator*"): "In the embodiment of FIG. 4, the driver IC is implemented as a digital signal processor (DSP) 34, which generates a pair of multi-bit sample streams $V_X(n)$ which are representative of the desired phase modulation to be applied to each branch **of an MZ modulator 4**." Ex.1005, 5:56-60.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶136.**

**Second**, Roberts teaches that the optical modulator operates to "modulate the amplitude and/or phase [of] the carrier signal" from laser 2 ("*for modulating the input optical signal*"). Ex.1005, 1:26-30.

**Third,** Roberts teaches that the output signal is modulated responsive to the x(m) signal ("*the plurality of N digital input data bits*"). Ex.1005, 1:32-33; Fig. 4. As explained above at [1.1]. Roberts's modulation system includes a DSP which receives the x(m) signal and converts it as shown in Roberts' Figure 4 below:



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶138.**

The DSP "generates a pair of multi-bit sample streams $V_X(n)$ which are representative of the desired phase modulation to be applied to each branch **of an MZ modulator 4**." Ex.1005, 5:56-60. Accordingly, because the modulator 4 modulates the input optical signal based on the signals from the DSP, which are based on the x(m) signal, the input optical signal is modulated *responsive* to the x(m) signal ("*modulating the input optical signal responsively to the plurality of N digital input data bits*").

**Fourth**, a POSITA would have recognized that modulating the amplitude and/or phase of the optical carrier signal as taught by Roberts would effect a modulation of the input optical signal ("*output a modulation of the input optical signal*") because it was well known in the art (and would have been part of a

POSITA's general background knowledge) that inputting an optical signal into an optical modulator would output a modulated optical signal. Ex.1003, ¶140.

Moreover, as discussed in Section V.D., the input-output transfer function of a Mach-Zehnder modulator moves between an optical minimum output power and optical maximum output power as voltage applied to the modulator changes. *See e.g.*, Ex.1013, pp. 65-67; Ex.1012, p. 43. Roberts' optical modulator is a Mach-Zehnder modulator. Ex.1003, 5:23-25, 56-60. Accordingly, changes in voltage applied to Roberts' modulator act to modulate the output. Roberts explains that the desired modulation is achieved through adaptations of a drive voltage applied to the optical modulator. *See* Ex.1005, 1:41-52.

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶135-42.

**[1.4] *thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers; and***

**First**, Roberts teaches that the modulation by the optical modulator operates to "generate the optical communications signal" ("*generating one or more modulated optical signal outputs*"). Ex.1005, 1:26-30. Figure 4 illustrates the optical communications signal being transmitted from the optical modulator:



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶144.**

**Second**, a POSITA would have found it obvious to transmit Roberts' output optical communications signal over an optical fiber because, as discussed at Section V.A., optical fibers had long been used to communicate optical signals. A POSITA also would have recognized that an optical modulator (e.g., Roberts' optical modulator 4) has long been part of the basic elements of an optical transmission link including analog optical transmission links. *See generally,* Ex.1011; Ex.1003, ¶145. Indeed, the Tarashuck reference cites to several articles related to fiber optics. *See* Ex.1006, References Cited.

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶143-46.

**[1.5]** *wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values;*

**First**, as discussed at [1.1], Taraschuk describes a linearizer (which may be implemented within Roberts' DSP) that maps ("*digital-to-digital mapping*") a 6-bit digital input signal ("*maps the plurality of N digital input data bits*") to an 8-bit digital output signal ("*to a set of M digital output data bits*"). [2] "**The linearizer 44 is designed in a known manner (e.g., using a random access memory look-up table) to map an M-bit digital signal 46 into an N-bit parallel digital signal 6** … **M=6 and N=8**." Ex.1006, 6:56-7:4.

Taraschuk describes both the 6-bit and 8-bit signals as "*digital*" signals. Ex.1006, 6:61-65. A POSITA would have therefore recognized that the mapping between the input and output signals is a digital-to-digital mapping. Ex.1003, ¶149.

Fig. 5 of Taraschuk illustrates that the linearizer outputs the 8-bit digital signal. Accordingly, a POSITA would have recognized that the 6-bit digital input signal is converted into the 8-bit digital output signal based on the mapping. *See* Ex.1003, ¶150, Fig. 5 below.

---

[2] The '998 patent uses the letter N to represent the number of input bits and the letter M to represent the number of output bits. Conversely, in Taraschuk, "M" represents the number of input bits and "N" the number of output bits. Ex.1003, ¶148.



**Ex.1006, Fig. 5 (annotated); Ex.1003, ¶150.**

Because the non-linear compensator of Roberts' DSP and Taraschuk's linearizer are both used to compensate for non-linearities of a Mach-Zehnder optical modulator, a POSITA would have found it obvious for Roberts' DSP to map and convert a 6-bit digital input signal to an 8-bit digital output signal as taught by Taraschuk (e.g., using a lookup table to provide nonlinear compensation). *See supra* VIII.A.3; Ex.1003, ¶151.

**Second**, Roberts teaches that the DSP outputs $V_R(n)$ and $V_L(n)$ signals (generally referred to as $V_X(n)$) and explains that the bits of such signals are representative of voltages to be applied to respective electrodes: "Each multi-bit sample stream $V_X(n)$ may be an N-bit parallel binary signal output from the DSP 34 on a corresponding N-bit data bus 36. In such a case, each line 38, of the N-bit

bus 36 is connected to control a number of electrodes 40 corresponding to its binary weight." Ex.1005, 6:40-54. "**Since each active electrode receives the same voltage (corresponding to logic State 1), it follows that the total phase delay experienced by light traversing each branch will vary directly with the number of active electrodes on that branch**, and thus the value of the corresponding multi-bit sample stream $V_X(n)$." Ex.1005, 7:35-44.

Accordingly, each electrode is provided with a voltage based on the binary values of the $V_X(n)$ signal, which is a multi-bit parallel binary signal. The binary values of the $V_X(n)$ signal are "*a plurality of voltage values*" because each "1" corresponds to the voltage to be applied to each electrode of the optical modulator. *See* Ex.1005, 7:35-44. In other words, the logical value of each bit of the $V_X(n)$ signal indicates the voltage that should be applied to a particular electrode. Said differently, the value of each bit in the multi-bit parallel binary signal indicates whether a specific voltage value is to be applied or not. For example, a logical "1" at a particular position in the binary signal indicates a particular voltage value for the corresponding electrode, such as +Vdd. *See* Ex.1005, 7:60-65 ("a binary control signal (having voltages of GND and +Vdd)"); 1:49-52 ("the drive voltage is adapted to achieve the desired amount of modulation"). A logical "0" would result in a different voltage being applied, such as GND (ground). Accordingly, the bits in the $V_X(n)$ signal are (or are associated with) different voltage values

("*associated with a plurality of voltage values*").

Moreover, the binary values of the $V_X(n)$ multi-bit parallel binary signals are no different than the description of "voltage values" in the '998 Patent. Specifically, as stated in the '998 Patent, "the electrode actuation vector is a binary vector, and wherein the M voltage values are selected from two voltage levels according to the M binary values." Ex.1001, 3:65-4:2; *see also* Ex.1005, 3:42-44 (describing a "5 volt swing between binary '0' and '1' logic states").

