

# *Markman* Presentation

*Cisco Systems, Inc. and Acacia Communications, Inc. v. Ramot at Tel Aviv University, LTD.*

September 17, 2024



C.A. No. 21-1365-GBW; C.A. No. 22-674-GBW (Consolidated)



# The Asserted Patents



# Asserted Patents

### The '872 Patent



### The '998 Patent



## LINEARIZED OPTICAL DIGITAL-TO-ANALOG MODULATOR





# Issue #1

## The '998 Patent



**Indefiniteness of '998 Patent Claims <u>1</u>, 4, 6-15, <u>45</u>-47, 49-54, <u>58</u> and 61-63**

# Indefiniteness Standard - *IPXL*

➢ "a single claim covering both an apparatus and a method of use of that apparatus is invalid"

➢ Functional language must be tied to a specific structure for that function

# *Rembrandt Data Techs. L.P. v. AOL, LLC*

| *Rembrandt* Indefinite Claim |
|---|
| 3. ==A data transmitting device== for transmitting signals corresponding to an incoming stream of bits, comprising: |

3. **A data transmitting device** for transmitting signals corresponding to an incoming stream of bits, comprising:

    **first buffer means** for partitioning …;

    **fractional encoding means** for receiving …;

    **second buffer means** for combining …;

    **trellis encoding means** for trellis encoding …; and

    **transmitting** the trellis encoded frames.

*Rembrandt Data Techs. LP v. AOL, LLC, et al.*, 641 F.3d 1331, 1339 (Fed. Cir. 2011)

# *Rembrandt* Claim vs. Ramot's Claims

| *Rembrandt* | Ramot Claim 1 |
|---|---|
| ➢ Directed to device | ➢ Directed to a system |
| ➢ Recites structure in the device ("buffer means", "fractional encoding means", etc.) | ➢ Recites structure in the system ("an input", "an input optical signal", "a modulator") |
| ➢ Recites a method limitation ("transmitting the trellis encoded …") | ➢ Recites a method limitation ("a digital-to-digital mapping maps …") |
| ➢ The recited method appears in isolation;  divorced from any recited structure | ➢ The recited method appears in isolation; divorced from any recited structure |

# *Rembrandt* Claim vs. Ramot's Claims (Cont'd)

| *Rembrandt* | Ramot Claim 1 |
|---|---|
| ➤ "transmitting" isn't permissible functional language simply because it is an element in a structural claim ("data transmitting device") | ➤ "mapping maps" isn't permissible functional language simply because it is an element in a structural claim ("optical modulation system") |
| ➤ Improper to rewrite claim to import an unrecited structure (e.g., a transmitter) for performing the recited method/function | ➤ Improper to rewrite claim to import an unrecited structure (e.g., logic, lookup table, DDC) for performing the recited method/function |
| ➤ Indefinite despite no recited user action | ➤ Indefinite despite no recited user action |

# *MasterMine Software, Inc. v. Microsoft Corp.* confirms *Rembrandt*

"We also applied this [*IPXL*] doctrine in *Rembrandt* … where … the claims at issued did not claim user action...

Though claim 8 includes active verbs—presents, receives, and generates—these verbs represent permissible functional language used to describe capabilities **of the 'reporting module'**…

**[U]nlike the claims in *Rembrandt*, the functional language here does not appear in isolation, but rather, is specifically tied to structure**:  the reporting module installed within the CRM software application."

874. F.3d 1307, 1314-1316 (Fed. Cir. 2017) (emphasis added)

# *Rembrandt* Claim vs. Ramot's Claim

| ***Rembrandt* Indefinite Claim** | **Ramot's Claim 1** |
|---|---|
| 3. A data transmitting device for transmitting signals corresponding to an incoming stream of bits, comprising:<br><br>first buffer means for partitioning …;<br><br>fractional encoding means for receiving …;<br><br>second buffer means for combining …;<br><br>trellis encoding means for trellis encoding …; and<br><br>transmitting the trellis encoded frames. | 1. An optical modulation system, the system comprising:<br><br>an input for a plurality of N digital input data bits;<br><br>an input optical signal;<br><br>a modulator for modulating the input optical signal responsively to the plurality of N digital input data bits …; and<br><br>wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values; … |

**Agreed Construction**

"**mapping/map/mapped/converting**" – selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical …

# Ramot Agrees the Claims as Construed Recite Verbs/Actions

Ramot agreed to a construction of mapping here—based on the Texas district court's construction—to clarify that the mapping can originate from logic implementing "selecting," such as from a look-up table, or "generating," such as from a function. JCCA at 4; *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, No. 2:19-cv-00225-JRG, D.I. 83 (Appx. Ex. 1) at 13-19 (E.D. Tex. May 15, 2020) ("2019 Texas Action") (construing "mapping"). "Selecting" and "generating" are merely different functional verbs alternatively describing the capabilities of the digital-to-digital

Ramot's Reply Position (D.I. 100 (Joint CC Br.) at 19 (§III.C))

