EXHIBIT 1

| From: | Corey Johanningmeier |
|---|---|
| To: | Engelmann, Holly E.; BDIP_Ramot; amayo@ashbygeddes.com |
| Cc: | CiscoRamot; jying@morrisnichols.com |
| Subject: | RE: Cisco/Ramot (DDE) \| ROG correction |
| Date: | Tuesday, September 12, 2023 1:43:56 PM |

Holly, as I previously explained to you and to Matt, when I asked that we spread this discovery over a longer period of time, my team is in trial this month, there are other conflicts, and Cisco's productions and interrogatory responses are deficient. You represented that you were amenable to a reasonable extension into mid-November, subject to your client's input. Then you spoke to your client and now you are suggesting double-tracking depositions and running against the arbitrary deadline. I am disappointed that Cisco has chosen to repeat this tactic.

  I will look at these designations in view of Cisco's responses and confirm any that I can, but I am concerned with the unfairness and inefficiency of scheduling depositions under Cisco's incomplete discovery record. There are also severe practical difficulties that would be easily remediated with more time.

  Just to give an example relevant to your designation with respect to ████████, Cisco's Interrogatory Responses do not even identify the ████████████████████████████████. Cisco has not produced information in its possession about these DSP chips, and Cisco has not provided and information about the firmware configuration of these DSP chips in its modules, nor any indication that it intends to do so. In fact, I learned that you represented to ████████ that simply agreeing to reuse of materials from the EDTex litigation would be sufficient to satisfy Cisco's duplication of our subpoena. It is clearly not enough to meet our reasonable and longstanding discovery requests. We require full responses and production of material concerning these DSP chips from Cisco, in order to inform ██████ what else they need to provide, and this must occur before we take depositions. I note that our Motion to Compel in Texas in *July of 2020* sought "configuration files, or configuration software for the modules and/or their components," as did our Feb. 15, 2023 Requests for Production here.

  As I mentioned, I am compiling a list of such deficiencies. Also, you did not answer my last inquiry about use of Rule 30(b)(1) testimony from the prior case. I propose that you review the letter I will send you later today, and we set a time tomorrow or Thursday to have a phone conversation. Please let me know what times might work.

  -- Corey

---

**From:** Engelmann, Holly E. <HEngelmann@duanemorris.com>
**Sent:** Tuesday, September 12, 2023 10:16 AM
**To:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>; BDIP_Ramot <bdip_ramot@bdiplaw.com>; amayo@ashbygeddes.com
**Cc:** CiscoRamot <CiscoRamot@duanemorris.com>; jying@morrisnichols.com
**Subject:** RE: Cisco/Ramot (DDE) \| ROG correction

[EXTERNAL]

Hi Corey,

We offer ███████████ in his individual capacity and as Cisco and Acacia's designee for Cisco Topics 1-3 █████████ 4-5, 6 ████████████████████ 8, 40 and Acacia Topic 6 on September 21 with a 10:00 am CDT start time.

As with the others, please confirm as soon as possible so we can lock down the logistics.

Thanks,
Holly

**HOLLY ENGELMANN, P.C.** | Duane Morris LLP

---

**From:** Engelmann, Holly E.
**Sent:** Tuesday, September 12, 2023 9:55 AM
**To:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>; BDIP_Ramot <bdip_ramot@bdiplaw.com>; amayo@ashbygeddes.com
**Cc:** CiscoRamot <CiscoRamot@duanemorris.com>; jying@morrisnichols.com
**Subject:** RE: Cisco/Ramot (DDE) | ROG correction

Good morning Corey,

Ramot served six 30(b)(1) notices and a 30(b)(6). To that end, we offer the following witnesses who will be sitting once for both their individual and corporate depositions.

- 9/21 11:00 CDT start - ██████████ will be Cisco and Acacia's designee for Cisco Topics 22, 23, and 26 and Acacia Topic 24.
- 9/26 8:30 CDT start - ██████████ will be Acacia's designee for Acacia Topics 15, 18, 20.
- 9/28 8:30 CDT start – ██████████ will be Acacia's designee for Acacia Topics 1-5, 6 (related to ████████████████████), 7, 8-9, and 35.
- 10/4 12:00 CDT start – ███████████ will be Cisco and Acacia's designee for Cisco Topics 1-3, 7, 12, 14, and 19 and Acacia Topics 12 and 14.

I will follow-up this week with dates for ██████████████████. We will hold ████████████ until after the depositions to see if Ramot still needs a deposition. With these dates, we believe only a one-week extension until October 6 is warranted.

Please let us know if Ramot will be taking these deposition via remote means and confirm as soon as you can so that the witnesses can confirm their schedules.

Please also provide dates for Ramot's witnesses.

Thanks,
Holly

**HOLLY ENGELMANN, P.C.** | Duane Morris LLP

---

**From:** Engelmann, Holly E.
**Sent:** Monday, September 11, 2023 9:53 AM
**To:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>; BDIP_Ramot

<bdip_ramot@bdiplaw.com>; amayo@ashbygeddes.com
**Cc:** CiscoRamot <CiscoRamot@duanemorris.com>; jying@morrisnichols.com
**Subject:** Cisco/Ramot (DDE) | ROG correction

Good morning Corey,

I hope you had a restful weekend!

In preparing for the depositions Ramot noticed, it came to our attention that there is a typo in our response to ROG 10. Please note that Acacia-Ramot_00000105 should be Acacia-Ramot_00000102. We will serve amended responses, but didn't want to delay in getting you this information.

Thanks,
Holly

**HOLLY ENGELMANN, P.C.** | Duane Morris LLP
214.257.7226 (office) | 214.228.1870 (cell)
hengelmann@duanemorris.com | www.duanemorris.com

For more information about Duane Morris, please visit http://www.DuaneMorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

# EXHIBIT 2

| | |
|---|---|
| **From:** | Corey Johanningmeier |
| **To:** | Engelmann, Holly E.; Gaudet, Matthew C. |
| **Subject:** | RE: Cisco v Ramot (Delaware Cases) - Service of Rule 30(b)(1) Deposition Notices |
| **Date:** | Friday, September 1, 2023 4:36:51 PM |
| **Attachments:** | image001.png |

Yes, no new serving of discovery, just more time to complete the discovery already served, and to work out what either side thinks is missing from productions/responses already served.

-- Corey

**From:** Engelmann, Holly E. <HEngelmann@duanemorris.com>
**Sent:** Friday, September 1, 2023 1:21 PM
**To:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>; Gaudet, Matthew C. <MCGaudet@duanemorris.com>
**Subject:** RE: Cisco v Ramot (Delaware Cases) - Service of Rule 30(b)(1) Deposition Notices

[EXTERNAL]

Hi Corey,

I'm sorry, we should have made time for a call. Thank you for sending this and we tend to agree. Before taking to our client, can you confirm that the agreement is based on discovery already served and no new discovery can be served no matter how long we push the date out?

Holly

**Holly Engelmann, P.C.** | Duane Morris LLP

**From:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>
**Sent:** Friday, September 1, 2023 3:15 PM
**To:** Gaudet, Matthew C. <MCGaudet@duanemorris.com>; Engelmann, Holly E. <HEngelmann@duanemorris.com>
**Subject:** FW: Cisco v Ramot (Delaware Cases) - Service of Rule 30(b)(1) Deposition Notices

Matt and Holly,

I was going to raise this if we had a call this week but we didn't, so:

Before we spend too much more time trying to arrange witnesses during a difficult time of the year to do so, it seems to me we're in a unique situation, up against a deadline for the close of discovery which will be immediately followed by a stay of unknown duration. I understand the value of a deadline in making things happen, and would like to get this discovery finished this year. But the amount of stuff both parties need to get done before the 29th seems potentially unworkable, and certainly painful. I assume you all also have other commitments this month.

Can we just agree to a more reasonable time frame to get this discovery done? Please let me know your thoughts,

Regards, and have a good weekend!

-- Corey

---

**From:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>
**Sent:** Friday, September 1, 2023 12:15 PM
**To:** Engelmann, Holly E. <HEngelmann@duanemorris.com>; Gaudet, Matthew C. <MCGaudet@duanemorris.com>
**Cc:** BDIP_Ramot <bdip_ramot@bdiplaw.com>; Mayo, Andrew C. <AMayo@ashbygeddes.com>; Ying, Jennifer <jying@morrisnichols.com>; CiscoRamot <CiscoRamot@duanemorris.com>
**Subject:** RE: Cisco v Ramot (Delaware Cases) - Service of Rule 30(b)(1) Deposition Notices

I had asked to get on the phone to discuss this, and deposition scheduling generally, but we can also email:

With respect to 30(b)(6) testimony, I think that comes in as party admissions even if we don't stipulate. But we can come up with a stipulation as to how that is to be used, and whether and to what extent it can be objected to, with the goal of making our pre-trial period more efficient.

But it seems maybe you are thinking of non-party testimony. With respect to the inventors for instance, they were not parties or employees. I believe we agreed you needn't subpoena them, but we didn't designate their testimony. Both sides took quite a bit of 30(b)(1) testimony, including some from party designees on subjects outside of what they were designated for. Is that the testimony you are wanting to stipulate about?

Concerning ███████, he was included in your supplemental disclosures, and appears from public information to have potentially unique knowledge about the marketing and benefits of key coherent optics and platform products in this case. I am amenable to scheduling his deposition after Cisco's 30(b)(6) designees, if you wish to have someone else testify for Cisco about those products, but can't agree *before* those party depositions that his individual testimony would not be needed.

Best regards,

-- Corey

---

**From:** Engelmann, Holly E. <HEngelmann@duanemorris.com>
**Sent:** Friday, September 1, 2023 10:19 AM
**To:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>; Gaudet, Matthew C. <MCGaudet@duanemorris.com>
**Cc:** BDIP_Ramot <bdip_ramot@bdiplaw.com>; Mayo, Andrew C. <AMayo@ashbygeddes.com>; Ying, Jennifer <jying@morrisnichols.com>; CiscoRamot <CiscoRamot@duanemorris.com>
**Subject:** RE: Cisco v Ramot (Delaware Cases) - Service of Rule 30(b)(1) Deposition Notices

[EXTERNAL]

Hi Corey,

Following up on the email below. It would be helpful to know if we have an agreement as we are trying to find dates to propose for the depositions. Scheduling less than full days will be easier.

Thanks,
Holly

**HOLLY ENGELMANN, P.C.** | Duane Morris LLP

---

**From:** Engelmann, Holly E.
**Sent:** Tuesday, August 29, 2023 3:12 PM
**To:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>; Gaudet, Matthew C. <MCGaudet@duanemorris.com>
**Cc:** BDIP_Ramot <bdip_ramot@bdiplaw.com>; Mayo, Andrew C. <AMayo@ashbygeddes.com>; Ying, Jennifer <jying@morrisnichols.com>; CiscoRamot <CiscoRamot@duanemorris.com>
**Subject:** RE: Cisco v Ramot (Delaware Cases) - Service of Rule 30(b)(1) Deposition Notices

Hi Corey,

Emailing about the deposition notices served by the parties.

Would Ramot be willing to enter a stipulation that the party depositions taken in the EDTX case are deemed as if taken in the Delaware cases? This would down on the scope of what the parties are seeking through their respective notices. If Ramot will so stipulate, we will agree to take no more than half a day with each of the inventors. Please let us know if we have an agreement so that we can work on identifying for you topics/witnesses/dates.

Also, Ramot noticed ████████, presumably because he was identified in Cisco/Acacia's initial disclosures. As we have digested Ramot's 30(b)(6) notice and what ████████ would testify about generally, we want to inform you that we do not believe he has any unique, non-duplicative information than the other individuals Ramot has sent individual deposition notices for and/or the witnesses Cisco/Acacia will designated as corporate witnesses. We also confirm that we do not intend to call █ ████ at trial and if for some unforeseen reason he is, then we would make him available before trial. In an effort to streamline discovery and narrow where we can we disclose this to see if Ramot will withdraw ████████ deposition notice.

Thanks,
Holly

**HOLLY ENGELMANN, P.C.** | Duane Morris LLP

---

**From:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>
**Sent:** Thursday, August 24, 2023 9:47 PM
**To:** Engelmann, Holly E. <HEngelmann@duanemorris.com>; Gaudet, Matthew C. <MCGaudet@duanemorris.com>
**Cc:** BDIP_Ramot <bdip_ramot@bdiplaw.com>; Mayo, Andrew C. <AMayo@ashbygeddes.com>; Ying, Jennifer <jying@morrisnichols.com>; CiscoRamot <CiscoRamot@duanemorris.com>
**Subject:** Cisco v Ramot (Delaware Cases) - Service of Rule 30(b)(1) Deposition Notices

Counsel,

Attached for service please find Ramot's notices of Rule 30(b)(1) deposition of ███████████
███████████████████████████

At some convenient point in the near future, we should confer to discuss 1) how to efficiently use prior relevant testimony from the Texas matter to the extent issues or products overlap, and 2) organizing and scheduling of remaining discovery.  Please let me know times you might be available for a discussion.

Best regards,

-- Corey



**Corey Johanningmeier**
*Partner*
**Bunsow  De Mory LLP**
701 El Camino Real, Redwood City, CA 94063
1-650-351-7240
cjohanningmeier@bdiplaw.com  |  www.bdiplaw.com

For more information about Duane Morris, please visit http://www.DuaneMorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

EXHIBIT 3

| | |
|---|---|
| **From:** | Corey Johanningmeier |
| **To:** | Engelmann, Holly E. |
| **Cc:** | Powers, Joseph A.; jving@morrisnichols.com; Gaudet, Matthew C.; Saleem, Sajid; Grant, Jayla C.; Mayo, Andrew C.; Denise De Mory |
| **Subject:** | RE: Cisco/Ramot | schedule |
| **Date:** | Monday, March 11, 2024 4:37:03 PM |

To schedule the number of witnesses noticed or designated, in view of the fact that we, and doubtless you all, have other cases taking up schedule space, I think we need **_at least_** the month of April.

I think that whether we need more time depends somewhat on when and if you update your discovery.  It has been five months since we last exchanged letters, but let me attempt a summary of the things that I think are both key and outstanding – that is, stuff we either need to get before we can take a complete deposition of technical witnesses, or intend to move to compel on if we are not going to get it soon:



1.

2.

3.

By listing these issues, I am not representing that these are the only issues, but merely trying to move forward as efficiently as possible.  Please let me know when you expect to provide the information long requested.  I am happy to have a meet and confer call to discuss.

-- Corey

---

**From:** Engelmann, Holly E. <HEngelmann@duanemorris.com>
**Sent:** Friday, March 8, 2024 11:47 AM
**To:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>
**Cc:** Powers, Joseph A. <JAPowers@duanemorris.com>; jying@morrisnichols.com; Gaudet, Matthew C. <MCGaudet@duanemorris.com>; Saleem, Sajid <SSaleem@duanemorris.com>; Grant, Jayla C. <JCGrant@duanemorris.com>
**Subject:** Cisco/Ramot | schedule

[EXTERNAL]

Hi Corey,

I believe that during your call yesterday there was discussion about extending the discovery schedule. Do you have a proposed date that you'd like to move the March 29 deadline to?

