IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CISCO SYSTEMS, INC. and ACACIA COMMUNICATIONS, INC., )<br><br>Plaintiffs, )<br><br>v. )<br><br>RAMOT AT TEL AVIV UNIVERSITY LTD., )<br><br>Defendant. ) | ▉▉▉▉▉▉▉▉▉▉▉<br><br>C.A. No. 21-1365-GBW |
| CISCO SYSTEMS, INC. and ACACIA COMMUNICATIONS, INC., )<br><br>Plaintiffs, )<br><br>v. )<br><br>RAMOT AT TEL AVIV UNIVERSITY LTD., )<br><br>Defendant. ) | C.A. No. 22-674-GBW (consolidated) |

**ANSWERING BRIEF IN OPPOSITION TO CISCO'S MOTION
TO EXCLUDE THE OPINIONS AND TESTIMONY OF STEPHEN E. DELL**

*Of Counsel:*

Denise De Mory
Robin King Curtis
Corey Johanningmeier
Michael Flynn-O'Brien
Brenda Entzminger
BUNSOW DE MORY LLP
701 El Camino Real
Redwood City, CA 94063
(650) 351-7248
ddemory@bdiplaw.com
rcurtis@bdiplaw.com
cjohanningmeier@bdiplaw.com
mflynnobrien@bdiplaw.com
bentzminger@bdiplaw.com

John G. Day (#2403)
Andrew C. Mayo (#5207)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant*

{02129260;v1 }

James T. Wilson
Wayne M. Helge
BUNSOW DE MORY LLP
277 S. Washington St., Suite 210, #1088
Alexandria, VA 22314
(571) 208-0186
jwilson@bdiplaw.com
whelge@bdiplaw.com

Dated: June 4, 2025

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................................ 1

II.   LEGAL STANDARDS ............................................................................................... 1

III.  MR. DELL APPORTIONS USING THE ANALYTICAL APPROACH ........................ 2

      A.   The Analytical Approach is a Reliable Method of Apportionment ....................... 2

      B.   Ramot's Expert, Mr. Dell, Uses the Recognized and Reliable Analytical
           Approach to Estimate an Incremental Value of the Patented Technology ............ 2

      C.   Cisco's Expert, Mr. Martinez, Uses the Analytical Approach to Estimate
           an Incremental Value of the Patented Technology of ▮▮▮▮▮▮▮▮▮ ........... 5

      D.   Cisco's Criticisms of Mr. Dell's Apportionment Analysis Have No Merit ........... 6

           1.   Mr. Dell May Apportion the Royalty Base, Royalty Rate, or Both ............ 6

           2.   Mr. Dell's Cost Savings is a Reliable Method of Apportionment ............. 8

           3.   Mr. Dell's Cost Savings Comparison is Reliable and Supported ............ 10

           4.   Mr. Dell's Inputs to the Cost Savings Analysis Are Also Reliable .......... 13

IV.   CISCO'S OTHER CRITICISMS ARE NOT METHODOLOGICAL OR VALID ........ 16

      A.   Application of a Royalty Rate Across Accused Products Is Reasonable ............. 16

      B.   Attribution of Laser Cost Savings Properly Attributable to Patents .................... 17

      C.   Cost Savings Based on Lasers Alone is Conservative and Appropriate .............. 18

      D.   Reliance on Expected Gross Margin and Other Metrics is Appropriate ............. 18

V.    CONCLUSION ........................................................................................................ 19

# TABLE OF AUTHORITIES

## CASES

*Acceleration Bay LLC v. Activision Blizzard Inc.*,
No. 1:16-CV-00453-RGA, 2019 WL 4194060 (D. Del. Sept. 4,
2019) ..................................................................................................... 12, 13

*CSIRO v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) .................................................................. 6

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .................................................................................... 1

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) .......................................................... 2, 6, 7

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*,
879 F.3d 1332 (Fed. Cir. 2018) .................................................................. 7

*Finjan LLC v. SonicWall, Inc.*,
84 F.4th 963 (Fed. Cir. 2023) ..................................................................... 8

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) ........................................................... 1

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) .................................................................. 8

*Helios Software, LLC v. Awareness Technologies, Inc.*,
No. CV 11-1259-LPS, 2015 WL 12806482 (D. Del. Apr. 13, 2015) ........... 8

*Inkit, Inc. v. airSlate, Inc.*,
No. CV 23-793-RGA, 2025 WL 871287 (D. Del. Mar. 20, 2025) ............ 13

*Karlo v. Pittsburgh Glass Works, LLC*,
849 F.3d 61 (3d Cir. 2017) ......................................................................... 2

*Metaswitch Networks Ltd. v. Genband US LLC*,
No. 2:14-CV-744-JRG, 2016 WL 874737 (E.D. Tex. Mar. 5, 2016) .......... 2

*Pineda v. Ford Motor Co.*,
520 F.3d 237 (3d Cir. 2008) ....................................................................... 1

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*,
904 F.3d 965 (Fed. Cir. 2018) .................................................................... 8

*Prism Technologies LLC v. Sprint Spectrum L.P.*,
849 F.3d 1360 (Fed. Cir. 2017) ........................................................... 8, 12

*Provisur Technologies, Inc. v. Weber, Inc.*,
    119 F.4th 948 (Fed. Cir. 2024) ............................................................................ 8

*Realtime Data LLC v. EchoStar Corp.*,
    No. 6:17-CV-00084-JDL, 2018 WL 6266301 (E.D. Tex. Nov. 15,
    2018) ................................................................................................................... 19

*Salazar v. HTC Corp.*,
    No. 2:16-cv-01096-JRG-RSP, 2018 WL 1783157 (E.D. Tex. Apr.
    13, 2018) ............................................................................................................. 19

*Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC,*
    No. CV 18-1752-RGA, 2022 WL 1801433 (D. Del. June 2, 2022) ................................. 9

*Sprint Communications Co. v. Charter Communications, Inc.*,
    No. CV 17-1734-RGA, 2021 WL 982732 (D. Del. Mar. 16, 2021) ....................... 8, 9, 18

*Summit 6, LLC v. Samsung Elecs. Co.*, Ltd.,
    802 F.3d 1283 (Fed. Cir. 2015) ............................................................... 1, 13, 19