Thus, Roberts and Taraschuk render this limitation obvious. Ex.1003, ¶¶147-55.

## [1.6] *wherein the input optical signal is modulated based on the plurality of voltage values;*

**First**, as discussed above at [1.2], Roberts further describes a laser that generates an optical carrier signal ("*an input optical signal*") that is provided to the optical modulator, which is designed specifically to modulate an optical signal based on applied voltages. Ex.1005, 1:24-30; Fig. 4.

**Second**, as discussed at [1.5], Roberts' DSP outputs parallel binary signals including binary values ("*the plurality of voltage values*") that indicate the voltage that should be applied to a particular electrode of an optical modulator. Ex.1005, 7:39-40. As shown in Roberts' Fig. 4 below, "*the input optical signal is modulated based on the plurality of voltage values.*"



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶158.**

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶156-59.

**[1.7]** *wherein the digital-to-digital mapping comprises, for each digital input value included in a set of possible digital input values for the plurality of N digital input data bits, a set of corresponding digital output values from a set of possible digital output values;*

**First**, as discussed at [1.5], a POSITA would have found it obvious for Roberts' DSP to map digital input bits to digital output bits (*"digital-to-digital mapping"*) using a look-up table as taught by Taraschuk: "The linearizer 44 is designed in a known manner (e.g., using a random access memory look up table)." Ex.1006, 6:61-63; Ex.1003, ¶161.

**Second**, a POSITA would have understood the term "look-up table" to be suggestive of multiple rows and columns of entries, e.g., separate columns for

input and output bit words where each column includes a series of entries documenting different combinations of possible bit values. In order to help ensure that inputs can be successfully mapped to outputs, a POSITA would have considered it obvious for Taraschuk's look-up table to include entries for all of the possible combinations of digital input bits such that the entries are mapped to a respective combination of digital output bits. Ex.1003, ¶162. In the 6-to-8 mapping of Taraschuk, there are 64 ($2^6$) possible 6-bit input values and 256 ($2^8$) possible 8-bit output values. Each of the 64 input values ("*each digital input value included in a set of possible digital input values for the plurality of N digital input data bits*") would thus be mapped, one-by-one, to 64 out of 256 possible output values ("*a set of corresponding digital output values from a set of possible digital output values*").

Taraschuk explains that the mapping of input to output bits compensates for the non-linearity of the optical modulator: "[A] mapping can be defined between the M-bit input digital signal 46 and an N-bit signal … which compensates for the combined non-linear effects of … the sinusoidal response of the modulator 52" such that the response of the optical modulator is "more nearly linear." Ex.1006, 7:61-67, 8:13-15; Ex.1003, ¶¶163-164 (explaining a POSITA's understanding of the sinusoidal response curve and desired linear output).

A POSITA would have understood that to counteract or compensate for a

non-linear response of the modulator, the input to the modulator should be adjusted in a complementary non-linear fashion to counteract non-linear response curve of the modulator. *See e.g.*, Ex.1008, 12:14-16 (describing a linearizer circuit to "present a nonlinearity, which ideally exactly counteracts the nonlinearities of the optical source"); Ex.1003, ¶165. The mapping described by Taraschuk creates this counteracting non-linearity. Ex.1006, 6:56-65. In other words, a POSITA would have understood that the lookup table described by Taraschuk would have mapped a linear set of input values to a non-linear set of output values designed to counteract the non-linear, sinusoidal response of the modulator. Ex.1003, ¶165.

Using such a lookup table, the overall system—from initial input to modulator output—would thus exhibit a generally linear response. Dr. Blumenthal's analysis explains how calculating such a non-linear compensating, digital-to-digital mapping would have been within the background knowledge of a POSITA, as such techniques had long been used to counteract the non-linear response curves of various devices. *See* Ex.1006, 6:61-65 ("designed in a known manner"). For example, U.S. 7,058,369 to Wright provides an overview of the basic concepts that were well-understood and generally known by electrical engineers about the operation of non-linear compensation circuits. Ex.1003, ¶¶166-168. As an example, Fig. 6A of Wright shows that the natural response curve 606 (here, for an amplifier) is non-linear.



**Ex.1009, Fig. 6A.**

To linearize the amplifier's response—so that it produces an output that scales linearly with an input voltage—a linearizer is employed. Wright refers to this linearizer as a "predistorter" and explains how the predistorter's response curve is configured to counteract the natural response of the amplifier such that, in tandem, they produce a linear amplifier response to an input voltage. *See* Ex.1009, 13:9-37. Those of skill in the art were familiar with using a "predistortion lookup table" to store information mapping input and output values for a nonlinear compensation circuit. *See* Ex.1009, 5:27-30; Ex.1006, 6:61-65 ("designed in a known manner (e.g., using a… lookup table)"); Ex.1003, ¶167.

A POSITA would have been familiar with the design of non-linear compensation devices and associated lookup tables. Ex.1003, ¶168. Since

nonlinear compensation devices had long been used in linearizing the output of other nonlinear devices—including RF amplifiers—a POSITA would have had an expectation of success in designing and employing a non-linear compensation device to use with Roberts' MZM. Ex.1003, ¶168. Roberts contemplates incorporating linearization techniques. Ex.1005, 2:43-50; 6:31-37. Because the MZM response curve was known to be sinusoidal (non-linear), a POSITA would have found it obvious to use known techniques to calculate a corresponding non-linear compensation function to linearize its output. Ex.1003, ¶168. Dr. Blumenthal's analysis provides an illustration of the sinusoidal response curve of an MZM, shown below. Ex.1003, ¶168.



**Ex.1003, ¶176.**

Dr. Blumenthal's declaration further outlines the step-by-step process of modeling the sinusoidal response curve for an MZM and calculating a non-linear compensation function to counteract the sinusoidal response curve. Ex.1003, ¶167-185. Dr. Blumenthal's analysis produces a mapping table based on a generic sinusoidal response curve and Taraschuk's example of a 6-bit to 8-bit linearizer. *See* Ex.1003, ¶185.

It would have been obvious for a POSITA implementing a nonlinear compensation lookup table, as suggested by Taraschuk (Ex.1006, 6:61-63), to use such known techniques for computing non-linear compensator look-up table values. Notably, the '998 Patent does not explain how to perform such steps for a real-world device, acknowledging that they were within the background knowledge of a POSITA. Ex.1003, ¶186; *cf.* Ex.1001, 9:33-13:2 (providing equations for an idealized MZI model without any derivation and stating they are "not difficult to verify").

Thus, because a POSITA would have found it obvious for Roberts' DSP to map digital input bits to digital output bits using a look-up table as taught by Taraschuk, and because a POSITA would have found it obvious for the look-up table to include entries for all possible combinations of digital input bits such that the entries are mapped to a respective combination of digital output bits, Roberts and Taraschuk render this limitation obvious. Ex.1003, ¶¶160-87.

**[1.8]** ***wherein, within the digital-to-digital mapping, for a first subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the first subset, decrease; and***

As discussed at [1.7] a POSITA would have found it obvious for Roberts to map between digital inputs and digital outputs ("*within the digital-to-digital mapping*") to compensate for a sinusoidal response of the modulator using a look-

up table "designed in a known manner" as taught by Taraschuk. Ex.1006, 6:61-65;

Ex.1003, ¶188. Dr. Blumenthal explains an exemplary "known manner" for

constructing a linearizing lookup table for use with Roberts. Ex.1003, ¶¶167-186.