# Two Dispositive Points

| *Rembrandt* Indefinite Claim | Ramot's Claim 1 |
|---|---|
| 3. **A data transmitting device** for transmitting signals corresponding to an incoming stream of bits, comprising:<br><br>**first buffer means** for partitioning …;<br><br>**fractional encoding means** for receiving …;<br><br>**second buffer means** for combining …;<br><br>**trellis encoding means** for trellis encoding …; and<br><br>**transmitting** the trellis encoded frames. | 1. **An optical modulation system**, the system comprising:<br><br>**an input** for a plurality of N digital input data bits;<br><br>**an input optical signal**:<br><br>**a modulator** for modulating the input optical signal responsively to the plurality of N digital input data bits …; and<br><br>**wherein a digital-to-digital mapping maps** the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values; … |

1. Construed as Verbs

2. No Structure for Performing the Verbs/Actions

# Claim 1 Is Invalid Under *IPXL*

1. An optical modulation system, the system comprising:  ← Apparatus (System) Claim

an input for a plurality of N digital input data bits;

an input optical signal;

a modulator for modulating the input optical signal responsively to the plurality of N digital input data bits to output a modulation of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers; and

Only recited structure in the system, none of which "maps"

wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values;  ← Method limitation

\*\*\*

# Claim 45 Is Invalid Inder *IPXL*

**45**. An optical modulation system for converting a plurality of input digital data words into a modulated optical output stream for transmission over an optical fiber, the modulation system comprising:

    an input configured to receive an input digital data word having N bits, where N>1;

    one or more electro-absorption signal generation devices, each configured for generating an optical signal output;

    wherein the N bits of the N bit digital input data word are mapped to a set of M output bits corresponding to a set of voltage values;

        **\*\*\***

    an output configured to combine the modulated optical signals from the one or more electro-absorption signal generation devices to generate a modulated output signal varying in intensity responsive to the input digital data word.

Apparatus (System) Claim

Only recited structure in the system, none of which "maps"

Method limitation

Only recited structure in the system, none of which "maps"

# Claim 58 Is Invalid Inder *IPXL*

58. An optical modulation system, the system comprising:  ← Apparatus (System) Claim

an input for a plurality of N digital input data bits;

an input optical signal;  ← Only recited structure in the system, none of which "maps"

wherein a digital-to-digital mapping maps the plurality of N digital input data bits to M digital output data bits;  ← Method limitation

**\*\*\***

wherein the optical modulation system further comprises a modulator for modulating the input optical signal responsively to the M digital output data bits, to output a modulation of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers.  ← Only recited structure in the system, none of which "maps"

15

# Ramot Relies On Cases With
# <span style="color:red">Structure</span> Specifically For Performing The Function

➢ *MasterMine Software, Inc. v. Microsoft Corp.,* 874. F.3d 1307, 1315 (Fed. Cir. 2017) ("presents", "receives" and "generates" functionality tied to "reporting module installed within the CRM software application")

"[a] system comprising":

....

a reporting module installed within the CRM software application ...;

....

wherein the reporting module installed within the CRM software application *presents* a set of user-selectable database fields as a function of the selected report template, *receives from the user a selection* of one or more of the user-selectable database fields, and *generates* a database query as a function of the user selected database fields;

....

# Ramot Relies On Cases With
# <span style="color:red">Structure</span> Specifically For Performing The Function

➢ *UltimatePointer, L.L.C. v. Nintendo*, 816 F.3d 816, 827-28 (Fed. Cir. 2016)
  ▪ "data generating" functionality tied to "<span style="color:red">image sensor</span>, said image sensor generating data";
  ▪ "Unlike the claims in *IPXL* and *Katz*, the claims do not recite functionality divorced from the cited structure."

1. An apparatus for controlling a feature on a computer generated image, the apparatus comprising:

a handheld device including:

an image sensor, said image sensor generating data related to the distance between a first point and a second point, the first point having a predetermined relation to the computer generated image and the second point having a predetermined relation to a handheld enclosure; and

a processor coupled to said handheld device to receive said generated data related to the distance between a first point and a second point and programmed to use the distance between the first point and the second point to control the feature on the image.

17

# Ramot Relies On Cases With
# Structure Specifically For Performing The Function

➢ *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (claim recited "pipelined processor possessing the recited structure" that performed the recited functions, e.g., fetching)

➢ *3G Licensing, S.A. v. Blackberry Ltd.*, No. 17-82-LPS-CJB, 2018 WL 4375091, at *10 (D. Del. Sept. 13, 2018) ("claim language describes the functional features [e.g., select one data record] of the claimed data storage module and the operations of the claimed processor" within claimed "mobile station")

# Ramot's Treatment of *HTC v. IPCom*

Before and after *Rembrandt*, the Federal Circuit clarified in a series of cases that functional language like "transmitting"—or "mapping," "selecting," or "generating"—is perfectly acceptable when describing the capabilities of a system. *See MasterMine*, 874 F.3d at 1314 ("a reporting module ..." "presents," "receives from the user a selection," "generates"); *UltimatePointer*, 816 F.3d at 819 ("a handheld device including:" "generating data"); *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1273 (Fed. Cir. 2012) ("A mobile station for ..." "storing," "holding," "maintaining," "causing," "deleting," "reactivating"); *Microprocessor Enhancement*, 520 F.3d at 1375 ("A pipelined processor for ..." "performing," "producing," "enabling," "disabling," "determining"). As in these cases, the verbs in the claims Cisco challenges here simply refer to functionality of the claimed system—here the "optical modulation system" of independent claims 1, 45, and 58. These are not method steps, as the claims and the context of the '998 patent make clear.