HOLLY ENGELMANN, P.C. | Duane Morris LLP
214.257.7226 (office) | 214.228.1870 (cell)
hengelmann@duanemorris.com | www.duanemorris.com

For more information about Duane Morris, please visit http://www.DuaneMorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

EXHIBIT 4

<u>**EXHIBIT A — TO RAMOT AT TEL AVIV UNIVERSITY LTD.'S**</u>
<u>**FINAL INFRINGMENT CONTENTIONS:**</u>
<u>**ACCUSED PRODUCTS**</u>

Ramot is currently aware of the following Cisco products that Cisco and its subsidiary Acacia makes, uses, sells, offers to sell and/or imports that infringe the Asserted Claims of the Asserted Patents.  All accused products identified in this exhibit are collectively the "Accused Instrumentalities" or "Accused Products."  Accused Products identified as infringing claims of the '998 Patent or '872 Patent are shown in the respective claim charts at Exhibits B and C, and may also be collectively referred to as the "'998 Accused Products" or "'872 Accused Products." Ramot reserves the right to amend this list and add additional products upon further investigation or discovery.

Cisco's "**Acacia Accused Products**" include, but are not limited to:

- 100 Gbps pluggable CFP-DCO modules;

- 200 and 400 Gbps, and tunable bandwidth, pluggable CFP2-DCO modules;

- 1.2T (AC1200) and 400G (AC400) embedded modules;

- CIM8 pluggable modules;

- 400 Gbps OSFP and QSFP-DD pluggable modules;

- 800 Gbps OSFP and QSFP-DD ZR/OpenZR+ pluggable modules; and

- 100 Gbps ZR/OpenZR+ pluggable modules.

And other modules that include similar functionality, such as by including one of Acacia's DSP chips.  Cisco's Acacia Accused Products also include Acacia-developed CFP2-ACO modules to the extent they are used with an Acacia- or Cisco-developed DSP ASIC on a linecard.

Cisco's "**Acacia Accused Products**" are further detailed in the Product ID (PID) chart below.

Refers to material marked CONFIDENTIAL or RESTRICTED–AEO

Cisco's **Cisco Accused Products** include infringing transceiver modules and associated DSP functionality that support advanced mapping and modulation techniques, including without limitation Quadrature Modulation (*e.g.*, 16-QAM) and Pulse Amplitude Modulation (*e.g.*, PAM4), and include modules that operate at speeds at or above 50 Gbps per optical or electrical lane. The Cisco Accused Products include Acacia Accused Products sold by Cisco under Cisco Product IDs, and also include, but are not limited to:

50 Gbs SFP56 Pluggable modules

100 Gbps "single lambda" modules

100G or 400G "BiDi" modules

200 Gbps QSFP and QSFP-DD pluggable modules;

400 Gbps QSFP-DD pluggable modules;

800 Gbps QSFP-DD pluggable modules;

And other modules that include similar functionality, along with the associated digital signal processing functionality, whether implemented in the module itself or in an associated circuit or processor on the line card or fixed chassis. Cisco's Cisco Accused Products also include CFP2-ACO modules to the extent they are used with an Acacia- or Cisco-developed DSP ASIC on a linecard.

Cisco and Acacia are also accused of directly infringing via their reference and test designs, and indirectly infringing by inducing or contributing to their customer's designs—that implement one of Cisco's Acacia-developed Sky, Denali, Meru, Pico, Greylock, Jannu, or Delphi DSP ASICs coupled together with one of Cisco's Acacia-developed Silicon Photonic ICs.

Cisco's **Cisco Accused Products** also include certain line cards for its routers, switches, and optical transport systems—that contain an embedded transceiver, that contain embedded TX

DSP functionality that participates in infringement, or that necessarily require one or more accused transceiver modules, such as a CFP2 DCO, CIM8, or 400G-ZR pluggable transceiver used as a "trunk" port module, to operate in the applications for which they are intended and sold. This category, listed in the chart below under "Line Cards:" also includes certain modular port adapter cards that are sold in order to adapt and use accused pluggable modules with Cisco's router products.

Cisco's "**Cisco Accused Products**" are further detailed in the Product ID (PID) chart below.

Specific model names and numbers known (based on publicly available and discovered sources) to be used by Cisco and Acacia for these products are listed below, without limitation. Acacia and Cisco part numbers have been included for identification purposes. To the extent that the same product has been previously orderable from Cisco with a different product ID—or a product ID with additional characters such as = to denote spares—those products are also accused. To the extent that the same product is also sold as part of a "bundle" or with associated licenses to enable accused functionality—which each may have its own separate Cisco product ID—those bundle and license sales are also accused.

On information and belief, other model names and numbers that operate in the manner and according to the industry specifications described above exist and are used, offered, sampled, and sold. Such instrumentalities are included within the Accused Products. Cisco maintains a searchable "Transceiver Module Group (TMG) Compatibility Matrix" at https://tmgmatrix.cisco.com/, which contains additional information associating certain transceiver modules identified herein with compatible Cisco Routers, Switches, and Optical Transport systems that employ them.



Refers to material marked CONFIDENTIAL or RESTRICTED–AEO

## II.    PRODUCTS TIED TO SALES OF ACCUSED PRODUCTS

Cisco's product line also includes certain line cards for its routers, and switches—whether those cards are sold separately as part of a Modular system (*e.g.*, 9000 Series and 8800 Routers, Nexus 9800 Series switches), are integrated and sold together with other components of a Fixed Chassis system (*e.g.*, 8100, 8200, and 8700 Routers), or are themselves the substantially complete functional instrumentality of a complete system (*e.g.*, certain Nexus 3000 Series or Nexus 9300 Series GX and GX2 switches)—which are uniquely adapted to be used with, marketed and sold together or bundled with, and/or only functional for their designed and marketed purpose with inclusion of, accused transceiver modules.  For example, Cisco markets and sells series of 400G and 800G data center switches, models of which consist substantially or entirely of ports for pluggable, accused 400G and 800G optical transceiver modules.  See, e.g., https://www.cisco.com/site/us/en/products/networking/cloud-networking-switches/400g-switches/index.html.  For instance, at least the following 400G and 800G switch products are not operational as designed and marketed without at least one accused QSFP-DD 400G or 800G transceiver module:  Cisco Nexus 9800 line card N9K-X9836DM-A; Cisco Nexus 9300 400G switches (9364D-GX2A, 9348D-GX2A, 9332D-GX2B, N9K-C9332D-H2R); Cisco Nexus 9300 800G switches (N9364E-SG2-O, N9364E-SG2-Q); and Cisco Nexus 9400 400G switches (N3K-C3432D-S, N3K-C3408-S with NXM-X4D expansion module).

Cisco derives revenue from sales of these products that is bundled with, tied to, convoyed with, or otherwise dependent on the existence and sales of Cisco Accused Products.  In addition, Cisco sells licenses for these router line cards and switches (for example per 100G of bandwidth) that are directly tied to use of accused transceiver modules in their ports.

Refers to material marked CONFIDENTIAL or RESTRICTED–AEO

Revenue from all of these product sales is accused and relevant to determining the benefit, and reasonable royalty, that Cisco receives from its marketing and sales of Accused Products. A partial list of these tied products is given below:

- ASR 9000 Series Routers

    o ASR 9900 Series 5th Generation 10-Port 400 Gigabit Ethernet Line Card: (A99-4T-FC and A99-10X400GE-X-)

    o ASR 9900 Series 5th Generation 32-Port 100 Gigabit Ethernet Line Card: (A99-32HG-FC and A99-32X100GE-X-)

    o ASR 9000 Series 5th Generation High-Density Multi-Rate Line Cards: 2 Terabit and 0.8 Terabit Cards: (A9K-20HG-FLEX-FC, A9K-20HG-FLEX- and A9K-8HG-FLEX-FC, A9K-8HG-FLEX-)

    o ASR 9000 Series 5th Generation 400 Gigabit Ethernet Multi-Rate Line Card: (A9K-4HG-FLEX-FC, A9K-4HG-FLEX-, and A99-4HG-FLEX-FC, A99-4HG-FLEX-)

    o ASR 9000 Series 16-Port 100 Gigabit Ethernet Packet Transport Line Card: (A9K-16X100GE-FC and A9K-16X100GE-TR)

    o ASR 9900 Series 16-Port 100 Gigabit Ethernet Service Edge Line Card: (A99-16X100GE-X-FC and A99-16X100GE-X-SE)

    o ASR 9000 Series 32-Port 100 Gigabit Ethernet Line Card: (A99-32X100GE-FC and A99-32X100GE-TR)

    o ASR 9000 Series 12-Port 100-Gigabit Ethernet Line Cards: (A99-12X100GE-FC and A99-12X100GE)

    o ASR 9900 Series 8-Port 100 Gigabit Ethernet Line Cards with 7-Fabric Support: (A99-8X100GE-FC and A99-8X100GE-)

    o ASR 9000 Series 8-Port 100-Gigabit Ethernet LAN Line Card: (A9K-8X100GE-FC and A9K-8X100GE-)

    o ASR 9000 Series 4-Port 100-Gigabit Ethernet LAN Line Card: (A9K-400GE-LAN-FC and A9K-4X100GE)

- Cisco 8000 Series Routers

    o 8700 Series Fixed Chassis Routers: (8711-32FH-M)

- o 8100 Series Fixed Chassis Routers: (8101-32H, 8102-64H, 8101-32FH, 8111-32EH, 8122-64EH, 8101-32H-O, 8102-64H-O, 8101-32FH-O, 8111-32EH-O, 8122-64EH-O)

- o 8200 Series Fixed Chassis Routers: (8201-SYS, 8202-SYS, 8201-24H8FH, 8201-32FH, 8202-32FH-M, 8201-32FH-O)

- o 8800 48x100GbE QSFP28 Line Card: (8800-LC-48H)

- o 8800 34x100GbE QSFP28 and 14x400GbE QSFP56-DD Line Card: (88-LC0-34H14FH)

- o 8800 36x400GbE QSFP56-DD Line Card: (8800-LC-36FH and 88-LC0-36FH)

- o 8800 36x400GbE QSFP56-DD Line Card with MACsec (88-LC0-36FH-M)

- o 8800 36x800GbE QSFP-DD800 Line Card: (88-LC1-36EH)

- NCS 5700 Series Line Cards and Fixed Chassis Routers

  - o NCS 5700 Series 400GE and 100GE Line Cards: (NC-57-24DD or NC57-24X400G-BA; NC-57-18DD-SE or NC57-18D12TH-SB; NC-57-36H-SE or NC57-36H-SB; NC-57-36H6D-S or NC57-36H6D-BM)

  - o NCS 5700 Series Line Cards with 400GE Ports: (NC-57-48Q2D-S, NC-57-48Q2D-SE-S, NC57-48Q2D-SM, and NC57-48Q2D-BM)

  - o NCS-57B1 Fixed Chassis: (NCS-57B1-6D24-SYS and NCS-57B1-5DSE-SYS)

  - o NCS-57C1 Fixed Chassis: (NCS-57C1-48Q6-SYS)

  - o NCS-57C3 Fixed Chassis: (NCS-57C3-MOD-SYS and NCS-57C3-MODS-SYS)

  - o NCS-57D2-18DD Fixed Chassis: (NCS-57D2-18DD-S and NCS-57D2-18DD-SYS)

- NCS 5500 Series Modular Chassis, including NCS 5508 and NCS 5516

  - o 24 Ports 100GE and 12 Ports 40GE Base Line Card: (NC55-24H12F-SE or NC55-24H12F-SB, NC55-24H12F-BA)

  - o 24X100G High Scale Modular Line Card: (NC55-24X100G-SE or NC55-24X100G-SB)

  - o 18-Port 100GE and 18-Port 40GE Base Line Card: (NC55-18H18F or NC55-18H18F-BA)

  - o 36X100G Base Modular Line Cards (NC55-36X100G or NC55-36X100G-BA)

- o 36X100G MACsec Modular Line Cards: (NC55-36X100G-S or NC55-36X100G-BM)

- o 36X100G High Scale Modular Line Cards (NC55-36X100G-A-SE)

- NCS 5500 Series Fixed Chassis Routers

  - o NCS 5501 System: (NCS-5501 and NCS-5501-SE)

  - o NCS 5502 System: (NCS-5502 and NCS-5502-SE)

  - o NCS 55A1 System: (NCS-55A1-36H-SE-S and NCS-55A1-36H-SE-S)

  - o NCS 5500 Dense 25G Fixed Chassis: (NCS-55A1-48Q6H)

  - o NCS-55A1-24Q6H Fixed Chassis: (NCS-55A1-24Q6H-S and NCS-55A1-24Q6H-SS)

- NCS 500 Series Routers, including NCS 560

  - o NCS 560 Series Router Interface Modules with 100/200G: (N560-IMA-2C, N560-IMA-1W, N560-IMA-2C-DD)

  - o NCS 540 Large Density Router: (N540-24Q8L2DD-SYS)

- Catalyst 9600 Series Switches with 400G and 100G Ethernet Line Cards

  - o Catalyst 9600 Series Combo Line Cards: (C9600-LC-40YL4CD and C9600X-LC-32CD)

- Catalyst 9500X and 9500 Series Switches with 100G and 400G Ethernet ports

  - o C9500X-28C8D

  - o C9500-32C, C9500-32QC, C9500-48Y4C, C9500-24Y4C

- Nexus 9800 Series Switches with 400G Ethernet Line Cards

  - o Nexus 9800 36-port 400G line card with MACsec: (N9K-X9836DM-A)

  - o Nexus 9800 14-port 400G and 34 port 100G line card: (N9K-X98900CD-A)

- Nexus 9500 Series Switches with 400G and 100G Ethernet Line Cards

  - o 400-Gigabit Ethernet Line Card: (N9K-X9716D-GX and N9K-X9624D-R2)

  - o 100-Gbps Line Cards: (N9K-X9736C-FX, N9K-X9736C-EX, N9K-X9732C-FX, N9K-X9732C-EX, N9K-X9636C-RX, N9K-X9636C-R, and N9K-X9432C-S)

- Nexus 9400 Series Switches with 400G and 200G Ethernet Line Cards

- o Nexus 9400 8p 400G QSFP-DD LEM: (N9K-X9400-8D)

- o Nexus 9400 16p 200G LEM: (N9K-X9400-16W)

- Nexus 9300 Series Switches with 800/400/200/100G Interfaces

  - o Nexus 9300 Series 800G Switches: (N9364E-SG2-O, N9364E-SG2-O=, N9364E-SG2-Q, N9364E-SG2-Q=)

  - o Nexus 9300-GX Series 400G Switches: (N9K-C9316D-GX, N9K-C93600CD-GX, and N9K-C9364C-GX, N9K-C9332D-H2R)

  - o Nexus 9300-GX2 Series 400G Switches: (N9K-C9364D-GX2A, N9K-C9348D-GX2A, and N9K-C9332D-GX2B)

  - o Nexus 9300-FX Series Switches: (N9K-C93180YC-FX, N9K-C93108TC-FX, and N9K-C9348GC-FXP)

  - o Nexus 9300-FX2 Series Switches: (N9K-C9336C-FX2, N9K-C9336C-FX2-E, N9K-C93240YC-FX2, N9K-C93360YC-FX2, and N9K-C93216TC-FX2)

  - o Nexus 9300-FX3 Series Switches: (N9K-C93180YC-FX3)

  - o Nexus 9300-FX3S Series Switch: (N9K-C93180YC-FX3S)