*TWM Mfg. Co. v. Dura Corp.*,
    789 F.2d 895 (Fed. Cir. 1986) ............................................................................. 2

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ......................................................................... 18

*VirnetX, Inc. v. Cisco Systems, Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ...................................................................... 8, 18

*Whitserve, LLC v. Comput. Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ............................................................................ 18

**TABLE OF EXHIBITS**

| Exhibit | Document | Citation |
|---------|----------|----------|
| Exhibit A | Expert Report of Christopher Martinez (Damages) 3/10/2025 (Excerpted) | Martinez Rpt. |
| Exhibit B | Deposition Transcript of Duncan MacFarlane PhD and Selected Exhibits, 4/23/2025, 4/25/2025 | MacFarlane Tr. |
| Exhibit C | Deposition Transcript of Christopher Martinez 4/22/2025 | Martinez Tr. |
| Exhibit D | Expert Report of Stephen Dell (Damages) 2/4/2025 | Dell Rpt. |
| Exhibit E | Expert Report of John Dallesasse PhD (Infringement) 2/4/2025 | Dallesasse Rpt. |
| Exhibit F | Cisco QSFP-DD Portfolio Presentation (Cisco-Ramot_00062595) | Ciso-Ramot_00062595 |
| Exhibit G | Deposition Transcript of Ray Nering 12/10/2024 | Nering Tr. |
| Exhibit H | Deposition Transcript of John Dallesasse (ED Tex.) 8/19/2020 | Dallesasse EDTX Tr. |
| Exhibit I | Deposition Transcript of Stephen E. Dell 5/1/2025 | Dell Tr. |
| Exhibit J | Deposition Transcript of Dan Lang (ED Tex.) 6/30/2020 | Lang EDTX Tr. |
| Exhibit K | ███████ (Cisco-Ramot_00062589) | Cisco-Ramot_00062589 |
| Exhibit L | Pico ██ Specification (Acacia-Ramot_00000009) | Acacia-Ramot_00000009 |
| Exhibit M | Pico ███████████ (Acacia-Ramot_00000213) | Acacia-Ramot_00000213 |
| Exhibit N | Acacia ███████ Specification (Acacia-Ramot_00000025) | Acacia-Ramot_00000025 |
| Exhibit O | ████████████ Specification (███████████) | ████████████ |
| Exhibit P | Deposition Transcript of John Dallesasse (D. Del.) 4/28/2025 | Dallesasse DDE Tr. Vol. I |
| Exhibit Q | Deposition Transcript of John Dallesasse (D. Del.) 4/29/2025 | Dallesasse DDE Tr. Vol. II |
| Exhibit R | ███████ (Cisco-Ramot_00065657) | Cisco-Ramot_00065657 |
| Exhibit S | Reply Expert Report of John Dallesasse PhD (Infringement) 4/3/2025 | Dallesasse Reply Rpt. |
| Exhibit T | Rebuttal Expert Report of Duncan MacFarlane, PhD Regarding Non-Infringement of U.S. Patent Nos. 11,133,872 and 11,342,998 3/10/2025 | MacFarlane Rebuttal Rpt. |

| Exhibit U | Cisco Article "The 100G Lambda MSA Specifies Cost-Effective 100GE and 400GE Optical Modules" (RAMOT_C-000753) | RAMOT_C-000753 |
|---|---|---|
| Exhibit V | Reply Expert Report of Stephen E. Dell, CVA Relating to Damages 4/3/2025 | Dell Reply Rpt. |
| Exhibit W | Declaration of John Dallesasse 6/4/2025 | Dallesasse Decl. |
| Exhibit X | Deposition Transcript of Jonas Geyer 12/12/2024 | Geyer Tr. |
| Exhibit Y | Acacia █████████████ Specification (Acacia-Ramot_00000021) | Acacia-Ramot_00000021 |

## I.    INTRODUCTION[1]

Ramot's damages expert, Stephen Dell, used reliable methods and relied on legally sufficient facts to arrive at an appropriate reasonable royalty as a result of Cisco's infringement in this case. Dell utilized the "Analytical Approach" and, as relevant, the fifteen factors identified in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) to arrive at a reasonable royalty that the parties would have agreed to at a hypothetical negotiation in or around September 2021, the date on which the first of the asserted patents issued and thus the date on which Cisco's infringement began. Relying on Ramot's technical expert, Dr. John Dallesasse, Cisco's witnesses, and the discovery in this case, Mr. Dell determined that the profit premium that Cisco earns by virtue of its use of the patented technology ranges between 6 and 20 percent. After carefully considering all of the *Georgia Pacific* Factors, Dell concluded that the parties would agree to a 10 percent reasonable royalty. His opinion is factually and legally sound.

## II.    LEGAL STANDARDS

Expert testimony must be relevant, based on reliable principles or methods, and be supported by legally sufficient facts and data. Fed. R. Evid. 702. Rule 702 "has a liberal policy of admissibility[,]" *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (citation omitted), as "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court[,]" *Summit 6, LLC v. Samsung Electronics Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" to challenge admissible testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993); *Karlo v.*

---

[1] All citations to numbered exhibits are to the exhibits filed in support of Cisco's Opening Brief in Support of Their Motion to Exclude the Opinions and Testimony of Stephen E. Dell. All citations to lettered exhibits are contained within the Declaration of Corey Johanningmeier filed concurrent with this opposition.

*Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017) (*quoting Daubert*, 509 U.S. at 596).

## III.    MR. DELL APPORTIONS USING THE ANALYTICAL APPROACH

Mr. Dell's expert analysis and conclusion that the parties would have agreed to a 10 percent reasonably royalty is based on a reliable methodology and supported by the evidence in this case.

### A.    The Analytical Approach is a Reliable Method of Apportionment

Apportionment is designed to isolate "the value attributable to the infringing features of the product, and no more." *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Dell utilized the common and widely accepted "Analytical Approach" and, as relevant, the fifteen *Georgia-Pacific* factors to arrive at a royalty that the parties would have agreed to at a hypothetical negotiation in or around September 2021. As the Federal Circuit has recognized, the Analytical Approach considers the anticipated incremental (or excess) profits that a licensee expects to earn as a result of utilizing the infringing technology over a "normal" profit, or the "next best alternative" noninfringing product, thereby analytically isolating the incremental profit directly attributed to the infringing technology.  *Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-CV-744-JRG, 2016 WL 874737, at *5 (E.D. Tex. Mar. 5, 2016), *citing TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986)).  Because this methodology focuses on the incremental profit generated by use of the patented technology, it necessarily apportions and accounts for only the value of the patented technology.  The Analytical Approach is often used by experts and has been accepted as an appropriate methodology.  *See, e.g.*, *TWM*, 789 F.2d at 899.