A POSITA would have recognized that the mapping performed by the

combination of Roberts and Taraschuk teaches this limitation because having a

digital-to-digital mapping in which the differences (i.e., *deltas*) between successive

output values either increase, decrease, or stay the same is merely an obvious

aspect of compensating for the nonlinear response curve of Roberts' Mach-

Zehnder modulator. As discussed in the Background section above, a POSITA

would have been familiar with the sinusoidal response curve of an MZM—that is,

that an MZM produces a sinusoidal intensity response relative to the applied input

voltage. Ex.1003, ¶189.

The exemplary compensator mapping from [1.7] is graphed below (in

green), with compensator input values on the lower horizontal axis, and

compensator output values on the left vertical axis. Ex.1003, ¶190. The graph

below also shows the natural MZM response curve (in blue) using the upper

horizontal axis and the right vertical axis. It is immediately apparent that the curve

of the compensation mapping appears as a mirror-image of the natural MZM

response curve. Ex.1003, ¶190.



X-axis: Numerical value of modulator input

X-axis: Numerical value of compensator input

**Ex.1003, ¶191.**

Returning to the recited claim language, it can be readily shown that this non-linear compensation mapping, which would have been obvious to a POSITA as explained above at [1.7] satisfies the recited *decrease* in *deltas*. Ex.1003, ¶192. Shown below is a portion of the mapping table (from [1.7]) where the data are arranged to show "*increasing*" numerical input values (corresponding to the

"*digital input values*"). The final column shows the numerical absolute value difference between successive output values ("*deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the first subset*").

| Numerical value of linearizer 6-bit input | Numerical value of linearizer 8-bit output | Delta |
|---|---|---|
| 0 | 0 | 21 |
| 1 | 21 | 8 |
| 2 | 29 | 7 |
| 3 | 36 | |

Ex.1003, ¶192.

Between successive inputs corresponding to the numerical values 0 to 3 ("*first subset*"), the numerical values of the "*deltas… decrease*" from 21 to 8 to 7. It would have thus been obvious to a POSITA for an MZM's nonlinear compensation lookup table to include a range of outputs whose successive numerical differences are decreasing. Ex.1003, ¶193. This characteristic is a natural consequence of the nonlinear compensation response curve being a reflection of the MZM sinusoidal response curve across the desired linear output line. It is readily visible in the graph below showing green dots representing the computed nonlinear compensation lookup table values:



**Ex.1003, ¶194.**

It would have been obvious for a POSITA implementing a nonlinear compensation lookup table, as suggested by Taraschuk, to follow a process substantially similar to what is explained here. While a POSITA implementing an actual compensator for a real MZM would have used measurements from that MZM, testing an MZM and gathering response curve information was within the

ordinary knowledge and skill set of engineers in the prior art period. Ex.1003, ¶195.

In addition to the reasons mentioned above, a POSITA would have found it obvious to try a mapping scheme in which entries in the look-up table as taught by Taraschuk are structured such that successively increasing input values correspond to digital output entries whose corresponding numerical values have deltas that are decreasing, increasing, or unchanged. Doing so would have involved choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success. In that regard, the deltas between numerical values of digital outputs can either increase, decrease, or stay the same. Accordingly, there are only three possible relationships between such deltas. With so few possibilities, a POSITA would have found it obvious to try each of them. Ex.1003, ¶196.

To the extent Patent Owner would argue for a different interpretation of this claim limitation, it is noted that the specification of the '998 Patent discloses this limitation with no more specificity than the prior art presented here. In a parent case, the Patent Owner stated in prosecution that a similar claim limitation was disclosed by pointing to paragraph [0065] of the specification-as-filed, Fig. 2B, and Fig. 4. Ex.1010, 173. None of these portions of the specification discusses the deltas between successive digital outputs. Thus, to the extent that the '998 Patent specification would have enabled a POSITA to produce a device with *deltas...*

*decreasing*, it is apparent that the '998 Patent itself relied on the background knowledge of a POSITA to do so. Ex.1003, ¶197.

In summary, because a POSITA would have found it obvious for Roberts to map between digital inputs and digital outputs to compensate for a sinusoidal response of the modulator using a look-up table as taught by Taraschuk, and because an obvious aspect of doing so would have been for the deltas between numerical values of successive digital outputs to decrease, Roberts and Taraschuk render this limitation obvious. Ex.1003, ¶¶188-98.

**[1.9]** *wherein, within the digital-to-digital mapping, for a second subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the second subset, increase.*

As discussed at [1.7] and [1.8], a POSITA would have found it obvious for Roberts to map between digital inputs and digital outputs to compensate for a sinusoidal response of the modulator using a look-up table as taught by Taraschuk, and an obvious aspect of doing so would have been that for *successively increasing digital inputs*, the deltas increase, stay the same, or decrease. This limitation is similar to [1.8] but recites that the "*deltas … increase.*" For example, the portion of the mapping table in [1.7] with numerical input values 60 to 63 ("*second subset*") shows that the corresponding deltas between numerical output values increase from 7 to 8 to 21:

53

| Numerical value of linearizer 6-bit input | Numerical value of linearizer 8-bit output | Delta |
|---|---|---|
| 60 | 219 | 7 |
| 61 | 226 | 8 |
| 62 | 234 | 21 |
| 63 | 255 | |

Ex.1003, ¶199.

This increasing delta feature is similarly visible in the response curve of the nonlinear compensation mapping:



**Ex.1003, ¶200.**

Thus, Roberts and Taraschuk render this limitation obvious. Ex.1003,

¶¶199-202.

### 5.    Claim 2

**[2.1]** *The optical modulation system of claim 1: wherein, within the digital-to-digital mapping, for a third subset of successively decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital outputs corresponding respectively to the successively decreasing digital input values in the third subset, decrease, and*

As discussed at [1.7] and [1.8], a POSITA would have found it obvious for

Roberts to map between digital inputs and digital outputs to compensate for a sinusoidal response of the modulator using a look-up table as taught by Taraschuk, and an obvious aspect of doing so would have been that for *successively increasing digital input values*, the deltas increase, stay the same, or decrease. It logically follows that if the mapping table is arranged with *successively **decreasing** digital input values* (e.g., if the table entries are put in the reverse order), the output value deltas of various portions of the table will decrease, stay the same, or increase. For example, the portion of the mapping table in [1.7] with input values 62 to 59 ("*third subset*") shows that the corresponding *deltas* decrease from 8 to 7 to 5:

| Numerical value of linearizer 6-bit input | Numerical value of linearizer 8-bit output | Delta |
|---|---|---|
| 62 | 234 | 8 |
| 61 | 226 | 7 |
| 60 | 219 | 5 |
| 59 | 214 | |

Ex.1003, ¶203.