Ramot's Reply Position
(D.I. 100 (Joint CC Br.) at 20-21 (§III.C))

# *HTC Corp. v. IPCom*

**The Fed. Cir. held the opposite**:

➤ "If the mobile station implements the functions, the claims are indefinite because they recite both an apparatus—the mobile station—and method steps—the functions enumerated in paragraphs 2-7."

667 F.3d 1270, 1274 (Fed. Cir. 2012)

# *HTC Corp. v. IPCom*

**Claim found valid because it was the "<u>network environment</u>" that performed the functions, *not* the claimed "<u>mobile station</u>":**

➢ "[The claims] do not recite a mobile station and then have the mobile station perform the six enumerated functions."

667 F.3d 1270, 1277 (Fed. Cir. 2012)

# Indefiniteness Standard - *Nautilus*

➢ "A patent is invalid for indefiniteness if its claims, read in light of the patent's specification and prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus Inc. v. Biosig Instruments, Inc*., 134 S.Ct 2120, 2123 (2014)

➢ Even if the '998 Patent claim language is viewed as reciting some functionality/capability, then scope of claim cannot be determined with reasonable certainty
- ▪ Overly broad pure functional claiming—divorced from any specific structure—is not permissible functional claiming

# Claims Are Indefinite Under *Nautilus*

Even if the claim language is viewed as a "capability" of some structure, the claims recite **no structure** for performing the recited functions of "mapping maps …" (Claims 1 and 58) or "are mapped …" (Claim 45)

➢ *Markem-Imaje Corp. v. Zipher Ltd. & Videojet Tech., Inc.*, No. 07-cv-00006-PB, 2012 WL 3263517, at *8 (D.N.H Aug. 9, 2012) (claim indefinite when functional claiming "implies some additional unidentified structure that is required to perform the claimed function" and "the purely functional claim language broadly and impermissibly 'covers any means which anyone may ever discover of producing the result'") (quoting *In re Fuetterer*, 319 F.2d 259, 263 (C.C.P.A. 1963))

# Claims Are Indefinite Under *Nautilus*

➢ Claims 1 and 58:  (i) "an input …", (ii) "an input optical signal" and (iii) "a modulator for modulating the input optical signal …"

- None of these structures "map"

➢ Claim 45:  (i) "an input …", (ii) "one or more electro-absorption signal generation devices, each configured for generating an optical signal output" and (iii) "an output …"

- None of these structures map

# Issue #2

**'998 Patent**

**'872 Patent**



# Ramot's IPR Disclaimers (Both Patents)

# Cisco's Proposed Constructions

| '872 Patent: claims 1, 11, 15 | '872 Patent: claims 13, 23 | '998 Patent, Cl. 1 | '998 Patent, Cl. 45 | '998 Patent, Cl. 58 |
|---|---|---|---|---|
| converting, based on a digital-to-digital mapping, … to M digital output data bits associated with M drive voltage values **for directly driving electrodes of the modulator without any mediating digital-to-analog converter** | mapping, based on a digital-to-digital mapping, … to a first digital output associated with M drive voltages **for directly driving electrodes of the modulator without any mediating digital-to-analog converter** | digital-to-digital mapping maps … to a set of M digital output data bits associated with a plurality of voltage values **for directly driving electrodes of the modulator without any mediating digital-to-analog converter** | mapped to a set of M output bits corresponding to a set of voltage values **for directly driving electrodes of the one or more electro-absorption signal generation devices without any mediating digital-to-analog converter** | digital-to-digital mapping maps … to M digital output data bits **for directly driving electrodes of the modulator without any mediating digital-to-analog converter** |

Cisco's Responsive Position (D.I. 100 (Joint CC Br.) at 33 (§III.B))

| | '872: 1, 11, 15 | '872: 13, 23 | '998: 1 | '998: 45 | '998: 58 |
|---|---|---|---|---|---|
| Cisco's Constructions | converting, based on a digital-to-digital mapping, … to M digital output data bits associated with M drive voltage values for directly driving electrodes of the modulator without any mediating digital-to-analog converter | mapping, based on a digital-to-digital mapping, … to a first digital output bits associated with M drive voltages for directly driving electrodes of the modulator without any mediating digital-to-analog converter | digital-to-digital mapping maps … to a set of M digital output data bits associated with a plurality of voltage values for directly driving electrodes of the modulator without any mediating digital-to-analog converter | mapped to a set of M output bits corresponding to a set of voltage values for directly driving electrodes of the one or more electro-absorption signal generation devices without any mediating digital-to-analog converter | digital-to-digital mapping maps … to M digital output data bits for directly driving electrodes of the modulator without any mediating digital-to-analog converter |

**for directly driving electrodes of the modulator without any mediating digital-to-analog converter**

Accordingly, the invention of the '535 Patent achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead directly driving the modulator with digital signal vectors and using the optical modulator itself to effect a faster digital-to-analog conversion. *See, e.g.,* EX1001, 15:16-18 ("The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as 'Direct Digital Driving'"). The claimed techniques also more efficiently correct for the known problem of non-linear response in optical modulators operated at high transmission speeds—by the novel digital-to-digital mapping of the challenged claims. *See, e.g., id.,* 7:33-66.