  - o Nexus 93108TC-FX3P Switch: (N9K-C93108TC-FX3P)

  - o Nexus 9332C and 9364C Fixed Spine Switches: (N9K-C9364C and N9K-C9332C)

  - o Nexus 9300-EX Series Switches: (N9K-C93180YC-EX, N9K-C93108TC-EX, and N9K-C93180LC-EX)

  - o Nexus 9300-EX and FX 24 Port Series Switches: (N9K-C93180YC-FX-24, N9K-C93108TC-FX-24, N9K-C93180YC-EX-24, and N9K-C93108TC-EX-24)

- Nexus 9200 Series Platform Switches with QSFP28 ports for 100G Ethernet Modules

  - o N9K-92348GC-X

  - o N9K-92160YC-X

  - o N9K-92300YC

  - o N9K-92304QC

  - o N9K-9236C

- Nexus 7000 Series Switches with 100G Ethernet Line Cards

-13-

- o Nexus 7700 F4-Series 30-Port 100-Gigabit Ethernet Module: (N77-F430CQ-36)

- o Nexus 7700 F3-Series 12-Port 100 Gigabit Ethernet Module: (N77-F312CK-26)

- o Nexus 7700 M3-Series 100 Gigabit Ethernet Module: (N77-M312CQ-26L)

- o Nexus 7000 F3-Series 6-Port 100 Gigabit Ethernet Module: (N7K-F306CK-25)

- Nexus 3000 Series Switches with QSFP-DD ports for 400G Ethernet modules and QSFP28 ports for 100G Ethernet modules

  - o Nexus 3432D-S 400G Switch: (N3K-C3432D-S)

  - o Nexus 3408-S 400G Switch (N3K-C3408-S) with: Nexus 100G Line Expansion Module (NXM-X16C) or Nexus 400G Line Expansion Module (NXM-X4D)

  - o Nexus 3600 Series Switches: (N3K-C3636C-R, N3K-C36180YC-R)

  - o Nexus 3400 Series Switches: (N3K-C34180YC, N3K-C3464C)

  - o Nexus 3200 Series Switches: (N3K-C3264C-E, N3K-C3232C)

  - o Nexus 3100-Z Series Switches: (N3K-C3132C-Z)

  - o Nexus 3100-V Series Switches: (N3K-C31108PC-V, N3K-C31108TC-V, and N3K-C31108TCV-32T)

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BIODELIVERY SCIENCES )
INTERNATIONAL, INC. and ARIUS )
TWO, INC., )
            )
            Plaintiffs, )
            )
            v. )       Civil Action No. 19-444-CFC-CJB
            )
CHEMO RESEARCH, S.L., INSUD )
PHARMA S.L.U., INTELGENX CORP. )
and INTELGENX TECHNOLOGIES )
CORP., )
            )
            Defendants. )

## MEMORANDUM ORDER

At Wilmington, Delaware this **20th day of February, 2020**.

**WHEREAS**, Defendants Chemo Research, S.L., Insud Pharma S.L.U., IntelGenX Corp. and IntelGenX Technologies Corp. ("Defendants") have filed a Motion for Leave to Amend Invalidity Contentions ("Motion"), (D.I. 121), and Plaintiffs BioDelivery Sciences International, Inc. and Arius Two, Inc. ("Plaintiffs") oppose the Motion, (D.I. 125), and the Court has considered the parties' briefs, (D.I. 121; D.I. 134; D.I. 138), and heard argument on February 10, 2020 (D.I. 174, hereinafter "Tr."):[1]

**NOW, THEREFORE, IT IS HEREBY ORDERED** as follows:

1.      With their Motion, Defendants seek to amend their invalidity contentions, in order to add certain defenses pursuant to 35 U.S.C. § 112. (Tr. at 13) Here, in the governing Scheduling Order, the District Court required that if a party seeks to amend its initial

---

[1]      This case is referred to the Court to resolve all disputes relating to discovery and the protective order. (D.I. 57)

infringement or invalidity contentions, it must first make a showing of good cause. (D.I. 39 at ¶ 7); *see also* Fed. R. Civ. P. 16(b)(4). Both parties agree (and the Court agrees) that a movant seeking to show that good cause has been established in this situation would, at a minimum, need to demonstrate that it has acted diligently in moving to amend. (D.I. 121 at 4 (citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1363-68 (Fed. Cir. 2006); *Bayer Cropscience AG v. Dow AgroSciences LLC*, Civil Action No. 10-1045-RMB-JS, 2012 WL 12904381, at *1 (D. Del. Feb. 27, 2017); D.I. 134 at 5 (citing *O2 Micro*); *see also* D.I. 39 at ¶ 7 (noting, in setting out exemplary showings of good cause, that diligence on the part of the moving party is required))

       2.      Defendants argue that the impetus for amendment was the District Court's construction of certain claim terms (the "layer terms"); the District Court first informed the parties of its constructions for these claim terms during the December 20, 2019 *Markman* hearing (wherein the District Court adopted Plaintiffs' proposed constructions for the terms). (D.I. 121 at 1; *see also id.*, ex. A at 40) The Court agrees with Plaintiffs (and with the many courts who have concluded the same) that in general, when a party seeks to amend contentions in light of on a district court's claim construction order, "the moving party's diligence, without which there is no good cause, [should be] measured from the day the moving party received the proposed [claim] constructions, not the date of issuance of the Court's claim construction opinion." *Word to Info Inc. v. Facebook Inc.*, Case No. 15-cv-03485-WHO, 2016 WL 6276956, at *4 (N.D. Cal. Oct. 27, 2016) (internal quotation marks and citations omitted) (citing cases), *aff'd*, 700 F. App'x 1007 (Fed. Cir. 2017); *Takeda Pharm. Co. Ltd. v. Sun Pharma Global FZE*, Civil Action No. 14-4616 (MLC), 2016 WL 9229318, at *4-5 (D.N.J. May 16, 2016). This general rule makes good sense, as: (1) if a movant seeks amendment in light of a court's

2

adoption of a construction that was previously proposed many months earlier; and (2) the movant was nevertheless always found to have acted diligently; then (3) this "would mean that [the moving] party could wait until after the construction to take action, even though [in many cases] they were fully equipped to act sooner." *Takeda*, 2016 WL 9229318, at *5 (citation omitted). Such an outcome would promote and reward delay and inefficiency, not diligence.

3.      Of course, there are scenarios where, even after a *Markman* order issues, a movant's attempt to amend contentions might still be found to be diligent. One such scenario could be if the district court adopted a construction that had not been proposed by any party— and that new construction was the basis for the subsequent motion to amend. *See Word to Info*, 2016 WL 6276956, at *4-5. Another could arise if a party had earlier put forward a claim construction for a term, but was deliberately vague about the construction's true meaning or scope (e.g., where the party only made clear the true proposed meaning or scope of the construction during the *Markman* hearing itself).[2] This latter scenario is what Defendants argue occurred here. Defendants assert that even though Plaintiffs put forward their construction for the layer terms (and provided some explanation in support thereof) on September 13, 2019[3] in Plaintiffs' opening claim construction brief, (D.I. 54), it was not truly until the December 20, 2019 *Markman* hearing "that the full scope and consequences of [Plaintiffs'] arguments [about the layer terms] became apparent." (D.I. 138 at 2; *see also* Tr. at 7-8)

---

[2]      There could, of course, be other such similar scenarios.

[3]      For their part, Plaintiffs note that they served a draft chart with proposed constructions for the layer terms even earlier—on August 27, 2019; they suggest that this is the actual date from which diligence should be measured. (D.I. 134 at 3, 7 & ex. G) The Court, however, will focus herein on the September 13, 2019 date. The Court need not decide whether the August 27, 2019 date is the right "starting point" here, in light of its decision below.

4.      The Court is not persuaded by this argument.  Prior to claim construction briefing, the parties had proposed constructions for the layer terms, which are found in certain of the patents-in-suit.  With their proposed constructions, Defendants asserted that the layer at issue was a "solid" layer; Plaintiffs put forward constructions for the terms that did not include the word "solid."  (D.I. 134, ex. G)  Then, in their September 13, 2019 opening claim construction brief, Plaintiffs articulated several supporting rationales for why they took their view. Importantly, they explained there that adding "solid" to the claim term failed to fully capture the covered product described in the specification, which begins "in solid form" but "ultimately erodes or dissolves over time[.]"  (D.I. 84 at 10; *see also id.* at 10-11 ("While the mucoadhesive layer is *in solid form*, as opposed to a liquid or a gas, *at stages during the administration to a patient*, there is no reason why this particular feature needs to be added to the claim.") (emphasis added); Tr. at 30-31, 41-42)  Plaintiffs reiterated this same view in their reply claim construction brief, served on October 29, 2019.  (D.I. 66)  There, they again argued—repeatedly—that even though the layer "is not an aqueous solution[,] [it] does not mean that the word 'solid' needs to be read into the claim, *particularly where the layer erodes over time* and the inventors chose to use the word 'bioerodable' to define the layer, as opposed to 'solid.'"  (D.I. 84 at 66 (certain internal quotation marks and citation omitted) (emphasis added); *see also id.* at 20, 27)  And then, during the December 2019 *Markman* hearing, Plaintiffs' counsel again made the same point in support of Plaintiffs' proposed constructions, explaining that "[t]he written description does not refer to a solid bioeradable mucosal layer pretty much because it dissolves. . . [i]t goes away . . . . [i]t's not there after 20 to 30 minutes[.]"  (D.I. 121, ex. A at 23; *see also id.* at 38 (Plaintiff's counsel referring to the layer during the *Markman* hearing as a "bioerodable 50-micron layer that goes away"); Tr. at 43)  In sum, so far as the Court can tell, Plaintiffs' position

4

Plaintiffs' position as to the "right" constructions for these terms and their rationale behind these constructions have been evident since September 13, 2019, when Plaintiffs served their opening claim construction brief on Defendants. And Defendants have not otherwise sufficiently explained why this is not so.

5.      Having therefore established that Defendants were on notice of the need to move to amend at least as early as September 13, 2019, the Court notes that Defendants did not file this Motion until January 6, 2020. (D.I. 121) Absent the existence of other mitigating circumstances, which are not present here,[4] this nearly four-month delay demonstrates a lack of diligence on Defendants' part. *See Word to Info*, 2016 WL 6276956, at *6 (finding that a four-to-five-month delay prior to the proposed amendment demonstrated a lack of diligence); *O2 Micro*, 467 F.3d at 1367-68 (affirming a district court ruling concluding that a three-month delay in serving proposed amended contentions amounted to a lack of diligence); *Par Pharm., Inc. v. Takeda Pharm. Co., Ltd.*, Case No. 5:13-cv-01927-LHK-PSG, Case No. 5:13-cv-02416-LHK-PSG, Case No. 5:13-cv-02420-LHK-PSG, 2014 WL 3704819, at *2 (N.D. Cal. July 23, 2014) (finding that a four-month delay showed a lack of diligence); *Acer, Inc. v. Tech. Props. Ltd.*,

---

[4]      Defendants cite to opinions in a few other cases where a delay of four months (or longer) did not preclude a finding of diligence. (D.I. 121 at 8) However, diligence is a "fact sensitive" inquiry, *see Bayer Cropscience AG*, 2012 WL 12904381, at *1 n.1, and the cases that Defendants cite usually presented some other, mitigating circumstances not present in this case. *See, e.g., Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, Case No. 14-cv-00876-RS (JSC), 2016 WL 2855260, at *6 (N.D. Cal. May 13, 2016) (finding that although the movant filed its motion to amend 15 months after initially discovering the prior art references at issue, it had established diligence, but only because the motion was pending for one of those months, the case was stayed for nine of those months, and the movant had notified the opposing party of its intent to amend the contentions immediately when the stay was lifted); *Vasudevan Software, Inc. v. Int'l Bus. Machs. Corp.*, No. C09-05897 RS (HRL), 2011 WL 940263, at *2 (N.D. Cal. Feb. 18, 2011) (concluding that a delay of four months between the amending party's earliest notice of the potential need to amend and the amendment of its contentions was not preclusive, where the party worked diligently throughout that four-month period to confirm its understanding of the technology and its need to amend).

Nos. 5:08-cv-00877 JF/HRL, 5:08-cv-00882 JF/HRL, 5:08-cv-05398 JF/HRL, 2010 WL

3618687, at *4-5 (N.D. Cal. Sept. 10, 2010) (concluding that a party was not diligent in waiting

three months after a stay was lifted to begin investigation and another three weeks to file

amended infringement contentions); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK,

2012 WL 1067548, at *2 (N.D. Cal. Mar. 27, 2012) (finding that a delay of two and one-half

months demonstrated a lack of diligence). Accordingly, Defendants' Motion is DENIED.

      6.     Because this Memorandum Order may contain confidential information, it has

been released under seal, pending review by the parties to allow them to submit a single, jointly

proposed, redacted version (if necessary) of the document. Any such redacted version shall be

submitted by no later than **February 25, 2020**, for review by the Court, along with a motion for

redaction that includes a clear, factually detailed explanation as to why disclosure of any

proposed redacted material would "work a clearly defined and serious injury to the party seeking

closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation

marks and citation omitted). The Court will subsequently issue a publicly-available version of

its Memorandum Order.

_____

Christopher J. Burke

UNITED STATES MAGISTRATE JUDGE

EXHIBIT 6

| | |
|---|---|
| **From:** | Engelmann, Holly E. |
| **To:** | Corey Johanningmeier; BDIP_Ramot; Mayo, Andrew C. |
| **Cc:** | Ying, Jennifer; Gaudet, Matthew C.; Powers, Joseph A.; Saleem, Sajid; Mitchell, Daniel |
| **Subject:** | RE: Ramot v Cisco/Acacia | Depositions |
| **Date:** | Tuesday, November 26, 2024 3:01:10 PM |

Hi Corey,

We have not received any confirmations of Cisco witness deposition dates from you since our call last week, nor have we received any proposed dates for Ramot witnesses from you. We understand Ramot's position that your firm's caseload will make it difficult to complete discovery by the deadline, but the deadline has been set for a long time, after being re-set multiple times. At this point, we do not see how a further extension of the discovery period is feasible, unless the trial date is moved. Please recall that we noted that Cisco's holiday shutdown prevents us from offering deposition dates during the last two weeks of December.

If Ramot would like to file a motion to extend the case schedule and postpone the trial date, we would likely not oppose such a motion (subject to accommodating any conflicts that our team or witnesses would have). But regardless, we have made our witnesses available during the fact discovery period and if Ramot elects to forego the opportunity to take these Cisco depositions (leaving aside the consequences for Ramot's failure to make its witnesses available during the fact discovery period), we will not be offering them for later dates under the present schedule.

For ease, the dates we have offered are listed below – note that since we offered a date for ██████ ██████ has since needed to move his availability to December 13. Please also recall that ████ is presenting a witness on December 5.