### B.    Ramot's Expert, Mr. Dell, Uses the Recognized and Reliable Analytical Approach to Estimate an Incremental Value of the Patented Technology

Mr. Dell uses the Analytical Approach to apportion Cisco's revenues to the incremental value of the patented technology.  Mr. Dell begins by extensively analyzing the benefits of the asserted patents.  *See* Ex. D (Dell Rpt.) ¶¶ 248-291.  Mr. Dell is a valuation expert—not a technical

expert—and so he unsurprisingly relies on the written opinions of, and conversations with, Dr. Dallesasse—a distinguished Professor of Electrical and Computer Engineering at the University of Illinois and undisputed expert in this field—to explain the benefits of implementing the patented technology in Cisco's products. *Id.* ¶¶ 13, 105, 248-291, 307-317, 362, *passim*.  Mr. Dell also relies on, and indeed takes his approach, directly from Cisco own documents. *Id.* ¶¶ 309-319, 317-319.

Dr. Dallesasse's Report contains a lengthy discussion of the advantages of the invention. *See* Ex. E (Dallesasse Rpt.) ¶¶ 32-49.  He further describes the benefits of the infringing features of the accused products to Cisco.  *Id.* ¶¶ 679-694. Mr. Dell also relied on conversations with Dr. Dallesasse. Ex. D (Dell Rpt.) ¶ 250. And Dr. Dallesasse explained that patented technology enabled the use of "multi-level modulation, such as Pulse-Amplitude Modulation ("PAM4") and Quadrature Amplitude Modulation ("QAM")", that allows for "the reduction (or elimination) in the number of lasers (or laser modules) in the Accused Products as a result of the ability of the device to carry out four levels of modulation over a single lane or fiber."  *Id*. ¶ 250, 262. This discussion included comparing the components necessary in the prior, non-accused techniques and in the PAM and QAM modulation techniques of the accused products.  Dr. Dallesasse explained that prior techniques for sending data at ever-increasing speeds required sending the data over multiple lanes in parallel, referred to as Wavelength Division Multiplexing or WDM.  Ex. E (Dallesasse Rpt.) ¶ 38. Dallesasse then explained that in contrast, the PAM and QAM modulation techniques "have the benefit of ***reducing the number of optical components*** relative to parallel transmission methods" and that these techniques use only "2 short-wavelength (~850 nm) lasers" or "an ~1310 nm laser externally modulated … to achieve 100 gigabits per second" instead, rather than the previously required 10 or 4 lasers in WDM products.  *Id*. at ¶ 42 (emphasis added).  Dr. Dallesasse also explained that "[r]educing the number of components and power dissipation enable the use of smaller-footprint optical modules" which provides further benefit.  *Id.* ¶ 48, ¶¶ 681-694.

Cisco's documents are in accord. Specifically, Mr. Dell found and relied upon Cisco documents that describe and extoll the benefits described by Dr. Dallesasse in the form of comparisons between the accused ████████████████████ modules and the non-accused ████████████ products.[2] These products are otherwise similar with respect to speed, distance and form factor—but they differ in the manner identified by Dr. Dallesasse as attributable to the implementation of the patented technology. *See* Ex. E (Dallesasse Rpt.) ¶¶ 682; 679-694.



Ex. D (Dell Rpt.) at ¶ 263, *citing* Ex. F (Ciso-Ramot_00062595) at p. 7.  In other words, Cisco's own contemporaneous documents provided Mr. Dell with a natural product comparison to a non-infringing alternative through which he could isolate the value of the patented technology herein.

Accordingly, Mr. Dell utilized the comparison in Cisco's documents between the unaccused ████████████████████, on the one hand, and the ████████████████, on the other, analyzed bills of materials (to the extent Cisco produced them) and calculated a

---

[2] Mr. Dell also cites the testimony of Cisco witnesses Mr. Traverso and Mr. Kupfer, as well as Cisco documents that confirm and expound upon those advantages.  Ex. D (Dell Rpt.) ¶¶ 254-261.

conservative estimate of the incremental profit (cost savings) attributable to patented technology as a result of fewer lasers being required. Ex. D (Dell Rpt.) ¶ 263; Attachments 10, 10.1, 10.2, 10.3; *see also* ¶¶248-291; 304-347; Ex. V (Dell Reply Rpt.) ¶ 34-67. To be clear, Mr. Dell could have also deducted the costs of other optical componentry, but conservatively relied only on the cost of the laser. Ex. D (Dell Rpt.) ¶ 263.  Mr. Dell also considered this information in view of other accused products. *Id.* ¶ 344; Attachment 11. Mr. Dell ultimately calculated an incremental profit attributable to the patented technology of ████████    *Id.* ¶ 347.

### C.    Cisco's Expert, Mr. Martinez, Uses the Analytical Approach to Estimate an Incremental Value of the Patented Technology of ████████

Demonstrating both the reliability of the Analytical Approach that Mr. Dell applies and the reasonableness of his opinions, Cisco's damages expert, Mr. Martinez, also applies the Analytical Approach to estimate an incremental value of the patented technology of ████████.