Specifically, between successive numerical values 62, 61, 60, and 59 the deltas decrease from 8 to 7 to 5. It would have thus been obvious to a POSITA for an MZM's nonlinear compensation lookup table to include a range of output values whose successive numerical differences are decreasing. This characteristic is a natural consequence of the nonlinear compensation response curve being a

reflection of the MZM sinusoidal response curve across the desired linear output line. The graph below shows green dots representing the computed nonlinear compensation lookup table values:



**Ex.1003, ¶205.**

Thus, Roberts and Taraschuk render this limitation obvious. Ex.1003, ¶¶203-06.

**[2.2]** *wherein, within the digital-to-digital mapping, for a fourth subset of successively decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital outputs corresponding respectively to the successively decreasing digital input values in the fourth subset, increase.*

This limitation is substantially similar to [2.1], except that it recites a "**fourth** *subset*" of values over which "*deltas…* ***increase***." The mapping table in [1.7] also shows that over the range of compensator input values, there are subsets where the *deltas* of successively decreasing output values ***increase***. For example, as the input values are successively decreasing from 4 to 1, the corresponding deltas increase from 5 to 7 to 8:

| Numerical value of linearizer 6-bit input | Numerical value of linearizer 8-bit output | Delta |
|---|---|---|
| 4 | 41 | 5 |
| 3 | 36 | 7 |
| 2 | 29 | 8 |
| 1 | 21 | |

Ex.1003, ¶207.

This increasing delta feature is similarly visible in a graph of the nonlinear compensation mapping:



**Ex.1003, ¶209.**

Thus Roberts and Taraschuk render this limitation. Ex.1003, ¶¶207-09.

6.    **Claim 3**

**[3.1] …*claim 1, wherein, within the digital-to-digital mapping, for a third subset of successively increasing or decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital output values corresponding to the successively increasing or decreasing digital input values in the third subset, remain the same.***

59

This limitation is substantially similar to [1.8] and [1.9], except that it recites a "***third** subset*" of values over which "*deltas… **remain the same**.*" As discussed at [1.7]-[1.9], a POSITA would have found it obvious for *deltas* to *remain the same*. As shown in the look-up table of [1.7], for example, that over the input value range of 49-45, the deltas *remain the same* (at 3):

| Numerical value of linearizer 6-bit input | Numerical value of linearizer 8-bit output | Delta |
|---|---|---|
| 49 | 175 | 3 |
| 48 | 172 | 3 |
| 47 | 169 | 3 |
| 46 | 166 | 3 |
| 45 | 163 | |

Ex.1003, ¶210.

Thus, Roberts and Taraschuk render this limitation obvious. Ex.1003, ¶¶210-11.

### 7.    **Claim 4**

**[4.1] …***claim 1, wherein one or more electrodes of the modulator are driven based on the plurality of voltage values to modulate the input optical signal, thereby generating the one or more modulated optical signal outputs.*

**First**, as explained above at [1.4], Roberts' modulator generates one or more modulated optical signal outputs.

**Second**, Roberts' modulator includes electrodes. *See* Ex.1005, 5:47-55.

**Third**, as explained above at [1.5], Roberts' modulator includes a DSP that outputs parallel binary signals corresponding to voltage values. Roberts teaches that the DSP outputs $V_R(n)$ and $V_L(n)$ signals (generally referred to as $V_X(n)$) and explains that the bits of such signals are representative of voltages to be applied to respective electrodes: "Each multi-bit sample stream $V_X(n)$ may be an N-bit parallel binary signal output from the DSP 34 on a corresponding N-bit data bus 36. In such a case, each line 38, of the N-bit bus 36 is connected to control a number of electrodes 40 corresponding to its binary weight." Ex.1005, 6:40-54. "Since each active electrode receives the same voltage (corresponding to logic State 1), it follows that the total phase delay experienced by light traversing each branch will vary directly with the number of active electrodes on that branch, and thus the value of the corresponding multi-bit sample stream $V_X(n)$." Ex.1005, 7:35-44.

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶212-15.

8.    **Claim 5**

**[5.1] …claim 1, wherein one or more electrodes of the modulator are driven directly responsive to the plurality of voltage values to modulate the input optical signal, thereby generating the one or more modulated optical signal outputs.**

This claim is nearly identical to claim 4 but recites that the electrodes are driven "*directly*" by the voltage values. As shown in Fig. 4 below, the bus lines that carry the $V_X(n)$ signals are directly connected to the electrodes.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶216.**

Furthermore, the number of active electrodes varies directly based on binary value represented in the parallel bus lines to the modulator: "As may be seen from FIG. 4, the number of "active" electrodes, and thus the effective electrode length within each branch of the MZ modulator 4, will **vary directly** with the binary value of the corresponding multi-bit sample stream $V_X(n)$." Ex.1005, 7:35-44.

Accordingly, because the parallel bus lines carrying the $V_X(n)$ signals are directly connected to the modulator, and the number of active electrodes vary directly based on the binary value of the $V_X(n)$ signals, the electrodes are driven directly responsive to the $V_X(n)$ signals.

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶216-18.

62

9.    **Claim 6**

**[6.1] …*claim 1, wherein the modulator comprises a plurality of waveguide branches that are enabled to modulate the input optical signal, and wherein a first set of the plurality of voltage values drives a first of the plurality of waveguide branches, a second set of the plurality of voltage values drives a second of the plurality of waveguide branches, and wherein outputs of the first and second waveguide branches are joined to provide at least part of the one or more modulated optical signal outputs.***

This claim limitation recites the basic structure of a dual-branch Mach-Zehnder interferometer. Roberts similarly describes a dual-branch Mach-Zehnder interferometer. Roberts' system includes a DSP that "generates a pair of multi-bit sample streams $V_X(n)$ which are representative of the desired phase modulation to be applied to **each branch** of an MZ modulator 4." Ex.1005, 5:56-6:3.

As shown in Fig. 4 below, the $V_X(n)$ signal is comprised of a $V_L(n)$ signal ("*first set of the plurality of voltage values*") applied to a first branch ("*first of the plurality of waveguide branches*") and the $V_R(n)$ signal *("second set of the plurality of voltage values*") applied to the second branch ("*second of the plurality of waveguide branches*"). The two waveguide branches are then joined at the end where the output optical signal ("*one or more modulated optical signals*") is produced. Ex.1003, ¶221 (Citing Ex.1025 and Ex.1026).

IPR2022-01283 Petition
*Inter Partes* Review of 11,342,998



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶220.**

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶219-22.

10.    **Claim 7**

**[7.1] …*claim 1, wherein the modulating comprises one of phase modulation, amplitude modulation, or phase and amplitude modulation.***

Roberts teaches that "[t]he optical modulator 4 operates to modulate the

**amplitude and/or phase** the carrier signal 6 to generate the optical

communications signal 8." Ex.1005, 1:26-29. Thus, Roberts renders this limitation

obvious. Ex.1003, ¶223.