Ramot's '535 POPR at 34 (D.I. 88 (JCC), Ex. G)

# "electrodes of the modulator"



Cisco's Tutorial
(D.I. 106)

| | '872: 1, 11, 15 | '872: 13, 23 | '998: 1 | '998: 45 | '998: 58 |
|---|---|---|---|---|---|
| Cisco's Constructions | converting, based on a digital-to-digital mapping, … to M digital output data bits associated with M drive voltage values for directly driving electrodes of the modulator without any mediating digital-to-analog converter | mapping, based on a digital-to-digital mapping, … to a first digital output bits associated with M drive voltages for directly driving electrodes of the modulator without any mediating digital-to-analog converter | digital-to-digital mapping maps … to a set of M digital output data bits associated with a plurality of voltage values for directly driving electrodes of the modulator without any mediating digital-to-analog converter | mapped to a set of M output bits corresponding to a set of voltage values for directly driving electrodes of the one or more electro-absorption signal generation devices without any mediating digital-to-analog converter | digital-to-digital mapping maps … to M digital output data bits for directly driving electrodes of the modulator without any mediating digital-to-analog converter |

**for directly driving electrodes of the modulator without any mediating digital-to-analog converter**

Accordingly, the invention of the '535 Patent achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead directly driving the modulator with digital signal vectors and using the optical modulator itself to effect a faster digital-to-analog conversion. *See, e.g.*, EX1001, 15:16-18 ("The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as 'Direct Digital Driving'"). The claimed techniques also more efficiently correct for the known problem of non-linear response in optical modulators operated at high transmission speeds—by the novel digital-to-digital mapping of the challenged claims. *See, e.g.*, *id.*, 7:33-66.

Ramot's '535 POPR at 34 (D.I. 88 (JCC),Ex. G)

# "without any mediating digital-to-analog converter"



| 4-Bit Data Word | DAC Output Level |
|---|---|
| 0000 | 0 |
| 0001 | 1 |
| 0010 | 2 |
| 0011 | 3 |
| 0100 | 4 |
| 0101 | 5 |
| 0110 | 6 |
| 0111 | 7 |
| 1000 | 8 |
| 1001 | 9 |
| 1010 | 10 |
| 1011 | 11 |
| 1100 | 12 |
| 1101 | 13 |
| 1110 | 14 |
| 1111 | 15 |

Digital Signal In

Digital to Analog Converter (DAC)

Analog Signal Out

Electrode

Branch 1

converter. *See, e.g.*, EX1008, 5:47-54. This known approach is explicitly distinguished as undesirable by the '535 Patent. *See* EX1001, 15:16-18 ("The application of the electrical signals is preferably directly upon the modulator *without any mediating [e.g., DAC] circuits*, referred to herein as 'Direct Digital Driving.'").

Ramot's '535 POPR at 64 (D.I. 88 (JCC),Ex. G)

Cisco's Tutorial (D.I. 106)

30



Accordingly, the invention of the '535 Patent achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead directly driving the modulator with digital signal vectors and using the optical modulator itself to effect a faster digital-to-analog conversion. *See, e.g.*, EX1001, 15:16-18 ("The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as 'Direct Digital Driving'"). The claimed techniques also more efficiently correct for the known problem of non-linear response in optical modulators operated at high transmission speeds—by the novel digital-to-digital mapping of the challenged claims. *See, e.g.*, *id.*, 7:33-66.

Ramot's '535 POPR at 34 (D.I. 88 (JCC), Ex. G)

Cisco's Tutorial (D.I. 106)

"Digital Driven" Modulators

Directly driving

Cisco's Tutorial (D.I. 106)

# *Regents of the Univ. of Minn. v. AGA Med. Corp.,* 717 F.3d 929 (Fed. Cir. 2013)

**1**

Thus, our cases establish that the two patents must have the same or closely related claim limitation language. If **the language of the later limitation is significantly different**, the disclaimer will not apply.

717 F.3d at 943

**2**

The sole exception is when **the disclaimer is directed to the scope of the invention as a whole, not a particular c**laim. *See, e.g., Ormco Corp. v. Align Tech., Inc., 498 F.3d 1307, 1314-15 (Fed. Cir. 2007)* (the patentee's statements "w[ere] not associated with particular language from [the] claims" but were instead directed to the "present invention" and the "overall method" claimed).

717 F.3d at 943 n.8

# *Microsoft Corp. v. Multi-Tech Sys.,*
# 357 F.3d 1340, 1349-50 (Fed. Cir. 2004)

Moreover, although Multi-Tech made the above quoted statement during prosecution of the '627 patent, it is also applicable to both the '649 and the '532 patents. In the past, we have held that the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application. *E.g.*, *Jonsson v. Stanley Works, 903 F.2d 812, 818 (Fed. Cir. 1990)*; *see also Laitram Corp. v. Morehouse Indus., Inc., 143 F.3d 1456, 1460 n.2 (Fed. Cir. 1998)* (applying the prosecution histories of two sibling patents, which shared a common written description, to one another). We likewise believe that Multi-Tech's statement made during prosecution of the '627 patent is **relevant to an understanding of the common disclosure in the sibling** '649 and '532 patents. Multi-Tech's statement was expressly directed to the "communications system" **disclosed "in the[] specification**." That communications system encompasses the inventions of all three patents, *see* '289 patent, col. 1, ll. 35-37 (stating that the "system . . . contains multiple inventions"), and as noted above, the **specification is identical for all three patents**. Multi-Tech's statement to the PTO was thus not limited to the invention disclosed in the '627 patent, but **was a representation of its own understanding of the inventions disclosed in all three patents**. We therefore conclude that that statement from the '627 patent's prosecution history is pertinent to an interpretation of the later issued '532 patent. *See Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 980 (Fed. Cir. 1999)* (applying the prosecution history of one patent to a related, subsequently issued patent).