- ███████████████████████████████████████████████████████
- █████████████████████████████████████████████████
- ██████████████████████████████
- ███████████████████████████████████
- ██████████████████████████████████████████
- ███████████████████████████████████████

**HOLLY ENGELMANN, P.C.** | Duane Morris LLP

---

**From:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>
**Sent:** Wednesday, November 20, 2024 12:17 PM
**To:** Engelmann, Holly E. <HEngelmann@duanemorris.com>; BDIP_Ramot <bdip_ramot@bdiplaw.com>; Mayo, Andrew C. <AMayo@ashbygeddes.com>
**Cc:** Ying, Jennifer <jying@morrisnichols.com>; Gaudet, Matthew C. <MCGaudet@duanemorris.com>; Powers, Joseph A. <JAPowers@duanemorris.com>; Saleem, Sajid <SSaleem@duanemorris.com>; Mitchell, Daniel <DMitchell@duanemorris.com>

**Subject:** RE: Ramot v Cisco/Acacia | Depositions

_____

A couple quick points to save time on the call.  We are going to need designations corresponding to the topics in our August 15, 2023 Rule 30(b)(6) deposition notices to Cisco and Acacia.  Also, in August of 2023 we served 30(b)(1) notices on ██████████ who I understand has subsequently left Cisco for █████, and on ████████████ who is still at Cisco but you have left off the list below.

**From:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>
**Sent:** Wednesday, November 20, 2024 9:57 AM
**To:** Engelmann, Holly E. <HEngelmann@duanemorris.com>; BDIP_Ramot <bdip_ramot@bdiplaw.com>; Mayo, Andrew C. <AMayo@ashbygeddes.com>
**Cc:** Ying, Jennifer <jying@morrisnichols.com>; Gaudet, Matthew C. <MCGaudet@duanemorris.com>; Powers, Joseph A. <JAPowers@duanemorris.com>; Saleem, Sajid <SSaleem@duanemorris.com>; Mitchell, Daniel <DMitchell@duanemorris.com>
**Subject:** RE: Ramot v Cisco/Acacia | Depositions

Holly, let's discuss on the phone today, 6pm eastern / 3pm pacific works for me, can you send a dial-in?  Thanks.

**From:** Engelmann, Holly E. <HEngelmann@duanemorris.com>
**Sent:** Wednesday, November 20, 2024 9:53 AM
**To:** Corey Johanningmeier <cjohanningmeier@bdiplaw.com>; BDIP_Ramot <bdip_ramot@bdiplaw.com>; Mayo, Andrew C. <AMayo@ashbygeddes.com>
**Cc:** Ying, Jennifer <jying@morrisnichols.com>; Gaudet, Matthew C. <MCGaudet@duanemorris.com>; Powers, Joseph A. <JAPowers@duanemorris.com>; Saleem, Sajid <SSaleem@duanemorris.com>; Mitchell, Daniel <DMitchell@duanemorris.com>
**Subject:** Ramot v Cisco/Acacia | Depositions

[EXTERNAL]

Hi Corey,

We have offered several of the following dates and need to confirm them as soon as possible because people are holding their calendars for your team to conduct depositions. Since you said December 10 does not work, we offer ████████████ on December 11. We added a date for ████ ██████████████. This should be the entirety of the Cisco deposition witness lineup.

- ████████████████████████████████████████████████████
- ██████████████████████████████████████████
- ██████████████████████████████████████

- ████████████████████████
- █████████████████████████
- ████████████████████████████

Thanks,
Holly

**Holly Engelmann, P.C.** | Duane Morris LLP
214.257.7226 (office) | 214.228.1870 (cell)
hengelmann@duanemorris.com | www.duanemorris.com

For more information about Duane Morris, please visit http://www.DuaneMorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ENZO LIFE SCIENCES, INC.         )
                                )
          Plaintiff,             )
                                )
v.                              )   C. A. No. 12-106-LPS
                                )
ROCHE MOLECULAR SYSTEMS, INC.,    )   JURY TRIAL DEMANDED
ROCHE DIAGNOSTICS CORPORATION,    )
ROCHE DIAGNOSTICS OPERATIONS, INC.   )
and ROCHE NIMBLEGEN, INC.          )
                                )
          Defendants.         )

## [PROPOSED] ORDER

WHEREAS, Defendants Roche Molecular Systems, Inc., Roche Diagnostics Corporation, Roche Diagnostics Operations, Inc. and Roche Nimblegen, Inc. (collectively, "Roche") moved to strike the newly accused products of Roche set forth in Enzo Life Sciences, Inc.'s Supplemental Infringement Charts dated September 30, 2014 (the "Motion");

WHEREAS, the Court considered the Motion and opposition thereto;

IT IS HEREBY ORDERED this ____ day of ____January____, 2015, for the reasons set forth by the Court during the December 18 conference, that Roche's Motion to Strike Enzo's Newly Accused Products (D.I. 168) is GRANTED in full as follows: The newly accused products of Roche, as listed in Exhibit 1 to this order, are stricken from Enzo Life Sciences, Inc.'s Supplemental Infringement Charts dated September 30, 2014.

_____
The Honorable Leonard P. Stark
Chief, United States District Judge

# EXHIBIT 1

**Stricken Roche Products[1]**

1.  COBAS® TaqMan® MTB Test
2.  cobas® HPV Test
3.  cobas® KRAS® Mutation Test
4.  cobas® TaqScreen DPX Test
5.  cobas® 4800 MRSA/SA Test
6.  cobas® C. diff Test
7.  cobas® HSV Test
8.  cobas® EGFR Test
9.  cobas® HEV Test
10. cobas® CMV Test
11. cobas® HSV 1 and 2 Test
12. Affymetrix GeneChip technology-based products other than AmpliChip CYP450 Tests:

- CF
- HLA
- HPV
- Leukemia
- PS3
- Osteo
- CVD Risk
- Rheumatoid Arthritis Monitoring and Therapy Monitoring
- Asthma Therapy Prediction
- Hypertension Therapy Prediction
- Stroke Predisposition
- HIV Genotyping

---

[1] The products identified in Enzo's September 2013 infringement contentions are not subject to the Court's ruling on Roche's motion.

# EXHIBIT 8

                                                                                      1

 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3   NOKIA CORPORATION, NOKIA, INC.,     :    CIVIL ACTION
     INTELLISYNC CORPORATION, and        :
 4   NAVTEQ NORTH AMERICA, LLC,          :
                                         :
 5              Plaintiffs,              :
     v                                   :
 6                                       :
     HTC CORPORATION, HTC AMERICA, INC., :
 7   and EXEDEA INC.,                    :
                                         :
 8              Defendants.              :    NO. 12-550-LPS
     ------------------------------------
 9   NOKIA CORPORATION and NOKIA, INC.,  :    CIVIL ACTION
                                         :
10              Plaintiffs,              :
     v                                   :
11                                       :
     HTC CORPORATION, HTC AMERICA, INC., :
12   and EXEDEA INC.,                    :
                                         :
13              Defendants.              :    NO. 12-551-LPS
                                   - - -

14
                            Wilmington, Delaware
15                       Tuesday, December 17, 2013
                            *Telephone Conference*
16
                                   - - -
17
     BEFORE:      HONORABLE **LEONARD P. STARK**, U.S.D.C.J.
18
                                   - - -
19
     APPEARANCES:
20
                  FARNAN, LLP
21                BY:  BRIAN E. FARNAN, ESQ.

22                     and

23

24
                                   Brian P. Gaffigan
25                                 Official Court Reporter

Case 1:22-cv-00674-GBW    Document 158-1    Filed 12/17/24    Page 45 of 103 PageID #:
3506
Case 1:12-cv-00550-LPS   Document 162   Filed 01/02/14  Page 2 of 42 PageID #: 3846

2

```
 1   APPEARANCES: (Continued)

 2
                DESMARAIS, LLP
 3              BY:   ALAN S. KELLMAN, ESQ., and
                      JASON BERREBI, ESQ.
 4                    (New York, New York)

 5                         Counsel on behalf of plaintiffs

 6
                POTTER, ANDERSON & CORROON, LLP
 7              BY:   DAVID E. MOORE, ESQ.

 8                    and

 9              McDERMOTT WILL & EMERY, LLP
                BY:   D. STUART BARTOW, ESQ.,
10                    MASHHOOD RASSAM, ESQ., and
                      PHILIP OU, ESQ.
11                    (Menlo Park, California)

12                         Counsel for HTC Corporation
                           and HTC America, Inc.
13

14

15

16

17                         - oOo -

18                   P R O C E E D I N G S

19              (REPORTER'S NOTE:  The following telephone

20   conference was held in chambers, beginning at 11:31 a.m.)

21              THE COURT:  Good morning, everybody.  This is

22   Judge Stark.  Who is there, please?

23              MR. FARNAN:  Good morning, Your Honor.  It's

24   Brian Farnan for the plaintiffs and with me is Alan Kellman

25   and Jason Berrebi from Desmarais, LLP in New York City.
```

3

```
 1              THE COURT:  Okay.  Somebody is moving around
 2   making an awful lot of noise.  I will ask you to stop.
 3              Thank you, Mr. Farnan.  Who is there for
 4   defendants, please?
 5              MR. MOORE:  For HTC, Your Honor, David Moore at
 6   Potter Anderson.  With me on the line from McDermott Will &
 7   Emery are Stuart Bartow, Mashhood Rassam and Philip Ou.
 8              THE COURT:  Okay.  Thank you.  Is that it today?
 9              MR. FARNAN:  Yes, Your Honor.
10              THE COURT:  Okay.
11              MR. MOORE:  Yes, it is.
12              THE COURT:  Thank you.  I have my court reporter
13   here, of course; and for the record, it is our case of Nokia
14   corporation, et al. versus HTC Corporation, et al., two
15   civil actions, Civil Action 12-550-LPS as well as
16   12-551-LPS.  Today is our time to talk about discovery
17   disputes, primarily raised by the defendants, also some
18   raised by the plaintiff.
19              I want to start with the issues raised by the
20   defendants HTC and go through them, hearing from both sides,
21   issue by issue in the order that the issues are raised in
22   the defendants' letter, so that means we'll hear first from
23   HTC on the request to strike the new dependent claims and
24   new accused products.  So, HTC, you may go ahead.
25              MR. RASSAM:  Good morning, Your Honor.  This is
```

1  Mashhood Rassam.

2          HTC is asking that Nokia's amended infringement

3  contentions which were served right after the claim

4  construction hearing be struck to the extent they add new

5  claims and new products.  And I just want to start by giving

6  the Court a little bit of context here.

7          Claim construction processes in this case, Your

8  Honor, started in July.  It lasted over four months and

9  culminated in a six hour hearing before you on November 21st.

10         On November 25th, two business days later, we get

11 Nokia's amended infringement contentions, and these contentions

12 add new claims and new products.  In particular, the new

13 claims impact the claim construction process because they

14 recite new terms which we're assessing but which may need to

15 be construed.  They also impact the 101 hearing before the

16 Court because two of the claims, two of the new claims are

17 dependent claims that depend from the independent claims

18 which HTC argued weren't valid for lack of subject matter,

19 because they weren't patentable subject matter.

20         We know that Nokia was working on these amended

21 contentions, Your Honor, long before the hearing.  Exhibit D

22 to our letter brief shows that Nokia was assessing, was

23 working on new contentions at least since November 12th, yet

24 at no time during the hearing, Your Honor, did Nokia tell us

25 that it was preparing to amend the contentions in a way that

5

1   would impact claim construction and our 101 argument.

2   Instead, they strategically amended two days later.

3                Your Honor, we think these contentions should

4   be struck for two reasons:

5                First, they demonstrate a lack diligence on

6   Nokia's part.  Nokia obviously had the claims when it served

7   its first set of infringement contentions in June, but it

8   chose not to assert those claims.  Now, Nokia says we didn't

9   have source code at that time so we couldn't assert those

10  claims.

11               Your Honor, that argument just does not seem

12  credible.  Nokia was able to assert the independent claims

13  of the '870 patent and the '370 patent without source code,

14  and it has given no explanation as to why it needed source

15  code for these dependent claims.  And, in fact, if you look

16  at their infringement contentions, no source code has been

17  cited, for instance, for the '370.  They just have a screen

18  shot.

19               So they haven't been diligent, Your Honor, in

20  adding the new claim, and they haven't been diligent in

21  adding the new products.  They've added 11 new products

22  here, Your Honor.  By my count, 10 of them were available --

23  nine of them were available before Nokia served its initial

24  infringement contentions, ten of them were available before

25  claim construction briefing began in this case, yet Nokia

6

 1    didn't assert those products.

 2              Now, they say in a footnote in their letter

 3    brief that, for instance, they have added a bunch of the

 4    new products for the '884 patent.   That's the EMR shielding

 5    patent, Your Honor.   And they say, well, we needed to

 6    examine, we needed to open up the phone and examine them to

 7    assert infringement.

 8              Why didn't they do that in June?   I've litigated

 9    before against the Desmarais firm representing HTC.   I see

10    they have many of these phones in their possession.   They

11    choose not to do the analysis in June.   They shouldn't now

12    be able to, late in the discovery process, come in with new

13    products, Your Honor.   They just have not been diligent.

14              Also, Your Honor, we think that the new

15    contentions should be struck because they burden the Court and

16    they inflict prejudice on HTC.   These new claims may need to

17    be construed.   We're still assessing that, but there is a

18    whole claim construction process that now needs to happen

19    where the parties meet and confer, exchange proposals, try

20    to narrow the differences between them, and that may result

21    in new briefing and a new hearing before the Court.

22              We may also need to revisit our 101 hearing and

23    briefing.   We're still assessing that, Your Honor.

24              So all of that can inflict additional burden on

25    the Court.   It also prejudices HTC, Your Honor.   We now have

Case 1:22-cv-00674-GBW    Document 158-1    Filed 12/17/24    Page 50 of 103 PageID #:
3511
Case 1:12-cv-00550-LPS    Document 162    Filed 01/02/14    Page 7 of 42 PageID #: 3851

7

1    to, with less than three months left in discovery, Your

2    Honor, with the holidays in between, we have to now start an

3    invalidity prior art search from scratch to try to address

4    these new claims.  That just inflicts deep prejudice on us.

5    And also not to mention the extent our client has paid, has

6    expended a lot of effort to go through the claim construction

7    process, and now we have to revisit that process again.

8           So, Your Honor, due to Nokia's lack of diligence,

9    the prejudice on HTC, the burden on the Court, their new

10   contentions should be struck.  They made a tactical decision

11   to sit on these contentions and serve them after the claim

12   construction hearing.  They should not be allowed to do that,

13   Your Honor.

14          Thank you.

15          THE COURT:  Thank you.  Let me hear from the

16   plaintiff, please.

17          MR. BERREBI:  Good morning, Your Honor.  Jason

18   Berrebi for Nokia.  I just want to walk through the points

19   that defendants raise in the order they raised them.

20          The first position that they were arguing here

21   was regarding claim construction and the potential need for

22   claim construction.

23          As an initial matter on that point, at this

24   point HTC says they're still assessing it so I think it's a

25   moot point on this issue and hasn't been raised as to how,

Case 1:12-cv-00550-LPS  Document 162  Filed 01/02/14  Page 8 of 42 PageID #: 3852

8

 1    if at all, there would be need for any construction at this

 2    point.

 3              THE COURT:  Well, Mr. Berrebi, let me interrupt

 4    you.