Specifically, Mr. Martinez provides an alternative damages calculation that includes an "illustrative apportionment of accused products." Ex. A (Martinez Rpt.) ¶¶ 319-321 (Tables 32-33) & Scheds. 5.0-6.1. Mr. Martinez begins with Cisco's revenues for the accused products, and relies on Mr. Dell's royalty bases for this purpose. He then applies certain "apportionment factors" provided by Cisco's technical expert, Dr. MacFarlane, to those revenues. *See* Ex. B (MacFarlane Tr.) 250:4-20; Ex. C (Martinez Tr.) 154:7-157:14, 159:9-22, 161:19-164:1. Dr. MacFarlane confirmed his factors "conservatively isolate the value of the product that's contributed by the alleged infringing functionality from any value that comes from other things." Ex. B (MacFarlane Tr.) 262:23-263:4; 261:7-11; 261:23-262:22; 250:4-20; 251:7-252:8.  Mr. Martinez then concludes that the incremental value of the patented technology is between ████████. *See* Ex. C (Martinez Tr.) 154:7-157:14, 159:9-22, 162:6-24; Ex. A (Martinez Rpt.) ¶¶ 319-321.

| Table 32: Alternative Dell Royalties Based Upon Dr. MacFarlane Apportionment Factors[52] | | | | | |
|---|---|---|---|---|---|
| ($ in millions) | | Scenario | | | |
| | | 1 | 2 | 3 | 4 |
| Low-End Apportioned Accused Product Revenue | | | | | |
| Mr. Dell's Royalty Rate | | | | | |
| **Mr. Dell's Royalty Damages Based Upon Dr. MacFarlane's Lesser Apportionment of Accused Sales** | | | | | |
| High-End Apportioned Accused Product Revenue | | | | | |
| Mr. Dell's Royalty Rate | | | | | |
| **Mr. Dell's Royalty Damages Based Upon Dr. MacFarlane's Higher Apportionment of Accused Sales** | | | | | |

| Table 33: Apportionment of Cisco-Ramot_10023244[53] | | | |
|---|---|---|---|
| Dr. MacFarlane's Product Groupings | Accused Sales | Apportionment Factor | Apportioned Accused Sales |
| Coherent Optical Modules from Acacia | | | |
| 100G Single Lambda and 400G Optical Modules | | | |
| 40/100G BiDi Modules | | | |
| Line Cards with AC1200 Optical Modules | | | |
| Line Cards with Etna Denali DSP and Analog Coherent Optics Modules | | | |
| Line Cards with Etna DSP and Integrated Optical Modulators | | | |
| Line Cards without DSPs and Optical Modulators | | | |
| **Total** | | | |

*See e.g.*, Ex. A (Martinez Rpt.) ¶¶ 319-321 & Scheds. 5.0-6.1. This is the Analytical Method.

For purposes of the present motion, it is worth mentioning that Mr. Dell's apportionment figures are not that different from those of Cisco's technical expert, Dr. MacFarlane, upon which Mr. Martinez relies. Specifically, as recounted by Mr. Martinez, "[a]ccording to Dr. MacFarlane and demonstrated [in Tables 31 and 33], the Patents-in-Suit could be ascribed to, at most, ▮▮▮▮ ▮▮▮ of the value of the Accused Products for purposes of assessing accused sales." Ex. A (Martinez Rpt.) ¶ 319. This is a difference of degree, and not of kind, from Mr. Dell's ▮▮▮▮

### D.    Cisco's Criticisms of Mr. Dell's Apportionment Analysis Have No Merit

Cisco's criticisms of Mr. Dell's apportionment have no merit. There is no dispute that the "damages awarded for patent infringement 'must reflect the value attributable to the infringing features of the product, and no more.'" *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (citing *Ericsson*, 773 F.3d at 1226). That is exactly what Mr. Dell determined in this case.

### 1.    Mr. Dell May Apportion the Royalty Base, Royalty Rate, or Both

Cisco's primary criticism of Mr. Dell's analysis is that he was required to apportion the royalty base *rather than* the royalty rate. Mot. at 4-10. As a preliminary matter, Mr. Dell did both. As Cisco begrudgingly admits but would like to ignore (Mot. at 8-9), where appropriate, Mr. Dell also "apportioned the revenue attributed to the[] accused Line Cards in order to account for only the portion of the revenue or value that would be directly applicable to the use and benefits of the patents at issue" based on conversations with Dr. Dallesasse and review of Bills of Materials

produced by Cisco, and provided a supporting analysis. Ex. D (Dell Rpt.) ¶¶ 99-103 & Attach. 12.

In any event, there is no support for Cisco's alleged requirement. On the contrary, the case law is clear that a damages expert may apportion through the royalty base, the royalty rate, or both.

> On appeal, Briggs argues that Exmark's expert should have apportioned or separated the value of the baffle from the other features of the mower through the royalty base rather than the royalty rate. We disagree. We have held that apportionment can be addressed in a variety of ways, including "by careful selection of the royalty base to reflect the value added by the patented feature [or] ... by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." [*Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)]. So long as Exmark adequately and reliably apportions between the improved and conventional features of the accused mower, using the accused mower as a royalty base and apportioning through the royalty rate is an acceptable methodology. *Id.* (citing *Garretson*, 111 U.S. at 121, 4 S.Ct. 291).

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1348 (Fed. Cir. 2018). As the Federal Circuit explained in setting out that flexible framework, "[t]he essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Id.* (quoting *Ericsson*, 773 F.3d. at 1226). And that is precisely what Mr. Dell's cost savings analysis has done. By identifying and comparing a set of products for which the patented technology is the distinguishing factor, and calculating the cost savings (or profit premium) enabled by its implementation, Mr. Dell has isolated the "value attributable to the infringing features of the product, and no more." *CSIRO*, 809 F.3d at 1301.

That Mr. Dell has apportioned through the royalty rate rather than the royalty base is of no moment. To see this, consider the reasonable royalty formula in mathematical terms, wherein Base [B] x Rate [R] = Damages [D]. A damages expert must conduct some measure of apportionment [A] to ensure that damages [D] correspond to the value of the patented technology. Assume, for simplicity, that the revenue base is $100 (B=$100), that parties agree that the patented technology is responsible for 5% of the revenue derived from the product (A=0.05), and that the only

remaining input into the royalty rate (R) is the split between the parties, which is consistent across the parties experts at 50% each. To wit, you could apply the apportionment factor of 5% to the royalty base or royalty rate and derive the same answer: damages would be $2.5 out of $100.

#1 – Apportion the base: B(A) * R = D ➔ 100(0.05) * 0.5 = D ➔ D = 2.5

#2 – Apportion the rate: B * R(A) = D ➔ 100 * 0.5(0.05) = D ➔ D = 2.5

It is this undeniable mathematical principle that underlies the flexible framework in *Exmark*.