11.    **Claim 8**

**[8.1] …*claim 1, wherein the one or more modulated optical signal outputs vary in intensity responsive to the input.***

Roberts explains that because "each active electrode receives the same voltage (corresponding to logic State 1), it follows that the total phase delay experienced by light traversing each branch **will vary** directly with the number of active electrodes on that branch, and thus the value of the corresponding multi-bit sample stream $V_X(n)$." Ex.1005, 7:39-44. While Roberts here refers to an example in which phase modulation is used, Roberts further notes that the modulator may use "amplitude and/or phase" modulation. Roberts also equates amplitude modulation with intensity modulation: "U.S. Pat. No. 4,288,785 (Papuchon et al) teaches a digitally controlled light **intensity (amplitude)** modulator." Accordingly, it would have been obvious for Roberts's modulator to vary the intensity of the output optical signal based on the number of active electrodes applied to the branches. Thus, Roberts renders this limitation obvious. Ex.1003, ¶224.

### 12. **Claim 9**

**[9.1] …claim 1, wherein the one or more modulated optical signal outputs vary in amplitude responsive to the input.**

Roberts explains that because "each active electrode receives the same voltage (corresponding to logic State 1), it follows that the total phase delay experienced by light traversing each branch **will vary** directly with the number of active electrodes on that branch, and thus the value of the corresponding multi-bit sample stream $V_X(n)$." Ex.1005, 7:39-44. While Roberts here refers to an example

in which phase modulation is used, Roberts further notes that the modulator may produce "amplitude and/or phase" modulation. Accordingly, it would have been obvious for Roberts's modulator to vary the amplitude of the output optical signal based on the number of active electrodes applied to the branches. Thus, Roberts renders this limitation obvious. Ex.1003, ¶225.

### 13. **Claim 10**

**[10.1] …*claim 1, wherein the one or more modulated optical signal outputs vary in phase responsive to the input.***

Roberts explains that because "each active electrode receives the same voltage (corresponding to logic State 1), it follows that the total **phase delay** experienced by light traversing each branch **will vary** directly with the number of active electrodes on that branch, and thus the value of the corresponding multi-bit sample stream $V_X(n)$." Ex.1005, 7:39-44. Accordingly, it would have been obvious for Roberts's modulator to vary the phase of the output optical signal based on the number of active electrodes applied to the branches. Thus, Roberts renders this limitation obvious. Ex.1003, ¶226.

### 14. **Claim 11**

**[11.1] …*claim 1, wherein the modulator comprises one or more Mach-Zehnder interferometer (MZI) based modulators.***

Roberts teaches that "the optical modulator 4 is provided by a well known **Mach-Zehnder (MZ) interferometer**." Ex.1005, 1:35-37. *See also* Ex.1005,

5:59-60 ("the desired phase modulation to be applied to each branch of an **MZ**

**modulator 4**"). Thus, Roberts renders this limitation obvious. Ex.1003, ¶227.

    15.    **Claim 12**

**[12.1] …*claim 1, wherein the one or more modulated optical signal outputs are corrected for nonlinearities due to non-linear characteristics of the [optical] modulator or non-linearities due to non-linear characteristics of one or more optical fibers transmitting modulated optical signal outputs.*** [3]

**First**, as explained above at [1.3], a POSITA would have found it obvious

for Roberts's DSP to implement the claim mapping techniques described by

Taraschuk to perform the non-linear compensation function described by Roberts.

*See* Ex.1005, 6:31-37 (Roberts' DSP includes a "non-linear compensator 18 used

to compensate non-linearities of the optical modulator 4."). Taraschuk teaches that

the mapping can be defined such that the mapping compensates for the non-linear

effects of the optical modulator (corrects "*for nonlinearities due to non-linear

characteristics of the modulator*"). Ex.1006, 7:59-8:15. Taraschuk explains that

"linearizer 44 can also be used to compensate **non-linearities of the optical

modulator 52**." Ex.1006, 7:56-59. Taraschuk further explains that "conventional

optical modulators, such as for example, a Mach-Zehnder modulator, display

---

[3] A pending Certificate of Correction request to remove the bracketed word

"optical" does not impact the claim analysis. Ex.1002, 8.

sinusoidal response to an input control signal." Ex.1006, 7:59-61. Taraschuk goes on to state that "a mapping can be defined between the M-bit input digital signal 46 and an N-bit signal … which compensates for the combined **non-linear effects of … the sinusoidal response of the modulator 52**" such that the response of the optical modulator is "more nearly linear." Ex.1006, 7:61-67, 8:13-15. As such, it would have been obvious to a POSITA that rendering the response of the optical modulator "more nearly linear" corrects *"for nonlinearities due to non-linear characteristics of the modulator."* Ex.1003, ¶229.

**Second**, Roberts also teaches the alternative recitation of this claim that "*the one or more modulated optical signal outputs are corrected for … non-linearities due to non-linear characteristics of one or more optical fibers transmitting modulated optical signal outputs.*" Roberts describes a compensation function c(t) to "compensate [for] impairments of an optical link" by generating a pre-distorted signal output "which will be transformed by the link impairments into a substantially undistorted optical signal at a receiver end of the link." Ex.1005, 2:50-55; Ex.1003, ¶¶230-31.

Thus, Roberts and Taraschuk render this limitation obvious. Ex.1003, ¶¶228-32.

16.    **Claim 13**

**[13.1]** *…claim 1, wherein, for a given digital input value, the mapping to a corresponding digital output value is determined based on a pattern for actuating drive voltages that alters a linearity of an optical response of the modulator.*

**First**, as discussed at [1.5], a POSITA would have found it obvious for Roberts' DSP to map ("*the mapping*") a given number of digital input bits ("*a given digital input value*") to a different number of digital output bits ("*a corresponding digital output value*") using a look-up table as taught by Taraschuk. Ex.1003, ¶234.

**Second**, Roberts teaches that the DSP's output is a multi-bit "parallel binary signal." Ex.1005, 6:40-42. Since the output is a "binary" signal, it would have been obvious to a POSITA for bits of the output to correspond to binary values. As would have been understood by a POSITA, the binary values would be in a pattern of 1s and 0s ("*pattern for actuating drive voltages*"). Ex.1003, ¶235. In that regard, as discussed at [1.5], the binary value of each output bit indicates whether a specific voltage value ("*drive voltage*") is to be applied to electrodes of an optical modulator or not. Accordingly, it would have been obvious to a POSITA for entries in the look-up table to map input bits to output bits based on a binary pattern of the output bits where the binary pattern of the output bits corresponds to the transmission of voltage values to electrodes of an optical modulator ("*mapping to a corresponding digital output value is determined based on a pattern for*

*actuating drive voltages*"). Ex.1003, ¶235.

Moreover, the prior art mapping of input bits to output bits where the binary pattern of the output bits corresponds to voltage values to electrodes to control an optical modulator is no different than the pattern-based mapping in the '998 Patent. *See* Ex.1003, ¶236 (citing Ex.1001, Fig. 4).

**Third**, Taraschuk teaches that the mapping can be defined such that the mapping compensates for the non-linear effects of the optical modulator ("*alters a linearity of an optical response of the modulator*"). Ex.1006, 7:59-8:15. In that regard, Taraschuk teaches that "linearizer 44 can also be used to compensate non-linearities of the optical modulator 52." Ex.1006, 7:56-59. Taraschuk explains that "conventional optical modulators, such as for example, a Mach-Zehnder modulator, display sinusoidal response to an input control signal." Ex.1006, 7:59-61. Taraschuk goes on to teach that "a mapping can be defined between the M-bit input digital signal 46 and an N-bit signal … which compensates for the combined non-linear effects of … the sinusoidal response of the modulator 52" such that the response of the optical modulator is "more nearly linear." Ex.1006, 7:61-67, 8:13-15. Since Taraschuk's modulator is an optical modulator, a POSITA would have recognized that the response of Taraschuk's modulator is an "*optical response.*" As such, it would have been obvious to a POSITA that rendering the response of the optical modulator "more nearly linear" *alters the linearity of an optical response of*

*the modulator.* Ex.1003, ¶237.