## Prior Prosecution Statements in *Microsoft*

In response to the examiner's first office action, Multi-Tech took the opportunity to provide a "summary of the invention" before addressing the *§ 103* rejection. It stated:

> In their specification, Applicants disclose a communications system which operates over a standard telephone line. Such a telephone line is commonly referred to in the art as a "plain old telephone service" (POTS) line and establishes a point-to-point connection between telephone equipment on each end of the line. Applicants' invention . . . transmits the packets across a POTS line to a remote site . . . .

(citations omitted). That statement, which expressly related to the specification shared by all three patents and the communications system disclosed in all three patents, makes clear that Multi-Tech viewed the local and remote sites of its inventions as communicating directly over a telephone line. . . . That statement unambiguously reflects Multi-Tech's own understanding of its inventions in the '627, '649, and '532 patents as being limited to the transmission of data packets over a telephone line. We cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO.

357 F.3d at 1349

## '535 POPR Statements by Ramot

Accordingly, the invention of the '535 Patent achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead directly driving the modulator with digital signal vectors and using the optical modulator itself to effect a faster digital-to-analog conversion. *See, e.g.,* EX1001, 15:16-18 ("The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as 'Direct Digital Driving'"). The claimed techniques also more efficiently correct for the known problem of non-linear response in optical modulators operated at high transmission speeds—by the novel digital-to-digital mapping of the challenged claims. *See, e.g., id.*, 7:33-66.

Ramot's '535 POPR at 34
(D.I. 88 (JCC), Ex. G)

*Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("An applicant's invocation of multiple grounds for distinguishing a prior art reference does not immunize each of them from being used to construe the claim language.").

## Prior Prosecution Statements in *Microsoft*

In response to the examiner's first office action, Multi-Tech took the opportunity to provide a "summary of the invention" before addressing the *§ 103* rejection. It stated:

> In their specification, Applicants disclose a communications system which operates over a standard telephone line. Such a telephone line is commonly referred to in the art as a "plain old telephone service" (POTS) line and establishes a point-to-point connection between telephone equipment on each end of the line. Applicants' invention . . . transmits the packets across a POTS line to a remote site . . . .

(citations omitted). That statement, which expressly related to the specification shared by all three patents and the communications system disclosed in all three patents, makes clear that Multi-Tech viewed the local and remote sites of its inventions as communicating directly over a telephone line. . . . That statement unambiguously reflects Multi-Tech's own understanding of its inventions in the '627, '649, and '532 patents as being limited to the transmission of data packets over a telephone line. We cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO.

357 F.3d at 1349

## '535 POPR Statements by Ramot

> Each of the challenged claims requires converting digital input values to a digital vector of output values. Element B. As discussed below, the '535 Patent specification makes clear that this converting occurs in the digital-to-digital domain, and results in the sets of input and selected output values being non-identical. This non-identical digital-to-digital converting enables the invented system to correct for non-linearities or other undesirable signal characteristics, and to do so without employing the complex, slow, and power-hungry DAC circuits of prior solutions. *See, e.g.*, EX1001, 4:62-5:3, 7:33-66, Figures 4, 2A & 2B.

Ramot's '535 POPR at 37-38
(D.I. 88 (JCC), Ex. G)

35

# *Ormco Corp. v. Align Tech., Inc.,*
# 498 F.3d 1307, 1319-20 (Fed. Cir. 2007)

When the application of prosecution disclaimer involves statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed, those statements in the familial application are relevant in construing the claims at issue. *See, e.g., Wang Lab., Inc. v. Am. Online, Inc., 197 F.3d 1377, 1384 (Fed. Cir. 1999)*; *Jonsson v. Stanley Works, 903 F.2d 812, 818 (Fed. Cir. 1990)*. In this case, **the specifications of the prior '562 patent, which is the parent of three of the patents in issue, and all the presently litigated patents, have the same content**. Thus, the **prosecution history** of the claims of application number 07/973,973, which led to the '562 patent, **are relevant** in construing the claims of the '432, the '243, the '861, and the '444 patents.

## Prior Prosecution Statements in *Ormco*

In a Response on March 16, 1994, the inventors made a number of statements characterizing the Lemchen patent and seeking to distinguish their invention. The first part of the Response describing Lemchen, noted by the district court, states:

> Using such a CAD [computer-aided design] program in a conventional manner, as Lemchen describes, *an operator would manipulate* the tooth images to provide the desired occlusion. This would presumably involve *some decision making* by the operator. As the operator manipulates the images, the computer, under the control of the conventional CAD program, would perform the calculations that would generate data of the tooth movements made by the operator and thus of the finish positions of the teeth.

(emphases added). This passage illustrates the Inventors' characterization of the Lemchen prior art, *viz.*, that it involves use of an operator.