 5              Why, at this point, should they have to go to

 6    the trouble of assessing whether there needs to be additional

 7    claim construction?  And why should I even take the risk that

 8    I may have to do more claim construction?

 9              MR. BERREBI:  Well, I don't think that is the

10    issue, Your Honor, especially if you look at the joint claim

11    construction sheet between the parties, even at that point

12    the defendants had made a decision call to only put certain

13    terms in front of Your Honor and the Court to construe.  And

14    I think that is the process of claim construction generally.

15    You put the issues that are most significant and are

16    dispositive to the case in front of the Judge.  There just

17    isn't enough time to put everything before the Court.

18              That is the case with these terms.  Unless they

19    claim, which they haven't done so far, that this is one of

20    those terms that would be case dispositive to the terms or

21    the claims, I just see this being an issue even.

22              THE COURT:  Okay.  Go on.

23              MR. BERREBI:  Turning to their second point

24    about the 101 motion practice.  Again, first of all, at

25    this point, HTC has not put forward again any comments or

9

1   reasoning of why they think these two additional dependent

2   claims would have any bearing on the 101 motion and the

3   postures that are put forward there.

4        Just as a more important note, I think they raise

5   this as a tactical matter.  Again, Your Honor, one of the

6   points we raised here is that this isn't for the purpose of

7   adding claims, nothing to do with the 101 motion, and that

8   can be seen by the addition of the '870 claim.  I think this

9   is just part of the discovery process itself generally.  And

10  according to the local rules on discovery, I believe the party

11  has the ability to supplement their infringement contentions

12  through that fact discovery, and that is what we have done here.

13            THE COURT:  Is there anything else?

14            MR. BERREBI:  Well, turning to the point on the

15  source code, Your Honor.  Again, at the point of supplementing

16  infringement contentions, the source code hasn't been provided

17  to us in hard copy to include in our infringement contentions,

18  so I don't think that is a fair point, Your Honor, to state

19  that we haven't and won't include that supplementation.  There

20  was supplementation related to the infringement obtained

21  during that process and will be included in the infringement

22  charts going forward and as they are further supplemented

23  during discovery.

24            THE COURT:  All right.  Thank you.  Is there

25  anything further from HTC on this one?

                                                                              10

 1                    MR. RASSAM:   Just very briefly, Your Honor.

 2                    Simply because we choose not to construe some

 3        other terms when we went through the initial claim

 4        construction process does not mean that new terms do not

 5        need to be addressed here.  For instance, if you look at

 6        claims 3 and 52 for the '370 patent which were added, there

 7        is a term "broadcast reference signal."  I look at Nokia's

 8        infringement contentions, I can't tell what that means.

 9        That is going to be important to the issue of noninfringement.

10                    We're assessing that term but that is likely

11        significant that may need to get construed.  I didn't hear

12        anything from Mr. Berrebi that says otherwise.

13                    Same with claim 5 of the '870 patent.  It has

14        several terms like "close proximity," "reception channel

15        frequency," "predetermined pitch relation."

16                    All of those terms we need to have an understand-

17        ing of them, Your Honor, to be able to determine if we

18        infringe or not.  So the claim construction needs to start

19        back up in this case, the process needs to start back up so

20        that we can assess where we stand and what our noninfringement

21        positions are.

22                    Let me just briefly note the issue of source

23        code, Your Honor.  Mr. Berrebi was in our office reviewing

24        source code for a week.  If he really needed to cite source

25        code for these new claims, which again does not appear

1   credible since he was able to assert infringement against

2   the independent claims, why didn't he use his notes to say,

3   look, we think these packages, these source code packages

4   are implicated for these claims?  Why didn't they leave a

5   placeholder in the infringement contentions saying, look, we

6   think source code is needed for these particular claims but

7   we're waiting for that to be produced?

8              None of that was done, Your Honor.  In fact,

9   these contentions are backed up with screen shots.  And the

10  reason for that is source code was not needed and it appears

11  to be an after-the-fact excuse to justify Nokia's lack of

12  diligence, Your Honor.

13             THE COURT:  What about Mr. Berrebi's point about

14  supplementation is permitted at least until well into the

15  discovery period, if not beyond?

16             MR. RASSAM:  Well, Your Honor, I don't doubt a

17  plaintiff can supplement.  A plaintiff can come in, assert

18  a certain set of claims and as discovery is made available,

19  they can potentially add some evidence to back up their

20  contentions.

21             That is not what is going on here.  It's not

22  that Nokia is looking at the discovery and then backing up

23  the allegations they had initially made.  They are coming

24  in and adding new claims that they could have added earlier

25  in the case.  They're coming in and added new products that

Case 1:22-cv-00674-GBW    Document 158-1    Filed 12/17/24    Page 55 of 103 PageID #:
3516
Case 1:12-cv-00550-LPS   Document 162   Filed 01/02/14   Page 12 of 42 PageID #: 3856

12

1    they could have added in the case.  So just because you

2    can bring in new contentions doesn't mean you have a right

3    not -- doesn't mean you just have a carte blanche not to be

4    diligent.

5              And I don't think that the right to sort of

6    supplement contentions means that you can inflict prejudice

7    on HTC.  I think prejudice has to be taken into account

8    here.  We now have to start back our invalidity process as

9    discovery is only a couple months away from closing.  So

10   simply because they can amend doesn't mean they can inflict

11   prejudice on us.

12             THE COURT:  All right.  Thank you.  On this

13   issue --

14             MR. BERREBI:  Your Honor.

15             THE COURT:  I've heard enough.  Thank you.

16             On this one, I'm going to grant HTC's request, and

17   I am hereby striking the amended infringement contentions

18   served by Nokia to the extent that HTC has asked me to

19   strike them, particularly with respect to the new asserted

20   independent claims and the new accused products.

21             On the surface, having reviewed all the materials

22   and having heard the argument, this does look like a tactical

23   decision on the part of plaintiff to serve these supplemental

24   infringement contentions in the time frame that they did after

25   clearly everybody, including the Court, invested enormous

1   resources in preparing for what was a very lengthy and complex

2   Markman hearing as well as argument on the 101 motion, and

3   then to find that just a couple of days later, there was an

4   effort made to expand the case looks, as I say, like a tactical

5   decision; and, unfortunately, I see nothing in the record and

6   have heard nothing today to make any of that appear more

7   justifiable at this point.

8          So under the circumstances, I do think and find

9   that there is a demonstrated lack of diligence as well as

10  resulting unfair prejudice to the defendant, and an unfair

11  and really unwise burden attempted to be imposed on the Court.

12          It is true that supplementation may, in the

13  right circumstances, be permitted at this point in the case

14  or even at a later point in an appropriate case, but under

15  the circumstances here, I see no basis to permit the

16  supplementation attempted by the plaintiff at this point in

17  this case in this manner.  So, again, I'm granting HTC's

18  request for relief.

19          Let's move on to the second issue whereby HTC is

20  asking the plaintiff to identify some purported first

21  embodiment of the asserted claim.  Let me hear from HTC on

22  that one, please.

23          MR. BERREBI:  Your Honor, just for a point of

24  clarification.  Jason Berrebi from Nokia.

25          There was also an issue raised about the new

1    products.  From everything that we have seen briefed and

2    even as framed by the letters to the Court, those new

3    products are only with respect to the '884 patent and

4    actually some of those devices actually appear in some of

5    the other patents that are being asserted already.

6              So I just want to make sure the record is

7    clear that you're agreeing with them or if you are agreeing

8    with them only with respect to the '884 patent about the

9    addition of new products.

10             THE COURT:  Mr. Rassam, do you want to address

11   that?

12             MR. RASSAM:  Sure, Your Honor.

13             I don't think that new products are only with

14   respect to the '884 patent.  For instance, I'm looking at my

15   chart here, and I think the one Mini is asserted against the

16   '263, '351, '788 and '953 patents.  The Mini Plus, Your

17   Honor, is asserted against the '870 patent.  So we're not

18   just talking about as to the '884 patent.  They have

19   asserted new products against other patents as well, and we

20   don't think they should be allowed in the case.

21             THE COURT:  Mr. Rassam, so your request for

22   relief with respect to the new accused products is precisely

23   what?

24             MR. RASSAM:  My request, Your Honor, is that the

25   new products that have been added as to the '884 patent, as

15

1    to the '263, '351, '788, '953, and '870 patents also not be

2    allowed.

3              THE COURT:  And, Mr. Berrebi, yes, given what I

4    have said, why should I not just go ahead and clarify that I

5    have already granted the full extent of the relief asked for?

6              MR. BERREBI:  Your Honor, especially, the

7    parties haven't even met and conferred or even discussed the

8    issues about the other patents.  Their letters up to this

9    point and our phone calls have all been related to the '884

10   patent and evidence provided to the defendants relates to

11   that.

12             As for the new products, I believe our

13   infringement contentions are broad enough to include any

14   product developed and that are being produced by HTC during

15   the discovery process.  To limit Nokia from including those

16   new products now would be unfair and would be part of the

17   fact discovery process.  Those are brand new products that

18   weren't available to Nokia prior to the initial infringement

19   contentions.

20             THE COURT:  All right.  Mr. Rassam, do you want

21   to have the last word on this?

22             MR. RASSAM:  Sure.  Your Honor, to the extent a

23   product was added after the initial infringement contentions,

24   I think, if I'm right, that only implicates the Mini Plus, but

25   if the product was still released before claim construction

Case 1:22-cv-00674-GBW    Document 158-1    Filed 12/17/24    Page 59 of 103 PageID #:
3520
Case 1:12-cv-00550-LPS   Document 162   Filed 01/02/14   Page 16 of 42 PageID #: 3860
16

1    briefing began in this case, I don't see why they waited

2    for month to add it.  Why didn't they add it earlier?  So I

3    think to the extent products were on the market before claim

4    construction briefing began and Nokia failed to add them,

5    those products should be struck.

6              THE COURT:  Well, I think I'm going to stick to

7    my ruling, which is granting the relief that was sought by

8    HTC.  I think given how the issue was presented to me and

9    given my finding about lack of diligence and prejudice and

10   burden, it follows that the full extent of the relief sought

11   by HTC in its letter is granted.

12             So let's move on now to the second issue.  And,

13   again, we'll hear from HTC on that first.

14             MR. BARTOW:  Thank you, Your Honor.  This is

15   Stuart Bartow on behalf of HTC.

16             With respect to the first embodiment issue, Your

17   Honor, Nokia refuses to respond to basic fundamental

18   discovery about whether any of its products ever practiced

19   the asserted claims.  And I don't know of any better way to

20   show this to Your Honor than to point you to, I believe it's

21   Exhibit I to our letter briefing and show you Interrogatory

22   No. 6, which we served on March 5th, 2013, so about nine

23   months ago.

24             That interrogatory requests that Nokia identify

25   the product or thing that constitutes the first embodiment,

1    and also to identify when it was offered for sale, first

2    sold, first publicly used, first publicly disclosed or first

3    disclosed to anyone not an employee of Nokia, or an assignee.

4          We made that request, that interrogatory because

5    these issues are basic and fundamental to the issues of,

6    among other things, conception and reduction to practice of

7    the claims at issue, potentially damages, public use, the

8    on-sale bar -- and I know that Your Honor has dealt with

9    the on-sale bar on a number of occasions over the past few

10   years.  It's relevant to all of those issues.

11         If you look at page 8 of Exhibit I, Nokia's

12   response, their initial response to this -- and this is back

13   on May 6th.  We probably should have included the dates in

14   there.  Their first response was the patents in suit are

15   presumed valid under 35 U.S.C., Section 282.  HTC has the

16   burden to prove invalidity by clear and convincing evidence.

17   HTC has not identified any evidence to disturb the presumption

18   of validity, nor has it identified evidence to prove invalidity

19   by clear and convincing evidence.

20         That was the sum total of their response, Your

21   Honor.

22         Their next response, their supplemental response

23   on October 21st, 2013, in that response, they said -- and

24   I'll point you to the second line of that, which is about

25   halfway down the document.  They say:  "HTC contends that

18

1    the Nokia 2010, 2060, and Nokia 9000 devices are responsive

2    to those interrogatories."

3            In addition it's not what Nokia says, it's not

4    their contention.  They're saying HTC contends that these

5    are prior art products.

6            Well, that wasn't the question at all.  What we

7    really want to know is were these products ever reduced to

8    practice and sold by Nokia?  If so, when?  Who was involved?

9    I mean this is just basic fundamental discovery that goes to

10   the issues that I mentioned earlier; and they simply haven't

11   responded, and they haven't been willing to respond.

12           I mean I guess I should say they provided a

13   little bit of information on the '870 patent.  They mention

14   one product, the Nokia 6310, but they haven't responded on

15   any of the other products at all.

16           Now, I know that Nokia's response in their

17   letter briefing is that they don't -- they're characterizing

18   this as a request for them to go back through all of their

19   prior art products, perform an infringement analysis and

20   report the results back.  That is not what we're asking for

21   at all.

22           Your Honor, in my experience in a few years

23   of patent litigation and in what I will call a prior life

24   as an engineer, big technology companies don't just drop

25   these things out of the sky in a Eureka moment.  I suspect,

19

1    strongly suspect that these products were -- these patents

2    were derived from certain product development products,

3    certain research projects that were undertaken at Nokia.

4    And Nokia knows very well what they are.  And for all sort

5    of reasons, including accounting and tax purposes, companies

6    like Nokia track what patents are being used in what products.

7    So I believe Nokia absolutely has the resources to answer

8    these questions, if they haven't already.

9              Oh.  And, by the way, they also represent most

10   of the inventors of these patents.  They're represented by

11   Desmarais and they are still affiliated with Nokia, many of

12   them.

13             So I know that is what you are going to hear,

14   but we believe that this is simply fundamental discovery

15   to which we're entitled, and we would ask that the Court

16   order Nokia to provide more fulsome answers to our

17   interrogatories, including Interrogatory No. 6.

18             Thank you, Your Honor.

19             THE COURT:  So you have drawn our attention

20   to Interrogatory No. 6, but let me ask you, are there --

21   there are certain products that HTC has identified that it

22   believes are embodiments of some of these patents.  Correct?

23             MR. BARTOW:  That is true, Your Honor.

24             THE COURT:  So have you served an interrogatory

25   asking the plaintiff for requests for admission or something

1    to simply get the plaintiff's position on whether products

2    you have identified are, in their view, embodiments of their

3    patents?

4              MR. BARTOW:    In at least one instance, we have,

5    Your Honor.    And we have had no response.

6              THE COURT:    You got a similar type of response?

7              MR. BARTOW:    Correct.

8              THE COURT:    So why isn't the answer here that

9    you need to identify the products first and then ask the

10   plaintiff to disclose its position in the context of respond-

11   ing to an invalidity contention, for instance, identify its

12   position only at that point as to whether or not what you have

13   identified is an embodiment that in some way could be relevant

14   to the validity of their patent?

15             MR. BARTOW:    Well, I think we ought to do that

16   as well, Your Honor.    But I do think that with respect to --

17   I do think we ought to be entitled to Nokia's position on

18   that issue and their contention.    As I mentioned earlier, I

19   do believe that Nokia is in possession of this information

20   and could readily provide it as to whether these patents

21   were in fact incorporated into the products.    I don't think

22   it's a matter of infringement analysis or invalidity

23   analysis.    I think it's just simply a matter of stating

24   basic facts as to the development of not only these products

25   but any other products that Nokia would contend practice the

 1    claims.

 2                THE COURT:  Have you served document requests

 3    seeking production of documents or some sort of record that

 4    you speculate would exist that might in their records link

 5    up their patents and some of their products?