### 2.  Mr. Dell's Cost Savings is a Reliable Method of Apportionment

None of Cisco's cited cases compel a different result. Nor does its attempt to invoke the specter of the EMVR. *See* Mot. at 6-9. Whether we are talking about *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308 (Fed. Cir. 2014), *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 904 F.3d 965, 978 (Fed. Cir. 2018), *Finjan LLC v. SonicWall, Inc.*, 84 F.4th 963, 975-77 (Fed. Cir. 2023), *Provisur Technologies, Inc. v. Weber, Inc.*, 119 F.4th 948 (Fed. Cir. 2024), *cert. denied*, 145 S. Ct. 1181 (2025), or *Helios Software, LLC v. Awareness Technologies, Inc.*, No. CV 11-1259-LPS, 2015 WL 12806482 (D. Del. Apr. 13, 2015), the motivating concern is whether "the damages for patent infringement [has been] apportioned to reflect only the value of the patented feature." *Power Integrations, Inc.*, 904 F.3d at 978. Mr. Dell has done that here.

Cisco fails to cite any case law that questions the propriety and reliability of a cost savings analysis for apportioning damages to the incremental value of the patented technology. But the methodology has been consistently approved. *See Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) (collecting cases); *see also Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080 (Fed. Cir. 1983) ("Reliance upon estimated cost savings from use of the infringing product is a well-settled method of determining a reasonable royalty."). For example, in *Sprint Communications Co. v. Charter Communications, Inc.*, No. CV 17-1734-RGA, 2021 WL 982732 (D. Del. Mar. 16, 2021), the Court denied a motion to exclude a cost savings analysis

where the "profit analysis compares margins on circuit-switched and VoIP services with comparable features, where one (i.e., VoIP) is cheaper to deploy" and "the only meaningful difference between the two compared systems is the profit margin of the VoIP system specifically." No. CV 17-1734-RGA, 2021 WL 982732 at *13-14. The Court found that approach methodologically sound. To the extent the defendants sought to challenge aspects thereof, they could "address the credibility… through cross examination and opposing expert testimony." *Id.*

It is worth noting that the Court in *Sprint Commc'ns* further approved expert testimony that "the parties would agree that the plaintiff gets 100% of the cost savings" so calculated. *Id.*, at *10.

> The Federal Circuit has affirmed use of the analytical approach where the infringer's usual net profit is subtracted from its anticipated net profit realized from sales of infringing products. *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Dr. Mangum did exactly that, as he subtracted the "normal" industry profits from the expected VoIP profits, resulting in a VoIP profit premium. (D.I. 499-1, Exh. 1 at 75-83 of 1128). This analysis follows the approach affirmed by the Federal Circuit in TWM. *See TWM Mfg. Co.*, 789 F.2d at 899 (awarding a 30% royalty not an abuse of discretion when the difference between anticipated net profit and "industry standard net profit" was about 30%). Whether it makes sense to award 100% to Plaintiff in these particular cases may be challenged by cross-examination and an opposing expert's opinion. *See Lucent*, 580 F.3d at 1324 (quoting John Skenyon, Patent Damages Law & Practice § 3.4, at 3-9 to 3-10 (2008) (the analytical method involves " 'calculating damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then apportioning the projected profits between the patent owner and the infringer.' ")) (dicta). Thus, Defendants' motion to exclude on this ground is denied.

*Id.*, at *11. To be clear, Mr. Dell has not offered that opinion in this case, instead allocating just a portion of the cost savings to Ramot. Ex. D (Dell Rpt.) ¶¶ 372-387. And on the defendant's renewed *Daubert* motion, the court once again denied it and acknowledged the appropriateness of the expert's cost savings analysis because the "analytical approach is based on real-world documents" *Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC,* No. CV 18-1752-RGA, 2022 WL 1801433, at *2 (D. Del. June 2, 2022). Dell's opinion is also grounded in analysis of real-world documents. Again, the proper outlet for any criticism is cross examination, not exclusion.

### 3.   Mr. Dell's Cost Savings Comparison is Reliable and Supported

Mr. Dell's cost savings comparison is reliable and supported by the facts of this case. To avoid that outcome, Cisco seeks to impose several requirements: a) there must be a separate cost savings analysis for each accused product, and b) to do that, each accused product must have an identified non-infringing alternative to compare it with. Mot. at 10-11. These "requirements" are made of whole cloth, and reflect a fundamental misunderstanding of a proper cost saving analysis.

As an initial matter, Cisco's emphasis on "180 accused products" is a red herring. That number refers to the number of Product ID (or PID) codes at issue, many (if not most) of which are variations of the same "thing" and all of which refer to differences irrelevant to a cost savings analysis. Indeed, as Cisco acknowledges, 6 of the 7 categories (categories 1, 3-7) of these products are "optical modules" and the last (category 2) "include[s] optical transceivers." *See id.* at 8. As such, all of the accused products are essentially variations of the same or similar optical transceiver product. Indeed, elsewhere in its motion, Cisco is eager to emphasize the similarities across these products, referring to all of them as "optical transceivers" and stating, "by definition, an 'optical transceiver' can both 'transmit' and 'receive'" and providing a single "diagram of an exemplary accused product," evidencing that it is appropriate to generalize across different PIDs. *Id.* at 4-5.

Second, the fact that Mr. Dell's cost savings analysis focuses on a limited set of products is a "feature not a bug." That is because a proper cost savings analysis requires a set of products—as Mr. Dell found here in Cisco's documents—where the primary difference reflects, and can be fairly attributed to, the patented technology. And where there is a lengthy period of infringement, in an industry of consistent product advances and releases, and the patented technology represents a fundamental technological improvement carried from one generation to another—there is likely to be only one or two product evolutions that fit the bill and those would be among the earliest of the accused products. Thus, it is not surprising that Mr. Dell's cost savings analysis focuses on two

of the oldest accused products, wherein the fundamental technological transition took place here.



Ex. D (Dell Rpt.) ¶ 263; Ex. F (Cisco-Ramot_00062595) at pp. 7, 26, 27; Ex. U (RAMOT_C-000753). As noted above, in its own presentations, Cisco itself identified the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ products as the "low cost alternative" to the ▮▮▮▮▮▮▮ products, which Mr. Dell relies upon. *Id.* Those presentations also provide the same or similar cost savings analysis as Mr. Dell conducts in this case. *See e.g.*, Ex. U (RAMOT_C-000753) at p.3 ("Relative Cost Comparison (4L vs 1L" and "Transition from 4L to 1L results in relative cost reduction > 40%").