Thus, Roberts and Taraschuk render this limitation obvious. Ex.1003, ¶¶233-38.

17.  **Claim 14**

**[14.1] …claim 1, wherein at least some of the first subset of successively increasing digital input values are specified in the digital-to-digital mapping non-contiguously, and wherein at least some of the second subset of successively increasing digital input values are specified in the digital-to-digital mapping non-contiguously.**

**First**, as explained above at [1.8], Roberts and Taraschuk teach a first subset of successively increasing numerical input values ranging from 0-3 (and which have corresponding 6-bit *digital input values*). While this example of a first subset is contiguous, it would be just as obvious for the *first subset* to be selected so as to be non-contiguous. For example:

| Numerical value of linearizer 6-bit input | Numerical value of linearizer 8-bit output | Delta |
|---|---|---|
| 0 | 0 | 21 |
| 1 | 21 | |
| … | … | |
| 3 | 36 | 5 |
| 4 | 41 | |
| … | … | |
| 6 | 51 | 4 |
| 7 | 55 | |

Ex.1003, ¶238.

Note that, consistent with the claim limitation of [1.8], the *deltas* are *decreasing* (from 21 to 5 to 4).

**Second**, as explained above at [1.9], Roberts and Taraschuk teach a second subset of successively increasing digital input values ranging from 60-63. While this example of a second subset is contiguous, it would be just as obvious for the second subset to be selected so as to be non-contiguous. For example:

| Numerical value of linearizer 6-bit input | Numerical value of linearizer 8-bit output | Delta |
|---|---|---|
| 56 | 200 | 4 |
| 57 | 204 | |
| … | … | |
| 59 | 214 | 5 |
| 60 | 219 | |
| … | … | |
| 62 | 234 | 21 |
| 63 | 255 | |

Note again that, consistent with the claim limitations of [1.9], the *deltas* are *increasing* (from 4 to 5 to 21). To the extent Patent Owner would argue for a different interpretation of this claim limitation, it is noted that the specification of the '998 Patent discloses this limitation with no more specificity than the prior art presented here.

Thus, Roberts and Taraschuk render this limitation obvious. Ex.1003,

¶¶239-43.

18. **Claim 15**

**[15.1] …*claim 1, wherein the input optical signal is provided by an optical signal source.***

Roberts teaches a laser ("*an optical signal source*") coupled to an external optical modulator. Ex.1005, 1:23-24; Fig. 4. Roberts further teaches that the laser generates an optical carrier signal that is provided to the optical modulator ("*the input optical signal is provided by an optical signal source*"). Ex.1005, 1:24-30; Fig. 4.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶244.**

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶244-45.

19. **Claims 16-21**

These claims are substantially identical to claims 1-6, except that the

mapping's *digital input values* (in independent claim 16) are recited as being in *decreasing* order. Since the claims still recite subsets whose *deltas increase*, *decrease*, or *remain the same*, the substantive scope of the claims is not meaningfully different. Accordingly, the analysis above applies to these claims as well. Ex.1003, ¶¶246-61.

### 20.    **Claim 22**

**[22.1] …*claim 21, wherein a phase of the input optical signal associated with each waveguide branch is modulated by the respective set of voltage values applied to one or more electrodes of the waveguide branch.***

**First**, as explained above at [6.1], Roberts describes a dual-branch modulator in which electrodes are applied to each branch to modulate the input optical signal.

**Second**, Roberts explains that because "each active electrode receives the same voltage (corresponding to logic State 1), it follows that the **total phase delay experienced by light traversing each branch** will vary directly with the number of active electrodes on that branch, and thus the value of the corresponding multi-bit sample stream $V_X(n)$." Ex.1005, 7:39-44.

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶262-64.

### 21.    **Claims 23-31**

These claims recite limitations that are substantially identical to those in claims 7-15. Accordingly, the analysis above applies to these claims as well.

Ex.1003, ¶¶265-73.

22.    **Claim 32**

**[32.0]** *An optical modulation system for converting a plurality of input digital data words into a modulated optical output stream for transmission over an optical fiber, the modulation system comprising:*

**First**, as described above at [1.0], Roberts teaches an optical modulation system.

**Second**, consistent with the discussion above at [1.3], Roberts' modulation system modulates an input optical signal responsive to an x(m) signal. *See* Ex.1005, 1:26-30; 5:56-60. It was common for optical communication systems to handle far more data than a single *data word*, and thus would have been obvious for Roberts' x(m) signal to provide *a plurality of input digital data words*. Ex.1003, ¶275 (citing Ex.1008, 2:4-5).

**Third**, consistent with the discussion above at [1.4], Roberts teaches that modulating the input optical signal generates an "optical communications signal" ("*a modulated optical output stream*"). Ex.1005, 1:26-30; 1:32-33.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶276.**

Accordingly, by generating a modulated communication signal responsive to a multi-bit x(m) signal, Roberts' modulator is "*converting*" the x(m) signal to the modulated communication signal ("*converting a plurality of input digital data words into a modulated optical output stream*").

**Fourth**, a POSITA would have found it obvious to transmit Roberts' output optical communications signal over an optical fiber for the reasons explained above at [1.4]. Ex.1003, ¶278.

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶274-79.

**[32.1]** *an input configured to receive an input digital data word having N bits, where N>1;*

As described above at [1.1], Roberts and Taraschuk teach "a*n input for a*

*plurality of N digital input data bits*." For similar reasons, Roberts and Taraschuk teach "*an input configured to receive an input digital data word having N bits*." Further, in the example of Taraschuk, the number of input bits is six, which is greater than 1 ("*N>1*"). Thus, Roberts and Taraschuk render this limitation obvious. Ex.1003, ¶280.

**[32.2]** *an input optical signal;*

*See* [1.1]. Ex.1003, ¶281.

**[32.3]** *an electrically controllable electro-optic modulator comprising a plurality of waveguide branches, each waveguide branch configured to receive the input optical signal;*

**First**, as described above at [1.3] and [11.1], Roberts optical modulation system includes a Mach-Zehnder (MZ) modulator. Roberts further describes MZ modulators as electro-optic components. Ex.1005, 3:1-2. (referring to "**electro-optical** components such as MZ modulators.") A POSITA would have understood that MZ modulators are "*electrically controllable*" because they are controlled using voltage signals, as described above at [1.4].

**Second**, as described above at [6.1], Roberts describes a dual-branch modulator in which each branch receives and modulates the input optical signal.

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶282-84.

**[32.4]** *wherein the N bits of the N bit digital input data word are mapped to a set of M output bits corresponding to a set of voltage values;*

See analysis of [1.5]. Ex.1003, ¶285.