498 F.3d at 1314-15

## '535 POPR Statements by Ramot

> Similarly, the *Burchfiel* reference employs an admitted prior art solution using a look up table to relate input digital symbols to stored representations of analog voltage levels, which are driven onto electrodes of a modulator via a digital-to-analog converter (DAC). EX1008, Fig. 1, 3:18-27 ("The first and the second digital-to-analog converters 114, 120 generate first and second analog signals"), 5:56-62 ("pre-programmed voltages stored in the memory look-up table 106"). But both the '535 Patent and Petitioner's cited *Roberts* art teach away from and disparage solutions such as *Burchfiel*'s that use DAC circuits as electrode drivers. For example, the '535 Patent discusses the advantage of operating "without any mediating [DAC] circuits." *See, e.g.*, EX1001, 15:16-18. *Roberts* discusses a prior art system using DACs, including its disadvantages. EX1005, 1:54-2:2, Fig. 2, 3:8-13 (referring to undesirable power levels of Fig. 2).

Ramot's '535 POPR at 8
(D.I. 88 (JCC),Ex. G)

37

## Prior Prosecution Statements in *Ormco*

In a Response on March 16, 1994, the inventors made a number of statements characterizing the Lemchen patent and seeking to distinguish their invention. The first part of the Response describing Lemchen, noted by the district court, states:

> Using such a CAD [computer-aided design] program in a conventional manner, as Lemchen describes, *an operator would manipulate* the tooth images to provide the desired occlusion. This would presumably involve *some decision making* by the operator. As the operator manipulates the images, the computer, under the control of the conventional CAD program, would perform the calculations that would generate data of the tooth movements made by the operator and thus of the finish positions of the teeth.

(emphases added). This passage illustrates the Inventors' characterization of the Lemchen prior art, *viz.*, that it involves use of an operator.

498 F.3d at 1314-15

## '535 POPR Statements by Ramot



Ramot's '535 POPR at 28 (D.I. 88 (JCC), Ex. G)

## Prior Prosecution Statements in *Ormco*

The inventors then distinguish between their automated design process and processes that are merely computer assisted and involve human input in a further characterization of the Lemchen patent:

> The Lemchen patent relies, to produce the calculations, on the conventional calculation techniques employed in generalized CAD software. This in turn relies on a user interactive interface by which an *operator contributes human decision making* powers to manipulate images until the operator is satisfied that finish tooth position criteria have been met. . . . However, with conventional CAD programs, the reliance on human decision making is heavy, and *rigorous fully automated arrival at tooth finish positions is lacking*.

(emphases added). The inventors thus distinguished Lemchen by emphasizing its reliance on an operator for the decision-making process.

498 F.3d at 1315

## '535 POPR Statements by Ramot

Similarly, the *Burchfiel* reference employs an admitted prior art solution using a look up table to relate input digital symbols to stored representations of analog voltage levels, which are driven onto electrodes of a modulator via a digital-to-analog converter (DAC). EX1008, Fig. 1, 3:18-27 ("The first and the second digital-to-analog converters 114, 120 generate first and second analog signals"), 5:56-62 ("pre-programmed voltages stored in the memory look-up table 106"). But both the '535 Patent and Petitioner's cited *Roberts* art teach away from and disparage solutions such as *Burchfiel*'s that use DAC circuits as electrode drivers. For example, the '535 Patent discusses the advantage of operating "without any mediating [DAC] circuits." *See, e.g.*, EX1001, 15:16-18. *Roberts* discusses a prior art system using DACs, including its disadvantages. EX1005, 1:54-2:2, Fig. 2, 3:8-13 (referring to undesirable power levels of Fig. 2).

Ramot's '535 POPR at 8
(D.I. 88 (JCC),Ex. G)

39

## Prior Prosecution Statements in *Ormco*

The inventors then <u>distinguish between their automated</u> <u>design process</u> and processes that are merely computer assisted and involve human input <u>in a further</u> <u>characterization of the Lemchen patent</u>:

> <u>The Lemchen patent relies,</u> to produce the calculations, on the <u>conventional calculation</u> <u>techniques employed in generalized CAD software.</u> This in turn relies on a user interactive interface by which an *operator contributes human decision making* powers to manipulate images until the operator is satisfied that finish tooth position criteria have been met. . . . <u>However, with conventional</u> <u>CAD programs,</u> the reliance on human decision making is heavy, and *rigorous fully automated arrival at tooth finish positions is lacking*.

(emphases added). The inventors thus <u>distinguished</u> <u>Lemchen by emphasizing its reliance</u> on an operator for the decision-making process.

498 F.3d at 1315

## '535 POPR Statements by Ramot

converter. *See, e.g.,* EX1008, 5:47-54. This known approach is explicitly <u>distinguished as undesirable by the '535 Patent.</u> *See* EX1001, <u>15:16-18</u> ("The application of the electrical signals is preferably directly upon the modulator ***without any mediating [e.g., DAC] circuits,*** referred to herein as 'Direct Digital Driving.'").

Ramot's '535 POPR at 64
(D.I. 88 (JCC),Ex. G)

## Prior Prosecution Statements in *Ormco*

Further statements by the inventors in arguing for allowance of their claims in their Response continued to characterize their method by which final tooth positions may be determined. They stated. "The present invention of applicants is directed toward the most complete and *fully automated* method for orthodontic appliance design and manufacture made." (emphasis added).