 6                MR. BARTOW:  We have, Your Honor.  And I believe

 7    we specifically have followed up, in fact, regarding that

 8    issue with respect to documents relating to the development

 9    programs that led to these patents.

10                THE COURT:  What is the nature of the response

11    you are getting as to that?

12                MR. BARTOW:  Your Honor, well, we haven't seen

13    the documents that we think ought to be there.  So I would

14    say either something is missing or perhaps even lost,

15    destroyed over time.  I don't know.  But certainly they're

16    not there.

17                THE COURT:  All right.  Let me hear from the

18    plaintiff on this one, please.

19                MR. BERREBI:  Your Honor, we're in 100 percent

20    agreement here, I think.  The only thing I really need to

21    add to this is we actually have gone through and identified

22    some of the projects that the defendants are asking for.

23    That was actually spelled out and incorporated from Rog No.

24    6 for at least the patents that we were able to investigate

25    and find information regarding those products.

```
1            And with regard to the production, for the
2    invalidity contentions we received to date, we produced over
3    65,000 pages of documents regarding those actual products.
4    And the parties have agreed some day in the future, we're
5    still working out a date, to exchange those invalidity or
6    validity contentions for noninfringement positions as well.
7    But, again, those have all been played out already through
8    correspondence and I think the parties are in agreement to
9    do that at some point.
10            THE COURT:  And that is Mr. Berrebi; correct?
11            MR. BERREBI:  Yes, Your Honor.
12            THE COURT:  Mr. Berrebi, if there are document
13    requests asking you for project related documents for
14    products that relate to your own patents, you either have
15    provided responsive documents or will be?  Is that what you
16    are saying?
17            MR. BERREBI:  So long as they're not privileged
18    documents, we have been producing those documents up-to-date
19    and will continue to do so if there are any others that are
20    found.
21            THE COURT:  All right.  Thank you.
22            Mr. Bartow, is there any response?
23            MR. BARTOW:  Just briefly, Your Honor.
24            At least as to the '798 patent, the acoustic
25    path patent and the '884 patent, the shielding patent, we
```

 1    know that both of those were developed at Nokia.  We have

 2    not had any information by interrogatory and very little, if

 3    any, by document request showing any such development.

 4           I would also point out that the inventors once

 5    again are, by and large, associated with Nokia, and it seems

 6    they ought to be able to answer these questions very quickly.

 7    So, again, I would just reinforce I think Nokia has the

 8    information that it needs to provide a response to this.

 9    And on that same note, substantial completion for documents,

10    that date was last Friday and it has passed.  So I'm not

11    sure what additional documentation we're going to get but

12    certainly we have been seeking it and we would like to

13    have it.

14           So I think, in sum, due to the high relevance

15    of these documents, the high relevance of these issues in

16    general, I think it would be appropriate for the Court to

17    order Nokia to produce any further documentation that it has

18    regarding any of these development programs.

19           Thank you.

20           THE COURT:  All right.  Thank you.

21           Well, I'm focused on the dispute that you put

22    in the letter and the relief that you put in the letter.  The

23    relief you are asking for is for me to order the plaintiff to

24    respond more fully, more meaningfully to Interrogatory No. 6.

25    I'm not persuaded that I should do that at this time.

24

1    I do think that to some extent, there is a

2  dispute here as to who has the burden of coming forward

3  initially with this type of information.  Given that it

4  arises in the context of invalidity, given the plaintiff's

5  representations that they are and will continue to respond

6  to document requests relating to the underlying issues,

7  given that they will respond to invalidity contentions that

8  are directed to any purported embodiments of their patents,

9  that they will do so at the appropriate time after the

10  defendant has identified the products.  Based on all that, I

11  don't see a basis at this time to grant the relief that is

12  asked for in the letter.  Therefore, I'm denying HTC's

13  second request.

14    Let's move on to HTC's third request in its

15  letter which relates to a request to compel production of

16  testing material.  My question here really to HTC first is,

17  is this dispute still a ripe dispute or is it moot in light

18  of the representations from the plaintiff?

19    MR. BARTOW:  Well, Your Honor, my understanding

20  is that we were going to have a supplemental response to

21  Interrogatory No. 14 as of yesterday and we did not, so I do

22  believe the issue is still ripe.

23    So with respect to the '798 patent, as you may

24  recall during the Markman hearing a few weeks ago, our team

25  laid out our understanding that we believe that Nokia is

1    attempting to read "acoustic path" on basically what is a

2    non-path, that is something that is sealed, sealed with a

3    rubber gasket and has a PC bead board behind it, so it's

4    effectively like saying a brick wall is part of an acoustic

5    path.  We believe that that is their read.  We believe that

6    the tests were conducted in such a way by Nokia such that

7    would reveal their infringement theory.  And so we are

8    looking for information, the raw data, whether photographs

9    were taken, video, the device that was used, that sort of

10   information regarding what they did in particular in their

11   testing.

12            And that testing, by the way, is in Exhibit J

13   to our briefing on page 6.  You can see one example of

14   one of the graphs that Nokia included in its infringement

15   contentions.

16            After a couple of months of meet and confer,

17   really other than just getting a catalog of what testing

18   equipment was used and production of product manuals for

19   that test equipment, all we really have is one additional

20   sentence worth of detail as to how they did the testing,

21   and that is on page 7 of Exhibit K.  In their second

22   supplemental response, they add one sentence:

23            "To isolate operation of only the first acoustic

24   path, the apertures on the mobile phone for the second

25   acoustic path were sealed."

 1            Well, that is not a description that is going to

 2     allow us to either replicate their testing or meaningfully

 3     understand how it was done.  And, yes, we are going to have

 4     an opportunity to depose the person who did the testing in

 5     short order but we don't think we even have the documents

 6     right now that we need to do that, Your Honor.  We don't

 7     have any information on their testing at all.  So we would

 8     ask that the Court grant this request so that we may -- you

 9     know, I think we're entitled to the information that they

10     generated concerning that test.

11            THE COURT:  All right.  Thank you.  Let me hear

12     the plaintiff's response, please.

13            MR. BERREBI:  Yes, Your Honor.  So Jason Berrebi

14     again for Nokia.

15            At this point, we produced all the documents

16     associated with that testing.  We'll be glad to go look

17     again to see that anything else we may have missed.

18            In addition, again, I think counsel for HTC has

19     put forward that we are actually putting up a witness who

20     did the actual testing; and I believe that is scheduled for

21     the second week in January.  So I'm not sure exactly what

22     else HTC wants from us at this point.

23            THE COURT:  Well, he gave you some specifics:

24     photographs and other things.  But I think the broader

25     question is:  Have you provided everything?  And is it

1    enough to allow HTC to replicate these tests, if they wish

2    to do so?

3              MR. BERREBI:  Your Honor, I believe so.  I think

4    we produced everything that we have been able to locate that

5    is not privileged, and then we have the witness, that they

6    can ask the fact questions regarding testing, discussions of

7    any of the images that were included in the infringement

8    contention charts.  Again, I don't think there is anything

9    else out there, Your Honor.

10             THE COURT:  What about the promised supplemental

11   response to Interrogatory No. 14?  When is that coming?

12             MR. BERREBI:  So Interrogatory No. 14 actually

13   refers to the '404 patent, so I'm not exactly sure how that

14   relates to the issue at hand here.  And that -- I believe we

15   reached out to the other side.  That should be coming today.

16   Unfortunately, it got lost through the shuffle, and I

17   apologize to them if that is there already.

18             THE COURT:  All right.  Thank you.  Was it

19   Mr. Bartow?  Did you want to respond?

20             MR. BARTOW:  Just briefly, Your Honor.  Yes.

21             I think perhaps there was a misunderstanding

22   on my part concerning that the supplemental response was

23   going to be concerning Interrogatory No. 14.  I understand

24   that is related to another patent and not the '798 patent.

25             Notwithstanding that, I do think there is

1    additional -- there must be additional documentation out

2    there concerning the tests.  I certainly haven't heard a

3    definitive representation from counsel that it has been

4    produced.

5            Along the lines of the deposition notice, it's

6    true that we noticed -- well, we have about 15 depositions

7    noticed on calendar for January or February, and we note

8    we did that in early December and now the dates that we're

9    getting are kind of late January-ish, early February-ish,

10   and we have a significant concern that we're not going to

11   be able to do our investigation, replication of any relevant

12   tests, et cetera, by the March discovery deadline.  So I

13   think we're really jammed at this point, and this is

14   information we have been asking for for quite a long time.

15           I don't think it has been included as responses

16   to the requests for production.  So we respectfully would

17   request an order that all such information be produced so

18   that we can conduct, as we have really been jammed for a

19   significant amount of time.  In fact, I'm not sure that even

20   having documents by, let's say, late January will cure the

21   prejudice to us.

22           THE COURT:  Well, on this one, I'm granting

23   some limited relief in the sense and to the extent that I'm

24   directing the plaintiff to look again, to do your reasonable

25   diligent search and produce to the defendants, to the extent

1    you haven't already, any other nonprivileged materials that

2    relates to this test because I do think that a fair scope of

3    discovery, once you add up interrogatory responses, document

4    responses and then, of course, meaningfully, the deposition

5    of the person who did the test, at the end of all that, the

6    defendants are entitled to be in a position in which they

7    know precisely how the test was run, how the results were

8    achieved, so that they can, if they wish, try to replicate

9    the study or the test.

10           Plaintiffs suggests that they have already

11   produced all of those materials; and if that is the case,

12   of course, I can't make them produce something that doesn't

13   exist, but I am directing that the plaintiff take one

14   additional good faith diligent look to see if there is

15   anything else that falls into this category, and to produce

16   such materials in an expeditious manner and certainly in

17   advance, sufficiently in advance of the deposition of

18   whoever it is that was involved in this test, to allow the

19   defendant a fair opportunity to prepare for that deposition.

20           Are there questions about what I have ordered

21   with respect to this Issue No. 3; first, Mr. Bartow?

22           MR. BARTOW:  No, Your Honor.  Thank you.

23           THE COURT:  And Mr. Berrebi?

24           MR. BERREBI:  No, Your Honor.

25           THE COURT:  All right.  Let's move on to HTC's

1    final issue which relates to production of materials

2    relating to damages.  We'll hear briefly first from HTC on

3    this.

4              MR. RASSAM:   Your Honor, this is Mashhood Rassam.

5              This request really can be broke up into two ways:

6              First, we would like documents such as memos,

7    studies, presentations that show evaluations of the patents

8    in suit or the valuation of those patents at a part of a

9    portfolio.

10             I'll give you an example:  Recently, to great

11   fanfare, Nokia licensed its portfolio to Microsoft for

12   $1.65 billion.  If there is documents out there that show

13   how the portfolio was broken up into that manner, whether

14   there is some patents that are more valuable than others, we

15   think we're entitled to that information.

16             It's clearly relevant.  No one disputes that

17   it's relevant.  But yet, Nokia, in its briefing, has said

18   that, well, we'll produce some of this stuff but not if it's

19   too speculative.  And,

20             Your Honor, I would suggest that Nokia cannot

21   withhold relevant information because counsel for Nokia has

22   judged that information not to have sufficient probative

23   value.  If they have relevant information about the valuation

24   of these patents, they need to produce it and let the

25   fact-finder determine the probative value of that information.

31

1        So that is the first issue, Your Honor.  And I

2    can either stop there or move on to the second issue as well.

3        THE COURT:  Let's move on.  We're starting to

4    run out of time so go ahead.

5        MR. RASSAM:  Okay.  I apologize, Your Honor.

6        The second issue is that we served an

7    interrogatory that asks for the underlying facts to Nokia's

8    damages analysis.  In other words, if they're going to rely

9    on our lost profits analysis, give us the underlying facts,

10   supplement that interrogatory.

11       The interrogatory has been pending since March of

12   this year, Your Honor.  If you are going to do a reasonable

13   royalty analysis, Nokia pleads to give us the underlying

14   facts.  To date, we have gotten -- after nine months, we have

15   gotten no reasonable response to that interrogatory other

16   than Nokia will ask for the damages that it was due and that

17   It will give us an expert report.

18       That is not the way discovery should be done.

19   They need to supplement in a timely manner.

20       And, Your Honor, Nokia has said that we're

21   forcing them to choose between a reasonable royalty and lost

22   profits too early in the case.  We're not forcing them to

23   choose.  I'm just saying if you are doing an analysis and

24   you have got facts, give us the facts now.  Give us lost

25   profit facts, give us reasonable royalty facts now, and then

32

1    I understand that down the line you may choose to only

2    pursue one path or the other when you deal with your expert

3    reports.  I don't want a full blown expert report right now.

4    I just want the underlying facts, Your Honor.

5             THE COURT:  All right.  Thank you.  Let me hear

6    from plaintiff.

7             MR. KELLMAN:  Your Honor, this is Alan Kellman.

8    Let me address them in order.

9             With respect to the valuation document, I'm not

10   really sure what the dispute is here because we have told

11   them, and we have put this in the letter as well, that if

12   there are documents that discuss the patents that are in

13   suit in this case and that are not privileged and they value

14   the patents in some way, we'll give them to the defendants.

15            I have no problem doing that.  In fact, throughout

16   this litigation, whenever we get document requests, we always

17   tell them we'll produce anything that is relevant or related

18   to the patents in suit in some way.  I have no problem with

19   that.

20            What I think is going on here, however, is

21   the defendants want something beyond that.  They want

22   negotiations that happened between third parties on things

23   that had nothing to do with the particular patents in this

24   case.  That is frankly a fishing expedition, and we're

25   going to wind up producing every document relating to every

33

1     licensing transaction that ever took place at Nokia, if that

2     is where we're going.

3              So if we limit it to the patents in this case

4     and we limit it to the documents that actually discuss

5     those patents and place, potentially even place some value

6     on it, I'm happy to produce them.  I'm not trying to figure

7     out whether they're relevant or not or whether they're

8     particularly probative or not.  I'm not try to make that

9     distinction.  I'm just trying to see do they mention the

10    patents in any way?  And if they do, I'll give them.

11             THE COURT:  All right.  So, Mr. Kellman, just

12    to be clear on this, if there were a negotiation document

13    but it specifically referenced one of the patents in suit

14    and a potential thought about the value of that patent, you

15    would produce it; correct?

16             MR. KELLMAN:  Right.  If somebody generated a

17    document that said here is one of the patents in this case,

18    the '404 patent, and it is worth X, yes, we'll give that.

19    Absolutely.  We look for the names of the patents all

20    throughout.  That is part of the search terms that we look

21    for when we give that information.  As long as it's not

22    privileged, obviously.  Let me obviously put that caveat.

23    If it's part of a lawyer analysis or something like that,

24    obviously we'll withhold it but otherwise absolutely.

25             THE COURT:  But you are not withholding anything

Case 1:22-cv-00674-GBW    Document 158-1    Filed 12/17/24    Page 77 of 103 PageID #:
3538
Case 1:12-cv-00550-LPS   Document 162   Filed 01/02/14   Page 34 of 42 PageID #: 3878
34

 1     on the basis that that valuation is just simply too

 2     speculative and probative value is just too little?

 3                 MR. KELLMAN:  No, absolutely not.

 4                 THE COURT:  All right.  Move on to the second.

 5                 MR. KELLMAN:  I'm agreeing with Your Honor.  I

 6     am sorry.  I said that in the negative.  I am agreeing with

 7     you.