This does not preclude the benefits calculus from applying to other, especially future, products that incorporate the patented technology.  On the contrary, one would expect the benefits to accrue to later products generations as well, especially where, as here, the technology reflects a fundamental improvement that is incorporated in every later product generation. Indeed, it is the benefits of the technology that ensure there are no non-infringing alternatives to compare the later product generations to because it would be irrational to continue to produce such inferior products.

Third, Mr. Dell's application of the cost savings analysis to future product generations, as well as related products, is well supported by the facts and evidence. Dr. Dallesasse, in his report and conversations with Mr. Dell, explained exactly why the benefits analysis from the earlier set of products carries through to new and different products. For example, Dr. Dallesasse explains why the cost savings derived from an analysis of 100G products applies to 400G products as well.

340.  I understand that the cost savings discussed above is also realized by Cisco

with its newly released QSFP-400G transceiver module Accused Products. Based on my review of Cisco documents, I understand that these modules realize the same or similar economic benefits attributed to the reduction in product complexity and component costs.



Ex. D (Dell Rpt.) ¶ 340. Cisco's witnesses testified in accord. For example, Mr. Nering explained

that

Ex. G (Nering Tr.) at 71. Dr. Dallesasse also explains how those same benefits

apply to other accused products, including coherent modules. *See* Ex. E (Dallesasse Rpt.) ¶¶ 679-694; Ex. S (Dallesasse Reply Rpt.) ¶¶ 94-99 ("analogous cost savings occur with other products, including the accused coherent products); Ex. V (Dell Reply Rpt.) ¶¶ 47-48; *see also id*. ¶¶ 41-44.

To the extent that Cisco disagrees with Dr. Dallesasse or the testimony of its own witnesses, and believes that Mr. Dell's cost savings analysis is not sufficiently or appropriately representative of the accused products, that is a matter for cross-examination, not exclusion. Cisco's cited case law does not suggest otherwise. In *Prism Technologies LLC v. Sprint Spectrum L.P.*, the Federal Circuit affirmed that "[a] price for a hypothetical license may appropriately be based on consideration of the costs and availability of non-infringing alternatives and the potential infringer's cost-savings." 849 F.3d at 1367. That supports Mr. Dell's analysis rather than undercuts it. And Judge Andrews' opinion in *Acceleration Bay LLC v. Activision Blizzard Inc.* does not, as Cisco suggests, establish a rigid and non-sensical rule whereby ***every*** accused product in the case must have "an actual, viable non-infringing alternative" for a cost savings analysis to be applied.

On the contrary, Judge Andrews simply held that a damages expert could not construct the non-infringing alternative with which to compare from whole cloth. *See* No. 1:16-CV-00453-RGA, 2019 WL 4194060, at *3-4 (D. Del. Sept. 4, 2019). But that's not what Mr. Dell did here. Rather he compared specific real-world undisputed non-infringing alternatives to the immediate successor accused products identified in Cisco's own documents and estimated the cost savings attributable to the benefits described therein. *See* Ex. D (Dell Rpt.) ¶¶ 306-361.

### 4. Mr. Dell's Inputs to the Cost Savings Analysis Are Also Reliable

Cisco's only remaining criticism of Mr. Dell's cost savings analysis is that he did not have—and thus did not use—the ***actual*** cost of the laser component in the unaccused ███████ ███████ products used in that analysis, but rather "assumed" that the cost would be the same as in the accused ███████ products. Mot. at 13-18. There are several issues with this criticism.

First, even if everything Cisco says is true (it is not), this is not a methodological error, but a factual or credibility issue appropriately addressed through cross examination. After all, whether "data, or factual assumptions have flaws, these flaws go to the weight of the evidence, not to its admissibility." *Summit 6, LLC*, 802 F.3d at 1299 (affirming district court's refusal to exclude expert testimony based on factual assumptions); *see also Inkit, Inc. v. airSlate, Inc.,* No. CV 23-793-RGA, 2025 WL 871287, at *4 (D. Del. Mar. 20, 2025), reconsideration denied, No. CV 23-793-RGA, 2025 WL 947729 (D. Del. Mar. 28, 2025) (internal marks omitted) (denying motion to exclude expert regarding assumptions; defendant could challenge through cross examination).

Second, to the extent Mr. Dell "assumed…that the cost of one 25G laser [in the unaccused products] would be the same as the cost of one 50G laser [in the accused products]" (Mot. at 14), it was only necessary because the actual cost of the 25G laser was not produced during discovery. Cisco seeks to deflect responsibility by blaming its OEM suppliers for withholding such data and alleging, incredibly, that Cisco never received a Bill of Materials nor received component cost

information from them. *See* Mot. at 17 & n.6. That is difficult to credit, but in any event, explains why Mr. Dell was forced to estimate the cost of the 25G laser and justifies his decision to do so.

Third, Mr. Dell's estimation of the cost of the "25G laser" in the unaccused products has sufficient basis. Mr. Dell recounts how he and Dr. Dallesasse "reviewed the applicable component cost shown in the BOMs provided by Cisco for the accused ███████████████████ ████████ modules" and "identified the applicable laser cost, that in [Dr. Dallesasse's] opinion would be similar, if not the same, as the laser cost in the non-accused ███████████ modules." Ex. D (Dell Rpt.) ¶ 321. Mr. Dell also observed, based on the Bills of Materials, how █████████ ████████████████████████████████. *Id.* ¶ 343; ¶¶ 322-342. This is also consistent with Cisco's own documents related to this product comparison and upon which Mr. Dell relies. *See e.g.*, Ex. U (RAMOT_C-000753) at 3 ("Relative Cost Comparisons (4L v 1L"; and regarding "IC's": "Relative cost remains nearly constant in moving from 4L to 1L").

Cisco attempts to discredit Mr. Dell's reliance with misleading characterizations and incomplete, out-of-context quotations from Dr. Dallesasse's deposition. In one portion that Cisco ignores, Dr. Dallesasse explained that "there would be similarities" between the "laser chip, I mean, the actual semiconductor that forms the laser" for the accused and unaccused products. Indeed, "with regard to the chip itself, I mean, the chip may be similar in lots of ways." Ex. Q (Dallesasse DDE Tr. Vol. II) 153:22-154:3. And while Dr. Dallesasse testified that he did not know the cost of the lasers in the unaccused products off the top of his head at deposition (*see id.* 155:4-156:22), Dr. Dallesasse certainly recalled that he "outlined a methodology that could be used for doing [a cost comparison], and the methodology would be relatively straightforward." *Id.* 156:24-157:11. And that methodology is one that Mr. Dell recalls the two experts undertaking. *See* Ex. I (Dell Tr.) at 107:7-115:7. In any event, depositions are not memory tests, and Dr. Dallesasse's failure to remember a portion of his conversation(s) with Mr. Dell does not warrant their exclusion.