**[32.5]** *wherein the input digital data word is one from a set of $2^N$ input data words, the M output bits are from a set of $2^M$ M output bits, wherein each M output bits in the set of $2^M$ M output bits corresponds to a different set of voltage values;*

**First**, as discussed at [1.1], a POSITA would have found it obvious for Roberts' input digital data signal x(m) to include N digital input data bits. Further, a POSITA would have found it obvious for a digital input provided by the x(m) signal to be *from a set of $2^N$ input data words* because Roberts describes x(m) as a "digital" signal. Ex.1005, 1:33; Ex.1003, ¶286. Roberts recognizes that binary signals were a known type of digital signal. *See* Ex.1005, 1:61-64; 6:40-41 (variously referring to sample streams $V_X(n)$ as "digital" and "binary signal[s]"). A POSITA would have therefore found it obvious for input digital signal x(m) to be a binary signal. In a binary signal, there are only two possible values for each bit—either 0 or 1. The set of possible inputs is calculated by raising two (the number of possible values for each bit) to a power of N (the number of bits in the signal). For example, a two-bit binary signal would have $2^2 = 4$ possible inputs (00, 01, 10, 11). A six-bit input, such as the one described by Taraschuk, would have $2^6 = 64$ possible inputs. Accordingly, it is an obvious mathematical concept that a binary digital input having N bits is *one from a set of $2^N$ input data words*. Ex.1003, ¶286.

**Second**, as discussed at [1.5], Roberts teaches outputting $V_R(n)$ and $V_L(n)$

signals (generically referred to as $V_X(n)$). A POSITA would have found it obvious for a particular value represented by the signal $V_X(n)$ to be *from a set of $2^M$ M output bits* because Roberts describes $V_X(n)$ as a "multi-bit … parallel binary signal." Ex.1005, 6:40-42. It is an obvious mathematical concept that a binary digital output having M bits is *from a set of … $2^M$ M output bits*. In Taraschuk's example of an eight-bit output of the mapping, there are 256 ($2^8$) possible eight-bit values.

**Third**, as discussed at [1.5], the output bits correspond to voltage values.

Thus, Roberts and Taraschuk render this limitation obvious. Ex.1003, ¶¶286-89.

**[32.6]** *wherein the input optical signal received by each of the waveguide branches of the modulator is modulated based on at least a subset of the set of voltage values to generate a corresponding modulated optical signal;*

This claim limitation recites the basic structure of a dual-branch Mach-Zehnder interferometer. Roberts similarly describes a dual-branch Mach-Zehnder interferometer. *See* Ex.1005, 5:56-6:3.

As shown in Fig. 4 below, the $V_X(n)$ signal is comprised of a $V_L(n)$ signal and the $V_R(n)$ signal, either of which is "*at least a subset of the set of voltage values.*" Each branch thus produces its own "*modulated optical signal.*"



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶291.**

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶290-92.

**[32.7]** *wherein an output of the modulator combines the modulated optical signals corresponding to the plurality of waveguide branches to generate a modulated output signal varying in one or more of intensity, amplitude, and phase responsive to the input digital data word; and*

**First**, as explained above at [6.1] and [32.6], consistent with the standard structure of an MZ modulator, Roberts illustrates how the two waveguide branches of the modulator combine to produce the modulated output signal.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶292.**

**Second**, as described above at [7.1], [8.1], [9.1], and [10.1], the modulated output signal may vary in phase, intensity, or amplitude.

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶293-95.

### [32.8] *wherein the modulated optical signal is transmitted as a portion of the modulated output optical stream.*

As explained above at [32.6] and [32.7], each branch of Roberts' modulator produces a "*modulated optical signal*" that is combined to produce a "*modulated output signal.*" As the modulated output signal is transmitted over a fiber it becomes "*the modulated output optical stream*" as described above at [32.0]. Accordingly, the "*modulated optical signal*" is "*a portion of the modulated output optical stream.*" Thus, Roberts renders this limitation obvious. Ex.1003, ¶296.

23. **Claims 33-42**

These claims recite limitations that are substantially identical to those in claims 1-3 and 7-15. Accordingly, the analysis above applies to these claims as well. Ex.1003, ¶¶297-310.

24. **Claim 45**

**[45.0] *An optical modulation system… comprising:***

*See* [32.0]. Ex.1003, ¶311.

**[45.1] *an input…;***

*See* [32.1]. Ex.1003, ¶312.

**[45.2] *one or more electro-absorption signal generation devices, each configured for generating an optical signal output;***

As explained above at [32.2], Roberts' modulation system includes a modulator, which may be an MZ modulator. Roberts further notes that its teachings are compatible with other types of modulators, including "**an electro-absorptive modulator (EAM)**." Ex.1005, 1:37-42. A POSITA would have recognized that the EAM example referred to by Roberts would include a dual-branch EAM modulator, given that it was known that the phase-shifting mechanisms in branches of an MZ modulator were interchangeable with phase shifting using semiconductor EAM devices in each branch of the interferometer. Ex.1003, ¶313. As an example, Wooten describes replacing the lithium niobate

82

substrate[4] of an MZ modulator with a semiconductor electro-optic substrate: "For example, it is possible to replace the lithium niobate substrate with another electro-optic substrate, such as a semiconductor (e.g., GaAs or InP), to provide an RF input terminal for each interferometer." Ex.1011, 32:53-67; *see also* Ex.1011, 30:52-31:6.

Because an EAM is used for amplitude and/or phase modulation of an optical signal, it would have been obvious to a POSITA that Roberts' modulator 4, implemented as an EAM as explicitly taught by Roberts, produces (i.e., generates) an "*optical signal output*." Ex.1003, ¶314.

---

[4] A POSITA would have understood that lithium niobate substrates were used for MZ modulators. *See e.g.,* Ex.1011, 1:42-45 ("The Mach-Zehnder optical modulator 10 includes an optical waveguide 20 formed on an electro-optic substrate 30, which for exemplary purposes is lithium niobate (LiNbO)"); Ex.1003, ¶313.



**Ex.1005, Fig. 4 (annotated); Ex.1003, ¶314.**

Thus, Roberts renders this limitation obvious. Ex.1003, ¶¶313-15.

**[45.3]-[45.4] *wherein the N bits…; wherein the input digital data word…;***

*See* [32.4]-[32.5]. Ex.1003, ¶¶316-317.

**[45.5] *wherein each of the optical signal output generated by the electro-absorption signal generation device is modulated…; and***

*See* [32.6]. This limitation differs from [32.6] in that it refers to an electro-absorption modulator rather than the branches of a Mach-Zehnder. For the reasons described above at [32.2], Roberts describes that its teachings apply to EAM modulators as well. Ex.1003, ¶318.

**[45.6] *an output….***

*See* [32.7]. Ex.1003, ¶¶319-20.

25. **Claims 46-57**

These claims recite limitations that are substantially identical to those in claims 1-3, 7-10, 12-14, and 45. Accordingly, the analysis above applies to these claims as well. Ex.1003, ¶¶321-34.

26. **Claims 58-63**

These claims recite limitations that are substantially identical to those in claims 1-3, 6-7, and 14. Accordingly, the analysis above applies to these claims as well. Ex.1003, ¶¶335-48.