498 F.3d at 1315

## '535 POPR Statements by Ramot

Accordingly, the invention of the '535 Patent achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead directly driving the modulator with digital signal vectors and using the optical modulator itself to effect a faster digital-to-analog conversion. *See, e.g.,* EX1001, 15:16-18 ("The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as 'Direct Digital Driving'"). The claimed techniques also more efficiently correct for the known problem of non-linear response in optical modulators operated at high transmission speeds—by the novel digital-to-digital mapping of the challenged claims. *See, e.g., id.,* 7:33-66.

Ramot's '535 POPR at 34 (D.I. 88 (JCC),Ex. G)

41

## Prior Prosecution Statements in *Ormco*

Further statements by the inventors in arguing for allowance of their claims in their Response continued to characterize their method by which final tooth positions may be determined. They stated, "The present invention of applicants is directed toward the most complete and *fully automated* method for orthodontic appliance design and manufacture made." (emphasis added).

498 F.3d at 1315

## '535 POPR Statements by Ramot

Each of the challenged claims requires converting digital input values to a digital vector of output values. Element B. As discussed below, the '535 Patent specification makes clear that this converting occurs in the digital-to-digital domain, and results in the sets of input and selected output values being non-identical. This non-identical digital-to-digital converting enables the invented system to correct for non-linearities or other undesirable signal characteristics, and to do so without employing the complex, slow, and power-hungry DAC circuits of prior solutions. *See, e.g.*, EX1001, 4:62-5:3, 7:33-66, Figures 4, 2A & 2B.

Ramot's '535 POPR at 37-38
(D.I. 88 (JCC),Ex. G)

42

## Prior Prosecution Statements in *Ormco*

None of the prior statements in the Response were limited to particular claims. Again, in a section entitled "Deriving Finish Positions from Derived Ideal Dental Archform," the inventors argued, "The judgment, or decision making, on the acceptability of tooth positions must be imposed externally of Lemchen's system. This leads to human error and inconsistencies from patient to patient. Lemchen does not disclose this being done automatically thereby avoiding such errors and inconsistencies." In that same section, the inventors conclude, "Therefore, Lemchen, while primarily concerned with bracket placement, uses a user interactive computer system to calculate tooth finish positions, [but] applicants have provided a computerized system with the intelligence to decide *for itself* the best finish positions of the teeth." (emphasis added). That statement was directed to amended claims 1-30, 35-38, and 65-72, but was not associated with particular language from those claims. Furthermore, the method of amended claim 1 included the step of "deriving with the computer tooth finish positions," demonstrating that the same subject matter of automatic determination of finish tooth positions was included in those claims.

498 F.3d at 1315

## '535 POPR Statements by Ramot

Each of the challenged claims requires converting digital input values to a digital vector of output values. Element B. As discussed below, the '535 Patent specification makes clear that this converting occurs in the digital-to-digital domain, and results in the sets of input and selected output values being non-identical. This non-identical digital-to-digital converting enables the invented system to correct for non-linearities or other undesirable signal characteristics, and to do so without employing the complex, slow, and power-hungry DAC circuits of prior solutions. *See, e.g.,* EX1001, 4:62-5:3, 7:33-66, Figures 4, 2A & 2B.

Ramot's '535 POPR at 37-38
(D.I. 88 (JCC),Ex. G)

## Prior Prosecution Statements in *Ormco*

None of the prior statements in the Response were limited to particular claims. Again, in a section entitled "Deriving Finish Positions from Derived Ideal Dental Archform," the inventors argued, "The judgment, or decision making, on the acceptability of tooth positions must be imposed externally of Lemchen's system. This leads to human error and inconsistencies from patient to patient. Lemchen does not disclose this being done automatically thereby avoiding such errors and inconsistencies." In that same section, the inventors conclude, "Therefore, Lemchen, while primarily concerned with bracket placement, uses a user interactive computer system to calculate tooth finish positions, [but] applicants have provided a computerized system with the intelligence to decide *for itself* the best finish positions of the teeth." (emphasis added). That statement was directed to amended claims 1-30, 35-38, and 65-72, but was not associated with particular language from those claims. Furthermore, the method of amended claim 1 included the step of "deriving with the computer tooth finish positions," demonstrating that the same subject matter of automatic determination of finish tooth positions was included in those claims.

498 F.3d at 1315

## '535 POPR Statements by Ramot

converter. *See, e.g.*, EX1008, 5:47-54. This known approach is explicitly distinguished as undesirable by the '535 Patent. *See* EX1001, 15:16-18 ("The application of the electrical signals is preferably directly upon the modulator *without any mediating [e.g., DAC] circuits*, referred to herein as 'Direct Digital Driving.'").

Ramot's '535 POPR at 64
(D.I. 88 (JCC),Ex. G)

44

## Prior Prosecution Statements in *Ormco*

None of the prior statements in the Response were limited to particular claims. Again, in a section entitled "Deriving Finish Positions from Derived Ideal Dental Archform," the inventors argued, "The judgment, or decision making, on the acceptability of tooth positions must be imposed externally of Lemchen's system. This leads to human error and inconsistencies from patient to patient. Lemchen does not disclose this being done automatically thereby avoiding such errors and inconsistencies." In that same section, the inventors conclude, "Therefore, Lemchen, while primarily concerned with bracket placement, uses a user interactive computer system to calculate tooth finish positions, [but] applicants have provided a computerized system with the intelligence to decide *for itself* the best finish positions of the teeth." (emphasis added). That statement was directed to amended claims 1-30, 35-38, and 65-72, but was not associated with particular language from those claims. Furthermore, the method of amended claim 1 included the step of "deriving with the computer tooth finish positions," demonstrating that the same subject matter of automatic determination of finish tooth positions was included in those claims.