 8                 THE COURT:  The transcript will be ambiguous,

 9     but I understand you to agree.  Go on to the second issue.

10                 MR. KELLMAN:  Sure.  With respect to the laying

11     out damages theories, I thought it was actually telling

12     that HTC hasn't cited a case where someone lays out all the

13     damages analysis before expert reports.  In the typical case

14     that I have been involved in, and I know Your Honor has done

15     this many, many, many times, most of the damages that is

16     done is part of expert reports.

17                 Trying to cabin us in on a lost profits theory

18     at this point is premature because we don't know everything

19     from HTC yet.  We don't have the full information regarding

20     market share.  We don't have the full information regarding

21     their technical detail.  We don't have the full information

22     regarding substitutes.  It's still a work in process.  We

23     have months left to go in discovery.  And we can certainly

24     supplement over time but, right now, pinning us to a damages

25     theory, it's just premature.

 1          THE COURT:  But they're not requiring -- they're

 2    not trying, as they say, to hold you to one or the other.

 3    You'll be able to supplement as you learn more of that

 4    information.  And they're concerned, they say, that they

 5    won't have a chance to develop a rebuttal case.  Respond to

 6    all of that, please.

 7          MR. KELLMAN:  Right.  So I think what we're

 8    talking about there, if I understand what the defendants are

 9    framing here, is specifically with respect to lost profits.

10    That is what they discussed in their document.

11          We have not -- I don't believe we have withheld

12    discovery that they have asked of us regarding specific

13    products that they want to, if they want to discover that.

14    We're still in the process of evaluating that theory, and

15    we're happy to agree on a date to supplement rogs and

16    similar requests from us to them as well.

17          Trying to figure out what all the facts are

18    now to support a damages theory is premature as we're

19    just figuring out the infringement theories.  We just had

20    infringement documents produced as of I think last week is

21    when they were supposed to be done.

22          So I'm happy to continue to supplement, but

23    I'm not aware of authority that requires me to lay out a

24    theory certainly not beyond lost profits and nothing is in

25    the letter that we have seen that requires that at this

36

 1    stage.

 2              THE COURT:  All right.  Thank you.  Mr. Rassam,

 3    briefly.

 4              MR. RASSAM:  Your Honor, very briefly.

 5              Again, we're not asking for the theory.  I'm

 6    asking for the underlying facts.  And I'm very surprised

 7    that Mr. Kellman frankly says we're not withholding anything

 8    that would show a lost profits analysis.

 9              We've asked them for financials regarding their

10    own products so we can see where potential lost profits

11    analysis would go, and they have refused to produce that

12    material.  So they're already withholding damages material

13    from us in terms of documents and they won't put the facts

14    in an interrogatory response.  So we are completely

15    hamstrung in trying to develop our rebuttal theory, Your

16    Honor.

17              This is kind of a theme that is developing in

18    this case where Nokia is repeatedly dragging its feet in

19    providing us discovery.  And, Your Honor, we're really

20    getting hamstrung.  March 14th is not that far away.  We

21    have got a lot of depositions to take, we have a lot of

22    depositions to defend, and we can't even get ready for the

23    depositions that are coming up in January.

24              So I disagree that Nokia has provided us the

25    relevant damages documents that we need, damages materials,

37

```
 1    and they're also not giving us a lot of other materials,

 2    Your Honor.  It is really prejudice to HTC in terms of being

 3    able to develop its case with the discovery close cutoff not

 4    too far away, Your Honor.

 5              THE COURT:  Mr. Kellman, just briefly respond

 6    because you're telling me you are providing all this stuff,

 7    and I'm hearing you are not.  So what do I do with that?

 8              MR. KELLMAN:  Your Honor, I think there is a bit

 9    of confusion there as to -- and maybe we're talking about

10    two separate things, counsel and I are talking about two

11    separate things.  What I think they're talking about is

12    specific interrogatories directed towards having us link a

13    product to a particular product.

14              If they ask us for financial information

15    regarding specific products, we haven't -- I don't think we

16    have, and if we have withheld that, I'm telling you now I

17    will give that.

18              So that, I don't think that that is the issue.

19    What I think the issue is, forcing us at this point to tie

20    particular theories to particular products and then tacking

21    that on to the damages.  And that is just something that is

22    premature at this point.

23              THE COURT:  All right.  Mr. Rassam, is there any

24    response?

25              MR. RASSAM:  Your Honor, just very briefly.
```

Case 1:22-cv-00674-GBW   Document 158-1   Filed 12/17/24   Page 81 of 103 PageID #:
3542
Case 1:12-cv-00550-LPS   Document 162   Filed 01/02/14   Page 38 of 42 PageID #: 3882
38

1           If they're going to do lost profits analysis,

2    it's tied to their own documents, their own materials, and

3    there is no reason not to give us the underlying facts now.

4           Mr. Kellman wanted authority.  Well, Rule 26(c)

5    of the Federal Rules of Civil Procedure requires timely

6    supplementation of interrogatory responses.

7           I don't want to pin him down to a theory.  I

8    understand he will write an expert report in April.  I just

9    want the underlying facts right now, and he doesn't even

10   have to give all of them to me.  Give me what you have now

11   and then supplement, but don't say in your letter brief that

12   you are going to supplement at some later date, because if

13   they end up supplementing this interrogatory two days before

14   the close of discovery, there is nothing I can do at that

15   point to develop my rebuttal case, Your Honor.

16          THE COURT:  All right.  Well, I'm denying the

17   relief that is sought here.  I don't believe even in that

18   circumstance there is nothing you can do.

19          First off, with respect to the documents, the

20   plaintiff is representing repeatedly that they have already

21   provided valuation documents, to the extent that they're not

22   privileged, if they make any reference to any of the patents

23   in suit, and they represent that they have or would be willing

24   to produce other documents, for instance, the financials

25   that were discussed, so I don't see any basis for me to

1    order the plaintiff to produce more documents relating to

2    this last issue.

3              The broader or tougher I suppose issue is the

4    second one about whether, in a response to interrogatory,

5    the plaintiff should be required to supplement right now to

6    provide at least some of what they believe will ultimately

7    be their contentions relating to damages.  And I, again, am

8    not persuaded that the plaintiff needs to supplement today

9    or in the very near future to provide the information the

10   defendants are looking for.

11             I believe time has been built into both of the

12   fact and expert discovery schedule to allow both sides to

13   flesh out all of the issues, including the damages issues;

14   and, very meaningfully, of course, there will be expert

15   discovery.  There will be expert reports.  The plaintiff

16   will have to put its whole damages case on the table in

17   connection at least with the expert discovery.  And if the

18   defendants find that they think that the plaintiff has

19   waited too long or played other games in a way that is

20   unfairly prejudicial to the defendants, and I see the

21   defendants developing that theme through various comments

22   today, concerned that depositions may not be as productive

23   as they should otherwise be, well, I think it's pretty

24   clear from some of my rulings today and from the time we're

25   spending together today that if the defendants have a good

1    case to make that the plaintiff is in some ways not going

2    about discovery in the way that it should, you come back to

3    me and we will do what we can to ameliorate that prejudice

4    at that time.  But just keeping my eye on the issues in

5    front of me today, the request for relief on this Issue

6    No. 4 by the defendants is denied.

7            I have just a couple minutes left.  If the

8    plaintiff wants, we can talk about the issue raised in your

9    affirmative letter.  It had to do with source code and

10   drawings.  Is that something that the plaintiff wants a

11   ruling on?  If so, go ahead.

12           MR. KELLMAN:  Yes, Your Honor.  Just very

13   briefly.  This is Alan Kellman.  I'm sorry.

14           The initial question regarding the CAD documents

15   I think has been resolved in regard with their response as

16   long as they're going to provide that at the end of the

17   month, so I think we're finally resolved.  That's what we

18   wanted was a date certain on that.

19           With respect to just providing source code, the

20   only thing we're really asking for here is that we not have

21   to figure out what HTC had as far as source code or not.

22   There is a continuing theme here we ask for source code and

23   then something gets provided but it's not the complete set

24   and we have to try to figure on the what is missing.  We

25   just want an order that HTC will now, at least by the end of

Case 1:22-cv-00674-GBW    Document 158-1    Filed 12/17/24    Page 84 of 103 PageID #:
3545
Case 1:12-cv-00550-LPS   Document 162   Filed 01/02/14   Page 41 of 42 PageID #: 3885
41

1   this month, if possible, to produce a full source code

2   computer with all the source code so we don't have to try to

3   figure out.

4            THE COURT:  All right.  HTC.

5            MR. RASSAM:  Your Honor, well, it sounds as if

6   the computer automated design, the CAD file issue is

7   resolved, and we believe the other issue had been resolved

8   even prior to the scheduling of this call.  But we are

9   producing the whole source code for commercial releases of

10  new products.  We're not withholding anything.  We're not

11  parsing anything out.  In fact, when the plaintiff came to

12  us and said, hey, we think there is a bunch of stuff

13  missing, it turned out that most of it was in fact not

14  missing and was there.

15           To the extent there is anything else that is

16  not complete, we are reviewing and verifying our complete

17  production now.  And by the end of the year, they will have,

18  if they don't already, they will have full commercial

19  releases of source code for every accused product.

20           THE COURT:  Mr. Kellman, it sounds like you have

21  what you have asked for.  Is that right?

22           MR. KELLMAN:  It sounds like it.  Let's see what

23  we get.  Obviously, if there is an issue, as Your Honor has

24  already offered, we'll come back.  Hopefully, we won't have

25  to.

42

1              THE COURT:  Right, hopefully not.  But it does

2    seem to me under the circumstances that both of the issues

3    raised by the plaintiff are at this point moot and/or unripe

4    and there is nothing for me to decide.

5              That covers all of the things that were on the

6    agenda for today.  Thank you all very much for your time.

7    Good-bye.

8              (Telephone conference ends at 12:26 p.m.)

9

10        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

11

12                      /s/ Brian P. Gaffigan
                        Official Court Reporter
13                      U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 9

12/10/24, 2:34 PM    Case 1:22-cv-00674-GBW    Document 158-1   Filed 12/17/24   Page 87 of 103 PageID #:
3548
Acacia Introduces 800ZR and 800G ZR+ with Interoperable PCS in QSFP-...



# Acacia Introduces 800ZR and 800G ZR+ with Interoperable PCS in QSFP-DD and OSFP

**By Acacia** | Posted on March 21, 2024

**Enables 800G Standards-Based Interconnects Between Data Centers in Metro and Regional Networks**

With data center bandwidth growing rapidly, high-performance pluggable modules have become an important tool for network operators to scale their networks cost-efficiently. Acacia has worked closely with network operators to drive the industry's first interoperable Probabilistic Constellation Shaped (PCS) interfaces. Acacia's newest portfolio of silicon-based 800G coherent pluggables has been designed to double the connectivity speed from 400G to 800G to support data center interconnect (DCI) upgrades, taking advantage of next-generation routers with 800G I/O port speeds. When plugged into these routers, this family of 800G pluggables can replace traditional transport equipment across a greater range of infrastructure to meet demand for cloud and AI.

**OIF Compliant 800ZR Modules**

OIF compliant 400ZR has been a great success for the coherent pluggable industry with multiple suppliers and a tremendous volume of 400ZR QSFP-DD and OSFP modules deployed in metro DCI applications. With the switch and router 800G ports available, 800ZR will further reduce the cost, power, and space per 100G in the same applications. Acacia's 800ZR pluggables support QSFP-





*Acacia Delphi DSP-based coherent pluggable modules*

**800G ZR+ Modules with Interoperable PCS**
Acacia's 800G ZR+ modules are designed to support the recently
released OpenROADM specifications that include interoperable
PCS transmission capability. The 131Gbaud PCS provides an
additional OSNR margin at 800G for longer reach suitable for
regional DCI applications, linking multiple fiber spans and in-line
amplification between data centers. Acacia 800G ZR+ pluggables
support QSFP-DD and OSFP form factors with >1dBm transmit
output power.

"The success of ZR+ at 400G was largely driven by its
performance and interoperability, which enabled a multi-source
environment to emerge," said Scott Wilkinson, Lead Analyst for
Optical Components at Cignal AI. "The interoperability now being
proposed with 800G – not only in short distance applications
(800ZR), but also in long distance (800*G* ZR+) – expands the
environment even further. Interoperable PCS will take the market
for 800G pluggables beyond simple DCI into regional and even
long-haul networks."



added a new QSFP-DD for 800G ultra-long-haul networks that include 400G QPSK and PCS with various baud rates to fit into different ROADM optical line systems. It is capable of >1dBm transmit power and high transmit OSNR over the entire C-band thanks to the integrated tunable optical filter for amplified spontaneous emission reduction.

**Backed by Industry Leading Coherent Technology**

Both the 800G pluggable portfolio and 400G ultra long haul pluggable are powered by Delphi, Acacia's 9th generation Digital Signal Processor (DSP) ASIC. Acacia boasts the broadest field-proven 400G MSA coherent pluggable portfolio in the industry with more than 250,000 ports shipped based on the Greylock DSP, including more than 10,000 **Bright 400ZR+** ports. Acacia's 800G and 400G pluggable portfolios benefit from Acacia's 3D Siliconization approach, which applies integration and 3D stacking techniques to enable a single packaged device that includes all the high-speed optoelectronic functions necessary for coherent communications to provide benefits in cost, reliability, power, and size. These devices are manufactured using standard electronics packaging processes and result in improved signal integrity and performance through the reduction of electrical interconnects.

The Delphi DSP-based pluggable modules are planned to be available beginning in Q2 CY2024.

**Additional Resources:**

Blog: **Key Challenges and Requirements for 800G MSA Pluggables**



⊙ **Back to blog**

›            ›



## Related

### The Road to 800G MSA Pluggables: Challenges and Requirement

10/1/2023

Enables 800G Standards-Based Interconnects Between Data Centers...



### Blog

## Key Challenges and Requirements for 800G MSA Pluggables

11/16/2023

In this blog, we outline key requirements...

›          ›





# Connect with Acacia

Stay informed and get Acacia's blog emailed to you.

enter email                                    **Submit**

**Applications**                               **Technology**

                                               DSP

                                               Silicon PIC

                                               3D Siliconization

⟩                    ⟩



Submarine

Wireless Access

Wired Access

Cable Access/Remote PHY

## Learn

Blog

Newsroom

Resources

Events

## About

History

Careers

Contact

Support

## Follow Us

in  𝕏

## Acacia

3 Mill and Main Place Suite 400
Maynard, MA 01754
(833) 222-0151

©2024 Cisco and/or its affiliates.
All Rights Reserved. | Connecting at the speed of light®

**Terms of Use**      **Privacy Policy**      **Cookies**

EXHIBIT 10



701 El Camino Real
Redwood City, CA 94063
+1 (650) 351-7248

**Corey Johanningmeier**
Direct: +1 (650) 351-7420
cjohanningmeier@bdiplaw.com

VIA ELECTRONIC MAIL

September 13, 2023

Holly Engelmann
DUANE MORRIS LLP
100 Crescent Court, Suite 1200
Dallas, TX 75201
Telephone: (214) 257-7226
Email: hengelmann@duanemorris.com

**Re:**   ***Cisco Systems, Inc. and Acacia Communications, Inc. v. Ramot at Tel Aviv University Ltd.***
**Case Nos. 21-cv-01365-GBW-CJB, 22-cv-674-GBW-CJB**

Dear Counsel:

I write regarding deficiencies in Cisco's document production and in this case to date. I previously wrote regarding deficiencies in Cisco's and Acacia's (collectively "your" or "Cisco's") document production and responses in this case—including via email on April 10, 2023—and we have discussed some of these matters in conferences. While some of the few dozen documents you produced in April were highly relevant, those documents themselves demonstrate that there are large numbers of additional relevant and responsive technical documents remaining unproduced.