Moreover, one potential source of confusion is that this is the second time that Mr. Dell and Dr. Dallesasse have discussed these issues. As Cisco is well aware, in the earlier Texas case, when Cisco asked Dallesasse about his "discussions with Dell regarding the cost of lasers in the ███████," Dallesasse confirmed that they "had general discussions about costs of lasers in general.... we had a general discussion of the cost of VCSELs versus 1310 lasers, parallel versus serial, et cetera." Ex. H (Dallesasse EDTX Tr.) at 138:19-25. Further, Dallesasse testified about the lasers in the █████████████ modules: "the laser itself is a similar laser in that it is in the same material system" and that "in many cases these are going to be requiring ████." *Id.*, at 145:24-146:9. Dallesasse's answer addressed the types of lasers used in the accused ████ ████████████████████ products, and the non-accused ██████████ products and testified that the lasers used in all the products are similar. *Id.* This supports Dell's opinion.

Finally, there is no reason to believe that Mr. Dell's estimation of the laser cost of the unaccused products in his comparison is wrong. Cisco has certainly not provided any such reason. Mr. Martinez and Dr. MacFarlane did not include any prices for such lasers in their report, and at trial, their criticism of Ramot's analysis will be subject to cross-examination by Cisco's own data. And that data shows a price of ████ for each of the four lasers in a similar ██████████ product, which is consistent with Mr. Dell's estimation. *See* Ex. K (Cisco-Ramot_00062589) (sheet entitled ████████████ items ██████████ shows a price of ████ for each of the ████████ lasers).

In the end, the dispute about the price of the lasers in the non-accused products is a subject for cross examination. Mr. Dell relied on Dr. Dallesasse's opinion that the applicable laser cost of ██████ "would be similar, if not the same, as the laser cost in the non-accused ██████████ modules." Ex. D (Dell Rpt.) ¶ 269; Ex. E (Dallesasse Rpt.) ¶¶ 681-682; Ex. S (Dallesasse Reply Rpt.) ¶ 97. Cisco's data backs up that assertion. To the extent Cisco wants to criticize Ramot's experts for not putting eyes on the actual costs of the lasers in the unaccused products, Ramot can

criticize Cisco's experts for not mentioning its identical costs for ███████ lasers in a product with a different shape but same optical design.  This is a factual and credibility dispute for trial.

## IV.    CISCO'S OTHER CRITICISMS ARE NOT METHODOLOGICAL OR VALID

Cisco's "additional methodological failings" are nothing of the sort. In no event do they necessitate excluding Mr. Dell—rather, Cisco is free to address them through cross examination.

### A.    Application of a Royalty Rate Across Accused Products Is Reasonable

Cisco apparently takes issue with Mr. Dell's application of a single royalty rate across the accused products (Mot. at 18), but it would be highly unusual for parties to negotiate and agree on *separate* royalty rates for *each* accused product in the hypothetical negotiation, much less the in the real world.  Cisco certainly provides no legal support for any such requirement. Further, a single royalty rate is supported by Cisco's professed desire to reduce the administrative burden of royalties.  Dan Lang, Cisco's 30(b)(6) witness regarding licensing practices, testified that ███

████████████████████████████████████████████████████

Ex. J (Lang EDTX Tr.) at 45:3-23; Ex. D (Dell Rpt.) at ¶ 365.  Thus, to the extent the parties would have agreed to a running royalty in September 2021 for the reasons offered by Mr. Dell (and supported, for example, by Ramot's licensing history ████████████████), Cisco would have surely wanted to make sure that the agreed running royalty was simple to administer. And applying the same royalty rate for all the licensed products would have furthered that objective.

Moreover, for the reasons described above, the nature of a cost savings analysis often limits the ability of the parties to identify accused vs. unaccused comparisons for each accused product. As here, in order to identify a set of comparable products that isolates the value of the patented technology, one must often look to the earliest adoption of the technology. That does not, however, limit the applicability of those benefits (and the related cost savings analysis) to future products for the reasons explained by Mr. Dell and Dr. Dallesasse. *See* Ex. E (Dallesasse Rpt.) ¶¶ 679-694;

Ex. S (Dallesasse Reply Rpt.) ¶¶ 94-99 ("analogous cost savings occur with other products, including the accused coherent products); Ex. V (Dell Reply Rpt.) ¶¶ 47-48; *see also id*. ¶¶ 41-44.

Finally, the notion that the laser components in some of the accused products are several magnitudes larger than the ███ estimate used by Mr. Dell only demonstrates that his opinions are conservative. After all, if "[t]he lasers used in the ███████ accused products cost over ███" (Mot. at 18), then the cost savings derived from reducing the numbers of those lasers in the accused products as a result of the patented technology is almost ██ times Mr. Dell's estimation.

**B.    Attribution of Laser Cost Savings Properly Attributable to Patents**

Contrary to Cisco's assertion (Mot. at 19), Mr. Dell did not attribute the total cost difference resulting from the reduction in necessary optical lanes or channels solely to the asserted patents. Indeed, Mr. Dell's analysis also considers apportionment for other enabling technologies. Take the "coherent/QAM accused products" for which the lasers ███████████ By applying the cost of the older lasers, which were in the range of █████, to those products Mr. Dell is necessarily apportioning out other enabling technologies, such as the "tunable" nature of those more expensive lasers. *See* Ex. I (Dell Tr.) at 89:19-90:11; 91:17-21. Similarly, if as Cisco points out, "Mr. Dell's entire analysis is based only on the cost savings of having fewer lasers" (Mot. at 20), consider Dr. Dallesasse's opinion that "one could look at the cost differences of the lasers ***and other optical component costs*** between products." Ex. E (Dallesasse Rpt.) ¶ 682.  By ignoring the costs of those "other optical components," Mr. Dell's cost savings benefit analysis is effectively apportioned for other enabling technologies in the accused products. *See* Ex. I (Dell Tr.) at 81:6-22; 96:1-18.