## C.    Ground 2

Ground 1 presents the combination of Roberts and Taraschuk as teaching the claimed limitations in light of the background knowledge of a POSITA. That background knowledge is evidenced by Wright. As an alternative, Ground 2 incorporates Wright into the combination of references with Roberts and Taraschuk. As explained above at [1.5], Taraschuk notes that the linear compensation look-up table is designed in a "**known manner**." Ex.1006, 6:61-63. A POSITA would have found it obvious to consult other references documenting such known techniques for populating a linear compensation look-up table. Wright provides an example of a "known manner" for determining the values for a non-linear compensation look-up table. Wright describes "a digital predistortion linearizer." Ex.1009, abstract. Wright employs this predistortion linearizer (i.e.,

non-linear compensator) to linearize an amplifier's response. Wright explains how the predistorter's response curve is configured to counteract the natural response of the amplifier such that, in tandem, they produce a linear amplifier response to an input voltage. *See* Ex.1009, 13:9-37. Thus, Wright is analogous art because it is pertinent to the problem of linearizing the output response of an electrically-driven device. *See* Ex.1001, 1:35-37, 2:35-37; Ex.1009, Abstract & 1:17-18.

Taraschuk's mapping is performed by a linearizer described as being "designed in a **known manner** (e.g., using a random access memory look-up table) to map an M-bit digital signal 46 into an N-bit parallel digital signal." Ex.1006, 6:61-65. A POSITA would have thus looked to known sources for a teaching of the "known manner" of computing values for a non-linear compensation look-up table referred to by Taraschuk. The combination of Wright with Roberts and Taraschuk is merely the use of known technique (Wright's technique for designing a non-linear compensation look-up table) to improve similar methods (Taraschuk's non-linear compensation look-up table) in the same way. Ex.1003, ¶¶349-55; *see also* Ex.1009. The claim analysis for this ground is the same as the analysis for claims 1-63 provided in Ground 1. Ex.1003, ¶355.

## XI.    CONCLUSION

Petitioner establishes a reasonable likelihood that the Challenged Claims are

unpatentable.

Respectfully submitted,

| | |
|---|---|
| Dated: July 20, 2022 | /Theodore M. Foster/ |
| HAYNES AND BOONE, LLP | Theodore M. Foster |
| 2323 Victory Avenue, Suite 700 | Lead Counsel for Petitioner |
| Dallas, Texas 75219 | Registration No. 57,456 |
| Customer No. 27683 | |

## XII.  MANDATORY NOTICES

### A.    Real Party-in-Interest

Pursuant to 37 C.F.R. § 42.8(b)(1), Petitioner certifies that the real parties-in-interest are Cisco Systems, Inc. and its subsidiary, Acacia Communications, Inc.

### B.    Related Matters

Pursuant to 37 C.F.R. § 42.8(b)(2), to the best knowledge of the Petitioner, the '998 Patent is or was involved in the following cases:

| Case Heading | Number | Court | Date |
|---|---|---|---|
| *Cisco Systems, Inc. et al v. Ramot at Tel Aviv University Ltd.* | 1-22-cv-00674 | DDE | May 24, 2022 |
| *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.* | 2-22-cv-00168 | EDTX | May 24, 2022 |

The '998 Patent is also related to multiple patents that were the subject of previously-filed IPRs:

IPR2022-01283 Petition
*Inter Partes* Review of 11,342,998

| Case Heading | Number | Patent |
|---|---|---|
| *Cisco Systems, Inc. v. Ramot at Tel-Aviv University Ltd.* | IPR2022-00575 (pending) | U.S. 11,133,872 |
| *Cisco Systems, Inc. v. Ramot at Tel-Aviv University Ltd.* | IPR2020-00576 (pending) | U.S. 11,133,872 |
| *Cisco Systems, Inc. v. Ramot at Tel-Aviv University Ltd.* | IPR2020-00484 | U.S. 10,461,866 |
| *Cisco Systems, Inc. v. Ramot at Tel-Aviv University Ltd.* | IPR2020-00122 | U.S. 10,033,465 |
| *Cisco Systems, Inc. v. Ramot at Tel-Aviv University Ltd.* | IPR2020-00123 | U.S. 10,270,535 |

Multiple related patents are also currently involved in the following ex parte reexamination proceedings:

| Reexamination No. | Status | Patent |
|---|---|---|
| 90/014,526 merged w/ 90/014,608 | All challenged claims rejected | U.S. 10,461,866 |
| 90/014,528 merged w/ 90/014,607 & 90/014,728 | All challenged claims rejected | U.S. 10,033,465 |
| 90/014,527 merged w/ 90/014,606 | All challenged claims rejected | U.S. 10,270,535 |

IPR2022-01283 Petition
*Inter Partes* Review of 11,342,998

### C.    Lead and Back-up Counsel and Service Information

Lead Counsel

Theodore M. Foster                    Phone: (972) 739-8649
HAYNES AND BOONE, LLP          Fax: (214) 200-0853
2323 Victory Ave. Suite 700        ipr.theo.foster@haynesboone.com
Dallas, TX 75219                       USPTO Reg. No. 57,456

Back-up Counsel

David L. McCombs                    Phone: (214) 651-5533
HAYNES AND BOONE, LLP          Fax: (214) 200-0853
2323 Victory Ave. Suite 700        david.mccombs.ipr@haynesboone.com
Dallas, TX 75219                       USPTO Reg. No. 32,271

Calmann J. Clements                 Phone: (972) 739-8638
HAYNES AND BOONE, LLP          Fax: (214) 200-0853
2323 Victory Ave. Suite 700        calmann.clements.ipr@haynesboone.com
Dallas, TX 75219                       USPTO Reg. No. 66,910

Please address all correspondence to lead and back-up counsel. Petitioner

consents to service in this proceeding by email at the addresses above.

IPR2022-01283 Petition
*Inter Partes* Review of 11,342,998

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to 37 C.F.R. § 42.24(d), Petitioner hereby certifies, in accordance with and in reliance on the word count provided by the word-processing system used to prepare this Petition, that the number of words in this paper is 13,995.

Pursuant to 37 C.F.R. § 42.24(d), this word count excludes the table of contents, table of authorities, mandatory notices under § 42.8, certificate of service, certificate of word count, appendix of exhibits, and any claim listing.

Dated: July 20, 2022

/Theodore M. Foster/
Theodore M. Foster
Lead Counsel for Petitioner
Registration No. 57,456

## CERTIFICATE OF SERVICE

The undersigned certifies that, in accordance with 37 C.F.R. § 42.6(e) and

37 C.F.R. § 42.105, service was made on Patent Owner as detailed below.

| | |
|---|---|
| *Date of service* | July 20, 2022 |
| *Manner of service* | FEDERAL EXPRESS |
| *Documents served* | Petition for *Inter Partes* Review Under 35 U.S.C. § 312 and 37 C.F.R. § 42.104 of U.S. 11,342,998; Petitioner's Exhibit List; Exhibits 1001-1015, 1017-1023, and 1025-1026; and Petitioner's Power of Attorney. |
| *Persons served* | Artegis Law Group, LLP<br>John Carey<br>7710 Cherry Park Drive Suite T #104<br>Houston TX 77095 |

/Theodore M. Foster/
Theodore M. Foster
Lead Counsel for Petitioner
Registration No. 57,456