498 F.3d at 1315

## '535 POPR Statements by Ramot

Accordingly, the invention of the '535 Patent achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead directly driving the modulator with digital signal vectors and using the optical modulator itself to effect a faster digital-to-analog conversion. *See, e.g.,* EX1001, 15:16-18 ("The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as 'Direct Digital Driving'"). The claimed techniques also more efficiently correct for the known problem of non-linear response in optical modulators operated at high transmission speeds—by the novel digital-to-digital mapping of the challenged claims. *See, e.g., id.,* 7:33-66.

Ramot's '535 POPR at 34
(D.I. 88 (JCC),Ex. G)

*Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("An applicant's invocation of multiple grounds for distinguishing a prior art reference does not immunize each of them from being used to construe the claim language.").

# *Regents of the Univ. of Minn. v. AGA Med. Corp.,* 717 F.3d 929 (Fed. Cir. 2013)

**1**

Thus, our cases establish that the two patents must have the same or closely related claim limitation language. If **the language of the later limitation is significantly different**, the disclaimer will not apply.

717 F.3d at 943

**2**

The sole exception is when **the disclaimer is directed to the scope of the invention as a whole, not a particular c**laim. *See, e.g., Ormco Corp. v. Align Tech., Inc., 498 F.3d 1307, 1314-15 (Fed. Cir. 2007)* (the patentee's statements "w[ere] not associated with particular language from [the] claims" but were instead directed to the "present invention" and the "overall method" claimed).

717 F.3d at 943 n.8

46

| '535 Patent, claim 1 | '872 Patent, claim 1 | '998 Patent, claim 1 |
|---|---|---|
| 1. A method of modulating and transmitting an optical signal over an optical fiber in response to N bits of digital data in parallel, the method comprising: … converting the N bits of digital data to M drive voltage values, where M>N and N>1; coupling the M drive voltage values to the unmodulated optical signal, said coupling enabling pulse modulation of the unmodulated optical signal, thereby generating a pulse modulated optical signal; | 1. A modulation system, the system comprising: … and a converter for: converting, based on a digital-to-digital mapping, the plurality N digital input data bits to M digital output data bits associated with M drive voltage values, and providing the M drive voltage values to the modulator for the modulating, … | 1. An optical modulation system, the system comprising: … wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values; wherein the input optical signal is modulated based on the plurality of voltage values; … |

**'535 POPR Statements by Ramot**

Accordingly, the invention of the '535 Patent achieved higher performance without the need for analog pre-distortion or signal conditioning circuits or DACs, instead directly driving the modulator with digital signal vectors and using the optical modulator itself to effect a faster digital-to-analog conversion. *See, e.g.,* EX1001, 15:16-18 ("The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as 'Direct Digital Driving'"). The claimed techniques also more efficiently correct for the known problem of non-linear response in optical modulators operated at high transmission speeds—by the novel digital-to-digital mapping of the challenged claims. *See, e.g., id.,* 7:33-66.

Ramot's '535 POPR at 34 (D.I. 88 (JCC), Ex. G)

| '535 Patent, claim 1 | '872 Patent, claim 1 | '998 Patent, claim 1 |
|---|---|---|
| 1. A method of modulating and transmitting an optical signal over an optical fiber in response to N bits of digital data in parallel, the method comprising:<br>… <br>converting the N bits of digital data to M drive voltage values, where M>N and N>1;<br>coupling the M drive voltage values to the unmodulated optical signal, said coupling enabling pulse modulation of the unmodulated optical signal, thereby generating a pulse modulated optical signal; | 1. A modulation system, the system comprising:<br>…<br>and<br>a converter for:<br>converting, based on a digital-to-digital mapping, the plurality N digital input data bits to M digital output data bits associated with M drive voltage values, and<br>providing the M drive voltage values to the modulator for the modulating, … | 1. An optical modulation system, the system comprising:<br>…<br>wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values;<br>wherein the input optical signal is modulated based on the plurality of voltage values;<br>… |

**'535 POPR Statements by Ramot**

Each of the challenged claims requires converting digital input values to a digital vector of output values. Element B. As discussed below, the '535 Patent specification makes clear that this converting occurs in the digital-to-digital domain, and results in the sets of input and selected output values being non-identical. This non-identical digital-to-digital converting enables the invented system to correct for non-linearies or other undesirable signal characteristics, and to do so without employing the complex, slow, and power-hungry DAC circuits of prior solutions. *See, e.g.*, EX1001, 4:62-5:3, 7:33-66, Figures 4, 2A & 2B.

Ramot's '535 POPR at 37-38 (D.I. 88 (JCC),Ex. G)

# IPR Theory On Asserted Patents Relied On Prior Art Direct Digital Driving (i.e., without a mediating DAC)



Ex.1005, Fig. 4 (annotated); Ex.1003, ¶ 155.

Cisco's '872 IPR Petition at 48
(D.I. 101 (Joint Appendix), Ex. 4);

Cisco's '998 IPR Petition at 41
(D.I. 101 (Joint Appendix), Ex. 5);

# Thank You