I also note that some of these issues with Cisco's discovery persist from the stayed prior Eastern District of Texas case. As you will recall, Ramot filed a Motion to Compel in that case on July 6, 2020—seeking, *inter alia*, documents showing firmware configuration of the accused modules, technical information about certain then-new products, as well as technical information about certain then-new products, as well as technical information about Acacia's transmit DSP functionality.

Cisco and Acacia's failure to produce these materials and provide complete responses has prejudiced Ramot in preparing its case. Now as in the prior E.D. Texas case, Cisco is seeking to force Ramot into a last-minute rush to take depositions on an incomplete record. Please immediately advise as to times this week that we may confer and identify those issues for which Ramot must move to compel.

## Cisco's and Acacia's Productions and Interrogatory Responses are Deficient

### 1. Improper unilateral redefinition of "Accused Products"

Just as in the prior litigation, in its responses Cisco has improperly and unilaterally redefined "Accused Products" to exclude chassis, line card, and switch products that utilize pluggable slots for infringing transceiver modules—and has refused to provide interrogatory responses, complete technical documentation, and sales and cost data, for those Accused Products.

The objected-to products are designed to use—and in some cases exclusively designed for the use of—accused pluggable transceiver modules. They are also marketed with, and sold in bundles with, accused pluggable transceiver modules. In the prior litigation, the parties extensively discussed this issue. Also in the prior litigation, Cisco ultimately provided sales figures for such products accused there, which were used and debated by experts in their reports. Cisco cannot possibly deny the relevance of information about the marketing and sales (bundled, convoyed, or otherwise) of these products.

Yet Cisco has not provided sales, cost, or bundling information for the chassis, pluggable line card, and switch products and time-period at issue here. This failure, along with others discussed herein, prevents Ramot from effectively deposing Cisco about its (incomplete) financial information.

### 2. Missing Accused Products

The following products are Accused Products according to the definitions and/or model number identifications in Ramot's counterclaim, disclosure of asserted patents, accused products, and damages model, and preliminary infringement contentions. Cisco has either refused or failed to include these products in its interrogatory responses and has not produced core technical documents with respect to these products:

CIM8-C-K9, CIM8-L-K9 / CIM-8
DP01QSDD-ZF1 / QDD-100G-ZR-S
DP04QSDD-HE0, DP04QSDD-HK9, DP01QSDD-LK9 / QSFP-DD-400G (Bright)
DP04CFP2-D15 / 400G CFP2 DCO BiDi
DP04SFP8
SFP-50G-SL
SFP-50G-SR-S
SFP-50G-LR-S
QDD-8X100G-FR
QDD-2X400G-FR4

In addition, the gross revenue information Cisco has produced in this case lacks data for at least the following Accused Products (in addition to all of those chassis, pluggable line card, and switch products mentioned in Section 1. above):

CIM8-C-K9
CIM8-L-K9
DP04CFP2-D15

DP04QSDD-HE0, DP04QSDD-HK9, DP04QSDD-LK9
QSFP-100G-SR1.2
QDD-400G-SR4.2-BD
QDD-8X100G-FR
QDD-2X400G-FR4
NCS1K4-QXP-K9
NCS1K4-QXP-L-K9
NCS1K4-2.4T-K9

If you contend that any of these products are missing or excluded because there have been no "general" sales, please identify those products in your responses. Also, this would not be a valid objection as our discovery requests cover qualification, sampling, and other "pre-sale" delivery and sales to customers. Information about use by Cisco and its customers, as well as technical information about these products, is indisputably relevant—and largely or completely missing from Cisco's responses and productions.



### 5.  Missing identification of components and production re: OEM modules

Ramot's Interrogatory No. 7 asked for the identification of DSP and other components within Cisco's transceiver modules.  Cisco failed to do so with respect to modules "sourced from third parties."  But Cisco has this information in its possession, and its failure to provide it has substantially prejudiced Ramot, forcing and then delaying effective subpoena discovery of Cisco's OEMs, who have objected that they also need component identification in order to respond.

Ramot also sought technical information from Cisco about Each Accused Product, including:  Engineering specifications and design documents (RFP Nos. 3, 7, 10); Schematics, block diagrams, etc. (RFP No. 4); Bill of Materials or other documents to show the components (and their costs) included in each Accused Product (RFP No. 6).  Cisco's production of these materials has been inadequate, particularly with respect to modules "sourced from third parties," which include those designed by, or with input from, Cisco.

And particularly relevant for modules "sourced from third parties," Ramot requested Cisco produce, from its possession, customer documentation, *e.g.*, datasheets, device specifications, design guidelines, programming or configuration guides, application notes, and whitepapers (RFP No. 11).  Cisco has not done so, forcing Ramot to seek via subpoena documents that Cisco's third-party OEMs provide their customers like Cisco in the ordinary course and here.

This obstruction has prejudiced Ramot's ability to complete discovery.  For example, the lack of documents from Cisco detailing the components and operation of modules built by OEMs has prevented Ramot from mitigating Cisco's failure in interrogatory responses to identify such components and detail such operation.

Cisco's failure to identify components and provide complete technical discovery, including for OEM products, has delayed discovery, has impeded Ramot in third-party discovery, and prevents Ramot from effectively deposing Cisco's technical witnesses about the Accused Products.

### 5.  Incomplete production re: Acacia components

The few customer specifications and programming guides produced in this case for certain of the Acacia DSP products contain lists of other relevant documents, many of which are obviously relevant and responsive to Ramot's requests, but are not included in the production.  And similar customer specifications and programming guides appear to be missing for other of Acacia's DSP chips.  A complete list of this material is outside the scope of this letter and not Ramot's responsibility to compile, but examples can be provided to assist Cisco's discovery compliance.

Also, Cisco's April production included, for the first time in four years of litigation, a handful of engineering specifications for



These documents are highly relevant to Ramot's allegations of infringement, and

their sparse selection and late production demonstrates that Cisco's search for and production of non-public technical materials remains manifestly incomplete.

*     *     *

Ramot has already been prejudiced by Cisco and Acacia's failure to timely produce these materials, and additional delay will compound this prejudice.

<u>Accordingly, please immediately remedy the deficiencies identified herein, let us know a date certain by when you will do so, or identify times when you can be available to meet and confer about these issues</u>.  We are available to answer any questions you may have or to otherwise confer about the above.

Regards,

Corey Johanningmeier

cc: All Counsel of Record

EXHIBIT 11

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
FORT WORTH
AUSTIN

HANOI
HO CHI MINH CITY
SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR

ALLIANCES IN MEXICO

# DuaneMorris®

*FIRM and AFFILIATE OFFICES*

HOLLY ENGELMANN, P.C.
DIRECT DIAL: +1 214 257 7226
PERSONAL FAX: +1 214 292 9454
*E-MAIL:* HEngelmann@duanemorris.com

*www.duanemorris.com*

October 6, 2023

VIA E-MAIL

Corey Johanningmeier
Bunsow De Mory
701 El Camino Real
Redwood City, CA 94063
cjohanningmeier@bdiplaw.com

Re:    **Cisco Sys., Inc. and Acacia Comms., Inc. v. Ramot at Tel Aviv Univ. Ltd.,
Case Nos. 1:21-cv-01365-GBW and 1:22-cv-00674-GBW (D.D.E.)**

Dear Corey:

I write in response to your letter dated September 13, 2023.

As an initial matter, Cisco and Acacia have not "prejudiced Ramot in preparing its case" and our offer to extend the Fact Discovery deadline by a week was in no way intended to force Ramot "into a last-minute rush to take depositions on an incomplete record." As you note in your letter, the litigation between the parties has spanned many years, with the current actions filed more than two years ago (September 28, 2021), with additional cases added eight months later (May 24, 2022). The current Scheduling Orders were entered over a year ago (September 8, 2022) and provided for disclosures to be made on September 14, 2022, Cisco's production of core technical documents on October 14, 2022, and discovery following thereafter until the September 29, 2023 deadline. As required, Cisco and Acacia served its Initial Disclosures on September 14, 2022, served interrogatories and RFPs on September 28, 2022, and produced core technical documents on October 14, 2022. Five months later on February 15, 2023, Ramot served interrogatories and RFPs, to which Cisco and Acacia responded and objected on April 21, 2023. Only as the September 29, 2023 fact discovery deadline loomed did Ramot serve 30(b)(6) deposition notices (August 15, 2023), third-party subpoenas (August 22, 2023), 30(b)(1) deposition notices (August 24, 2023), additional third-party subpoenas (August 29, 2023), and a second set of interrogatories (August 29, 2023). To blame Cisco and Acacia for a "last-minute rush" is belied by this timeline.

Corey Johanningmeier
October 6, 2023
Page 2

DuaneMorris

For documentary purposes, I note that since your September 13 letter and before this response, the parties filed a stipulation staying all discovery (other than third-party document discovery) until after the issuance of the Final Written Decision in the '872 Patent *inter partes* reviews. 1:21-cv-01365-GBW, Dkt. 87, 1:22-cv-00674-GBW, Dkt. 77 (Sept. 20, 2023). The Court ordered the stay on September 21, 2023. No new discovery can be served, but should the stay be lifted the parties can seek responses, documents, and depositions for discovery already served.

Regarding your reference to Ramot's Motion to Compel in the Eastern District of Texas Case (*Ramot at Tel Aviv Univ. Ltd. v. Cisco Sys., Inc.*, Case No. 2:19-cv-00225-JRG) both parties filed motions to compel: Cisco filed a motion on July 3, 2020 (Dkt. 93); and Ramot filed a motion on July 6, 2020 (Dkt. 96). Cisco's motion sought documents relating to the prosecution of the patents-in-suit and/or patents related by priority to the patents-in-suit. ████████████████████ The parties filed responses (Dkt. Nos. 101 and 104 respectively), but the Court did not hear argument or issue a ruling before staying the case pending resolution of ex parte reexaminations (Dkt. 235). So to your point, it appears both parties have issues that persist from the EDTX Matter.

Turning to your specific complaints.

1.      **Ramot's Allegation that Cisco Improperly Redefined "Accused Products"**

In its February 15, 2023 discovery requests, Ramot defined "Accused Products" so broadly as to encompass Cisco routers, switches, and optical transport systems, regardless of whether those products have been accused of infringement and could possibly be accused of infringement; and regardless of whether those products are sold separately as part of a Modular system (e.g., 9000 Series and 8800 Routers), are integrated and sold together with other components of a Fixed Chassis system (e.g., 8100 and 8200 Routers), or are themselves the substantially complete functional instrumentality of a complete system (e.g., certain Nexus 3000 Series or Nexus 9300 Series GX and GX2 switches). The patents in suit relate to a laser modulator and thus, Cisco's and Acacia's discovery responses identified the specific optical transceiver modules identified in Ramot's definition and further identified by product name or model number in Ramot's preliminary infringement contentions served on December 16, 2022 those products that (1) included optical modulators and operate at speeds at or above 100G, and (2) routers, switches, or line cards that include the transmit DSP functionality that Ramot accuses of infringement. In total we identified over a hundred products by description and ID number. Moreover, limiting discovery to the actual accused products for which Ramot has provided Cisco and Acacia with infringement claim charts is proper.



Corey Johanningmeier
October 6, 2023
Page 3

Chassis, pluggable line cards, router and switch products that do not contain optical modulators are not within the proper scope of discovery in this case. Given that these are apparatus claims that are all directed exclusively to an optical modulator, and given that the claim elements all recite the details of the claimed optical modulator, Ramot cannot in good faith accuse products that do not even have an optical modulator. If you actually are doing so, please let us know, and please provide a chart specific to any such product, including an explanation of how claim elements directed exclusively to an optical modulator could be infringed by a product without an optical modulator.

2.      "Missing Accused Products."

You allege that technical information about certain products has not been produced. Cisco and Acacia disagree with your characterization, and refer you to Cisco's and Acacia's responses to Ramot's Interrogatory No. 1, which identifies specific technical documents, and Interrogatory No. 5. Cisco and Acacia further note that the products you identify were not identified in Ramot's preliminary infringement contentions. Cisco and Acacia do not have an obligation to identify accused products for Ramot, particularly where the products are publicly available. *See, e.g., Honeywell Int'l Inc. v. Audiovox Commc'ns Corp.,* C.A. No. 04-1337-KAJ, 2005 WL 3988905, at *1 n.2 (D. Del. Oct. 7, 2005); *Invensas Corp. v. Renesas Elecs. Corp.,* 287 F.R.D. 273, 286 (D. Del. 2012). Nevertheless, in the spirit of compromise, to the extent such products have been released or are expected to be released by opening expert reports in these cases and to the extent such products contain either transmit DSP functionality and/or optical modulators, Cisco and Acacia will supplement their Interrogatory responses to identify such products and produce additional relevant documents should the stay be lifted.

3.

4.



Corey Johanningmeier
October 6, 2023
Page 4

**DuaneMorris**

5.      **"Missing identification of components and production re: OEM Modules."**

In response to Interrogatory 7, we identified the OEMs for each pluggable, noting by Product ID the third-party supplier. ███████████████████████████████████████████████████████████████████████████████████████████████████████ These third-parties supply the modules and components and thus, have technical information (e.g., datasheets, device specifications, engineering specifications, design documents and guidelines, schematics, block diagrams, programming or configuration guides, application notes, whitepapers) responsive to Ramot's discovery requests that Cisco and Acacia do not have. Having to seek that information from the third-parties who generate and maintain the documentation Ramot seeks is not prejudicial, but a normal and ordinary course of litigation. Ramot served subpoenas on many of the identified third-parties and Cisco and Acacia expect Ramot to obtain information from those sources.

6.      **"Incomplete production re: Acacia components."**

Production of "highly relevant" documents does not demonstrate that "there are large numbers of additional relevant and responsive technical documents remaining unproduced," nor is it evidence that Cisco's and Acacia's productions have been "manifestly incomplete." Production of documents five months before the close of fact discovery is anything but late, particularly where Cisco and Acacia fully complied with the substantial document completion deadline in the scheduling order.   Likewise, Ramot's complaints about receiving Acacia specifications in the current litigation ignore the fact that while Acacia is a party to the current Delaware litigation, Acacia is a non-party in the EDTX Matter from whom Ramot sought documentation via subpoena, and from whom Ramot did not move to compel any documents or information Ramot thought missing in the EDTX Matter. You state that Ramot can provide examples of what it seeks to assist in a document search. We welcome such assistance and look forward to receiving a list.

*        *        *

Please let me know if you have any questions.  If you wish to meet and confer concerning each side's discovery letters, we are amenable.  Please propose a time and we can set something up.  Thank you.

Sincerely

*/s/ Holly Engelmann*

Holly Engelmann