But even if it were true (it is not) that "Mr. Dell gives Ramot 100% credit for increased speed in the lasers, with no discounting to account for other enabling technologies" (Mot. at 9), that would not be inappropriate. After all, even if there are multiple "enabling" technologies, the removal of any one such technology, such as Ramot's patented technology, would necessarily be

"disabling" and preclude Cisco from realizing any and all of the benefits. Thus, in the hypothetical negotiation, Ramot would have a reasonable basis to seek 100% of the cost savings associated with the reduction of the number of lasers. At least that would not justify excluding such testimony. *See Sprint Commcn's*, No. CV 17-1734-RGA, 2021 WL 982732, at *10 (approved expert testimony that "the parties would agree that plaintiff gets 100% of the cost savings" so calculated).

### C.    Cost Savings Based on Lasers Alone is Conservative and Appropriate

It is Cisco's criticism that is "half baked." Mot. at 20. The "other optical components" that Dr. Dallesasse refers to in his report are ***additional cost savings*** associated with the use of the patented technology. Ex. E (Dallesasse Rpt.) ¶ 682. Mr. Dell excluded the additional cost savings associated with those "other optical components" (see above regarding apportionment), thereby ensuring that his analysis was conservative, the benefit of which accrues to entirely to Cisco.

### D.    Reliance on Expected Gross Margin and Other Metrics is Appropriate

It is not clear what Cisco is complaining about with respect to Mr. Dell's consideration of Cisco's expected gross margins ██████ on the accused products. *See* Mot. at 20. Cisco fails to even cite to which paragraphs of Dell's report it is challenging.   The cases cited relate to applications of the "rule of thumb," the Nash Bargaining rule, and the like. *Id.* (citing to *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011); *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012); *VirnetX*, 767 F.3d at 1333). But Mr. Dell has done none of those things—and Cisco does not appear to suggest that he has. *See* Mot. at 20.

What Mr. Dell did is consider, in the context of and along with the *Georgia-Pacific* factors, several "benefit share metrics" that the parties to this hypothetical negotiation would consider in determining how to distribute the cost savings associated with the use of the patented technology. *See* Ex. D (Dell Rpt.) at ¶¶ 349-353.  This included, but was not limited to, Cisco's "target" margin on the accused products, which Mr. Dell reasonably concluded Cisco would push to maintain in

any royalty calculation based on its bargaining strength at the negotiation. *See id.* ¶¶ 351-352; *see also* Ex. I (Dell Tr.) at 57:8-10; 58:4-11. Mr. Dell also considered and analyzed metrics such as Cisco's return on invested capital (ROIC) ███, and Cisco's operating margin for the accused products ███. Ex. D (Dell Rpt.) at ¶¶ 352-353. He then applied those metrics to the range of incremental profit premiums attributable to the use of the patented technology, and considered all the Georgia Pacific factors to determine a reasonable royalty rate. *See id.* ¶¶ 353-361, 372-387. In other words, Mr. Dell's opinions, including regarding Cisco's target margin, are tied to the facts.

To be clear, a damages model envisioning a hypothetical negotiation in which the parties bargain for respective shares of the economic benefit of a negotiation (such as cost savings) is not inadmissible merely because it invokes a percentage split—indeed, the Analytical Approach assumes that one would—so long as the analysis is grounded in the specific facts of the case at hand. *Realtime Data LLC v. EchoStar Corp.*, No. 6:17-CV-00084-JDL, 2018 WL 6266301, at *11 (E.D. Tex. Nov. 15, 2018) (denying motion to exclude Dell) (citing *Summit 6, LLC*, 802 F.3d at 1298; *Salazar v. HTC Corp.*, No. 2:16-cv-01096-JRG-RSP, 2018 WL 1783157, at *2 (E.D. Tex. Apr. 13, 2018)). And, here, as in *RealTime Data*, Mr. Dell did not rely on any economic theorem, but did "consider[] specific facts of the case and the respective Parties' bargaining positions." *Realtime Data*, 2018 WL 6266301, at *11; *see also Salazar*, 2018 WL 1783157, at *2 (denying motion to exclude where expert considered lack of non-infringing alternatives, competitiveness of industry, patent value, and relative bargaining power in determining split of incremental profit).

## V.    CONCLUSION

For the reasons set forth above, Ramot respectfully requests the Court deny Cisco's *Daubert* motion.

*Of Counsel:*

Denise De Mory
Robin King Curtis
Corey Johanningmeier
Michael Flynn-O'Brien
Brenda Entzminger
BUNSOW DE MORY LLP
701 El Camino Real
Redwood City, CA 94063
(650) 351-7248
ddemory@bdiplaw.com
rcurtis@bdiplaw.com
cjohanningmeier@bdiplaw.com
mflynnobrien@bdiplaw.com
bentzminger@bdiplaw.com

James T. Wilson
Wayne M. Helge
BUNSOW DE MORY LLP
277 S. Washington St., Suite 210, #1088
Alexandria, VA 22314
(571) 208-0186
jwilson@bdiplaw.com
whelge@bdiplaw.com

Dated: June 4, 2025

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of June, 2025, the attached **ANSWERING BRIEF IN OPPOSITION TO CISCO'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF STEPHEN E. DELL** was served upon the below-named counsel of record at the address and in the manner indicated:

Jennifer Ying, Esquire                                              <u>VIA ELECTRONIC MAIL</u>
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
Wilmington, DE  19801

L. Norwood Jameson, Esquire                                <u>VIA ELECTRONIC MAIL</u>
DUANE MORRIS LLP
1075 Peachtree Street NE, Suite 2000
Atlanta, GA 30309-3929

Joseph A. Powers, Esquire                                       <u>VIA ELECTRONIC MAIL</u>
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196

Holly Engelmann, Esquire                                       <u>VIA ELECTRONIC MAIL</u>
DUANE MORRIS LLP
Terrace 7
2801 Via Fortuna, Suite 200
Austin, TX 78746-7567

Elizabeth Moulton, Esquire                                     <u>VIA ELECTRONIC MAIL</u>
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco CA 94105-2669

*/s/ Andrew C. Mayo*
_____
Andrew C. Mayo